Bricky/ Cass Ylan

F 4/29/13

*To be argued by*
Paul Skip Laisure
*(15 Minutes)*

# New York Supreme Court

## APPELLATE DIVISION -- SECOND DEPARTMENT

PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

- *against* -

HAROLD GOPAUL

*Defendant-Appellant.*

TO BE HEARD ON
THE ORIGINAL
RECORD

Queens County
Ind.No.   2065/08

A.D.No.   10-09352

## BRIEF FOR DEFENDANT-APPELLANT

2013 FEB 28   P 12: 14

APPEALS BUREAU
QUEENS COUNTY D.A.

LYNN W.L. FAHEY
Attorney for Defendant-
Appellant
2 Rector Street, 10th Floor
New York, N.Y. 10006
(212) 693-0085

Paul Skip Laisure
*Of Counsel*
February 27, 2013

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 5531 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

QUESTION PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   The Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      The Prosecutor's Opening Statement . . . . . . . . . . . . . . . . . . . . . . . . . 5

      The People's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

         The Introduction of Expert Testimony . . . . . . . . . . . . . . . . . . 14

      The Defense Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      The Defense Summation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      The Prosecutor's Summation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

   The Verdict and Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

   POINT I

      THE   ADMISSION   OF   EXPERT   TESTIMONY
      CONCERNING ADOLESCENT SEXUAL ABUSE THAT
      WAS NOT BEYOND THE KEN OF THE AVERAGE
      JUROR   AND   FOCUSED,   IN   PART,   ON
      CHARACTERISTICS OF THE ABUSER, VIOLATED
      APPELLANT'S DUE PROCESS RIGHTS . . . . . . . . . . . . . . . . . . . . 27

POINT II

>   THE PROSECUTOR'S ARGUMENTS, DURING HIS
>   OPENING STATEMENT AND IN SUMMATION,
>   THAT THE DEFENSE ARGUMENTS WERE
>   "RIDICULOUS," "ABSURD," AND "ILLOGICAL"
>   DISTRACTIONS AND SHOULD BE IGNORED; THAT
>   THE COMPLAINANT WAS "COURAGEOUS" FOR
>   TELLING HER EMBARRASSING STORY TO
>   STRANGERS AND MUST BE A "SICK, DESPICABLE
>   HUMAN BEING" IF SHE WAS NOT BEING
>   TRUTHFUL; VOUCHING FOR THE COMPLAINANT'S
>   CREDIBILITY; AND RELYING ON THE VOTE OF
>   THE GRAND JURY, VIOLATED APPELLANT'S DUE
>   PROCESS RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

POINT III

>   THE TRIAL COURT ERRED IN DENYING
>   APPELLANT'S REQUEST FOR A MISSING WITNESS
>   CHARGE AS TO THE OFFICER WHO
>   APPREHENDED HIM IN THE PRECINCT BECAUSE
>   THAT OFFICER'S TESTIMONY WAS MATERIAL TO
>   THE CENTRAL QUESTION WHETHER ABUSE BY
>   THE POLICE DURING AND AFTER THE ARREST
>   RENDERED HIS STATEMENTS INVOLUNTARY . . . . . . . . . . . 42

POINT IV

>   THE ADMISSION OF THE COMPLAINANT'S
>   TESTIMONY THAT SHE TOLD HER FRIEND SHE
>   HAD BEEN ABUSED, AND OF THE FRIEND'S
>   TESTIMONY THAT SHE ASKED THE
>   COMPLAINANT WHETHER SHE HAD BEEN
>   ABUSED, WAS ERROR BECAUSE NEITHER WAS
>   PROBATIVE OF PROMPT OUTCRY OR ANY
>   EXCEPTION TO THE HEARSAY RULE . . . . . . . . . . . . . . . . . . . 47

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
----------------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,       :

           Respondent,                      :

           against,      .                 :

HAROLD GOPAUL,                      :

           Defendant-Appellant.         :
----------------------------------------------------------------------------x

## STATEMENT PURSUANT TO RULE 5531

1.    The indictment number in the court below was 2065/08.

2.    The full names of the original parties were People of the State of New York against Harold Gopaul.

3.    This action was commenced in Supreme Court, Queens County.

4.    This action was originally commenced by the filing of an indictment on September 4, 2008..

5.    This is an appeal from a judgment entered on September 10, 2010, convicting appellant of six counts of criminal sexual act in the first degree, six counts of sexual abuse in the first degree, one count of criminal sexual act in the second degree, two counts of criminal sexual act in the third degree, one count of assault in the third degree, and one count of endangering the welfare of a child.

6.    Appellant has been granted permission to appeal as a poor person on the original record.  The appendix method is not being used.

1

## **PRELIMINARY STATEMENT**

Appellant Harold Gopaul appeals the judgment of Supreme Court, Queens County, rendered September 10, 2010, convicting him, after a jury trial, of six counts each of criminal sexual act in the first degree, six counts of sexual abuse in the first degree, one count of criminal sexual act in the second degree, two counts of criminal sexual act in the third degree, one count of assault in the third degree, and one count of endangering the welfare of a child. The court imposed concurrent determinate prison terms of 18 years on the first-degree criminal sexual act counts, 5 years on the first degree sexual abuse and second degree criminal sexual act counts, 3 years on the third-degree criminal sexual act counts, all to be followed by 10 years of post-release supervision, and 1 year on the assault and endangering counts (Lasak, J.).

Timely notice of appeal was filed and, on March 4, 2011, this Court granted appellant leave to appeal as a poor person and assigned Lynn W. L. Fahey as appellate counsel. Appellant is incarcerated pursuant to the judgment. No stay has been sought.

# QUESTIONS PRESENTED

1.     Did the admission of expert testimony concerning
adolescent sexual abuse, which was not beyond the ken of the
average juror and focused, in part, on characteristics of the
abuser, violate appellant's due process rights?

2.     Did the prosecutor's arguments, during his opening
statement and in summation, that the defense arguments were
"ridiculous," "absurd," and "illogical" distractions and should
be ignored; that the complainant was "courageous" for telling
her embarrassing story to strangers and must be a "sick,
despicable human being" if she was not being truthful;
vouching for the complainant's credibility; and relying on the
vote of the grand jury, violate appellant's due process rights?

3.     Did the trial court err in denying appellant's request
for a missing witness charge as to the officer who
apprehended him in the precinct given that the officer's
testimony was material to the central question whether abuse
by the police during and after the arrest rendered his
statements involuntary?

4.     Was the admission of the complainant's testimony that
she told her friend she had been abused, and of the friend's
testimony that she asked the complainant whether she had
been abused, error when neither testimony was probative of
prompt outcry or permitted by any exception to the hearsay
rule?

## STATEMENT OF FACTS

<u>Introduction</u>

Appellant Harold Gopaul was arrested when, two days after he hit his daughter Sana Awan for complaining about leaving a church fair early, she told a friend, Christine, that he had been sexually abused her for the preceding three years. During the trial and over objection, the prosecutor, instead of eliciting Ms. Awan's report from Christine, was permitted to elicit from Ms. Awan her own hearsay prior consistent statement to Christine as well as Christine's hearsay statement to her. And although Ms. Awan coherently explained the timing of her report, had no difficulty remembering specific allegations of abuse, and apparently exhibited no signs of a demeanor inconsistent with the gravity of her allegations, the prosecutor, over objection, was permitted to introduce an expert witness to explain such problems. The expert was also permitted to testify about traits and behaviors typical of sexual abusers.

At the close of the People's case, defense counsel asked for a missing witness charge with respect to the police officer who initially apprehended Mr. Gopaul when he went to the police precinct to report that Ms. Awan was missing. Counsel explained that the witness was knowledgeable about the force and intimidation that was used during the arrest and thereafter, which was relevant and material to Ms. Gopaul's claim that a confession he gave to the police was the product of police coercion and untrue. The court ruled that the testimony would not have been material and refused to give the instruction.

4

During his opening statement, the prosecutor praised Ms. Awan's courage for testifying in court and engaged in an 18-page summation-style argument that repeatedly emphasized that a grand jury heard the evidence and voted to indict on various counts. In summation, the prosecutor repeatedly denigrated Mr. Gopaul's testimony and defense theories as being ridiculous, absurd, illogical, offensive and devoid of common sense, urged the jurors to ignore them, and twice told the jurors that only a "sick, despicable human being" would make such allegations against Mr. Gopaul if they were not true.

The Trial

The Prosecutor's Opening Statement

The prosecutor, highlighting in detail the factual allegations underlying each of the crimes with which Mr. Gopaul was charged, informed the jurors that "a grand jury comprised of citizens like yourself from this county indicted the defendant on a litany of charges," and reminded them that a grand jury had indicted Mr. Gopaul on each crime as he discussed it (305-07). He went on to lionize the complainant,

> now a stronger and more courageous girl than she was previously [who would] come into this courtroom during the course of this trial and speak to you, 16 strangers who she has never met, and describe to you how the defendant took advantage of her sexually. She will rehash the embarrassing details of a secret she held for years . . . (310).

His extremely detailed exposition of the evidence, which read as a comprehensive moment-to-moment review of each bit of evidence and testimony that would be offered, spanned 18 pages of transcript (304-22).

5

The People's Case

Complainant SANA AWAN, 19 years old at the time of her testimony lived in Queens prior to June 23, 2008, with her mother, Merlyn Ali Gopaul, her brother and sister, and her stepfather, appellant Harold Gopaul (445-46). She was closer to Mr. Gopaul, who provided for the family and took an interest in her activities, than she was to her mother (447-48). Ms. Awan, who was a B student in 2005, actually improved her Math and English grades to an A average by 2008 (526-27), and became an A student her first year of college (527).

Ms. Awan's relationship with Mr. Gopaul changed sometime in May or June, 2005 — she was 14 years old and in the eighth grade — at the time, when Mr. Gopaul entered the family bathroom as she was getting out of the shower, removed her towel and fondled her breast, then put her on the hamper and put his mouth on her vagina (450). He told her to "hush" and "behave" when she told him to stop (452). She did not recall the exact date, but knew that this happened before school when the rest of the family was asleep (455-56). Mr. Gopaul also put his mouth on Ms. Awan's vagina once between September and December, 2005; once between January and April, 2006; once between May and August, 2006; once during September, 2006; once between January and April, 2007; once between May and August, 2007; and once between September and December, 2007 (457, 460-61). On the occasion between January and April, 2007, and in May 2007, Mr. Gopaul also put his hand on her breast (460, 461-63).

6

During January or February, 2008, Mr. Gopaul, who was watching "porn" in the living room, pulled Ms. Awan onto his lap, told her to watch the porn on the television, took off her pants and touched her breasts and vagina with his hands and then put his mouth on her vagina (465-66). During March, 2008, Mr. Gopaul called Ms. Awan to the dining room late in the evening and, holding her down, put his mouth on her vagina(469-470). During April, 2008, when one of her parents sent her to the basement to get something, Mr. Gopaul followed her down, told her to get up on the freezer, and put his mouth on her vagina (470).

In May, 2008, when Mr. Gopaul was picking Ms. Awan up from school, he saw her walking with a boy (472). After repeated questioning by Mr. Gopaul and her mother, Ms. Awan said the boy was her boyfriend (472). They yelled at her and told her not to go to class with him any more, but she told them she could not drop the class (472). Some time later that month, she saw a knife in Mr. Gopaul's car (474). One morning before school, she saw Mr. Gopaul sharpening the knife. He said "I bought this for you" and that "it could cut clean through anything" (474). After that, she "always" saw the knife in Mr. Gopaul's car (474).

Later that same month, when Mr. Gopaul was driving Ms. Awan to school, he stopped under an overpass and "wanted [her] to perform oral on him" (476). When she refused, he said she would not have to do that if she kissed him instead (477). She did so, and he fondled her breast, but told her she was not doing it right and would cut off her finger because she was not behaving (477).

7

On May 14, 2008, Mr. Gopaul picked Ms. Awan up from school and told her he wanted to have sex with her and asked whether she wanted to do it in a week or a month (482). Ms. Awan said she promised to do it in a month, but did not really mean it (482-83).

Sometime between May 1 and May 30, 2008, Mr. Gopaul approached Ms. Awan in their kitchen, got down on his knees, told her to spread her legs and pushed them apart with his hands so he could "perform oral" on her (484). Ms. Awan resisted until Mr. Gopaul grabbed a kitchen utensil and threatened to "stick this up there if you don't behave," so she "just listened and let him do it" (484). He then told her to hold his penis over the garbage can and after she let go he ejaculated into the garbage (498).

Between June 1 and June 20, 2008, Mr. Gopaul came into Ms. Awan's bedroom and touched her breasts and vagina (486). She tried to move away from him but he continued (486). On June 19, 2008, Mr. Gopaul reminded Ms. Awan about her "promise" to have sex with him, and made her choose a date the next week (496). She chose Friday, June 27, 2008, because it was the end of the week (496).

Two days later, on Saturday, June 21, 2008, Mr. Gopaul brought Ms. Awan onto the bed in her mother's room, pulled a vibrator from under the bed, put it between her legs, and turned it on(499). She fought against him as he held her down and then began to cry, so he slapped her and left the room (500).

That afternoon, the whole family went to a fair (506). Ms. Awan and her friend were in line to go on the "Zipper" ride together, but a boy ahead of them had no partner,

8

so Ms. Awan's friend decided to go on the ride with him and then return to go on the

ride with her (506, 507). Mr. Gopaul became angry when he saw this and told Ms. Awan

that because she was letting people cut the line, they were leaving the fair (506). Ms.

Awan became upset and cried on the way home (506). After they got home, Mr. Gopaul

followed her upstairs and started hitting her on her arms legs and face, leaving bruises on

her arms and ear (507, 509). Ms. Awan packed a bag with clothes, intending to run away

to avoid having sex with Mr. Gopaul (509-10).

At about 8:00 or 8:30 p.m. on Monday, June 23, 2008, while Mr. Gopaul was at

work and the rest of the family was asleep, Ms. Awan called her friend CHRISTINE

ALIOTO (511). Over defense counsel's objection, the prosecutor asked Ms. Awan,

"without telling us what she said to you, what did you say to [Christine]," and Ms. Awan

testified that she told Christine that she was running away because she "was being

molested" (511). Warning Christine not to "tell us what she said," the prosecutor asked

"what did you say to [Ms. Awan]" (606). When defense counsel objected on hearsay

grounds, the prosecutor argued that even if the testimony would be hearsay it was

admissible because Christine was available for cross-examination (607). Counsel argued

that availability for cross-examination was not a basis for admissibility but the court

overruled the objection (607). The prosecutor then elicited from Christine that she asked

Ms. Awan, "has he touched you" and that Ms. Awan responded (C. Alioto 607).

Christine then woke her mother, DENISE ALIOTO, and handed the phone to her (C.

Alioto 609; D. Alioto 622). Ms. Awan had not told her mother about what had been

9

happening because she did not feel she could confide in her, and anticipated that if she did, Mr. Gopaul would say she was lying and she would get in trouble because her mother would believe him (Awan 519).

During a brief 3-minute telephone conversation with Denise (D. Alioto 622), Ms. Awan told her what she had told Christine, and "might have said that I thought I was going to be raped" (S. Awan 512). Ms. Awan, who slipped out the back door, met Denise and Christine on the street (S. Awan; D. Alioto 622). She got into their car and Denise, after getting advice from relatives as to what she should do, drove to the 105th Precinct (S. Awan 512; D. Alioto 624). At the precinct, Christine noticed a cut and bruises on Ms. Awan's ear (C. Alioto 611).

Denise Alioto went into the precinct and returned with an officer who escorted Ms. Awan inside where she spoke with Officer Morris, for whom she wrote a written statement, and Administration for Children's Services personnel (D. Alioto 624; S. Awan 513). She was then interviewed, in the presence of the ACS worker, by Detective LEONARD SHULMAN, who had been assigned to her case (S. Awan 514; Shulman 331, 333). Detective Shulman described her as "upset" and "distraught" and observed welts on her arms (333). He spoke with her for about 1 1/2 hours (386).

At some point during that interview, Denise Alioto went downstairs to smoke a cigarette and saw Mr. Gopaul walking into the precinct (626, 637-38). There were four or five officers present, one of whom grabbed him by the arm, "put him up against the wall," and handcuffed him (639-40).

10

Meanwhile, Police Officer CELICA ALFARO HARBUS, was notified that Mr. Gopaul had come to the 105th Precinct and that there was an "open complaint" against him (560). She went to the precinct and, finding him already in custody in a second-floor interview room, formally arrested him (561, 581-82). After hearing about Mr. Gopaul's arrest, Detective Shulman had him brought to an interview room at 5:15 a.m., almost 3 hours after Mr. Gopaul's arrival at the precinct, and advised him of his Miranda rights (335, 337, 339, 342-45). Five minutes after Mr. Gopaul indicated that he was willing to speak to him (343), Detective Shulman presented Mr. Gopaul with forms for consenting to a search of his home and his car (345-49; 349-50). Mr. Gopaul consented to searches of his home and car and signed both forms (349; 352).

At 6:15 a.m., Detective Shulman asked Mr. Gopaul if he would like to make a written statement and Mr. Gopaul agreed to do so (355). Mr. Gopaul wrote that on Saturday, June 21, 2008, the family had gone to a fair. At some point during the day, Ms. Awan waited on the line for the Zipper ride for 20 or 25 minutes but, when her turn came, she allowed her friend to get on the ride with someone else, delaying her own turn on the ride (359). Because Mr. Gopaul's wife was in pain due to a root canal problem and wanted to leave, Mr. Gopaul called her out of the line (359). Ms. Awan argued with him, which Mr. Gopaul thought was wrong, so he "put a few slaps on her as a little discipline" (359). Sunday was uneventful, but when he returned home from work late Monday night into Tuesday morning, Ms. Awan was missing (359-60). He came to the precinct where he was arrested (360).

11

An hour or so later, Detective Shulman told Mr. Gopaul that Ms. Awan had made

allegations "that there was inappropriate behavior involving him" — which he refused

to describe — and asked whether Mr. Gopaul wanted to "address that" (361)

Mr. Gopaul said he felt bad and agreed to give a written statement that included the

following:

> The accusation that was made toward me and my daughter,
> it started about the end of 2006 where we both got into a
> relationship where I would touch her vagina and breast and
> she would touch my penis, and we will both kiss. It
> happened about five or six times total, once at 400
> Community drive and in our home.
>
> I want you to know I wish it had never happened. I
> am a hard working husband and father. I work sometimes
> 80-95 hours per week to keep my family together. I admit
> what happened was very, very wrong. Also admit I need
> help. Something happened that should never happen. I am
> very sorry. I will accept any help I can get. I don't want to be
> away from my family. my daughter, Sana Awan is the person
> I am talking about (364, 425-26).

Mr. Gopaul finished this short statement an hour later, at 8:30 a.m. (363). After

Detective Shulman read what Mr. Gopaul had written, the detective asked him whether

he had any vibrators in his car (370). Mr. Gopaul replied that he had multiple vibrators

in the house and a "white fold-up massager" in the car that he used for his neck and

never used on Ms. Awan (370, 434). Mr. Gopaul then drew a picture of the vibrators he

had admitted possessing (371).

Over eight hours later, Detective Shulman asked Mr. Gopaul if he would be willing

to make a videotaped statement to an Assistant District Attorney and Mr. Gopaul agreed

to do so (366). A.D.A <u>BRIAN HUGHES</u>, conducted the interview, and the resulting videotaped statement was played for the jury (690-95).

Ms. Awan, who was examined at North Shore Hospital during the day on Tuesday, June 24, 2008, returned to the precinct in the evening and spoke with Officer Alfaro (Awan 517; Alfaro 562). The officer brought Ms. Awan to Mr. Gopaul's truck, which was parked at the precinct, and asked her whether a meat cleaver was inside (Alfaro 564). Ms. Awan showed her a "mini meat cleaver" that was in the center console of the vehicle (Alfaro 564; Awan 517-18). Officer Alfaro also conducted a search of Mr. Gopaul's home and recovered a vibrator from under his bed, which Ms. Awan recognized as the one Mr. Gopaul had used on her (Alfaro 569-70; Awan 502).

Ms. Awan went home about 24 hours after she had first gone to the precinct (520). She stayed the night, but the next day, her mother told her she should pack a bag and go stay with the Aliotos (520). She stayed with the Aliotos that night and the following day until dinner, when she returned home to find 10 relatives of Mr. Gopaul, one of whom commented that she had "messed up everyone's life" (520). When she went to her room in tears, she discovered that her diary was missing (521). About a week later, on July 3, 2008, Denise Alioto became Ms. Awan's foster parent (Awan 523; D. Alioto 628).

On January 31, 2009, Ms. Awan's mother came to the pharmacy at which Ms. Awan worked, and began asking questions and yelling at her (537). Ms. Awan did not answer except to tell her mother she had to leave (537). She denied having told her mother that Mr. Gopaul never touched her (537).

13

## The Introduction of Expert Testimony

When defense counsel sought an offer of proof concerning the prosecutor's intent to introduce the testimony of Dr. Donald Lewittes, a clinical and forensic psychologist, the prosecutor explained that the testimony would cover three areas (541). First, Lewittes would explain delayed disclosure. Second, he would identify "a known pattern of behavior that's seen in child abuse cases" involving family members. Third, he would testify about the concept of "blending" which involves a victim's difficulty remembering each of many similar individual acts and when they occurred (541).

Defense counsel argued that there was nothing about Ms. Awan's testimony that indicated an inability to recall specific incidents and that the prosecutor would not be able to show that "this science is accepted in the scientific community" (542). Counsel also argued that delayed disclosure in the face of threats was not beyond the ken of the average juror such that expert testimony was required (542). Noting that defense counsel had questioned Ms. Awan about threats she said Mr. Gopaul made, the court ruled that Lewittes could testify (544).

Just before the prosecutor called Lewittes to the stand, defense counsel again objected (646). The court, without further explanation, ruled that Lewittes could testify "as to the study of victims of this type of abuse." (646). Specifically, the court permitted inquiry regarding "[t]he fact that there is often a delay in reporting, the fact that there may be a lack of affect when they testify, the fact that they may have a problem remembering

14

dates" (646). After further discussion, the court also permitted inquiry about "blending" (650).

Doctor <u>DONALD LEWITTES</u>, a forensic and clinical psychologist was qualified as an expert in clinical psychology and adolescent sexual abuse over objection (654-55). He had not treated Ms. Awan (655). Relying on the research of Dr. Susan Sgroi, Lewittes described a pattern of behavior known as "intra-familial child and adolescent sexual abuse syndrome (656).According to Lewittes, there are five "stages" of Intrafamilial Child Sex Abuse Syndrome: engagement, sexual interaction, secrecy, disclosure, and suppression/repression. (Lewittes: 656-61).

Lewittes explained that "engagement" was when the adult appropriately participates in his normal role of authority with respect to the child or "tricks" the child into trusting the adult; "sexual interaction" is when the adult changes that role by abusing the child; "secrecy" refers to the child's reluctance to disclose the abuse for fear of what may happen to her, particularly when other family members care for the adult; "disclosure" is when the child discloses the abuse (659-660). Lewittes did not explain "suppression/repression."

When the prosecutor asked what factors might hinder an adolescent from moving to the disclosure "stage," Lewittes explained that adolescents with different personalities might react to abuse differently, that individuals might fear for their safety, or that there could be economic considerations (660). Lewittes then testified that adolescents are at a stage in development in which discussing sexuality, particularly with strangers, is

15

embarrassing and difficult (661). As a result, someone who must do so tries "to hold it together" and "just get it out," often without displaying facial emotional affect, or "flat affect" (661).

The prosecutor then asked about whether adolescent victims of sexual abuse have difficulty remembering specific dates of abuse over an extended period of time (662). After recognizing that memory fades with time (662), Lewittes testified that the victim tends to "blend" multiple occurrences so that she "may remember . . . who did what to whom . . . and possibly where," but peripheral details like specific dates would not be remembered (663). He also talked about "pegs" or memory cues, without discussing them in relation to adolescent sexual abuse, and distinguished between emotional, or purposeful, disclosure, and accidental disclosure, such as when the activity is discovered by happenstance, email, etc. (665). Finally, Lewittes testified that a first experience tends to be more memorable than subsequent similar ones (664).

On cross-examination, Lewittes claimed that there is "no symptomology" with respect to "intrafamilial child and adolescent sexual abuse symptom" because individual reactions to trauma vary so widely (673). "[Y]ou can't use anyone's symptoms to go backwards and say they were sexually abused (673-74).

When the People rested, defense counsel noted his intention to request a missing witness charge and the court reserved argument and decision (714). Counsel made his record concerning the defense argument for a missing witness charge during a charge

16

conference just prior to summations (895).[1]  Counsel argued that Mr. Gopaul was taken into custody by a police officer in the 105th precinct who was not called as a witness at trial (895-96).  The defense made repeated attempts to identify that officer but no witness at trial disclosed who it was; Officer Alfaro testified only that Mr. Gopaul was already in custody when she arrived and Denise Alioto testified that a uniformed officer apprehended him at the precinct (896).   Counsel argued that since the voluntariness of Mr. Gopaul's statement was central to the defense, including whether he asked for a lawyer or invoked his right to remain silent, that officer "clearly has material relevant evidence to offer in this area" (896).  Although the identity of the apprehending officer was not established during the trial, defense counsel pointed out that "the DA has the ability to get the information to bring this witness in and chose not to do that" (897). The prosecutor did not dispute that the officer could be identified, but merely argued, summarily, that the testimony would not have been material (897).  The court denied the missing witness charge application without explanation (897).

### The Defense Case

Mr. Gopaul's wife, MERLIN ALI GOPAUL, a data entry worker with 1 1/2 years of college, had a child from a previous marriage, Ms. Awan, when she married Mr. Gopaul (720-21).  They had two children together, Darien and Kaitlin (722).  The family lived in house with three adjoining bedrooms; Kaitlin and Ms. Awan shared one, Darien

---

[1]     The prosecution did not assert that the request was untimely, thereby waiving any untimeliness claim, see People v. Erts, 73 N.Y.2d 872, 874 (1988);  People v. Robertson, 205 A.D.2d 243, 245 (1st Dept. 1994).

17

had the second, and their parents the third (722-23). Mr. Gopaul occasionally drove Ms. Awan home from school (723-26).

During the spring of 2008, Mrs. Gopaul discovered that Ms. Awan had a boyfriend. She became upset because "she was too young and I needed her to finish school" (728-29). When she found out that Ms. Awan had continued to see the boyfriend against her wishes, Mrs. Gopaul confronted her and conveyed her feelings about it (729).

On June 21, 2008, although Mrs. Gopaul's root canal "had gone bad" and was causing her pain, the family went to a fair (730-31). While Ms. Awan was on line for the Zipper ride, a boy in front of her went on the ride with Ms. Awan's friend, leaving Ms. Awan to wait another 15 to 20 minutes to go on the ride (732). Mr. Gopaul told Ms. Awan they could not wait because "mommy isn't feeling well" (732). Mrs. Gopaul was crying because of the pain (732). Ms. Awan, however, became upset about leaving and started to cry (732). When they arrived home Mrs. Gopaul told Mr. Gopaul to take the children upstairs. Ms. Awan was fussing and Mr. Gopaul hit her on the arm (732). Mrs. Gopaul went upstairs and told him to stop, so he did (732).

The following Monday, Mr. Gopaul left for work at 4:30 a.m., the younger children went to school and Ms. Awan stayed home with Mrs. Gopaul who was suffering with her infected tooth (733-34). Mrs. Gopaul went to bed at 6:00 p.m. and the children at 7:30 p.m. (734). Mr. Gopaul woke her at 2:30 a.m., and the two of them began searching the house looking for Ms. Awan (734-35). When they did not find her, Mr.

18

Gopaul went to the 105th precinct (735). Mr. Gopaul never returned home, so after Mrs. Gopaul sent the younger children off to school, she went to the precinct (738). She was unable to see Mr. Gopaul but met with Detective Shulman (738). Mrs. Gopaul first testified that she was finally able to speak with Mr. Gopaul on June 26th or 27th and did not discuss what happened to him at the precinct, but then remembered that he had called her on June 24, 2008, the night of his arrest (740, 750). She first testified that she could not recall the conversation itself (750).

When the prosecutor reminded her that Mr. Gopaul had called her at home on June 29th (740, 750), Mrs. Gopaul said that during that call she was angry with Mr. Gopaul because their relationship had changed, and she reminded him that on the night of his arrest he told her he had abused Ms. Awan, and had done this because he was sick and needed help (751, 752). She told him, having learned of his confession, that "people don't confess to something they don't do" (752). Finally, after the prosecutor refreshed her recollection with an audiotape recording, Mrs. Gopaul testified that she spoke with Mr. Gopaul on the phone on July 10, 2008, and told him that because of what he had done to Ms. Awan, he was not welcome back home (758).

The day of Mr. Gopaul's arrest, when Ms. Awan was in the hospital, Mrs. Gopaul was present in another room but never asked to see her (761). On July 3, 2008, Ms. Awan was removed from Mrs. Gopaul's home (740).

On January 31, 2009, Mrs. Gopaul went to the Rocky Hill Pharmacy to get medications and had a conversation there with Ms. Awan (743). She did not realize that

19

a revised order of protection permitted her to go to the pharmacy so long as she had no contact with Ms. Awan (779-80). During their conversation, Ms. Awan admitted that Mr. Gopaul had never touched her (743).

The prosecutor asked Mrs. Gopaul during his cross-examination whether, on July 10, 2009, she had told Mr. Gopaul that she knew he had molested Ms. Awan. Mrs. Gopaul said she could not recall (754). The prosecutor then had her listen to an audiotape of the conversation. Her memory refreshed, Mrs. Gopaul agreed that she had told him that "because of what he did, because he molested [Ms. Awan], he can't come back" (757-78).

Appellant HAROLD GOPAUL, was married to Merlin Gopaul, whose daughter was Ms. Awan, for 14 years and had two children with her, Kaitlynn and Darien (807). Mr. Gopaul worked various jobs until 1999 when he became a sewer specialist with Ecolab Pest Elimination (808). He was the sole bread winner in the family (850). In May, 2008, Mr. Gopaul and his wife learned that Ms. Awan had a boyfriend (853). Mr. and Mrs. Gopaul did not approve of her having a boyfriend at her age (856).

On June 23, 2008, Mr. Gopaul went to work at 4:30 a.m. and returned home at 2:00 a.m. the following morning (810). He looked in on his wife and children and found that Ms. Awan was missing (810). He called his wife and the two searched the house and garage, finding the back door of the garage open (811). Mr. Gopaul called Christine Alioto but there was no answer (811).

After discussing the matter with Mrs. Gopaul, Mr. Gopaul went to the police precinct (812). As soon as he walked in the door and said he was there to make a report, several officers surrounded him, and one asked him pedigree questions and solicited his report about Ms. Awan being missing (813). That officer then took his hand and slammed him into the wall while the other officers frisked him (813). Finding no weapon, the officers rear-cuffed him and pushed him to the other side of the building and slammed him onto a long counter (814). The officers then took all of Mr. Gopaul's property from his pockets and called Detective Shulman, who came and told Mr. Gopaul he was being taken upstairs because he had some questions he wanted to ask (815).

Detective Shulman pushed him up the stairs into an interview room known as "the box," slammed him into a wall, and cursed at him, asking, "you know what you are here for, you fucker"? Mr. Gopaul did not know what the detective was talking about (817). Eventually, Detective Shulman told him that his daughter had accused him of sexually abusing her (818). Mr. Gopaul said he did not want to talk to the detective and asked to make a phone call to his wife so she could contact a lawyer, but the detective refused (819). Instead, Detective Shulman told him that he was going to put Mr. Gopaul away for a long time if he did not talk without a lawyer (819). The detective then brought Mr. Gopaul a notepad and told him he was going to make a statement (820). Detective Shulman repeated that he was not getting a phone call, produced a <u>Miranda</u> warning card, and told Mr. Gopaul he was giving up his rights (820). Mr. Gopaul initialed the <u>Miranda</u> warnings because he was afraid of Detective Shulman (820).

Detective Shulman then left the room and returned with two consent forms (821). He told Mr. Gopaul that Ms. Awan had mentioned vibrators. Mr. Gopaul acknowledged that he had massagers in his truck and in the house but initially refused to consent to searches (821, 856). Mr. Gopaul also acknowledged that the knife found in his truck belonged to him (861). When Detective Shulman told him he would be in big trouble if he did not consent, Mr. Gopaul, afraid of what the detective might do to him, signed the consent forms (823). The detective then told him to write a confession (823). Mr. Gopaul wanted to know what Ms. Awan claimed he did, but the detective did not answer. Instead he asked Mr. Gopaul what happened on June 21, 2008, at the fair (823). Mr. Gopaul told him that while they were at the fair his wife was in a lot of pain due to a root canal problem and wanted to go home (825). The detective asked him to write down his statement, so he did.

After Mr. Gopaul finished writing his first statement, Detective Shulman left the room and returned 15 minutes later demanding that he write down what he had done to Ms. Awan (826). Mr. Gopaul refused, telling him that he had not done anything to her (826). The detective responded by pulling him by the shoulder and telling him he would get beaten up if he did not write a statement (826). Detective Shulman then read the accusations to Mr. Gopaul, who wrote them down in his statement and, at the detective's direction, added that he was sick and needed help (827). Mr. Gopaul complied because he was tired and hungry — he had not eaten for a day and a half — and was told that

22

when he finished confessing he would be released (827, 830). He signed the third statement, which included a drawing of a massager, as well (830).

Detective Shulman then told him he would need to "do one more thing before you go home," which was to make a statement to an assistant district attorney (830). The detective assured Mr. Gopaul that "[w]e are going to do this and [you are] going to be going home," and Mr. Gopaul believed this (834, 869). Mr. Gopaul gave the videotaped statement that Detective Shulman told him to give, but the admissions were not true (835-36, 868-69).

### The Defense Summation

Defense counsel argued that the People had presented no physical evidence supporting Ms. Awan's allegations; the examining physician never testified (899). Nor was there testimony by any of the other family members about witnessing any of the abuse, which allegedly took place in close proximity of rooms on the same floor (899). School professionals trained to notice signs of abuse reported none and Ms. Awan's grades actually improved during the course of the alleged abuses (901).

Counsel also argued that the circumstances of Mr. Gopaul's arrest, such as his going to the precinct in the first place, were inconsistent with guilt (909). He found it suspicious that the People had been unable to identify the officer who initially apprehended Mr. Gopaul at the precinct — the one who could have testified about the force that was used (909), and questioned why a different officer was called in to handle the arrest when there was a precinct full of officers already on the scene (910). Add to

23

that Mr. Gopaul's shirt collar being pulled out during the videotape and it became clear that Mr. Gopaul was "physically roughed up" by the police who knew better than to strike him where bruising would be visible (913). Counsel suggested that the reason Mr. Gopaul's third statement was written by Detective Shulman was that he had become tired of forcing Mr. Gopaul to write it himself (915).

### The Prosecutor's Summation

The prosecutor began by arguing from the evidence that Ms. Awan's testimony was credible and that the testimony of Mr. Gopaul, who was an interested witness with felony convictions, was not (921-26). He also argued that Mr. Gopaul's statements to the police, Ms. Awan's testimony, and the knife and vibrators, all proved Mr. Gopaul's guilt beyond a reasonable doubt (927).

Then, however, the prosecutor veered away from the evidence by telling the jurors that the defense arguments were "distractions" that "are intended to divert your attention away from the real issues in this case" (929). The prosecutor posited implausible scenarios and attributed them to defense argument: "Do you think that when the defendant was going to abuse his daughter he called the family down to let them know . . .?", and then asked the jury whether such illogical defense arguments were reasonable (930). The prosecutor went so far as to call counsel's argument concerning the proximity of the upstairs rooms "ridiculous," and instructed the jurors to "pay no mind to that" (930).

24

The prosecutor also argued that it was "absolutely absurd," "illogical," "offensive," and "defies common sense" for the defense to point to Ms. Awan's scholastic improvement during the period she claimed she was abused as a reason to doubt the allegations (931). Next, he claimed that the defense was that "every single person who testified for the People is lying, every single one of them," naming each witness together with the epithet "liar" (931). At the same time, the prosecutor told the jury that Ms. Awan "had no reason" to lie to police officers, the grand jury, and the jury in this case (933), and labeled a person who would tell such lies "so sinister, so despicable, so screwed up in the head, that's what type of person who would make that up" (934). Then, as if Ms. Awan, who had never had one, would have known the nature of the invasive medical examination that would be conducted as a result of her allegations, graphically described the procedure and asked the jury, rhetorically, why she would choose to endure such an examination (936). The prosecutor repeated that only a "sick, despicable human being" would make up the allegations against Mr. Gopaul (936).

The prosecutor assured the jury that Ms Awan "tells the police that she is abused because for the last three years she was abused" and was not the "cold, calculating liar" the defense claimed she was (937). He again denigrated the defense as "unreasonable," "illogical" and "doesn't make sense" (937). In particular, he said that Mr. Gopaul's testimony was a "plan to distort the truth" that backfired because it is "so patently illogical, it is so patently unreasonable that it defies common sense" (941).

25

Addressing Dr. Lewittes testimony, the prosecutor claimed it was necessary because adolescent sexual abuse is "so unique" that "things weren't what we normally expect" (944). The expert explained by "the victim of abuse can't remember every single act, why they blend together (944).

The prosecutor closed by commenting on the credibility of Mr. Gopaul's videotaped statement and by reviewing the charges that would be submitted to the jury (945).

Verdict and Sentence

The jury found Mr. Gopaul guilty of six counts of criminal sexual act in the first degree, six counts of sexual abuse in the first degree, one count of criminal sexual act in the second degree, two counts of criminal sexual act in the third degree, one count of assault in the third degree, and one count of endangering the welfare of a child (993-98).

26

## ARGUMENT

### POINT I

THE ADMISSION OF EXPERT TESTIMONY CONCERNING ADOLESCENT SEXUAL ABUSE THAT WAS NOT BEYOND THE KEN OF THE AVERAGE JUROR AND FOCUSED, IN PART, ON CHARACTERISTICS OF THE ABUSER, VIOLATED APPELLANT'S DUE PROCESS RIGHTS.

Expert testimony is not admissible in New York unless, as a threshold matter, it "would help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror." De Long v. County of Erie, 60 N.Y.2d 296, 307 (1983); see also People v. Lee, 96 N.Y.2d 157, 162 (2001); People v. Taylor, 75 N.Y.2d 277, 288 (1990); People v. Cronin, 60 N.Y.2d 430, 433 (1983). And even when such testimony is beyond the ken of the jury, the court must first "determine whether 'the potential value of the evidence is outweighed by the possibility of undue prejudice to the defendant or interference with the province of the jury'" before admitting it. People v. Rivers, 18 N.Y.3d 222, 228 (2011) (quoting People v. Bennett, 79 N.Y.2d 464, 473 (1992)).

In the sexual abuse context, the Court of Appeals has recognized that expert testimony can be relevant to explain the otherwise potentially puzzling behavior of the victim. People v. Spicola, 16 N.Y.3d 441, 465 (2011); People v. Carroll, 95 N.Y.2d 375, 387 (2000); Bennett, 79 N.Y.2d at 472-73; Taylor, 75 N.Y.2d at 293; People v. Keindl, 68 N.Y.2d 410 (1986); see also Matter of Nicole V., 71 N.Y.2d 112 (1987). It may be

27

introduced to provide information helpful to the jury, e.g., Taylor, 75 N.Y.2d at 293, or

when the defense has assailed the victim's credibility by arguing that her post-offense

conduct is inconsistent with her having been abused, e.g., Spicola, 16 N.Y.3d at 463-64.

In general, then, expert testimony is admissible "to explain behavior of a victim

that might appear unusual or that jurors may not be expected to understand." Carroll,

95 N.Y.2d at 387; see People v. Califano, 216 A.D.2d 574 (2d Dept. 1995) (expert

testimony "helped to explain the complainant's behavior after the abuse, and was not

within the purview of the average juror"). Such counter-intuitive victim behavior may

include delayed outcry, id.; a victim's reluctance to admit or reveal the crime or the

identity of the abuser in a family setting, Taylor, 75 N.Y.2d at 288-93; People v. Singh,

186 A.D.2d 285, 286 (2d Dept. 1992); a victim's lack of emotional affect afterward,

Taylor, 75 N.Y.2d at 283; or a victim's continuing to have contact or maintain a

relationship with the abuser. People v. McGuinness, 245 A.D.2d 701, 701-02 (3d Dept.

1997). See generally Spicola, 16 N.Y.3d at 465 (Court has "long held" that "evidence of

psychological syndromes affecting certain crime victims [is] admissible for the purpose

of explaining behavior that might be puzzling to a jury").

In this case, as defense counsel explained in detail when objecting to Dr. Lewittes's

testimony, nothing about Ms. Awan's testimony or behavior was "puzzling" or created

a need for an expert's explanation. Her delay in reporting her allegations of ongoing

abuse and continued contact with Mr. Gopaul was easily explained by her distrust of her

mother, who depended on Mr. Gopaul as the bread winner of the family for the family's

28

overall circumstances. Not reporting abuse under those circumstances, because she felt she would "get in trouble," until rape became imminent, was not at all counter-intuitive. Indeed, what happened after the report — her ostracization by her mother and separation from her family — bore out how rational her initial failure to report was.

Nor, as counsel made clear, did Ms. Awan have any difficulty recalling events. She recounted what happened, where, and when, with specificity and without confusion. There being no "blending" displayed during her testimony, there was no need for an expert to inject that theory into the case.

The utter lack of any reason for Lewittes to testify was underscored by the prosecutor's weak attempt during summation to render it relevant. He claimed that Lewittes's testimony was necessary because adolescent sexual abuse is "so unique" that "things weren't what we normally expect" (944), without being able to articulate what "things" he meant, and that the expert had explained why "the victim of abuse can't remember every single act, why they blend together (944), even though there was no actual confusion or failure of recollection during Ms. Awan's testimony.

The prosecutor had not included in his proffer about Lewittes's testimony any mention that Lewittes would explain why a sexual abuse victim would have a "flat affect" that a jury might find inconsistent with outward expression of trauma that would be expected of a victim of sexual abuse. Nor did the prosecutor ever indicate that Ms. Awan had such a demeanor during her testimony; he did not address Ms. Awan's affect in his

29

summation at all. As a result, this testimony also was unnecessary and, therefore, inadmissible.

There being no need for any of Lewittes's testimony about child and adolescent sexual abuse, its only purpose ended up being to provide an aura of expert approval for the prosecution of Mr. Gopaul, so that the jury would conclude he had committed the crimes alleged. But "[w]hen the expert testimony is introduced primarily to prove that a crime took place, its probative value is outweighed by the possibility of undue prejudice." People v. Knupp, 179 A.D.2d 1030, 1031 (4th Dept. 1992). While Lewittes never came right out and said that the circumstances of this case were consistent with the five stages of "intra-familial child and adolescent sexual abuse syndrome," see People v. Piedra, 87 A.D.3d 706 (2d Dept. 2011), the jury could only have concluded that he must have found them consistent. The mere possibility that the jury would reach that inappropriate conclusion outweighed the probative value of his testimony, which was zero. In short, the court should not have permitted Lewittes to testify at all.

But the harm resulting from Lewittes's testimony was not limited to its capacity to legitimize the prosecution and mislead the jury. He also testified that in the intra-familial sexual abuse context, the abuser typically "engages" the victim by participating in the role of a care-taker and "tricking" the victim into trusting him, and then changes his relationship to the victim by engaging in "sexual interaction," at which point the victim is led to keep the abuse secret by express or implied threats. But testimony about how an abuser typically operates is not probative to explain the victim's behavior and,

30

therefore, is not admissible. See, e.g., Carroll, 95 N.Y.2d at 387 (expert testimony relevant "to explain behavior of a victim that might appear unusual or that jurors may not be expected to understand"; emphasis added); People v. Torres, 78 A.D.3d 866, 867 (2d Dept. 2010) (same); People v. Rich, 78 A.D.3d 1200, 1202 (2d Dept. 2010) (same). In fact, courts have found expert testimony admissible specifically because it did not paint a portrait of abusers that suggested the defendant was one. See People v. Carroll, 300 A.D.2d 911, 914 (3d Dept. 2002) (expert did not "testify that defendant's specific actions or behavior were that of an abuser"); see also People v. Wallace, 60 A.D.3d 1268, 1270 (4th Dept. 2009) (expert "provided only a general explanation of the possible behaviors demonstrated by a victim of child sex abuse, and . . . did not impermissibly offer an opinion on the issue of whether defendant had committed" the crimes); People v. Weber, 25 A.D.3d 919, 923 (3d Dept. 2006) (expert did not "attempt to prove" that "defendant fit any abuser profile").

Besides, testimony about how abusers typically operate is not beyond the ken of the typical fact-finder today, and is inadmissible for that reason as well. It is well known that abusers are most often trusted family members or authority figures, and that they usually accomplish their crimes through seductive attention instead of kidnaping or violence. As one court has noted about an expert's observations regarding the methods of "nice guy" child molesters who "groom" their victims:

> Those observations are hardly rocket science. A jury in 2010 does not need expert testimony to help it understand that not every child abuser is "a dirty old man in a wrinkled rain-coat"

31

> who snatches children off the street as they wait for the
> school bus. . . . Today's news unfortunately is replete with
> stories of child sexual abuse involving priests and pastors,
> teachers and doctors, family members, and, in fact, almost
> every kind of trusted and seemingly trustworthy person.

United States v. Raymond, 700 F. Supp. 2d 142, 151 (D. Me. 2010) (internal citation
omitted).

Indeed, the Court of Appeals has already recognized that the average New York
juror knows about such matters. In People v. Riback, 13 N.Y.3d 416, 420-21 (2009), a
sex offender treatment expert was permitted to give testimony in a sex abuse trial
defining the term "pedophilia" and providing the "central characteristics" of a
"pedophile." The Court held this testimony to be erroneously admitted because such
knowledge was not beyond the ken of the average juror: "Unfortunately, it is difficult to
imagine that this information was unknown to the jurors." Id. at 421. Cf. People v.
Clyde, 18 N.Y.3d 145, 154 (2011) (because the "facts that underlie physical injury and risk
of serious physical injury can readily be stated to a jury so as to enable the jurors to form
an accurate judgment concerning the elements of assault and unlawful imprisonment,"
error to admit expert testimony at trial).

Nothing about the circumstances of the case or Ms. Awan's testimony created a
question about Mr. Gopaul's alleged conduct that required expert explanation. The
defense did not argue that it was unbelievable or strange that Mr. Gopaul would use his
father-figure and caretaking status to take advantage of Ms. Awan, progress from less to

more intrusive sexual acts, or try to keep the abuse a secret in order to ensure continued access. There was thus no need for Dr. Lewittes to explain to jurors that this was typical abuser behavior. Nor was the alleged conduct bizarre. To the contrary, appellant's trial involved commonplace allegations of intrafamilial sexual abuse. Thus, this case did not present the type of fairness concerns that might permit the People to introduce expert testimony about abuser conduct.

Here, the only possible purpose of expert testimony regarding the typical behavior of an abuser was to render more credible the complainants' allegations by showing them -- in the guise of expert opinion -- to be "more likely than not." Taylor, 75 N.Y.2d at 284. See also Bennett, 79 N.Y.2d at 473; People v. Ciaccio 47 N.Y.2d 431, 439 (1979); Knupp, 179 A.D.2d at 1031. Since that is precisely what the expert may not do, the introduction of Lewittes's testimony was error.

The People presented no direct physical evidence of Mr. Gopaul's guilt and only indirect evidence, in the form of the vibrators and knife — which she could have known about without their having been used on her — to corroborate her testimony. The case was essentially a credibility contest between Ms. Awan and her parents. The admission of Lewittes's testimony was not, under those circumstances, harmless error. Knupp, 179 A.D.2d at 1031 ("Because the People's entire case turned upon the credibility of defendant's children, we conclude that the [improper admission of expert testimony] cannot be deemed harmless"). Accordingly, this Court must reverse Mr. Gopaul's conviction and order a new trial

33

## POINT II

THE PROSECUTOR'S ARGUMENTS, DURING HIS OPENING STATEMENT AND IN SUMMATION, THAT THE DEFENSE ARGUMENTS WERE "RIDICULOUS," "ABSURD," AND "ILLOGICAL" DISTRACTIONS AND SHOULD BE IGNORED; THAT THE COMPLAINANT WAS "COURAGEOUS" FOR TELLING HER EMBARRASSING STORY TO STRANGERS AND MUST BE A "SICK, DESPICABLE HUMAN BEING" IF SHE WAS NOT BEING TRUTHFUL; VOUCHING FOR THE COMPLAINANT'S CREDIBILITY; AND RELYING ON THE VOTE OF THE GRAND JURY, VIOLATED APPELLANT'S DUE PROCESS RIGHTS.

Not content to rely on the evidence alone, as he was required to do during his opening statement and in summation, the prosecutor engaged in several improper tactics designed to solicit the jurors' sympathy for Ms. Awan while unfairly denigrating proper defense arguments. The prosecutor's theme was that Ms. Awan was a courageous and truthful witness, not the "sick, despicable human being" the defense was indirectly suggesting she was, and that her testimony was true, while the defense arguments were ridiculous, absurd and illogical lies intended to distract the jury and divert it from its proper role in the case. He also relied on the vote of the grand jury as if it constituted evidence against Mr. Gopaul and claimed that the defense was arguing that every single prosecution witness had to be lying. Because none of these tactics comported with the prosecutor's responsibility to present fair argument from "the four corners of the evidence" to the jury, People v. Ashwal, 39 N.Y.2d 105, 109-110 (1976), the prosecutor violated Mr. Gopaul's due process right to a fair trial. Berger v. United States, 295 U.S.

34

78 (1935); People v. Calabria, 94 N.Y.2d 519 (2000); U.S. Const., Amend. XIV; N.Y. Const., Art. I, § 6.

The rules governing a prosecutor's summation comments are clear. "Evenhanded justice and respect for the fundamentals of a fair trial mandate the presentation of legal evidence unimpaired by intemperate conduct aimed at sidetracking the jury from its ultimate responsibility -- determining facts relevant to guilt or innocence." Calabria, 94 N.Y.2d at 523. Moreover, the prosecutor has a duty of fair dealing to the court and the accused. Napue v. Illinois, 360 U.S. 264 (1959); People v. Pelchat, 62 N.Y.2d 97, 105 (1984) (citing People v. Robertson, 12 N.Y.2d 355 (1963)). The prosecutor violates that duty by advancing false arguments in an effort to mislead the jury. See Berger v. United States, 295 U.S. at 88 (prosecutor must "refrain from improper methods calculated to produce a wrongful conviction") .

35

(A)

The prosecutor's favorite improper tactic was repeatedly denigrating the defense arguments generally, and Mr. Gopaul's testimony in particular, as "ridiculous," "absurd" and "illogical" (929, 930, 931, 937, 941). He started by claiming that the defense arguments were "distractions" that "are intended to divert your attention away from the real issues in this case" (929), and then proceeded to mischaracterize reasonable and logical defense arguments in truly ridiculous terms. Referring to defense counsel's reasonable argument that it was unlikely that the alleged abuse took place in closely proximate rooms without anyone overhearing, the prosecutor rhetorically asked,

> Do you think that when the defendant was going to abuse his daughter he called the family down to let them know what was going to happen?" (930). Honey, I'm going to pull my daughter to the basement now and get on my knees and abuse her. Does that make sense? (930).

He then attacked that incorrect, fabricated defense argument as "ridiculous" "defies common sense," and "illogical," and instructed the jurors not to consider it during deliberations, and to "pay no mind to that" (930).

Similarly, the prosecutor excoriated counsel's logical suggestion that Mr. Awan's scholastic improvement in the face of the alleged abuse belied that it had actually occurred as "absolutely absurd," "illogical," "offensive," and "defies common sense" (931). He repeated these same claims as applicable to the entire defense (937), and added that the defense was claiming that every single prosecution witness lied, calling each by name, a "liar" (931). These attacks on defense counsel and the defense case were

36

blatantly improper. See, e.g., People v. Gordon, 50 A.D.3d 821, 822 (2d Dept. 2008)(prosecutor improperly denigrated the defense by likening it to a "Hollywood" story and characterizing it as "ridiculous" and "absurd"); People v. Robinson, 260 A.D.2d 508 (2d Dept. 1999) (improperly disparaging defense by saying it was following a "script" and accusing it of manufacturing evidence); People v. Diaz, 170 A.D.2d 202 (1st Dept. 1991)(personal attacks on defense counsel's credibility and on defense theories as "insult," "absurd," and "desperate," improperly suggested that counsel was trying to deceive jury); People v. Simms, 130 A.D.2d 525, 526 (2d Dept. 1987) (characterized defense summation as "fairy tale").

The prosecutor's repeated and vociferous derogatory comments not only unfairly maligned defense counsel, but improperly conveyed the prosecutor's opinion that appellant was a liar. He followed them up with a direct attack on Mr. Gopaul's testimony specifically, calling it a "plan to distort the truth" that backfired because it was "so patently illogical" and "unreasonable" that it "defies common sense" (941).

Calling a defendant a liar and making similar disparaging remarks about a defendant's testimony and defense has also been repeatedly condemned. People v. Pagan, 2 A.D.3d 879 (2d Dept. 2003) (in summation, prosecutor contended that defendant lied on the witness stand); People v. Washington, 278 A.D.2d 517 (2d Dept. 2000)(prosecutor called the defendant's testimony a "lie" and "pile of crock" and urged the jury not to "fooled" by "patently absurd" defense theory); People v. Walters, 251 A.D.2d 433, 434 (2d Dept. 1998) (prosecutor characterized defendant's testimony as

37

"continued lies on top of lies" and expressed his opinion regarding the falsity of witnesses' testimony); People v. Tarantola, 178 A.D.2d 768, 769 (3d Dept. 1991) (prosecutor impermissibly characterized defendant's testimony as "garbage"); see also People v. Bailey, 58 N.Y.2d 272, 274-275 (1983) (prosecutor asserted that witness's testimony was a "bald face lie"); Robinson, 260 A.D.2d at 509 (defense witness was "more full of crap than a Christmas turkey").

The prosecutor's attacks were also improper because they conveyed his personal disbelief of appellant's credibility, and presented him as an unsworn witness against Mr. Gopaul. Berger v. United States, 295 U.S. at 88; Bailey, 58 N.Y.2d at 277 ("utterly impermissible" for prosecutor to present himself as an unsworn witness to a witness's truthfulness by expressing an opinion about the witness's testimony); People v. Lovello, 1 N.Y.2d 436, 438-439 (1956) (prosecutor made himself into an unsworn witness and supported his case by his own veracity and position); Robinson, 260 A.D.2d at 509 (prosecutor improperly conveyed opinion about defense witness's credibility); People v. Hall, 138 A.D.2d 404, 405 (2d Dept. 1988) (prosecutor erred in advancing personal opinion regarding merits of case during summation). While a prosecutor was free to make credibility arguments based on the evidence, he was not free to engage in the no-holds-barred ad-hominem attacks he made in this case.

(B)

Juxtaposed against his unfair attacks on Mr. Gopaul and his defense were the prosecutor's efforts to elicit from the jury sympathy and respect for Ms. Awn. At the

38

very beginning of the case, during his opening statement, the prosecutor told the jurors that Ms. Awan was a "stronger and more courageous girl than she was previously" and praised her for "com[ing] into this courtroom during the course of this trial and to speak to you, 16 strangers who she has never met" to "rehash the embarrassing details of a secret she held for years" (310). He followed that introduction with a lengthy and graphic description of those details — which was presented in a style worthy of summation — so as to maximize the jurors' appreciation for how difficult Ms. Awan's testimony would be (304-322).

This approach was improper because "emotional turmoil tends to cloud the mind and interferes with the jury's function to weigh and evaluate the evidence objectively." People v. Nevedo, 202 A.D.2d 183 (1st Dept. 1994); see also People v. Caruso, 246 N.Y. 437 (1927). As a result, a prosecutor may neither elicit evidence nor advance arguments that appeal to jurors' sympathy, passion, or prejudice to influence the deliberative process. Ashwal, 39 N.Y.2d at 110; Caruso, 246 N.Y. at 443-445. The prosecutor in this case ignored those directives and made certain the jurors were sympathetic to Ms. Awan even before she took the stand.

39

(C)

The prosecutor made certain not just to arouse sympathy in the jurors for Ms. Awan, but to use that sympathy to ensure that they believed her testimony. He told them that Ms. Awan "had no reason" to lie about the allegations and labeled a person who would testify falsely about them as "so sinister, so despicable, so screwed up in the head, that's what type of person who would make that up" (934). He then magnified this improper argument by suggesting that Ms. Awan had made up the allegations knowing that she would be subjected to an invasive medical examination, which he described in graphic detail ("knees are pressed up towards where her ears are"), and "continued to tell the truth" because "[i]n order for you to believe that these allegations were made up, you have to believe she is a sick, despicable human being" (936). Obviously, the prosecutor was banking on the jurors not being comfortable coming to the conclusion that the sympathetic Ms. Awan was such a person. But just to make certain, he gave his personal assurance that she was telling the truth when he told them, Ms. Awan "tells the police that she is abused because for the last three years she was abused" and was not the "cold, calculating liar" the defense claimed she was (937).

This argument grossly distorted the defense in a manner that can only have been intended to provoke the jury's antagonism against appellant for suggesting that Ms. Awan could be such an amoral person. While defense counsel had suggested that Ms. Awan falsely accused appellant out of anger at her father for preventing her from seeing her boyfriend and hitting her after the fair, neither Mr. Gopaul nor defense counsel described

40

her in such derogatory terms. As a result, the prosecutor's argument, which was obviously meant to inflame the jury, was not fair response.

Moreover, equating an acquittal with a finding that the complainant lied is burden shifting. People v. Yant, 75 A.D.2d 653, 654 (2d Dept. 1980). To equate it with a finding that Ms. Awan was a "sinister," "sick," "screwed up in the head," and "despicable human being" (934, 36, 37), was not only inflammatory and improper, but shifted to the defense an unfair burden it should not have had to carry in order to win an acquittal.

### (D)

During his opening statement, the prosecutor highlighted for the jury that "a grand jury comprised of citizens like yourself from this county indicted the defendant on a litany of charges," and then, when discussing each count, reminded the jurors that a grand jury had indicted Mr. Gopaul on that count. Since it is absolutely clear that an indictment is not evidence of guilt, People v. Remillard, 267 A.D.2d 610, 612 (3d Dept. 1999), there was no possible reason for the prosecutor to mention the grand jury's action other than to improperly urge the jurors to conclude that the grand jury has already heard and credited a prosecution witness — a tactic that was not only reprehensible but strictly forbidden. People v. Levandowski, 8 A.D.3d 898, 900 (3d Dept. 2004); People v. Jamal, 307 A.D.2d 267 (2d Dept. 2003); People v. LaDolce, 196 A.D.2d 49, 54-55 (4th Dept. 1994); People v. Ferrara, 78 A.D.2d 660, 661 (2d Dept. 1980); People v. Mejias, 72 A.D.2d 570, 571 (2d Dept. 1979). That argument, together with his attempt to garner sympathy for Ms. Awan (see Part A, ante), undermined the jury's ability to bring

41

impartiality to bear when assessing her credibility. Accordingly, this Court should reverse

Mr. Gopaul's conviction and order a new trial.

POINT III

> THE TRIAL COURT ERRED IN DENYING APPELLANT'S
> REQUEST FOR A MISSING WITNESS CHARGE AS TO THE
> OFFICER WHO APPREHENDED HIM IN THE PRECINCT
> BECAUSE THAT OFFICER'S TESTIMONY WAS MATERIAL
> TO THE CENTRAL QUESTION WHETHER ABUSE BY THE
> POLICE DURING AND AFTER THE ARREST RENDERED
> HIS STATEMENTS INVOLUNTARY

Central to Mr. Gopaul's defense was that his statements to the police confessing to

Ms. Awan's allegations of sexual abuse had been coerced by a course of police abuse and

threats that began with a brutal apprehension by many officers in the police precinct. Mr.

Gopaul testified about that course of events, and his testimony was partially corroborated

by Ms. Alioto's testimony that four or five officers were present during the arrest,

although she stopped short of acknowledging that they abused Mr. Gopaul, saying only

that they put him up against the wall. Since the apprehending officer would have been

expected to testify in favor of the People on a material issue in the case, the court was

obligated to grant Mr. Gopaul's request for a missing witness instruction. Its refusal to

give the charge violated Mr. Gopaul's due process right to a fair trial. U.S. Const.,

Amend XIV; N.Y. Const., Art I, § 6.

Under well-settled law, when a party seeking a missing witness charge

42

> has established prima facie that an uncalled witness is knowledgeable about a pending material issue and that such witness would be expected to testify favorably to the opposing party, it becomes incumbent upon the opposing party, in order to defeat the request to charge, to account for the witness' absence or otherwise demonstrate that the charge would not be appropriate.

People v. Gonzalez, 68 N.Y.2d 424, 428 (1986); People v. Vasquez, 76 N.Y.2d 722 (1990); People v. Roberts, 187 A.D.2d 615 (2d Dept. 1992). The party opposing the charge may satisfy this burden by demonstrating that the witness is not knowledgeable about the issue, the issue is not material or relevant, the testimony would be cumulative, the witness is not available, "or that the witness is not under the party's 'control' such that he would not be expected to testify in his or her favor." Gonzalez, 68 N.Y.2d at 428.

In this case, defense counsel easily carried his burden of establishing that the apprehending officer would be expected to offer testimony favorable to the People on a material issue when he argued that the officer was knowledgeable about whether Mr. Gopaul's statements were voluntary, whether he asked for a lawyer, and whether he invoked his right to remain silent, and that "[w]hoever this is clearly has material relevant evidence to offer in this area" (896).[2] Although the identity of the apprehending officer was not established during the trial, defense counsel pointed out that "the DA has the

---

[2]     Appellant made his initial request for a missing witness charge at the close of the People's case (714), but the court decided to hear argument on that question during the charge conference at the close of all evidence the following day (895-97). The prosecution did not assert that the request was untimely, thereby waiving any untimeliness claim, see People v. Erts, 73 N.Y.2d 872, 874 (1988); People v. Robertson, 205 A.D.2d 243, 245 (1st Dept. 1994).

43

ability to get the information to bring this witness in and chose not to do that" (897). The prosecutor did not argue that the witness could not be found or was unavailable.

Nor did the prosecutor claim that the witness was not in the People's control. A police officer "by nature of his status" would be expected to testify favorably for the prosecution. Gonzalez, 68 N.Y.2d at 429. Law enforcement officers "[c]ertainly" are witnesses "who are 'or may be inferred to be, of good will" [citation omitted] to the prosecution and can be expected to testify favorably to the prosecution and adversely to the defendant." Id. at 429-30. Thus, the apprehending officer was manifestly under the People's control. People v. Fields, 76 N.Y.2d 761, 763 (1990) (police officer who witnessed station house interrogation of defendant "as a police officer, would have been expected to testify favorably to the People"); People v. Erts, 73 N.Y.2d 872, 874 (1988) (error to deny missing witness charge as to second undercover officer in drug case); People v. Wright, 41 N.Y.2d 172, 176 (1976) (erroneous failure to give missing witness charge as to arresting officer's partner); Roberts, 187 A.D.2d at 616 ("law enforcement officers could be expected to testify favorably for the People").

Instead, the prosecutor argued that the apprehending officer would not be testifying about a material fact (897). The prosecutor, and the court, could not have been more incorrect. Mr. Gopaul's entire defense depended on establishing that his confession to Shulman was the result of coercion and threats by the police. It would be very difficult to convince the jury that Ms. Awan had lied unless he could prove that his statements confirming her allegations were not true. Central to his coercion claim was the manner

44

of his arrest. He claimed that many officers attacked him, cursed at him, and slammed him into a wall and a counter, handcuffed him, and took all his property away (813-14). Only then did Detective Shulman arrive to force him up the stairs into an interview room where he slammed him into a wall again, told him he could not have a lawyer, and threatened to put him in prison for a long time unless he confessed (815). The apprehending officer would have known about, and been expected to dispute that, excessive force was used in arresting Mr. Gopaul. Therefore, since the use of force was a crucial part of Mr. Gopaul's defense, that testimony was material.[3]  Gonzalez, 68 N.Y.2d at 428 ( from the officer's "relationship to the issues or events in dispute ... [he] was in a position to have knowledge of these issues or to have observed the events"); accord People v. Kitching, 78 N.Y.2d 532, 537 (1991).

Indeed, Officer Alfaro was called back to the precinct after she had left, and was assigned to process Mr. Gopaul's arrest, even though any number off officers were available at the precinct. This otherwise irrational assignment makes sense, however, it was made specifically because she had no knowledge about the circumstance of Mr. Gopaul's apprehension and would be able to testify as to his arrest without being subject to cross-examination about them.

Instead, the trial judge dismissed the request out of hand without even inquiring who the officer was or whether he or she was available. The prosecutor never suggested

---

[3]     For the very same reasons, the court's refusal to give a missing witness charge was not harmless. Vasquez, 76 N.Y.2d at 725; Robertson, 205 A.D.2d at 247; Roberts, 187 A.D.2d at 616-17; People v. Gladden, 180 A.D.2d 747, 748 (2d Dept. 1992).

45

that he could not find the witness and the record presents no basis for a finding that the prosecution would have been unable to produce this witness. Under those circumstances, it was "incumbent" upon the prosecution "to account for the witness' absence or otherwise demonstrate that the charge would not be appropriate." Gonzalez, supra, 68 N.Y.2d at 428. The prosecutor made no attempt to do either.

In conclusion, since Mr. Gopaul made a prima facie showing of his entitlement to a missing witness charge as to someone within the People's control, and the prosecution failed to demonstrate that he was unavailable or that the charge would otherwise be inappropriate, the court erred when it denied appellant's request for a missing witness charge.[4] Mr. Gopaul was entitled to a charge that the jury could infer that the missing officer's testimony would not have supported or would even have contradicted Detective Shulman's claim that Mr. Gopaul's statements were not the product of abuse, intimidation and threats on the part of the police, and would instead have supported Mr. Gopaul's testimony that he was subjected to such abuse, intimidation and threats. I Criminal Jury Instructions, New York § 8.54.

---

[4]     Since the prosecution advanced no arguments to demonstrate the inappropriateness of the charge, and the court never articulated any basis other than the People's alleged inability to identify the officer and his equal availability to the defense, the People may not challenge the propriety of a missing witness charge on any other ground on this appeal. People v. Paulin, 70 N.Y.2d 685, 687 (1987); People v. Gonzalez, 68 N.Y.2d, 424, 430 (1986); see Erts, 73 N.Y.2d at 574 (although the People might have defeated missing witness request by making appropriate showing, they "advanced none of these arguments and, so far as can be discerned from the record, the trial court did not base its ruling on any of these grounds").

Since the court's failure to give the necessary missing witness charge deprived appellant of his due process right to a fair trial, this Court should reverse appellant's conviction and order a new trial.

## POINT IV

THE ADMISSION OF THE COMPLAINANT'S TESTIMONY THAT SHE TOLD HER FRIEND SHE HAD BEEN ABUSED, AND OF THE FRIEND'S TESTIMONY THAT SHE ASKED THE COMPLAINANT WHETHER SHE HAD BEEN ABUSED, WAS ERROR BECAUSE NEITHER WAS PROBATIVE OF PROMPT OUTCRY OR ANY EXCEPTION TO THE HEARSAY RULE.

Over objection, the People elicited from Ms. Awan that, on the night of Mr. Gopaul's arrest, she told her friend Christine Alioto, "I was being molested," and that she then told Christine's mother "the same thing. I might have said that I thought I was going to be raped" (511-12). There being no defense claim of recent fabrication, Ms. Awan's testimony about her own prior consistent statement was inadmissible hearsay not probative of prompt outcry. The prosecutor also elicited from Christine that she asked Ms. Awan, "Has he touched you" and that Ms. Awan responded (607). Because the defense had made no claim of recent fabrication and none of that testimony was probative of prompt outcry, the admission of that testimony was error that deprived Mr. Gopaul of his due process right to a fair trial. U.S. Const., Amend. XIV; N.Y. Const., Art. I, § 6. People v. McDaniel, 81 N.Y.2d 10 (1993).

It is long-established black-letter law in New York that a witness's prior consistent out-of-court statements may not be used to bolster her in-court testimony. McDaniel, 81

47

N.Y.2d at 16; People v. McClean, 69 N.Y.2d 426, 429 (1967); see People v. Singer, 300 N.Y. 120 (1949). The Court of appeals has explained that this is so because, among other things, "untrustworthy testimony does not become less so merely by repetition." Daniels, 81 N.Y. at 16. Because no exception to the rule applied in this case, the court's admission of Ms. Awan's testimony about her own prior consistent statements to Christine and Denise Alioto was error.

First, Ms. Awan's statements to the Aliotos was elicited on direct examination before the defense could have interposed a claim of recent fabrication and, in fact, the defense never made such a claim. As a result Ms. Awan's testimony about her prior consistent statement did not fall under the exception for rebutting claims of recent fabrication. See McClean, 69 N.Y.2d at 428.

Second, Ms. Awan's own testimony about her statements to the Aliotos was not sufficiently probative of "prompt outcry" to permit its admission. While testimony by the person to whom an outcry is made may testify about the report, the point of such testimony is the timing of the report, not its substance. McDaniels, 81 N.Y.2d at 17. It is for that reason that only the fact of the complaint, not its details, is admissible. Id. In McDaniels, for example, the Court of Appeals upheld the introduction of prompt outcry testimony elicited from the child victim's mother under that exception, but found error in the introduction of the child victim's own testimony about her outcry reports to police and District attorney because they were made after the time when the defense claimed she fabricated her allegations. Id. at 19. The mother's testimony was analyzed according

48

to the prompt outcry exception while the victim's own testimony was analyzed under the recent fabrication exception. If the victim's own testimony was probative of prompt outcry, the Court would not have limited its discussion as it did.

Christine Alioto's testimony about what she asked Ms. Awan was inadmissible for similar reasons. Because the prosecutor elicited only her question of Ms. Awan, and not Ms. Awan's answer, it did not constitute outcry testimony at all. It was strictly an out-of-court hearsay statement to which no exception applied.

The errors appear to stem from a shared fundamental misunderstanding by the prosecutor and the court as to admissibility of hearsay statements. When he was inquiring of Ms. Awan, he directed her as follows: "without telling us what she said to you, what did you say to her?" (511). Defense counsel's objection was overruled and Ms. Awan testified about telling the Aliotos that she had been molested. And when the prosecutor was examining Christine, he asked, "Don't tell us what she said, but what did you say to her" (606). Defense counsel objected on hearsay grounds, but the court permitted the inquiry because "[s]he can be examined as to what she said. She is here before the jury for them to evaluate her credibility" (607). Defense counsel argued, to no avail, that "[t]hat's not a basis for the admissibility [of a ] statement [—] that I can cross-examine her on [it]" (607). Counsel was correct: that hearsay testimony does not also violate the Confrontation Clause does not justify its admission over hearsay objection. Hearsay evidence is inadmissible regardless of its confrontation ramifications. See People v. Young, 296 A.D.3d 588, 590 (3d Dept. 2002) (defense claim that

49

statements were inadmissible under hearsay rules waived when counsel had argued only that they violated the Confrontation Clause). That is why in case after case courts have found statements by testifying witnesses to have been inadmissible hearsay. See, e.g., People v. Buie, 86 N.Y.2d 501 (1995) (911 call was hearsay and inadmissible even though the declarant was available and testified at trial; People v. Jacobs, 278 A.D.2d 21 (1st Dept. 2000) (coworker's testimony about defendant's past beliefs was inadmissible hearsay) People v. Canty, 153 A.D.2d 640 (2d Dept. 1989) (officer's testimony that vehicle was stolen was inadmissible hearsay). Nevertheless, the prosecutor repeated his question, "Don't tell us what [Ms. Awan] said to you, but what did you say to her?" and Christine testified that he asked "has he touched you" (607). That testimony was inadmissible. For the reasons stated above, see pages 46-47, ante, the errors were not harmless and Mr. Gopaul is entitled to a new trial.

## CONCLUSION

FOR THE FOREGOING REASONS, THIS COURT SHOULD
REVERSE APPELLANT'S CONVICTION AND ORDER A
NEW TRIAL.

Respectfully Submitted,

LYNN W. L. FAHEY
Attorney for the Defendant-Appellant
Appellate Advocates
2 Rector Street, Fl. 10
New York, NY 10006

Paul Skip Laisure
Of Counsel
February 27, 2013

50

## CERTIFICATE OF COMPLIANCE

The foregoing brief was prepared on a computer. A proportionate typeface was used, as follows:

```
Name of typeface:        Garamond
Point Size:              14
Line Spacing:            Double
```

The total number of words in the brief, inclusive of point headings, footnotes, and table of contents, and exclusive of pages containing the proof of service, and certification of compliance, is 13,513.

Paul Skip Laisure
Supervising Attorney

*To be argued by*
EMIL BRICKER
(TIME REQUESTED: 15 MINUTES)

# New York Supreme Court

### Appellate Division--Second Department

AD No. 10-09352

THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

*against*

HAROLD GOPAUL,

*Defendant-Appellant.*

## BRIEF FOR RESPONDENT

RICHARD A. BROWN
District Attorney
Queens County
*Attorney for Respondent*
125-01 Queens Boulevard
Kew Gardens, New York 11415
(718) 286-5862

JOHN M. CASTELLANO
JOHNNETTE TRAILL
   Assistant District Attorneys
   *Of Counsel*

EMIL BRICKER
   Special Assistant District Attorney

April 29, 2013

Queens County
Indictment Number 2065/08

# **TABLE OF CONTENTS**

**Page No.**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

THE TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    The People's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    The Defense Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

POINT ONE

    THE COURT PROPERLY ADMITTED EXPERT
    TESTIMONY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

POINT TWO

    DEFENDANT FAILED TO OBJECT TO THE
    PROSECUTOR'S SUMMATION, WHICH WAS
    NOT ERRONEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

POINT THREE

    THE COURT PROPERLY DENIED
    DEFENDANT'S REQUEST FOR A MISSING
    WITNESS CHARGE; ANY ERROR WAS
    HARMLESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

POINT FOUR

    THE COURT PROPERLY ADMITTED
    EVIDENCE OF THE VICTIM'S RECENT
    OUTCRY; ANY ERROR WAS HARMLESS . . . . . . . . . . . . 59

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : SECOND DEPARTMENT
-------------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,      :

                   Respondent,      :

             -against-      :

HAROLD GOPAUL,      :

            Defendant-Appellant.      :

-------------------------------------------------------------------------x

## BRIEF FOR RESPONDENT

## PRELIMINARY STATEMENT

Defendant Harold Gopaul appeals from a September 10, 2010,

judgment of the Supreme Court, Queens County (Lasak, J.). By that judgment,

defendant was convicted, after a jury trial, of Criminal Sexual Act in the First

Degree (Penal Law §130.50[1]) (six counts); Sexual Abuse in the First Degree

(Penal Law §130.65[1]) (six counts); Criminal Sexual Act in the Second

Degree (Penal Law §130.45[1]), Criminal Sexual Act in the Third Degree

(Penal Law §130.40[2]) (two counts); Assault in the Third Degree (Penal Law

§120.00[1]); and Endangering the Welfare of a Child (Penal Law §260.10[1]).

The court imposed on him concurrent sentences of eighteen years (for the first-

degree criminal sexual act), five years (for the first-degree sexual abuse and

second-degree criminal sexual act), three years (for the third-degree criminal sexual act), and one year (for the assault and endangering counts), to be followed by ten years of post-release supervision. Defendant is presently incarcerated.

## INTRODUCTION

From May, 2005, until June, 2008, defendant repeatedly sexually abused his stepdaughter, Sana Awan. He touched her vagina six times during that period, both in the family's home in Queens, as well as in his truck, while driving her to and from school. On June 21, 2008, defendant also put a vibrator to the victim's vagina. Later that day, he took his entire family to a fair, but left early, and became upset at his stepdaughter, hitting her repeatedly, once they arrived home. Sana fled two nights later and reported the crimes. Subsequently, defendant confessed to the police to his crimes both in writing and on videotape. A knife and vibrator were recovered from his truck as well as a vibrator from under a bed in his home.

For his crimes, defendant was charged with thirteen counts of sexual act in the first degree, thirty counts of sexual abuse in the first degree, two counts of criminal sexual act in the second degree, seven counts of criminal sexual act in the third degree, assault in the third degree, and

2

endangering the welfare of a child, in Queens County Indictment Number 2065/08.

Defendant proceeded to a hearing before the Hon. James P. McCormack, and to a trial before the Hon. Gregory L. Lasak and a jury, resulting in the conviction noted above.

On appeal, defendant claims that the trial court improperly allowed an expert to testify about adolescent sexual abuse, which, defendant claims, was not beyond the ken of the average juror. Next, defendant complains that he was denied a fair trial by the prosecutor's opening and closing statements that denigrated the defense, vouched for the People's witnesses, and sought sympathy for the victim. Defendant also argues that the trial court improperly denied his application for a missing witness charge for the officer who apprehended him in the precinct. And, finally, defendant claims that the court should not have allowed into evidence the victim's testimony that she had told her friend that she had been abused and the friend's testimony that she had asked the victim whether she had been abused. Almost all of defendant's claims, however, are unpreserved for this Court's review, and all of them are meritless.

3

## THE TRIAL

### The People's Case[1]

Sana Awan, a college sophomore (Awan: 444-445, 527), had, until June, 2008, lived at 242-10 89th Avenue in Queens, with her mother, her stepfather – defendant – and her brother and sister. Since June, 2008, she had had no communication with any of them, and no relationship with her mother (Awan: 445-446, 523, 524). Defendant had been her father-figure, with whom she had lived since age three. He was also the only family member with a job. Sana was not emotionally close to her mother, and could not confide in her, but was closer to defendant, her "Dad" (Awan: 446-448). He was strict about her schoolwork and also imposed "strict rules," barring her from going out with her friends, after school (Awan: 449).

Between May and June, 2005, when Sana was fourteen, her relationship with defendant changed (Awan: 524). On a date she could no longer recall, when Sana emerged from a morning shower, defendant, already in the bathroom, pulled off her towel, told her to sit on the hamper, pushed her there, and touched her breast (Awan: 454-455, 534); then knelt, held her legs open, and put his mouth to her vagina. When Sana pushed him away and told

---

[1]Numbers refer to defendant's trial, and names, when provided, refer to witnesses.

4

him to stop, he told her to hush, and to behave – and continued (Awan: 449-454). Sana was scared (Awan: 456).

Between September, 2005, and January, 2006, after Sana had entered high school, defendant continued to touch her breasts and put his mouth to her vagina (Awan: 456-457, 525). Once, between January and the end of April, 2006, defendant's mouth touched her vagina (Awan: 460); and once again, between May through the end of August, 2006 (Awan: 460); and again, once, in September, 2006 (Awan: 460).

In May, 2006, defendant entered Sana's room. He told her to lie on the bed and removed her pants. Though she fought back, defendant put his mouth to her vagina and touched her breasts, telling Sana to hush (Awan: 462-463).

Between January and April, 2007, defendant once forced his mouth on her vagina and his hands touched her breasts (Awan: 460). Defendant's mouth touched her vagina once, between May and August, and again, between September and December, 2007 (Awan: 460-461).

Between January and February, 2008, on a weekday evening, defendant, who was watching pornography, grabbed Sana's hand, made her watch the pornography, took off her pants, held her on his lap while he touched

5

her breasts and vagina, over and under her clothes, and then put his mouth to her vagina (Awan: 464-466).

On her seventeenth birthday, in March, 2008, defendant took pictures of Sana in a purple top and dress, telling her to put one leg up on a chair and stick her butt out; she complied (Awan: 467-468). Thereafter, also in March, 2008, defendant touched her while she tried to go upstairs, then held her down and put his mouth on her vagina (Awan: 468-469).

In April, 2008, as her mother was outside, gardening, Sana went into the basement. Defendant followed her inside, told her to step up on the freezer, and put his mouth to her vagina (Awan: 470-471).

In May, 2008, when defendant picked Sana up at school, and saw her with an eighteen-year-old boy, he kept asking her who the boy was. Eventually she admitted to both parents that this was a boyfriend, and both yelled at her. Defendant threatened to come into the school, if she sat next to the boy, in class. From then on, defendant picked her up from school in his truck, every day (Awan: 472, 497, 527, 529-532).

Shortly after Sara's admission about the boyfriend, as she came downstairs to go to school, she saw defendant sharpening a knife. He said, "I

6

bought this for you," and added that it could cut clean through anything. After that, she always saw the knife in his truck (Awan: 474).

Later in May, as defendant drove Sana to school, he wanted her to perform oral sex on him. She refused, and he told her to kiss him, instead. She complied, and he touched her breast while kissing her, but complained that she was not doing it right, and threatened to cut off her finger because she was not behaving (Awan: 476-477).

On May 14, 2008, defendant picked Sana up and drove her to a parking lot. He made her promise to have sex with him and asked whether she wanted to do it within a week or a month. Sana reluctantly agreed. Defendant asked if she were really promising; she said she was, though in fact she was not (Awan: 477-478, 482-483).

In May, 2008, defendant called Sana into the family kitchen, knelt, and told her to spread her legs. He got a fork or knife and said, "I'm going to stick this up there if you don't behave" (Awan: 484), and put his mouth on her vagina. He also told her to hold his penis over the garbage can; and, when she let go, he ejaculated into the garbage (Awan: 483-485, 498-499).

On a weekend morning between June 1 and June 20, 2008, defendant came to Sana's bedroom and tried to touch her breasts and vagina,

7

under the covers. She kept moving around to stop him because she could not push him off. She did not succeed (Awan: 485-487).

On June 19, 2008, defendant asked Sana whether she remembered her promise to have sex with him, and asked her when she was going to fulfill it. He told her that she would have to pick a day that week, so she picked Friday the 27th, because it was the end of the week (Awan: 487, 496).

One day between June 1 and June 20, defendant, driving her to school, as he now did each day, told her – after she refused to perform oral sex -- that he would cut off her finger if she did not behave (Awan: 497-498).

On Saturday, June 21, 2008, defendant told Sana to come into her mother's bedroom and lie on the bed. Defendant held her down and put a gray, twelve-inch-long vibrator on her vagina, though she fought him. He slapped her and told her to behave when she started to cry (Awan: 499-502, 509).

That afternoon, the family went to a church fair. As Sana and a friend waited for one of the rides, defendant, said that Sana was letting people cut ahead of her in line. He got angry and told Sana to leave. Sana grew embarrassed. As they walked home, she started crying; at home, she went to her room. Defendant followed her and hit her on her arms, face, and legs, and leaving painful black-and-blue marks on her arms and ear (Awan: 506-509).

8

On Monday, June 23, at 8:00 to 8:30 p.m., Sana called her best friend, Christine Alioto, saying that she was being molested and was running away (Awan: 510-511,[2] 519) – her first statement to anyone about what had happened over the past three years with her stepfather (Awan: 534, 538). She had never told her mother and did not know whether her mother would believe her if defendant had said that she was lying (Awan: 519, 536). Then she spoke to Christine's mother, Denise, and told her what had happened (Awan: 512).

Christine had been to Sana's home and knew defendant, who had driven her to school (C. Alioto: 604-605, 613, 615). On June 23, 2008, Sana telephoned her, seeming very nervous, speaking in an abnormal tone. Christine asked, "Has he touched you," and Sana answered. Sana had never before discussed her stepfather (C. Alioto: 615). Christine woke her mother and gave her the phone (C. Alioto: 608-609).

Denise Alioto knew Sana as her daughter's friend and had once met defendant, Sana's stepfather (D. Alioto: 619-620, 629). At 8:30 p.m., on June 23, 2008, she had been sleeping, when her daughter handed her the telephone. She spoke to Sana (D. Alioto: 622).

---

[2]Counsel objected, but never explained the basis for those objections, which were overruled (Awan: 511).

9

Sana fled her home through the back door and met Denise and Christine in their truck. She was running and appeared scared and nervous (C. Alioto: 609; D. Alioto: 622). They drove first to a video store, then to the precinct, arriving between 9:00 and 10:00 p.m. (Awan: 512-513; C. Alioto: 610; D. Alioto: 624, 632, 636). Christine noticed that Sana had bruises on her arms and a cut and bruise on her earlobe (C. Alioto: 611). Sana wrote a statement (Awan: 514), and later spoke with a Child Service representative, and to Detective Lennard Shulman, remaining at the precinct until 11:00 a.m. on June 24 (Awan: 514-515; C. Alioto: 611; D. Alioto: 625).

At about 2:30 a.m. on June 24, 2008, Detective Lennard Shulman learned of Sana's presence in the precinct (Shulman: 378-379, 384, 393-394), and discussed the matter with a case worker from the Administration for Children's Services (Shulman: 384-385). At 3:20 a.m., he spoke with Sana (Shulman: 386-387, 394; Awan: 514-515), on the precinct's second floor, and saw that she had red welts on both her arms, and seemed distraught (Shulman: 330, 332, 334-335, 377, 380, 386).

At some time after 4:00 a.m., Mrs. Alioto went downstairs and saw defendant coming into the precinct. Two police officers were on duty at the front door (D. Alioto: 638-639). She motioned to them that he was the

10

abuser and stood so that defendant did not see her. A single officer put defendant against a wall and handcuffed him, in her presence, grabbing defendant by the back of his arm (D. Alioto: 626-627, 637-639).

At about 4:40 a.m., Officer Celica Alfaro, who had been out on patrol, returned to the precinct to arrest defendant, who was already in custody (Alfaro: 559-561, 573, 575, 579).

At about 4:45 a.m., Detective Shulman asked that defendant be brought up to a separate room on the precinct's second floor (Shulman: 372-377, 395, 405). To his knowledge, no officer had yet interrogated defendant, or given him the *Miranda* warnings, or assaulted him; nor had defendant sought a lawyer (Shulman: 399). Defendant also had no contact with Sana during this period (Shulman: 335, 401), and, when the Detective commenced speaking with him at about 5:10 a.m., he was seated, free of handcuffs, and alert (Shulman: 338, 400).

The Detective, unarmed and making no threats or promises read defendant the *Miranda* warnings, and defendant responsively and soberly answered, then read and initialed them, without requesting to speak to an attorney (Shulman: 337-345, 407-410). Similarly, without uttering threats or making promises, the detective read aloud consent-to-search forms to

11

defendant, and at 5:20 a.m., received defendant's written consent to search his home and vehicle. Defendant never refused to speak, nor sought a lawyer (Shulman: 345-353, 411-413).

At about 6:20 a.m., the detective, who had in the interim left the interview room (Shulman: 414-415), returned, and questioned defendant, who again appeared alert. When asked if he knew why he had been arrested, defendant replied about the incident of his slapping Sana. The detective asked defendant to write a statement about that; defendant did so (Shulman: 354-356), admitting that, after the incident at the fair, "I put a few slaps on her as a little discipline" (Shulman: 359). Defendant concluded this statement at 6:45 a.m. (Shulman: 360, 416-421).

At about 7:20 a.m., Detective Schulman returned to the interview room, finding defendant seated and awake. He did not put defendant against a wall, nor tell him that he was now going to tell the truth; nor threaten, nor say that he would help defendant. He also never said that defendant could leave the precinct if he made a statement (Shulman: 425, 429, 431). He told defendant that Sana had made allegations of inappropriate behavior involving him and asked whether defendant wanted to make a statement. When defendant asked what she had said, the detective would not tell. But defendant

12

wanted to make a statement, and said that "he felt bad about it, about what was going on, and he wanted to talk about it" (Shulman: 361, 426-427). He agreed to write a statement, and concluded it at 8:30 a.m.. The detective read this verbatim to the jury, including defendant's admission that "I would touch her vagina and breast, and she would touch my penis, and we will both kiss. It happened about five or six times." Defendant additionally wrote, "I admit what happened was very, very wrong. Also admit I need help." He explicitly added that his victim had been Sana Awan (Shulman: 362, 364, 423, 425, 428-430, 434). The detective did not tell him what to write (Shulman: 431).

At 8:30 a.m., the Detective asked defendant whether he had any vibrators in his truck. Defendant replied that he had multiple vibrators in his home as well as a white fold-up massager in his truck that he claimed never to have used on Sana. Defendant drew a picture of this item (Shulman: 370-371, 434-435).

At about 9:00 a.m., Sana's mother appeared at the precinct (D. Alioto: 628). Detective Shulman at some point spoke to her (Shulman: 432, 435).

After 9:00 a.m. Sana also spoke to Police Officer Alfaro and went with her and with Detective Shulman to defendant's truck, which was parked

13

outside, where she pointed out to the Officer both the knife and the vibrator (Shulman: 367; Awan: 503-504, 517-518; Alfaro: 562-564, 594-595).

From the precinct, Sana went to North Shore Hospital, where she was vaginally examined for the first time. She also spoke with members of the District Attorney's Office, including Assistant District Attorney Brian Hughes. Then, she returned to the precinct (Awan: 515-516; Hughes: 689).

That afternoon, when Detective Shulman asked defendant whether he would be willing to make a videotaped statement to the District Attorney's Office. After defendant agreed, members of the Office arrived at about 5:00 p.m. (Shulman: 355, 436-437). When defendant made his statement, he appeared uninjured (Hughes: 690-692, 701).

When Sana returned home, her mother told her to go to Christine's house (Awan: 520). With the Aliotos, she later returned to her home, and a member of defendant's family commented "about how [she] messed up everyone's life" (Awan: 520). Sana, crying, went to her room, which appeared to have been searched. Her diary was missing (Awan: 521). Sana also saw Officer Alfaro recover the vibrator from under the bed in her parents' room (Awan: 502-503; Alfaro: 569, 597, 599).

14

Officer Alfaro photographed defendant at about 8:00 p.m., after his arrest, and noticed no injuries on his person; nor did defendant require medical treatment (Alfaro: 572).

On July 3, 2008, Denise Alioto became Sana's foster parent (Awan: 521, 523; D. Alioto: 628).

While Sana was in high school, her grades continued to improve, from a "B" to an "A" (Awan: 526).

On January 31, 2009, Sana's mother came to Sana's job, at a pharmacy, asking questions and yelling at her. Sana kept saying, "No, you have to leave." Sana tried to get her mother away from her workplace and never told her mother that defendant had never touched her (Awan: 536-538).

Dr. Don Lewittes, an expert forensic and clinical psychologist who evaluated children in connection with allegations of child sexual abuse, had never examined Sana, but described the literature assessing intra-family sexual abuse of children (Lewittes: 651-656).

The first phase generally encountered in such abuse is "engagement" – the adult, acting parentally, tricks the child into a sexually abusive situation for the adult's gratification (Lewittes: 656-657). Usually, too, there is a "secrecy" stage – the child, who often believes that she has a

15

dirty secret, and fears what will happen if she tells, is trapped (Lewittes: 678).

She also knows that other family members care for the abusive adult. These

concerns weigh against speaking out immediately (Lewittes: 657-659).

Delay becomes the next stage – at times, delay for years (Lewittes:

658-659). Sometimes, disclosure occurs, if the victim is sufficiently frightened

or has sufficient self-esteem, or if the family's structure and economic

necessity permit (Lewittes: 660). Adolescents generally do not discuss

sexuality or embarrassing matters with strangers; and, if required to do so, may

adopt a flat affect or blank emotionlessness (Lewittes: 661-662). Disclosure

is not strategic, designed to alert the authorities, but is instead cathartic

(Lewittes: 666).

Memory of such events decays over the years; moreover, the

victims tend not to remember dates and times, as there is no reason to do so.

What results is "blending" of events – particularly when the incidents of abuse

are similar to one another. The first and the most recent events tend to be

remembered (Lewittes: 662-664). The child's accomplishments in school are

not correlated to issues of abuse; nor is the child's resort to drugs or alcohol

necessarily a symptom of such abuse (Lewittes: 670-671, 673, 677-678).

## The Defense Case

According to defendant and his wife -- Sana's mother – Merlin Gopaul, defendant had been a father-figure to Sana and had played an active role in raising her (M. Gopaul: 744; H. Gopaul: 844). Sana was a very good student and well-behaved (M. Gopaul: 745-746; H. Gopaul: 846-847). Defendant occasionally drove her to school (H. Gopaul: 862-863). He kept a knife and a vibrator in his truck, and another under his bed, at home (H. Gopaul: 861-862).

In the spring of 2008, Mrs. Gopaul and defendant discovered that Sana had a boyfriend and that she continued to see the boyfriend against her mother's wishes. Mrs. Gopaul confronted Sana about this. Defendant thought her having a boyfriend was wrong (M. Gopaul: 728-729; H. Gopaul: 853-856; 863-864).

On June 21, 2008, Mrs. Gopaul's bad toothache flared up during a visit to a fair and led to the family's early departure, which upset Sana. Ultimately, defendant hit Sana on the arm, and Mrs. Gopaul told him to stop (M. Gopaul: 730-733, 747).

Early in the morning, on June 24, defendant, the family's sole bread-winner, who had been convicted of more than six felonies in May, 2009

17

(H. Gopaul: 841, 849), and who kept a knife and a vibrator in his truck, and another vibrator under his bed, at home (H. Gopaul: 861-862), saw that Sana was not home (H. Gopaul: 808-810). As a result at 2:25 a.m., he drove to the precinct (H. Gopaul: 860).

When he walked through the door and spoke to a female officer, male officers came up. Some eight or nine were present (H. Gopaul: 822). One took defendant by his left hand and slammed him on the wall. Officers pushed and squeezed defendant against a wall and searched him. When he asked to make a phone call, officers denied his request and cursed him. When he asked to call a lawyer, this too was denied (H. Gopaul: 819). Defendant was handcuffed, and the officers again slammed him into a counter. Then Detective Shulman came down, introduced himself, and said that he would take defendant upstairs, to ask a few questions. Defendant agreed to talk, and Detective Shulman at times pushed or helped (H. Gopaul: 867) defendant up the stairs. When they got to a room called 'the box,' the detective twice slammed defendant against a wall and cursed him, saying that defendant knew what he was here for. Defendant did not know what the detective was talking about (H. Gopaul: 812-817, 819, 865-868).

18

The detective removed defendant's handcuffs, exited, returned, and asked defendant if he knew why he was under arrest. He told defendant that Sana had made accusations, but did not say what those were. Defendant said that he had nothing to tell. The detective again cursed defendant and pulled him over a table; defendant became afraid. When defendant again asked to call a lawyer, Detective Shulman said that he would not get a lawyer here (H. Gopaul: 819). The detective explained that Sana had accused defendant of sexual abuse; defendant denied the charge, and the detective threatened that if defendant did not talk, the detective would put him away for a long time (H. Gopaul: 817-819).

Again, the detective departed and when he returned, he demanded that defendant make a statement. Defendant refused and asked for a lawyer and a phone call, both of which the detective denied. Defendant was hungry, tired, depressed. The detective read the *Miranda* warnings and asked defendant to initial them; defendant did so, still afraid of the detective. Then the detective went out, returned with two forms, began to tell him what Sana had said, and questioned defendant about vibrators. Defendant denied possessing any, though he had a massager in his truck, and more at home. He refused permission to search his home or truck, and demanded a telephone call

to a lawyer, which the detective refused, threatening that if defendant did not sign the permission slips, he would be in big trouble. Defendant, afraid of being hit, signed (H. Gopaul: 819-823).

Detective Schulman again departed and returned, asking defendant to write a confession about what Sana said defendant had done to her. Defendant did not know what this was, but, out of fear, told what had happened at the fair, and wrote that down (H. Gopaul: 823-826).

Once again the detective departed and returned, telling defendant that he wanted a statement about the things that Sana said he had done. Defendant replied that he could not; that he had not done anything. Detective Shulman pulled defendant by the shoulder and told him that he was going to do it, or get beaten up, and defendant decided to do it. The detective read from the accusations, and defendant wrote down some of them at the Detective's direction; signed a paper; and wrote that he needed help. The detective said that he would now release defendant, who did not know how long he had been in the room. The detective departed and returned once more. He asked defendant to sign another paper with a picture drawn on it. Defendant did so, after the detective had written on it something about a vibrator. Again the Detective left (H. Gopaul: 826-830, 868).

20

When the detective returned, he said that he needed defendant to make a statement to the District Attorney, and that, if he made a statement, he could go home (H. Gopaul: 865). Defendant had had no food or drink since Sunday night and had not been permitted to see his wife or call a lawyer. The detective told defendant to answer the questions asked of him. Defendant asked if he should have a lawyer, and the Detective replied that, if he got a lawyer, he would have to start all over again and that this statement was his way home (H. Gopaul: 830-834, 868-870).

When defendant failed to return from the precinct by 8:15 a.m., she walked to the precinct and inquired about Sana and defendant, but was never told that defendant was actually there, and did not see him, that day (M. Gopaul: 733-737).

According to defendant he told the truth on the videotaped statement, but then corrected that to, "I tell the truth of what Shulman told me to say about what I was going home" (H. Gopaul: 834). The charges of sexual abuse were not true (H. Gopaul: 835-836). But he agreed that, on the tape, he never complained of pain, asked for medical attention, or claimed that he had been mistreated. He was read his *Miranda* rights, and agreed to all of them, not asking for an attorney. He was not afraid of the Assistant District

21

Attorneys. Nor, during the taping, did anyone tell him what to say. He was permitted to ask questions, and did so, asking at one point whether he could explain something – and was given that opportunity. He moved his limbs and was never threatened with a firearm. He had the opportunity to stop the video at any time, but did not. He also answered "No," to one of Detective Shulman's questions (H. Gopaul: 872-876).

On that video, defendant explained how the sexual relationship with Sana had begun (H. Gopaul: 876). When asked how his relationship with his wife had changed, defendant replied, on the tape, that it was hard to explain – an answer he said was not provided for him by Detective Shulman (H. Gopaul: 878). Also, he never made any complaint against the police, on the tape; nor did he tell a judge, on that same day, that the police had beaten him or forced him to speak. And no one intimidated him on the video (H. Gopaul: 879-880).

On that day, Mrs. Gopaul saw Sana and members of the District Attorney's Office at the hospital, but she never attempted to console Sana (M. Gopaul: 759-761). She also never accompanied Sana to the District Attorney's Office (M. Gopaul: 770).

Mrs. Gopaul at first did not remember what defendant said that day in a phone call, but later remembered that she had asked him whether he had done this, and he told her he was sick (M. Gopaul: 749-750), and confessed that he had abused Sana, and needed help (M. Gopaul: 752).

On June 29, defendant called his wife, and she angrily said that he had already told her that he had done this because he was sick. She also admitted that her own relationship with defendant was "not the same anymore" (M. Gopaul: 751). She had seen his video confession, and said to defendant on June 29 that "people don't confess to something they don't do" (M. Gopaul: 751).

On June 30 or July 1, Mrs. Gopaul went with Sana to defendant's attorney, but did not leave Sana alone to speak with him. She did not know whether Sana's diary was given to the lawyer (M. Gopaul: 762-765).

On July 10, Mrs. Gopaul told defendant that he had molested Sana (M. Gopaul: 758).

On January 31, 2009, Mrs. Gopaul went to the pharmacy where Sana worked, and spoke with Sana. She did not recall that an Order of Protection issued on January 30 had barred her from speaking with Sana – who told her mother that defendant never touched her (M. Gopaul: 740-743, 779).

23

## POINT ONE

## THE COURT PROPERLY ADMITTED EXPERT TESTIMONY(Answering Defendant's Point I)

The court properly admitted expert testimony about the behavior of sexually abused teenagers as that testimony described a syndrome beyond the jury's ken and never addressed the facts of defendant's case. Defendant, arguing otherwise, is wrong.

In *People v. Diaz,* ___N.Y.3d___, 2013 N.Y. LEXIS 503 (March 26, 2013), the Court of Appeals addressed the admissibility of expert testimony about the sexual abuse of children and delayed outcry, when that testimony had been objected to as 1) wrongly addressing matters within the jury's common knowledge, 2) improperly discussing the abuser's behavior as well as the child-victim's, and 3) improperly bolstering the victim's testimony. The expert in *Diaz* testified that an abuser might engage a child in sexual play by introducing it in the guise of games or sexual education, or by showing pornography. She noted that the abuser was frequently in a position of authority over the child. 2013 N.Y. LEXIS 503 at *2-*4.

The Court, citing to *Delong v Erie County*, 60 NY2d 296, 307 (1983), found the testimony as a whole admissible, and ruled that there had been no abuse of discretion

> to permit expert testimony regarding the behavior of sexual abusers.
> That testimony is permissible as helpful for the jury to understand
> victims' unusual behavior . . . . Although some of the testimony
> discussed behavior similar to that alleged by the complainant in this
> case, the expert spoke of such behavior [solely] in general terms . .
> . .

2013 N.Y. LEXIS 503 at *8.

In the companion case of *People v. Williams*, 2013 N.Y. LEXIS 509 (March 26, 2013), the Court faced circumstances even closer to the facts of the present matter: the admissibility of expert testimony about the five stages of child-sexual-abuse-accommodation-syndrome. The Court ruled that such expert testimony, describing the stages of engagement, sexual interaction, secrecy, disclosure, and repression, was indeed admissible despite defense claims that that testimony improperly described the behavior of the abuser as well as of the child:

> Here, the admission of the expert's testimony concerning abusers'
> behavior that was relevant to explain the accommodation syndrome
> was a proper exercise of discretion. That testimony assisted in
> explaining victims' subsequent behavior that the fact-finder might not
> understand, such as why victims may accommodate abusers and why
> they wait before disclosing the abuse.

25

2013 N.Y. LEXIS 509 at *5-*6. The Court found error, though, in the expert's answering hypothetical questions bearing on the actual facts of the case before the jury. 2013 N.Y. LEXIS 509 at *7.

In the present case, the exact conditions of *Williams* were replicated – aside from the improper hypothetical questions – and, over identical objections, exactly such expert opinion was properly offered – for *Williams* explicitly permits such testimony as occurred, below.

When counsel sought an offer of proof concerning the expert, the prosecutor explained that the expert had frequently been qualified as such and would testify to the reasons why abused children delay disclosing a crime; how the abuse occurs over a period of time; and how "blending" occurs, so that it becomes difficult for a victim to remember each individual act. The expert, the prosecutor said, would also attest to the flat affect of such victims in reciting what had happened. The prosecutor also explained that jurors would not understand why the victim failed to recall the exact dates of many of the crimes (Proceedings: 540-541, 552-553, 555-556).

Counsel replied that Sana had not forgotten dates. Rather, he resited, the fault lay in the indictment and that an expert should not be

26

permitted to explain this fault. Instead, counsel argued there should have been further investigation and more specific testimony elicited from the victim. Counsel did not know whether the science was accepted, believed that the area of proposed testimony was not beyond the ken of an ordinary juror, and argued that the victim had answered all the questions that the expert would be called on to attest to. He claimed that the witness seemed capable of remembering specific dates, and that the People had never asked questions about her flat affect (Proceedings: 542-544, 553-555, 646).

The court ruled the expert's testimony admissible (Proceedings: 544). During later argument, it noted that it would permit the witness to testify about the study of victims of such abuse; the fact that there is often a delay in reporting; that there may be a lack of affect when they testify; that they might have a problem remembering dates – but it would not permit any testimony about "blending," and ordered the prosecutor to tell his expert the limitations imposed on his testimony (Sidebar Conference: 646-647). The prosecutor argued that he would be unable to present all of the counts in the indictment to the jury, owing to Sana's failure to remember some of the criminal events (Sidebar Conference: 648-649). The court ultimately permitted testimony about "blending" (Sidebar Conference: 650).

The expert's resultant testimony explained, in general terms, the studies of intra-family sexual abuse of children, and the phases of such criminal events, describing the behavior of the abuser, as well as the child, explaining the abuser's effect on the child's state of mind, and discussing the child's resultant behavior – exactly as had occurred in *Williams* (Lewittes: 651-683).

This testimony, identical in form and purpose to that recently found admissible in *Williams* and *Diaz,* was not erroneously admitted.

Defendant does not quarrel with the host of appellate cases that have deemed such testimony admissible (Defendant's Brief at 27-28), but argues that the peculiar facts of his case should have precluded expert testimony because nothing in Sana's behavior seemed puzzling or unusual (Defendant's Brief at 28-29). Yet defendant neglects to note that the girl, apparently highly intelligent, endured sexual abuse for three full years, before disclosing that terrible fact. Her remarkable delay in so doing, and the reasons for that delay, exactly fit the typical behavior of a victim of sexual abuse, and so were proper grist for the expert. Her inability to remember many of the dates of defendant's crimes – resulting in a mass-dismissal of more than thirty counts in the indictment – were likewise typical of a victim's behavior, and

that behavior as well lay properly in the expert's ambit. *People v. Diaz, People v. Williams, supra.*

Her flat affect, when testifying, was also the proper subject of expert testimony. *People v. Taylor,* 75 N.Y.2d 277, 283 (1990). Though defendant now argues that, the prosecutor having failed to mention this characteristic, the expert should not have been permitted to attest to it (Defendant's Brief at 29-30), he is wrong. The court possessed broad powers of discretion to admit testimony, believed such testimony relevant, and properly admitted it. "Generally, [the determination to admit expert testimony] is left to the sound discretion of the trial court." *Williams,* 2013 N.Y. LEXIS at *4-*5. Defendant's argument to this Court wrongly assumes that the People must describe every jot and tittle of an expert's testimony as a precursor to its admission; however, as the power to admit lies with the court, the court, having heard the manner in which Sana testified properly and independently exercised its discretion to permit such additional testimony.

Additionally, defendant's claim that the expert's testimony was offered solely to prove that a crime occurred (Defendant's Brief at 30), is remarkably weak, and the Court should discount it. Indeed, the lengthy testimony of Sana herself proved the occurrence of the crimes, here.

29

Defendant's further claim, *id*, that the expert bolstered Sana's testimony, is belied by the facts as the expert explicitly stated had he was entirely unacquainted with the case (Lewittes 651-656).

Moreover, defendant's argument about the harm done by the expert's testimony, and its lack of probative value (Defendant's Brief at 30-31), is virtually identical to those unsuccessfully raised by the defense in *Diaz* and *Williams*, and should meet the same result.   The Court in *Williams*, particularly, found expert testimony about the abuser's activities and the phenomenon of "engagement," admissible – exactly contrary to defendant's present position (Defendant's Brief at 31-33).

Were there error in the admission of the expert's testimony, it was harmless beyond a reasonable doubt, owing to the overwhelming proof of defendant's guilt.   This was a remarkably strong case.   The reason for the guilty verdict against defendant was clear: his guilt was proven by Sana's testimony; by the marks on her body attesting to his physical abuse; by his own wife's remarkable testimony that he had confessed his guilt to her; by his own repeated confessions; by his calm, but regretful demeanor, on the video; by the absence of any signs of violence on his body; by the absence of any complaints by him against the police; by the knife and the vibrator found in his truck.   The

jury, speedily recognizing the strength of the People's case, apparently took no more than a few minutes to arrive at its verdict of Guilty on all counts submitted.

In sum, the court's properly admitted the expert's testimony about the syndrome of children's accommodation of sexual abuse and any putative error in that admission was harmless.

## POINT TWO

### DEFENDANT FAILED TO OBJECT TO THE PROSECUTOR'S SUMMATION, WHICH WAS NOT ERRONEOUS (Answering Defendant's Point II).

The prosecutor's closing argument was not inflammatory, but instead a logical appraisal of the evidence of defendant's guilt. Defendant argues otherwise, but he failed to preserve his meritless claims for appellate review.

"For preservation purposes, a party must make a specific objection regarding a claimed error in order to afford the trial court an opportunity to correct the error." *People v. Chestnut,* 19 N.Y.3d 606, 611 (2012). *See also People v. Riback,* 13 N.Y.3d 416, 420 (2009); *People v. Liccione,* 50 N.Y.2d 850 (1980) (prosecutorial misconduct unpreserved; conviction affirmed).

31

Nor will even preserved prosecutorial misconduct provide cause for reversible error except in instances of serious prejudice to defendant. *People v. Roopchand,* 65 N.Y.2d 837 (1985) (prosecutor's summation no basis for reversal, in strong case, despite prosecutor's attempt to portray car theft case as aborted felony-murder). Instead, within certain set limits, "broad bounds of rhetorical comment [are] permissible in closing argument." *People v. Galloway,* 54 N.Y.2d 396, 399 (1981). This Court has found acceptable, and within those bounds, a prosecutor's implication that the defense employed deceptive tactics. *People v. Vaughn,* 136 A.D.2d 752, 753 (2d Dept. 1988). The Court of Appeals, too, has found no error in a prosecutor's comment that an absence of credible testimony supported the defense's contentions. *People v. Smith,* 82 N.Y.2d 731, 733 (1993).

Furthermore, the doctrine of fair response to the defense summation's excesses, recognized in *People v. Marks,* 6 N.Y.2d 67 (1959), *cert. denied,* 362 U.S. 912 (1960), permits a prosecutor faced with a defense summation that had improperly attacked the credibility of the People's witnesses, to commit what would otherwise be error, by vouching for the witnesses' credibility. *See People v. Halm,* 81 N.Y.2d 819, 821 (1993) (prosecutor's portrayal of sodomy victims as"[k]ids. Your kids. My kids. Our

kids. The youth of America," evaluated in view of defense closing argument, which put character and credibility of complainants into issue and justified People's response); *People v. Evans,* 192 A.D.2d 671, 672 (2d Dept. 1993) (prosecutor's comments on witnesses' lack of motive to lie not improper, given defense comments on credibility of witnesses); *People v. Paulino,* 187 A.D.2d 736 (2d Dept. 1992) (while some of prosecutor's comments perhaps exceeded bounds of rhetoric, not unreasonable in view of comments by defense during summation); *People v. Blackstock,* 184 A.D.2d 775, 776 (2d Dept. 1992) (prosecutor's remarks about police officers properly offered in fair response to defense counsel's characterization of People's case as police cover-up; no vouching for unsworn witnesses when remarking that defendant claimed that six police officers had framed defendant; deemed fair response to defendant's allegations, and fair comment on evidence); *People v. Jakes,* 181 A.D.2d 913, 914 (2d Dept. 1992) (prosecutor's repeated references to complainant's taking the stand constituted not improper bolstering, but instead fair response to defense's attack on complainant's reliability; prosecutor's remark that defense tried to divert jury from complainant's identification of defendant constituted fair comment on defense summation); *People v. Stephens,* 161 A.D.2d 740, 741 (2d Dept. 1990) (not error for prosecutor to comment on complainant's

33

motivation to lie, after complainant's credibility called into question; fair comment on evidence to mention seriousness of complainant's injury; also fair response to co-counsel's remarks, who denigrated complainant's injury); *People v. Johnson,* 154 A.D.2d 618, 619 (2d Dept. 1989) (defense portrayed police officers as mistaken, or liars; consequently, prosecutor's characterization of defense as claiming that police lied constituted fair response).

The prosecutor's summation in this matter can be fairly evaluated only in the context of counsel's closing remarks. The first words of counsel's summation vouched for his client's innocence (Defendant's Summation: 898). Counsel also offered the jury his own opinion that Sana did not appear to be a victim of sexual abuse (Defendant's Summation: 902). Assessing Sana's testimony, he argued, "What does the DA have here, right? We all know what he has. He has a girl who testified within two months, within two months of her parents disrupting a relationship with an older boy who remains unidentified, right" (Defendant's Summation: 905). Counsel attacked the expert witness as a "hired gun" (*id*), and a "waste of time" (Summation: 903). He offered his personal views of the Aliotos: "I'm not quite sure what the Aliotos are all about. I have to tell you, I don't get it, all right?" (Summation:

34

906), adding that they drove Sana "all around Queens," and made "secret

phone calls, these clandestine phone calls" (*id*). Sarcastically, he termed it

"beautiful" that Mrs. Alioto identified defendant to the police (*id*). "This is

very exciting for her, I guess. You know, a big soap opera, very traumatic"

(Summation: 907). He termed it "interesting" that Mrs. Alioto "never reached

out to Sana's mom," and speculated whether she had had an "experience" that

would have prevented her from doing so (Summation: 908). He said that

calling the mother "would be what my neighbor would do" (*id*), and added of

Mrs. Alioto that "maybe she is running around making phone calls because she

has got an agenda" (*id*).

Counsel offered his personal opinion that, when defendant arrived

at the precinct, "this thing spins . . . completely out of control, right? We know

that" (Summation: 909). He argued that Detective Shulman had not told the

jury what it needed to know, and apostrophized: "Why don't you just tell us

what's going on? . . . . What don't you want us to know?" (Defendant's

Summation: 911). Assessing matters from defendant's point of view, counsel

said, "These cops are beating the crap out of me" (*id*). He argued that, to get

the second statement out of defendant, the detective "roll[ed] his sleeves up"

(Summation: 913), though there had been no such testimony. He vouched for

35

defendant's version of events: "This guy was physically roughed up" (*id*), and argued that Detective Shulman "did what he had to do" (*id*). Counsel assumed, discussing defendant's third written statement, that the detective got "frustrated" (Summation: 915), and "was getting tired of telling my guy what to write, says do you know what, it's frigging 9 o-clock in the morning. I am just writing it myself" (*id*). Counsel added, "It's horrible. Detective sworn to uphold justice would operate in this fashion" (*id*), and continued, "He knew who the police officer was who placed [defendant] in custody. You don't get to be second grade detective. He knew exactly what he was doing. He was going to get a statement out of this guy no matter what" (*id*). Counsel argued that Detective Shulman "prepped" defendant for the video, *id*, which resulted in a "script" (Summation: 917). Moreover, he claimed, "the DA told you he spoke to Shulman before he went there. There he knew what Shulman had gotten out of him already. They knew what was going to come out when they got there" (*id*). Shulman was present at the video "[t]o make sure he says what he wants him to say" (*id*). Later, he asked,

> What's Shulman doing to him? And the DA is probably going to make a whole point of why, why would the cops make this up . . . ? That's ridiculous, that's nonsense . . . .

Well, I'll tell you.  Police Officer Alfaro got up here and I caught her lying twice under oath.  Twice, right? . . . .  She lied.  It's on record, okay?  She lied under oath.

And then there's a second lie . . . .  I don't know why.  I don't know why.  Can't answer why police officers lie, but she lied. . . .

Shulman doesn't know who the police officer was that placed my client in custody.  Do you really believe that?  Why does he have to lie about that?  You know he is not telling the truth about that, right? . . . .  Something must have happened, right?  They are withholding, holding back, can't trust that testimony.

(Defendant's Summation: 918-919).

Describing Mrs. Gopaul's testimony, counsel argued, "She came in here and testified for the defense.  You know who [*sic*] she believed" (Summation: 920).

In his peroration, counsel declaimed,  "You know, words, people, words, just saying these isn't enough.  You can say really horrible things but it doesn't make it true, right?  You can say really horrible things but it doesn't make them true" – all this, in reference to Sana's accusations (*id*).  He closed by informing the jury that "my client is not guilty of any of these charges" (Summation: 921).

The prosecutor's own closing remarks, by sharp contrast, were cogent, logical, and based on the evidence.  He did not resort to name-calling,

nor to any emotional appeal to the jury. His summation also constituted, in part, a fair response to the blatant excesses of counsel's arguments. Contrary to defendant's present claims, he did not denigrate counsel, but instead based his arguments solely on reasonable inferences from the facts in evidence.

Assessing the more than thirty pages of the prosecutor's logical, well-ordered summation, defendant complains of A) denigration of the defense; B) seeking of sympathy for the victim; C) using that sympathy to strengthen the victim's testimony; and D) impropriety in the opening statement. But all of defendant's claims are entirely unpreserved as he failed to object to any of the comments he complains about on appeal. *People v. Liccione,* 50 N.Y.2d at 850.

Nor should the Court review defendant's claims in the interest of justice. Defendant's startling initial claims to this Court, accompanied by citations to *Napue v. Illinois,* 360 U.S. 264 (1959), and *People v. Pelchat,* 62 N.Y.2d 9 (1984), are wildly out of place, and bear no relation to the arguments that the prosecutor actually made below. In the body of his later argument, defendant never proves or suggests that the prosecutor deliberately deceived the court, or propounded "false arguments" (Defendant's Brief at 35), as he

38

initially contends. These initial, overbroad, intemperate accusations far exceed the facts of the summation, and the court should reject them.

As has been noted, the prosecutor's tone – in sharp contrast to counsel's – was calm and logical, rather than inflammatory. He commenced by addressing counsel's argument that Sana did not look like a victim of abuse, then reminded the jury of the facts of abuse that she had attested to, and discussed defendant's abuse of his position as her stepfather, to impose his will on her (People's Summation: 921-922). Addressing the issue of lying, the prosecutor objectively noted that "the two versions of events are certainly conflicting. Someone took the stand and lied. Are you going to believe the defendant? Who has a greater motive to lie than him [*sic*]?" (People's Summation: 922). He pointed out that Sana had relinquished all continuing relations with her family after making this accusation, and that defendant, a convicted felon, had admitted to his wife his abuse of Sana (People's Summation: 922-925). All of these remarks amounted to fair comment on the evidence. *People v. Benton,* 2013 App. Div. Lexis 677, *2 (2d Dept. February 13, 2013); *People v. Vaughn,* 136 A.D.2d at 753.

The prosecutor also logically assessed defendant's testimony: "For every statement that the defendant made to you under oath, ask yourself: is it

credible, do I believe it" (People's Summation: 926). He discussed defendant's written statements and the video, and then unemotionally recited facts when he reminded jurors that a knife and a vibrator had been recovered from defendant's car, and that Sana had disclosed the abuse to her friend. He bluntly recited the undisputed facts in the case (People's Summation: 926-929). These remarks constituted fair comment. *See People v. Fisher,* 18 N.Y.3d 964, 966 (2012) (prosecutor may not argue facts not in evidence).

Defendant's claims of error in the prosecutor's comments purportedly denigrating the defense, or accusing the defense of distracting or diverting of the jury's attention (Defendant's Brief at 36-37), do not examine those comments in context (Summation: 929, 930, 931, 937, 941). The prosecutor did not simply call names and move on. Instead, he showed the jury exactly how the particular defense arguments did not logically connect to the ultimate issue before the jury: defendant's responsibility for the crimes (Summation: 929-931). His remark that defendant was unlikely to call his family down to witness his crimes (Defendant's Brief at 36; People's Summation: 930), was offered in fair response to defendant's argument that someone surely should have witnessed them, over the years. *People v. Marks,* 6 N.Y.2d at 67.

Though defendant now (Defendant's Brief at 36) attacks the prosecutor's use of such words as "illogical" or "defies common sense" as improper, precisely such arguments constitute the proper essence of summation: holding the facts and arguments up to logic and reason, and testing them by those touchstones. The use of such phrases, in connection with an appraisal of the facts, constitutes fair comment on the evidence. *People v. Benton,* 2013 App. Div. Lexis 677 at *2; *People v. Vaughn,* 136 A.D.2d at 753.

Defendant's reliance on *People v. Gordon,* 50 A.D.3d 821, 822 (2d Dept. 2008), *People v. Robinson,* 260 A.D.2d 508 (2d dept. 1999), *People v. Diaz,* 170 A.D.2d 202 (1st Dept. 1991), and *People v. Simms,* 130 A.D.2d 525, 526 (2d Dept. 1987), is therefore mistaken – for, in those cases, the prosecutor's remarks were part of emotional presentations to the jury. In *Gordon,* the "Hollywood" nature of the defense was the prosecutor's main theme, despite sustained objections; nor was there any suggestion of a fair response. In *Robinson,* the improper remarks, about a defense "script," persisted throughout the emotional summation, and in *Diaz,* the remarks mischaracterized the defense, and personally denigrated the defendant. In *Simms,* the prosecutor did not confine himself to the facts in evidence, and called the defense summation a fairy tale. Here, by stark contrast, the

41

prosecutor's tone and words were logical; he did not excessively dwell on words of ridicule, and his argument was an appeal to the jurors' reason, rather than their emotions.

Additionally, the prosecutor's comment that counsel's own earlier remark about Sana's good grades was "offensive," was also a fair comment on the sole evidence on the issue – that propounded by Dr. Lewittes, that achievement in school did not correlate with sexual abuse.

The prosecutor's comment that the defense amounted to a claim that every prosecution witness was lying was actually borne out by counsel's own summation, that had attacked the truthfulness of Sana, Detective Shulman, Mrs. Alioto, and Officer Alfaro – virtually every material witness presented by the People. The prosecutor's remark therefore constituted a fair assessment of, and response to, the defense's actual argument. *People v. Marks,* 6 N.Y.2d at 67. But the prosecutor did not lash out with the word "liar" as a name-calling tool, as defendant now improperly suggests – instead, he asked the jury to consider the evidence supporting a claim that such lying had occurred and argued that this defense claim was no more than speculative (People's Summation: 931-932).

42

*People v. Pagan*, 2 A.D.3d 879 (2d Dept. 2003) (Defendant's Brief at 37) is a poor match for this case, as defendant suggests, because it is weighted down by numerous grossly improper comments by the prosecutor. Also, in *Pagan*, there is no indication that any of those remarks had been offered – as here – in fair response to the defense's summation. And in *People v. Washington*, 278 A.D.2d 517 (2d Dept. 2000), the prosecutor repeatedly called the defendant a liar, and resorted to emotional name-calling, rather than relying on logical argument. Defendant's string citations to *People v. Walters*, 251 A.D.2d 433, 434 (2d Dept. 1998) (inflammatory, emotional, burden-shifting summation); *People v. Tarantola*, 178 A.D.2d 768, 769 (3d Dept. 1991) (repeated name-calling, among the names, Liar); *People v. Bailey*, 58 N.Y.2d 272, 274-275 (1983) (prosecutor calls witness a liar, to her face; no claim of fair response) (Defendant's Brief at 37-38), likewise refer to improperly emotional, rather than logical arguments by the prosecutor. But the summation here, by contrast, was logical and calm. The brief remark on defendant's claim that the People's witnesses were lying was also directly responsive to the defense's summation.

The prosecutor reminded the jury that defendant had confessed in writing and on video to his sexual and physical abuse of his daughter, and

43

argued that the claims of lying must be evaluated in this context, and by an assessment of the witnesses' motivation to lie – particularly, Sana's motivation (Summation: 932-933). And, contrary to defendant's contentions (Defendant's Brief at 36), the prosecutor was fully entitled to address the People's witnesses' absence of motive to lie, once counsel's summation had repeatedly called their credibility – and their truthfulness – into question. *People v. Stephens,* 161 A.D.2d at 741.

Defendant next claims (Defendant's Brief at 38-41), that the prosecutor employed unfair tactics to enlist the jury's sympathy for Sana and to support her testimony. But, in fact, no such thing occurred. The prosecutor's argument on this issue was logical throughout, rather than emotional. He asked the jury – hypothetically, and not in connection with Sana herself – what sort of person would consistently lie about sexual abuse, and pronounced such a person sinister and despicable, setting out logically the sort of personality that might so viciously and consistently lie, and then contrasting that with what the jury had seen in Sana's testimony (People's Summation: 934). Contrary to defendant's present claim (Defendant's Brief at 40), this argument was not improper, but connected the facts of the case to the personalities of the witnesses who had testified, and logically asked the jury to

44

consider whether the accusations against defendant had been made by a person capable of such remarkable and twisted behavior. This, too, was a fair comment on the evidence *of personality* that the jurors had seen during the course of the trial, and was not erroneous. *People v. Benton,* 2013 App. Div. Lexis 677 at *2; *People v. Vaughn,* 136 A.D.2d at 753. Though defendant denigrates this argument as an attempt to garner sympathy for Sana, that was by no means its purpose. This was an argument to test the logical connection between the accusations made and the persistently-lying personality that would necessarily have made them, if the accusations were untrue. It was proper to confront the jurors with this argument, because this case was not solely about facts: it was about people. The jurors, assessing the evidence, must also logically assess their source; and the prosecutor, calling to the jury's attention the personality that would continue to propound a pernicious lie about sexual abuse, made a reasonable argument that Sana was not such a person, and therefore was in all likelihood telling the truth. *People v. Halm,* 81 N.Y.2d at 821; *People v. Evans,* 192 A.D.2d at 672.

It should also be noted that, assessing her personality, the prosecutor employed no terms of kindness or endearment; he simply ticked off the logical facts: that she had done well in school, did not drink or do drugs;

behaved well; and had lost much, and would gain nothing as a result of her testimony (People's Summation: 934). He asked the jurors, to use its common sense -- not sympathies; then he recited the things that Sana had given up, owing to having made these accusations (Summation: 934-935).

Though defendant now also complains about the prosecutor's mention of the invasiveness of Sana's gynecological exam (Defendant's Brief at 40), these facts, too, were in evidence, and the prosecutor's recitation of them was also fair comment on the evidence. *People v. Fisher,* 18 N.Y.3d at 966; *People v. Benton,* 2013 App. Div. Lexis 677 at *2; *People v. Vaughn,* 136 A.D.2d at 753.

In this regard, he pointed out that, accusing defendant of sexual attacks, Sana -- if lying -- had chosen the most embarrassing possible events to describe; that she could have claimed solely that defendant hit her, if she wanted to escape the family (Summation: 936-937). The prosecutor's vouching for Sana's truthfulness was brief (Summation: 937) -- a single line -- "She tells the police that she is abused because for the last three years she was abused." And this came in fair response to counsel's excessive comments summations that Sana had lied simply in order to continue seeing a boyfriend (*cf.* Defense Summation: 904). *People v. Marks,* 6 N.Y.2d at 67. The

46

prosecutor's comment was immediately followed by an argument replete with "doesn't make sense," "unreasonable," and "illogical" (Summation: 937) – all proper means of evaluating testimony. The prosecutor's ensuing line of argument likewise   stressed the logical means by which the jurors might evaluate testimony (Summation: 938).

The prosecutor next assessed the defense witnesses, arguing that they appeared to contradict one another, and that Mrs. Gopaul had testified that defendant had confessed his crimes to her (Summation: 938-941). Though defendant takes umbrage at the prosecutor's remark that defendant's plan to distort the truth backfired because his testimony was illogical, unreasonable, and defied common sense (Defendant's Brief at 37; Summation: 941), there was little if any error in these remarks – because they were not indications of an emotional binge or an improper, *ad hominem,* line of attack, but instead *immediately* held the consistency of defendant's statements up to the touchstone of logic. Though the prosecutor's remarks showed defendant in a bad light, it was a bad light of defendant's own making, based entirely on his own statement – and so constituted fair comment on the evidence. *People v. Benton,* 2013 App. Div. Lexis 677, *2; *People v. Vaughn,* 136 A.D.2d at 753.

47

Defendant's claim that the prosecutor's summation shifted the burden of proof to the defense (Defendant's Brief at 41), is unfounded and unsupported. The sole case on which he relies, *People v. Yant,* 75 A.D.2d 653, 654 (2d Dept. 1980), in fact does not support his claim. In that matter, the prosecutor improperly and repeatedly called the defendant a liar, but this Court never so much as mentioned any shifting of the burden of proof. Nor can defendant point to anything in this closing argument suggesting that the prosecutor was either explicitly or subtly shifted the burden of proof to the defense.

Defendant also discerns error, in the prosecutor's opening remarks (Defendant's Brief at 38-39, 41-42) for allegedly trying to gain sympathy for the victim, but this claims too is unpreserved for this Court's review. *People v. Chestnut,* 19 N.Y.3d at 611; *People v. Riback,* 13 N.Y.3d at 420; *People v. Liccione,* 50 N.Y.2d at 850.

Nor should this Court address that matter in the interest of justice. The prosecutor's opening statement had been sober and restrained; its length was necessitated by the voluminousness of the indictment, and of the necessity to explain the many charges. He began by mentioning Sana's and defendant's ages, and the fact that Sana had lived in the family home with defendant since

48

she had been three years old. He then set out the many criminal events cited in the fifty-three count indictment, briefly noting that, as a result of defendant's crimes, "a grand jury composed of citizens like yourself from this county indicted the defendant on a litany of charges" (Opening-People: 306). There was no error in this insignificant comment, for the indictment itself contained repeated statements that the Grand Jury of the County of Queens had charged defendant with all crimes set out in the indictment -- and there was indeed a litany of charges. The prosecutor's brief explanation that the Grand Jury was composed of ordinary citizens in fact weakened the imposing nature of the indictment, for unknowing jurors might otherwise have assumed that high officials, following an extensive investigation of the matter, had created the indictment. The fact that solely ordinary citizens had voted on the indictment actually detracted from, rather than added to, the importance which the jurors would accord it.

The prosecutor then described the conduct that led to the counts, also explaining the emotional relationship between defendant and his victim (Opening-People: 308), and defendant's betrayal of her trust (Opening-People: 308-310).

The prosecutor also remarked of Sana, without objection, that

49

[s]he is no longer 14 years old. She is now 19 years old. She no longer lives with or has any contact with her mother or stepfather. She is now a stronger and more courageous girl than she was previously, and she is going to come into this courtroom during the course of this trial and speak to you, 16 strangers who [*sic*] she has never met, and describe to you how the defendant took advantage of her sexually. She will rehash the embarrassing details of a secret she held for years, a secret she held onto and didn't tell anyone until 2008.

(Opening-People: 310).

The prosecutor then set out the chronological sequence of events and crimes, noting that Sana kept her secret for three years (Opening-People: 311-313). He pointed out that, during the course of a lengthy sexual abuse, her remembrances tend to blend (Opening-People: 313). He explained that defendant intended to rape his stepdaughter and had picked out the date, and that Sana feared its coming, withstood more of defendant's abuse, made an outcry, and eventually fled the home and reported the crime to the police (Opening-People: 314-317). He described defendant's arrival, arrest, and statements, at the precinct (Opening-People: 317-322).

Though defendant now complains of excesses in the prosecutor's opening (Defendant's Brief at 38-39), it was instead counsel whom the court censured for an improper opening; counsel who improperly remonstrated with the court, before the jury – and counsel who even after that castigation

50

continued to deliver an opening statement replete with emotional appeal, vouching for his own witnesses, and calling the victim a liar. Accordingly, nothing that the prosecutor said in his opening statement denied defendant a fair trial.

The prosecutor's remarks about Sana's courage, *supra,* were comparative – he suggested that she was now more courageous than she had been, and did not otherwise tout her courage to the jurors. His further remark that she would appear in court and describe the crimes before the jury, sixteen strangers, was self-evident, and not an attempt to gain advance sympathy for her.

Furthermore, that opening statement was separated by many days and six hundred pages of transcript from the prosecutor's summation, which contained no sympathetic remarks about Sana. Defendant's citations (Defendant's Brief at 39), to *People v. People v. Nevedo,* 202 A.D.2d 183 (1st Dept. 1994) (excessively emotional summation, rife with hyperbole, rhetoric, and metaphor), and to *People v. Caruso,* 240 N.Y. 437 (1927) (widow of deceased testified to emotionally charged matters) (*id*), do not apply here. The remarks uttered in the prosecutor's opening did not recur on summation, nor

51

did any witness testify emotionally. To the contrary, Sana apparently had a flat affect.

Though defendant suggests to this Court that the prosecutor's opening remarks were all-of-a-piece with his summation, he neglects the lengthy period between the two events, during which interval it would have been foolish for the prosecutor to have expected jurors to have remembered his comments during the opening statement. Instead, if there were sympathy in the jury's minds for Sana, at the time when the jury retired to deliberate, it derived from the jurors' having heard and believed her testimony – not from the prosecutor's attempts to dwell on such matters. By the end of the case, the prosecutor's opening remarks were long forgotten, and there was no such instance in his summation. His few brief, unpresered words in the opening statement should not result in reversal, in this overwhelming case.

In any event, there was no significant probability that the jury would have acquitted defendant had these comments not been uttered. *People v. Ayala,* 75 N.Y.2d 422, 431 (1990). *People v. Crimmins,* 36 N.Y.2d 230, 241-242 (1975). Indeed any error in the prosecutor's remarks was harmless owing to the overwhelming proof of defendant's guilt. *See* Argument, Point One, *supra.* The reason for the guilty verdict against defendant was clear: the

People offered overwhelming evidence to prove his guilt of the charges. In any event, the prosecutor "did not engage in a pervasive pattern of misconduct sufficient to deny defendant due process of law." *People v. Ellis,* 188 A.D.2d at 1044; *see also People v. Ceballo,* 242 A.D.2d at 428. Finally, any prejudice was further alleviated by the court's jury instructions.      Almost immediately after the prosecutor's summation, the court, commencing its charge, informed jurors that they were to rely for their verdict solely on the evidence, rather than on counsel's arguments (Summation: 953-954).      And the jury must be presumed to have followed that instruction. *People v. Gibbs,* 59 N.Y.2d 930 (1983); *People v. Berg,* 59 N.Y.2d 294 (1983).

In sum, because defendant has failed to preserve any of his present claims against the purported errors in the prosecutor's summation, which in large measure constituted fair response to the defense's closing argument, and which, if erroneous, was at worst minimal in its error; and which was also harmless, given the remarkably powerful proof of defendant's guilt, defendant's contention of reversible prosecutorial error is excessive and unfounded, and the Court should deny it.

## POINT THREE

### THE COURT PROPERLY DENIED DEFENDANT'S REQUEST FOR A MISSING WITNESS CHARGE; ANY ERROR WAS HARMLESS (Answering Defendant's Point III.

Having heard testimony from Mrs. Denise Alioto about the manner of defendant's arrest and from Detective Lennard Shulman about his interrogation of defendant, and having seen defendant's videotaped confession, the court, properly recognizing that further testimony on the subject of that arrest would have been cumulative and immaterial, correctly denied defendant's request for a missing-witness charge directed at the officer who had taken defendant into custody. Defendant argues otherwise, but is wrong.

In *People v. Gonzalez,* 68 N.Y.2d 424, 428 (1986), the Court of appeals set out the parameters for a court's delivery of a missing witness charge. The proponent of the charge must demonstrate, in as timely a manner as possible, the necessity for such a charge, so that he will not take his opponent by surprise. He must show that the missing witness is knowledgeable about a material issue in the case and would be expected to testify favorably to the party that has not called him. In response, the opponent of the charge must demonstrate that the un-called witness lacks such

knowledge, that the issue is not material, that the proposed testimony would be cumulative, or that the witness is either unavailable, or not in the party's control. *Id.* Material issues, for the purpose of the missing-witness charge, may result from contentions raised by the defense, and are not restricted to matters relevant to the prosecution. *People v. Vasquez,* 76 N.Y.2d 722, 723 (1990).

Counsel first broached the issue of a missing witness during a sidebar after the People had rested their case (Proceedings: 714). He addressed it again, before summations, arguing that defendant had been taken into custody by an officer who did not testify at trial. Counsel argued that this missing witness would be relevant to explain the voluntariness of defendant's statement and his request for an attorney; that the officer would offer material, relevant evidence on this point. In the absence of this witness, counsel sought a missing-witness charge (Proceedings: 895-897). The prosecutor responded that this witness's testimony would not bear on a material fact, and the court denied the request (Proceedings: 897).

Initially, defendant deliberately surprised the People by requesting the charge solely after the People's case had concluded. He never hinted, during the entire People's case, that he would seek the testimony of the apprehending officer. Counsel doubtless knew in advance that he would make

such a request; but never, all that while, did he ask that that officer be produced. Rather, counsel sought the testimony only after the People were powerless to produce any further witnesses. This lengthy silence throughout days of trial and hundreds of pages of testimony amounts to unfair surprise of the worst sort, that ought not be condoned. *People v. Gonzalez,* 68 N.Y.2d at 428. Indeed, counsel, already doubtless aware of his intent to seek such a charge, deliberately refrained from mentioning it, during a sidebar early on in the case, at which he vehemently sought information about the apprehending officer (Shulman: 3397). Though the People, unfairly surprised by the eventual and belated request, did not complain of this tactical subterfuge, such strategies should not now be honored in this Court. *Contra, People v. Erts,* 73 N.Y.2d 872, 874 (1988).

Moreover, the court's decision not to deliver a missing-witness charge was correct. Counsel had earlier questioned Mrs. Alioto on the circumstances of defendant's apprehension (Alioto: 637-643), and had also questioned Detective Shulman at length about defendant's state of being, throughout his time in the detective's custody and during the detective's physical and verbal engagements with defendant (Shulman: 397-438, *seriatim*; *see* 425, 429-431). Under these circumstances, the apprehending officer's

56

testimony was not material because the People had already presented the testimony of Mrs. Alioto that covered defendant's seizure, and of Detective Shulman that encompassed all of the questioning and all of defendant's ensuing statements. The apprehending officer would have provided no better than cumulative testimony on the manner of defendant's apprehension, and could have added nothing about the circumstances of his later statements, that were made solely to Detective Shulman.

Defendant's present arguments questioning the choice of Officer Alfaro as defendant's arresting officer (Defendant's Brief at 45) are both speculative and irrelevant.

Furthermore, the defense's claim of a statement beaten out of defendant is wholly refuted by the words of both defendant himself and defendant's wife – who testified that defendant remorsefully told her that he had abused Sana.

Additionally, claims of coercion are put to rest by defendant's own appearance and demeanor on the videotape. There, he bears no bruises; nor does he cringe; he acts as an ashamed, embarrassed man – not as one coerced. He takes his time to answer questions; he disputes or downplays his criminal responsibility, attempting to shift blame, and suggests that Sana was

57

equally avid to continue a sexual course of conduct with her own stepfather. Defendant neither seems, acts, or speaks as would a beaten man. His statements, written and embodied in video, combined with his wife's surprising evidence and Sana's unshaken testimony and the corroboration of the physical evidence – knife and vibrators exactly where Sana had said they would be – led the jury to an almost instantaneous verdict. That finding of guilt should therefore, not now be overturned.

In any event, any error in the trial court's ruling was harmless (*see* Defense Brief at 46, fn. 4). Such analysis is appropriate to the assessment of missing-witness issues. *People v. Vasquez,* 76 N.Y.2d at 725; *People v. Roberts,* 187 A.D.2d 615, 616 (2d Dept. 1992). And, in the present matter, defendant's guilt was overwhelmingly proven. *See* Argument, *supra.* Even had the jury been instructed about the missing witness, there would have been no alteration in its verdict.

In sum, defendant's deliberate and improper delay in announcing his request for a missing witness should not be condoned. The court's decision not to deliver a missing-witness charge was correct, under the circumstances, because the intended testimony would have been immaterial and cumulative;

and any error in that ruling was harmless, owing to the overwhelming proof of defendant's guilt.

### POINT FOUR

### THE COURT PROPERLY ADMITTED EVIDENCE OF THE VICTIM'S RECENT OUTCRY; ANY ERROR WAS HARMLESS (Answering Defendant's Point IV).

The court properly admitted evidence of the victim's recent outcry. Moreover, as the fact of Sana's outcry that night had already been placed before the jury – by the defense – long before her testimony began, the precise details of that outcry became insignificant, and any error in the court's resolution of the issue was harmless. Defendant, arguing otherwise, is wrong.

In *People v. McDaniel,* 81 N.Y.2d 10, 16 (1993), the Court of Appeals ruled that "evidence that a victim of sexual assault promptly complained about the incident is admissible to corroborate the allegation that an assault took place" (citations omitted). However, "only the fact of a complaint, not its accompanying details, may be elicited." 81 N.Y.2d at 17.

Addressing the related issue of prior consistent statements, particularly in the context of a complaint of sexual assault, the Court in *Mcdaniel* ruled that

59

> [i]f upon cross-examination a witness' testimony is assailed--either directly or inferentially--as a recent fabrication, the witness may be rehabilitated with prior consistent statements that predated the motive to falsify . . . .

81 N.Y.2d at 18; citations omitted.

The court below properly admitted the fact of Sana's complaint to Christine Alioto. Her statement that she was being molested and was running away (Awan: 511), was virtually identical to the outcry admitted in *McDaniel:*

> the prosecutor was entitled to elicit the nature of the complaint, which was not apparent from the context. [The victim's mother's] responses--that her daughter reported being bothered, attacked, molested--did not exceed the allowable level of detail.

81 N.Y.2d at 18.

Though defendant now complains (Defendant's Brief at 48), that the detail admitted here was excessive, it instead fit precisely within the parameters set by *McDaniel.*

When the prosecutor asked Christine Alioto what she said to Sana, counsel objected, on the basis of hearsay (C. Alioto: 606-607). The prosecutor argued that the testimony would not be hearsay, and that, even if it were, the witness could be examined about what she had said; the jury could evaluate her credibility. Counsel responded that the availability for cross-examination was

not a basis for admissibility. The court overruled that objection (C. Alioto: 607).

After Christine testified that she had asked Sana whether "he" had touched her, the court overruled counsel's objection (C. Alioto: 608). But when the prosecutor asked Christine what Sana had told her, in response, counsel objected, the prosecutor withdrew the question, and the court sustained the objection (C. Alioto: 608-609).

It should be noted that counsel, on his own case, repeatedly resorted to the same version of hearsay that defendant now attacks. At one point, counsel told Mrs. Gopaul, "I don't want you to say anything that somebody might have said to you while you were there" (M. Gopaul: 736). He did the exactly the same thing on direct examination of defendant (H. Gopaul: 811-812).

Defendant complains (Defendant's Brief at 48-49), that the testimony about the outcry had come from the wrong witness – from Sana, rather than from Christine. But, in the peculiar circumstances of this case, that complaint of error amounts to an exaltation of form over substance, and a distinction without any practical difference. The facts of the actual outcry were these: Sana testified, "I said [to Christine] that I was being molested" (Awan:

61

511). Christine, for her part, did not describe the nature of Sana's outcry, and testified only that "I said [to Sana] – has he touched you. She responded" (C. Alioto: 607).

But these were not the sole facts of consequence about Sana's outcry. In fact, it was already evident to the jury, long before the two girls testified, that Sana had made outcry that night, and that the tenor of her outcry had been that she had been sexually molested. Detective Shulman, the People's first witness at trial, told the jury as much, when he described how he had confronted defendant with exactly this accusation, in the early hours of that morning. That testimony passed without objection, and, in fact, it was largely brought out independently by the defense.

On direct, the detective had testified to the following, without objection: "I indicated to [defendant] that his daughter had made some allegations that there was inappropriate behavior involving him and if he wanted to address that" (Shulman: 361). Then counsel, following up during cross, asked the detective, "You were aware that [Sana] was making allegations of a sexual abuse nature against her stepfather; is that correct?" The detective answered in the affirmative (Shulman: 405). So it was defendant himself who

62

first explicitly brought to the jury's attention the fact that Sana had made a complaint of sexual abuse, that night.

It follows that the fact of Sana's outcry that night *had been already accepted into evidence* at the time of Sana's and Christine's later testimony at trial. By that time, the jury already knew about Sana's outcry, and the details of that outcry provided by those two witnesses were in effect no more than corroborative of the earlier evidence that they had already heard from Detective Shulman, chiefly through counsel's own actions.

In this context, defendant's complaint against the manner in which the evidence of recent outcry was placed before the jury through Sana and Christine, pales into insignificance. Everything of which defendant now complains was rendered anticlimactic or trivial, at trial, because, at the time of Sana's and Christine's testimony, the jury already knew that she had made an outcry that night against defendant – and had learned that through counsel's own question to Detective Shulman. Having heard his testimony, the jury – long before having heard a word from either Sana or Christine – must unquestionably have inferred that Sana had disclosed the fact of her abuse –

and her sexual abuse – that night.[3]  As the fact of that outcry, and the source of

that outcry, and the nature of the crimes, were already before the jury after the

People's first witness had completed his testimony, the cat was already out of

the bag – and defendant's complaints against the manner and details of that

disclosure in the testimony of Sana and Christine became largely academic.

Moreover, the overwhelming proof of defendant's guilt renders

any error on this issue harmless beyond a reasonable doubt. *See* Argument at

Point One, *supra.*  Defendant, confronted with his daughter's accusation, did

not protest or exclaim his innocence, but promptly wrote a confession to his

crimes.  He repeated that confession, in remorseful tones, on video.  His wife

attested independently to his entirely separate confession to her.  All of these

events powerfully corroborated Sana's uncontradicted testimony about

defendant's crimes against her, and rendered any error in the admission of her

outcry, harmless beyond a reasonable doubt.

In sum, the facts of Sana's outcry on the night of her escape were

already before the jury well before she testified to the making of that outcry,

---

[3]Defendant's present argument concerning the Confrontation Clause and *People v. Young,* 296 A.D.2d 588, 590 (2d Dept. 2002) (Defendant's Brief at 49), was not argued, below, is not preserved, and should not now be addressed in the interest of justice, owing to the overwhelming proof of defendant's guilt.

and any errors in the elicitation of that outcry were consequently harmless, owing to the jury's own prior knowledge that such outcry had been made, that night; moreover, the overwhelming proof of defendant's guilt rendered any such error harmless beyond a reasonable doubt.

## **CONCLUSION**

Defendant's judgment of conviction should be affirmed.


Respectfully submitted,

RICHARD A. BROWN
District Attorney
Queens County


JOHN M. CASTELLANO
JOHNNETTE TRAILL
    Assistant District Attorneys
      of Counsel

EMIL BRICKER
    Special Assistant District Attorney

April 29, 2013

## CERTIFICATE OF COMPLIANCE

I certify the following in compliance with section 670.10.3 of the Rules of this Court:

1. The foregoing brief was prepared on a computer.

2. The typeface used is Times New Roman.

3. The point size of the text is 14 point, except for footnotes, which are 12 point.

4. The brief is double spaced, except for the Table of Contents, point headings, footnotes, and block quotes.

5. The brief contains 13,495 words, exclusive of the Table of Contents, proof of service, and the certificate of compliance, based on the word count of the word-processing system used to prepare this brief.


Dated:      Kew Gardens, New York
            April 29, 2013


_____
Assistant District Attorney

*Brecker /*
*Trace*

*To be argued by*
Paul Skip Laisure
*(15 Minutes)*

# New York Supreme Court

## APPELLATE DIVISION -- SECOND DEPARTMENT

PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

- *against* -

HAROLD GOPAUL

*Defendant-Appellant.*

TO BE HEARD ON
THE ORIGINAL
RECORD

Queens County
Ind.No.   2065/08

A.D.No.   10-09352

## REPLY BRIEF
## FOR DEFENDANT-APPELLANT

LYNN W.L. FAHEY
Attorney for Defendant-
Appellant
2 Rector Street, 10th Floor
New York, N.Y. 10006
(212) 693-0085

Paul Skip Laisure
*Of Counsel*
May 13, 2013

# **TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**ARGUMENT**

    POINT I

        THE COURT'S ADMISSION OF EXPERT TESTIMONY
        CONCERNING "INTRA-FAMILIAL CHILD AND
        ADOLESCENT SEXUAL ABUSE SYNDROME"
        VIOLATED DUE PROCESS BECAUSE THAT
        EVIDENCE WAS NOT NECESSARY TO UNUSUAL
        BEHAVIOR OF A VICTIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    POINT II

        THE PROSECUTOR'S IMPROPER SUMMATION
        ARGUMENTS, WHICH WERE NOT JUSTIFIED BY
        DEFENSE COUNSEL'S SUMMATION, AND HIS PLEA
        FOR SYMPATHY FOR THE COMPLAINANT DURING
        HIS OPENING STATEMENT, VIOLATED
        APPELLANT'S DUE PROCESS RIGHT TO A FAIR
        TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    POINT III

        BECAUSE THE APPREHENDING OFFICER WOULD
        HAVE OFFERED NON-CUMULATIVE, MATERIAL,
        TESTIMONY BEARING ON APPELLANT'S DEFENSE
        THAT HIS STATEMENTS TO THE POLICE WERE
        THE PRODUCT OF VIOLENT ARREST AND
        INTERROGATION CONDUCT, THE COURT'S
        REFUSAL TO GIVE THE REQUESTED MISSING
        WITNESS INSTRUCTION VIOLATED HIS DUE
        PROCESS RIGHT TO A FAIR TRIAL . . . . . . . . . . . . . . . . . . . . . . . 10

    POINT IV

        THE ADMISSION OF HEARSAY EVIDENCE NOT
        CONSTITUTING OUTCRY TESTIMONY WAS ERROR. . . . . . . . 12

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

-------------------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK                     :

                  Respondent,                          :

              -against-                             :

HAROLD GOPAUL,                                          :

              Defendant-Appellant.                  :

-------------------------------------------------------------------------------x

## **PRELIMINARY STATEMENT**

This Reply Brief is submitted in response to the Brief for Respondent, which was

postmarked April 29, 2013, and received by defendant-appellant on April 30, 2013.

## **ARGUMENT**

### POINT I

THE COURT'S ADMISSION OF EXPERT TESTIMONY
CONCERNING "INTRA-FAMILIAL CHILD AND
ADOLESCENT SEXUAL ABUSE SYNDROME"
VIOLATED DUE PROCESS BECAUSE THAT
EVIDENCE WAS NOT NECESSARY TO UNUSUAL
BEHAVIOR OF A VICTIM.

Dr. Donald Lewittes, a well-traveled expert witness for the prosecution, testified

about the five stages of Intra-Familial Child and Adolescent Sexual Abuse Syndrome:

1