1

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF NASSAU : CRIMINAL TERM PART 80

3   -------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,   :  Indictment
4                                :  No. 2415N/08
          -against-              :
5
                                  :
     HAROLD GOPAUL,                  :  Sex Abuse 1
6                                  :
                    Defendant.    :  Huntley/Mapp
7   -------------------------------------------X  Hearings

8                        April 30, 2009

9                        252 Old Country Road
                        Mineola, New York
10

11   B E F O R E:

12              HONORABLE JAMES P. McCORMACK,
                   Acting Supreme Court Justice
13

14

15   A P P E A R A N C E S:

16          HON. KATHLEEN M. RICE
          Nassau County District Attorney
17         For the People
         BY:  JAMIE JOHNSON, ESQ.,
18                   Assistant District Attorney
                   of Counsel.
19

20          DONALD R. SCHECHTER, ESQ.
          Attorney for Defendant
          80-02 Kew Gardens Road - Suite 1030
21          Kew Gardens, New York  11415

22              *          *         *

23                    *

24                   WENDY SILAS
                   Senior Court Reporter

25

Proceedings                    2

1          THE CLERK:  Case is on for hearing, People of

2    the State of New York against Harold Gopaul,

3    Indictment 2415N of 2008.

4          Counsel?

5          MS. JOHNSON:  Good afternoon, Judge.

6          For the People, Jamie Johnson.

7          MR. SCHECHTER:  On behalf of the defendant,

8    Harold Gopaul, Donald R. Schechter, 80-02 Kew Gardens

9    Road, Kew Gardens, New York.

10          THE COURT:  Good afternoon.

11          This matter has been sent to me by

12    Judge Donnino for purposes of hearing and I think

13    ultimately trial.

14          I see that as a result of the decision by

15    Judge Calabrese this is a Mapp/Huntley Hearing?

16          MS. JOHNSON:  Correct, Judge.

17          THE COURT:  Mr. Schechter, that's your

18    understanding as well.

19          MR. SCHECHTER:  Combined Mapp/Huntley, yes,

20    Judge.

21          THE COURT:  All right, now, People you

22    indicate that you have some witnesses, police

23    personnel, from New York City?

24          MS. JOHNSON:  Yes, Judge.  The hearing for

25    the Huntley/Mapp issues involves two witnesses.

Proceedings                          3

1          The first is Detective Schulman of the NYPD,

2     he is here today.

3          And, second, is a uniformed police officer,

4     Officer Alfaro.  She was unavailable for today.  I do

5     not anticipate, as it is now 3:15, finishing with

6     Detective Schulman today.

7          I did step outside to speak with him.  There

8     are some issues with having NYPD officers come here on

9     their days off.  He does have child care issues

10    tomorrow, your Honor.  I asked him if he would be

11    available, come tomorrow, for continuation.  He said

12    due to personal child care issues he would not be.

13          THE COURT:  Who is this that we're referring

14    to?

15          MS. JOHNSON:  Detective Schulman, who is here

16    today.

17          I did send a teletype already for tomorrow

18    for the uniformed officer, so if we have to finish with

19    Detective Schulman another day and go a little bit out

20    of order and continue with the uniformed officer

21    tomorrow, I anticipate being able to do that.

22          I have not heard anything from the 105

23    command that the uniform officer would be unable to

24    come tomorrow.  Last I heard she would be available and

25    she has been teletyped for 9 o'clock tomorrow morning.

Proceedings                    4

1              THE COURT:  So there's two witnesses for the

2      hearing?

3              MS. JOHNSON:  Yes.

4              THE COURT:  Detective Schulman and a --

5              MS. JOHNSON:  Officer Alfaro.

6              THE COURT:  And Schulman has an issue with

7      regard to child care tomorrow and the other officer has

8      been teletyped to be here for tomorrow.

9              MS. JOHNSON:  She's been teletyped for

10     9 o'clock tomorrow and I haven't -- we confirmed that

11     the 105 received the teletype.  I haven't heard any

12     problems or conflicts and this was as of this morning.

13             THE COURT:  Okay.

14             MR. SCHECHTER:  If it please the Court, there

15     are a few issues I have of my own.

16             Firstly, I understand that counsel is

17     indicating that my client allegedly executed a consent

18     to search document.

19             I had made discovery application requesting

20     any and all such information and I never received

21     copies of consent to search whatsoever.

22             As a matter of fact, in the discovery

23     applications counsel claimed that the search was an

24     open view, did not claim in the discovery materials

25     that my client executed a consent to search.

ws

Proceedings                          5

1          If the Court will peruse the District

2    Attorney's answer, I think it's devoid of any mention

3    my client executed a consent to search form, unless I'm

4    mistaken.

5          That's the first initial issue, Judge.

6          (Pause in the proceedings.)

7          THE COURT:  All right, how many consent forms

8    are there?

9          MS. JOHNSON:  Two, Judge, one with regard to

10   searching of the residence and one with regard to

11   searching of the vehicle.

12         So your Honor knows, today was the first time

13   I had been provided that paperwork as it was with city

14   detective's case jacket.  So I did provide that in the

15   Rosario material.

16         MR. SCHECHTER:  I don't think, really, that's

17   an issue for a Rosario matter, I think that's a

18   discovery matter, so I respectfully --

19         THE COURT:  Now that you have the consent

20   form, is there some way in which you've been prejudiced

21   by receiving it today as opposed to having received it

22   at some other point?

23         MR. SCHECHTER:  Certainly, your Honor.

24         That belies the People's bill of particulars.

25   I respectfully submit if the People, in the bill of

                                                    ws

Proceedings                          6

1   particulars, allege that the issue at this hearing is

2   whether or not the officer acted and seized the

3   information -- seized the alleged evidence in plain

4   view, that was what was prepared for this hearing.

5            As a matter of fact, I submit that's the

6   purpose of a bill of particulars; for the People to

7   specify the particulars of the case that we are dealing

8   with and that is how defense counsel prepares the case.

9            Now, on the eve of the hearing, for the first

10  time, I am given these consent documents which I had

11  absolutely no knowledge of from the District Attorney

12  and I submit that she should be confined to the

13  parameters of the four corners of her bill of

14  particulars, which is what she sent me, which is that

15  the issue here is whether or not the items seized by

16  the officer, not this officer, another officer, a

17  female officer who will be testifying, I guess,

18  tomorrow, whether, in fact, that evidence was seized

19  because it was in open view.

20           I direct your Honor's attention to counsel's

21  bill of particulars and her response to discovery,

22  namely Page 5.

23           THE COURT:  Page 5 of what?

24           MR. SCHECHTER:  Of affirmation in opposition

25  to defendant's omnibus motion dated February 5, 2009.

                                                    ws

Proceedings                           7

1      All counsel spoke about was her opposition to the

2      motion because standing was not alleged.

3             Then she says on Page 6, "In the alternative,

4      the People submit that the seizure of the physical

5      evidence from the car without a search warrant was

6      justified because the property was in plain view of the

7      officers as follows:  Police Officer Celica Alfaro

8      observed the defendant's vehicle and inside said

9      vehicle the officer observed the meat clever/knife and

10     a massager.  Police Officer Alfaro recovered said items

11     from the vehicle."

12            There is absolutely no mention or no setting

13     forth here that the basis that she is claiming the

14     legality of the search is a signed consent to search.

15     There's nothing in her pleadings to say that, Judge,

16     and that's the purpose of a bill of particulars.

17            Does the Court have --

18            THE COURT:  I have your -- I have the

19     People's response to the discovery demand, which I take

20     it there was another attorney prior to yourself,

21     Mr. Schechter?

22            MR. SCHECHTER:  Your Honor, there was a prior

23     attorney which made motions which were insufficient and

24     I was given the right to make my own omnibus motions

25     which I, in fact, did.

                                                    ws

Proceedings                    8

1        However, the response of the People

2   replicates the same allocations concerning the bill of

3   particulars as to the justification of the search.

4        THE COURT:  All right, so, People, there was

5   a search of the defendant's vehicle?

6        MR. SCHECHTER:  And home.

7        MS. JOHNSON:  There was a search of the

8   vehicle and a search of the home, which I believe -- as

9   to notice, I believe that counsel was provided them

10  from the Queens District Attorney's Office, Judge, and

11  I believe a copy of the property vouchers were turned

12  over in discovery to both attorneys.

13       So I'm just looking for those now because I

14  believe --

15       MR. SCHECHTER:  No, never got the vouchers

16  and I was never given a justification for the search

17  with respect to this.

18       This is counsel's bill of particulars in

19  Nassau County.  Queens and Nassau are not contiguous.

20  What the DA in Nassau -- in Queens does not bind with

21  the District Attorney in Nassau.

22       MS. JOHNSON:  Since we are prior to the trial

23  and start of any hearing, we would make a motion to

24  amend our bill of particulars orally and in our

25  continuing duty to disclose any property or anything

Proceedings                    9

1    under 240.20, we are not only relying upon the consent

2    form, but we are also relying on the property that was

3    recovered in plain view.

4            Obviously, you know, it's up to your Honor if

5    counsel is going to be given the right to re-argue

6    whether or not his client has standing, but, either

7    way, we are prepared to litigate all aspects of not

8    only the consent, but the plain view part of the

9    search.

10           MR. SCHECHTER:  People can't have it both

11   ways, your Honor.

12           They said that they were ready.  They claimed

13   they were ready.  They made this application telling

14   the judge they are ready.  As such, the bill of

15   particulars becomes fixed.

16           There are time constraints on the defendant

17   as well.  The time constraints -- there are time

18   constraints on the defendant as well.

19           THE COURT:  I don't have your papers.

20   There's a lot of papers in front of me between your

21   papers, the prior attorney's papers, the People's

22   responses.

23           As to whether or not you had demanded copies

24   of any consent searches --

25           MR. SCHECHTER:  Any what?

                                                   ws

Proceedings                    10

1              THE COURT:  Consent search forms?

2              MR. SCHECHTER:  Your Honor, you're presuming

3       I would know about them.

4              It's part of their duty to provide me that in

5       discovery.

6              THE COURT:  It gets back to my initial

7       question.

8              How are you and your client prejudiced at

9       this point since we're only conducting a pretrial

10      hearing with regard to these suppression issues?

11             MR. SCHECHTER:  Because, your Honor, we are

12      required under the law to provide our motions within a

13      certain period of time and the People --

14             THE COURT:  I understand.

15             You've now been apprised of the consent

16      searches, the manner in which these searches were

17      conducted.  You're now about to begin the hearings in

18      this matter.

19             Could you articulate to me as to how you

20      would be prejudiced or foreclosed from litigating the

21      issue as to whether or not your client validly executed

22      a consent to search for his vehicle or for his car?

23             What's the remedy?

24             What are you asking me to do?

25             MR. SCHECHTER:  Preclude.  I'm asking the

                                              ws

Proceedings                    11

1      Court to direct that the District Attorney proceed on

2      the basis of plain view; that, in fact, that the theory

3      that she proffered and the justification for the search

4      proffered in her bill of particulars is what she's

5      bound by.

6               That's the purpose of a bill of particulars.

7      Otherwise, it would render a bill of particulars

8      virtually meaningless and I ask that the People be held

9      to the proof that they claimed that they had, namely --

10              THE COURT:  Could you show me your bill of

11     particulars?

12              I am looking at your discovery demand, which

13     didn't ask for any of the items you're claiming you

14     want to have precluded now, or at least the consent

15     searches.

16              MR. SCHECHTER:  Let me get a copy of my

17     demand, Judge.

18              Your Honor, the motions were made in response

19     to the People's representations with respect to how the

20     search occurred.  They never, ever gave us any notice

21     that there was a consent form, never in any of the

22     VDFs, nothing.

23              THE COURT:  All right, so you've gotten the

24     hearing, you've now been apprised as to the manner in

25     which the property was recovered.

ws

Proceedings                    12

1          MR. SCHECHTER:  And I'm respectfully asking

2     that the Court make a determination.

3          THE COURT:  Well, you first asked to have the

4     items precluded.

5          Now it seems to be that you're acknowledging

6     that you didn't ask for those items in your demand.

7          MR. SCHECHTER:  Well, I'm asking for a

8     hearing --

9          THE COURT:  Now you're shifting your argument

10    to, well, now, because they didn't mention it in their

11    motion papers, that therefore they should be precluded

12    as well?

13         MR. SCHECHTER:  What I'm saying, your Honor,

14    is the District Attorney, in their response to my

15    motion papers, specified a theory, specified the basis,

16    the justification, for the search.  They did that.

17    They did that sua sponte.

18         As such, they proffered the theory that they

19    were proceeding under and that is an open view theory,

20    okay?

21         Now, right before we start the hearing, they

22    say, "No, I'm changing the theory.  Now I'm going to

23    claim it was consensual."

24         I'm saying, of course, it's a surprise, but

25    not only is it a surprise, they posited what they did

                                                     ws

Proceedings                    13

1    in a bill of particulars and I'm saying they're

2    required to present the theory specified in the bill of

3    particulars.

4              That's my application, judge.

5              THE COURT:  All right, I'll reserve decision

6    on your application at this time.

7              Anything else we need to address?

8              MR. SCHECHTER:  Yes, Judge.

9              I've provided counsel with a list of forms

10   that I noticed was not included in the Rosario

11   material.

12             For example, there are prepared, to my

13   understanding in the normal course of police arrests,

14   documents that have not been provided and I will list

15   them the same as I gave the District Attorney.

16             One is an activity log.

17             Two might be provided, I haven't had a chance

18   to look through the documentation, is a complaint

19   report.  The document is PD 313-152.  That's a

20   complaint report.

21             The other document I did not receive is a

22   New York State standardized domestic incident report

23   with the form numbers DCJS 3221 and a report of

24   suspected child abuse PD 377-1544.

25             He is a mandatory reporter.  He was supposed

ws

Proceedings                    14

1       to make those -- do those documents.

2               His report to his patrol supervisor, I did

3       not get that.

4               The domestic report incident log, I did not

5       get that either.

6               Now, I don't know if there was an on-line

7       booking system arrest work sheet, but, if there was,

8       I'm entitled to that.

9               And, lastly - I have asked for this on

10      several occasions and it has been granted because it's

11      required - the commanding officer of the precinct,

12      under certain circumstances, makes a request for a

13      recommendation for commendation which contains within

14      that request the statements and comments of the

15      arresting officer as to the incidents.

16              I am requesting that a copy of that

17      recommendation for a commendation, if such form exists.

18              THE COURT:  All right, Ms. Johnson?

19              MS. JOHNSON:  Your Honor, with regards to

20      most of those documents that counsel had requested, a

21      lot of it is not Rosario material for hearing purposes.

22              Let me start -- I mean, the complaint report

23      is a narrative of the detective's conversation with the

24      victim.

25              It has nothing to do with the defendant's

                                                        ws

Proceedings                    15

1   statement.  It has nothing to do with any of the

2   property.  It has nothing to do with any conversations

3   that a detective had with the defendant.

4              It's similar to our 32Bs here, except they

5   don't do actual 32Bs in the city.

6              As to the domestic incident report, again,

7   that is certainly Rosario for trial, but is not a

8   written recorded statement about the detective's

9   conversation with the defendant.

10             Same thing with the domestic report incident

11  log, the report of suspected child abuse.

12             I have protective services reports here and

13  I've gone through them.  I'm happy to show your Honor

14  what I have.  Everything that is listed in this

15  paperwork that is in the detective's case jacket is not

16  about the substance of his testimony at this hearing.

17             What I've turned over is everything that the

18  defendant (sic) has memorialized in regards to his

19  contact with the defendant, his conversations with the

20  defendant, nothing about his contact with the

21  complainant as there is no Dunaway or probable cause

22  aspect to the hearing.

23             But I'm happy -- if your Honor would like to

24  review any of this in camera, I have it to review.

25             THE COURT:  I'll take a look at the material

ws

Proceedings                    16

1    in camera, Mr. Schechter.

2              Whatever you want to explore for purposes of

3    cross-examination as to these documents, as to whether

4    or not they have some bearing or would be considered

5    Rosario for purposes of the hearing, I'll certainly

6    give you leeway to do that.

7              MR. SCHECHTER:  Thank you, Judge.

8              THE COURT:  All right, anything else?

9              MR. SCHECHTER:  Well, I have no problem with

10   the People beginning their direct examination, your

11   Honor.

12             However, since, as -- it seems to be the law

13   and the inclination of most prosecutors, I have just

14   been given a pile of papers which are alleged to be

15   Rosario material.

16             Therefore, I would like my cross-examination

17   of the detective to be reserved for when I have an

18   opportunity to peruse them, which would be, if not

19   tomorrow, then I guess Monday.

20             MS. JOHNSON:  Judge, considering the video is

21   20 minutes to a half hour, I don't think we're getting

22   there anyway.

23             THE COURT:  It will appear you'll get your

24   request.

25             MR. SCHECHTER:  Thank you, Judge.

                                                        ws

Proceedings                    17

1          MS. JOHNSON:  There were two packets turned

2     over to the Court and counsel, one with a Rosario cover

3     sheet and the other one is the grand jury minutes of

4     the detective, so I just want to make counsel

5     acknowledges receipt of both of those.

6          MR. SCHECHTER:  Let me hear this again,

7     please?

8          MS. JOHNSON:  Other than the packet, there

9     was a separate packet that was the detective's Queens

10    County grand jury testimony.

11          I want to make sure you got both of them.

12          MR. SCHECHTER:  I have the grand jury

13    testimony regarding --  part of what I was given was

14    crossed out, so I don't know what that relates to.

15          So with respect to the grand jury testimony,

16    absent what was contained that was crossed out on one

17    of the -- on one, two, three -- three pages, I was

18    given what appears to be the grand jury testimony from

19    Queens.

20          MS. JOHNSON:  Your Honor, what's crossed out

21    is colloquy between a question from the grand jury and

22    the Queens ADA.  All the testimony is there.

23          So if your Honor would like to see what was

24    redacted, I have that for the Court as well.

25          MR. SCHECHTER:  Your Honor, I've been doing

ws

Proceedings                    18

1   this a long time.  It's the first time I've ever seen

2   colloquy in a grand jury redacted from grand jury

3   minutes.

4            THE COURT:  Can I ask you what we're talking

5   about, because you people have been dealing with this

6   case for the last umpteen months.  I got it a half hour

7   ago, so -- this is grand jury testimony of whom?

8            MS. JOHNSON:  Detective Schulman.

9            THE COURT:  In the Queens grand jury?

10           MS. JOHNSON:  Yes, Judge.

11           That is an original marked-out copy, so you

12   can actually see through the black ink what was written

13   there.  It's on the last couple of pages.

14           (Shown to Court.)

15           THE COURT:  And this is what pertains to the

16   detective's interactions with the complainant?

17           MS. JOHNSON:  No, it's not his testimony.

18           It's a question posed by the grand jury to

19   the prosecutor which the prosecutor then asked.  The

20   actual part redacted is a grand juror's testimony.

21           THE COURT:  In other words, it's colloquy

22   between the DA in Queens and the grand juror?

23           MS. JOHNSON:  Correct.

24           THE COURT:  All right, Mr. Schechter, that

25   does seem to be the case.

                                                        ws

1          MR. SCHECHTER:  I understand that, your

2     Honor.          However, I respectfully submit,

3     notwithstanding that, I don't believe counsel has a

4     right to redact any part of those grand jury minutes,

5     regardless of what they are.

6          If it's colloquy, I'm entitled to look at it.

7     Maybe grand jury had a question with respect

8     to the officer's appearance, what the officer said or

9     what the law was.  Maybe he or she was confused.  There

10    are a lot of issues there that counsel is blocking me

11    from considering.

12          I have never -- when I was in the District

13    Attorney's Office I gave the grand jury testimony.

14    It's what they're entitled to.  I never redacted

15    anything unless it dealt with matters that were going

16    to be dealt with on trial and then I would give them a

17    separate grand jury minutes at trial containing the

18    whole grand jury minutes, but I've never seen them

19    redacted like that.

20          MS. JOHNSON:  Judge, Judge Calabrese already

21    reviewed the minutes, indicated that portions were not

22    to be disclosed to defense attorney.

23          As the prosecutor, I have an obligation to

24    keep those matters secret that are not Rosario and

25    that's exactly what I've done.

1              MR. SCHECHTER:  I don't recall such a

2      direction from Judge Calabrese.  Certainly, it wasn't

3      reduced to a writing.

4              THE COURT:  Well, it doesn't appear,

5      Mr. Schechter, to be -- it's certainly not statements

6      made by any witness that would testify in this case.

7              It's clearly between a grand juror and the DA

8      who, I assume, is Mr. Rosenblatt?

9              MR. SCHECHTER:  Yes.

10             MS. JOHNSON:  Yes, Judge.

11             THE COURT:  So I don't see any reason at this

12     time to unredact it, if you will, so I'm going to leave

13     it as such over your objection.

14             MR. SCHECHTER:  Thank you, Judge.

15             All right, People, you want to call your

16     first witness?

17             MS. JOHNSON:  Yes.  Detective Leonard

18     Schulman.

19     L E O N A R D  S H U L M A N, a witness called on behalf of

20         the People, having been first duly sworn by the clerk

21         of the Court, was examined and testified under oath as

22         follows:

23             COURT OFFICER:  For the record, state your

24     name, spell your last name, shield number, rank and

25     command?

Schulman - People - direct          21

1          THE WITNESS:  Detective Leonard Schulman,

2     last name is, S-c-h-u-l-m-a-n, Shield 6387, assigned to

3     the 105 Precinct detective squad in Queens, New York of

4     the New York City Police Department.

5  DIRECT EXAMINATION

6  MS. JOHNSON:

7     Q.   Good afternoon, detective.

8     A.   Good afternoon.

9     Q.   Detective, how long have you been employed by the

10  New York City Police Department?

11    A.   About 15 and a half years.

12    Q.   How long have you been a detective?

13    A.   Almost ten years.

14    Q.   Can you take us through the assignments that

15  you've worked at through your -- the course of your career?

16    A.   Obviously, initially the Police Academy.

17         From there I was assigned as a patrol officer in

18  the 105 Precinct in Queens, New York.  I was then assigned

19  to the -- a citywide anti-crime unit for about five years

20  and for the last seven years I've been assigned as a

21  detective in the 105 Precinct detective squad.

22    Q.   What area of Queens County does the 105 cover?

23    A.   It's southeast Queens.  It covers many different

24  communities.  It ranges all the way from the Queens side of

25  Floral Park, all the way down to Rosedale.

                                                        ws

Schulman - People - direct          22

1      Q.    I'm going to direct your attention to June 23rd

2   into the 4th of 2008.

3             Were you working on that day?

4      A.    Yes, I was.

5      Q.    Were you working as a detective in the 105?

6      A.    Yes, I was.

7      Q.    What was your tour of duty that day?

8      A.    I believe I was probably working a 4:30 p.m. from

9   the night of the 23rd to 1 o'clock in the morning the

10  morning of the 24th.

11            MR. SCHECHTER:  Objection.  Not probably, I

12        would like to know what the officer's tour of duty was,

13        Judge.

14            THE COURT:  All right, detective, is that

15        your recollection as to --

16            THE WITNESS:  Yes, your Honor.

17            THE COURT:  The objection is overruled.

18            MR. SCHECHTER:  Is this June 23rd?

19            THE COURT:  Yes, into the early morning of

20        June 24th.

21            MR. SCHECHTER:  Your Honor, did I hear the

22        hours.

23            I'm sorry.

24            THE COURT:  4:30 p.m. on the 23rd to 1 a.m.

25        the morning of the 24th.

                                              ws

1     Q.   On June 23rd, 2008 during the course of your tour

2  did there come a time when an investigation was assigned to

3  you?

4     A.   There did.  I believe it was actually probably

5  about 12:30 in the morning of the morning of the 24th.

6             MR. SCHECHTER:  Your Honor, once again, if

7        the officer says approximately I have no problem, but

8        when he says probably, then he's guessing.

9             THE COURT:  All right, let me make the

10       following suggestion.

11            Detective, I notice you're looking at some

12       paperwork that's there.

13            Do you need to look at that to refresh your

14       recollection?

15            THE WITNESS:  Only on a couple of minor

16       things.  I mean, we're talking almost a year ago.

17            THE COURT:  If you're going to look at any

18       paperwork, whether it's the DA or defense counsel,

19       indicate you need to look at it and what it is you're

20       looking at.

21            MR. SCHECHTER:  Your Honor --

22            THE WITNESS:  All right.

23            MR. SCHECHTER:  Your Honor, I respectfully

24  ask the officer be asked if he has to refresh his

25  recollection then, if he does, we know he's testifying

                                                      ws

Schulman - People - direct                24

1       from a refreshed recollection.

2               THE COURT:  I'll let you and Ms. Johnson

3       figure out how you're going to ask that.

4               Go ahead, Ms. Johnson, do you want to re-ask

5       that?

6               MS. JOHNSON:  Yes.

7       Q.   On June 23rd, 2008, during the course of your

8       tour, did there come a time that you received an assignment?

9       A.   Yes.

10      Q.   And what was the nature of the investigation that

11      you were assigned to on June 23rd of 2008?

12      A.   On the early morning hours of the 24th, where I

13      was still on duty from my tour, I was notified that there

14      was a complainant in the 105 Precinct that was alleging that

15      she was a victim of a crime involving her stepfather as a

16      perpetrator and that it was of a sexual nature and that both

17      that complainant and ACS were involved in the case and that

18      an investigator was being asked to assist in the interviews.

19              THE COURT:  Please lower the window?

20              Thank you.

21      Q.   What was the name, not of the victim, of the

22      subject of the investigation?

23      A.   I learned that the subject in the investigation's

24      name was Harold Gopaul.

25      Q.   Can you tell us the circumstances of your first

                                                        ws

Schulman - People - direct          25

1    encounter with Harold Gopaul?

2         A.   I was advised by a Sergeant O'Hagan of the

3    105 Precinct, the desk officer, that he told me that

4    Mr. Gopaul had come into the precinct and based on --

5    Sergeant O'Hagan said to me based on his knowledge of this

6    particular case, that he recognized that Mr. Gopaul was the

7    subject of the investigation and he initiated to have

8    Mr. Gopaul taken into custody and arrested downstairs in the

9    precinct.

10        Q.   When were you advised Mr. Gopaul came into the

11   105 Precinct?

12        A.   About 4:45 in the morning on the morning of the

13   24th.

14        Q.   What were you doing at approximately 4:45 in the

15   morning on June 24th?

16        A.   I was still speaking to the victim, Sana Awan.

17             THE COURT:  All right, let me just step back

18        for a minute.

19             Go back to you said Officer O'Hagan --

20             THE WITNESS:  Sergeant O'Hagan.

21             THE COURT:  Sergeant O'Hagan.

22             He's a sergeant where?

23             THE WITNESS:  The 105 Precinct.

24             THE COURT:  Which is your precinct?

25             THE WITNESS:  Yes.  My office is upstairs on

                                                      ws

Schulman - People - direct          26

1    the second floor and the patrol desk is on the first

2    floor.

3              THE COURT:  And he tells you that the

4    defendant has come in to indicate that he is engaged in

5    what?

6              Can you give us the time when this happens,

7    the date?

8              THE WITNESS:  I'm -- I think I understand

9    you're question.

10             Sergeant O'Hagan --

11             THE COURT:  Just so you understand, I'm

12   trying to get a time context of when -- you say that

13   you get notified in the early morning hours of an

14   assignment concerning a possible investigation of

15   sexual abuse.

16             THE WITNESS:  That's correct.

17             THE COURT:  And that comes from O'Hagan?

18             THE WITNESS:  I get a call from a detective

19   at the detective bureau, Queens, alerting me there was

20   a situation downstairs in the precinct.

21             THE COURT:  In your own precinct?

22             THE WITNESS:  In my precinct.

23             I then contacted the sergeant downstairs who

24   provided me with some additional information and

25   enabled me to then be able to speak to the victim and

                                              ws

Schulman - People - direct          27

1        the ACS worker that was in the building interviewing

2        the complainant.

3                    THE COURT:  Now, the victim in the building

4        at the time?

5                    THE WITNESS:  Yes.

6                    THE COURT:  And where is the defendant at

7        that time?

8                    THE WITNESS:  When I'm alerted?

9                    He's not in the building.  He comes in a few

10       hours later on his own and he walks into the precinct

11       and says who he is and that he's there looking for his

12       daughter.

13                   THE COURT:  Okay, go ahead.

14       Q.   And do you learn this information from Sergeant --

15       from the sergeant?

16       A.   Yes, I do.

17       Q.   And what's his last name?

18       A.   O'Hagan.

19       Q.   Where -- are you still with the victim when you

20       actually hear this information from Sergeant O'Hagan?

21       A.   I had stepped out from speaking to the victim.  I

22       was alerted that the sergeant had something to tell me.

23                   I came out of interviewing the victim and I had a

24       conversation that Mr. Gopaul had come into the precinct

25       wearing an Ecolab uniform, which is the company he, at the

ws

Schulman - People - direct          28

1   time, we were told, he worked for.  Sergeant O'Hagan had

2   indicated that he had been informed of that information

3   earlier so when he saw the Ecolab uniform and Mr. Gopaul

4   came in and said whatever he said, that they recognized that

5   he was going to be the subject in regards to the

6   investigation that was going on at that moment.

7        Q.   Did you learn from the sergeant what it was that

8   the -- that Harold Gopaul was coming to the precinct for?

9        A.   Sergeant O'Hagan told me that -- based on what he

10  was telling me, that Mr. Gopaul was coming in and he was

11  looking to report his daughter Sana Awan missing, that he

12  didn't know where she was, and at that point in time once

13  they knew who he was they had -- they took him into custody

14  and arrested him.

15       Q.   And do you see the person you referred to as

16  Harold Gopaul in the courtroom?

17       A.   Yes, I do.

18       Q.   Can you point to that person and identify an item

19  of clothing that they're wearing?

20       A.   A dark-skinned male wearing, it looks like,

21  possibly a blue striped suit with a red, blue-and-white-type

22  tie at the table.

23            MS. JOHNSON:  Your Honor, let the record

24       indicate the witness has identified the defendant.

25            THE COURT:  Yes.

ws

Schulman - People - direct          29

1      Q.   Where was the defendant when you came into your

2   first contact with him?

3      A.   He was in an interview room in my office where I

4   had instructed one of the uniformed officers to bring him so

5   I can speak to him.

6      Q.   Can you describe for us what that interview room

7   looks like?

8      A.   It's -- there's a door leading into a room and the

9   room is probably ten by eight.  I would speculate as to the

10  measurements, without never having measured it myself.

11          When you first walk in there is a chair in front

12  of you, there's a table that's maybe two by three feet in

13  front of the chair and then there's another chair on the

14  other side of the table.

15              THE COURT:  All right, what time,

16      approximately when you meet him for the first time?

17                  THE WITNESS:  It's about 5:10 in the morning.

18              THE COURT:  And this is in the --

19              THE WITNESS:  Morning of June 24th.

20              THE COURT:  In an interview room in the

21      105 Squad.

22              THE WITNESS:  That's correct, Judge.

23      Q.   Are there any windows in that interview room?

24      A.   There's a small window on the door, maybe 14 by 14

25  or 12 by 12 right, you know, like eye level on the door.

                                                          ws

Schulman - People - direct          30

1          Q.   Who was in the room with the defendant when you

2     first got there?

3          A.   He was in there by himself.  And the door had been

4     secured from the outside and I opened the door and walked

5     in.

6          Q.   Who was outside of the door?

7          A.   I don't recall specifically.  I don't want to

8     speculate.  It would have been whoever the sergeant had sent

9     Mr. Gopaul up with.

10              MR. SCHECHTER:  Objection as to what was

11         probable.

12              THE COURT:  Yes, don't guess.  If you don't

13         know just tell us.

14              THE WITNESS:  Yes, I don't know specifically.

15         Q.   Was it a police officer or civilian?

16         A.   Police officer.

17         Q.   What was the defendant doing inside that room when

18    you first entered?

19         A.   He was sitting in a chair at a table.

20         Q.   Was he handcuffed?

21         A.   No.

22         Q.   Where were his handcuffs, if you know?

23         A.   Pardon me?

24         Q.   Where were his handcuffs if you know?

25         A.   I don't know.

ws

Schulman - People - direct          31

1      Q.    Where was your gun when you entered the room?

2      A.    It was locked up outside in my office.

3      Q.    When had you locked your gun up?

4      A.    When I was first apprised that Mr. Gopaul had been

5    taken into custody and was going to be brought up to be

6    interviewed in my office.

7      Q.    Was the defendant sitting or standing when you

8    came -- when you went into the interview room?

9      A.    Sitting.

10     Q.    Was he sleeping?

11     A.    No.

12           MR. SCHECHTER:   Objection to the leading.

13     Q.    What was he doing?

14     A.    He was awake and conscious and he was just sitting

15   at the table.

16     Q.    Where did you go upon entering the interview room?

17     A.    I sat at the first chair on the opposite side of

18   the table of Mr. Gopaul facing him.

19           THE COURT:   Okay, let me just interrupt you.

20           Could I just see both counsel?

21           (Discussion held at the bench, off the

22   record.)

23           (Pause in the proceedings.)

24           THE COURT:   All right, Ms. Johnson, whenever

25   you're ready.

ws

1     Q.    What did you say to defendant when you entered the

2    interview room?

3     A.    I introduced myself, something to the effect of,

4    "I'm Detective Schulman.  I'm conducting an investigation.

5    Before I can speak to you about the investigation I need to

6    read you what's called Miranda warnings before I can proceed

7    with having any other conversation with you."

8     Q.    What was the defendant's response to you, if any

9    response?

10    A.    I don't know initially that he said anything.  I

11    think he might have just nodded his head in an okay-type

12    motion.

13          I then went on to -- you know, I had a pre-printed

14    Miranda warning form that I went on to -- you know, I

15    explained to him, "I'm going to read you these questions.  I

16    need a clear and concise answer, yes or no, if you

17    understand what I'm reading to you."

18          He said okay.

19          I read him the first question of the Miranda

20    warning.

21          Mr. Gopaul acknowledged that his answer was yes,

22    that he understood.

23          I proceeded -- I mean, should -- I proceeded

24    likewise for all six questions on the Miranda form and

25    Mr. Gopaul's responses to each question was yes, he

Schulman - People - direct                33

1    understood.

2         Q.   What language were you having this conversation

3    in?

4         A.   In English.

5         Q.   And what language were the defendant's responses

6    in?

7         A.   In English.

8              MS. JOHNSON:   I'm going to ask that this be

9         marked as People's Exhibit Number 1 for identification,

10        please?

11             THE COURT:   People's 1.

12             (People's Exhibit 1 marked for

13        identification.)

14             MS. JOHNSON:   May I have that shown to the

15        witness, please?

16             (Shown to witness.)

17        Q.   Detective Schulman, if you could take a look at

18   People's 1 for identification?

19             Do you recognize that document?

20        A.   Yes, I do.

21        Q.   What do you recognize that to be?

22        A.   It's a photocopy of the Miranda warning sheet that

23   was used and read to Mr. Gopaul and prepared on the morning

24   of June 24th of 2008.

25        Q.   How is it that you know that it was the form that

                                                            ws

Schulman - People - direct          34

1    was prepared with regards to this case?

2         A.   The spots on the form that were prepared by me are

3    in my handwriting.  I was present when Mr. Gopaul signed it

4    and I affixed my own signature as well.

5         Q.   Is that a fair and accurate copy of the original?

6         A.   Yes, it is.

7              MR. SCHECHTER:  May I have a voir dire?

8              THE COURT:  Well, could you wait until she

9         offers it?

10             MR. SCHECHTER:  Yes, Judge.

11             MS. JOHNSON:  I would now offer what's been

12        marked as People's 1 for identification into evidence

13        for purposes of the hearing.

14             THE COURT:  You want a voir dire,

15        Mr. Schechter?

16             MR. SCHECHTER:  Yes, Judge. I jumped the gun

17        a little bit.

18   VOIR DIRE EXAMINATION

19   BY MR. SCHECHTER:

20        Q.   Detective Schulman, where is the original of this

21   document?

22        A.   In my case folder.

23        Q.   May I see it, please?

24             THE COURT:  Yeah, if you have it.

25             THE WITNESS:  Should I leave it in the folder

                                                        ws

1      or take it out?

2                  THE COURT:  Can you take it out without

3      having papers fly all over the place?

4                  THE WITNESS:  I'll do my best.

5                  (Shown to counsel.)

6          Q.   Now, officer, how many of these documents do you

7      have with you when you go into the room to speak to an

8      accused?

9          A.   Just one.

10         Q.   And when -- where did this document come from?

11         A.   Can you be more specific?

12         Q.   Yes, where did you get this document from?

13         A.   There's a file drawer in my office where there is

14     assorted documents that we might need on any given day.

15         Q.   And all those documents are the same?

16         A.   Depending which drawer you look at.

17         Q.   All the Miranda warning documents are the same?

18         A.   To my knowledge, yes.

19         Q.   They're in your drawer, correct?

20         A.   Pardon me?

21         Q.   They're in your drawer?

22         A.   It's not my drawer, it's an office drawer.

23         Q.   Office drawer, I see.

24              When you took this document out, was this document

25     blank or did it have any writing on it?

Schulman - People - direct          36

1      A.   It was blank.

2      Q.   And who put the notation of 0510 on the top right

3  of the document?

4      A.   When I sat down with Mr. Gopaul I did.

5      Q.   So that wasn't there when you got the document?

6      A.   No.

7      Q.   Were there anything -- was there anything else

8  written on this document when you came into the room?

9      A.   Other than the typed pre-printed information, no.

10          MR. SCHECHTER:  Judge, I'm finished with voir

11     dire.

12          THE COURT:  Okay, any objection?

13          MR. SCHECHTER:  Not for purposes of the

14     hearing.

15          THE COURT:  All right, People's 1 to be

16     received in evidence.

17          (People's Exhibit 1 received in evidence.)

18  DIRECT EXAMINATION CONT'D

19  BY MS. JOHNSON:

20     Q.   Detective Schulman, can you please read for us how

21  you read the defendant his Miranda warnings on June 24th,

22  2008?

23     A.   Well, as I was just describing, I initially wrote

24  0510 as to note the time that I was starting to read them.

25          I then said, "You have the right to remain silent

                                                              ws

1    and refuse to answer questions.  Do you understand?"

2              Mr. Gopaul clearly stated yes, that he understood.

3              "Anything you do say may be used against you in a

4    court of law.  Do you understand?"

5              Mr. Gopaul replied yes.

6              "You have the right to consult an attorney before

7    speaking to the police and to have an attorney present

8    during any questioning, now or in the future.  Do you

9    understand?"

10             Mr. Gopaul responded yes.

11             If I could just backtrack, as Mr. Gopaul was

12   responding yes to each question I was writing his answer

13   down at each line before I proceeded to the next question.

14             THE COURT:  So the yes that appears after

15        each question is your handwriting?

16             THE WITNESS:  That is correct.

17   Q.   And whose initials appear next to yes?

18   A.   Mr. Gopaul's.

19   Q.   And who wrote those initials down?

20   A.   Mr. Gopaul, after the complete -- should I

21   continue reading all six questions or no?

22   Q.   Yes, please.

23   A.   As I was saying, I read Question 1.  I asked, "Do

24   you understand?"

25             Mr. Gopaul replied yes.  I wrote yes in my

ws

1     handwriting.

2           I read Question 2 and, again, after he responded

3     yes I wrote yes.

4           And I think I was up to Question 4, is that

5     accurate?

6     Q.    Yes.

7     A.    Okay, "If you cannot afford an attorney one will

8     be provided for you without cost.  Do you understand?"

9           Mr. Gopaul replied yes.  I wrote the answer yes.

10          "If you do not have an attorney available you have

11    the right to remain silent until you have had an opportunity

12    to consult with one.  Do you understand?"

13          Mr. Gopaul responded yes.  I wrote the answer yes.

14          "Now that I have advised you of your writes are

15    you willing to answer questions?"

16          Mr. Gopaul answered yes and I wrote the answer

17    yes.

18    Q.    And after you marked yes who was it that initialed

19    after each question?

20    A.    Well, I then said to Mr. Gopaul, "I would like you

21    to read each question yourself, make sure you understand

22    what I read to you and affirm that the yes answers you gave

23    to me are still your answers to these questions."

24    Q.    Did you hand him the piece of paper?

25    A.    I handed him the piece of paper, took it and

WS

Schulman - People - direct                 39

1    looked at it, read each question and he said to me that, "My

2    yes answers to each question are still correct."

3           I asked Mr. Gopaul, "If you would, please place

4    your initials next to each yes answer you responded to me

5    and also if you would print and sign your name on the lower

6    portion of the form to indicate that you understand these

7    rights."

8           He did, he did in each place, printed and signed

9    his name on the back, handed it back.

10          I signed and affixed my shield number and then I

11   wrote the date and time that was complete.

12   Q.   And is that the June 24th 2008 at 5:15 a.m.?

13   A.   That is correct.

14   Q.   Were any threats made to the defendant prior to

15   him signing that Miranda warning sheet?

16   A.   No.

17   Q.   Were any promises made to him?

18   A.   No.

19   Q.   Where was your gun while those Miranda warnings

20.  were issued?

21   A.   It was locked up outside in my office.

22   Q.   At any time during the issuance of these Miranda

23   warnings did defendant ask to speak to an attorney?

24   A.   No.

25   Q.   At any time during the issuance of these Miranda

 1    warnings did defendant indicate he no longer wished to speak

 2    to you?

 3         A.   No, he did not.

 4         Q.   Was the defendant cooperative with you?

 5         A.   Yes.

 6         Q.   Did you actually -- did you personally observe him

 7    sign and print his name where it's marked defendant?

 8         A.   Yes, I did.

 9         Q.   Did he ever ask -- did he ever indicate to you he

10    had any questions for you?

11         A.   No, he did not.

12         Q.   After the defendant signed the Miranda warning

13    form what did you do next?

14              THE WITNESS:  I'm just going to refer to my

15         notes so I have the correct order of the next form.

16              THE COURT:  Do you need to look at them to

17         refresh your recollection?

18              THE WITNESS:  I do, your Honor.

19              THE COURT:  Could you please indicate what

20         you're referring to?

21              THE WITNESS:  Absolutely, your Honor.

22              Okay, I'm referring to a complaint follow-up

23         report that I prepared.

24              THE COURT:  Does it got a number?

25              THE WITNESS:  It's labeled follow-up

                                                              ws

1     Number 3.

2              THE COURT:  Do you have that, Mr. Schechter?

3              MR. SCHECHTER:  As I said, your Honor, I was

4     just given these documents and I have not had a chance

5     to review them.

6              If counsel could refer them to me, then it

7     certainly will be helpful.

8     Q.   Detective Schulman, are you referring to the

9     complaint follow-up informational report unapproved under

10    summary of investigation?

11    A.   I'm referring to an approved copy.

12    Q.   With a summary of investigation, Paragraph 1, on

13    June 24th, 2008 at approximately 4:45 hours?

14    A.   That would be the report that I'm referring to.

15             MS. JOHNSON:  That would be in the Rosario

16    material.

17             MR. SCHECHTER:  I don't believe I have it,

18    Judge.

19             MS. JOHNSON:  Page --

20             MR. SCHECHTER:  Can I see the report please?

21             MS. JOHNSON:  Sure.

22             (Shown to counsel.)

23             MR. SCHECHTER:  I don't have that.  At least

24    I don't see it.

25             If I could be given just one minute?

1    A.    I don't want to speak out of turn.

2              MS. JOHNSON:  It's towards the end.

3              (Pause in the proceedings.)

4              THE WITNESS:  Is it okay if I leave this

5    here?

6              THE COURT:  Yes.

7              Okay, Ms. Johnson, did you have a question?

8              MS. JOHNSON:  Can I continue?

9              THE COURT:  Yes.

10   Q.    Detective Schulman, what happened after you issued

11   the Miranda warnings to the defendant and he signed them?

12             MR. SCHECHTER:  Your Honor, I'm a little

13   confused.  Counsel asked the officer a question about

14   the complaint follow-up report and she said it's marked

15   unapproved and the officer answered that, no, it's

16   approved.  I only got an unapproved copy so I don't

17   know what the officer is referring to here.

18             THE COURT:  All right.

19             THE WITNESS:  Can I explain why that is, your

20   Honor?

21             THE COURT:  Yeah, could you?

22             THE WITNESS:  And it's based on my

23   understanding.  The computer system that the Police

24   Department was using at the time allows for us to,

25   using the computer program, type our complaint

ws

Schulman - People - direct          43

1    follow-up reports and then they're submitted to the

2    supervisor for approval.

3              After the supervisor approves it it no longer

4    shows the unapproved marking on it.

5              So I have the completed version which is

6    going to be consistent with the unapproved one with the

7    exception of the unapproved no longer appears.

8              THE COURT:  Let me ask you this.  Is it

9    identical of the unapproved one.

10             MR. SCHECHTER:  I don't have a copy of the --

11             THE COURT:  Mr. Schechter, would you mind if

12   I got some answers before you start interrupting me?

13             MR. SCHECHTER:  I'm sorry and I do apologize.

14             THE COURT:  Would it be identical to the

15   unapproved?

16             THE WITNESS:  The unapproved would no longer

17   appear and the supervisor that approved this

18   information would then be tagged in.

19             THE COURT:  People, what I'm going to direct

20   you to do is whatever he's referring to, make a copy of

21   it before Mr. Schechter cross-examines the detective.

22             MS. JOHNSON:  That's fine, your Honor.

23             MR. SCHECHTER:  Thank you, your Honor.

24   Q.   Detective Schulman, is the summary of the

25   investigation in the unapproved the same as that of the

                                                    ws

Schulman - People - direct                    44

1      approved?

2          A.    It is.

3          Q.    And is that what you're refreshing your

4      recollection with, the summary of the investigation?

5          A.    Yes.

6          Q.    Can you now tell us what happened after the

7      defendant signed that Miranda form?

8          A.    Okay, I then stated to Mr. Gopaul that before I

9      could proceed that I would like to gather his consent to

10     search his work vehicle that he was in possession of and his

11     home.

12             I said, "In order for me to do that I'm going to

13     read to you a consent form that I have in order to get your

14     permission."

15             I then -- you know, while I was sitting in front

16     of Mr. Gopaul I wrote his name in the blank on the consent

17     search of the home form and I wrote in the home address and

18     who he would be authorizing if he consented to this search.

19             I then --

20         Q.    I'm sorry, just to interrupt you there, was this

21     still all going on in the interview room?

22         A.    Yes.

23         Q.    Had anybody else come into the room at this point?

24         A.    No, they had not.

25         Q.    Was defendant still unhandcuffed?

Schulman - People - direct          45

1     A.   Yes, he was.

2     Q.   Were you still at the same desk with him?

3     A.   Yes, I was.

4     Q.   And was your weapon still secured?

5     A.   Yes, it was.

6     Q.   At that point had the defendant indicated he no

7  longer wished to speak to you?

8     A.   No, he had not.

9     Q.   Did he ask any questions of you?

10     A.   No, he had not.

11     Q.   Did he ask to speak to an attorney?

12     A.   No, he had not.

13          MS. JOHNSON:  I'm going to ask that this be

14  marked as People's Exhibit Number 2 for identification.

15          (People's Exhibit 2 marked for

16  identification.)

17          (Shown to witness.)

18          MS. JOHNSON:  If I could have that shown to

19  the witness, please?

20          THE COURT:  He's got it.

21     Q.   Detective, if you could take a look at People's 2

22  for identification?

23          Do you recognize that?

24     A.   Yes, I do.

25     Q.   What do you recognize that to be?

                                                        ws

1      A.    It is a photocopy of the consent search

2  pre-printed form that I had filled in a couple of blanks and

3  then read to Mr. Gopaul, to which he had given his consent

4  to search his home.

5      Q.    Is that the form you were just referring to prior

6  to me marking that for identification purposes?

7      A.    Yes, it is.

8      Q.    And can you explain to us what the conversation

9  was with the defendant prior to him signing this consent

10  form?

11      A.    I read to Mr. Gopaul the substance of the form

12  which at that point, after I had filled in a couple of

13  blanks, "That I, Harold Gopaul, having been requested to

14  consent to a search of my home located at 242-10 89th

15  Avenue, Bellerose, New York, 11426, and having been duly

16  advised of my Constitutional rights to, A, refuse such

17  consent; B, to require that a search warrant be obtained

18  prior to any search; C, that if I do consent to a search,

19  any evidence found as a result of such search can and will

20  be used against me in any civil or criminal proceedings; D,

21  that I may consult with an attorney of my choosing before or

22  during the search; and, that, E, I may withdraw my consent

23  to a search at any time prior to its conclusion.

24           I then read, "After having been advised of my

25  Constitutional rights I hereby knowingly, intelligently and

                                                          ws

1   voluntarily waive my above rights and consent to search.   I

2   authorize Detective Schulman or authorized representative of

3   the NYPD to conduct a complete search of the above-described

4   location, premise, residence/location apartment."

5        Q.   And is People's 2 for identification a fair and

6   accurate copy of the form you read to the defendant?

7        A.   Yes, it is.

8             MS. JOHNSON:  Your honor, I would ask that

9        for hearing purposes People's Exhibit 2 be marked into

10       evidence.

11            MR. SCHECHTER:  May I see the original

12       document, your Honor, before?

13            THE COURT:  Yes.

14            MR. SCHECHTER:  It might obviate the

15       necessity for voir dire.

16            (Shown to counsel.)

17            THE COURT:  Any objection?

18            MR. SCHECHTER:  Not for the purposes of the

19       hearing, your Honor.

20            THE COURT:  All right, so without objection

21       for the hearing, People's 2 will be received in

22       evidence.

23            (People's Exhibit 2 received in evidence.)

24            (Shown to witness.)

25       Q.   Detective Schulman, what you just read to us, was

Schulman - People - direct          48

1   that how you read it to the detective in the interview room?

2       A.   Yes, it was.

3       Q.   And what was his response to you reading that

4   consent search form?

5       A.   Mr. Gopaul stated yes, he would consent.

6            I then said to him, "Well, again, I would like to

7   you read this to yourself."

8            He read it to himself and then he signed his name

9   and he put the date and time and our location on the bottom

10  of the form and handed it back to me.

11      Q.   Did you observe the defendant put his signature on

12  that form?

13      A.   Yes, I did.

14      Q.   And who was it that actually wrote the location,

15  the date and the time?

16      A.   Mr. Gopaul.

17      Q.   And by that are you indicating that the defendant

18  wrote 5:20 a.m., June 24th, 2008, 105 detective squad?

19      A.   Yes, I am.

20      Q.   Did you observe him read this form?

21      A.   Yes, I did.

22      Q.   Did he have any questions for you after reading

23  it?

24      A.   He did not.

25      Q.   Did he ask to speak to an attorney after he read

Schulman - People - direct          49

1   it and before he signed it?

2       A.   He did not.

3       Q.   Were any threats made to him prior to signing it?

4       A.   No, there were not.

5       Q.   Were any promises made?

6       A.   No.

7       Q.   Had anybody entered or left the room during the

8   time this consent form was read to the defendant?

9       A.   No.

10      Q.   And where was your weapon at that point?

11      A.   It was still locked up outside in my office.

12      Q.   Following the defendant's signing this consent

13  form marked as People's 2, what was the next conversation

14  you had with the defendant?

15      A.   Well, after he signed it I signed it and then the

16  next thing I did is I said to him that, as I had priorly

17  (sic) said to him, I was going to read to him a consent to

18  search his vehicle.

19              MS. JOHNSON:  Your Honor, I'll ask this be

20          marked as People's Exhibit 3 for identification.

21              (People's Exhibit 3 marked for

22          identification.)

23              (Shown to witness.)

24      Q.   Detective, if you could please take a look at what

25  has been marked as People's Exhibit 3 for identification

ws

Schulman - People - direct          50

1   purposes?

2          Do you recognize that?

3      A.   Yes, I do.

4      Q.   What do you recognize that to be?

5      A.   This is the pre-printed consent form that I used

6   to ask Mr. Gopaul for consent to search the vehicle that he

7   was the legal custodian of at the time.

8      Q.   How do you know that that's the one you used in

9   this case with this defendant?

10      A.   The handwriting of the items that I filled in are

11   in my handwriting, I witnessed when it was signed and I also

12   affixed my own signature on the bottom of the form.

13      Q.   Is that a fair and accurate copy of the original

14   form?

15      A.   Yes, it is.

16          MS. JOHNSON:   Your Honor, we would ask that

17      this be marked as People's 3 in evidence for purposes

18      of this hearing.

19          THE COURT:   You're getting the original right

20      now, Mr. Schechter.

21          MR. SCHECHTER:   Thank you, Judge.

22          (Shown to counsel.)

23          MR. SCHECHTER:   No objection for purposes of

24      the hearing.

25          THE COURT:   Without objection, People's 3 in

ws

Schulman - People - direct              51

1       evidence.

2                    (People's Exhibit 3 received in evidence.)

3                    THE COURT:  Okay, Ms. Johnson.

4                    (Shown to witness.)

5       Q.    Detective, if you could take a look at that

6       document?

7                    Could you tell us how it was that you read that

8       document to Mr. Gopaul on June 24th, 2008?

9       A.    While I was sitting with Mr. Gopaul I was filling

10      in the top captions that would need to be filled in for me

11      to read it to him.

12                   After that was complete I then read, "I Harold

13      Gopaul am the owner/legal custodian of a 2006 Dodge Ram

14      bearing license plate number 22726JV and VIN number

15      1D7HA16NX6J220067, which is currently located at side of the

16      105 Precinct.

17                   "I have been duly advised of my rights to:  One,

18      refuse such consent; two, require that a search warrant be

19      obtained prior to any search; three, that if I do consent to

20      a search, any evidence found as a result of such search can

21      and will be used against me in any criminal proceeding;

22      four, that I may withdraw my consent to search any time

23      prior to its conclusion.

24                   "I knowingly, intelligently and voluntarily waive

25      my above rights and consent and authorize Detective Schulman

                                                              ws

Schulman - People - direct          52

1    or his duly authorized agent of the New York City Police

2    Department to conduct said search."

3         Q.    And who signed this document?

4         A.    After Mr. Gopaul indicated that he would consent

5    he again he read the form to himself and agreed that he

6    would consent.  He then affixed in his own handwriting, the

7    date and time and he printed his name and he signed his name

8    and then I signed my name below as witness.

9         Q.    Where it says date June 24th, 2008, time 5:30

10   a.m., is that your handwriting or the defendant's

11   handwriting?

12        A.    That is Mr. Gopaul's handwriting.

13        Q.    And next to the word subject where it is a printed

14   name of Harold Gopaul and then a signature, who marked that

15   printed name?

16        A.    Mr. Gopaul.

17        Q.    And did you observe him sign that document?

18        A.    Yes, I did.

19        Q.    Prior to defendant signing this were any promises

20   made to him?

21        A.    No, there were not.

22        Q.    Were there any threats made to him?

23        A.    No.

24        Q.    Any physical force used upon him?

25        A.    No.

ws

Schulman - People - direct                 53

1        Q.   Was he still unhandcuffed?

2        A.   Yes, he was.

3        Q.   Had anybody -- any member of law enforcement

4   entered or left the room up until that point?

5        A.   No.

6        Q.   Did he indicate he wanted to speak to an attorney

7   at the time?

8        A.   No, he did not.

9        Q.   Did he have any questions for you?

10        A.   No, did he not.

11        Q.   And he indicated orally prior to signing this that

12   he wished to waive his rights and consent to this?

13        A.   Yes.

14        Q.   Did you observe him read over the documents?

15        A.   Yes.

16             THE COURT:  Detective, just to kind of put

17        this -- put some context to this, are these forms being

18        presented to him after you've now read him his Miranda

19        warnings, as you've testified?

20             THE WITNESS:  That's correct.

21             THE COURT:  Is there any time that's on the

22        forms or that you noted anywhere as to when these

23        events are taking place at all?

24             THE WITNESS:  Yes, your Honor.

25             THE COURT:  On the forms themselves?

ws

1              THE WITNESS:  Yes.

2        Q.    With regards to the -- I'm sorry, do you have both

3    of the documents up there for you?

4        A.    Yes.

5        Q.    With regards to the consent search that's been

6    marked into evidence of the home, that 5:20 a.m. time, is

7    that the time that the consent was read or the time the

8    defendant signed it?

9        A.    The time that he's signing it.

10       Q.    And on the consent form for the vehicle, the 5:30

11   a.m., what time does that represent, that 5:30 time?

12       A.    That, again, represents the time that he is

13   signing it.

14       Q.    And --

15       A.    Which he actually wrote in his own handwriting

16   just prior to signing it.

17       Q.    And those were both signed after the Miranda

18   warnings were issued?

19       A.    That is correct.

20       Q.    And after the defendant signed the Miranda form?

21       A.    That's correct.

22       Q.    After both of those consent forms were signed what

23   did you do?

24       A.    At that moment I stepped out and took a break for

25   a little while.  I had to go back and speak to the victim

Schulman - People - direct            55

1    and get some other information.

2         Q.   Did there come a time when you came back into the

3    interview room to speak with the defendant?

4         A.   There did.

5         Q.   Approximately what time was that?

6              THE WITNESS:  Again, I'm going to refer to

7         that same report, your Honor.

8              THE COURT:  Okay.

9         A.   It was approximately 6:20 on the morning of

10   June 24th.

11        Q.   What was the defendant doing at 6:20 when you went

12   into the interview room?

13        A.   He was sitting awake, and appeared coherent, in

14   the same chair that he had been sitting in with his eyes

15   open.

16        Q.   Same interview room as before?

17        A.   Same interview room.

18        Q.   Was he handcuffed?

19        A.   No, he was not.

20        Q.   Was your weapon still secured?

21        A.   Yes, it was.

22        Q.   Was anybody else in the room?

23        A.   No, they were not.

24        Q.   What did you do when you went into the interview

25   room?

Schulman - People - direct            56

1        A.    Okay, I went in and asked Mr. Gopaul if he knew

2   why he was in custody and under arrest.

3              And he stated that, you know, on Saturday, prior,

4   he had an argument and he had to slap Sana.

5              So I asked him if he wished to, you know, to make

6   a written statement in regards to what had happened Saturday

7   and he indicated yes.

8        Q.    When you say Sana you're referring to Sana Awan,

9   the complainant in this matter?

10       A.    That's correct.

11       Q.    Where was the victim while you were having this

12  conversation with the defendant?

13       A.    She was in another interview room in my office.

14       Q.    What did the defendant say to you after you asked

15  him if he would like to talk about what happened on that

16  Saturday?

17       A.    Well, he then --

18             MR. SCHECHTER:   Your Honor, I'm sorry to

19        interrupt the witness, your Honor, but the witness has

20        been continually reading from his documents.  I'm going

21        to object because instead of it being his testimony,

22        he's reading from documents and they're not in

23        evidence.

24             THE COURT:   There's times when I'm making my

25        own notes and I may not see that myself.

Schulman - People - direct          57

1          Detective, if you're going to look at the

2     documents just indicate you need to look at them and

3     just tell Ms. Johnson and just identify -- I'm

4     assuming, unless I hear from you differently, the

5     document -- you're referring to the document that you

6     have as approved, but our copies say unapproved?

7               THE WITNESS:  Yes.

8               THE COURT:  Is that what you're referring to?

9               THE WITNESS:  Sometimes I'm just looking

10    down, I'm not actually look looking at it.

11              THE COURT:  Okay, if you're referring to any

12    document just tell us you need to do that.

13              THE WITNESS:  Yes, your Honor.

14    Q.    What did the defendant say to you after you asked

15    him if he would like to talk to you about what happened on

16    Saturday?

17    A.    He made that initial comment that he had an

18    argument with her on Saturday and slapped her.

19          I asked him if he would like to make a written

20    statement about that and he said yes.  I then gave him a pad

21    and a pen and he was allowed to write out a statement.

22    Q.    What did you say to him when you gave him the pad

23    and the pen?

24    A.    Write down what happened, or something to that

25    effect, very similar to that.

ws

Schulman - People - direct          58

1    Q.    And you provided him with the pad and the pen?

2    A.    That's correct.

3    Q.    And what did defendant do with the pad and pen?

4    A.    He wrote out a statement.

5              MS. JOHNSON:  I'm going to ask this be marked

6    as People's Exhibit 4 for identification.

7              THE COURT: People's 4.

8              (People's Exhibit 4 marked for

9    identification.)

10             THE COURT:  Okay, Ms. Johnson?

11             MR. SCHECHTER:   Can I see the original?

12             THE COURT:  Are you going to be offering this

13   in evidence?

14             MS. JOHNSON:  Yes, your Honor.

15             THE COURT:  So why don't you give the

16   original to my officer?

17             (Shown to counsel.)

18             MR. SCHECHTER:   May I have a moment, your

19   Honor?

20             THE COURT:  Yes.

21             (Pause in the proceedings.)

22             MS. JOHNSON:  Your Honor, there's another

23   statement I'm going to be offering, so if we could just

24   have the detective pull that out now.

25             THE COURT:  Well, I'm looking at MY clock.

ws

Schulman - People - direct            59

1      Let's just deal with this one statement.

2                  MS. JOHNSON:  Okay.

3                  (Pause in the proceedings.)

4                  MR. SCHECHTER:   Your Honor, I would just

5      like to say parenthetically, the copy of that statement

6      that was given to me does not contain a second page and

7      leaves out at least three or four lines on the bottom.

8      This is the first I've noticed the second page as well

9      as the bottom of that first page.

10                 THE COURT:  You're talking about the second

11     page?

12                 MR. SCHECHTER:   Of this statement.

13                 THE COURT:  It's a two-page statement, yes?

14                 MR. SCHECHTER:   Yes.  I only have one page.

15                 THE COURT:  In terms of the Rosario material?

16                 MR. SCHECHTER:   In terms of my discovery

17     material, Judge.

18                 THE COURT:  Okay.  Well, let me ask you this,

19     before we get to the parenthetical material, do you

20     have any objection to this coming into evidence?

21                 MR. SCHECHTER:   Not for purposes of the

22     hearing.

23                 THE COURT:  For purposes of the hearing.

24                 MS. JOHNSON:  We're talking about the

25     June 24th, 2008 statement first that was timed 6: --

Proceedings                    60

1           MR. SCHECHTER:   30.

2           MS. JOHNSON:  -- 25 a.m.?

3           MR. SCHECHTER:   Yes, that statement.

4           THE COURT:  Detective, would you do me a

5     favor, just so the record is clear, look at what's been

6     marked People's 4 for identification and could you tell

7     us what time that statement is?

8           THE WITNESS:  6:25 a.m. on June 24th of 2008.

9           THE COURT:  And how many pages is it?

10           MS. JOHNSON:  It is two pages.

11           THE WITNESS:  It is two pages, your Honor.

12           THE COURT:  So at this point I'm going to

13     interrupt Ms. Johnson, we're going to break until

14     tomorrow.

15           MS. JOHNSON:  For the uniformed officer.

16           THE COURT:  For the uniformed officer.

17           MR. SCHECHTER:   What is the officer's

18     commitments with respect to his return for purposes of

19     completion of the record?

20           THE COURT:  I'm going to get that in a

21     minute.

22           Let me ask you this, detective, are you

23     unavailable tomorrow?

24           THE WITNESS:  I am -- your Honor, actually, I

25     only got notified last minute last night about today

Proceedings                61

1    and I didn't get home until 4 o'clock from working last

2    time and then out of courtesy for the Court I made it a

3    point of changing my schedule today, so I actually have

4    my children in the morning tomorrow.

5                THE COURT:  Can you be here Monday morning?

6                THE WITNESS:  Again, I'll have my children.

7    It will be a little difficult.

8                THE COURT:  I don't mean to be difficult

9    myself and I understand.

10               THE WITNESS:  Is there a chance we can do

11   Monday afternoon?

12               I want to work with the Court.

13               THE COURT:  All right, what I'm going to do

14   is plan on being here Monday, regardless.  I'll let

15   Ms. Johnson know as to whether or not I definitely need

16   you here Monday morning or afternoon.

17               MR. SCHECHTER:   May I have a sidebar when

18   the officer is off the stand?

19               THE COURT:  For now you are excused until

20   Monday.  Make sure you take your file with you.

21               MR. SCHECHTER:   Maybe you could hold him for

22   one brief second while I have a sidebar with the Court,

23   please?

24               THE COURT:  Yeah, why don't you just gather

25   your stuff, detective, have a seat in the back of the

                                                    ws

1        courtroom.

2                    (Witness steps down.)

3                    (Discussion held at the bench, off the

4        record.)

5                    THE COURT:  Mr. Schechter, I'm going to ask

6        your client some questions relative to this application

7        for daily copy.

8                    Mr. Gopaul, I'm showing you a document that I

9        believe your attorney went over with you earlier.  It

10       appears to have your signature in there and it deals

11       with certain financial matters regarding your request

12       for minutes to be provided to your attorney on a daily

13       basis.

14                   Is that your signature that appears there?

15                   THE DEFENDANT:  Yes, your Honor.

16                   THE COURT:  And you went over this with your

17       attorney before signing it?

18                   THE DEFENDANT:  Yes, sir.

19                   THE COURT:  And everything that you -- all

20       the answers that are contained in there are true?

21                   THE DEFENDANT:  Yes, your Honor.

22                   MR. SCHECHTER:   Just so that the record is

23       clear and your Honor understands, your Honor, this

24       document -- it's his wife -- he has a business, an

25       extermination business, that's in his wife's name.  He

                                                              ws

Proceedings                    63

1      is the worker for his company and paid a salary, but

2      the wife is the owner of the company and the money that

3      is alleged there in that document is money that is in

4      the wife's name and the wife's bank accounts.

5              THE COURT:  Okay, all right, so I've signed

6      it.  I'll direct my reporter to provide you with daily

7      copy.

8              MR. SCHECHTER:   Thank you, Judge.

9              THE COURT:  Mr. Gopaul, listen to my clerk

10     for a moment.

11             THE CLERK:  Mr. Gopaul, you have to appear

12     tomorrow morning.

13             If you fail to appear a warrant can be issued

14     for your arrest, you will be subject to the charge of

15     bail jumping and the case will proceed in your absence.

16             Do you understand?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Detective, we need you to be here

19     9:30 Monday.

20             THE WITNESS:  Okay.

21             THE COURT:  And, you know, I was told that

22     this matter was ready to go.  It's got to go from day

23     to day.  Everybody has certain scheduling orders that

24     they have to follow, including myself, so we're going

25     to need you here 9:30 on Monday, okay?

Proceedings                    64

1              (Proceedings adjourned to Friday, March 1st,

2      2009 at 9:30 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ws

65

```
1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF NASSAU : CRIMINAL TERM PART 80

3    ----------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,    :    Indictment
4                                            :    No. 2415N/08
               -against-                     :
5                                            :
     HAROLD GOPAUL,                          :    Sex Abuse 1
6                                            :
                        Defendant.           :    Huntley/Mapp
7    ----------------------------------------X    Hearings

8                               May 1, 2009

9                               252 Old Country Road
                                Mineola, New York
10

11   B E F O R E:

12                HONORABLE JAMES P. McCORMACK,
                         Acting Supreme Court Justice
13

14   A P P E A R A N C E S:

15           (As previously noted.)

16
                  *      *      *      *      *
17

18           THE CLERK:  The People against Harold Gopaul,

19   Indictment 2415N of 2008

20           MS. JOHNSON:  For the People, Jamie Johnson.

21           MR. SCHECHTER:  On behalf of the defendant,

22   Harold Gopaul, Donald R. Schechter, 80-02 Kew Gardens

23   Road, Kew Gardens, New York.

24           I'm ready to proceed.

25           THE COURT:  People?
```

Proceedings                66

1      MS. JOHNSON:  Your Honor, yesterday we had

2   sent a subpoena yesterday early morning for -- and, in

3   fact, it was sent also while I wasn't at work on

4   Wednesday for Police Officer Alfaro, A-l-f-a-r-o, to

5   appear for the hearing.  We had sent one subpoena for

6   her to appear at the hearing yesterday and we sent

7   another one for her to appear today.

8        I have spoken personally with police liaison

9   from the NYPD and I've spoken to police liaison from

10   Nassau County.

11        Subpoenas were sent for Officer Alfaro for

12   yesterday.  They were also sent for today.  I confirmed

13   this morning at 9:30 in the morning with a sergeant at

14   the 105 Precinct that they did, in fact, receive an

15   appropriate and an accurate subpoena for

16   Police Officer Alfaro.

17        However, the sergeant indicated to me that it

18   was what they call RDO, Officer Alfaro's regular day

19   off.  They called her on her personal cell phone and

20   did attempt to notify her to be here not only

21   yesterday, but today.

22        She had not responded to their calls or their

23   messages when they advised her that she would be need

24   ed in court.

25        When I spoke to the sergeant this morning he

ws

Proceedings                    67

1    said that despite even contacting her, there may have

2    been an issue with overtime through the city.

3              Be that as it may, I asked about having her

4    possibly for this afternoon and then definitely for

5    Monday.

6              He advised me her next regular scheduled tour

7    is Tuesday.  I told him I would be sending a subpoena

8    either way for Monday for hearing and for Tuesday as

9    well.

10             His response to me was that even if I send it

11   and they receive it, just as they had with the other

12   subpoena, most likely they would not be sending the

13   officer until Tuesday, her regularly scheduled tour

14   back.

15             They advised me they would notify her about

16   Monday once we sent the subpoena and once they received

17   it, but due to the fact that it is her scheduled day

18   off if she does not personally respond to it and for

19   overtime constraints they cannot promise me they would

20   send her before Tuesday morning.

21             THE COURT:  What does the New York City

22   jurisdictions do with their cases when one of their

23   officers is off?

24             Do they just refuse to acknowledge the

25   subpoenas and not come to court or is it just because

                                                      ws

Proceedings                          68

1       it's coming out of Nassau County?

2               MS. JOHNSON:  I actually asked the sergeant

3       what their procedures were for notification.

4               He said they require 24 hours notice, which

5       we did give, but 24 hours notice from their last

6       scheduled tour.  So because she has not been at the

7       precinct and she has been consistently on days off,

8       they haven't seen her to actually give her the notice.

9               THE COURT:  So when did she last work?

10              MS. JOHNSON:  She wasn't working yesterday to

11      receive the notice.

12              THE COURT:  You said you sent a subpoena on

13      Wednesday for yesterday.

14              MS. JOHNSON:  It was sent Wednesday, your

15      Honor.  I was not at work on Wednesday, but police

16      liaison in my office through my paralegal received it

17      and the NYPD did receive it on Wednesday for Thursday.

18              So they have not been able to get in personal

19      contact with her to advise her, since she hasn't

20      been --

21              THE COURT:  I have a hard time thinking that

22      if the New York City Police Department needs to reach

23      one of their members that they're unable to reach them.

24              MS. JOHNSON:  And the sergeant advised me

25      they contacted her on her cell phone.  She has not

                                                        ws

Proceedings                    69

1      answered it and she has not responded.

2              And they further indicated that other than

3      that, due to overtime constraints, they would not be

4      able to guarantee that they would, in fact, be able to

5      send her.

6              But they did say either way they have not

7      been able to reach her.

8              THE COURT:  So what do you suggest?

9              MS. JOHNSON:  My suggestion to your Honor

10     is --

11             THE COURT:  Does the New York City Police

12     Department honor court orders any more or they don't

13     honor subpoenas?

14             Did you ask them if that would be something

15     that they would recognize?

16             MS. JOHNSON:  I spoke to the sergeant who was

17     in charge of their scheduling and I asked him, I said,

18     can you continue to follow up with her?

19             He said yes, he would give her a call, but at

20     this point whatever your Honor suggests -- I would

21     absolutely make another phone call, advise them that

22     the Court has requested her presence, not just the DA's

23     Office, that this is a continued hearing in a criminal

24     case.

25             They've been aware of this, but at this point

                                                        ws

Proceedings                    70

1      I'm at the whim of, unfortunately, the 105th Precinct

2      and the New York City Police Department.

3                  THE COURT:  Mr. Schechter?

4                  MR. SCHECHTER:  If it please the Court, the

5      105 Precinct had been informed earlier by Judge Donnino

6      in a nice way to cooperate with my investigator so my

7      investigator could get pictures of the room, the

8      interrogation room, where my client was interrogated.

9                  They, for lack of a better term, jerked my

10     investigator around for the better part of a week

11     claiming that the room could not be used because the

12     room was in constant use.  All we needed was three

13     minutes just to snap photographs.  They refused to

14     cooperate.

15                 Judge Donnino then made another call asking

16     when this could happen and they did it in a nice way

17     and just short of an order and finally last, I

18     believe -- a few days ago my investigator was finally

19     able to get access to that room called the box and got

20     pictures.

21                 They have been stonewalling and I think one

22     of the reasons for stonewalling is a question of

23     jurisdiction.  The point of view of the city, and I've

24     dealt with this for years already, New York City Police

25     Department says taxpayers of New York City pay their

Proceedings                    71

1    salary, that this is out of county, therefore they do

2    not want to utilize the services of the New York City

3    Police Department for out-of-county work and that is

4    why they would not be cooperating.

5              If this were a New York City case I am pretty

6    certain that the police officer, over time or not,

7    would be here.

8              My question to your Honor is, what if we were

9    on trial and we had a jury in the box and continuity --

10             THE COURT:  That's my question.

11             I understand, Ms. Johnson, you're here on

12   behalf of the District Attorney of this county,

13   normally you're used to dealing with the Police

14   Department for Nassau County, but that's, quite

15   frankly, what my question is to you.

16             Would they -- have they indicated to you that

17   if the officers are not working that they will not come

18   to court even on matters that involve their own

19   jurisdiction?

20             MS. JOHNSON:  They have not indicated

21   anything about that, your Honor.

22             What I would intend to do, then, is --

23   obviously we know that these witnesses are going to be

24   necessary for trial.  I will advise the commanding

25   officer of what the situation is and if I have to have

ws

Proceedings                    72

1      something in writing from them that they're going to

2      send them to give to the Court, then that's what I'll

3      do, but nobody has indicated to me that because it's a

4      Nassau County case that that's not why they're sending

5      them.

6              And, in fact, I've been in constant

7      communication with the Queen's DA and I know

8      overtime -- just as overtime is a problem out here,

9      it's no different in the city.

10             THE COURT:  I understand all of the

11     jurisdictions are under, you know, budgetary

12     constraints and I'm sure New York City is not immune to

13     it either.

14             I'm just rather shocked that they would get

15     subpoenas two days in a row -- do they even give you,

16     if you will, a heads up to say don't expect this

17     officer to be here?

18             MS. JOHNSON:  In fact, yesterday when we were

19     at a bench conference at the hearing I advised the

20     Court that yesterday, while I was here doing the

21     hearing, my paralegal called the city to confirm that

22     they received it and they did and there were no

23     problems.  I guess we had -- them receiving it and them

24     actually having the officer here are two different

25     things for the city.

                                                        ws

Proceedings                    73

1        But we had no indication, no phone calls,

2   that there was any problem and, in fact, this morning

3   the sergeant confirmed with me that the teletype was

4   sent appropriately, it was received within the

5   appropriate amount of time, but just that they couldn't

6   reach out to her.

7        THE COURT:  All right, who is -- the sergeant

8   that you're referring to is the sergeant at the 105?

9        MS. JOHNSON:  He is a sergeant at the 105

10  that when I spoke to -- when I called the precinct I

11  asked who would be in charge of speaking to somebody in

12  regard to a subpoena for an officer that's supposed to

13  come no Nassau County.  I didn't catch his last name,

14  but he was in charge of, I guess, the scheduling for

15  them.

16       THE COURT:  Okay, do you have a number and a

17  name that if my chambers staff should call I would be

18  able to do so?

19       MS. JOHNSON:  I have it on an e-mail in my

20  office, so I do have the number you would be able to

21  contact.

22       THE COURT:  All right, I'll try to see what I

23  can do.

24       MR. SCHECHTER:  I understand, your Honor.

25       I'm going to respectfully ask, your Honor,

                                             ws

Proceedings                74

1   that henceforth, since it appears the New York City

2   Police Department is not being cooperative here, that

3   the Court so order every subpoena with respect to the

4   New York City Police Department and make it a Court

5   order because unless your Honor threatens these people

6   with contempt, they're going to hold this court in

7   contempt, which is what they're doing now.

8            Now, I would normally be criticizing my

9   adversary for not having seen this and done this for a

10  week in advance.

11           However, counsel has been on trial up until

12  Tuesday last and needed Wednesday to basically

13  re-charge her batteries and still sent messages to her

14  paralegal to take care of this while she wasn't here.

15  So it wasn't as if there was a hiatus from her point of

16  view in terms of bad faith.  So I'm not claiming bad

17  faith on the part of counsel.

18           However, because the New York City Police

19  Department appears to be contumacious in this

20  situation, I have a man here accused of a very serious

21  crime, and because they seem to be flouting the

22  subpoenas of the prosecutors of Nassau County, I don't

23  see any other basis or any other means of compelling

24  them to be here unless you threaten them with jail.

25  There's no other way to do it.

Proceedings                              75

1            THE COURT:  Before we go from A to Z,

2    Mr. Schechter and start throwing adjectives around like

3    contumacious and flouting Court orders, which they

4    haven't up until now other than the DA's subpoena, I

5    would like to speak to the people in New York City to

6    find out whether or not there is any sort of budgetary

7    issue that will keep on arising during the course of

8    this case and I'll deal with it as I think appropriate.

9            MR. SCHECHTER:  I appreciate the Court's

10   intercession in this matter.

11           My only concern is I remember when I was a

12   prosecutor we didn't have it as bad as it is today, but

13   certainly in situations such as this I would ask the

14   Court to so order the subpoena and tell the precinct or

15   the location if this officer doesn't come here, and the

16   courts will do that, then they suffer the penalty of me

17   considering a sanction of contempt because the New York

18   City Police Department, as most police departments,

19   it's even worse in the federal government, of course,

20   but the New York City Police Department believes many

21   times that they are above the law and that they don't

22   have to obey the orders of the Court and I'm asking the

23   Court to do that.

24           THE COURT:  Mr. Schechter, your past

25   experience is of no moment to me and I'm not going to

Proceedings                 76

1        sit here and get into a bashing session of the New York

2        City Police Department because of your prior

3        experiences, whether they're justified or not, and let

4        me deal with it the way I think it's appropriate to

5        deal with.  I appreciate your suggestions, but at this

6        point they're just suggestions.

7                MS. JOHNSON:  Your Honor, one thing that the

8        sergeant did say to me, I don't quite know what it

9        means because I don't know what their lingo is, but I

10       did ask him if the officer was notified and you spoke

11       with her and then she failed to come to Nassau what

12       would happen.  He said she would be given a CD.  I

13       don't know what a CD means in NYPD terms, but obviously

14       there would have been ramifications to the officer had

15       she actually spoken to the precinct.

16               THE COURT:  Let's just move on for a moment.

17               I take it that with respect to Schulman, I

18       would ask you to be in contact with him today or this

19       afternoon.  I don't know whether he's working this

20       morning.  It sounded like he wasn't available this

21       morning.

22               MS. JOHNSON:  No, he's not working.  I have

23       his cell phone number and I --

24               THE COURT:  I would ask you to be in contact

25       with him, be here on Monday.

                                                              ws

Proceedings                    77

1          My understanding is that Judge Donnino had

2     indicated to you, the DA, that after the hearing he was

3     going to give or had agreed to, if you will, a one or

4     two-day period where the case was not going to be -- in

5     other words, it wasn't going to go straight into trial.

6     It was going to be a one or two-day period, I guess,

7     for you to prepare, whatever.

8          I think in light of what's going on you may

9     have used your one or two-day period between today and

10    Monday.

11         So I would tell both of you to prepare that

12    at the conclusion of the hearing, whether it's Tuesday

13    or Wednesday morning, that we're going to be picking a

14    jury by the afternoon.

15         MR. SCHECHTER:  Thank you, your Honor.

16         One other suggestion, if I might.

17         I think that the videotaped confession is

18    something -- since the Court has no familiarity with

19    this case whatsoever, the videotaped confession is

20    about a half hour.

21         Counsel, I don't believe, has done anything

22    with respect to the Miranda warnings on the video

23    confession.

24         However, if we could somehow have a mechanism

25    where that the predicate -- the predicates to the

Proceedings                    78

1   introduction of that are done, perhaps we could allow

2   the Court to see the videotape so we can get on with

3   this.

4           Because, your Honor, the videotape has within

5   it some of the things that I'm going to be talking

6   about on cross-examination.  I don't know if counsel

7   has the ability today of getting any people here with

8   respect to the video confession.

9           Maybe the District Attorney in Queens County

10  can come out here and -- he was present on the video

11  and I think he is -- was present, at least, if not

12  administered the rights to my client on the video.

13          So if he can come here perhaps we could at

14  least get that done?

15          MS. JOHNSON:  He's on trial.  I already tried

16  that.  ADA Rosenblatt actually was picking a jury

17  yesterday and I was going to have him here as a backup.

18  So he's actually on trial.

19          THE COURT:  I thought you were only calling

20  two witnesses.

21          MS. JOHNSON:  I am.

22          Because what counsel was saying was instead

23  of continuing with Detective Schulman for purposes of

24  the video, I could have called the Queens ADA who

25  actually is on the video, but I can't, he's on trial.

                                              ws

Proceedings                    79

1    I tried that already.

2              THE COURT:  So you plan on calling the Queens

3    DA at all for the purpose of the hearing?

4              MS. JOHNSON:  No, not at all.

5              MR. SCHECHTER:  There was two, not only Jared

6    Rosenblatt, but there was another DA that --

7              MS. JOHNSON:  I was going to do it if

8    Detective Schulman was completely unavailable, but he's

9    coming back.

10             THE COURT:  Is Officer Schulman present in

11   the videotape?

12             MS. JOHNSON:  Yes, it's two ADAs the video

13   person and the detective.  So the detective is there

14   throughout the whole video.

15             THE COURT:  Mr. Schechter, what I ask you to

16   do before you leave here today, give my clerk both your

17   office phone and cell phone in the event that -- we're

18   going to have Schulman here on Monday.

19             MS. JOHNSON:  Correct.

20             THE COURT:  Assume you're going to be here on

21   Monday.

22             MR. SCHECHTER:  If that's the case, I suppose

23   we ready and pass until Monday rather than doing this

24   torturous kind of --

25             THE COURT:  There's nothing we can do.

                                                      ws

Proceedings                    80

1           The last bit of advice I'm going to give both

2      of you is whatever pretrial issues you want me to

3      decide prior to jury selection, you better get it to me

4      in writing with whatever case law you feel is

5      appropriate to back it up.  I'm not going to have a

6      whole day's worth of banter back and forth about oral

7      applications because it sounded like that's what was

8      going to start happening yesterday, even though we're

9      only doing the hearing.  You better get it to me in

10     writing, you better have it backed up with case law,

11     you better get it to my secretary a day or two ahead of

12     time.

13             MS. JOHNSON:  I'll start working on that.

14             MR. SCHECHTER:  Yes, Judge.

15             THE COURT:  We'll see you -- you'll back here

16     Monday morning at 9:30.

17             MR. SCHECHTER:  Yes, Judge.

18             (Proceedings adjourned to Monday, May 4th,

19     2009 at 9:30 a.m.)

20

21

22

23

24

25

ws

1  SUPREME COURT OF THE STATE OF NEW YORK.

2  COUNTY OF NASSAU : CRIMINAL TERM PART 80

3  -------------------------------------------X

   THE PEOPLE OF THE STATE OF NEW YORK,      : Indictment
4                                            : No. 2415N/08

             -against-                       :
5                                            :

   HAROLD GOPAUL,                            : Sex Abuse 1
6                                            :

                    Defendant.               : Huntley/Mapp
7  -------------------------------------------X  Hearings

8                              May 4, 2009

9                              252 Old Country Road
                               Mineola, New York
10

11  B E F O R E:

12          HONORABLE JAMES P. McCORMACK,
                 Acting Supreme Court Justice
13

14  A P P E A R A N C E S:

15          (As Previously Noted)

16

17          *      *      *      *      *

18          THE CLERK:  Continued hearing, People of the

19  State of New York against Harold Gopaul,

20  Indictment 2415N of 2008.

21          MS. JOHNSON:  Good morning, Judge.

22          For the People, Jamie Johnson.

23          THE COURT:  Mr. Schechter, do you want to put

24  your appearance on the record?

25          MR. SCHECHTER:  On behalf of Harold Gopaul,

                                                    ws

Proceedings                    82

1    Donald R. Schechter, 80-02 Kew Gardens Road, Kew

2    Gardens, New York.

3              Your Honor, I would like the record to

4    reflect I have made a motion in limine, a courtesy copy

5    which I gave to the Court.  Since time is pressing I

6    had served the District Attorney myself in person with

7    her copy.

8              It relates to what we were discussing

9    regarding the use of any pending charged materials,

10   namely the information or charges that my client is

11   charged with in Queens County.

12             The Court of Appeals, in fact, proscribes

13   that conduct.

14             I submitted my motion to the Court and, as I

15   said, my copies to the DA and that would include a

16   redaction of the confession which the People have

17   indicated they intend to use on direct examination.

18             So those are the -- that is my motion in

19   limine.

20             The Court had asked me for case support, case

21   material, and I have supplied the Court's request.

22             THE COURT:  I appreciate that.  Thank you.

23             MS. JOHNSON:  Your Honor, I did receive a

24   copy of this.

25             I will have a written response in response to

                                                        ws

Proceedings                    83

1    his motion in limine along with any Molineaux by the

2    People.  I'll have it filed with the clerk's office

3    today and I'll just fax over a courtesy copy to the

4    Court because I know it takes some time to get there.

5              I did also provide, I gave it to your clerk,

6    a copy of the grand jury minutes.  Your Honor had

7    requested a copy of those.

8              THE COURT:  Yes.

9              MS. JOHNSON:  And this morning I turned over

10   additional Rosario material.  I provided a copy to the

11   Court as well as counsel.

12             I haven't had a chance to put a cover on it

13   so let me, for the record -- the packet includes a

14   property clerk's invoice for a two-speed massager

15   white/gray, a property voucher for a white body

16   massager, Officer Alfaro's memo book, the actual date

17   of June 24th, 2008, along with the outside cover of the

18   memo book, the unapproved complaint report related to

19   the recovery of the property, prisoner movement slip,

20   the arrest paperwork from the NYPD, two pages, the

21   on-line booking system arrest work sheet, that's

22   several pages, some of them are double-sided, so I just

23   direct the Court's attention to that, the complaint

24   follow-up information system index sheet, the

25   detective's bureau investigation review work sheet,

Proceedings                    84

1    and, your Honor, there was testimony regarding

2    unapproved versus approved reports.

3              THE COURT:  Yes.

4              MS. JOHNSON:  The last three pages of this

5    are identical to the unapproved.  The only difference

6    is that this is the approved version and I'll note what

7    the difference is.

8              On the last page it indicates the

9    supervisor's name, Sergeant Hanrahan, and the word

10   unapproved is missing.  Other than that, the contents

11   of it is identical to what was provided last week.

12             THE COURT:  And you've received that,

13   Mr. Schechter?

14             MR. SCHECHTER:  Your Honor, I haven't had an

15   opportunity to peruse what she's given me nor to read

16   it.  I mean, I just got it in court today.

17             One other thing, your Honor.  I submitted two

18   subpoenas for the Court to sign.  My investigator is

19   waiting for those.  I request that those be signed

20   forthwith so I can get her out to serve them.

21             THE COURT:  Right.  Actually, I was going to

22   go over that next.

23             MR. SCHECHTER:  I believe, your Honor, those

24   are ex parte applications.  I don't think that -- since

25   the District Attorney is able to serve her subpoenas

ws

Proceedings                          85

1    without notifying me --

2              THE COURT:  I understand, but I do think that

3    there may be matters that -- in these documents that

4    may very well have some privilege or confidentiality

5    that may attach to it.

6              So I'm going to sign the subpoenas, the only

7    question -- the only direction I'm going to ask, and

8    I'll have my law secretary just make a notation on the

9    subpoena, that they get brought to my chambers so I can

10   review them in camera.

11             MS. JOHNSON:  Your Honor, can I -- I don't

12   know if the Court is willing to disclose, but I would

13   just like to know what they're for.

14             MR. SCHECHTER:  That's the purpose of their

15   being ex parte.

16             THE COURT:  At this time I'm going to sign

17   the subpoenas.

18             MS. JOHNSON:  Just so your Honor knows,

19   counsel had provided Judge Donnino, when we were before

20   him, with various subpoenas, including My Space or

21   Facebook and New York City Board of Education.  I don't

22   know if those are returned to Judge Donnino as part of

23   the file, so --

24             THE COURT:  I'm hearing that for the first

25   time.  I'm not in possession of anything from Judge

1      Donnino other than the court file.

2              MR. SCHECHTER:  I respectfully request an

3      opportunity to review what counsel says she has given

4      me so I can respond adequately to the Court's inquiry,

5      your Honor.  She's indicated she's given me some new

6      Rosario material and I haven't had, really, a chance to

7      look at it.  I'm trying to arrange my file on the desk

8      and -- however, the other materials that I had

9      requested, your Honor, from counsel and from -- I asked

10     the Court direct they provide me have not been provided

11     me based upon what she said and on that basis I -- you

12     know, I have an issue with the Rosario material that

13     was requested and one of them is a mandatory report

14     that the police officer is required to submit with

15     respect to allegations of child abuse and those

16     documents I have not been given and unless he did not

17     do so, which means he violated the law, I request a

18     copy of those reports.

19             That's just one of them, Judge.  There was

20     several others that I requested as well.

21             MS. JOHNSON:  Well, as to first that, Judge,

22     I don't have a problem turning them over at trial, but

23     I don't see how they're Rosario for purposes of a

24     Huntley Hearing or for purposes of a Mapp Hearing.

25             One other request was there was an issue

ws

Proceedings                               87

1    about the second page of the written statements.

2                 THE COURT:  Yes.

3                 MS. JOHNSON:  I have a copy of that and

4    unfortunately the paper that the Police Department uses

5    is bigger than 11 by 14, so the part that was missing

6    on the first page when it was Xeroxed just says to be

7    continued on the other page so I'll have copies of that

8    for counsel right now.

9                 THE COURT:  All right, could you also, at

10   some point, give copies for the Court because --

11                MS. JOHNSON:  I will, Judge.

12                THE COURT:  These are the defendants

13   so-called written statements, yes?

14                MS. JOHNSON:  Yes, your Honor.

15                THE COURT:  And I take it there's one page

16   from June 24th, '08 at 7:30 a.m. and that's just a

17   single page?

18                MS. JOHNSON:  Yes.

19                THE COURT:  And then there's a second one or

20   actually the first one from June 24th of '08 at

21   6:25 a.m.?

22                MS. JOHNSON:  Yes.

23                THE COURT:  And that's the two-page one?

24                MS. JOHNSON:  Correct.

25                THE COURT:  Which I also don't have, other

                                                        ws

Proceedings                    88

1       than the first page.

2               MS. JOHNSON:  And then there is 8:30 on June

3       24th.  That is a question/answer page.

4               THE COURT:  Yes, that I have.

5               MS. JOHNSON:  I'm giving counsel and the

6       Court the copy of the second page.

7               Judge, when I made a copy of the first page

8       to show the bottom of it, it cuts off the top of it so

9       I'm going to use one to mark it.  I'll show it to

10      counsel and if he wants me to copy it as two pages, the

11      problem is the Xerox paper just isn't big enough.

12              THE COURT:  All right, could I just take a

13      look at what you have in your hand?

14              MS. JOHNSON:  Sure.

15              (Shown to Court.)

16              MS. JOHNSON:  Your Honor, I'll show

17      Mr. Schechter the bottom of the page.  It just seems to

18      get cut off every time we copy it.

19              THE COURT:  All right, Mr. Schechter, I don't

20      see any reason why we can't proceed with Detective

21      Shulman at this point.  We're still in, I take it, the

22      middle of his direct or coming at the end of his

23      direct.

24              The additional Rosario material here, in

25      large part, seems to pertain to Officer Alfaro.

                                                    ws

Proceedings                              89

1              MR. SCHECHTER:  Well, I would like the

2    opportunity, prior to beginning my cross-examination of

3    Detective Shulman to review this material, your Honor.

4              THE COURT:  And I intend to give that to you.

5              MR. SCHECHTER:  Thank you.

6              And the other issue is the Rosario material

7    that I had named earlier on the record that I have not

8    been supplied with.  I don't think we've really dealt

9    with that, Judge.

10             Now, counsel has indicated to me she was

11   going to contact the Queens District Attorney's Office

12   with respect to materials contained by him in his file

13   and I submit that's inadequate.

14             As the prosecutor in this case it is her

15   obligation to provide me with those Rosario materials

16   that I am entitled to under the law, whether or not

17   Jared Rosenblatt has them or not.

18             MS. JOHNSON:  Your Honor, I spoke to the ADA

19   in Queens.  He faxed me over on Thursday and Friday a

20   copy of his file that he had not yet provided to us.

21             There is handwritten notes in the file.  I

22   showed them this morning to Police Officer Alfaro and

23   to Detective Shulman.  They are neither of their notes.

24   They are actually the DA's work product and his

25   information and Rosario material and at this point,

                                                    ws

Proceedings                          90

1     from what I can read from it, most of it has to do with

2     conversations with the complainant and his work product

3     with regards to the file.

4              THE COURT:  When you say his, you're

5     referring to --

6              MS. JOHNSON:  The DA in Queens.  Yes, Judge.

7              MR. SCHECHTER:  I would ask the Court to

8     examine the documents, your Honor, to make the

9     determination if there's Rosario issues there.

10             Additionally, it's my experience that

11    District Attorneys routinely, when they speak to

12    arresting officer or complainants, make notes on their

13    file concerning the conversations and therefore if the

14    materials are copied from Mr. Rosenblatt's file

15    regarding conversations he had with the officer who is

16    testifying now, I certainly am entitled to those.

17             So if counsel is making some representation

18    as to work product, I would like the Court to make sua

19    sponte.

20             THE COURT:  Well, is this -- I thought I

21    understood you to say that these are notes that the DA

22    had with the complainant, no?

23             MS. JOHNSON:  The first page, Judge, is notes

24    about the complainant and notes -- the ones that refer

25    to the detective, it appears to be work product with

                                                        ws

Proceedings                    91

1    regard to his review of the file.

2            I'm happy to show them to the Court.  Two

3    pages are completely about -- it says interview with

4    the complainant.  I'll provide them to the Court now,

5    and the rest of it, other than grand jury testimony

6    that he has already provided to me, is the domestic

7    incident report, which wouldn't -- has nothing to do

8    with the Huntley or the Mapp portion, I would submit to

9    the Court, and the actual DA's -- their version -- we

10   have yellow cards in our files for notes, their version

11   of the yellow card and their ECAB paperwork that

12   references bail information, nothing about the

13   detective, but I'll happily hand that up to the Court.

14           THE COURT:  One other item I think

15   Mr. Schechter had referenced last week is is there any

16   reports that got generated by anybody with regard to

17   the detective requesting any kind of commendation or

18   recognition with regard to the case itself?

19           MR. SCHECHTER:  No.  It would be the

20   commanding officer, after speaking to the detective,

21   would then make a recommendation.

22           THE COURT:  Right, I understand.

23           MS. JOHNSON:  I didn't see anything in his

24   file.  I can step out, ask him and double check.

25           THE COURT:  Why don't you do that?

                                                    ws

Proceedings                    92

1          Why don't you hand me up that material so I

2     can at least take a look at that?

3               (Shown to Court.)

4               (Pause in the proceedings.)

5               THE COURT:  And the answer is?

6               He doesn't know.

7               MS. JOHNSON:  There was no request for

8     departmental recognition made in this case by the

9     officer or the detective.

10               THE COURT:  Okay.

11               (Pause in the proceedings.)

12               MR. SCHECHTER:  We also have that request for

13     the report he was supposed to mandatorily (sic) make to

14     the --

15               THE COURT:  Let's see.

16               I take it, Ms. Johnson, that you don't have

17     the report that Mr. Schechter is referring to or you're

18     not aware of its existence.

19               MS. JOHNSON:  I do.  I believe I said there's

20     nothing in it that's relevant for purposes of the

21     hearing.

22               MR. SCHECHTER:  Your Honor, I, for the life

23     of me, don't understand why prosecutors do this.

24     Rosario material, it's sort of like trial by ambush,

25     they give it to you at the last minute --

Proceedings                    93

1           THE COURT:  Mr. Schechter, before we get on

2    soap boxes and give speeches can I look at the material

3    before --

4           (Paused in the proceedings.)

5           THE COURT:  Ms. Johnson, this -- the

6    documents that you handed to me, this is from the

7    Queen's Assistant DA?

8           MS. JOHNSON:  Yes.

9           THE COURT:  The first page, is this his notes

10   of his interview with the complainant?

11          MS. JOHNSON:  I don't have another copy of

12   it, Judge, so I would have to take a look at what the

13   Court is looking at.

14          Your Honor, I'm just going to step out and

15   ask the detective to show me which is the ACS work

16   sheet because they all look alike to me.

17          THE COURT:  Okay.

18          (Pause in the proceedings.)

19          THE COURT:  All right, just to try to address

20   some of these Rosario materials, Mr. Schechter, the

21   packet or material Ms. Johnson gave me from the Queen's

22   Assistant DA would appear to me, for the most part to,

23   be his interview with the complainant in this case.

24          There doesn't appear to be any material, at

25   least at this time, at this stage of the hearing, that

                                                    ws

Proceedings                                94

1      would be considered Rosario material.  That may be

2      different as far as the trial is concerned as far as

3      the complainant is concerned.  I don't see anything

4      really here that would touch upon the issues that are

5      going to be addressed at this hearing.

6              People, do you want to -- what's the other

7      material?

8              MS. JOHNSON:  Yes, as to the adult and child

9      protective child services information, there was part

10     of, in one of the complaint reports, our version of a

11     crime report, there was reference to it.

12             I just stepped outside and spoke to Detective

13     Shulman.  He never spoke to adult protective services.

14     In fact, he said by the time he met with the victim

15     adult protective service was already at the precinct

16     meeting with the victim, so another officer, not

17     testifying at this hearing, would have prepared that

18     paperwork and contacted ACS.

19             He did indicate he did speak with them, but

20     no paperwork was generated from him and they were

21     already there when he got there, so --

22             THE COURT:  All right, and I think, having

23     myself reviewed the portion of our testimony that we've

24     had so far, he does state when the complainant does

25     come to the precinct I think an ACS worker is there, as

                                                        ws

Proceedings                    95

1    a matter of fact?

2                MR. SCHECHTER:  I'm sorry, your Honor?

3                THE COURT:  I think in his direct testimony

4    so far Detective Shulman has testified that there was

5    an ACS worker that was present at the 105 Precinct

6    interviewing the complainant.

7                Anything else, Mr. Schechter?

8                MR. SCHECHTER:  Not at this time, your Honor.

9                THE COURT:  All right, so, if we could --

10               MS. JOHNSON:  Let me just rev up, make sure

11   this is working.

12               THE COURT:  I think, Ms. Johnson, we were at

13   People's 4?

14               MS. JOHNSON:  Yes, I have that, your Honor.

15               And I believe only one page was marked, so

16   I'll put it on the record.

17               (The witness, Detective Leonard Shulman,

18   having previously been sworn, resumed the witness

19   stand.)

20               THE CLERK:  Detective, you're reminded that

21   you're still under oath.

22               THE WITNESS:  Yes.

23               MS. JOHNSON:  May I, Judge?

24               THE COURT:  Yes.

25               MS. JOHNSON:  Your Honor, when we left off on

                                                        ws

Shulman - People - direct                96

1        Thursday I had asked for the June 24th, 6:25 statement

2        to be marked.  It is two pages.  One page was marked.

3        I just want the record to note that it is a two-page

4        document.  I don't know if the Court reporter has to

5        change it on the sticker to say it's actually two

6        pages.

7                MR. SCHECHTER:  May I see the document,

8        please?

9                (Shown to counsel.)

10               MS. JOHNSON:  If I could have it shown to the

11       witness, please?

12               (Shown to witness.)

13   DIRECT EXAMINATION CONT'D

14   BY MS. JOHNSON:

15       Q.   Detective Shulman, if you could take a look at

16   People's 4, the two-page document for identification

17   purposes, please?

18            Do you recognize that?

19       A.   Yes, I do.

20       Q.   What do you recognize it to be?

21       A.   It is a photocopy of a two-page statement that was

22   written by Mr. Gopaul in my presence.

23       Q.   Is that a fair and accurate copy of the original

24   statement that you took on June 24th, 2008?

25       A.   Yes, it is.

ws

MS. JOHNSON: Your Honor, I would ask that that be marked into evidence for purposes of the hearing.

MR. SCHECHTER: May I have a voir dire, your Honor?

THE COURT: Yes.

VOIR DIRE EXAMINATION

BY MR. SCHECHTER:

Q. Detective Shulman, that isn't a fair and accurate copy of the original, is it?

A. Pardon me?

Q. That is not a fair and accurate copy of the original, is it?

A. It's a photocopy, but it represents what the original looks like.

Q. Did you tell the grand jury that the -- there's a little scribble that happened to get written on the paper?

MR. SCHECHTER: I don't have a page number, Judge, so I cannot refer to the page number.

Q. Did you tell them there's a little scribble that just happened to get written on the original that's not on the copy?

MS. JOHNSON: Which page?

MR. SCHECHTER: Counsel, you did not give me a cover page, so I can't tell you what date it is. I

Shulman - People - direct                98

1    can't tell you what page number it is because there's

2    no page numbers on here.

3            Let me just say, in the copies on the top you

4    may want to look on the right top -- you might want to

5    look up 66.  If you look in the right corner on the

6    top, 66.

7    A.    I'm not sure what document you're referring me to

8    look at.

9            MR. SCHECHTER:  May I approach the witness,

10   your Honor?

11           THE COURT:  Yes.

12   Q.    Detective Shulman, did you tell the grand jury

13   that the original had some scribble that happened to get

14   written on the paper of the original that's not on the copy.

15           Did you tell them that?

16   A.    I might have, but I don't believe -- I wasn't

17   referring to the statement.  There's more than one statement

18   in this case.

19   Q.    Which statement were you referring to there?

20   A.    Well, I believe I was speaking in regards to a

21   statement that we haven't yet come to.

22   Q.    May I see the statement you've got there?

23           THE COURT:  You're talking about the one

24   that's been marked?

25           MR. SCHECHTER:  The one before the Court,

ws

Shulman - People - direct               99

1      yeah.

2                    (Shown to counsel.)

3                    MR. SCHECHTER:   I stand corrected.   Thank

4      you, Judge.   I have no more questions at this time of

5      the witness on voir dire.

6                    THE COURT:   Any objection for the purposes of

7      the hearing for this statement being received?

8                    MR. SCHECHTER:   None for the purpose of the

9      hearing, Judge.

10                   THE COURT:   So marked.

11                   MS. JOHNSON:   If I could have that marked,

12     please, your Honor?

13                   (People's Exhibit 4 received in evidence.)

14                   MS. JOHNSON:   If I could have it shown to the

15     witness?

16                   (Shown to witness.)

17     DIRECT EXAMINATION CONT'D

18     BY MS. JOHNSON:

19         Q.    Detective Shulman, if you could take a look at

20     People's 4 in evidence, that two-page statement?

21               Who provided the name, address, date and time that

22     appears on that document?

23         A.    Mr. Gopaul.

24         Q.    Is there any part of any page of that document

25     that is in your handwriting?

                                                              ws

1      A.    On Page 2 I affixed my signature indicating my

2   shield number and then I noted a date and time at the

3   conclusion of this written statement.

4      Q.    Can you explain to us how it was that it came

5   about that the defendant, after being given a piece of paper

6   and a pen, wrote this statement?

7          What happened in the room?

8      A.    I had explained to Mr. Gopaul that, you know, his

9   daughter had made some allegations and I got to the point I

10  asked him if he wanted to make a statement, if he wanted to

11  make a written statement.

12         He indicated he did.

13         I gave him a pad and a pen.  I said, you know, "If

14  you can indicate your name, address, phone number and

15  today's date and time on the top and then if you could write

16  what your story is."

17     Q.    What information did you give the defendant about

18  what his daughter had said?

19             THE WITNESS:  I'm just going to refer back to

20             my complaint follow-up, your Honor, just to

21             refresh my memory?

22     A.    Okay, I had asked him if he knew why he was under

23  arrest and in custody a few moments prior to this statement

24  and he said on the Saturday before he had an argument with

25  his daughter an he slapped her.

1    So I then asked him if he would like to make a

2   written statement about it and upon indicating yes is when I

3   gave him an opportunity to make a written statement about

4   what had occurred.

5    Q.   Did you explain to the defendant what type of

6   information should be put into this two-page document?

7    A.   Other than his words about what had transpired

8   with his daughter.

9    Q.   Did you watch him sign this and did you watch him

10   write it?

11    A.   Yes, I did.

12    Q.   Did you ask him if he wanted to make any changes?

13    A.   Yes, I did.

14    Q.   What did he say?

15    A.   He said no.

16    Q.   At any time while he was writing the statement did

17   he ask to speak to an attorney?

18    A.   No, he did not.

19    Q.   If you could take a look at the first page, the

20   first line of the first paragraph, where it indicates

21   Saturday, June 21st, 2008?

22    Do you see the date where it says June 21st?

23    A.   Yes, I do.

24    Q.   And do you see that there is a one marked over the

25   two on the 22nd?

Shulman - People - direct                102

1        A.   Yes, I do.

2        Q.   Who made that marking?

3        A.   Mr. Gopaul.

4        Q.   Detective, can you read for us what has been

5    marked into evidence as People's 4?

6             THE COURT:  Is that really necessary?

7             MS. JOHNSON:  If your Honor --

8             THE COURT:  No.

9             MS. JOHNSON:  Even better.  Thank you, Judge.

10       Q.   At any time during the time the defendant was

11   writing the statement did he ask to speak to an attorney?

12       A.   No, he did not.

13       Q.   At any time did he tell you he no longer wished to

14   speak to you?

15       A.   No, he did not.

16       Q.   At any time did he indicate he had any questions

17   for you?

18       A.   No, he did not.

19       Q.   Was he cooperative with you?

20       A.   Yes, he was.

21       Q.   Was he handcuffed at the time?

22       A.   No, he was not.

23       Q.   Was your weapon still secured?

24       A.   Yes, it was.

25       Q.   And other than telling the defendant -- other than

1    asking him if he wanted to make any statement was there any

2    conversation between the defendant and yourself while he was

3    actually writing?

4         A.   No.

5         Q.   And you observed him sign it?

6         A.   Yes, I did.

7         Q.   Okay.  Was that the end of your contact with

8    Harold Gopaul?

9         A.   No, it was not.

10        Q.   What happened -- excuse me, let me step back for

11   one second.

12             Did you ask the defendant to read his statement

13   after he wrote it out?

14        A.   I did.

15        Q.   And was that the time you asked him if he wanted

16   to make any changes?

17        A.   Yes.

18        Q.   Did you observe him read the statement over?

19        A.   Yes.

20        Q.   Okay.  What did defendant ask of you following

21   signing the statement?

22        A.   He asked if he could use the restroom.  I ceased

23   the interview and I brought him to the restroom.

24        Q.   The restroom is outside of the interview room?

25        A.   Yes, it is.

1    Q.   Was he handcuffed when he was brought to the

2    restroom?

3    A.   Yes, he was.

4    Q.   And where did you bring him after the restroom?

5    A.   He was brought to the restroom.  He was

6    unhandcuffed so he could do what he needed to do in the

7    restroom.  He was then rehandcuffed and brought back to my

8    office to the interview room where the handcuffs were taken

9    off him.

10    Q.   And what happened in the interview room when you

11    came back from the restroom?

12    A.   Initially, I just had Mr. Gopaul sit in the

13    interview room and I took a little break from speaking to

14    him.

15    Q.   Where did you go?

16    A.   I believe I went to speak to the victim.  I

17    probably went to my desk.

18            MR. SCHECHTER:  Objection to what the officer

19        probably did, Judge.

20            THE COURT:  Yeah, if you recall what you did,

21        detective -- if you're not sure just tell us.

22            THE WITNESS:  I'm not 100 percent sure.  I

23        know I did other things.

24    Q.   You left the interview room?

25    A.   Yes, I did.

ws

1    Q.    Who was with the defendant when you left the

2   interview room?

3    A.    He was by himself.

4    Q.    Was there an officer outside the room?

5    A.    I don't recall, but the interview room was

6   secured.

7    Q.    When you left was he handcuffed?

8    A.    No, he was not.

9    Q.    Did he ask you for anything before you left?

10    A.    No, he did not.

11    Q.    Did you have any conversation with him before you

12   left?

13    A.    I believe I said, "I'll be back with you in a

14   little while," or something similar to that nature.

15    Q.    Did there come a time when you went back to the

16   interview room?

17    A.    There did.

18    Q.    Approximately what time was that?

19    A.    I think it was about 7:20 or 7:25.

20    Q.    What was your purpose in going back to the

21   interview room?

22    A.    To continue speaking to Mr. Gopaul in regards to

23   the allegations made against him.

24    Q.    What was the defendant doing when you went back

25   into the interview room?

1        A.    He was sitting in a chair facing the table in the

2    room.

3        Q.    Did you sit down at the table?

4        A.    Yes, I did.

5        Q.    What happened?

6        A.    I sat down across from Mr. Gopaul, the first chair

7    when you walk in the room again.  I indicated to him that

8    his step daughter, Sana Awan, had made some allegations

9    against him that there was some activity of an inappropriate

10   nature and if he wanted to talk to me about it.

11       Q.    Did you give the defendant the details of the

12   allegation?

13       A.    I did not.

14       Q.    Did you advise him that it was of a sexual nature?

15             THE WITNESS:  If I could just refer to my

16   complaint follow-up again, your Honor?

17             THE COURT:  Yes.

18             MR. SCHECHTER:  Your Honor, please note my

19   objection.

20             THE COURT:  I will note your objection.  He

21   can look at it.

22             Go ahead.

23       A.    Okay, I believe my words were that the allegation

24   was he was acting inappropriately towards her and that I was

25   not going to tell him exactly what the allegation was, but

1    that I would give him an opportunity to discuss things if he

2    wanted to.

3        Q.   Did you actually tell him you were not going to

4    give him the details of the allegation?

5        A.   Yes, I did.

6        Q.   What was his response to that?

7        A.   That he would like to say something about it.

8        Q.   What did you do after the defendant told you he

9    wanted to say something about it?

10       A.   Again, I'm just referring to my notes again here

11   in the complaint follow-up.

12            MR. SCHECHTER:  Excuse me, your Honor, I'm

13       sorry to interrupt, however I'm constrained to object

14       simply because the officer is not testifying from

15       memory.

16            What he is doing is parroting information he

17       plugged into a document almost a year ago, so he's

18       really not testifying, all he's doing is reading from a

19       document not in evidence, can't be in evidence and he's

20       only reading from -- this is not his testimony, this is

21       his document.

22            THE COURT:  Ms. Johnson, would you like to

23       ask the officer some questions with regard to the

24       document?

25            MS. JOHNSON:  Yes.

Shulman - People - direct                    108

1      Q.    Detective, you can not read from a document not in

2    evidence.

3           If you wish to refresh your memory you must say so

4    and once you're done refreshing your memory with your notes

5    please look up and don't read from any documents.  You must

6    testify as to what your recollection is after having your

7    memory refreshed.

8           When you went back into the room what did you do

9    after the defendant indicated he wanted to talk to you?

10     A.    He said something of the nature he felt bad about

11   it and he wanted to make a statement.

12          I then gave him a note pad and a pen and again

13   said, "Here," you know, "if you could right write your name,

14   address, the date and time and you could write your

15   statement."

16     Q.    Similar to the notepad you had given to him

17   before?

18     A.    I believe it was the same notepad, but the

19   previous statement had been removed from the top of the

20   notepad.

21     Q.    Were the pages blank?

22     A.    Yes.

23     Q.    What did you say to the defendant when you gave

24   him the pad and the pen?

25     A.    Something of the effect of, "If you could write

Shulman - People - direct                109

1    your name, address and phone number and the date and time on

2    the top and then write," you know, "your statement in your

3    words as to what you want to say about this."

4              MS. JOHNSON:  Your Honor, I'm going to ask

5         that this be marked as People's Exhibit 5 for

6         identification purposes?

7              THE COURT:  People's 5.

8              (People's Exhibit 5 marked for

9         identification.)

10             MS. JOHNSON:  Can I have People's 4 back?

11             (Shown to counsel.)

12        Q.   Detective, if you could take a look at People's 5

13   for identification purposes?

14             Do you recognize that?

15        A.   I do.

16        Q.   What do you recognize it to be?

17        A.   It is a photocopy of a statement written by.

18   Mr. Gopaul.

19        Q.   How do you know that?

20        A.   I observed it being written and after its

21   completion I did sign my name and placed my shield number

22   and I did note the date and time on the bottom of said

23   statement.

24        Q.   Is that a fair and accurate copy of the original

25   that was taken on June 24th, 2008?

                                                      ws

Shulman - People - direct                110

1    A.    Yes.

2              MS. JOHNSON:   Your Honor, we would offer

3    People's 5 in evidence for purposes of the hearing.

4              MR. SCHECHTER:   Voir dire, your Honor?

5              THE COURT:   Yes.

6    VOIR DIRE EXAMINATION

7    BY MR. SCHECHTER:

8    Q.    I redirect your attention to your grand jury

9    testimony, detective, where you indicated at Page 66 that

10   there was some scribble written on the original that was not

11   on the copy.

12              Would you please show us where the scribble that's

13   written on the original that's not on the copy, then?

14   A.    And, again, that's not -- I don't believe that's

15   pertinent to this particular one page.

16              THE COURT:   Well, let me ask you this.

17              THE WITNESS:   There is another page, your

18   Honor, that Ms. Johnson has not introduced yet.

19              THE COURT:   But it's not People's 5?

20              THE WITNESS:   It's not that page right there.

21              MR. SCHECHTER:   Okay.   May I have the paper,

22   please?

23              (Shown to counsel.)

24   Q.    Officer, on this copy there seems to be something

25   written on the very top above Harold Gopaul's name.

1      Could you please tell the Court what, if any --

2  what that is?

3          It's on the copy.

4          MS. JOHNSON:  I think it's the staple when I

5      Xeroxed it.

6          (Shown to witness.)

7  A.    It looks like a staple loop.

8  Q.    Do you see the original?

9      Do you have the original there?

10 A.    Yes, I have the original.

11 Q.    Could you please look at the original and let me

12 know if that's on there?

13 A.    It's not on the original.  It's either a flaw in

14 the photocopy or the copier this was copied from had a

15 staple in it.

16         MR. SCHECHTER:  May I see the original,

17     please?

18         THE COURT:  Yes.

19         (Shown to counsel.)

20         MR. SCHECHTER:  Thank you.

21         No more questions, Judge.

22         THE COURT:  Any objection?

23         MR. SCHECHTER:  Not for the purposes of the

24     hearing.

25         THE COURT:  All right, so we'll receive

Shulman - People - direct                112

1          People's 5 in evidence.

2                    (People's Exhibit 5 received in evidence.)

3                    MS. JOHNSON:  If I could have it shown to the

4          witness, please?

5                    (Shown to witness.)

6     DIRECT EXAMINATION CONT'D

7     BY MS. JOHNSON:

8          Q.   Detective, if you could take a look at People's 5

9     in evidence?

10               Whose handwriting appears on that document?

11         A.   With the exception of my signature and shield and

12    date and time across the bottom, Mr. Gopaul's handwriting is

13    affixed on this paper.

14         Q.   On the top right-hand side where it says the date

15    and time, who provided that information?

16         A.   Mr. Gopaul.

17         Q.   Did you observe him write this statement?

18         A.   Yes, I did.

19         Q.   Was this after you had issued Miranda warnings to

20    him?

21         A.   Yes, it was.

22         Q.   And at this time was your gun still secured?

23         A.   Yes, it was.

24         Q.   Was this after the defendant went to the bathroom?

25         A.   Yes, it was.

1      Q.   Was any physical force used on the defendant prior

2    to him writing this statement?

3      A.   No, it was not.

4      Q.   Were any threats made to the defendant prior to

5    him writing this statement?

6      A.   No, there were not.

7      Q.   Did you ask the defendant if he wanted to make any

8    changes to the statement?

9      A.   Upon his completion of writing the statement I

10   asked him to read it over to himself and make sure it was

11   what he wanted to say and if there were any changes he

12   wanted to make he was able to.

13              THE COURT:  Does that mean he did make

14       changes or he didn't make changes?

15              THE WITNESS:  He didn't make changes, but he

16       was afforded an opportunity if he wanted to.

17     Q.   Did you observe him reread the statement?

18     A.   Yes, I did.

19     Q.   Did you observe him sign it?

20     A.   Yes, I did.

21     Q.   And the June 24th, 2008 at 8:30 hours, what does

22   that indicate?

23     A.   That was the time I was signing it as this

24   particular statement was complete.

25     Q.   Was that after you observed the defendant read the

1   statement over?

2        A.   Yes, it was.

3        Q.   Was that after you asked him if he wanted to make

4   any changes?

5        A.   Yes.

6        Q.   At any time while he was writing the statement did

7   he ask to speak to an attorney?

8        A.   No, he did not.

9        Q.   At any time did he indicate he no longer wished to

10  speak to you?

11       A.   No, he did not.

12       Q.   Was the defendant cooperative with you at this

13  time in the interview room?

14       A.   Yes, he was.

15       Q.   Did he ask to go to the bathroom while he was

16  signing this?

17       A.   No, he did not.

18            MS. JOHNSON:   I can take back People's 5.

19            (Shown to counsel.)

20       Q.   After you affixed your signature to the bottom of

21  that document was that the end of your conversation with the

22  defendant?

23       A.   No, it was not.

24       Q.   What happened next?

25       A.   Immediately after I signed the document and dated

ws

Shulman - People - direct                115

1    and timed on the bottom I asked him if he had any vibrators

2    in his car.

3         Q.    Did you memorialize that conversation in any way?

4         A.    After the question was answered.

5         Q.    Can you walk us through how that conversation

6    happened?

7         A.    Right after I finished that other written

8    statement I asked him if he had any vibrators in the car.

9              I believe he said that he had some vibrators in

10   his house and that he had a body massager in his car that

11   was, you know, for himself, but that he had never -- hadn't

12   used it on his daughter.

13        Q.    What did you do after this conversation?

14        A.    I took off the previous statement off the notepad

15   and I had another notepad.  I wrote the date and time that I

16   was asking the question.  I then memorialized the question I

17   had asked him and the answer he had given in reply.

18              MS. JOHNSON:  Your Honor, I'll ask that this

19        be marked as People's Exhibit 6 for identification.

20              THE COURT:  People's 6.

21              (People's Exhibit 6 marked for

22        identification.)

23              MS. JOHNSON:  If I could have that shown to

24        the witness, please?

25              (Shown to witness.)

                                                          ws

1      Q.   Detective Shulman, take a look at People's 6 for

2   identification purposes, please.

3           Do you recognize that?

4      A.   Yes, I do.

5      Q.   What do you recognize it to be?

6      A.   It is the -- a photocopy of the question and

7   answers that I memorialized when I was speaking to

8   Mr. Gopaul on June 24th of 2008.

9      Q.   How do you know that?

10     A.   It's in my handwriting and my signature appears on

11  the bottom as I had placed it.

12     Q.   And is that a fair and accurate copy of the

13  original?

14     A.   I mean, other than the confidential stamp that I'm

15  assuming that somebody in the DA's Office or somebody must

16  have --

17           MR. SCHECHTER:  Objection to what the officer

18      assumes, please.

19     Q.   Do you have the original with you, detective?

20     A.   Yes, I do.

21     Q.   If you could just take that out of your case

22  jacket, please?

23           MS. JOHNSON:  I'll have that marked as

24      People's 6A.

25           THE COURT:  Fine.

ws

1          MS. JOHNSON:  For the hearing.

2          MR. SCHECHTER:  What is 6A, now?

3          MS. JOHNSON:  The original.

4          THE COURT:  It's the original without the

5     stamp on it.

6               (People's Exhibit 6A marked for

7     identification.)

8     Q.    Detective, if you could take a look at People's 6

9     and 6A for identification purposes?

10              (Shown to witness.)

11    Q.    Is People's 6 a fair and accurate copy other than

12    the stamp from the original 6A that you just took from your

13    case jacket?

14    A.    Yes, it is.

15    Q.    Is there anything missing from the Xerox copy that

16    is on the original?

17    A.    No.

18    Q.    Or vice versa, other than the stamp?

19    A.    No.

20    Q.    Are there any scribbles on that page that counsel

21    is referring to before?

22    A.    Yes, there is.

23    Q.    And is that on the original or on the copy?

24    A.    It is on the original.

25    Q.    Is it on the copy?

Shulman - People - direct              118

1          A.    It is on this particular copy, yes.

2          Q.    And so it's a fair and accurate copy other than

3     the stamp?

4          A.    Yes.

5              MS. JOHNSON:  Your Honor, we would ask that

6          People's 6 be marked into evidence for purposes of the

7          hearing.

8              THE COURT:  And that's the copy?

9              MS. JOHNSON:  The copy, Judge.

10             MR. SCHECHTER:  Voir dire, if I may, Judge?

11             THE COURT:  Yes.

12    VOIR DIRE EXAMINATION

13    BY MR. SCHECHTER:

14         Q.    Officer do you not recall testifying a short time

15    ago that every time I asked you a question concerning the

16    scribbles on the original that were not on the copy you had

17    stated there were other papers that -- other statements that

18    were made that had not yet been shown to you?

19             Do you recall that question and your answer?

20         A.    Yes.

21         Q.    Now you tell us that you -- you testified in the

22    grand jury that there was scribble on the original, but not

23    on the copy -- I'm sorry -- what are you referring to?

24             What scribble is not on the original that's on the

25    copy?

                                                           ws

1      A.    I don't know the specific context of that

2  testimony, but I believe on the lower portion of this, I

3  guess it's number 6A, and 6, that there's a Q with a couple

4  of lines through it, that after I had completed my

5  questioning of Mr. Gopaul and had signed it, that subsequent

6  to that is when that Q and the dash had gotten written.

7              MR. SCHECHTER:   I respectfully object to this

8       exhibit.   I don't think this exhibit is in the same

9       condition at the time it was made.

10             THE COURT:   And the basis for that is?

11             MR. SCHECHTER:   Basis is his grand jury

12      testimony where he indicated that there is, and I'll

13      quote it, Judge, "I think there's a little scribble

14      that just happened to get written on the paper of the

15      original that's not on the copy."

16             I can show you the grand jury testimony if

17      the Court wishes.

18             THE COURT:   I have the grand jury testimony.

19             MR. SCHECHTER:   Now the officer testifies, in

20      fact, that it's on both.

21             What is he referring to?

22             THE WITNESS:   I mean, if I could, your Honor?

23             MR. SCHECHTER:   He said it's not on the first

24      statement, it's not on the second statement.

25             Now we got the third and it's not on there.

1          THE COURT:  All right, do you have any

2     questions, Ms. Johnson, of the detective?

3          MS. JOHNSON:  I'm not done with the

4     statement.

5          THE COURT:  Okay.

6     DIRECT EXAMINATION CONT'D

7     BY MS. JOHNSON:

8     Q.   Detective, that scribble, the Q that's indicated

9     on that document, does that appear on your original copy?

10    A.   Yes.

11    Q.   Your original?

12    A.   Yes.

13    Q.   Can you tell us when that was put on the piece of

14    paper?

15    A.   Subsequent to my completion of my interview with

16    Mr. Gopaul while I was still in my office that day.

17    Q.   And what was the reason or why did you put that Q

18    on the piece of paper?

19    A.   I don't know specifically.  I mean -- can I say

20    what I believe I was thinking at the time?

21          MR. SCHECHTER:  Objection.

22          THE COURT:  Yeah, if you don't know exactly

23     why it was there, just tell us that.

24    A.   I don't recall specifically why it's there.

25    Q.   Was this Q on the bottom of the page marked on

Shulman - People - direct          121

1   that piece of paper while you were in the interview room or

2   after?

3                    MR. SCHECHTER:  Objection, it's been asked

4        and answered.  The officer already testified when he

5        put that on the paper, after the interview.

6                    THE COURT:  I'll allow it.

7                    You can answer that.

8        A.    After the interview was completed.

9        Q.    While in the room with the defendant or after?

10       A.    I don't recall, specifically.

11       Q.    Does the top of the page on top of that scribbled

12  Q, is that part of your -- of what's marked as

13  People's Exhibit 6 and 6A, is that a fair and accurate copy

14  of your memorialization of your interview with the

15  defendant?

16       A.    Absolutely.

17       Q.    And which part of People's 6 or 6A was written by

18  you and which part was written by the defendant?

19       A.    There's a drawing that Mr. Gopaul drew of what he

20  was describing as the vibrators that he was saying was in

21  his house, that is in his handwriting, and other than his

22  signature, the rest of the statement is in my handwriting.

23       Q.    Under the picture where it narrates what the

24  picture is of, who wrote that?

25       A.    I wrote that.

1     Q.   Was that in the defendant's presence?

2     A.   Yes, it was.

3     Q.   Did you show that to the defendant after you wrote

4    what the narrative of that picture is?

5     A.   Yes, I did.

6     Q.   And did you show the defendant the question and

7    answer that appeared on that document?

8     A.   Yes, I did.

9     Q.   And when you showed it to him did he sign

10   People's 6 or 6A?

11    A.   He indicated to me that it was accurate as to the

12   question I had asked him and what his answer was and to what

13   he had drawn and what I was labelling as his drawing and

14   then he affixed his signature as him saying it was accurate.

15    Q.   And did he indicate he wanted to make any changes

16   to either the question, answer or the picture?

17    A.   No, he did not.

18    Q.   And did you watch him sign it?

19    A.   Yes, I did.

20    Q.   Did you explain to the defendant how to draw the

21   picture?

22    A.   No, I did not.

23    Q.   What did you say to him?

24    A.   He made a comment about having vibrators in the

25   house and I think I said something, "Well, can you describe

ws

Shulman - People - direct                123

1    what it looked like?"

2           And I think he said something similar to, "It will

3    be easier if I just draw it for you."

4           MR. SCHECHTER:  Objection to what the officer

5       thinks.

6           THE COURT:  Yeah, if you don't know exactly

7       what it is that he said just tell us that.

8           THE WITNESS:  In sum and substance.

9    A.    I don't know verbatim, but it was very similar to

10   that which is what prompted me to give him the paper and pen

11   and say, "If you want to draw it you can draw it."

12   Q.    And everything that appears above your signature

13   and above the defendant's signature, was that all

14   memorialized in the defendant's presence?

15   A.    Yes, it was.

16   Q.    And was that all in the -- memorialized in the

17   interview room?

18   A.    Yes, it was.

19          MS. JOHNSON:  Your Honor, for purposes of the

20      hearing we would ask to offer that part of the

21      statement into evidence as that is the fair and

22      accurate copy as the detective testified.

23          MR. SCHECHTER:  I'm still objecting, Judge,

24      on the grounds that it was altered upon the signature.

25          THE COURT:  No, I'll -- I'm going to allow

1      the entire statement over objection in evidence,

2      People's 6.

3                  MR. SCHECHTER:  Your Honor, would the Court

4      please note that my objection to the offer of this

5      material is continuous even throughout the trial,

6      rather than my making continual objections to it?

7                  THE COURT:  Yes.

8                  MR. SCHECHTER: Thank you, Judge.

9                  (People's Exhibit 6 received in evidence.)

10                 THE COURT:  You're not offering 6A in?

11                 MS. JOHNSON:  No.

12                 MR. SCHECHTER:  6 is in evidence?

13                 THE COURT:  Yes, that's the copy.

14                 MR. SCHECHTER:  6A is not.

15                 MS. JOHNSON:  Can the detective leave that in

16     his case jacket or is the Court going to need it?

17                 It's marked for ID.

18                 THE COURT:  No, it's not being offered at

19     this time.  He can leave it in his case jacket.

20     Q.   Detective, who wrote the date and time on

21     People's 6 on the top right-hand corner of the document?

22     A.   I did.  I wrote that.

23     Q.   And is that your handwriting, the question and the

24     answer?

25     A.   Yes, it is.

1          THE COURT:  Just if I could interrupt,

2    detective, just with regard to if you could take out 6A

3    again and compare it to 6?

4              Is 6A a photocopy of 6?

5          THE WITNESS:  Yes, it is, your Honor.

6          THE COURT:  Is there anything on 6A or -- I

7    should say on 6A that is not on 6, other than the

8    stamp, the confidential stamp?

9          THE WITNESS:  No, other than that they're

10    accurate.

11    Q.   Detective, at any time when defendant was making

12    that drawing did he ask to speak to an attorney?

13    A.   No, he did not.

14    Q.   And at any time did he indicate he no longer

15    wished to speak with you?

16    A.   No, did he not.

17    Q.   Was he still cooperative?

18    A.   Yes, he was.

19    Q.   Was any forced used upon this defendant prior to

20    him making that drawing?

21    A.   No, there was not.

22    Q.   And were any threats made upon him prior to him

23    making that drawing?

24    A.   No.

25    Q.   Was that the end of your contact with the

1   defendant -- and, I'm sorry, let me just step back.

2             Had anybody walked in and out of the interview

3   room during this time?

4        A.   No.

5        Q.   Was that the end of your contact with the

6   defendant after People's 6 was memorialized?

7        A.   I believe I interacted with him further during the

8   course of the day, but not of any substantive matter.

9        Q.   What did you do next?

10            Who did you contact?

11       A.   At some point in time I spoke to Police

12  Officer Alfaro.  I indicated to her what the -- what the

13  statements Mr. Gopaul had made were.

14            I indicated to her that I believe there was

15  evidence in his home or his vehicle that were pertinent to

16  the case.  I indicated to her that Mr. Gopaul had given me

17  written consent to search both the vehicle that he was a

18  legal custodian of and his home to recover items.

19       Q.   To your knowledge, was that done?

20       A.   Yes.

21       Q.   And was it you or Officer Alfaro that recovered

22  the property in this matter?

23       A.   Officer Alfaro recovered the evidence in this

24  case.

25            MR. SCHECHTER:  Objection.

Shulman - People - direct          127

1      Q.   Well, you didn't recover the evidence, right?

2      A.   I was present --

3           THE COURT:  Objection sustained.

4           Go ahead.  You got a new question.

5      Q.   Did you recover any evidence in this case?

6      A.   I did not.

7      Q.   Did there come a time when you contacted the

8  Queens DA's Office?

9      A.   There did.

10     Q.   Tell us how that happened?

11          MR. SCHECHTER:  Objection.

12          Did he say they did?

13          THE WITNESS:  I said I did.

14          THE COURT:  All right, you contacted the DA's

15     Office.

16          Go ahead Ms. Johnson.

17     Q.   What was your purpose for contacting the DA's

18  Office?

19     A.   Mr. Gopaul had made statements to me.  I had -- at

20  some point in time I asked him if he would be willing to

21  make a videotaped statement with the Queens District

22  Attorney's Office.

23     Q.   If I could just stop you there for one moment.

24          Was it before or after the written statements were

25  given that you asked Mr. Gopaul if he wanted to make a video

ws

1      statement?

2           A.    After.

3           Q.    Was it after Miranda warnings had been issued?

4           A.    Yes.

5           Q.    Was it after People's 1, 2, 3, 4, 5, and 6 that

6      have been marked into evidence, was it after that time

7      frame?

8           A.    Yes.

9           Q.    Was it in the interview room that that

10     conversation took place?

11          A.    Yes.

12          Q.    Can you tell us how that came about?

13               What did you actually ask him?

14          A.    I indicated to Mr. Gopaul that, if he would like,

15     that the Queens District Attorney's Office might be

16     interested in coming and speaking to him and interviewing

17     him on videotape and if that was something that he would be

18     willing to do, that I would called the District Attorney's

19     Office and make an inquiry if he was interested in doing

20     that.

21          Q.    What did he say when you asked him that?

22          A.    He said he would be willing to make a video

23     statement.

24               I left the interview room, leaving Mr. Gopaul in

25     the interview room, and I contacted the Queens District

ws

1    Attorney's Office.

2         Q.   Was a video subsequently made?

3         A.   Yes, it was.

4         Q.   Were you present for that?

5         A.   Yes, I was.

6         Q.   Where was the video made?

7         A.   In an interview room in my office.

8         Q.   In the 105?

9         A.   The 105 Precinct detective squad.

10        Q.   Was it the same room that you were interviewing

11   the defendant in before?

12        A.   No, it was not.

13        Q.   How come?

14        A.   The room that's used to make this particular video

15   at the initial time of speaking to the defendant, the victim

16   in this case, Miss Sana Awan, was in that other interview

17   room, so Mr. Gopaul was spoken to in the second interview

18   room.

19             At the time that we were going to make the video

20   Miss Sana Awan was no longer in that room, I had access to

21   that room, which also has the ability to plug in the video

22   cassette recorders and is a slightly bigger room to allow

23   room for the District Attorney, the defendant, myself and

24   the videographer.

25        Q.   Can you tell us how it came about that the

                                                            ws

Shulman - People - direct                    130

1    defendant was brought from the smaller interview room to the

2    video room?

3         A.   I took Mr. Gopaul out of the smaller interview

4    room and walked him to the other interview room and asked

5    him to have a seat in the chair in the room.

6         Q.   Was that before or after the DA's -- the Assistant

7    District Attorneys and the videographer had arrived at the

8    precinct?

9         A.   After.

10        Q.   At any time did the defendant indicate he no

11   longer wished to make a video statement?

12        A.   No, he did not.

13        Q.   At any time before or when the Queens DAs arrived

14   did he indicate that he wants to speak with an attorney?

15        A.   No, he did not.

16        Q.   Were any other officers or detectives in the video

17   room prior to the Queens DA's arriving?

18        A.   No, there were not.

19        Q.   Was the defendant handcuffed in the video room?

20        A.   No, he was not.

21        Q.   What was -- where was the defendant brought in the

22   room for when the DAs arrived?

23             Was he sitting at the table?

24             MR. SCHECHTER:  Objection, multiple question

25        and she's leading, your Honor.

                                                              ws

1              THE COURT:  Yeah, sustained.

2        Q.   What was the defendant's position when the Queens

3   ADAs arrived?

4        A.   He was sitting in a chair at a table in the

5   interview room.

6        Q.   Who was in the room?

7        A.   I was in the room and the videographer was in the

8   room.

9        Q.   Is the videographer a civilian or a police

10  officer?

11       A.   I believe in this case it was a police officer.

12            MR. SCHECHTER:  Objection as to what the

13       officer believes, again, Judge.

14            THE COURT:  Do you remember, have a

15       recollection, as to --

16            THE WITNESS:  I'm pretty sure it was a

17       detective, your Honor.

18       Q.   Is it a detective with your precinct?

19       A.   No.

20       Q.   Somebody with the DA's Office?

21       A.   Yes.

22       Q.   Where was your weapon when you went into that

23  room?

24       A.   It was still secured in my office in my --

25       Q.   To your knowledge, did the videographer have any

1    weapons with him?

2         A.   His were also secured upon his arrival prior to

3    him going into the interview room.

4         Q.   Is that Police Department policy?

5         A.   Yes.

6         Q.   Have you had the opportunity to review that video,

7    detective, since that date?

8         A.   Yes, I have.

9              MS. JOHNSON:   I'm going to ask that this be

10        marked as People's Exhibit 7 for identification

11        purposes.

12             THE COURT:   People's 7.

13             (People's Exhibit 7 marked for

14        identification.)

15        Q.   Detective, if you could take a look at People's 7

16   for ID?

17             (Shown to witness.)

18        Q.   Do you recognize that tape?

19        A.   Yes, I do.

20        Q.   What do you recognize it to be?

21        A.   It's a videotape that I reviewed that contains a

22   substance of a video interview with Mr. Gopaul back on

23   June 24th of 2008.

24        Q.   Is that a fair and accurate copy of the entire

25   interview with Mr. Gopaul in that room?

1      A.   Yes.

2           MS. JOHNSON:   Your Honor, I would ask that

3      this be marked into evidence.

4           MR. SCHECHTER:   May I have a voir dire?

5           THE COURT:   Yes.

6   VOIR DIRE EXAMINATION

7   BY MR. SCHECHTER:

8      Q.   Detective, is this a copy of the original or is

9   this the original tape that was made?

10     A.   I believe it's a copy.

11          MR. SCHECHTER:   Objection to what he

12     believes, your Honor.

13          THE COURT:   Do you know for a fact whether

14     it's a copy or the original?

15          THE WITNESS:   I didn't take the video, I

16     didn't operate the camera, so I couldn't say

17     specifically.

18     Q.   How do you know that this is a videotape of the

19   interview of Mr. Gopaul?

20     A.   I viewed the videotape on two occasions and

21   watched the substance of what's on the tape and it is myself

22   present in a room when Mr. Gopaul is being interviewed by

23   the Queen's District Attorney's Office.

24     Q.   But you don't have that -- that tape is not on for

25   view now, so you don't know if this tape is the interview of

ws

Shulman - People - direct                    134

1     Mr. Gopaul of your own knowledge?

2          A.    Well, I believe in October of '08 when I watched

3     the video I believe in the grand jury and prior to that I

4     affixed my signature on the white tape on the side.

5          Q.    Is your signature on this tape?

6          A.    Yes.

7               MR. SCHECHTER:  May I approach the witness,

8     Judge?

9               THE COURT:  Yes.

10         Q.    Please show us where your signature is on the

11    tape?

12              (Shown to witness.)

13         A.    (Indicating).

14              MR. SCHECHTER:  Then I have no objection for

15    the purposes of this hearing, Judge.

16              MS. JOHNSON:  Your Honor, before I play

17    that --

18              THE COURT:  Mark it.

19              (People's Exhibit 7 received in evidence.)

20         Q.    Detective, I'm going to play what's been marked as

21    People's Exhibit 7.

22              Were Miranda warnings issued again on this tape?

23         A.    Yes, they were.

24         Q.    And was that done in your presence?

25         A.    Yes, it was.

                                                        ws

1          THE COURT:  Are you going to play it now?

2          MS. JOHNSON:  I am, Judge, yes.

3          (Witness steps down.)

4          MS. JOHNSON:  Can I have a minute, Judge?

5          THE COURT:  Yes.

6          (Pause in the proceedings.)

7          (People's Exhibit 7 published at this time.)

8          (Witness resumes the stand.)

9      Q.   Detective Shulman, where was the defendant brought

10   at the conclusion of that video?

11     A.   Initially, I believe he stayed in that interview

12   room and at some point in time Officer Alfaro, I believe,

13   brought him downstairs and he was subsequently transported

14   to the Queens Central Booking facility.

15     Q.   Was your contact with the defendant over at the

16   end of this video?

17     A.   Pretty much, yes.

18     Q.   At any time during the totality of your contact

19   with the defendant on June 24th, 2008 did he ever ask to

20   speak with an attorney?

21     A.   No, he did not.

22     Q.   Did he ever indicate to you that he did not want

23   to speak with you?

24     A.   No, he did not.

25     Q.   Was there ever a language barrier?

ws

Shulman - People - direct                136

1        A.    No, there was not.

2        Q.    Was there ever any force used upon him in your

3    presence?

4        A.    No, there was not.

5        Q.    Any threats made upon him?

6        A.    No.

7        Q.    Any promises made of him?

8        A.    No.

9        Q.    I have no other questions of Detective Shulman.

10             MR. SCHECHTER:  May I have about five to

11   seven minutes to look at the Rosario material, Judge?

12             THE COURT:  Actually, you can have a little

13   bit longer than that, I have to break by 12:20.

14             So why don't we pick it up at 2:15?

15             MR. SCHECHTER:  2:15?

16             Okay.

17             THE COURT:  I take it by then you will have

18   had enough time to review the material?

19             MR. SCHECHTER:  Yes.

20             MS. JOHNSON:  Can I leave everything here,

21   Judge?

22             THE COURT:  Yes.

23             We'll see everybody at 2:15.

24             (The luncheon recess was taken at this time.)

25             *      *      *      *      *

                                                      ws

Proceedings                137

1              A F T E R N O O N   S E S S I O N

2              MR. SCHECHTER:  I have Pages 2 and 3 of the

3      arrest report -- of the complaint report, but not

4      Page 1 of the complaint report.  I would like to know

5      why not.

6              MS. JOHNSON:  Your Honor, Page 1 of the

7      complaint report is similar to our narrative and our

8      crime reports.  It reflects conversations with the

9      victim along with personal information of the victim.

10     It has nothing to do with the Huntley or Mapp.

11              If the Court would like to see it?

12              (Shown to Court.)

13              (Pause in the proceedings.)

14              THE COURT:  Who is, People -- who would CV

15     stand for in this report here?

16              There's a reference to a TPO, I'm assuming

17     that's time and place of occurrence, CV walked inside?

18              MS. JOHNSON:  Crime victim.

19              THE COURT:  I mean, it appears,

20     Mr. Schechter, that this Page 1, the narrative portion

21     which is the only portion that is of any significance

22     at least in terms of what's said, essentially is

23     statements that the complainant, crime victim, stated

24     to, I'm assuming, police personnel.

25              MR. SCHECHTER:  Well, if we can mark that a

                                                        ws

Proceedings                    138

1      court exhibit?

2             As long as I get that in Rosario material

3      when she testifies.

4             THE COURT:  Absolutely.  I would think you

5      would be absolutely entitled to it.

6             MS. JOHNSON:  I agree.

7             MR. SCHECHTER:  Your Honor, the other thin kg

8      is on the arrest report I have one of three and I have

9      two of three, but I don't have three of three.

10            THE COURT:  Is that the arrest work sheet?

11            MR. SCHECHTER:  Arrest report it says here,

12     your Honor.

13            THE COURT:  Is that what was handed over to

14     you this morning?

15            MR. SCHECHTER:  Either this morning or on

16     Friday.

17            MS. JOHNSON:  Your Honor, there is one page

18     that I showed counsel of a Page 3, it's completely

19     blank, and another page on an arrest report.

20            I don't have a Page 3 of three.  I don't

21     believe one exists.  I can have Detective Schulman

22     double check his case jacket.  I don't have a three of

23     three.  It could have been blank.  I have one of three,

24     I have two of three and then when I -- next page I have

25     is the defendant's mugshot.

Proceedings                139

1          MR. SCHECHTER:  It says three pages, Judge --

2     that's one of the reasons --

3          THE COURT:  I'm at somewhat of a disadvantage

4     because it's been awhile since I dealt with Rosario

5     material that gets generated, if you will, by Police

6     Department, so --

7          MS. JOHNSON:  I can double check.  He's right

8     outside.

9          THE COURT:  Is this the online systems

10    arrest?

11          Is that what you're referring to?

12          MR. SCHECHTER:  This says omni form system

13    arrest.

14          THE COURT:  Right.

15          MR. SCHECHTER:  On the top is written arrest

16    report, one of three.

17          THE COURT:  I see that.

18          MR. SCHECHTER:  And the next one also says

19    arrest report on the top and then it has my client's

20    home and cell numbers and then some information

21    underneath with Officer Alfaro's information, but it

22    says then three of three which there's no three of

23    three.  I just don't know where three of three.

24          MS. JOHNSON:  In fact, at the bottom of

25    Page 2 it says end of arrest report.

                                              ws

1        MR. SCHECHTER:  No, your Honor, if you look

2   at the other pages, if you look at the complaint

3   report, what they mean by end of complaint report they

4   mean end of complaint report for that page because in

5   the complaint report there's two of three and three of

6   three and not one of three.  One of three we already

7   discussed has the complainants information, but it says

8   on the bottom end of complaint report, so I suppose no

9   one could say something was written below it, but it

10  doesn't mean it's the end of the entire report,

11  apparently.  That's why it's confusing.

12        MS. JOHNSON:  The opposite is true for the

13  arrest report.  Bottom of Page 1 of the arrest report

14  is information and then the bottom of Page 2 says end

15  of arrest report.

16        MR. SCHECHTER:  Again, same thing with Page 2

17  and 3 of the complaint report.  On the bottom of Page 2

18  of the complaint report is end of complaint report and

19  the bottom of Page 3 it says end of complaint report.

20        What I'm saying to you --

21        THE COURT:  Why don't we do this?

22        Let's get him on the stand.  You ask him --

23  present these things to him because otherwise you're

24  asking me to figure out what this detective may have

25  generated in the way of Rosario material.

ws