Proceedings                    141

1          MR. SCHECHTER:  There's one additional one

2     and I only have two of three and I have no idea what

3     this is.

4               (Shown to counsel.)

5          MS. JOHNSON:  What does it say on the cover

6     page of your Rosario packet?

7               Where did you pull that out of?

8          MR. SCHECHTER:  I got it from the group of

9     papers you gave me.

10         MS. JOHNSON:  Because the cover page had a

11    list of what everything was, so let me just take a look

12    at mine.

13              (Pause in the proceedings.)

14              It's part of a complaint report that wasn't

15    part of the narrative, which is why what was turned

16    over, is the defendant's information and the part that

17    was redacted was the personal information of the

18    complainant.

19         MR. SCHECHTER:  Well, certainly I'm entitled

20    to that on Rosario with respect to the complainant, but

21    we should have some kind of Court follow-up on this,

22    maybe make these Court exhibits, to make sure I get

23    these papers and there are other documents I did not

24    get and I would like to give reference to them, if I

25    may.

ws

Proceedings                    142

1        MS. JOHNSON:  I agree, they are absolutely

2   Rosario for purposes of the trial.

3        THE COURT:  I'm a little confused,

4   Mr. Schechter, as to what you're asking me.

5        MR. SCHECHTER:  I could have this marked as a

6   Court exhibit, if the Court wishes, and ask her why --

7   there are three papers.  I only have two of three.

8   There's not one of three I don't have and three of

9   three I don't have.  I have no idea what that document

10  is.

11       MS. JOHNSON:  It's part of a complaint

12  report, your Honor, and the part that was not provided

13  was narrative about the complainant, information

14  involving the complainant.

15       The part that was disclosed for hearing

16  purposes is what was relevant not only to the testimony

17  of both witnesses here, but the defendant.

18       THE COURT:  Let me ask you this.

19       Did you provide -- I'm looking at something

20  that's a document that says Page 2 of three.

21       Did you provide Page 1 and page 3?

22       MS. JOHNSON:  I would not have, Judge, if it

23  was part of the victim's narrative.

24       MR. SCHECHTER:  No, I did not get it.

25       MS. JOHNSON:  And Page 3, I believe, is the

                                              ws

Proceedings                    143

1    one I showed counsel that's blank.

2           MR. SCHECHTER:  That's a different report,

3    Judge.  That Page 3 that was blank was the arrest

4    report.

5           THE COURT:  Well, I have no idea what I'm

6    looking at.

7           MR. SCHECHTER:  I don't either, Judge, and

8    that's why I'm raising this to the Court.

9           THE COURT:  Do you see what he's handed up to

10   the Court, Ms. Johnson?

11          MR. SCHECHTER:  I showed it to her, I

12   believe, Judge.

13          MS. JOHNSON:  I'm pulling out -- I have a

14   full copy of the detective's case jacket, so let me

15   take a look.

16          (Pause in the proceedings.)

17          MS. JOHNSON:  What he just handed up to the

18   Court was Page 2 of the complaint report, Page 1 being

19   what your Honor had looked at where it said at

20   time/place of occurrence, crime victim walked inside of

21   105th Precinct.

22          So here is Page 2 of that three-page

23   complaint report.  Page 3 already being provided to

24   counsel which indicates the defendant's information and

25   a portion where it says crime data and details.  So

                                                      ws

Proceedings                  144

1    this is Page 2 of the complaint report.

2              MR. SCHECHTER:  I think -- may I see that,

3    please?

4              (Shown to counsel.)

5              MR. SCHECHTER:  I believe counsel is mistaken

6    and I would like to show you why.

7              She had alluded to the fact Page 1 of three

8    is that narrative.  She's referring to the complaint

9    report.

10             This is another complaint report.  If you

11   look at Page 2 of three, which is the one I have here,

12   it's completely different.

13             MS. JOHNSON:  There's more than one complaint

14   report, that's why.

15             MR. SCHECHTER:  It's not the same first page

16   for both reports, counsel, is what I'm saying.

17   page 1 is different for each one.  And there's no

18   Page 3 here either.  All I have is two of three on this

19   particular item.

20             Just so that the record is clear, the

21   document I'm referring to has information concerning

22   the complainant which is blacked out on the top and in

23   one of the boxes it says reporter, colon, a number

24   sign, one of one and then again it appears to be

25   information about the complainant which is blacked out

                                                    ws

Proceedings                    145

1      and then underneath that, wanted number, one of one, it

2      refers to a male, five feet nine inches tall, my

3      client's name, but that's all there is on this document

4      and I have no idea what it relates to.

5              Certainly, the Page 1 alluded to by counsel

6      cannot possibly relate to the same complaint report.

7              MS. JOHNSON:  Judge, I have them both in

8      front of me.

9              THE COURT:  This is part of what was handed

10     over, I think, last week.

11             I've got Page -- it starts off with -- it's a

12     legal size copy.  It says Page 2 of three.

13             MR. SCHECHTER:  Is that the one that's

14     blacked out on the top and the sex box?

15             THE COURT:  No, it's not blacked out.

16             MR. SCHECHTER:  Two of three I have --

17             THE COURT:  But then at the bottom of the

18     first it says end of complaint report.

19             MR. SCHECHTER:  Is your Honor referring to --

20             THE COURT:  Excuse me.

21             MR. SCHECHTER:  I'm sorry.

22             THE COURT:  So then I go to the next page,

23     there's another two of three.

24             MR. SCHECHTER:  Yes.

25             THE COURT:  That has -- at the top it says --

ws

Proceedings                    146

1    there starts to be some blacked out items.  Then it

2    says reporter, one of one.

3                MR. SCHECHTER:  Right.

4                THE COURT:  There's a name that's blacked out

5    next to that.

6                MR. SCHECHTER:  Yes.

7                THE COURT:  Then it refers to a male, which

8    I'm assuming is the defendant.

9                MR. SCHECHTER:  My client's name is there,

10   Judge.

11               But I'm saying I don't have anything --

12               THE COURT:  Then it goes to Page 3 of three

13   and then it says end of complaint report.

14               So you've got --

15               MS. JOHNSON:  Because there was two complaint

16   reports generated, your Honor, one that was printed

17   probably from the PD website and one that was printed

18   from the internal computer which is why he has two

19   copies.

20               One of them -- both of them begin the same

21   way.  One has more information than the other, but the

22   information as to the defendant has all been provided.

23               If your Honor wants to take a look I'll show

24   you both of the reports, but everything that's --

25               THE COURT:  Let me just tell you this.

                                                      ws

Proceedings                    147

1           The Page 2, if you will, of two of three, as

2   I indicated, I have two of them.

3                MS. JOHNSON:  Yes.

4                MR. SCHECHTER:  Right.

5                THE COURT:  They're two different pages.

6                MS. JOHNSON:  Yes, because there's two

7   complaint reports, so both were turned over.

8                THE COURT:  So both were what?

9                MS. JOHNSON:  Both were put in the packet

10  because there was two complaint reports that were

11  generated.

12               MR. SCHECHTER:  Well, I only have, as I said,

13  two of the three of them on one and only one of the

14  three on the other, the second page.

15           I have nothing regarding Page 1 and 3 of the

16  one we're talking about now, Judge.

17               THE COURT:  Where is the Page 1 of -- where

18  is Page 1 of -- you're telling me that there's two

19  complaint reports that get generated?

20               MS. JOHNSON:  I'm looking at them right here,

21  Judge.

22           Both of the complaint reports, both Page 1,

23  have the narrative involving the complainant.  Both of

24  them start the same, have the same information, the

25  occurrence location, occurrence from, classification

ws

Proceedings                    148

1   and the narrative.

2           THE COURT:  Now, that hasn't been provided as

3   part of the Rosario, yes?

4           MR. SCHECHTER:  Has not.

5           MS. JOHNSON:  That has not.  There was no

6   information in there other than the victim's

7   information and the narrative.

8           THE COURT:  Is that what I just looked at a

9   moment ago?

10          MS. JOHNSON:  Yes, Judge.

11          THE COURT:  So I ruled that that appeared,

12  from my standpoint, to be dealing just with statements

13  the complainant may have made.

14          MS. JOHNSON:  Page 2 with regards to both

15  complaint reports has the reporter information and the

16  wanted information and the defendant's personal

17  information that counsel has in his hands right now, in

18  his left hand.

19          MR. SCHECHTER:  Right.  That's the first one.

20  We already disposed of that.

21          I'm talking about the second one with the

22  blackened out material Page 2 of three.  I don't know

23  what three of three is on that.

24          MS. JOHNSON:  Page 3 is exactly the same as

25  Page 2 of the other report.

ws

Proceedings                    149

1           THE COURT:  Well, there's a three of three

2      that I have and that's where it says end of complaint

3      report.

4           MS. JOHNSON:  Yes, Judge.  That is the same.

5      In fact, it has less information than Page 2 of 3.

6           If counsel wants to just take a look at it, I

7      mean, I'll show it to him, but he has it.

8           THE COURT:  Let me ask you this.

9           Why was there two Page 2s, if you will,

10     generated out of a complaint report?

11          MS. JOHNSON:  I believe it's because when

12     they generate the reports, once the supervisor approves

13     them more information is put at the bottom, which is

14     why Page 2 of the other report has all the supervisor's

15     information.  It's sort of like the unauthorized versus

16     authorized.

17          So they both have all the exact same

18     information, it's just lined up on the page differently

19     and the final report has the sergeant's name.

20          THE COURT:  Can I just see these?

21          MS. JOHNSON:  Sure.

22          THE COURT:  Because you make it very, very

23     difficult when you start, you know, extracting, you

24     know, pages out because it becomes apparent that there

25     looks like there are things that are missing.

                                              ws

Proceedings                    150

1              I'm not claiming anyone is doing it

2       intentionally.

3              MS. JOHNSON:  What I should have done was

4       give all the pages with redactions instead of pulling

5       the pages out.

6              THE COURT:  Right.

7              MS. JOHNSON:  So I'm going to give the Court

8       all of the complaint reports that I have.

9              MR. SCHECHTER:  I have a few other issues,

10      Judge, but let's get through this first.

11             MS. JOHNSON:  I'm sorry, here is the first

12      page that your Honor already looked at.

13             (Shown to Court.)

14             THE COURT:  All right, this I've seen.

15             (Pause in the proceedings.)

16             THE COURT:  Well, you know what I'm going to

17      direct the People to do because, quite frankly, this

18      shouldn't be me doing this, I'm going to direct the

19      People to put together whatever these complaint reports

20      are, whatever order they were in in terms of the pages.

21             MS. JOHNSON:  Of course.

22             THE COURT:  Whatever you feel you need to

23      redact, I want you to indicate that to me.

24             MS. JOHNSON:  Okay.

25             MR. SCHECHTER:  Your Honor, I'm truly

                                                    ws

Proceedings                151

1    cognizant and I appreciate the Court's direction,

2    however, for the life of me, I don't understand why

3    counsel just, since I'm going to require them

4    eventually anyway, provide me with the Rosario material

5    for the witnesses so we could avoid all this.

6              THE COURT:  That would seem to be the easiest

7    way of dealing with it, which I recognize.

8              I'm not going to force the People -- having

9    said that, I'm not going to force them to give over

10   Rosario, at least with respect to the first page.

11             In all fairness, I don't think they're

12   entitled -- or required, at this point, to provide to

13   you.

14             I understand your point.

15             MR. SCHECHTER:  All I'm saying, your Honor,

16   is all this does is exacerbate the length of time and

17   the delay in this case because I then have to look at

18   this stuff.

19             MS. JOHNSON:  I'll give him everything.  I'll

20   just redact the narrative, that's what I'll do, if I

21   could use the copy machine I'll make copies for

22   everyone.

23             THE COURT:  Yes.

24             MR. SCHECHTER:  Before she goes, there's

25   more.

Proceedings                    152

1              THE COURT:  What else is there,

2     Mr. Schechter?

3              MR. SCHECHTER:  The complaint follow-up

4     reports, I was given two of them.

5              Now, I would direct the Court's attention to

6     the right side of the top of the page, the second box

7     down, it says follow-up number.

8              I have follow-up Number 3 and I have

9     follow-up complaint report Number 4.

10             I do not have follow-up Number 1 or Number 2.

11             MS. JOHNSON:  Can I take a look at that?

12             MR. SCHECHTER:  Sure.

13             (Shown to counsel.)

14             MS. JOHNSON:  Which ones are you missing?

15             MR. SCHECHTER:  I don't have follow-up report

16    Number 2 or 1, complaint follow-up reports Number 1 and

17    2.

18             MS. JOHNSON:  I have those.  They're exactly

19    the same.

20             If he wants I'll give him a copy -- and you

21    don't have  4?

22             MR. SCHECHTER:  Number 1, I don't have.

23             MS. JOHNSON:  I'll give them to him.  They're

24    the same.  If anything, they're missing information

25    that was provided to him in the other ones.

                                                      ws

Proceedings                    153

1              THE COURT:  So give it to him.

2              MS. JOHNSON:  That's fine.

3              THE COURT:  What else Mr. Schechter?

4              MR. SCHECHTER:  If the Court please, I do not

5      have a copy of the activity log which, in my

6      understanding, is routinely filled out by the police

7      officer, including the desk sergeant's note of entries

8      as to when my client came into the precinct, which is

9      required when someone comes into the precinct and

10     arrested.  There's always a log entry made of it.  I

11     don't have that.  It's very important in the context of

12     this case.

13             I did not see complaint report entitled

14     Police Department PD 313-152, which is a complaint

15     report.  Now, Police Department documents are normally

16     numbered in that kind of way.  I did not see that

17     document.

18             I did not see the New York State standardized

19     domestic incident report.  That is called DCJS 3221.

20     That is mandated by Police Department regulations

21     procedure Number 208-36.

22             Counsel had indicated, I think, that report

23     of suspected child abuse form was not filled out

24     because ACS was at the precinct.

25             However, Police Department regulations

                                                    ws

Proceedings                    154

1      require that PD 377-154, which is report of suspected

2      child abuse, if same is done, must be prepared.

3              Additionally, the report to the patrol

4      supervisor, I have not gotten that.

5              The domestic report incident log, I did not

6      get that.

7              Now, I don't know if an online booking system

8      arrest work sheet was done.  If so, I have not gotten

9      that.

10             And I think we've ascertained, and I'm going

11     to ask the police officer if he knows, whether the

12     commander had, in fact, told him he was going to make a

13     recommendation for a commendation in his record.  That

14     we have to ascertain on the witness stand.

15             But those other documents I haven't gotten,

16     Judge.

17             MS. JOHNSON:  Judge, the DIR and the

18     complaint reports will be disclosed at trial.  It's all

19     narrative with regards to the complainant.

20             I'm looking now at some of the documents

21     counsel had requested, including the complaint

22     follow-up report Number 1.

23             Judge, this I'm going to ask the Court, if

24     the Court wants to review it, that I not turn it over.

25     It's Detective Schulman 's follow-up report.  It is all

                                                       ws

1      about the contact with ACS and conversations with the

2      complainant and his conversations with a detective.   It

3      has nothing to do with the defendant's statements.

4      It's all about conversations with the victim and

5      adult -- I don't know if it's CPS or --

6                  THE COURT:  Can I see it?

7                  MS. JOHNSON:  Of course.

8                  THE COURT:  What about the activity log

9      Mr. Schechter spoke about first?

10                 MS. JOHNSON:  Detective Schulman does not

11     generate information into that activity log.  I had

12     asked him before, in fact, if there was, like a time

13     log, like the PD has here?

14                 THE COURT:  Right.

15                 MS. JOHNSON:  He says that if it does get

16     generated it gets done by either the desk sergeant --

17     it was not done by the officer and it was not done by

18     this detective.

19                 He said there is no formal log like we have.

20     Sometimes there's a card that gets filled out, but he

21     did not prepare one and, according to my conversations

22     with Officer Alfaro, she did not prepare one either.

23                 MR. SCHECHTER:  Here's the problem.

24     Detective Schulman was not the arresting officer nor

25     was he the first one on the scene when my client came

Proceedings                    156

1       into the precinct.

2               The time when my client came into the

3       precinct is an important issue in this matter.  It is

4       my understanding that Sergeant O'Hagan being the desk

5       sergeant who participated in the arrest, according to

6       this complaint follow-up sheet, had to complete this

7       documentation and put down the time that my client came

8       into the precinct and when the arrest took place.

9               Short of subpoenaing Sergeant O'Hagan, I want

10      that desk log -- desk book.  Any time someone comes

11      into the precinct there's a desk entry made of it.

12      There has to be by New York City police regulation.  I

13      need the time when that happened.

14              THE COURT:  All right, is Detective Schulman,

15      Ms. Johnson, saying that there was no recording of when

16      the defendant came into the precinct?

17              MS. JOHNSON:  He doesn't have any -- he

18      didn't prepare anything and he didn't generate anything

19      into a logbook.

20              The way he knows the time is based on, like

21      when he testified the sergeant came to him to tell him

22      that the defendant had walked into the precinct.  So

23      whether or not the sergeant generated one, I don't

24      know.  I haven't spoke to the sergeant.

25              THE COURT:  Well, it would seem to me,

                                                        ws

Proceedings                157

1    particularly since we've just now watched the videotape

2    that was taken of the defendant, that appears to be

3    done sometime, I think, in the late 5 afternoon on the,

4    I think, the 24th of June.

5         It sounded as though, you know, in our

6    conference when the case initially came over, that

7    there's going to be some claim made, I'm assuming, that

8    these statements were somehow involuntarily made or the

9    product of some type of coercion, duress, etcetera.

10        MR. SCHECHTER:  Yes.

11        MS. JOHNSON:  Which is why I was going to say

12   to your Honor that I anticipate now, based on counsel's

13   arguments, if I have to call the sergeant as a witness

14   at the hearing I will advise him to bring any log that

15   exists.

16        THE COURT:  Well, I think whether or not you

17   call the sergeant or not, it would be my position that

18   Mr. Schechter is entitled to that activity log,

19   particularly given the fact that we're talking about at

20   least a 12-hour time period that the defendant is in

21   the custody of the police department or 105th Precinct

22   and I would direct the People provide that.

23        MS. JOHNSON:  Yes, Judge.

24        MR. SCHECHTER:  Thank you, Judge.

25        MS. JOHNSON:  As to the complaint follow-up,

Proceedings                                    158

1  follow up Number 2 --

2          MR. SCHECHTER:  1 and 2.  I believe you

3  said --

4          MS. JOHNSON:  I believe your Honor has 1 in

5  his hands.

6          THE COURT:  I have complaint follow-up

7  Number 1, yes.  I have follow-up Number 1.

8          MS. JOHNSON:  Follow-up Number 2 I have is

9  all regarding contact with the complainant conversation

10 with the complainant, narrative about the interview

11 with the complainant, nothing about contact with the

12 defendant.

13          I'll provide that to your Honor as well.

14          (Shown to Court.)

15          MS. JOHNSON:  Would your Honor like me to go

16 and make copies of the arrest reports?

17          THE COURT:  Yes, please.

18          (Pause in the proceedings.)

19          MS. JOHNSON:  Your Honor, I gave counsel, I

20 handed up a copy to the Court, I didn't even bother

21 redacting -- he now has all the complaint reports and

22 arrest reports.  I now have Detective Schulman outside

23 calling the 105 command pulling the log for that day.

24 He has my fax number.  If he has it before the end of

25 the hearing today he will fax that over.

                                               ws

Proceedings                    159

1          MR. SCHECHTER:  While we're on it, now that

2     we have this material - I thank counsel for providing

3     me this material - did she ascertain whether or not a

4     domestic incident report was done as per the procedure

5     regulation that I outlined or whether a --

6          THE COURT:  Was there a DIR report done?

7          MS. JOHNSON:  Yes, Judge, it's in my file.

8     It's the narrative of the complainant -- it's her 32B.

9          THE COURT:  Do you want to hand it up to me?

10         MS. JOHNSON:  Sure.

11         THE COURT:  Insofar as the complaint

12    follow-up reports, I've had an opportunity to look at

13    them, Mr. Schechter.  They are, for the most part,

14    interviews with the complainant and the ACS worker or

15    investigator, I should say, and hospital -- someone at

16    a hospital that the complainant treated at on

17    June 24th.

18         They would not appear to me, at this point,

19    to be Rosario for any of these witnesses.

20         (Shown to Court.)

21         THE COURT:  Can you just give this back to

22    the DA?

23         (Shown to counsel.)

24         THE COURT:  Now, what did you hand up to me

25    now?

Proceedings                    160

1           MS. JOHNSON:  The four-page DIR, your Honor.

2    I believe it's four pages.

3           THE COURT:  And, likewise, Mr. Schechter,

4    with the domestic incident report, it appears as though

5    that it is, as the People represent, a 32B of the

6    complainant in this case as well as another police

7    officer that actually generated the narrative report on

8    the front of it.

9           It's not Detective Schulman or

10   Detective Alfaro, so -- and I would not consider it to

11   be Rosario at this time.

12          Anything else?

13          MR. SCHECHTER:  Not at this time, your Honor.

14          I believe the officer is checking out the

15   activity log.

16          Is that what we're waiting on?

17          THE COURT:  Well, we're not waiting on it.

18   He's going -- I believe he called the 105 Precinct.  If

19   you need him back for further cross, I'll certainly

20   direct the People to do that.

21          MR. SCHECHTER:  Okay.

22          THE COURT:  Can I just ask the People one

23   question?

24          And I appreciate, Ms. Johnson, you were on

25   trial for, I think it was, close to a month.

                                                    ws

Proceedings                    161

1        MS. JOHNSON:  April 1st to the 30th.

2        THE COURT:  Was there any indication or

3    representation made before this case came to this part

4    that you had or had not had an opportunity to gather

5    this Rosario material in this case and go over it with

6    the police officers?

7        MS. JOHNSON:  Could we go off the record for

8    a minute?

9        THE COURT:  No, I would like to have it on

10   the record.

11       MS. JOHNSON:  Judge, my --

12       THE COURT:  Because at this point it appears

13   to me that, you know, this matter is not ready for

14   hearing in the sense that we're now spending more time

15   going over Rosario material than we are going over

16   testimony at this point.

17       MS. JOHNSON:  Your Honor, my verdict came in

18   on Tuesday, April 28th.

19       On the 29th my case was on before

20   Judge Donnino for a conference.  I was not at work on

21   the 29th.

22       When I came into work on the 30th I was

23   advised I was having a hearing and police officers and

24   detectives were going to be in my office at 2 o'clock

25   in the afternoon for purposes of hearing.

                                                      ws

Proceedings                    162

1          THE COURT:  And prior to that time is the

2     first time you started gathering Rosario material in

3     the case or somebody from your office gathered Rosario

4     material --

5          MS. JOHNSON:  I had some of the Rosario

6     material at the time of grand jury, but obviously

7     because there was another DA's Office that was handling

8     the other matter I did not have a complete detective's

9     jacket at the time of grand jury.

10         What I had was some of the complaint reports,

11    some of the arrest reports.  I did not have everything

12    at the time.  That's why I had the DA's Office from

13    Queens faxing over stuff to my office yesterday

14    because --

15         THE COURT:  So that is actually -- some of

16    this Rosario material is coming from the Queens DA's

17    Office, not necessarily the Police Department.

18         MS. JOHNSON:  Oh, yes.  I did not have all of

19    it.  Whatever was in Shulman's case jacket I had almost

20    all of it at the time of grand jury and all of that was

21    turned over last week when we came here for the

22    hearing.

23         But the stuff that was turned over today,

24    such as some of the property invoices, I got that from

25    the from the arresting officer this morning.

ws

Proceedings                    163

1          Apparently, the way the NYPD handles their

2     paperwork, is unlike Nassau.  Everything isn't in the

3     case jacket.  The arresting officers have their own

4     files, which is why this morning, I apologize for not

5     being here at 9:30, a lot of this online booking

6     information I got this morning.  I had never seen or

7     spoken to the arresting officer.

8          THE COURT:  Well, when the matter was sent

9     out for hearing on the -- was it the 28th or the 29th?

10          MS. JOHNSON:  It had been sent out before

11     then, but I was on trial so we were sent back to

12     Judge Donnino on the 29th when I was out of the office

13     that day.

14          THE COURT:  All right, Mr. Schechter,

15     obviously you may have been more privy to what was

16     going on before this matter went out.

17          Was there any discussions during the

18     conferencing of this case that -- about the Rosario

19     material and whether or not all this material was going

20     to be available prior to the hearing being started

21     instead of it being doled out, as it is now, by

22     piecemeal?

23          MR. SCHECHTER:  I was directed by

24     Judge Donnino to make this application before your

25     Honor.

                                                    ws

Proceedings                    164

1      THE COURT:  What application?

2      MR. SCHECHTER:  Any Rosario issues were to be

3  made before your Honor.

4      MS. JOHNSON:  When I was on trial there was

5  one day in the middle of my trial when I met with

6  Mr. Schechter in Judge Donnino's chambers and there was

7  issues coming up about the Rosario.

8      I had advised Judge Donnino in

9  Mr. Schechter's presence I had not yet received a

10 complete Queens DA's file that had Rosario material.

11     Mr. Schechter raised the issue and said he

12 believed it was Rosario and I agreed with Mr. Schechter

13 that not only was it Rosario, but obviously for trial I

14 would want a complete file.

15     This conversation happened, I believe, two

16 weeks ago while -- or maybe a week ago while I was on

17 the trial with the other matter.

18     MR. SCHECHTER:  Several -- counsel is

19 correct.  Several of these issues were raised before

20 Judge Donnino while counsel was in the middle of trial

21 and came by to try to, at least, answer on behalf of

22 her office, you know, when this case was called.

23     But since she was in the middle of a trial

24 she just had no means of securing all of this

25 documentation at this point.

                                          ws

Proceedings                165

1          THE COURT:  And when it was, on the 28th, you

2     were, what, still on trial?

3          MS. JOHNSON:  My verdict came in on the 28th

4     around 4:30, I believe.  It was way after lunch.

5          MR. SCHECHTER:  My issue is not with counsel,

6     your Honor, my issue is with her office.  Her office

7     should have done everything possible to have this

8     material available for her.

9          MS. JOHNSON:  Your Honor, we had --

10    Judge Donnino knew that I was on trial.  When we were

11    on in his part we were told we were going from hearing

12    directly into trial --

13         THE COURT:  Let me ask you this.

14         The two weeks you said before -- when you

15    were in Judge Donnino's part two weeks before this case

16    got sent out, did he or somebody from his office tell

17    you at that time that on April 29th this thing is going

18    out for hearing and trial?

19         MS. JOHNSON:  He actually told me that on

20    April 27th because he assumed I was going to have a

21    verdict that day and while I was in chambers in the

22    presence of counsel my exact words were, "Judge, I

23    would like to have a day to catch my breath," and I

24    took off the next day and I came back and we were

25    scheduled for hearings.

                                             ws

Proceedings                    166

1          THE COURT:  So when was the first time you

2   found out that this thing was going to hearings and

3   trial?

4          MS. JOHNSON:  Sometime in April.

5          THE COURT:  You have to narrow it down a

6   little bit.

7          MS. JOHNSON:  I don't know because I was on

8   trial the whole month of April and when I had indicated

9   that I didn't know at that time what my witnesses'

10  availability was, Judge Donnino insisted it was going

11  from hearing to trial.

12         When we had this conversation, I didn't have

13  all the Rosario material, I didn't have all the

14  paperwork and I was on trial, I couldn't get it all at

15  that time.

16         THE COURT:  Well, you know, as I indicated,

17  we're now spending more time trying to figure out what

18  Rosario material has been generated, what Rosario

19  material has been turned over, all of which I would

20  think, to a certain extent -- I understand there's

21  going to be Rosario material that may come available as

22  you're speaking to witnesses, I mean, that's to be

23  expected.

24         I mean at this point, since I understand and

25  I'm not finding fault with you, necessarily, that

                                            ws

Proceedings                          167

1    there's another jurisdiction that's involved, you may

2    not be familiar with the type of paperwork and material

3    that they generate, but, you know, certainly your

4    supervisors, who I have enormous amount of respect for,

5    both came out of the Queens DA's office, I would think

6    more than anybody, they would be familiar with the fact

7    that, look it, this material is going to have to be

8    gathered and ready to be distributed, there's going to

9    be applications to have it redacted.

10            MS. JOHNSON:  And, in defense of them, when I

11   was out on Wednesday they did contact and arrange for

12   the detective, the officer, to come, which is how it

13   was that I knew that they were subpoenaed before.  They

14   contacted the Queens DA, but --

15            THE COURT:  Let me ask you, did you know

16   during the course of your trial that as soon as you got

17   off trial in your other case your you were going to be

18   going into hearings and trial?

19            When did you find that out?

20            You still haven't answered that.

21            MS. JOHNSON:  We were told by Judge Donnino

22   we were going from hearings into trial.

23            However --

24            THE COURT:  When?

25            MS. JOHNSON:  I don't know when it was.

Proceedings                    168

1          However, as your Honor knows, I was in the

2    middle of pretrial in another matter, People versus

3    Mark Hercules.

4          When Judge Donnino put me on trial with the

5    last trial I was on, I reminded the Court that I had

6    back-to-back trials that were scheduled with an

7    incarcerated defendant and this matter had been sent

8    there.

9          His honor, Judge Donnino, had indicated to

10   me, "You're going to try that other case first," and

11   trials got backed up.

12         Because of that, Mark Hercules was assigned

13   to another prosecutor in anticipation of, per Judge

14   Donnino, this case going to trial first.

15         When we were -- when he advised we were going

16   directly from hearing into trial, I believe the first

17   time that happened was in April while I was on trial.

18         THE COURT:  And what did you do when he told

19   you that?

20         MS. JOHNSON:  I had advised him, Judge, going

21   hearing into trial, I said, "Judge, I don't know if

22   personally I am going to be ready.  I don't know if

23   myself I could be ready," but I was on trial and, in

24   fact, we had another control date which on -- because I

25   did take notes of this because I was concerned that

ws

Proceedings                    169

1    something would happen.

2              THE COURT:  Like this would happen?

3              MS. JOHNSON:  On April 16th we conferenced

4    the case with Judge Donnino and counsel in chambers and

5    was marked control for trial April 22nd.

6              The Court also indicated the Court wanted an

7    April 28th trial as his Honor had indicated I would

8    probably have a verdict by then, which I did not.

9              In fact, I was still on trial that full day

10   of the 28th.

11             On April 27th we were back in chambers and I

12   advised the Court that I needed to check the

13   availability of the New York City police officers and

14   the Court indicated -- actually, while we were in

15   chambers the Court indicated we were going directly

16   from hearing to trial.

17             Then when we went on the record I advised the

18   Court I did not know my witnesses' availability as I

19   did not have control over them because they were

20   New York City police officers.  The Court had forgotten

21   about that.  This was all before my verdict came in.

22             Then the Court put it on, I believe, for

23   control on the 29th --

24             THE COURT:  And on the 28th you got your

25   verdict.

ws

Proceedings                    170

1      MS. JOHNSON: I think at 4:30 or late in the

2  afternoon and, in fact, while counsel was in chambers I

3  had said to the Court, and the Court didn't have a

4  problem with the fact, that I was going to ask for a

5  couple of days to get everything together.

6      I don't know if the Court meant a couple of

7  days for the hearing or a couple of days from hearing

8  into trial, but I believe counsel was also there when

9  my exact words were, "Judge, I want a couple of days to

10 catch my breath to get everything together because,

11 again, I don't know my witnesses' availability."

12     THE COURT: Well, then when did you start

13 gathering the Rosario material?

14     MS. JOHNSON: I had some stuff at the time of

15 grand jury. Everything else I got on Thursday the

16 30th, when the detective came in with his case jacket

17 on that same day.

18     THE COURT: At that point you had been sent

19 out for hearings at that point because we started this

20 on the 30th.

21     MS. JOHNSON: Yes, Judge. The detective was

22 subpoenaed, came to my office around 1 o'clock, I

23 copied his case jacket and we began the hearings in

24 that afternoon.

25     Today was the first day I met with

ws

Proceedings                171

1    Officer Alfaro to gather her Rosario material that I

2    provided to counsel.

3         Friday as well, I believe, whatever the time

4    of the fax is, was the first time I received the

5    Rosario that was from the Queens DA's Office.

6         I had requested a day or two adjournment

7    through my office, if it would be possible, and I don't

8    know what conversation transpired between my bosses and

9    Judge Donnino, but apparently an adjournment was not a

10   possibility.

11        THE COURT:  Okay.

12        Mr. Schechter, does that square with what --

13   I know you're more concerned, and justifiably so, about

14   making sure you get everything you're entitled to.

15        MR. SCHECHTER:  The minutia of our

16   conversation with Judge Donnino, I don't recall every

17   one, but I do know Judge Donnino was very, very

18   strongly pushing this matter forward for trial and was

19   not really sympathetic with any adjournments and kept

20   this matter on a very tight leash, adjournments no more

21   than a week at a time, so that we could monitor

22   counsel's trial and what was happening.

23        So I do know that Judge Donnino was pushing

24   this very strongly for trial.

25        I do not have -- there's a few other things I

ws

Proceedings                    172

1    have here from counsel (sic).

2              I don't have external photos of subject's

3    vehicle which apparently were taken, meaning my

4    client's car, which is relevant to this hearing.

5              And Shulman has memo book entries, I have

6    those, but I don't know if these are the same as the

7    handwritten notes because they make reference to

8    Shulman's handwritten notes.  I don't know if they're

9    the same thing or not, but certainly I would be

10   entitled to those things as well.

11             MS. JOHNSON:  Judge, one other thing that

12   occurred during our conferencing was that there was

13   significant -- I don't want to speak for counsel, but

14   there was significant agreement on both my part and

15   counsel's part that it would be more appropriate for

16   the Queens matter to occur first and obviously

17   Mr. Schechter, correct me if I'm wrong, that was

18   certainly not a possibility.

19             THE COURT:  Well, you know, look it, I can

20   appreciate being on trial for the length of time that

21   you were, but unlike perhaps, Mr. Schechter, and I

22   don't even know whether he is or is not, you're not a

23   solo practitioner, you have an office, you have staff.

24             It sounds as though, to me, that the alarm

25   bells were being run while you were in the middle of

                                                    ws

Proceedings                    173

1    that other trial and, you know, certainly to be now in

2    the middle of this hearing and be getting stuff while

3    witnesses are on the witness stand, and I'm not talking

4    about a page here or a page there, I'm talking about in

5    excess of ten or 15 pages that you handed over this

6    morning, you know, really shouldn't be happening and,

7    you know, at this point, the way things are going, I

8    figure we'll be doing this hearing for the rest of this

9    week.

10          So I'll try to move it along, but to me the

11   way this thing is -- as I said, more discussion about

12   Rosario material and we haven't even gotten to the

13   cross-examination of one witness yet.

14          You're now indicating you may be wanting to

15   call a third witness in the case.  You don't know

16   whether or not he or she has generated Rosario

17   material.

18          We'll have to deal with the schedule as

19   things go on, but I'm just a little bit perplexed about

20   how ready this thing really is, quite frankly.

21          MR. SCHECHTER:  There's another interesting

22   issue, I find it interesting anyway, and that is the

23   issue as to if my client does testify in this matter,

24   the extent and parameters of the cross-examination.

25          My client has a prior disorderly conduct and

                                                    ws

1    that is -- a Sandoval application has to be made before

2    your Honor with respect to that one prior.  It's a

3    disorderly conduct.  I think it was on a shoplift

4    several years ago, which has nothing to do with this

5    case.

6              Additionally, if the Court recalls, the

7    motion in limine that I submitted to the Court citing,

8    I think, two Court of Appeals opinions and a lower

9    court opinion with respect to the use of

10   currently-charged allegations, which are proscribed by

11   the Court of Appeals, would also affect what elements

12   of the confession should be -- were the Court to

13   consider that the confessions were legally obtained,

14   what parts of the confessions would be utilized because

15   the Court -- because counsel can't do indirectly what

16   she can't do directly; namely, she can't cross-examine

17   him about pending cases and therefore she can't put in

18   on her direct examination the information concerning

19   pending cases.

20             So what we're going to need to do is an in

21   limine hearing or conference to determine what, if any,

22   parts of that confession could be introduced.

23             THE COURT:  And I'm aware of it, I'm

24   sensitive to it.  My law secretary is looking at the

25   material.  Obviously, you gave it to me this morning

                                                        ws

1     and I haven't even had a chance to look at it.

2                 Insofar as your client testifying at the

3     hearing, I'm not of a mind-set to allow some type of

4     freewheeling cross-examination that's going to go

5     beyond the parameters of what you elicited on your

6     direct examination and you can be guided accordingly

7     with that.

8                 MR. SCHECHTER:  Okay.

9                 THE COURT:  So, in the meantime, let's get

10    Detective Shulman up here.

11                (Witness resumes the stand.)

12                MS. JOHNSON:  Your Honor, Detective Shulman

13    just advised me the logbook is being faxed over to my

14    office.

15                THE COURT:  Okay, great.

16                THE WITNESS:  Good afternoon, your Honor.

17                THE COURT:  Good afternoon.

18                All right, Mr. Schechter, whenever you're

19    ready.

20                MR. SCHECHTER:  May it please the Court,

21    counsel.

22    CROSS-EXAMINATION

23    BY MR. SCHECHTER:

24        Q.    Detective Shulman, good afternoon.

25                Detective Shulman, what is your age?

                                                        ws

1         How old are you?

2     A.    Thirty-seven.

3     Q.    And you indicated that you were a police officer

4  for 15 years?

5     A.    A little over that, yes.

6     Q.    Did you have any occupation before you were a

7  police officer?

8     A.    Part-time work.  I wouldn't say career.

9     Q.    What did you do before you became a police

10 officer?

11    A.    I was a security guard in Maryland.

12    Q.    How long did you have that job?

13    A.    Year and a half, maybe.

14    Q.    Are you a native New Yorker or do you come from

15 Maryland?

16    A.    I'm a native New Yorker.

17    Q.    Okay, and you've indicated you had some training

18 at the academy with respect to interrogation of prisoners

19 and interviews of complainants and things of that nature,

20 would that be fair to say?

21    A.    I don't know if I've indicated to that, but that

22 would be accurate, though.

23    Q.    Did you -- were you taught the Reid method of

24 interrogation, R-e-i-d?

25    A.    Not that I can specifically say.

Shulman - People - cross                177

1      Q.   You spent how many years in anti-crime?

2      A.   Almost five in a citywide anti-crime unit.

3      Q.   Was that any specific detail, narcotics related or

4   street muggings?

5           What, specifically, were your assignments there?

6      A.   Violent street crimes.

7      Q.   And in the times that you were an anti-crime

8   officer were you working under a silver shield or a gold

9   shield?

10          MS. JOHNSON:  Objection.

11          THE COURT:  Yes.

12          MR. SCHECHTER:  I'll rephrase.

13     Q.   Were you a detective or patrolman?

14     A.   I was both at varying different times.

15     Q.   Well, were you first a patrolman and then a

16  detective or were you a patrolman, detective, patrolman?

17          How did that work?

18     A.   I was a patrolman and then I was promoted to

19  detective.

20     Q.   While on the anti-crime unit?

21     A.   Yes.

22     Q.   And in your duties as an anti-crime officer did

23  you have occasion to utilize informants?

24          MS. JOHNSON:  Objection.

25          THE COURT:  Yeah, sustained.

                                                    ws

1    Q.   Did you become accustomed to being able to turn

2  people into informants by virtue of your experience and your

3  training?

4            MS. JOHNSON:  Objection.

5            THE COURT:  Yeah, sustained.

6    Q.   Approximately what percentage of your arrests

7  generated confessions and inculpatory statements, detective?

8            MS. JOHNSON:  Objection.

9            THE COURT:  As?

10   Q.   As an anti-crime officer?

11           THE COURT:  If you know.

12   A.   I don't know that I could answer that.

13   Q.   Would it be more than 10 percent?

14           THE WITNESS:  I honestly don't know that I

15  could put a number on it, your Honor?

16           THE COURT:  Okay.

17   Q.   How many times have you testified in court?

18           MS. JOHNSON:  Objection.

19           THE COURT:  I'll allow that.

20           You can answer that.

21   A.   Again, I don't know that I could put a number on

22  it, but, you know, over the course of 15 and a half years,

23  many times.

24   Q.   Many times.

25           It would be more than 20?

1      A.    Probably.

2      Q.    More than 30?

3      A.    Probably.

4      Q.    And what percentage of those involved your taking

5    of statements?

6                    MS. JOHNSON:  Objection.

7                    THE COURT:  Yeah, sustained.

8                    MR. SCHECHTER:  I'll except to that one,

9    Judge.

10                   THE COURT:  Yes.

11     Q.    Did you -- now, on the day in question you

12   indicated, I believe, on direct examination you were working

13   a 4:30 to 1 o'clock tour?

14     A.    Yes, I did.

15     Q.    Had you made an arrest prior to the end of your

16   tour besides -- not including Mr. Gopaul?

17     A.    I had not, no.

18     Q.    So that your tour of duty was scheduled to expire

19   at 1 a.m. in the morning, would that be correct?

20     A.    Yes.

21     Q.    And you were working what detail?

22           Was that anti-crime you were working that night?

23     A.    On the night of Mr. Gopaul's case?

24     Q.    Yes, yes.

25     A.    No, I was assigned to the 105 Precinct detective

                                                          ws

Shulman - People - cross                    180

1   squad as an investigator.

2        Q.   And, basically, you were there to pick up whatever

3   came in, would that be fair to say?

4        A.   I don't know that I would use those words.

5        Q.   Now, you've indicated that your tour ended at

6   1 o'clock, correct?

7        A.   My scheduled tour would have been over at

8   1 o'clock.

9        Q.   Scheduled tour.

10            And there came a time when you were informed that

11  Mr. Gopaul came into the precinct, is that correct, yes or

12  no?

13       A.   That's correct.

14       Q.   And who informed you of that?

15       A.   Sergeant O'Hagan, the 105 Precinct desk officer.

16       Q.   Where is the desk officer in relation to the squad

17  within the 105 Precinct?

18       A.   They're on the first floor, I'm on the second

19  floor.

20       Q.   And were you present during Mr. Gopaul's arrest?

21       A.   No.

22       Q.   And do you know who was present during

23  Mr. Gopaul's arrest?

24       A.   I don't know, aside from Sergeant O'Hagan.

25       Q.   Well, when you first met Mr. Gopaul where was he?

1          A.    He was in one of my interview rooms in the

2     detective squad office.

3          Q.    To your knowledge, had he been fingerprinted and

4     had his mugshot taken?

5          A.    No, he had not.

6          Q.    Was he under arrest?

7          A.    Yes, he was.

8          Q.    What time did you first see Mr. Gopaul, if you can

9     recall?

10         A.    Right about 5:10 a.m. on the morning of the 24th

11    of June.

12         Q.    Officer, if your tour of duty ended at 1 o'clock,

13    what were you doing between 1 a.m. and 5:10 a.m.?

14         A.    I don't know what I was initially doing after

15    1 o'clock in the morning, to my recollection, but at some

16    point in time I had been notified by a detective at the

17    detective bureau in Queens that there was an incident being

18    investigated by patrol in the 105 Precinct and that

19    Administration for Children's Services known as ACS --

20              MR. SCHECHTER:  Objection, Judge, that's not

21         responsive to my question.

22         Q.    My question was, what were you doing between

23    1 a.m., end of your tour of duty, and 5:10 a.m.?

24              What were you doing?

25              THE COURT:  I think he was telling us.

ws

Shulman - People - cross                    182

1           The objection is overruled.

2           Go ahead.

3      A.    Okay, initially, I don't know what I was doing at

4  exactly 1 o'clock, but at some point in time I was notified

5  that an ACS worker was in the precinct interviewing a victim

6  that was alleging some sort of sexual complaint involving

7  her stepfather and that an investigator should assist in the

8  investigation.

9      Q.    What time were you informed of that?

10          THE WITNESS:  I would have to refer to my

11  report, your Honor.

12     Q.    Would you please look at your notes and I would

13  like to see what it is you're looking at as well?

14     A.    Sure, absolutely.  Okay, just referring to my

15  complaint follow-up report labeled as follow-up Number 1 and

16  I had noted the time at about 0230 in the morning that I was

17  informed.

18     Q.    So at 2:30 a.m. you were first informed of ACS

19  investigating suspected child abuse or something like that,

20  would that be fair to say?

21     A.    A complaint involving a sexual complaint that

22  involved ACS also.

23     Q.    Okay, so what were you doing from 1 a.m. to 2:30

24  at the precinct?

25     A.    I don't recall specifically.

Shulman - People - cross                    183

1        Q.    When you put in for your overtime did you put in

2    for your overtime from 1 a.m. or from 2:30 p.m.?

3        A.    I would imagine it would have been from 1 a.m.

4        Q.    So that you put in for overtime for what, from 1

5    to 2:30 a.m.?

6        A.    I don't recall specifically.  I would have to

7    check into it.

8        Q.    Isn't it a fact that Harold Gopaul came into the

9    precinct at 2:30 a.m.?

10            Isn't that a fact?

11       A.    Not to my knowledge.

12       Q.    Isn't it a fact that Sergeant O'Hagan, together

13   with eight other officers, pummeled Mr. Gopaul in the

14   precinct, spread-eagled him over a rail and beat him up?

15            Is that a fact?

16       A.    Not to my knowledge and I would find it highly

17   unlikely.

18            MR. SCHECHTER:  May I have this marked,

19       please, as Defendant's A?

20            (Defendant's Exhibit A marked for

21       identification.)

22            MR. SCHECHTER:  May I have that?

23            (Shown to counsel.)

24       Q.    Now, officer, you keep a memo book as part of your

25   required record keeping consistent with your duties as a

                                                        ws

1    police officer, correct?

2          A.    At various points in my career, yes.

3          Q.    Do you still keep a memo book?

4          A.    Yes.

5          Q.    You have it with you?

6          A.    No.

7          Q.    Were you told to bring it today?

8          A.    Not specifically, no.

9          Q.    Now, you've testified over 20 times in a court of

10   law, have you not?

11         A.    Yes.

12         Q.    And during those times you testified in a court of

13   law weren't you directed to bring your memo book with you by

14   the District Attorney?

15         A.    Not always.

16         Q.    Let me show you what's being marked as Defendant's

17   A for identification.

18                      (Shown to witness.)

19         Q.    Is this a copy of your memo entry?

20         A.    No, it's not.

21         Q.    It's not?

22         A.    No.

23         Q.    Did you provide this information to the District

24   Attorney's Office?

25         A.    No, I did not.

Shulman - People - cross              185

1       Q.   Do you know who provided that to the District

2   Attorney's Office?

3       A.   I don't know specifically who provided it to the

4   District Attorney's Office.

5       Q.   Is that first page?

6            Is that your memo book?

7       A.   This is not my memo book, no.

8            MR. SCHECHTER:  May I show it to the District

9   Attorney?

10           MS. JOHNSON:  It's probably Officer Alfaro's,

11  Judge.

12           MR. SCHECHTER:  May I have it, please?

13           (Shown to counsel.)

14      Q.   Did you keep a memo book in connection with this

15  case?

16      A.   I don't recall making any entries other than my

17  tour of duty in regards to this case.

18           MR. SCHECHTER:  I would like this to be

19  marked, please, as Defendant's B for identification?

20           (Defendant's Exhibit B marked for

21  identification.)

22           MR. SCHECHTER:  May I have that also?

23           (Shown  to counsel.)

24      Q.   Do you recall preparing or having prepared at your

25  direction a 105 Squad complaint follow-up index sheet?

                                                    ws

Shulman - People - cross                186

1      A.   Yes.

2                MR. SCHECHTER:  May I approach the witness,

3      your Honor?

4                THE COURT:  Just give it to my officer.

5                MR. SCHECHTER:  Officer, please show this to

6      the witness.

7                (Shown to witness.)

8      Q.   Is that a document you prepared as part of your

9      duties as a detective at the 105 Precinct?

10     A.   Yes.

11     Q.   Now, you'll -- is that document kept in the

12     ordinary course of business of the New York City Police

13     Department?

14     A.   On some occasions, yes.

15     Q.   Is it the ordinary course of business of the

16     Police Department to keep that document?

17     A.   Again, on some occasions, yes.

18     Q.   And were you under a duty to maintain that

19     document?

20     A.   Pardon me?

21     Q.   Were you under a business duty to maintain that

22     document on behalf of the Police Department?

23     A.   I don't know if I was under a business duty, but I

24     did prepare it.

25     Q.   Is it -- as part of your duties?

Shulman - People - cross                187

1          A.     As part of my documentation of my case, yes.

2          Q.     And are the entries that are on that piece of

3    paper, were they made basically at the same time as the

4    incidents for which you made up those documents?

5          You made up that paper about the same time you

6    rendered all the other paperwork in this case, did you not?

7          A.     Probably not at the exact same time.

8          At some point in time I take my cumulative case

9    and I organize it and I package it in a case folder and I

10   document what I'm including in my case folder.

11         Q.     This is within at least one or two days from the

12   time that you did all your paperwork, would that be fair to

13   say?

14         A.     Probably.

15         Q.     Okay.

16                MR. SCHECHTER:  I offer this as -- in

17   evidence, your Honor, as Defendant's B.

18                THE COURT:  People?

19                (Shown to counsel.)

20                MS. JOHNSON:  No objection.

21                THE COURT:  Okay, so B will be received in

22   evidence.

23                (Defendant's Exhibit B received in evidence.)

24                MR. SCHECHTER:  Please show it to the

25   witness.

ws

1          (Shown to witness.)

2          Q.    I direct your attention to the entry marked M, as

3    in Mary.

4                What does that say?

5          A.    It says M and then it says Shulman's handwritten

6    notes.

7          Q.    I call for the production of your handwritten

8    nets, Detective Shulman.

9                MS. JOHNSON:  I have them, Judge.

10               Prior to Detective Shulman testifying I

11   reviewed them with him.  They're conversations he had

12   with the complainant.

13               In fact, Judge, there is one page in the

14   Rosario material that was relevant for the hearing that

15   counsel was provided that's indicated, Number 13,

16   Shulman's notes.

17               Does the Court wish to see the other notes?

18               THE COURT:  Are you asking me to look at

19   them, Mr. Schechter?

20               MR. SCHECHTER:  I would like to see the note

21   counsel is referring to at the very least anyway,

22   Judge.  I don't recall seeing any other handwritten

23   entries.  If she could show me what she says relates to

24   this I would appreciate it.

25               MS. JOHNSON:  It's itemized in the Rosario

ws

 1     material turned over on October -- August -- excuse me,

 2     April 30th and it says Shulman's handwritten notes --

 3     Detective Shulman notes.

 4              MR. SCHECHTER:  If I might see this I might

 5     be able to obviate that.  All of this could have been

 6     avoided if all the Rosario was turned over.

 7              MS. JOHNSON:  It looks like this -- like a

 8     memo book.

 9              MR. SCHECHTER:  I don't recall getting that

10     document.

11              (Shown to Court.)

12              THE COURT:  What are you handing me now,

13     Shulman's entire notes?

14              MS. JOHNSON:  Yes, including the

15     conversations with the complainant, his handwritten

16     notes with regards to that.

17              THE COURT:  All right, have you shown

18     Mr. Schechter the one -- the page that you did provide?

19              MS. JOHNSON:  I'm looking for it in here,

20     Judge.

21              Your Honor, it is a page that says contacted

22     June 30th, 2008.  It has Mr. Schechter's name on it.

23     It's actually handwriting.

24              MR. SCHECHTER:  I didn't know.  It was just

25     nondescript.

                                                     ws

Shulman - People - cross                190

1        THE COURT:  I'm sorry.

2        MR. SCHECHTER:  I did not know that that was

3    the officer's handwriting.  There was nothing to

4    indicate where this came from.

5        MS. JOHNSON:  That's why there's a cover page

6    and it says Shulman's note.

7        MR. SCHECHTER:  Your Honor, I respectfully

8    call for the production of the officer's memo book in

9    this matter.  I don't -- he says he didn't bring it, no

10   one told him to bring it.

11       I think it strains credulity that an

12   experienced police officer doesn't know he needs his

13   memo book when he's testifying, however I will require

14   the memo book to continue my cross-examination after I

15   finish today with the officer.

16       THE COURT:  Well, is the -- is what you've

17   shown me, People, the copy of his memo book?

18       MS. JOHNSON:  That's what was taken out of

19   his file, Judge, but I believe he said that he doesn't

20   always keep a memo book for all cases so, I don't think

21   we've crossed the bridge whether or not he actually

22   made notations in a memo book on this case.

23       THE WITNESS:  There would have been no

24   notations in a memo book on the date in question

25   involving the case other than my possible work

ws

Shulman - People - cross                191

1    schedule.

2              MR. SCHECHTER:  See, your Honor, the memo

3    book also has a chronology of what he did on his tour

4    and I want to see that.

5              THE COURT:  Well, why don't you ask him that.

6              MR. SCHECHTER:  Because, your Honor, I don't

7    have any means of impeaching him in the event he does

8    not - with all due respect, officer - testify

9    truthfully during the times everything happened in this

10   case and I certainly would be entitled, before I ask

11   him those questions, to have that material before me so

12   I could use it for impeachment material.

13             I would ask him other questions, however I

14   would still reserve my right to cross-examine him about

15   his memo book and I request he be directed to bring it

16   tomorrow.

17             THE COURT:  What is it you expect to find it

18   in the memo book?

19             He said there was no entries related to this

20   investigation on that particular date.

21             Am I correct, detective?

22             THE WITNESS:  Yes.

23             MR. SCHECHTER:  With all due respect to the

24   detective I am not constrained to accept anything he

25   says with respect to what there is or there isn't.

                                              ws

1          Under People v. Rosario I am entitled to have

2     that information.  If that information is of no

3     moment --

4          THE COURT:  You want me to inspect his memo

5     book on that particular day to see whether or not his

6     entries that pertain to what he's testified to --

7          MR. SCHECHTER:  Even if the entries do not

8     pertain specifically to this case, the chronology based

9     upon his testimony here is important in this case and

10    I'm entitled to question him about the chronology of

11    events preceding this incident up to and including this

12    incident.

13         THE COURT:  Let me ask you this, detective.

14         Did you have a memo book -- do you have --

15    did you have a memo book with you on that day -- on

16    this date, the 24th or the 23rd of June?

17         THE WITNESS:  Again, your Honor, the only

18    thing I would have put in, if I had filled it out that

19    day, would have been my tour of duty, present for duty

20    and end of tour.

21         Everything else is documented on my

22    complaint follow-ups indicating times that I'm doing

23    different things.

24         Unlike a patrol officer,  I'm not required

25    every time I get a radio run to make a memo book entry.

ws

Shulman - People - cross                193

1                THE COURT:  I understand that.

2                Now, do you still have that memo book

3       available?

4                THE WITNESS:  I would have to check to

5       determine.

6                THE COURT:  All right, I'm going to ask that

7       you bring it with you tomorrow.

8                MR. SCHECHTER:  Thank you, Judge.

9       Q.   Now, detective, at what time did you first begin

10      speaking to the complainant?

11               MS. JOHNSON:  Objection.

12               THE COURT:  Yeah, sustained.

13               MR. SCHECHTER:  Your Honor, may I have -- I'm

14      not asking what he asked her and what she asked him.

15               I'm asking a chronology of time when he first

16      spoke to her.

17               THE COURT:  And what bearing would that have

18      on the issues that we have to address here?

19               MR. SCHECHTER:  If the Court wants me to have

20      an offer of proof I would be delighted to give it,

21      absent the officer being on the witness stand.

22               THE COURT:  All right, officer, you want to

23      step out -- detective, I should say?

24               (Witness steps down.)

25               MR. SCHECHTER:  I have reason to believe that

                                                    ws

Shulman - People - cross            194

1    the events that the officer is testifying to occurred

2    hours before he said they occurred.

3            As such, the memo book entries are crucial,

4    when he started speaking to the complainant is crucial,

5    because my client, when he testifies, will interlock

6    with that and I'm entitled to go into that simply -- I

7    know what happened.  She went to the precinct.  She

8    went to the precinct with two other people and she made

9    a statement to him as did possibly the two other

10   people.

11           I am entitled to know, your Honor, and I

12   apologize for pointing with a pen, I am entitled to

13   know when that happened.  I am entitled to develop a

14   chronology of events and not be so restricted doing so,

15   so I can find out exactly what the time picture is

16   here.  This is very important.

17           THE COURT:  And there's nothing in the

18   Rosario material that reflects when he spoke to her?

19           MR. SCHECHTER:  That involves his talking to

20   the complainant.  They don't give me that stuff.

21           MS. JOHNSON:  Your Honor, what does his -- I

22   still don't see what his offer of proof -- any

23   conversations Detective Shulman had with the

24   complainant prior to any contact with the defendant is

25   irrelevant for purposes of Huntley or for purposes of

                                                    ws

Shulman - People - cross                195

1    Mapp.  It would be before any contact with the

2    defendant.

3                MR. SCHECHTER:  That is --

4                THE COURT:  All right, let me ask you this,

5    Mr. Schechter.

6                Other than the time when he initially spoke

7    or met with the complainant, what other questions, just

8    so we can anticipate this while he's outside, do you

9    expect to ask him with regard to chronology?

10               MR. SCHECHTER:  I'm going to ask him how many

11   times he spoke to him.

12               THE COURT:  Him?

13               MR. SCHECHTER:  To her, thank you, and how

14   many times he spoke to my client and thereafter spoke

15   to the complaint and thereafter spoke to my client.  I

16   want to get this chronology, Judge.

17               THE COURT:  All right, let's bring him back

18   in.  I'll allow you to ask those questions.

19               MR. SCHECHTER:  Thank you.

20               (Witness resumes the stand.)

21               THE COURT:  Okay.

22   Q.    Officer, when for the first time did you speak to

23   the complaining witness that evening?

24   A.    I believe it's probably about 3:20 in the morning,

25   to my recollection, on the morning of the 24th.

                                                         ws

Shulman - People - cross                196

1      Q.   And when you spoke to her who was present?

2      A.   Just myself and the victim.

3      Q.   And after speaking to her you took notes of what

4   she was saying, yes or no?

5      A.   Yes.

6      Q.   And there came a time when you spoke to my client

7   after you spoke to her, sometime thereafter, is that

8   correct?

9      A.   Yes.

10     Q.   Do you recall when you first spoke to my client?

11     A.   Again, I believe it was about 5:10 in the morning.

12     Q.   So that would be about two hours after you spoke

13   to the complaining witness?

14     A.   Well, almost two hours from the time I initially

15   started speaking to the complainant.

16     Q.   How -- for what -- how long of a period of time

17   were you speaking to her, that first time?

18     A.   I spoke to her pretty substantially that first

19   time before I interrupted to speak to your client.

20     Q.   So it would be fair to say you spent two hours

21   speaking to her the first time you spoke to her?

22     A.   I may have taken a couple of little breaks in

23   between, but a considerable amount of time during that wo

24   hours, yes.

25     Q.   After speaking to her -- withdrawn.

Shulman - People - cross          197

1          After speaking to my client the first time did you

2     go back and speak to her again?

3          A.   Yes, I spoke to her several times during the

4     course of the day.

5          Q.   So it would be fair to say that you were speaking

6     to the complainant from approximately 3:10 in the morning

7     until about 8:30 in the morning?

8          A.   I don't understand your question.

9          Q.   Were you speaking to the complainant from 3:30 in

10    the morning, off and on, until approximately 8:30 in the

11    morning?

12         A.   Over the course of the day I spoke to her several

13    different times.

14         Q.   When is the last time you spoke to her, if you can

15    recall?

16         A.   Again, I spoke to her on and off at various points

17    during the -- all day, well into the evening.

18         Q.   Are you saying we're in the evening?

19              Are we not at --

20         A.   Into the next afternoon.

21         Q.   Was she always in the precinct when you spoke to

22    her?

23         A.   When I spoke to her, but she had left the precinct

24    at some point in time during the day.

25         Q.   And did she come back to the precinct to speak to

ws

Shulman - People - cross                198

1    you again?

2         A.    Yes.

3         Q.    Now, each time you spoke to Mr. Gopaul did you go

4    back and speak to the complainant?

5         A.    Not each time, no.

6         Q.    There came a time when you first spoke to

7    Mr. Gopaul, you said, at approximately 5:10, is that

8    correct?

9         A.    That's correct.

10              MR. SCHECHTER:  Now, before we get to that, I

11        would like these photographs marked Defendant's C, D, E

12        and F, your Honor.

13              THE COURT:  C,D,E and F.

14              (Defendant's Exhibits C,D,E and F marked for

15        identification.)

16        Q.    Now, officer, would you please look at Defendant's

17   Exhibits C, D, E and F?

18              (Shown to witness.)

19        Q.    Please keep them in the order.

20        A.    Okay.

21        Q.    Now, I direct your attention first to Exhibit C.

22              Does that photograph fairly and accurately

23   represent the outside of the 105 Precinct?

24        A.    Part of it.

25        Q.    Part of it, the front entrance, right?

ws

Shulman - People - cross                    199

1    A.   Yes.

2              MR. SCHECHTER:  Okay, I ask that be marked in

3    evidence as Defendant's C.

4              THE COURT:  All right, to kind of move things

5    along, I take it, Mr. Schechter, you're going to be

6    moving all of these in.

7              MR. SCHECHTER:  All of them, yes.

8              THE COURT:  Are you going to have any

9    objection to them, Ms. Johnson?

10             MS. JOHNSON:  As long as they're fair and

11   accurate as to how it looked on June 24th, 2008.

12             Let me see it again because this is the first

13   time I'm seeing them.  If that's the case, I have no

14   objection for purposes of the hearing.

15             (Shown to counsel.)

16             THE COURT:  And, detective, those

17   photographs, whatever they depict there, fairly and

18   accurately represent what those areas or places looked

19   like on June 24th, 2008?

20             THE WITNESS:  I would believe so.

21             I mean, the only thing is, E and F, you know,

22   don't show the full capacity of the room, I mean, just

23   because of the nature of the picture being taken from

24   outside of the doorway.

25             MR. SCHECHTER:  I'll get to that.

                                                        ws

Shulman - People - cross               200

1           THE COURT:  Other than that- -

2           THE WITNESS:  Yeah, other than that I would

3      imagine it's fairly close.

4           THE COURT:  You're offering them?

5           MR. SCHECHTER:  Yes, Judge, I am.

6           THE COURT:  Would you mark them, please?

7           (Defendant's Exhibits C,D,E and F received in

8      evidence.)

9           MR. SCHECHTER:  May I have them, please?

10          (Shown to counsel.)

11     Q.    Officer, let me direct your attention to

12     Defendant's Exhibit D in evidence.

13          (Shown to witness.)

14     Q.    Is that the outside door to what is commonly

15     called at the 105 Precinct the box?

16     A.    Well, I mean it's a door to an interview room.

17     Q.    Is it known in the 105 Precinct as the box?

18     A.    Not this room per se.  Interview rooms in general

19     are referred to that.

20     Q.    All interview rooms are known as the box?

21     A.    To my knowledge.

22     Q.    So -- now, looking at that picture could you

23     please read what's on the door there?

24     A.    221 for the room number.  There's a sticker that

25     says proper tactics saves lives.

                                                        ws

1       Q.   On the door?

2       A.   That's on the door.

3            And at the time of this picture there's a sign

4    that says interview room, complainants only.

5       Q.   Was that sign on that room when you spoke to

6    Mr. Gopaul in June?

7       A.   I don't know.  Could have been, I don't know.

8       Q.   What is the purpose of having a room saying

9    complainants only?

10      A.   Don't know.  I didn't put the sign up.

11      Q.   But you brought Mr. Gopaul into that room, would

12   that be fair to say?

13      A.   No, I didn't.

14      Q.   Who brought him up into that room?

15      A.   One of the patrol officer officers.

16      Q.   What's his name?

17      A.   I don't know which officer brought him up.

18      Q.   A uniform officer or a detective?

19      A.   Would have been a uniform officer.

20      Q.   And at whose direction would he have brought

21   Mr. Gopaul up?

22      A.   I had spoken to Sergeant O'Hagan and asked

23   Mr. Gopaul be brought upstairs and whoever he directed to

24   bring him upstairs would have brought him upstairs.

25      Q.   So at the time Mr. Gopaul was placed in that room

Shulman - People - cross                202

1   you were not there, is that correct?

2        A.   No, I was in the other interview room with the

3   victim.

4        Q.   That's correct.

5             So, for the purposes of the record, at the time

6   that Mr. Gopaul was brought up to that room you were not in

7   that room, is that correct?

8        A.   I think I just answered that.

9        Q.   No, you really didn't, officer.

10            The question is, at the time Mr. Gopaul was

11  brought into that room were you in that room, yes or no?

12       A.   No.

13       Q.   Now, does Police Department procedure mandate that

14  a prisoner who is left in a room be handcuffed to a rail or

15  some fixed object?

16       A.   Depends on the circumstances.

17       Q.   Well, isn't that done so that the person who is in

18  that room to be interrogated will not do harm either to

19  himself or the interrogating officer?

20       A.   Pardon me?

21       Q.   Isn't that rule in effect so that the person being

22  interrogated does not do physical harm either to himself or

23  the officer who is interrogating him?

24       A.   That could be one interpretation of that rule,

25  yes.

                                                    ws

Shulman - People - cross                203

1        Q.   Yet you said Mr. Gopaul was not handcuffed, is

2   that correct?

3        A.   Correct.

4        Q.   Where were you sitting in relation to the back

5   wall when you were interviewing Mr. Gopaul?

6             You may look at the picture, please, to aid you if

7   you need it.

8        A.   I have the picture with the closed door.

9        Q.   Okay, I'm sorry, I'm wrong.

10             MR. SCHECHTER:   Let me have this marked as

11        Defendant's G.

12             THE COURT:   It's already marked, in evidence.

13             MR. SCHECHTER:   I'm sorry, Defendant's F.

14        I'm sorry, let me show the officer Defendant's F.

15             (Shown to witness.)

16        A.   Okay, could you repeat your question, please?

17        Q.   Yes.

18             My question is where were you sitting in relation

19   to Mr. Gopaul?

20             Let me make it easier for you.   Where were you

21   sitting -- withdraw the question.

22             Where were you sitting and where was Mr. Gopaul

23   sitting at the time you interviewed him?

24        A.   I don't know if these are the exact chairs that

25   were in the room on that day, but relative to this picture,

                                                              ws

Shulman - People - cross                    204

1    the red and black chair would have been the position that

2    Mr. Gopaul was seated in and then the black and gray chair

3    on the opposite side of the table would have been where I

4    was sitting.

5         Q.    So that your back would be towards the door and

6    Mr. Gopaul would be facing the door, would that be fair to

7    say?

8         A.    That would be accurate, yes.

9               (Shown to Court.)

10        Q.    Were you the only officer in the room?

11        A.    Yes.

12        Q.    Now, there is a window into that room, with a

13   cover on the window, is that correct?

14        A.    Sometimes it's covered, sometimes it's not.

15        Q.    Well, was it covered at the time that you spoke to

16   Mr. Gopaul?

17        A.    I don't recall.

18        Q.    And when you came in to see Mr. Gopaul you say you

19   locked your weapon in your office?

20        A.    Yes.

21        Q.    Where is your office?

22        A.    The area that my weapon is secured is out -- I

23   can't really describe it from, I don't think, from this

24   picture, but there's another doorway right here and then

25   there's a half wall that comes all the way across separating

                                                              ws

Shulman - People - cross                    205

1    this whole section of the office from a whole another part

2    of our office and on the opposite end of that larger office

3    is where I have my desk.

4         It's probably, you know, I don't want to swear to

5    it, a measurement that I haven't measured, but probably a

6    good 12, 15, feet outside of that door entranceway locked up

7    in my desk.

8         Q.   Did you place the weapon inside the holster inside

9    your desk or was the weapon placed inside the desk and you

10   still held the holster?

11        A.   I don't recall.

12        I probably, just not to take my whole belt off,

13   probably would have just taken the weapon out and put it in

14   the desk.

15        Q.   Now, when you first came into the room how was

16   Mr. Gopaul dressed?

17        A.   He was wearing some sort of uniform.  I believe it

18   had a Ecolab patch on the arms.

19        Q.   What color was the shirt?

20        A.   I don't recall specifically.

21        Q.   And was there a tie with that shirt?

22        A.   I don't recall.

23        Q.   And do you recall the color of his pants?

24        A.   I don't recall.

25        Q.   Do you recall whether the shirt went into the

ws

Shulman - People - cross                    206

1    pants or not?

2        A.   Mr. Gopaul was seated, so I don't remember

3    noticing if his shirt was tucked in or not.

4        Q.   When you saw Mr. Gopaul had you asked him whether

5    he had eaten?

6        A.   I don't believe I had that conversation with him.

7        Q.   Did you ask him whether he had slept within the

8    past 24 hours?

9        A.   I hadn't had that conversation with him.

10       Q.   As part of your training are you not told in the

11   academy that the first thing you do when you when you're

12   questioning a suspect is to get rough with him and then,

13   after you're rough with him, try to make him your friend?

14            Is that part of your training at the Police

15   Academy?

16            MS. JOHNSON:  Objection.

17            THE COURT:  I'll allow it.

18            You can answer.

19       A.   No, it's not.

20       Q.   The first time that you spoke to Mr. Gopaul

21   Mr. Gopaul freely told you that he had this incident with

22   his daughter at a park, I think you indicated, is that

23   correct?

24       A.   Pardon me?

25       Q.   The first time you interviewed Mr. Gopaul he

                                                        WS

Shulman - People - cross                    207

1    explained to you that he had an incident involving his

2    daughter Sana at an amusement park, would that be correct?

3         A.   He indicates they had an argument and that he

4    slapped her and then I believe in his written statement he

5    spells out that it was revolving around an incident that had

6    occurred at some sort of fair or festive park event.

7         Q.   And he gave you that statement, is that correct,

8    written?

9         A.   Yes.

10        Q.   And that statement is already in evidence.  We've

11   seen it introduced in evidence in this courtroom, correct?

12        A.   Yes.

13        Q.   Now, after you received that statement where did

14   you go?

15        A.   At Mr. Gopaul's request I took him to the restroom

16   and allowed him to use the facilities.  I then brought him

17   back to the interview room and then he stayed in the

18   interview room for a short while while I did other duties.

19        Q.   When you took him to -- you personally took him to

20   the restroom?

21        A.   Yes.

22        Q.   Where was the officer who brought him to the

23   interview room?

24        A.   I don't know.

25        Q.   By Police Department regulation was he required to

                                                              ws

Shulman - People - cross          208

1    be handcuffed when he went to the -- was brought to the

2    interview room within the precinct?

3         A.   When he was brought to where?

4         Q.   When he was placed from -- withdrawn.

5              Where was Mr. Gopaul prior to being brought into

6    the interview room?

7         A.   Somewhere downstairs.

8         Q.   Are there holding pens downstairs?

9         A.   There are.

10        Q.   Where are they located?

11        A.   Behind the desk.

12        Q.   Behind the sergeant's desk?

13        A.   Yes.

14        Q.   And were there any prisoners in there besides

15   Mr. Gopaul?

16        A.   I don't know that Mr. Gopaul was in there or not

17   prior to coming up to my office.

18        Q.   You don't know where he was, then, would that be

19   fair to say?

20        A.   No.

21             THE COURT:   Is that no?

22             THE WITNESS:   No, once I was informed that he

23        was in custody I directed that he be brought up to my

24        office and within a short time thereafter he was

25        brought up into my office.

ws

Shulman - People - cross                209

1        Q.    When you made this direction was this by

2    telephone?

3        A.    Yes.

4        Q.    And you were sitting by your desk?

5        A.    I was at one of the desks in my office.

6        Q.    And when Mr. Gopaul was brought up was he brought

7    up in handcuffs or was he brought up without handcuffs?

8        A.    Again, I didn't see him brought up, but when I

9    first saw him he was not handcuffed, but he was in a secure

10   interview room.

11       Q.    Is there a key to that room?

12       A.    No.

13       Q.    So that room could be opened and closed freely, is

14   that what you're saying?

15       A.    Well, no, if you're securing somebody in there, as

16   you can see in the picture, there is a clasp on the door so

17   you can secure the door.

18       Q.    From the outside?

19       A.    From the outside.

20       Q.    Did you have your handcuffs with you when you

21   interviewed Mr. Gopaul?

22       A.    Yes.

23       Q.    Did you have to take the handcuffs off of

24   Mr. Gopaul?

25       A.    No.

ws

Shulman - People - cross                210

1       Q.   All right, so you order Mr. Gopaul to be brought

2   up from downstairs.

3            How long after you made that telephone call was

4   Mr. Gopaul brought to the room?

5       A.   Not too long.  I mean, I don't know exact time

6   frame because I went back in to speak to the victim.

7       Q.   Is it your testimony that after you asked

8   Mr. Gopaul to be brought back to the room you went back to

9   speak to the victim again?

10      A.   Yes.

11      Q.   What was your purpose in speaking to the victim

12  again?

13      A.   I was still speaking to the victim.  I hadn't

14  concluded speaking to the victim.

15      Q.   Did the victim know Mr. Gopaul was in that room?

16      A.   Not at that time, no.

17           MR. SCHECHTER:  May I show the witness

18      Exhibit E?

19           MS. JOHNSON:  Can I see which one it is?

20           (Shown to counsel.)

21           (Shown to witness.)

22      Q.   Now, officer, Exhibit E fairly represents the

23  other part of the room that were not in the photographs, the

24  other half of the room width-wise, would that be fair to

25  say?

                                                      ws

Shulman - People - cross          211

1        A.    The back portion.

2              The front corner is cut off, again, by the angle

3    of the picture, but it shows the back right corner.

4        Q.    How tall are you, officer?

5        A.    About five ten.

6        Q.    How much do you weigh?

7        A.    250, 260.

8        Q.    Now, as a police officer you're trained to

9    recognize the heights and weights of various witnesses or

10   defendants, isn't that correct?

11       A.    Well, I don't know that you can train that.

12       Q.    Did you make a determination how tall and how much

13   Mr. Gopaul weighs?

14             MS. JOHNSON:  Objection.

15             THE COURT:  Did he make a determination as to

16        how much Mr. Gopaul weighed?

17             Is that the question?

18             MR. SCHECHTER:  Yes.

19             THE COURT:  Did you make that determination?

20             THE WITNESS:  I don't think I had to think

21        about that at the moment.

22       Q.    Would it be fair to say that you -- on June 8th

23   you outweighed Mr. Gopaul by, easily, 70 pounds?

24       A.    On what date?

25       Q.    On June -- I'm sorry, on June 24th, 2008?

Shulman - People - cross                212

1       A.    I don't know how much I outweighed him by, but I

2   would imagine I outweighed him.

3       Q.    Isn't it a fact when you first got Mr. Gopaul in

4   the room you grabbed him by his collar and threw him against

5   the wall, holding on to the collar, and then grabbing,

6   maintaining holding on to the collar, you dragged him back

7   towards you?

8             Isn't that a fact when you first saw him in the

9   room --

10            MS. JOHNSON:  Objection.

11            THE COURT:  I'll allow it.

12      A.    Absolutely not.

13            MR. SCHECHTER:  Your Honor, can I please play

14  the tape, first part of the tape, videotape, for the

15  officer?

16            THE COURT:  You can play it tomorrow because

17  we're going to break at this point.

18            MR. SCHECHTER:  Okay, I just wanted the

19  officer to look at the tape.

20            All right, we're breaking now?

21            THE COURT:  Because I have a prisoner I have

22  to deal with, so I want to give my officers enough time

23  to get her downstairs.

24            MR. SCHECHTER:  Would the Court kindly direct

25  the officer not to discuss his testimony with

                                                        WS

Proceedings                    213

1      Officer Alfaro?

2              I did notice there was conversation, but I

3      don't know what it was about.

4              THE COURT:  Detective, you can speak to

5      Officer Alfaro, just not about your testimony.

6              We'll see you back here tomorrow morning.

7              MS. JOHNSON:  At the Court's direction, I

8      sent subpoenas for Officer Alfaro and Detective Shulman

9      tomorrow.

10             Officer Alfaro has already been subpoenaed

11     for two other matters, one being a Queens County

12     Criminal Court case and another being a traffic court

13     case.

14             I advised her this is an ongoing hearing and

15     my position was that this matter took precedence.

16             She indicated that traffic court is from 8:30

17     until 10 o'clock in the morning anyway, and I had

18     indicated to her that she would have to come here after

19     that, but I believe she has personal appointments

20     scheduled for tomorrow that she already did -- that she

21     had already had scheduled.

22             THE COURT:  All right, look it, she's under

23     subpoena.  I expect her to be here.

24             MS. JOHNSON:  And I would inform the

25     precinct, as I did yesterday, this is an on going

                                                        ws

Proceedings                          214

1     hearing, this takes precedence to other matters and I

2     thank the Court for the Court's phone call to assist

3     with witnesses.

4                    THE COURT:  All right, thank you.

5                    Detective, we'll see you tomorrow.

6                    (Witness steps down.)

7                    (Proceedings adjourned to Tuesday, May 5th,

8     2009 at 9:30 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

215

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF NASSAU : CRIMINAL TERM PART 80

3   ------------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,      :   Indictment
4                                             :   No. 2415N/08
            -against-                         :
5                                             :
    HAROLD GOPAUL,                            :   Sex Abuse 1
6                                             :
                        Defendant.            :   Huntley/Mapp
7   ------------------------------------------X   Hearings

8                               May 5, 2009

9                               252 Old Country Road
                                Mineola, New York
10

11  B E F O R E:

12              HONORABLE JAMES P. McCORMACK,
                    Acting Supreme Court Justice
13

14  A P P E A R A N C E S:

15          (As Previously Noted.)

16              *       *       *       *       *

17

18              THE CLERK:  This is a continued hearing of

19      Harold Gopaul, Indictment 2415N of 2008.

20              Are the People ready?

21          MS. JOHNSON:  Yes.

22              Can I place a couple of things on the record?

23          THE COURT:  Yes.

24          MS. JOHNSON:  I handed counsel a copy of

25      Detective Shulman's memo book from the date of

ws

Proceedings                    216

1    incident.  It's two pages.  It's the cover page of his

2    actual book and the entries.

3            I've also handed counsel a Xerox copy of

4    photographs as part of the People's continuing

5    discovery.  I indicated to him that we were not even

6    sure if we were going to be using them on our direct

7    case.

8            I've also handed a copy of a fax that I

9    received regarding the logbook from the command dated

10   Tuesday, June 24th, 2008.  That's what was faxed over

11   to my office yesterday.

12           I don't know if your Honor wants to deal with

13   the other issues now with the uniformed officer or just

14   get this going and we can do it after the detective is

15   done.

16           THE COURT:  Mr. Schechter, you received those

17   items, I take it?

18           MR. SCHECHTER:  Your Honor, I received what

19   appears to be the portion of Detective Shulman's memo

20   pad for June 24, 2008 and I received a portion of the

21   logbook for June 24th, 2008.

22           Unfortunately, it's missing a very crucial

23   time period of midnight to 5:57 p.m. -- a.m. and

24   therefore it's incomplete.

25           As I explained earlier, I requested the

                                                      ws

Proceedings                    217

1   entire logbook for June 24th, including the early

2   morning hours, which is where all the activities we're

3   dealing with here took place.

4             THE COURT:  All right, People, I think that's

5   a pretty fair assessment of the logbook.  It does

6   appear that there's a page that's missing.  The page I

7   have begins at 0558 hours, which is approximately

8   6 a.m., and ends at 8:45, so --

9             MS. JOHNSON:  Yes, Judge.

10            THE COURT:  I'm going to ask you, at some

11   point during the break, if you want to have

12   Detective Schulman contact the 105 and fax that page to

13   your office?

14            MS. JOHNSON:  Absolutely, your Honor.

15            And yesterday when I had asked them to fax it

16   over I asked for June 24th and this is what they sent,

17   but I will absolutely ask to have that faxed over.

18            THE COURT:  It seems at this point there is a

19   great deal of miscommunication between your office,

20   yourself, and the -- these officers in this case.

21            I've been sitting here since 9:30.  Is --

22   this detective doesn't understand that he's supposed to

23   be here at 9:30 or is he being told to come at some

24   other time?

25            MS. JOHNSON:  Your Honor, the teletypes

ws

Proceedings                     218

1    which, in fact, I provided a copy to the Court, are for

2    continuation for the hearings at 9:30.

3              The detective, when he finished his tour last

4    night, responded back to the precinct to pick up his

5    case jacket.  It's my understanding, I guess, that 9:30

6    was for him to be at the command for him to pick up his

7    case jacket and then to come to court.

8              I did advise him that hearings begin as soon

9    as he gets here at 9:30.  The Court is ready to proceed

10   at 9:30.  I believe your Honor knows I was obviously

11   here at 9:30 -- in my office at 9:30.

12             I am at the mercy of the Court to at least

13   have the Court advise --

14             THE COURT:  I plan to, but before I open my

15   mouth, if you will, I want to be sure he's not going to

16   tell me he's being told to come here at some other

17   time.

18             MS. JOHNSON:  Your Honor, he advised me that

19   he was going to get here as soon as he could.  I told

20   him, "We continue as soon as you get here at 9:30.  The

21   subpoena is for 9:30."

22             He says he has to go from his home to Queens

23   to pick up the case jacket.  I even called him on his

24   cell phone when he was running late.

25             THE COURT:  All right, I'll speak to him when

                                              ws

Proceedings                    219

1    he comes in.

2              What's the issue with this other officer?

3              Are we going to have her today?

4              MS. JOHNSON:  Your Honor, what the Court has

5    before the Court is a copy of the teletype that was

6    sent on May 1st for Officer Alfaro to appear here for

7    continuation of hearing, today being May 5th.

8              I spoke to police liaison.  They faxed me

9    that information.  A copy of the teletype that your

10   Honor has confirms that the NYPD received

11   communication.

12             However, as I indicated yesterday,

13   Officer Alfaro had already been subpoenaed for traffic

14   court and for another criminal case in Queens County.

15             I advised her that it was my belief that a

16   pending hearing took precedence to both of those

17   matters.

18             When I called the 105 Command they advised me

19   that traffic court takes precedence to all other

20   matters because if the officer does not show, the

21   ticket --

22             THE COURT:  What traffic court are we

23   referring to?

24             I mean, not that I -- in my mind, I can't

25   imagine traffic court taking any precedence over a

                                                    ws

Proceedings                    220

1    County Court matter.

2                MS. JOHNSON:   I agree with your Honor and

3    that was the PD's policy.  They said traffic court

4    takes precedence over other matters.  I asked them if

5    that was the policy.  They said yes.

6                Either way, your Honor, the officer informed

7    me that she was never notified by the command to appear

8    here for today, despite that subpoena that clearly

9    indicates that she was notified five days ago and that

10   the command received the notification.

11               THE COURT:   Is there somebody -- when you say

12   command, are you talking about the 105th Precinct?

13               MS. JOHNSON:   That is correct, Judge.  Their

14   actual notification goes through a records bureau and

15   goes through another channel.

16               We were told that they need 24 hours notice.

17   Here they've had four days notice that we were going to

18   need her.

19               Even if she knew that we were going to need

20   her for today, which I had advised her of, she is

21   ordered to go to the traffic court and go to the other

22   matters which she is officially notified through the

23   official channels.  So even though she knew about

24   this --

25               THE COURT:   Well, she was here yesterday.

                                                      ws

Proceedings                    221

1          MS. JOHNSON:  Yes.

2          THE COURT:  Obviously, she wouldn't have come

3    here if she didn't have a subpoena to come here.

4          MS. JOHNSON:  Absolutely.  And the precinct's

5    position and the PD's position is that she was already

6    notified for traffic court and for Criminal Court and

7    although we sent these, she was not officially notified

8    to come today.

9          She was working last night.  She was working

10   at the precinct because she's a night officer and we

11   complied with their 24-hour notification four days ago.

12         I don't know why their records bureau or

13   whoever is in charge of it there never actually said to

14   her, "Here is your subpoena from four days ago.  You

15   must come either after traffic court or after Criminal

16   Court to Nassau County."

17         THE COURT:  She's in traffic court where,

18   Nassau County, Queens?

19         MS. JOHNSON:  I believe it's the city, Judge.

20   I don't know.

21         The other issue is that because she is a

22   night officer and her official notification is for --

23   that she was notified from the command for traffic

24   court and Criminal Court, she is not permitted to come

25   here without the official notification, even though she

                                              ws

Proceedings                          222

1    actually knew about it, because the command didn't

2    officially tell her she must appear in court.

3              MR. SCHECHTER:  Judge, may I be heard?

4              THE COURT:  Yeah.

5              MR. SCHECHTER:  The system of traffic court

6    in New York City is that the traffic court is separate

7    from the Criminal Court unless they're dealing with

8    matters involving driving with a suspended license or

9    driving while intoxicated.

10             Any unclassified VTL misdemeanor is done in

11   Criminal Court.  All of the regular traffic

12   infractions, speeding, going through a red light, that

13   is done in traffic court which is completely the lowest

14   end of the criminal spectrum.

15             Additionally, Criminal Court never takes

16   precedence over County or Supreme Court, Judge.

17             I'm beginning to smell a rat here with the

18   superstructure of the 105 Precinct.  They only supplied

19   part of the documentation that was supposed to be

20   supplied to us, Judge, they've been stone walling us,

21   there are inconsistencies that will manifest itself

22   with respect to this officer's tours and I think

23   there's something in the nature of, I don't want to say

24   cover-up, but certainly I'm beginning to smell a rat

25   with respect to the 105 Precinct.  They are not

                                                  ws

Proceedings                    223

1    cooperating with this Court and I don't understand why.

2         Which is why normally I respectfully ask the

3    Courts to direct witnesses to be here the next day so

4    the witness has no squeaking room because if he

5    violates that it's a contempt of court.

6         MS. JOHNSON:  Your Honor, I even went so far

7    as we already sent a subpoena for Officer Alfaro for

8    tomorrow.  I didn't know what the Court's or

9    Mr. Schechter's schedule was, but to avoid any problem,

10   that was done over an hour and a half ago to make

11   sure --

12        THE COURT:  All right, well, let me --

13        MS. JOHNSON:  While your Honor steps off the

14   bench can I have Detective Schulman call the precinct

15   to have that other page faxed?

16        THE COURT:  Yes.

17        (Pause in the proceedings.)

18        (The witness, Leonard Schulman, having

19   previously been sworn, resumed the witness stand.)

20        THE COURT:  Detective, I need you here at

21   9:30.

22        I understand you work at nights?

23        THE WITNESS:  Yes, your Honor.

24        THE COURT:  All right, I can't lose an hour

25   and a half or an hour.  Like I said to you a couple of

ws

Proceedings                      224

1   days ago, we're under a tight schedule and I need you

2   here -- I don't know where your other officer is.

3            If there's an emergency, I understand.  If

4   something comes up, you have the DA's cell phone, call

5   her.  I'm sitting here for an hour and a half doing

6   nothing.

7            THE WITNESS:  I was here at 9:30 yesterday

8   morning, your Honor, and this morning I believe I was

9   able to park the car about 10:15.  I apologize.  I was

10   a little bit late.  There was a little bit of traffic

11   with the rain and all.

12            THE COURT:  Ms. Johnson, when was this

13   subpoena for Officer Alfaro sent because my law

14   secretary is being told --

15            MS. JOHNSON:  This is the fax.  This 9:12 --

16            LAW SECRETARY:  Back to you?

17            MS. JOHNSON:  Back to me from the liaison for

18   the Court.

19            Right here, your Honor, it says May 1st, 2009

20   up here.  That top fax is them faxing it over to me

21   this morning.

22            LAW SECRETARY:  It's a subpoena or a

23   teletype?

24            MS. JOHNSON:  It's a teletype.

25            LAW SECRETARY:  They're saying they don't

ws

Shulman - People - cross          225

1    have a subpoena and no record of her needing to be here

2    today.

3              MS. JOHNSON:  That's the receipt of it on

4    top.

5              THE COURT:  Ask them what they need and we'll

6    make sure they get it.

7              THE CLERK:  Detective, you're reminded that

8    you're still under oath.

9              THE WITNESS:  Yes.

10             MR. SCHECHTER:  Shall I proceed, your Honor?

11             THE COURT:  Yes.

12             MR. SCHECHTER:  If the Court pleases, I'm

13   just trying to find my last question and answer.

14   CROSS-EXAMINATION CONT'D

15   BY MR. SCHECHTER:

16       Q.   Now, Detective Schulman, you recall testifying

17   yesterday that on June 24th you were working a 4:30-to-1

18   tour?

19             Do you recall testifying to that?

20       A.   From the night of the 23rd into the morning of the

21   24th.

22       Q.   Right, 23rd into 0100 a.m.

23             On the 24th you say you were working an 8 to 4:30

24   tour?

25       A.   Due to the fact that I was still working on the

ws

Shulman - People - cross          226

1   Gopaul case and the Awan case at 8 o'clock in the morning, I

2   went back on a day tour.

3        Q.   Were you in court at 8 a.m. in the morning?

4        A.   No.

5        Q.   Where were you?

6        A.   I was in my office.

7        Q.   Was anybody with you?

8        A.   Probably.

9        Q.   Who was with you?

10       A.   I don't know specifically who was working.

11       Q.   Was it an officer or was it any of the witnesses?

12       A.   Mr. Gopaul was in my office.

13       Q.   At 8 a.m.?

14       A.   Yes.

15       Q.   And he was in your office or in the interrogation

16  room?

17       A.   He's in the interview room which is in my office.

18       Q.   Oh, I see.

19            So it would be fair to say you worked straight

20  through from 4:30 through 4:30 the next day?

21       A.   I worked through the next afternoon into the

22  evening.  I would have to look at the memo book to see

23  exactly what time I finished that day.

24       Q.   Okay, please do.

25       A.   I actually worked until 9:33 p.m. Tuesday evening

ws

Shulman - People - cross                227

1    and then I went back on duty again from 9:33 p.m. to 6:06

2    the next morning.

3         Q.   Is that all overtime?

4         A.   No.

5         Q.   What part was overtime, officer?

6              MS. JOHNSON:  Objection.

7              THE COURT:  Yeah, sustained.

8              MR. SCHECHTER:  Now, I would like if the

9         officer -- would I be able to ask the officer to sit in

10        the jury box so that he could view the videotape,

11        Judge?

12             THE COURT:  Yes.

13             Detective, if you would just have a seat

14        where you were yesterday for a moment?

15             (Witness steps down.)

16             MR. SCHECHTER:  Now, your Honor, I

17        respectfully ask counsel to turn the videotape on right

18        now.

19             Now, could you freeze that, please?

20        Q.   Now, officer, I draw your attention to

21   Mr. Gopaul's image in that videotape.

22             Can you see him clearly?

23        A.   Pretty much.

24        Q.   Would you need to go closer?

25        A.   No.

                                                    ws

1      Q.    I direct your attention --

2                  MR. SCHECHTER:  I ask the Court to also,

3      please.

4      Q.    I direct your attention to the collar of his

5      shirt.

6            Now, is the collar of his shirt closed or is it

7      spaced widely?

8      A.    It appears to be unbuttoned on the top.

9      Q.    And would you say that the distance between the

10     two sides of his shirt is not what normally that shirt would

11     look like were it closed?

12     A.    Again, it appears unbuttoned, so it doesn't look

13     the same as it looks when it's buttoned.

14     Q.    Was the shirt the same way when he came into the

15     room with you -- withdrawn.

16           Was his shirt in that same condition when you

17     first came into the room and observed him in that room?

18     A.    I don't recall if his shirt was unbuttoned or not

19     when I first came into the room.

20     Q.    Well, there came a point of time when you were

21     questioning him over a two or three-hour period, is that

22     correct?

23     A.    Yes.

24     Q.    Did his shirt always appear like that during the

25     two or three-hour period that you were questioning him?

                                                            ws

Shulman - People - cross                 229

1      A.   Again, I don't recall if his shirt was buttoned or

2   unbuttoned.

3      Q.   Now, you'll notice that the two lower parts of the

4   shirt --

5              MR. SCHECHTER:  I'm asking the Court to take

6         judicial notice of this, and I'm referring to this area

7         (indicating).

8      Q.   And I'm referring to this area here and this area

9   here is distorted downward.

10             Do you notice that?

11             THE COURT:  Do you want to, just for the

12        record, indicate what it is that you're point at?

13             MR. SCHECHTER:  Yes, I'm pointing to the area

14        on the videotape on a point on the lower right center

15        part of the video which shows the bottom left portion

16        of Mr. Gopaul's shirt and also the right lower portion.

17             All of this is basically in the center of the

18        video showing that the shirt is depressed down on the

19        left side and down on the right side.

20     Q.   Now, was Mr. Gopaul's shirt in that condition when

21   you first saw him?

22     A.   Again, I don't know if his shirt was buttoned or

23   unbuttoned when I first came in to speak to him.

24     Q.   When you -- withdrawn.

25             Have you any physical contact with Mr. Gopaul

ws

Shulman - People - redirect          230

1    whatsoever?

2         A.   I might have shook his hand when I introduced

3    myself, but other than that, no.

4         Q.   Isn't it a fact that you took your hand right by

5    his collar, right where that distortion of his shirt is, you

6    grabbed his shirt with your hand, indicating a hand with a

7    palm down, grabbing his shirt, pulling him towards you, then

8    pulling him away.

9              Isn't that what you did?

10        A.   Absolutely not.

11             MR. SCHECHTER:  Your Honor, I have no more

12             questions of the officer.

13             THE COURT:  Okay, sure.

14             If you would, detective, just resume your

15        seat back in the witness box?

16             (Witness resumes the stand.)

17   REDIRECT EXAMINATION

18   BY MS. JOHNSON:

19        Q.   Detective Schulman, during the time you were with

20   the defendant on June 24th, 2008 did he ever complain of any

21   injuries?

22        A.   No, he did not.

23        Q.   Did he ever ask for any medical attention?

24        A.   No, he did not.

25        Q.   Did you ever observe any injuries on him?

Shulman - People - redirect/recross        231

1      A.   No, I did not.

2                MS. JOHNSON:  Nothing further.

3                THE COURT:  All right, detective, if I could

4      just ask a couple of follow-up questions?

5                As I looked at the video of Mr. Gopaul seated

6      in the interview room there during the videotape it

7      appears as though -- was he wearing two shirts?

8                In other words, it looked to be a T-shirt or

9      some underlying shirt and then a shirt over it, if you

10     recall?

11               THE WITNESS:  I don't know if he had an

12     undershirt on or not, your Honor.  I mean, I didn't

13     have any contact with his clothing.

14               THE COURT:  Any other questions,

15     Mr. Schechter?

16               MR. SCHECHTER:  I have no questions of the

17     officer.

18               THE COURT:  All right, detective, thank you

19     very much, you're excused.

20               MR. SCHECHTER:  Wait, yes, I do.

21     RECROSS-EXAMINATION

22     BY MR. SCHECHTER:

23     Q.   Officer, did you have to do a physical inspection

24     of Mr. Gopaul's arms and legs at any time?

25     A.   Not that I recall specifically, no.

                                                           ws

Shulman - People - recross          232

1    Q.   Or his abdomen?

2    A.   No.

3              MR. SCHECHTER:  Thank you.  No more

4    questions.

5              THE COURT:  You're excused, detective, thank

6    you.

7              Could I just see the both of you?

8              (Discussion held at the bench, off the

9    record.)

10             (The luncheon recess was taken at this time.)

11             *      *      *      *      *

12             A F T E R N O O N   S E S S I O N

13             THE COURT:  Mr. Schechter, I indicated

14   earlier that this morning there was an individual who

15   my law secretary dealt with.  I don't know from what

16   facility one of those two subpoenas were directed to.

17   I think they were both two different facilities?

18             MR. SCHECHTER:  My investigator was informed,

19   your Honor, that they had to deliver everything through

20   the Manhattan facility, which they did.

21             As your Honor could tell from my subpoena,

22   there's one specific bit of information that I really

23   require out of that -- those materials and it's that

24   that I'm most interested in.

25             THE COURT:  All right, there was -- what took

                                                        ws

Proceedings                    233

1    place this morning is that subpoena came from one of

2    the facilities with printed out material that was from

3    a computer that they accessed.

4              What we were told is that there's a box of

5    materials that I believe comes from Manhattan that

6    we've directed them to send FedEx.

7              I take it that you're not, at least at this

8    point, expecting any witnesses to testify with regard

9    to the documents.

10             MR. SCHECHTER:  No.

11             THE COURT:  So what I asked them to do is

12   send those materials to chambers FedEx.

13             The materials that we did receive this

14   morning, I don't know how many pages there were, my law

15   secretary has gone over them.

16             In essence, there's really not any statements

17   by or attributable to her or attributable to these

18   incidents in terms of her talking about these

19   allegations.

20             A lot of them has to deal with her placement,

21   if you will.

22             MR. SCHECHTER:  That's what I'm most

23   interested --

24             THE COURT:  And that would be relevant in

25   what sense?

ws

Proceedings                234

1          MR. SCHECHTER:  I wish not to, with all due

2    respect, to disclose that information, your Honor,

3    especially in the presence of the prosecutor since this

4    is part of the theory of my case.

5          THE COURT:  Let me say this.

6          It's my intention, depending on what material

7    I find to be appropriate for disclosure, that it's

8    going to be disclosed to both sides.

9          MR. SCHECHTER:  Your Honor, I, with all due

10   respect, I do not understand how if I -- the whole

11   purpose of a subpoena, as it is with the People's

12   subpoena because they don't notify counsel when they

13   subpoena something, and I don't get any --

14         THE COURT:  As a matter of practice, if the

15   People were to subpoena things to my chambers and I

16   release them I would release them to the defendant as

17   well as the People.

18         MR. SCHECHTER:  They don't have to.  They can

19   routinely subpoena information and the Police

20   Department routinely gives them the information they

21   subpoena without us knowing a thing about it.

22         There's a reason that I have those things

23   subpoenaed and there's a reason why the subpoenas were

24   done ex parte, your Honor.

25         I do not want to, in any way, telegraph

                                                    ws

Proceedings                    235

1     counsel my intentions and the reasons for my doing

2     anything here.  I have my own theory of the case and it

3     entails getting certain information.  The specific

4     information is outlined in the first request part of my

5     subpoena.

6             THE COURT:  Well, as I indicated, I haven't

7     looked at the materials myself yet.

8             As I indicated to you, there may be some

9     materials that -- although I should preface my comments

10    by saying nobody from these facilities, as of yet, is

11    claiming any type of confidentiality or privilege

12    attached to these documents.

13            In thinking about it, if no one is going to

14    raise that, then I may just release them, again, as I

15    said, to both sides.

16            But, again, I haven't gone through them.  My

17    law secretary just handed me one document that does

18    appear to talk about the incident itself, so what I've

19    asked my law secretary to do is make copies of what we

20    received today.

21            As I indicated, there's apparently other

22    material we're expecting to get in the next -- I would

23    hope by tomorrow.

24            MR. SCHECHTER:  Okay, Judge, but, as I said,

25    just without specifying what it is, that first one or

                                                    ws

Proceedings                    236

1    two sentences of my subpoena pretty much outlines what

2    I really -- what I'm interested in, at least at this

3    juncture.

4             THE COURT:  All right.  Well, I'm going to

5    obviously provide what I do receive, absent somebody

6    claiming some type of privilege or confidentiality to

7    it.

8             I don't know whether it's going to be in

9    response to your subpoena.  Only you could say that,

10   obviously.

11            MR. SCHECHTER:  Okay.  All right --

12            MS. JOHNSON:  Your Honor, the logbook had not

13   yet been received by my office.

14            When I spoke to Detective Schulman he

15   indicated to me that although his detective squad is

16   housed at the 105 Precinct, it is a patrol division

17   log.  He has requested that the patrol supervisor, one

18   of the only people that can actually access the book,

19   immediately, upon getting it, fax it over to my office,

20   but I have not yet received that yet.

21            I also indicated to counsel -- I mean,

22   obviously Officer Alfaro is outside, we can proceed

23   with the hearing, with her testimony, but I had asked

24   for the Court's indulgence with a day to begin the

25   trial at least a day from now, but I just want

                                                      ws

Proceedings                    237

1    your Honor to know there is conflict and issues

2    concerning witness availability on Monday and Tuesday.

3              My suggestion to your Honor, and, of course,

4    this is -- I'm at the whim of the Court, is if we can

5    do pretrial tomorrow and start picking on Monday and

6    the reason why I ask that is because I have confirmed

7    with the officer and I've confirmed with the detective

8    that they are not available for personal reasons on

9    Monday and Tuesday of next week.

10             If we were to pick on Thursday and Friday I

11   would not have witnesses available for Monday and

12   Tuesday, that being May 12th -- May 11th and May 12th.

13             I did confirm with them they are both

14   available on Wednesday, Thursday and Friday.

15             THE COURT:  And that leaves us with one week

16   left for -- assuming all goes well and you get your

17   case in from Wednesday to Friday next week, that leaves

18   us with the week of the 18th for the defendant's case

19   to go in, which it appears as though there is going to

20   be somewhat of a defense case, you know, jury charge,

21   deliberations, and I've got Mr. Schechter looking to

22   get on a plane on the 27th.

23             MS. JOHNSON:  And I understand that, Judge.

24   That's why I'm bringing it to the Court's attention,

25   that the detective and the police officer are not

                                                    ws

Proceedings                    238

1    available on Monday or Tuesday.

2            MR. SCHECHTER:  The complainant is.

3            THE COURT:  At this point I really loathe to

4    entertain any applications from any of these officers

5    regarding their availability.  It seems as though

6    they've had issues with regard to their availability

7    since this case began.

8            You know, barring some type of medical

9    emergency, as far as I'm concerned, depending on what

10   we cover today, I would be inclined to order a panel

11   for tomorrow afternoon and start picking tomorrow

12   afternoon.

13           If that becomes not feasible, then we'll

14   start on Thursday morning.  I mean, obviously you'll

15   have your complainant.

16           MS. JOHNSON:  Yes, Judge.

17           THE COURT:  She is available.

18           MS. JOHNSON:  She is, your Honor.

19           THE COURT:  So -- I can't at this point, with

20   the history that's gone on so far -- and, believe me,

21   nobody wants to accommodate an attorney more than

22   myself, but at this point I can't run the risk of

23   picking on Monday.

24           Quite frankly, although there's only ten

25   peremptories for each side, I think given the nature of

                                              ws

Alfaro - People - direct          239

1     the case it's not going to be a jury selection that's

2     not going to be necessarily that quick, particularly

3     when jurors hear the nature of the allegations.

4                    So I think the sooner we get this going the

5     better off we're all going to be.

6                    I just want to give this back to my law

7     secretary so we could start making copies.

8                    Do you want to call Ms. -- Officer Alfaro?

9                    MS. JOHNSON:  People call Police Officer

10    Celica Alfaro.

11    C E L I C A  A L F A R O, a witness called on behalf of the

12    People, having been first duly sworn by the clerk of

13    the Court, was examined and testified under oath as

14    follows:

15                   COURT OFFICER:  Take a seat.

16                   For the record, state your name, spell your

17    last name, shield number, rank and command?

18                   THE WITNESS:  Celica -- PO Celica Alfaro,

19    A-l-f-a-r-o, shield number is 8865, from 105 Precinct,

20    Queens South.

21                   THE COURT:  Okay, Ms. Johnson.

22                   MS. JOHNSON:  Thank you, your Honor.

23    DIRECT EXAMINATION

24    BY JOHNSON:

25         Q.   Good afternoon, Officer Alfaro.

                                                        ws

Alfaro - People - direct                240

1          How long have you been employed by the New York

2     City Police Department?

3          A.    Approximately eight years.

4               MR. SCHECHTER:  How many years?

5               THE WITNESS:  Eight years.

6          Q.    You may just want to push the microphone over.

7               Have you been assigned to the 105 the entire time?

8          A.    Yes.

9          Q.    What are your general duties as an officer with

10    the 105th Precinct?

11         A.    Patrol.

12         Q.    I'm going to direct your attention to June 24th,

13    2008.

14               Were you working that day?

15         A.    Yes.

16         Q.    Where were you working?

17         A.    I don't recall.  A sector.

18         Q.    Were you assigned to the 105 Precinct?

19         A.    Yes.

20         Q.    What was your tour?

21         A.    12 to 8.

22         Q.    P.m. or a.m.?

23         A.    2315 by 0750.

24         Q.    That's 11:15 p.m. to 7:50 a.m.?

25         A.    Yes.

ws

Alfaro - People - direct          241

1      Q.   Would that be the 23rd going into the 24th?

2      A.   Yes.

3      Q.   Did there come a time when a Detective Schulman

4   asked you to assist in a case?

5      A.   Yes.

6      Q.   Can you tell us what happened?

7           What was it that Detective Schulman asked of you?

8      A.   To process an arrest.

9      Q.   What was the name of the suspect?

10     A.   Mr. Gopaul.

11     Q.   What --

12     A.   Howard.

13     Q.   What specifically was your job and your assignment

14   with regard to the arrest?

15     A.   Be an assigned officer and assist in processing

16   the arrest.

17     Q.   What did processing entail?

18     A.   Doing the online and interviewing the complainant.

19     Q.   When you say online, what does that mean?

20     A.   The booking sheet.

21     Q.   Would that be preparing the arrest paperwork?

22     A.   Yes.

23     Q.   Did you have any contact with the suspect,

24   Harold Gopaul, on June 24th, 2008?

25     A.   Yes.

ws

Alfaro - People - direct                    242

1     Q.    Do you see that individual in the courtroom today?

2     A.    Yes.

3     Q.    Can you point to that person and identify an item

4     of clothing that that person is wearing?

5     A.    He's wearing a gray suit.

6     Q.    Can you point to the individual you're referring

7     to?

8     A.    Yes (indicating).

9           THE COURT:  Indicating the defendant.

10    Q.    Officer Alfaro, can you tell us what was your

11    first contact with the defendant on June 24th, 2008?

12    A.    When I was bringing him down to the first floor

13    from the detective squad.

14    Q.    What was the defendant doing in the detective

15    squad when you first encountered him?

16    A.    Sitting down.

17    Q.    Where?

18    A.    In the interview room.

19    Q.    Was he handcuffed?

20    A.    No.

21    Q.    Was he with anybody?

22    A.    No.

23    Q.    What did you say to him when you first encountered

24    the defendant in the interview room?

25    A.    Saying that I was going to process his arrest and

                                                      ws

Alfaro - People - direct                    243

1    I was going to take him downstairs.

2        Q.   What was his response to you?

3        A.   Okay.

4        Q.   Was he cooperative?

5        A.   Yes.

6        Q.   What did you do to get him from the interview room

7    to the processing?

8        A.   I put the cuffs on him and took him downstairs and

9    put him in a cell.

10       Q.   Was there any conversation between you and the

11   defendant on the way from the interview room to the cell?

12       A.   Yes, I got his pedigree information in front of

13   the desk.

14       Q.   What type of pedigree information are you

15   referring to?

16       A.   His name, again, his address and his date of

17   birth.

18       Q.   Did the defendant provide that information to you?

19       A.   Yes.

20       Q.   What language was he speaking?

21       A.   English.

22       Q.   Were his answers responsive to your questions?

23       A.   Yes.

24       Q.   Was he cooperative?

25       A.   Yes.

                                                              ws

Alfaro - People - direct                    244

1      Q.   Did he ask you any questions?

2      A.   No.

3      Q.   Other than pedigree information what was the

4  extent of your conversation with the defendant at the desk?

5      A.   That was it.

6      Q.   Where did you go after that?

7      A.   To the cell area.

8      Q.   Where is that located compared to the desk?

9           MR. SCHECHTER:  Which area was that?

10          MS. JOHNSON:  The cell area.

11     Q.   Is that what you said?

12          MR. SCHECHTER:  Cell area.

13     A.   Yeah, the cell area.

14     Q.   Where is the cell area in relation to the desk?

15     A.   Behind the desk.

16     Q.   Did you personally bring the defendant to the cell

17  area?

18     A.   Yes.

19     Q.   Who else was around?

20     A.   I don't recall.

21     Q.   Were there other officers around?

22     A.   I don't recall.

23     Q.   Did any other officers have any conversation with

24  you or the defendant in route to the cell area?

25     A.   I don't recall.

ws

1      Q.   Did you observe any officers exert any physical

2   force upon the defendant?

3      A.   No.

4      Q.   Did you observe any officers or hear any officers

5   threaten the defendant?

6      A.   No.

7      Q.   Where was your weapon while transporting the

8   defendant from the interview room down to the desk?

9      A.   It was in a locked control -- a locked, I guess,

10  locker.

11     Q.   When did you put your weapon in the locker?

12     A.   Prior to me taking him to the cell area.

13     Q.   Was that Police Department procedure?

14     A.   Yes.

15     Q.   How did you get the defendant from the desk to the

16  cell?

17     A.   Walked him.

18     Q.   Did he walk on his own?

19     A.   No, I walked -- he walked in front of me and I

20  walked behind him.

21     Q.   Was he handcuffed?

22     A.   Yes.

23     Q.   Was he able to walk on his own?

24     A.   Yes.

25     Q.   Did he complain of any pain to you?

ws

Alfaro - People - direct                246

1       A.   No.

2       Q.   Did he ask to receive any medical attention?

3       A.   No.

4       Q.   Did you observe any bruises on him?

5       A.   No.

6       Q.   Did you observe any scratches on him?

7       A.   No.

8       Q.   Did he ever ask to speak with an attorney?

9       A.   No.

10      Q.   Did he ever ask to make any phone calls?

11      A.   No.

12      Q.   Other than yourself, to your knowledge, as best as

13  you remember, do you remember any other officers interacting

14  with you and the defendant upon him entering the cell?

15      A.   No.

16      Q.   What did you say to defendant once he was brought

17  into the cell?

18      A.   That I was going to process the paperwork.

19      Q.   Did you have any other conversation with him?

20      A.   No.

21      Q.   Was the defendant still handcuffed once he was

22  placed into the cell?

23      A.   No, I took the cuffs off.

24      Q.   When was it that you took the cuffs off?

25      A.   Once he was in the cell.

                                                        ws

Alfaro - People - direct                    247

1      Q.    After the door was closed?

2      A.    Before the door was closed.

3      Q.    Was your weapon still secured at that point?

4      A.    Yes.

5      Q.    Did you see any other members of law enforcement

6   go into the cell once the defendant was in there?

7      A.    No.

8      Q.    Did you have any conversation after -- with the

9   defendant after he was placed in the cell?

10     A.    No.

11     Q.    Did there come a time when Detective Schulman

12  asked you to further assist with recovering property in this

13  case?

14     A.    Yes.

15     Q.    What were you told to do?

16     A.    To take the complainant down and to show me where

17  the property was in the vehicle, where she pointed it out

18  to.

19     Q.    Where did you go with the complainant?

20     A.    On the side of the precinct where the vehicle was.

21     Q.    What type of vehicle was it?

22     A.    An Ecolab truck, work vehicle.

23     Q.    Do you recall what the defendant was wearing on

24  June 24th, 2008?

25     A.    Work uniform.

Alfaro - People - direct          248

1      Q.   How was it that you identified it as a work

2   uniform?

3      A.   Because it was all blue and it had, I believe, an

4   Ecolab sign on the side.

5      Q.   What happened when you went to the vehicle outside

6   the 105th Precinct?

7      A.   Excuse me?

8      Q.   What did you do once you got to the vehicle that

9   was parked outside the 105?

10      A.   I took the complainant there.  She showed me what

11   was --

12              THE COURT:  Let me just interrupt.

13              Did you take the complainant or the

14      defendant?

15              THE WITNESS:  The complainant.

16              THE COURT:  Okay.

17      A.   I took the complainant to the vehicle where she

18   showed me where a mini meat clever was in a middle console.

19      Q.   Did you recover that meat clever?

20      A.   Yes.

21      Q.   Where did you recover it from?

22      A.   The vehicle.

23      Q.   Where in the vehicle?

24      A.   The middle console.

25      Q.   What else did you recover from the vehicle?

ws

Alfaro - People - direct                    249

1      A.   A massager.

2      Q.   What did the massager look like?

3      A.   A cordless white massager.

4      Q.   Where was that recovered from?

5      A.   The vehicle.

6      Q.   Where in the vehicle?

7      A.   I don't recall.

8      Q.   Inside or outside?

9      A.   Inside.

10     Q.   What did you do with the white massager and the

11  meat clever after you recovered it?

12     A.   I vouchered it.

13     Q.   What does that mean?

14     A.   I basically took it into police custody for arrest

15  evidence.

16     Q.   Was that brought to a property bureau?

17     A.   It was placed in our property cell until the

18  property clerk picks it up and takes it.

19     Q.   Did you prepare vouchers --

20     A.   Yes.

21     Q.   -- with regard to the both of those items?

22     A.   Yes.

23     Q.   Was that the only evidence that you recovered in

24  this case?

25     A.   No.

1    Q.   Where else did you go?

2    A.   To the house.

3    Q.   Whose house?

4    A.   The defendant's house.

5    Q.   Where was that located?

6         THE WITNESS:  Can I refresh my memory?

7    I have to go back and look at the address.

8         THE COURT:  All right, just indicate to us

9    what it is that you're referring to.  You can look at

10   it, just tell us what it is that you're looking at.

11        THE WITNESS:  Oh, okay.

12        I'm looking at the complaint report?

13        THE COURT:  Okay.

14   A.   I went to 242-10, 89 Avenue.

15   Q.   In Queens?

16   A.   In Queens.

17   Q.   What did you do when you went to that location?

18   A.   I was met by the mother of the complainant.

19   Q.   Did she identify herself to you?

20   A.   Yes.

21   Q.   Who did you go with?

22   A.   I went with two other officers.

23   Q.   Do you recall what day it was that you went?

24   A.   Same day as the 24th.

25   Q.   What did you say to the victim's mother?

Alfaro - People - cross          251

1        A.    If it's possible, I can come inside.

2              She let me in.

3        Q.    Was she cooperative?

4        A.    Yes.

5        Q.    What did you do once inside the home?

6        A.    I asked if I can go upstairs to retrieve a

7    massager and she said yes.

8        Q.    Where did you go?

9        A.    To the bedroom.

10       Q.    Whose bedroom?

11       A.    The defendant's bedroom.

12       Q.    Did it appear to you to be a master bedroom?

13       A.    Yes.

14       Q.    What did you recover from the bedroom?

15       A.    A massager.

16       Q.    Where did you recover it from?

17       A.    Under the bed.

18       Q.    Under the bed of the defendant's bedroom?

19       A.    Yes.

20       Q.    What color was it?

21             THE WITNESS:  I would have to refresh my

22       memory again, your Honor.

23             THE COURT:  Yes.

24       A.    I'm looking at Voucher P240076 and it's a -- was a

25    two-speed massager, white and gray.

Alfaro - People - cross          252

1       Q.   Is that the one you're referring to that you

2   recovered from the defendant's bedroom?

3       A.   Yes.

4       Q.   What did you do with that massager upon recovering

5   it?

6       A.   I took it back to the station house and vouchered

7   it.

8       Q.   Similar to your vouchering of the other property?

9       A.   Yes.

10      Q.   Did you prepare a property receipt with regards to

11  that massager?

12      A.   Yes.

13      Q.   Once the defendant was placed into the cell behind

14  the desk was that your last contact with him?

15      A.   Yes.

16           MS. JOHNSON:   I have no other questions for

17      Officer Alfaro.

18           THE COURT:   Okay, Mr. Schechter?

19  CROSS-EXAMINATION

20  BY MR. SCHECHTER:

21      Q.   Officer Alfaro, prior to going to the defendant's

22  work vehicle did you have any conversation with

23  Detective Schulman?

24      A.   Yes.

25      Q.   And were you given anything by Detective Schulman?

ws

1     A.   A consent form.

2     Q.   And with that consent form, what did you do with

3  it?

4     A.   I read it.

5     Q.   And what did you do with it after you read it?

6     A.   I went with the complainant down to the vehicle.

7     Q.   And you already had the keys with you?

8     A.   I don't recall.

9     Q.   Where did you get the keys from?

10    A.   I don't recall.

11    Q.   Were you present in the courtroom yesterday with

12  Detective Schulman?

13    A.   Was I present in the courtroom?

14    Q.   No, on the outside of the courtroom?

15    A.   Yes.

16    Q.   And did Detective Schulman take you to the window

17  of this door behind me to the courtroom while the courtroom

18  was either in session or my client, Mr. Gopaul, was sitting

19  at the counsel table?

20    A.   Not that I recall.

21    Q.   Is it your testimony that he did not take you to

22  the window to view my client, Mr. Gopaul, and point him out

23  to you?

24         Is that your testimony?

25    A.   No.

Alfaro - People - cross                     254

1       Q.   Did he do that?

2       A.   No.

3       Q.   Now, you indicated that you were doing a 11:15 to

4    7:50 tour on Tuesday, June 24th, is that correct?

5       A.   Yes.

6       Q.   And part of your tour you were on radio motor

7    patrol?

8       A.   Yes.

9       Q.   Were you the operator or the recorder?

10      A.   I have to refresh my memory.

11             THE WITNESS:  Can I get my memo book?

12             THE COURT:  Yes, just tell us -- you're

13    looking at a memo book?

14             THE WITNESS:  Yes.

15      A.   I don't have it written down.

16      Q.   Do you recall if you were the operator or the

17    recorder?

18      A.   I don't recall.

19      Q.   Who was your partner?

20      A.   Officer Magor (ph).

21      Q.   And was he one of the individuals you went to the

22    house to search with?

23      A.   No.

24      Q.   What are the other names of the other police

25    officers who accompanied you to the house to search?

                                                         ws

1     A.    Officer Morris and Officer Ingracia (ph).

2     Q.    And when were you given this -- withdrawn.

3           When did you return to the station house after

4     your initial patrol, do you recall?

5     A.    Referring back to my memo book, approximately

6     0440 hours.

7     Q.    That would be would be -- 440 hours would be in

8     the morning, 4:40 a.m., correct?

9     A.    Yes.

10    Q.    And approximately what time did the sergeant

11    supervising your patrol sign your memo book?

12    A.    Prior to that at 0412 hours.

13    Q.    And where did that take place?

14    A.    Out on patrol.

15    Q.    Do you recall where when you were on patrol?

16    A.    No.

17    Q.    Now, you had -- when you were on patrol did you

18    make an arrest?

19    A.    I was asked if I wanted an arrest.  I said yes.

20    Q.    I'm sorry?

21    A.    I was asked if I wanted an arrest.  I said yes.

22    Q.    Who asked you that?

23    A.    The sergeant.

24    Q.    Approximately what time did he ask you that?

25    A.    Don't recall.

Alfaro - People - cross                    256

1      Q.   And did you go to the property clerk with some

2   property during your patrol?

3      A.   No.

4      Q.   I direct your attention to your memo book,

5   officer.   Your notation for 2337.   You notice where it says

6   borrow with property?

7           What does that mean?

8      A.   That's taking property from the day before.   I

9   took property down from the day before of everything that

10  was vouchered as to -- that had to go to the lab.

11     Q.   You made a narcotics arrest?

12     A.   No, I was just assigned to go there.   It was a

13  station house assignment.

14     Q.   And the property that you took to the -- is that

15  to the property clerk?

16     A.   No, to the 107 Precinct.

17     Q.   Oh, you took property from the 105 to the 107?

18     A.   Yes.

19     Q.   Do you recall what property that was?

20          MS. JOHNSON:   Objection.

21          THE COURT:   I'll allow it.

22          If you remember.

23     A.   No.

24     Q.   Now, this communication with respect to whether

25  you want an arrest, was that from Sergeant O'Hagan?

1      A.    No.

2      Q.    Who was that from?

3      A.    I believe it was Goodman.

4      Q.    Who?

5      A.    Sergeant Goodman.

6      Q.    Spell that name, please?

7      A.    G-o-o-d-m-a-n.

8      Q.    And Sergeant Goodman was working the desk that

9   night?

10     A.    No.

11     Q.    Who was working the desk, if you can recall?

12     A.    I don't recall.

13     Q.    Was it Sergeant O'Hagan?

14     A.    I don't recall.

15     Q.    Now, there came a point where you returned to the

16   precinct.

17           Do you remember when you returned to the precinct

18   after your initial motor patrol?

19     A.    Yeah.

20     Q.    What time?

21     A.    Approximately 0440.

22     Q.    Now, there's a notation in your memo book 10.2.

23           What does that mean?

24     A.    That means return to station house.

25     Q.    Now, I direct your attention to the third line

1    down from the top.  It says one yellow, 8.20.08.

2            What does that mean?

3        A.   That is the color of the day and the return date.

4        Q.   That is the color of what?

5        A.   The color of the day and the return date.

6        Q.   What does that mean?

7        A.   That means for the officers to know if there's

8    plainclothes that there's a color that we don't mistake with

9    somebody else and if you're doing a Criminal Court summons

10   that's the date that they're supposed to put down on the

11   summons to return to court for the defendants.

12       Q.   Got it.

13           Now, would it be fair to say that you received a

14   communication from Sergeant Goodman between -- withdrawn.

15           Sergeant Goodman signed your memo book on 0412,

16   didn't he?

17       A.   Yes.

18       Q.   And that was in the field, was it not?

19       A.   Yes.

20       Q.   Do you recall where you were when he signed your

21   memo book?

22       A.   No.

23       Q.   Now, did you know where Detective Schulman was at

24   that time?

25       A.   No.

1     Q.   Did you have any communication with Detective

2  Schulman?

3     A.   Yes.

4     Q.   And did that communication take place between 4:12

5  in the morning and 4:40 in the morning?

6     A.   No.

7     Q.   When did that communication take place?

8     A.   After 0445 hours.

9     Q.   And when you returned to the station house do you

10  recall who you saw behind the desk?

11     A.   No.

12     Q.   Did you observe Mr. Gopaul?

13     A.   No.

14     Q.   Had you been informed by the sergeant that there

15  was someone under arrest?

16     A.   Yes.

17     Q.   And that was Sergeant O'Hagan?

18     A.   I don't recall.

19     Q.   Now, did you take the -- you said you processed

20  Mr. Gopaul's arrest, is that correct?

21     A.   Yes.

22     Q.   Did you take the mugshot?

23     A.   Yes.

24     Q.   And where did you take that?

25     A.   In the cell area.

1    Q.   In point of fact, Mr. Gopaul was already under

2    arrest, was he not, Officer Alfaro?

3    A.   From my understanding, yes.

4    Q.   And he had been under arrest for a considerable

5    period of time, isn't that true?

6    A.   Can you rephrase the question?

7    Q.   Yes.  Mr. Gopaul, prior to your coming back to the

8    station house, had already been placed under arrest, isn't

9    that a fact?

10   A.   I don't know.  I was out in the field.  I

11   didn't --

12   Q.   Well, weren't you told to come back to the station

13   house to take an arrest?

14   A.   Yes.

15   Q.   Well, had you been informed when you got back to

16   the station house that Mr. Gopaul had already been placed

17   under arrest?

18   A.   Yes.

19   Q.   And who placed him under arrest?

20   A.   I wasn't there.

21   Q.   Who was the actual arresting officer of

22   Mr. Gopaul, Officer Alfaro?

23   A.   I am.

24   Q.   Well, I'm not talking about the processing

25   officer, Officer Alfaro, I'm talking about the arresting

1    officer.

2              Who first placed Mr. Gopaul under arrest?

3              MS. JOHNSON:  Objection, asked and answered

4    already.  She doesn't know.

5              MR. SCHECHTER:  Oh, no, no, no, no.

6              THE COURT:  I'll allow it.

7              Can you answer that, officer?

8              THE WITNESS:  I was out in the field.  I

9    can't answer that question.

10   Q.   Well, when you got back to the station house, were

11   you told who took credit for the collar?

12   A.   I took credit for the collar.

13   Q.   You took credit for the collar even though you had

14   nothing whatsoever to do with the arrest, is that what

15   you're saying?

16   A.   I placed -- I processed his arrest.  I'm the

17   arresting officer.

18   Q.   Well, obviously he was already under arrest when

19   you got back to the station house, that's what you just told

20   us a minute ago.

21             My question is, who placed him under arrest?

22   A.   I don't recall.

23   Q.   Did Sergeant O'Hagan tell you that he and other

24   officers placed him under arrest?

25   A.   I don't recall.

1      Q.   Were you told that Mr. Gopaul resisted arrest in

2  any way?

3      A.   I don't recall.

4      Q.   Officer, wouldn't you recall if an officer told

5  you that Mr. Gopaul was violent because he resisted arrest?

6           Wouldn't you recall that?

7      A.   I would have to look at my paperwork to see the

8  charges.

9      Q.   Do you have anything on you which would indicate

10  whether or not Mr. Gopaul had been violent at the time he

11  was placed under arrest?

12      A.   No.

13      Q.   Did you know whether Sergeant O'Hagan placed

14  Mr. Gopaul under arrest together with other officers?

15      A.   I don't recall.

16      Q.   Do you know how many offers certificates placed

17  him under arrest?

18      A.   Don't recall.

19      Q.   When you came back to the station house where was

20  Detective Schulman, if you know?

21      A.   When I returned?

22      Q.   Yes.

23      A.   Up in the squad.

24      Q.   Well, the squad is on the second floor of the

25  station house, correct?

ws

1      A.   Yes.

2      Q.   And was he with anyone or was he alone?

3      A.   I don't recall.

4      Q.   Well, did he have any conversation with you when

5   you returned to the station house?

6      A.   Yes, I went upstairs to the squad.

7      Q.   And what did he tell you?

8      A.   He told me the basics of the complaint report, of

9   an open 61.

10      Q.   Did you do a 61 in this?

11      A.   No.

12      Q.   Did you fill out any other police work, police

13   paperwork?

14      A.   Yes, the online.

15      Q.   The online booking sheet?

16      A.   Yes.

17      Q.   Do you have a copy of that with you?

18      A.   Yes.

19      Q.   Can I see it, please?

20           (Shown to counsel.)

21           THE COURT:   Just off the record one minute.

22           (Discussion held off the record.)

23      Q.   May I have the document, please?

24           MS. JOHNSON:   Judge, I just want to make sure

25   there's nothing in it that he's not entitled to.

                                                    ws

Alfaro - People - cross                264

1          (Shown to counsel.)

2              MS. JOHNSON:  I think he has this already.

3          (Shown to counsel.)

4     Q.   Now, officer, was Sergeant Manolingus (ph) on duty

5  at that time as well?

6          Sergeant Manolingus?

7     A.   I don't recall.

8     Q.   Do you know who that is?

9     A.   Sergeant Manolingus?

10    Q.   Yes.

11    A.   Yeah, supervisor.

12    Q.   And how many sergeants were on duty when you got

13 to the precinct?

14    A.   I don't recall.

15    Q.   Now, when you filled out the details of the

16 arrest, this wasn't as a result of your conversations with

17 the complainant, was it?

18    A.   Yes, I interviewed her first.

19    Q.   Oh, you interviewed her as well -- you interviewed

20 her before Detective Schulman did?

21              MS. JOHNSON:  Objection to this line of

22         questioning, your Honor.

23              THE COURT:  No, I'll allow it.

24    A.   I interviewed her after I made the arrest.

25    Q.   You interviewed her after you made the arrest?

                                                    ws

Alfaro - People - cross                    265

1          A.    I interviewed -- because it was an open 61.

2          Q.    Do you know whether Detective Schulman had

3     interviewed her?

4          A.    I don't recall.

5          Q.    Isn't it a fact, Officer Alfaro, that Detective

6     Schulman interviewed the complainant and you, in order to

7     get credit for the arrest, basically filled out this online

8     booking sheet to recite what Schulman told you?

9          A.    Can you rephrase the question?

10         Q.    Isn't it a fact that it was Schulman who

11    interviewed the complainant and that the information on this

12    online booking sheet was not your -- the product of your

13    interviewing the complainant, but what Schulman told you?

14         A.    No.

15              MS. JOHNSON:  Your Honor, counsel was

16         provided copies.

17              Can we give that back to the officer?

18              MR. SCHECHTER:  Yes, when I'm finished with

19         it.

20         Q.    Now, she told you that Mr. Gopaul punched her in

21    the face?

22              MS. JOHNSON:  Objection.  Your Honor, this is

23         totally outside the scope of the hearing, any

24         conversations with the complainant.

25              MR. SCHECHTER:  Withdraw the question, Judge.

                                                            ws

Alfaro - People - cross          266

1              I would like to return this to the o officer.

2              (Shown to witness.)

3    Q.   Now, officer, how long did it take you to process

4    Mr. Gopaul's arrest?

5    A.   I don't recall.

6    Q.   Was it one hour, two hours, three hours?

7         How long was it?

8    A.   I don't recall.

9    Q.   Well, what did you do when you processed

10   Mr. Gopaul's arrest?

11        Tell the Court what you did.

12   A.   When I processed it?

13   Q.   Yeah, what did you do?

14   A.   I processed him, fingerprinted, took his picture.

15   Q.   You fingerprinted him and you took his picture.

16        You took the picture or did a separate officer

17   take the picture?

18   A.   I took the picture.

19   Q.   And after you took the picture, that's just a

20   regular mugshot, it's like a Polaroid, right?

21   A.   It's a -- like a sheet that gets printed out

22   through a printer?

23   Q.   Well, how do you take the picture, with a camera

24   or through a computer?

25   A.   Through a camera.

ws

Alfaro - People - cross                  267

1        Q.   And what kind of camera was it you took the

2    picture with?

3        A.   Digital.

4        Q.   And that comes through the computer, then?

5        A.   Yes.

6        Q.   And you put some information together with the

7    photograph, is that correct?

8        A.   Yes.

9        Q.   And you took his fingerprints?

10        A.   Yes.

11        Q.   And you filled out some paperwork?

12        A.   Yes.

13        Q.   How many papers did you do, if you can recall?

14             The normal processing?

15        A.   I would have to look at my paperwork.

16        Q.   Well, let's see.

17             You got the online booking sheet?

18        A.   Um-hum.

19        Q.   You don't do 61s?

20        A.   I didn't do the 61.

21        Q.   And you're not a detective so you don't do the

22    DD5?

23        A.   I didn't do the DD5.

24        Q.   You did the vouchers, but that's later, after you

25    recover the material?

ws

1      A.    Yes.

2      Q.    Prior to the search, how long were you at the

3  precinct?

4      A.    Don't recall.

5      Q.    When did you do the search, do you recall that?

6      A.    For the vehicle, it was still daylight.

7      Q.    And when you -- did you take the vehicle into your

8  custody or did you leave it where it was?

9      A.    I left it where it was.

10     Q.    And that was at the precinct, correct?

11     A.    Yes.

12     Q.    Okay.  And how long did it take -- how far is

13  Mr. Gopaul's home from the precinct, if you can recall?

14     A.    About two minutes.

15     Q.    Okay.  Now, you say you arrested Mr. Gopaul at

16  4:45 a.m., is that correct?

17     A.    Yes.

18     Q.    Then the next log entry you have is 2124,

19  returning the Ecolab to a representative, I suppose, of

20  Ecolab company, would that be correct?

21     A.    Yes.

22     Q.    Please tell the Court what you did for

23  approximately 12 hours, or more?

24     A.    Waited for the Ecolab guys to come, waited for the

25  riding ADAs to come down to the precinct.

Alfaro - People - cross                    269

1        Q.   Now, hold on.

2             Who was -- is that for a statement to be taken of

3   Mr. Gopaul?

4        A.   I don't recall.

5        Q.   Well, what was the purpose of waiting for the DAs

6   to come to the precinct?

7        A.   Because it was a sensitive case.

8        Q.   Detective Schulman was there with Mr. Gopaul at

9   that point, was he not?

10       A.   Yes.

11       Q.   Well, what was the need for you to be there

12  waiting for the DAs if Detective Schulman was there?

13       A.   Because I was still the arresting officer.

14       Q.   Detective Schulman had Mr. Gopaul in his custody,

15  did he not?

16       A.   Yes, but he's still my prisoner.

17       Q.   Oh, so he's your prisoner.

18            So, in other words, what you're saying --

19       A.   I'm still responsible.

20       Q.   So from 4:45 a.m. until 9 o'clock at night the

21  following night, the 25th, that would be, let's see, that's

22  19 hours.

23            So what you're saying is you were with Mr. Gopaul

24  for 19 hours, is that correct?

25       A.   Just outside the interview room in the detective

                                                        ws

Alfaro - People - cross                    270

1    squad.

2         Q.   So you were sitting there for three tours, over

3    two tours?

4         A.   Yes.

5         Q.   And you received overtime for two tours, is that

6    correct?

7         A.   Yes.

8              MS. JOHNSON:  Objection.

9              THE COURT:  All right, overruled.

10        A.   Yes.

11        Q.   Now, what if I told you that the statements

12   obtained from Mr. Gopaul finished about a quarter to 9.

13             What were you doing from a quarter to 9 to 2124?

14             MS. JOHNSON:  Objection.

15             THE COURT:  Yeah, I'm just -- I'm going to

16        sustain it as to form.

17             Could you just be a little bit clearer?

18             MR. SCHECHTER:  Withdrawn.

19        Q.   Is it your obligation to stay with the prisoner

20   all the time until he is lodged?

21        A.   Yes.

22        Q.   Were you in the room at the time of the

23   interrogation?

24        A.   No.

25        Q.   Why?

1     A.   Because I was asked to step outside.

2     Q.   Why, it was your prisoner?

3     A.   Because --

4          MS. JOHNSON:  Objection.

5          Which interrogation are we talking about.

6          THE COURT:  Well --

7     Q.   The video statement?

8     A.   The ADAs asked me to stay outside while they did

9 the videotaping.

10    Q.   Did you transfer custody back to

11 Detective Schulman?

12    A.   Yes.  But I was still in the squad at the time.

13    Q.   What time, can you recall, did you receive the

14 call from the sergeant telling you that he wanted you to

15 take an arrest?

16    A.   I don't recall.

17    Q.   Was it during your radio motor patrol?

18    A.   Yes.

19    Q.   At any time were you present during any

20 interrogation of Mr. Gopaul?

21    A.   No.

22         MR. SCHECHTER:  No more questions of the

23    witness, Judge.

24         THE COURT:  Anything, Ms. Johnson?

25         MS. JOHNSON:  Just quickly.

1    REDIRECT EXAMINATION

2    BY MS. JOHNSON:

3         Q.   Officer Alfaro, did you have opportunity to

4    observe the defendant after he was interviewed by

5    Detective Schulman?

6         A.   Yes.

7         Q.   Did you observe any injuries on his body?

8         A.   No.

9         Q.   Did he complain of any injuries?

10        A.   No.

11        Q.   Did he ask for -- to receive any medical

12   attention?

13        A.   No.

14             MS. JOHNSON:   Nothing else, Judge.

15   RECROSS-EXAMINATION

16   BY MR. SCHECHTER:

17        Q.   Did you examine the defendant's arms and legs?

18        A.   No.

19        Q.   Did you examine his abdomen?

20        A.   No.

21             MR. SCHECHTER:   Thank you.

22             THE COURT:   Okay, thank you very much.

23             Step down.

24             (Witness excused.)

25             THE COURT:   People, you rest?

ws

Proceedings                    273

1          MS. JOHNSON:  I rest.

2          Can I just officially excuse her?

3          THE COURT:  Yes.

4          While you're doing that --

5          MS. JOHNSON:  Make a call?

6          THE COURT:  Yeah, make a call and tell her to

7     expect to see her next week early.

8          MR. SCHECHTER:  Your Honor, I'm respectfully

9     asking the Court to direct the witness to be available

10    for trial so that we don't have a repeat of today where

11    she ignored this Court's -- the DA's subpoena.

12         MS. JOHNSON:  Your Honor, I had a

13    conversation with Officer Alfaro about what occurred

14    today.

15         I think it's important that she addresses

16    your Honor as to what it is that happened because she

17    did speak with her command and they advised her to go

18    to traffic court.

19         So I don't want to be in a position where the

20    officer is leaving the witness stand shirking the Court

21    and any impression that she wasn't abiding by any

22    subpoenas.

23         THE COURT:  Just bring her in, please.

24         (Witness enters the courtroom.)

25         THE COURT:  Officer Alfaro, just have a seat

1    here for a moment.

2           I understand -- and I don't know whether

3    there's some miscommunication with your presence being

4    here, I understand from the People that they subpoenaed

5    you last week to be here today.

6           I expect a subpoena to be sent out sometime

7    in the next couple of days.

8           I'm assuming you're going to be calling

9    Officer Alfaro for the trial.

10          MS. JOHNSON:  That is correct, your Honor.

11          THE COURT:  So obviously I would direct you

12   to be here for any subpoena in the future with respect

13   to this case.

14          If there's any question whatsoever about what

15   takes priority, as far as this case is concerned, I

16   would ask you to call the assistant.

17          And if there's any question, Ms. Johnson, or

18   any confusion --

19          MS. JOHNSON:  Of course, Judge.

20          THE COURT:  -- please speak to my chambers,

21   but as far as I'm concerned, just by way of example, a

22   Criminal Court case, County Court case, is going to

23   take precedence over any traffic court matter.

24          I understand you may have been directed by

25   your command to go to traffic court.  Why they would

                                                      ws

Proceedings                    275

1      think that that is more important or takes precedence

2      over a County Court felony case, escapes me, but if

3      there's any question or any doubt in your mind about

4      where you should be, I would expect you to be here next

5      week.

6                  THE WITNESS:  Yes.  I do apologize for taking

7      up the Court's time on that.

8                  THE COURT:  Okay, we'll see you here next

9      week.

10                 THE WITNESS:  I'm not going to be needed for

11     tomorrow?

12                 THE COURT:  No.

13                 MS. JOHNSON:  And the officer has my personal

14     cell phone number.

15                 THE WITNESS:  Yes.

16                 MS. JOHNSON:  So if there's any problems

17     obviously she knows where to contact me.

18                 THE COURT:  See you next week.

19                 COURT OFFICER:  She can go, right?

20                 MS. JOHNSON:  Yes.

21                 (Witness excused.)

22                 THE COURT:  People, I think you said you're

23     resting?

24                 MS. JOHNSON:  We do, your Honor.

25                 THE COURT:  Mr. Schechter?

                                                        ws

1          MR. SCHECHTER:  I call the defendant.

2          THE COURT:  All right, Mr. Gopaul, if you

3     would, please, step forward?

4  H A R O L D   G O P A U L, Defendant, having been first duly

5     sworn by the clerk of the Court, was examined and

6     testified under oath as follows:

7          COURT OFFICER:  Take a seat.

8  DIRECT EXAMINATION

9  BY MR. SCHECHTER:

10       Q.   Mr. Gopaul --

11          COURT OFFICER:  Hold on.

12          For the record, state your name, spell your

13     last name?

14          THE WITNESS:  Harold Gopaul, G-o-p-a-u-l.

15          MR. SCHECHTER:  May I proceed?

16          THE COURT:  Yes.

17       Q.   Mr. Gopaul, how old are you?

18       A.   Now, I'm 51.

19       Q.   Fifty-one years of age?

20       A.   Yes.

21       Q.   On June 24th, by whom are you employed?

22       A.   Ecolab Pest Elimination.

23       Q.   Ecolab?

24       A.   Pest Elimination.

25       Q.   And what was your position with Ecolab pest

Gopaul - Defendant - direct                277

1    extermination?

2         A.    Service specialist.

3         Q.    Now, were you given a vehicle as part of your

4    duties?

5         A.    Yes.

6         Q.    And were you the principal occupant and driver of

7    that vehicle?

8         A.    Yes.

9         Q.    Anyone have permission to drive that vehicle but

10   you?

11        A.    No.

12        Q.    Now, did you suffer any injuries to your person

13   prior to June 24th, 2008?

14        A.    No.

15        Q.    Did you have any operations prior to June 24th,

16   2008?

17        A.    Yes, I did.

18        Q.    And where was that operation?

19        A.    I had a hernia on my naval, on my belly button, a

20   few years ago.

21        Q.    How many years ago, if you recall?

22        A.    Give or take, could be four years.

23        Q.    Do you suffer any lingering discomfort from that

24   operation?

25        A.    Off and on, I have pains in my belly.

ws

1    Q.   Now, on June 24th, when for the last time --

2    withdrawn.

3         When for the last time prior to June 24th had you

4    had anything to eat?

5    A.   Sunday before at 9 p.m.

6    Q.   Now, Sunday would be what, June 2 --

7    A.   22nd.

8    Q.   And why was that?

9    A.   Because I don't eat too late.  We went to a fair

10   and we came back.  I had some work done in the yard and then

11   I had dinner and we went to bed.

12   Q.   Why wasn't it you hadn't had anything to eat

13   between Sunday June 22nd and June 24?

14   A.   The reason why, I don't really eat outside.  If I

15   do buy food outside I take it home to the family.  At that

16   point in time I was working all day Monday straight through

17   Tuesday morning and I don't eat meat, I don't drink alcohol,

18   so the reason why I don't eat outside, because of the meat.

19   Q.   When you came home from work on the evening of

20   June 24th, was it, what, if anything, did you observe?

21   A.   Well, I --

22   Q.   You can answer the question.

23   A.   My regular duties as a parent, I check for my

24   kids, check for my wife, make sure everybody is in bed, I

25   cover them if it's cold, I put a fan on, I'll take it off.

1    Q.   Did you notice if anyone was missing?

2    A.   Sana Awan was missing.

3    Q.   Approximately what time was that?

4    A.   Around a quarter to 2 in the morning.

5    Q.   Where, if at all, did you go?

6    A.   I told my wife -- we look in the garage, we looked

7    downstairs in the basement, we looked up in the attic to see

8    if she was there.

9         And then I noticed that the back door was unlocked

10   so I told my wife, apparently Sana ran away.

11   Q.   So where did you go?

12   A.   I decided to go to the police to make a report.

13   Q.   How far away is the precinct from your house?

14   A.   A little more than a quarter mile.

15   Q.   And how did you get there?

16   A.   I drove the service vehicle that I had.

17   Q.   And approximately what time did you get to the

18   precinct?

19   A.   About 2:30.

20   Q.   And when you got to the precinct where did you go?

21   A.   I stood by the door and one officer asked me, "Can

22   I help you?"

23   Q.   Describe the officer?

24   A.   Tall, male, big in size.

25   Q.   About how much taller -- was he taller than you?

1       A.   Yes.

2       Q.   How much taller than you?

3       A.   I would say about probably six to eight inches

4   taller than me, give or take.

5       Q.   And how much did he weigh, approximately?

6       A.   Over 200 pounds.

7       Q.   And what, if anything, occurred between you and

8   the officer?

9       A.   He came up to me and asked me, he said, "Can I

10   help you?"

11           And I said, "I came to report my daughter is

12   missing."

13           And he asked my name and address.  He asked me

14   where -- I told him where I lived and my name and address

15   and he asked me why am I looking for my daughter.

16           I say, "I don't know.  I just came home and I went

17   looking for my kids in the bed and she was missing, so I

18   decide to come and make a report."

19           About -- at that time there were a few officers

20   there, give or take, nine or ten of them, they just came

21   around where I was standing close to me and they all stood

22   by me there.

23       Q.   Could you please describe some of the officers?

24       A.   They had a lot of white guys, they had a black guy

25   and a -- I don't know what race they was.  I know the white

Gopaul - Defendant - direct                281

1    skin and black guy.

2        Q.   What, if anything, occurred at that time that they

3    surrounded you?

4        A.   After they asked me the questions, the officer who

5    asked me the question, he grabbed me by my hand and slammed

6    me to the wall next to the front door.

7        Q.   Please describe how he did that?

8             Describe to the Court how that happened?

9        A.   Should I stand up or --

10            MR. SCHECHTER:  May he demonstrate, Judge?

11            THE COURT:  Yeah, go ahead.

12       A.   This is the front door here.  The officer was

13   standing here.  The rest of the officers was around him,

14   close to me, and they were like moving closer.

15            When I finished answering the question he hold me

16   by my hand and slammed me into the wall like this and put my

17   hand behind my back.

18       Q.   Go ahead.

19       A.   And then he -- the cop said, "Put the cuff on

20   him," and then one of the guy put the cuff on.

21            While they were putting the cuff on me they

22   arrested me, they were pulling me, they ws spreading my legs

23   as far as they can go.  They were scratching and squeezing

24   and tugging.

25       Q.   Where did they scratch you?

ws