1       A.   On my legs and on my hand.

2       Q.   In what position did you wind up?

3       A.   Well, after that they took me by my hand, with my

4  hand up in the hair, I was like this (indicating).

5       Q.   Indicating the arms displayed to the rear up in

6  the air in reverse fashion?

7       A.   Then they took me to the front of the counter and

8  they slammed me into the counter with -- I don't know how

9  many of them was pulling and tugging on me, the same thing

10  they did at the front door.

11       And then they put a hand on my neck and was

12  squeezing me on the counter.

13       I said, "Can I make a phone call to my wife?  Can

14  I tell her what's happening."

15       They said, "No fucking phone call for you," and

16  they started using a lot of nasty languages, MF.  They were

17  using a lot of languages.  No phone call.

18       While they were squeezing and pushing they went

19  into my pockets and took everything I had on my body.

20       Q.   Do you recall if any of those officers were

21  wearing sergeant stripes?

22       A.   In the midst of all this incident I didn't have

23  time to even look around.  They didn't want me to raise my

24  head.

25       Q.   Now, I would like to show you -- withdrawn.

ws

Gopaul - Defendant - direct                283

1          Did there come a time after you were finally

2     released -- withdrawn.  I withdraw that question.

3          Did there come a time when you -- another officer

4     came to see you?

5          A.   Yeah, a few minutes after a gentleman came and he

6     introduced himself to me as Detective Shulman.

7          Q.   And is that the same Detective Shulman who

8     testified here today?

9          A.   Yes.

10         Q.   And what, if anything, did Detective Shulman do?

11         A.   He took me by my hand and he took me upstairs and

12    while he was taking me upstairs he keep pushing me up the

13    stairs.  I almost fell like three times.

14         Q.   Where was your hands?

15         A.   Handcuffed behind my back.

16         Q.   And did you fall?

17         A.   No.

18         Q.   And where did he bring you?

19         A.   He bring me to a room that they call the box.

20         Q.   Did you see those photographs that we put in

21    evidence before?

22         A.   Yes.

23         Q.   Was that the room that he took you to?

24         A.   That's the room.

25         Q.   And where did he put himself relative to you?

                                                        ws

1    A.    Sitting on a chair with -- when he took me to the

2  room he slammed me to the wall.

3    Q.    How did he slam you to the wall?

4    A.    He hold me by my shirt and push me to the wall.

5    Q.    Show the Judge how he grabbed you by your shirt?

6          THE WITNESS:  May I stand up again?

7          THE COURT:  Yes.

8    Q.    As if Shulman were in front of you, show him how

9  he grabbed your shirt.

10         Show the Court please?

11   A.    He grabbed me like this and pushed me into it

12  wall.  Then he pulled me back up and pushed me onto the

13  chair.

14         MR. SCHECHTER:  Indicating both hands on the

15    sides of the collar pushing front, pulling back.

16   A.    Yes.

17   Q.    And then what did he -- did he say anything after

18  he did that?

19   A.    No, he took the handcuff off and he left.  He left

20  the room, he shut the door.

21   Q.    And how long did he leave you there like that?

22   A.    A couple -- a few minutes, about 15, 20, minutes I

23  average.  I didn't have anything on me to see the time.

24   Q.    Would it be fair say this all occurred -- the time

25  you came to the precinct to the time Detective Shulman got

ws

1    you, how much time elapsed, if you recall?

2         A.    Until he got me, about 20 minutes.

3         Q.    So it would be about between 2:30 and 3 o'clock,

4    would that be fair to say?

5         A.    Yes.

6         Q.    In the morning?

7         A.    Yes.

8         Q.    And how long did he leave you in the room before

9    he came back?

10        A.    Give or take, about ten or 15 minutes.  I don't

11   recall the time.

12        Q.    And when he came back what, if anything, did he

13   say to you?

14        A.    He asked me if I know why I'm here.

15              I say, "Yes I came to make a report, my daughter

16   is missing."

17              He said, "Is there anything else you want to tell

18   me?"

19              I said, "No, there's nothing I want to tell you.

20   I just came to report that she's missing."

21        Q.    Did he advise you of his rights -- your rights at

22   that time?

23        A.    No.

24        Q.    So what happened then?

25        A.    He left the room and he came back with some papers

1       in his hands.

2           Q.   And were those the papers that you observed your

3       signature on?

4           A.   No, it's some papers that had statement that he

5       told me that my step daughter made, accusation against me.

6           Q.   Did he show you the papers?

7           A.   No, he read it for me.

8           Q.   What did he say to you?

9           A.   She -- he read some of it and he said that my

10      daughter accused me of sexual harassment.

11          Q.   And what did you say to him?

12          A.   I said, "Well, this is not true."

13          Q.   What happened then?

14          A.   He said -- well, he started to read some more.  He

15      said, "Anything happen at the fair, morning of the fair?"

16               I said, "No, the only thing happened at the fair,

17      we had an argument."

18               Then he said, "Is there anything you want to tell

19      me?"

20               I said, "No, I don't want to tell you anything

21      else.  I just want to make a report that my daughter is

22      missing."

23               But he keep nagging me and cursing at me and then

24      he picked me up again.  He said, "I put away people for 20

25      years.  I'm going to put you away for a longer time if you

                                                              ws

Gopaul - Defendant - direct                287

1    don't tell me what's going on."

2        Q.   Did you ask for anything at that point?

3        A.   I asked to make a phone call to my wife again.

4             They said, "No fucking phone call for you," again.

5             I said, "Can I speak to a lawyer?"

6             He say, "You're not going to get no lawyer.   At

7    this time you're not going to get no lawyer."

8        Q.   What happened then?

9        A.   He left the room and he came back.

10       Q.   And when he came back what, if anything, occurred?

11       A.   He sit and he was talking again and asking me

12   question on what my daughter was -- the statement she was

13   making.  And he asked me again, "You want to tell me what

14   happened?"

15            And I gave him the story about the fair, what

16   happened at the fair.

17       Q.   Did there come a time when he asked you to sign a

18   waiver of rights?

19       A.   When he finished talking about the fair he went

20   back outside and he bring this other piece of paper with

21   him.

22       Q.   And what was that paper?

23       A.   He said it was a memorandum or some paper he

24   mentioned to me.

25       Q.   Did you read the paper?

                                                              ws

Gopaul - Defendant - direct                288

1        A.    He read the paper.

2        Q.    And after he read it what did you do, if anything?

3        A.    He put yes on the side of it and he told me to

4   initial on the side of it.  I didn't answer any of the

5   question.

6             I asked him for a lawyer at the time again and he

7   said, "You're not going to get no lawyer."

8        Q.    When -- now, who wrote down the word yes?

9        A.    He did, the officer did.

10       Q.    And was that written before you were asked

11  questions or after?

12       A.    It came in the room with yes on the side of it, on

13  the side of question.

14       Q.    And what did you do?

15       A.    Well, he made me initial them.  He force -- he

16  started to use threats at me and made me initial them.

17       Q.    Did he make any threats or promises at that time?

18       A.    At that time, no.

19       Q.    All right.  Did you sign that paper?

20       A.    Yes, I did.

21       Q.    Did you sign that paper voluntarily?

22       A.    No.

23       Q.    What happened after that?

24       A.    He took the paper outside and he came back with a

25  notepad and a pen.

ws

Gopaul - Defendant - direct                289

1    Q.   How long did that transpire?

2    A.   I would say about ten minutes again.

3    Q.   And did you then -- what, if anything, did you do?

4    A.   He asked me to write a statement on what happened

5    at the fair, so I did write a statement on what happened at

6    the fair.

7    Q.   And was that a true account of what happened at

8    the fair?

9    A.   Yes.

10   Q.   And after you wrote that account what, if

11   anything, did he do?

12   A.   He took the statement outside and then he came

13   back again.  He left the pen and the pad with me.  He took

14   the statement out and he came back.  About ten or 15 minutes

15   after he came back.

16   Q.   What transpired then?

17   A.   He asked me -- he told me what my daughter said.

18   He told me -- he read from a paper that what she said and he

19   asked me if I'm going to have to sign a confession paper on

20   what she said.

21        I said, "Why are you doing this to me?"  I said

22   can I have a lawyer?"

23        He said, "No, you're not going to have no lawyer."

24   He said, "I'm going to put you away for a long time," using

25   bad words.

ws

Gopaul - Defendant - direct          290

1          So he picked me up on the chair and he pushed me

2     from the chair -- I was facing the door, on the back wall,

3     and he said, "You're going to sign a confession for me."

4          So I -- he said, "If you sign this confession I'm

5     going to take this paper down to my supervisor.  He's going

6     to read it.  At the end of the paper you're going to put,

7     'I'm sorry and I made a mistake and I'm sorry,' and the

8     supervisor is going to read the paper, going to feel sorry

9     and say, 'This man need help,' and send me home."

10         Q.    Did he discuss with you what your daughter told

11    him?

12         A.    Yes.

13         Q.    How long did that discussion take, please?

14         A.    Almost 20 minutes.

15         Q.    And did you sign that paper?

16         A.    The paper --

17         Q.    Did you sign another paper?

18         A.    Yes, I did sign another paper.

19         Q.    And was that the second confession that we

20    observed in court earlier today?

21         A.    Yes.

22         Q.    And did that include a description of a vibrator?

23         A.    Yes.

24         Q.    Who drew the picture?

25         A.    He drew the picture.

ws

1      Q.   And what did he say, if anything, at the time he

2   drew the picture?

3      A.   He told me that my daughter accused me of using a

4   vibrator on her and she described some -- he said she

5   described a vibrator to him and that's the one he draw on

6   the paper.

7      Q.   And what did you say with respect to the vibrator?

8      A.   I said this is no description of the vibrator that

9   I have or massager.  I use a massager, a folding massager.

10      Q.   Now, after that, what happened?

11      A.   He took the paper outside and then he came back

12   and he had me sign a confession that I touched my daughter.

13      Q.   And how long after -- how long did it take from

14   the time he left until the time he came back?

15      A.   Well, every time he go it's like 20 minutes, 15,

16   20 minutes, ten, give or take.  I didn't have a watch with

17   me.

18      Q.   And what is the next thing that happened, if

19   anything?

20      A.   He made me sign a paper, write with my own

21   handwriting, this confession that I touched my daughter.

22      Q.   And after you signed that confession what happened

23   then?

24      A.   I signed it.  He said he going to take it to his

25   supervisor and I'm going to soon be going home.

1          I asked him for a lawyer again, I asked him for my

2    phone call to my wife, and he said no.

3          Q.    All right, and then what happened?

4          A.    He took the paper outside and he never came back

5    for a long time after.

6          Q.    How long?

7          A.    A long while.  I --

8          Q.    More than an hour?

9          A.    It could be.

10         Q.    More than two hours?

11         A.    I don't know.  It could be hour and a half or two

12   hour.  I don't know.

13         Q.    Did he tell you anything before he left?

14         A.    No.

15         Q.    Did he come back?

16         A.    He came back awhile, long while after.

17         Q.    And then what did he say, if anything?

18         A.    He said just, "Before you go home I want you to do

19   one thing for me.  The same statement you gave on the paper,

20   I want you to give testimony on video camera."  He said,

21   "The Assistant District Attorney is going to come in here

22   and they're going to do a video camera on you."

23         Q.    And did you ask him when?

24         A.    No.

25         Q.    All right, after he came and told you the

Gopaul - Defendant - direct          293

1   District Attorney is going to come and take a statement from

2   you, what happened?

3        A.   I asked him for a lawyer again.

4        Q.   And what happened then?

5        A.   He said, "If you get a lawyer now then we start

6   all over again.  You're not going to go home.  You're not

7   going to go home."  He said, "So you're not going to get no

8   lawyer."  He said, "When you come in, look at the camera.

9   Look at the people who asked the question.  Just try to be

10  calm and answer questions."

11       Q.   Did there come a time when the District Attorneys

12  did come to the precinct?

13       A.   Yeah, they came a long time after, very long time.

14       Q.   Incidentally, you saw Officer Alfaro in this

15  courtroom about ten minutes ago?

16       A.   Yes.

17       Q.   And she testified that she took you from the room

18  downstairs.

19            Is that true?

20       A.   No.

21       Q.   Tell the Court what happened?

22       A.   Ms. Alfaro came in.  I don't know what time it

23  was, but it was a long time after the videotape.  It was a

24  long time upstairs.  She came and she came with

25  Detective Shulman and he introduced her to me and then he

                                              ws

1   give me a lecture about I'm a horrible person and a lot of

2   nasty things he was saying to me in front of her.

3           And he said, "She's going to take you downstairs

4   and process you and then you're going to go to the court in

5   Queens."

6       Q.   Now, there came a time after you made -- we saw

7   the video statement you made in court?

8       A.   Yes.

9       Q.   Now, on that video statement you were read your

10  rights on camera, is that correct?

11      A.   Yes.

12      Q.   You were also read the paper on camera and signed

13  it on camera, is that correct?

14      A.   Yes.

15      Q.   Was that done freely or voluntarily?

16      A.   At that point in time it was, but I was prompt by

17  Mr. Shulman to do the same thing I did in the room.

18      Q.   Well, did he say anything prior to you signing

19  that confession or signing the waiver of rights?

20      A.   In the room.

21      Q.   What did he say?

22      A.   He said, "The same paper you sign in here is the

23  same question they're going to ask you outside.  You do the

24  same thing and give up that right."

25      Q.   Did he promise you anything if you signed that

ws

1    waiver?

2         A.    With the District Attorney he said they're going

3    to go and talk to the supervisors downstairs and I'm going

4    to be going home.  He said that's the last thing he wanted

5    me to do before I go home.

6         Q.    So prior to your waiving your rights

7    Detective Shulman promised you that if you signed that

8    waiver and made statements to the District Attorney you

9    would be leaving and going home, is that correct?

10        A.    Yes.

11        Q.    Okay.  Now, there came a time when you were

12   brought -- let me ask you this.

13             When for the last time did you get any sleep prior

14   to making any statements to Detective Shulman?

15        A.    Sunday night.

16        Q.    So how long have you been awake at the time that

17   you went to the precinct?

18        A.    Well, I left my house on Monday day around 6

19   o'clock in the morning and I didn't go home until just

20   before 2 o'clock Tuesday morning.

21        Q.    So Tuesday morning at 2 o'clock you went home, but

22   did you sleep at the time you went home?

23        A.    No.

24        Q.    And then you went to the precinct?

25        A.    I did not sleep there either.

                                                              ws

Gopaul - Defendant - direct                    296

1      Q.    So you had not slept from Sunday at 6 o'clock

2   through the time the statements were taken by the

3   District Attorney, would that be fair to say?

4      A.    Yes, no sleep.

5      Q.    Were you offered anything to eat or drink by

6   either Detective Shulman or the District Attorney?

7      A.    I was offered something to drink in the evening of

8   when the District Attorney came.   They give me a bottle of

9   water.

10     Q.    And prior to that District Attorney giving you a

11  bottle of water, which was over ten hours or 12 hours from

12  the time you went to the precinct, did you have anything to

13  eat?

14     A.    No.

15     Q.    Or drink?

16     A.    No.

17     Q.    Now, Detective Shulman testified that he gave you

18  an opportunity to go to the bathroom.

19           Is that true?

20     A.    Yes.

21     Q.    When did that occur?

22     A.    Sometime in the day.   I was in the room.   I don't

23  know if it's daylight or night, so I would say it was that

24  day.

25     Q.    Aside from going to the bathroom did you have

1    anything to eat or drink or did you get any sleep for over

2    15 hours?

3         A.   No.

4         Q.   Now, there came a time when you were -- when you

5    went to court, is that correct?

6         A.   Yes.

7         Q.   And there was a time when bail was set?

8              MS. JOHNSON:  Objection.

9              THE COURT:  I'll allow it.

10        Q.   And bail was set for you, correct?

11        A.   Yes.

12        Q.   And there came a time when you made bail and you

13   left the court?

14        A.   No, I didn't make bail.

15        Q.   Well, there came a time sometime afterwards that

16   you were released from court after bail was made for you, is

17   that correct?

18        A.   I made bail from the jail.

19        Q.   From the jail, okay.

20             Do you remember when that was?

21        A.   I think it was Thursday the 27th.

22        Q.   Thursday?

23        A.   Yeah.

24        Q.   And after left jail where did you go?

25        A.   I came to your office.

                                                        ws

Gopaul - Defendant - direct                    298

1      Q.    And after my office where did you go?

2      A.    To the hospital.

3      Q.    Which hospital did you go to?

4      A.    Long Island Jewish hospital.

5      Q.    And when you went to the hospital what, if

6      anything, did you say?

7      A.    I went to the emergency and I told them that --

8      what happened to me and I needed to get a physical check.

9      Q.    And while you were at the hospital were any

10     pictures taken of you?

11     A.    Yes.

12     Q.    And who took those pictures?

13     A.    My niece.

14     Q.    What's her name?

15     A.    Roxanne Seunarine, S-e-u-n-a-r-i-n-e.

16          MS. JOHNSON:  Your Honor, if counsel is

17     planning on showing pictures now, we haven't been privy

18     to anything and it was part of a reciprocal demand

19     months ago.

20          MR. SCHECHTER:  I did not have an opportunity

21     to give these pictures.

22          I also did not know until now that I would

23     either be using them or not using them, but they are

24     pictures of the injuries that my client has, in fact,

25     sustained.

                                                          ws

Gopaul - Defendant - direct          299

1              THE COURT:  Okay, Mr. -- I have no problem

2       with you using the pictures.

3              I just have one question.

4              Did you ask him if he went to a hospital

5       after leaving your office?

6              MR. SCHECHTER:  Yes.

7              THE COURT:  And the answer was?

8              THE WITNESS:  Yes.

9              MR. SCHECHTER:  Yes, Long Island Jewish

10      Hospital.

11      Q.   Now, I would like to show you a series of

12      photographs.

13             MR. SCHECHTER:  I believe this is -- would be

14      Defendant's G for identification.

15             Is that what we're up to?

16             THE COURT:  Defendant's G.

17             MR. SCHECHTER:  G,H,I,J.

18             (Defendant's Exhibits G, H,I and J so marked

19      for identification.)

20      Q.   Mr. Gopaul, I show you Defendant's G,H,I and J for

21      identification.

22             Do you recognize those photographs?

23             (Shown to witness.)

24      A.   Yes.

25      Q.   Except for the fact that some of the wounds are

                                                        ws

1   clotted, do those photographs fairly and accurately reflect

2   how you appeared upon leaving the police precinct on

3   June 24th, 2008 -- 2008?

4        A.   Yes.

5        Q.   And --

6             MR. SHECHTER:  I ask that those be marked

7        into evidence as Defendant's G, H,I and J?

8             THE COURT:  Ms. Johnson?

9   VOIR DIRE EXAMINATION

10  BY MS. JOHNSON:

11       Q.   Mr. Gopaul, who took those photos?

12            MR. SCHECHTER:  Is this voir dire?

13            MS. JOHNSON:  I'm sorry, if I may, Judge?

14            THE COURT:  Yes.

15       Q.   Who took those photos?

16       A.   My niece.

17       Q.   Where?

18       A.   In Long Island Jewish Hospital.

19       Q.   What date?

20       A.   The night of the 27th, Thursday.

21       Q.   June 27th, 2008?

22       A.   Yeah, going into the morning time.  I didn't check

23  the time.

24            MS. JOHNSON:  I have no objection.

25            THE COURT:  Okay, so without objection

                                                    ws

Gopaul - Defendant - direct          301

1    they'll be received in evidence.

2              (Defendant's Exhibits G,H,I and J received in

3    evidence.)

4              MR. SCHECHTER:  For the record, your Honor, I

5    will try to obtain duplicate copies of those for

6    counsel.  If I can't, I'll make photocopies for her.

7              THE COURT:  Okay.

8              MS. JOHNSON:  Thanks.

9    DIRECT EXAMINATION CONT'D

10   BY MR. SCHECHTER:

11       Q.  All right, now, Mr. Gopaul, I direct your

12   attention to those photographs.

13              Could you please look at them?

14              (Shown to witness.)

15       Q.  Now, the first photograph that you're looking at,

16   that's Defendant's G, what is that a photograph of?

17       A.  Photo of my leg.

18       Q.  And do you recall when you received those -- the

19   injury?

20       A.  The morning of the arrest.  The morning of

21   Tuesday, the 24th.

22       Q.  And how did you receive that injury?

23       A.  With the police officers pulling at me and

24   scratching.

25       Q.  All right, thank you.

Gopaul - Defendant - direct                    302

1          I direct your attention to Exhibit H.

2          What is that?

3     A.   L.

4     Q.   Make sure that you looked at the right photo.

5     Look at the back.

6               COURT OFFICER:  The last one was J.

7               MR. SCHECHTER:  I apologize.  Make that

8     Exhibit J, the scratch on the leg.  I stand corrected.

9     Q.   Mr. Gopaul, please look on the back of the photo

10    for the exhibit?

11    A.   All right, this is H.

12    Q.   What exhibit are you looking at now?

13    A.   H.

14    Q.   What does Exhibit H show?

15    A.   This is my belly.

16    Q.   And what is it a picture of?

17    A.   The surgery that I had a few years ago.

18    Q.   And what, if anything, happened at the precinct

19    with respect to that area?

20    A.   I had a lot of pain on my abdomen at that time.

21    Q.   What was that pain from?

22    A.   From the slamming on the counter.

23    Q.   Okay, thank you.

24    A.   From the police officers.

25    Q.   And what are you looking at now?

ws

1     A.   I.

2     Q.   I'm sorry?

3     A.   I.

4     Q.   And what is I a picture of?

5     A.   My elbow.

6     Q.   Sorry?

7     A.   My arm.

8     Q.   And do you see any injuries on that photograph?

9     A.   Scratches, yeah.

10    Q.   And what are those scratches from?

11    A.   The police officers.

12    Q.   And how were they incurred?

13    A.   By pulling at me and scratching at me.

14    Q.   And the last photograph, what number is that?

15    A.   G.

16    Q.   All right, what is that a photograph of?

17    A.   It's my abdomen again.

18    Q.   Sorry?

19    A.   My belly.

20    Q.   And that is the same injury that you had described

21    before, the hernia operation?

22    A.   Yes.

23    Q.   And -- what -- when you struck the counter what

24    part of your body came in contact with the counter?

25    A.   Well, my belly hit the counter and then they

ws

Gopaul - Defendant - direct          304

1   pushed my head, neck and everything down and they were

2   holding it down on the counter.

3        Q.   Now, you indicated you went to Long Island Jewish

4   Hospital, correct?

5        A.   Yes.

6        Q.   And when you went to Long Island Jewish Hospital

7   what were your complaints?

8        A.   The bruises, the scratches I had and the pain on

9   my neck and my belly.

10       Q.   I show you this document --

11            (Shown to counsel.)

12       Q.   -- from Long Island Jewish Hospital.

13            MR. SCHECHTER: Let the record reflect I am

14       showing it now to the District Attorney.

15            (Shown to counsel.)

16       Q.   Now, Mr. Gopaul, can you identify this document?

17            MR. SCHECHTER:  Please have it marked as, I

18       think it's, K?

19            THE COURT:  We'll mark it.

20            (Defendant's Exhibit K marked for

21       identification.)

22       Q.   Now, Mr. Gopaul, is that the medical record that

23   you obtained from the hospital that you went to for

24   treatment?

25       A.   Yes:

                                                      ws

1          MR. SCHECHTER:  I'll offer that in evidence,

2     your Honor, as Exhibit K.

3          THE COURT:  Ms. Johnson?

4          MS. JOHNSON:  For the hearing, I have no

5     objection.

6          THE COURT:  Marked Defendant's K in evidence.

7          (Defendant's Exhibit K received in evidence.)

8          MR. SCHECHTER:  I have no more questions,

9     Judge.

10          (Shown to Court.)

11          THE COURT:  Just give me a second.

12          (Pause in the proceedings.)

13          THE COURT:  Okay, Ms. Johnson.

14     CROSS-EXAMINATION

15     BY MS. JOHNSON:

16     Q.   Mr. Gopaul, do you read English?

17     A.   Yes.

18     Q.   Do you write English?

19     A.   Yes.

20     Q.   Do you have a high school diploma?

21     A.   Nope.

22     Q.   What's the highest level of school you completed?

23     A.   Elementary, seven standard.  Not here, in my

24     country.

25     Q.   And what country would that be?

Gopaul - Defendant - cross            306

1        A.    Trinidad and Tobago.

2        Q.    When you first walked into the precinct on

3    June 24th, 2008 to report your daughter was missing, was it

4    a police officer that you met with to speak to?

5        A.    Yes.

6        Q.    How many police officers did you end up speaking

7    to while in the entranceway of the 105th Precinct?

8        A.    One.

9        Q.    One?

10       A.    Yes.

11       Q.    Then you tell us that other officers came around?

12       A.    Yes.

13       Q.    How many?

14       A.    Eight or nine.  Could be ten, give or take.

15       Q.    Men and women?

16       A.    No, only men.

17       Q.    Were they in uniform?

18       A.    Yes.

19       Q.    What did they do?

20             Tell us exactly what they did to you?

21       A.    When the officer -- the one officer came up to me

22   and asked me what I came here for and I told him -- I give

23   him my name and address, I give him my step-daughter name

24   and address.

25             Then he took my hand --

                                                          ws

Gopaul - Defendant - cross          307

1       Q.    Okay, I'm going to stop you for one second.

2             How did he take your hands?

3       A.    He hold it with his hand.

4       Q.    Your left hand or right?

5       A.    My left hand first and he slammed me into the

6    wall.

7       Q.    How was he grabbing onto your left arm?

8       A.    With his hand.

9       Q.    Tight?

10      A.    Yes.

11      Q.    What was he saying?

12      A.    When he hold me and slam me to the wall, at that

13   time he tell the to guys cuff me.

14      Q.    Before he slammed you to the wall what did he say

15   before he grabbed your arm?

16      A.    Nothing.  He asked me that question and grabbed me

17   and slammed me to the wall.

18      Q.    What were the other officers doing when he grabbed

19   your hand?

20      A.    They were all using words and saying, "Cuff him."

21      Q.    What were the words they were using?

22      A.    They said, "Fucking cuff him.  Cuff him."

23      Q.    What else did they say?

24      A.    They said, "Take him up to the box."

25      Q.    All nine of them were saying that?

1          A.    Well, I didn't count, you know.

2          Q.    Were you able to see the officers?

3          A.    No, they had my head down.  They don't want me to

4    look around.

5          Q.    How were they holding your head down?

6          A.    Well, I was against the wall, they had me against

7    the wall.

8          Q.    How did they slam you against the wall?

9          A.    They hold my hand and turned me and pushed me into

10   the wall.

11         Q.    How many of them slammed you against the wall?

12         A.    One.  The first time it was one.

13         Q.    And the first time being when you were at the

14   entrance to the 105th Precinct?

15         A.    Yes.

16         Q.    What were the other officers doing while the one

17   officer slammed you to the wall?

18         A.    They start to pull and tug on me.

19         Q.    And how long how were they pulling and tugging on

20   you?

21         A.    They had my hand behind my back, spread my legs,

22   searching my pockets, squeeze my chest, my legs.

23         Q.    All nine of them?

24         A.    Well, as far as -- a lot of hands on me.  I don't

25   know if it was all nine, but all nine of them was around me.

ws

1     Q.    How many hands did you feel on you?

2     A.    A lot of hands.

3     Q.    More than one?

4     A.    Yes.

5     Q.    More man five?

6     A.    Yes.

7     Q.    How many voices did you hear?

8     A.    There were many voices.  I didn't count the

9     voices, but there was more than one voice.

10    Q.    Where on your body were the hands grabbing you?

11    A.    All over my legs, my hands, my back, my belly.

12    Q.    What about your face?

13    A.    My face was against the wall.

14    Q.    How did your face get against the wall?

15    A.    With the officer slamming me to the wall.

16    Q.    Did your face smack against the wall?

17    A.    No.  When he pushed me, my head was off the wall,

18    but when they start to push me my head went into the wall.

19    Q.    What's the wall made out of?

20          MR. SCHECHTER:  Objection.

21          How does he know?

22          THE COURT:  Presumably, he was there.  Maybe

23    he does know.

24          Do you recall what the wall was made of?

25          THE WITNESS:  It could be sheetrock, it could

Gopaul - Defendant - cross          310

1    be concrete.  I don't know.

2        Q.   Was it padded?

3        A.   I don't know.

4        Q.   You don't know if it was a padded wall?

5        A.   No.

6        Q.   Do you know if it was a concrete wall?

7        A.   Not for sure, no.

8        Q.   Was it hard?

9        A.   It was hard.

10       Q.   What did it feel like when your face slammed

11   against the wall?

12       A.   I don't know, it was with so many people around me

13   I didn't have time to think what wall it was.

14       Q.   How did it feel, though?

15       A.   Well, it feel like a wall.

16       Q.   Did it hurt?

17       A.   Yeah.

18       Q.   What type of pain did you feel?

19       A.   Pain.

20       Q.   Yes.  What type of pain did you feel?

21       A.   I feel pain when they was pulling my legs open.

22       Q.   On your face where did you feel pain?

23       A.   I didn't feel pain on my face.

24       Q.   Your face made contact with the wall, but you

25   didn't feel pain?

1     A.   They didn't slam my face to the wall, they just

2  slammed me into the wall.  My head was away from the wall at

3  the time.  Then they pushed my face into the wall.

4     Q.   Well, when they pushed your face into the wall

5  what part of your face made contact with the wall?

6     A.   The side of my face.

7     Q.   Which side?

8     A.   The right side.

9     Q.   Which part of the right side, your check?

10    A.   Yeah, the whole side of my face.

11    Q.   And when you say the whole side of the face does

12  that mean your eye also?

13    A.   No.

14    Q.   Your cheek?

15    A.   My cheek.

16    Q.   Your jaw?

17    A.   Well, my jaw is in front, so the side of my face.

18    Q.   The side of your jaw?

19    A.   Yes.

20    Q.   That made contact with the wall as well?

21    A.   Yes.

22    Q.   And the wall was hard?

23    A.   Yes.

24    Q.   And your face was pushed against that hard wall?

25    A.   Yes.

                                                    ws

Gopaul - Defendant - cross         312

1     Q.   And what happened once your face was against the

2 wall?

3     A.   They put the handcuff on me.

4     Q.   Who is they?

5     A.   One of the officers put the handcuff on me.

6     Q.   Were the other officers still around you?

7     A.   Yes.

8     Q.   What did they say to you once your face was

9 against the wall?

10    A.   They were using nasty languages.

11    Q.   What were they saying?

12    A.   They were saying, "Cuff the fucking guy," you

13 know, "We're going to take him up.  The chicken came home to

14 roost."

15    Q.   Who said the chicken --

16    A.   One of the officers.

17    Q.   Did you forget that on direct examination?

18    A.   At that time, yeah.

19    Q.   What position were your legs in when your face

20 made contact with the wall?

21    A.   It was spread apart.

22    Q.   Who spread them out?

23    A.   The officers.

24    Q.   How many?

25              MR. SCHECHTER:  Objection, been asked and

Gopaul - Defendant - cross          313

1        answered about three times already, Judge.

2                THE COURT:  Yeah, sustained.

3        Q.   How far were your legs spread open?

4        A.   As far as they can go.

5        Q.   Were you on the ground or were you standing?

6        A.   Standing.

7        Q.   And what part of your legs were being touched?

8        A.   My whole leg.  From my calves, come all the way up

9   to my groins.

10       Q.   Did one of the officers touch your groin?

11       A.   One of them touch.  They were squeezing me.

12       Q.   Where were they squeezing you?

13       A.   All over, my legs, my hands, my belly, my groins,

14   my back.  They were squeezing me.

15       Q.   Were you wearing long sleeves or short sleeves?

16       A.   Long sleeve.

17       Q.   A T-shirt under the long sleeve?

18       A.   No.

19       Q.   You weren't wearing a T-shirt under the long

20   sleeve?

21       A.   No.

22       Q.   Did you have a chance to see the video that was

23   played here?

24       A.   Yes.

25       Q.   You saw that before you came to court today?

Gopaul - Defendant - cross          314

1      A.   Yes.

2      Q.   So that saw that in your attorney's office?

3      A.   Yes.

4      Q.   And it's your testimony you weren't wearing a

5  T-shirt underneath the long-sleeved shirt?

6      A.   No.

7      Q.   Were you wearing pants or shorts?

8      A.   Long pants.

9      Q.   Jeans or pants?

10     A.   Cintas working pants.  The brand-name pants.  It's

11  a working pants.  Blue pants.

12     Q.   Like a uniform pants?

13     A.   Uniform pants.

14     Q.   You drove the Ecolab vehicle to the precinct that

15  day, right?

16     A.   Yes.

17     Q.   No one else had keys to it?

18     A.   No.

19     Q.   No one else was in it to your knowledge?

20     A.   No, that I know.

21     Q.   You hadn't given anybody else a key?

22     A.   No.

23     Q.   You hadn't seen anybody else drive it?

24     A.   No.

25     Q.   After your legs were spread what were the officers

ws

Gopaul - Defendant - cross          315

1   doing?

2        A.   They took me by my hand, as I showed before, and

3   they pulled me into the front of the counter on the other

4   side of the building.

5        Q.   Tell us how they took your hands.

6             What did they actually do?

7        A.   They put my hands above my head on my back and my

8   head was like bending to the floor.

9        Q.   Did your head make contact with anything?

10       A.   No, not at that time.

11       Q.   Did your head eventually make contact with

12  something?

13       A.   Yes, when they pushed me into the counter.

14       Q.   When they pushed you into the counter what part of

15  your body made contact with the counter?

16       A.   My belly and my chest and shoulder part and they

17  were pushing me down.

18       Q.   What about your head?

19       A.   My head was on the counter.

20       Q.   How did your head come into contact with the

21  counter?

22       A.   By them pushing me down.

23       Q.   Who is they?

24       A.   The officers.

25       Q.   And when you say that they pushed you into the

ws

Gopaul - Defendant - cross          316

1    counter, what part of your head did they push into the

2    counter?

3              MR. SCHECHTER:  Objection, this is ad

4         nauseam.  I think she's gone through this four or five

5         times already.

6              THE COURT:  Yeah, sustained.

7              MS. JOHNSON:  Can I see the pictures, Judge?

8              THE COURT:  Which ones?

9              MS. JOHNSON:  The ones that are in evidence.

10   I don't think he has them.

11             THE COURT:  I gave them back to somebody.

12             MR. SCHECHTER:  Gee, I'm sorry, my bad.

13             (Shown to counsel.)

14   Q.   Would you agree -- it's your testimony there was

15   more than one officer that slammed your head into the

16   counter?

17   A.   Yes.

18   Q.   I'm going to show you Defendant's Exhibit G.

19             (Shown to witness.)

20   Q.   Can you show us on Defendant's Exhibit G where

21   your -- where it was that your head made contact with the

22   counter and with the wall in the precinct?

23   A.   When they pushed me down my head turned on the

24   side, the same right side when they pushing my shoulder.

25             I couldn't keep it down because the counter was

ws

Gopaul - Defendant - cross          317

1    hard.  I had to turning to the side.

2         Q.   I'm asking you where it was on that picture?

3         A.   On this side.

4         Q.   And can you tell us where the injury is on your

5    face that you sustained as a result of being pushed into the

6    wall?

7         A.   I didn't get injuries on my face.

8         Q.   And you didn't get any injuries on your face when

9    you were slammed into the counter?

10        A.   They didn't slam my head on the counter, they

11   slammed my chest and then they pushed my head down.

12        Q.   I'm going to show you -- did you take a picture of

13   your chest?

14        A.   I didn't take any.  My niece took the photos.

15        Q.   Did anybody take a picture of your chest?

16        A.   That, I can't recall.  I don't know.

17        Q.   Did you go to Mr. Schechter's office before or

18   after you went to the hospital?

19        A.   I went to his office before.

20        Q.   So you went to Mr. Schechter's office first and

21   then you went to Long Island Jewish?

22        A.   Yes.

23        Q.   And after you went to Mr. Schechter's office those

24   pictures were taken?

25        A.   Yes.

                                                              ws

Gopaul - Defendant - cross          318

1          Q.    I'm going to show you what's been marked as

2    People's Exhibit 1 in evidence.

3                If you could take a look at that?

4                (Shown to witness.)

5          Q.    Whose name appears on the bottom of that form?

6          A.    This is my name.

7          Q.    You wrote your name on there, correct?

8          A.    Yes.

9          Q.    You signed your name, correct?

10         A.    Yes.

11         Q.    You initialed your name, correct?

12         A.    Yes.

13         Q.    You initialed it on June 24th, 2008, correct?

14         A.    Yes.

15         Q.    In the presence of Detective Shulman, right?

16         A.    Yes.

17         Q.    His gun was not present, right?

18         A.    Yes.

19         Q.    His gun was present?

20         A.    Yes.

21         Q.    And what was he doing with his gun?

22         A.    I don't know.  He had it on his holster.

23         Q.    Did he take it out?

24         A.    No.

25         Q.    But you saw it?

Gopaul - Defendant - cross          319

1      A.    Yes.

2      Q.    And that gun was -- you saw that gun in the

3  interview room?

4      A.    Yes.

5      Q.    Okay.  Detective Shulman, read you the rights that

6  appear in People's 1, correct?

7      A.    He didn't read this to me.  He bring it -- already

8  had yes on it in the room.

9      Q.    So by the time you saw that, yes was already

10  written on the form?

11     A.    Already on it.

12     Q.    What about on the video?

13           You were provided almost the exact -- in fact, the

14  exact same form on the video, correct?

15     A.    Yes.

16     Q.    Was yes on that document or --

17     A.    No, the District Attorney put the yes on there.

18     Q.    In your presence?

19     A.    Yes.

20     Q.    But Detective Shulman put yes before you got that?

21     A.    Yes.

22     Q.    And you initialed next to it after you read the

23  paperwork?

24     A.    I didn't read the paper.

25     Q.    You weren't given that paper?

ws

Gopaul - Defendant - cross                 320

1       A.    I didn't get it to read.

2       Q.    So when was it that you put your initials next to

3   it?

4       A.    After -- when he bring it to me he said -- I asked

5   him for a lawyer and I asked him for the phone call.

6             He said no.  He said, "Right now you're going to

7   sign me a confession," and he give me this to put my

8   initials on the side of it.

9       Q.    He handed you the piece of paper?

10      A.    Yes.

11      Q.    He handed you a pen?

12      A.    Yes.

13      Q.    You had that piece of paper in your hand, correct?

14      A.    It was on the desk.

15      Q.    And nobody else was in the room, right?

16      A.    No.

17      Q.    And you put your initials next to each one of

18  those questions?

19      A.    Yes.

20      Q.    And nothing was covering that piece of paper,

21  correct?

22      A.    No.

23      Q.    You were able to read it?

24      A.    No.

25      Q.    Why weren't you able to read it?

ws

Gopaul - Defendant - cross          321

1        A.   I didn't have my glasses.  I had to go down to

2   read and I couldn't go down to read.

3        Q.   What does the first line say?

4        A.   You have the right to remain silent.

5        Q.   Are you wearing your glasses now?

6        A.   No.

7             MS. JOHNSON:  Can I have that back, please?

8             (Shown to counsel.)

9             THE COURT:  Are you all right, Mr. Schechter?

10            MR. SCHECHTER:  Yeah, I just banged my leg,

11   Judge.  It's okay.

12            MS. JOHNSON:  Are you all right?

13            MR. SCHECHTER:  Yeah, I'm fine.

14       Q.   When you asked Detective Shulman if you can call

15   your attorney, who was it that you were planning on calling?

16       A.   I didn't ask him to call my attorney.  I asked him

17   to call my wife.

18       Q.   Well, you said you asked Detective Shulman if you

19   could speak to an attorney, correct?

20       A.   And I wanted a lawyer.

21       Q.   And who was it that you were going to call?

22       A.   I was going to call my wife to call a lawyer.  I

23   didn't have a lawyer at the time.

24       Q.   I'm going to show you what's been marked as

25   People's Exhibit 2 in evidence.

ws

Gopaul - Defendant - cross                    322

1                    (Shown to witness.)

2          Q.   Do you recognize that?

3          A.   Yes.

4          Q.   Whose signature appears on the bottom of that?

5          A.   Mines.

6          Q.   Whose name appears on the bottom of that?

7          A.   My name.

8          Q.   You signed your name on that?

9          A.   Yes.

10         Q.   You signed that in the presence of

11    Detective Shulman, correct?

12         A.   Yes.

13         Q.   You read that form, right?

14         A.   He read it for me.

15         Q.   He read it out loud to you?

16         A.   Yes.

17         Q.   And then he gave it to you, correct?

18         A.   Yes.

19         Q.   Who signed and dated it?

20              Who put the date on it?

21         A.   I put the date.

22         Q.   You put the time as well, correct?

23         A.   Yes, he told me the time, I put it on.

24         Q.   You knew the date, right?

25         A.   Until he told me, yes.

Gopaul - Defendant - cross                323

1      Q.   Did you read that before you signed it?

2      A.   Detective Shulman read it for me.

3      Q.   So you just signed it?

4      A.   Yes.

5      Q.   I'm going to show you People's 3.

6           (Shown to witness.)

7      Q.   You signed the bottom of People's 3, correct?

8      A.   Yes.

9      Q.   You dated it, correct?

10     A.   Yes.

11     Q.   You wrote your name on it, correct?

12     A.   Yes.

13     Q.   That was read to you, correct?

14     A.   Yes.

15     Q.   That was provided to you?

16     A.   Yes.

17          MS. JOHNSON:  I'm sorry.

18          (Shown to counsel.)

19     Q.   And both of those consent forms were given to you

20  after Detective Shulman read you those Miranda rights,

21  correct?

22     A.   He didn't read the rights to me.

23     Q.   Those two consent forms were signed after he read

24  you those rights, correct?

25     A.   He didn't read the rights to me.

ws

Gopaul - Defendant - cross          324

1      Q.    Okay.  I'm going to show you the first statement

2   that you gave Detective Shulman, People's 4.

3                    (Shown to witness.)

4      Q.    Is it fair to say Detective Shulman provided you

5   with a blank pad and pen?

6      A.    Yes.

7      Q.    That was after he read your Miranda rights,

8   correct?

9      A.    He didn't read the right.

10     Q.    The pad was blank when it was given to you,

11  correct?

12     A.    Yes.

13     Q.    Now, you testified before on direct that he

14  prompted you to write that statement, correct?

15     A.    He had his notes with him and he was telling me

16  what to write on the paper.  Most of it is what he made me,

17  from his notes.  He asked me question from his notes.  He

18  told me what my stepdaughter said on his notes and then he

19  had me do this paper.

20     Q.    Tell us how it is that he made you write that

21  piece of paper?

22     A.    Well, by using languages, bad languages, to me and

23  screaming at me.

24     Q.    What was that bad language that he was using?

25     A.    He was saying if I don't sign this fucking thing

ws

1     I'm not going to go home.  He was using the MF word.

2          Q.    What's an MF word?

3          A.    Motherfucker.  He was using those words at me.

4                He was over me on the table.  He was like leaning

5     like almost want to grab me.

6          Q.    When you say he was leaning almost like he was

7     going to grab you, he didn't grab you, right?

8          A.    No, he didn't grab me, but his hand was out.

9          Q.    And what was his hand doing?

10         A.    His hand was in my face.

11         Q.    What was his hand doing in your face?

12               What do you mean by that?

13         A.    Talking and waiving at me.

14         Q.    Talking with his hands?

15         A.    Just wavering, yeah.

16         Q.    Did his hands ever make contact with your body?

17         A.    When he slammed me to the walls, yeah.

18         Q.    So when he slammed you to the wall how does it

19    come about that his hands are on your body?

20         A.    He hold me by my shirt.

21         Q.    How was he holding you by your shirt?

22         A.    Grabbed my shirt and pushing me to the wall, slam

23    me to the wall.

24         Q.    What part of your body made contact with the wall?

25         A.    My back.

1      Q.   Your entire back?

2      A.   Yes.

3      Q.   Did you have pain?

4      A.   Yes.

5      Q.   Where did you have the pain?

6      A.   On my neck and shoulders.

7      Q.   Did you have trouble sitting after that?

8      A.   I was uneasy with it.

9      Q.   You had the opportunity to see the video, right?

10     A.   Yes.

11     Q.   You were able to move your arms in the video,

12  correct?

13     A.   Yes.

14     Q.   You lifted your arms, right?

15     A.   Yes.

16     Q.   You moved your arms, correct?

17     A.   Yes.

18     Q.   You were able to describe how you were touching

19  your daughter by using your arm movements, correct?

20     A.   Yes.

21     Q.   Did you ever complain of any pain on that video?

22     A.   No.

23     Q.   Did you ever ask for medical attention on the

24  video?

25     A.   No.

ws

1      Q.   Did you ever see any weapons drawn on that video?

2      A.   No.

3      Q.   Did you ever get threatened by any of the DAs on

4    that video?

5      A.   No.

6      Q.   Anybody lay a hand on you on that video?

7      A.   No.

8      Q.   Did you ever ask to speak to a lawyer on that

9    video?

10     A.   They asked me if I wanted to speak to a lawyer,

11   but the detective told me if I ask for a lawyer I'm not

12   going to go home, it going to be worse for me, it's going to

13   be worse, so just do the same thing, sign the Miranda that I

14   did in the room and they going to take it up to the

15   supervisor downstairs and they going to have an agreement to

16   send me home.

17     Q.   Nobody told you on that video what to say,

18   correct?

19     A.   No.

20     Q.   You were free to answer questions, correct?

21     A.   Well, I was free to answer question, but I was

22   scared of the detective.

23     Q.   And what do you mean by you were scared of him?

24          What were you afraid he was going to do?

25     A.   Probably going to take me back to the room and do

                                                        ws

1    something to me again.  I don't know.

2         Q.   What were you afraid he was going to do?

3         A.   Slam me to the wall, hit me or something.

4         Q.   Were you afraid of the prosecutor?

5         A.   No.

6         Q.   Were you afraid of the videographer?

7         A.   No.

8         Q.   And what was it about the detective's presence in

9    that video that you were concerned about?

10        A.   After the interview, what they going to do to

11   me -- what he going to do to me.

12        Q.   What did he say he was going to do to you?

13        A.   He didn't say nothing at the time.

14        Q.   He didn't tell you he was going to beat you up

15   after the video?

16        A.   No.

17        Q.   He didn't show his gun to you during the video?

18        A.   No.

19        Q.   You had the opportunity while that video was being

20   taped to ask for an attorney, correct?

21        A.   Yes.

22        Q.   You had the opportunity to stop that video,

23   correct?

24        A.   Yes.

25        Q.   You had the opportunity to say you no longer

Gopaul - Defendant - cross                329

1    wanted to answer any questions, correct?

2         A.   Yes.

3         Q.   You had the opportunity to tell the DA that this

4    video was over, correct?

5         A.   Yes.

6         Q.   You didn't have any trouble moving your arms on

7    the video, correct?

8         A.   No.

9         Q.   Did you ever make a complaint with Internal

10   Affairs about what Detective Shulman allegedly did to you?

11             MR. SCHECHTER:   I'm going to object.

12             He has two pending indictments against him.

13        Making a complaint to Internal Affairs with another

14        statement when he has counsel is not exactly the

15        appropriate thing to do.

16             It's an improper question.

17             MS. JOHNSON:   Judge, he's saying that police

18        officers beat him up.

19             Obviously, if there's any merit to it I have

20        the right to inquire as to whether or not he made a

21        complaint about it.

22             MR. SCHECHTER:   If he makes a complaint with

23        another statement he's further incriminating himself,

24        Judge.   He has a right to counsel.

25             THE COURT:   I'm going to overrule the

Gopaul - Defendant - cross          330

1       objection.

2           Q.   Did you make a complaint to Internal Affairs about

3    Detective Shulman?

4           A.   No.

5           Q.   Did you make a complaint to Internal Affairs about

6    any of the officers?

7           A.   No.

8           Q.   Did you make a complaint to the precinct about any

9    of the officers?

10          A.   No.

11          Q.   Did you make a phone call to the precinct about

12   what they did to you?

.13         A.   No.

14          Q.   Did you tell the detective in Nassau County what

15   Detective Shulman did to you?

16          A.   I don't recall.

17                   MS. JOHNSON:  I'm going to ask that this be

18          marked as People's 8 and 9 for identification.

19                   MR. SCHECHTER:  Can I see them, please?

20                   (Shown to counsel.)

21                   MR. SCHECHTER:  Your Honor, I'm going to

22          object.

23                   Counsel intends to show the witness something

24          that happened well -- over one month after the incident

25          and it's an interview sheet regarding his present

                                                     ws

1   condition after he was arrested in Nassau County.  It

2   has no relevance here.

3            THE COURT:  I have, obviously, no idea what

4   she's marking and what the exhibit is.

5            Do you want to make an offer?

6            MS. JOHNSON:  Yes, Judge.

7            It's the 79, physical condition

8   questionnaire, taken in Nassau County where -- my offer

9   of proof is the defendant is asked is he in good

10  health, does he have any injuries --

11           THE COURT:  And when is he asked those

12  questions?

13           MS. JOHNSON:  July 31st, 2008.

14           THE COURT:  So what bearing would that have

15  on what took place from June 24th to June 27th?

16           MS. JOHNSON:  Because defendant is saying he

17  had an injury from a hernia that was exacerbated by

18  these police officers.  That would have been in the

19  paperwork.

20           MR. SCHECHTER:  He just said he's in pain.

21           THE COURT:  If that's your offer, the

22  objection is sustained.

23           MR. SCHECHTER:  Thank you, Judge.

24           MS. JOHNSON:  Sustained as to the questions

25  or the offering of the documents, your Honor?

ws

1          THE COURT:  It's sustained as to the document

2      and any questions relating to what he may have been

3      asked a month later.

4      Q.   Mr. Gopaul, the statement -- the first statement

5   that you gave to Detective Shulman regarding what happened

6   at the fair, was that statement true or false?

7      A.   It's true.

8          MR. SCHECHTER:  Objection, that's improper.

9      Thirty years that's been an improper question, to ask

10     the truth or falsity of the statements.

11         THE COURT:  Would you just read back the

12     question, please?

13         (Record read.)

14         MR. SCHECHTER:  Withdraw the objection.

15         THE COURT:  And you answered that,

16     Mr. Gopaul?

17     A.   Yes.

18     Q.   Yes, it's true?

19     A.   Yes.

20     Q.   And it's your testimony that you were forced into

21   giving a true statement?

22     A.   No, I gave the truth on that statement.

23     Q.   After you were issued Miranda warnings?

24     A.   Yes.

25     Q.   Okay.  And as to the second statement that you

ws

Gopaul - Defendant - cross          333

1   gave to Detective Shulman, was that an accurate --

2        A.   Can you repeat?

3             MR. SCHECHTER:  Now I'm going to object to

4   that statement.

5             The law is, Judge, that it's improper at a

6   Huntley Hearing to ask the witness, the defendant,

7   whether or not the statement made was true.

8             I think it's been the law for 30 years.  I

9   had the case.  I read it yesterday.  Unfortunately, I

10  can't find it, but I looked at that possibility.

11            THE COURT:  I'm going to sustain the

12  objection.

13            MS. JOHNSON:  I didn't ask him if it was the

14  truth, I asked him if it was accurate.

15            MR. SCHECHTER:  Same idea.

16            THE COURT:  Truth, accuracy.  Quite frankly,

17  I think they're interchangeable under these

18  circumstances.

19            I also would think, Ms. Johnson, you could

20  anticipate what the answer will be to that question.

21            MS. JOHNSON:  As would I, most likely (sic).

22       Q.   Mr. Gopaul, you also indicated on direct that that

23  was Detective Shulman who drew the picture of the vibrator?

24       A.   Yes.

25       Q.   Was that following a conversation that you had

Gopaul - Defendant - cross                334

1    with him?

2         A.    Yes.

3         Q.    And was that following a conversation about a

4    vibrator?

5         A.    Yes.

6         Q.    You signed that piece of paper, correct?

7         A.    Yes.

8         Q.    You signed it underneath the question and answer,

9    is that fair to say?

10        A.    If I see the paper I'll know.  I think so.

11        Q.    Sure.

12             MS. JOHNSON:  Give me one second.

13             (Pause in the proceedings.)

14        Q.    Well, let me ask you this.

15             Was there already a picture of a vibrator on the

16   piece of paper when you signed that paper?

17        A.    No.

18        Q.    So the picture of the vibrator was put after you

19   signed it?

20        A.    No, it was before.  No, it was put before I signed

21   the paper.

22        Q.    So the vibrator was on the piece of paper before

23   you signed it?

24        A.    Yes.

25        Q.    After a conversation you had with

                                                        WS

1    Detective Shulman about vibrators that you had?

2         A.    Yes.

3         Q.    And you indicated that you were provided with a

4    bottle of water?

5         A.    Yes, from the ADA.

6         Q.    And you were permitted to go to the bathroom?

7         A.    Not at that time.

8         Q.    Well, you were permitted to go to the bathroom,

9    correct?

10        A.    Yeah, but I didn't have to use the bathroom at

11   that time.

12        Q.    You saw the video yesterday?

13        A.    No, I was on the back of it.

14        Q.    You've seen the video before?

15        A.    I saw it before.

16        Q.    Do you see any injuries on your face?

17        A.    No.

18        Q.    Do you see any injuries on your hands?

19        A.    No.

20             MR. SCHECHTER:   I'm going to object.

21             He never claimed there were injuries to his

22   face or hands, Judge.

23             The injuries were to his neck, his belly, his

24   arms and his legs.

25             He never said anything about his hands.

Gopaul - Defendant - cross          336

1          THE COURT:  The record will speak for itself.

2          MS. JOHNSON:  I have nothing else.

3          MR. SCHECHTER:  No redirect.

4          THE COURT:  Mr. Gopaul, you testified before

5     that you were released from jail.

6               In other words, you were brought to court,

7     you were arraigned and then you bailed out, am I right?

8          THE WITNESS:  When they set the bail for me

9     my wife didn't reach in time or I think she didn't have

10    the money at the time, so the time ran out on the court

11    and they had to put me in the Bronx.

12         THE COURT:  So you were transferred to --

13         THE WITNESS:  To the Bronx.

14         THE COURT:  -- to a correctional facility in

15    the Bronx?

16         THE WITNESS:  The boat?

17              I think they call it the boat.

18         THE COURT:  The what?

19         THE WITNESS:  The boat.

20         THE COURT:  And when you went over to that

21    facility was there any type of medical screening given

22    to you at that point --

23         THE WITNESS:  Yes.

24         THE COURT:  -- by people at the New York City

25    Correctional Department?

                                                    ws

Gopaul - Defendant - cross          337

1              THE WITNESS:  Yes.

2              THE COURT:  And did they ask you if you had

3    any injuries?

4              THE WITNESS:  Yes.

5              THE COURT:  Did you say whether or not you

6    had any injuries similar to what you said in

7    Defendant's K in evidence?

8              THE WITNESS:  No, no.

9              THE COURT:  All right.

10             Anybody have any questions as a result of

11   mine?

12             MS. JOHNSON:  I was just going to ask -- I'm

13   assuming those are not the complete medical records

14   from LIJ.

15             If counsel is planning on offering them --

16             MR. SCHECHTER:  It's an emergency room.  He's

17   only in the emergency room.

18             THE COURT:  Okay.  Thank you very much.

19             MS. JOHNSON:  Can I actually ask just a

20   couple of questions?

21             THE COURT:  Yes.

22             MS. JOHNSON:  Just briefly.

23   Q.   Mr. Gopaul, were you housed with other inmates in

24   the Bronx?

25   A.   Yes.

ws

Gopaul - Defendant - redirect          338

1      Q.    Were you housed with other inmates at the

2   105 Precinct?

3      A.    No.

4      Q.    Were you housed with other inmates at

5   arraignments?

6      A.    Yes.

7      Q.    In one big cell?

8      A.    Yes.

9              MS. JOHNSON:  I have nothing else.

10  REDIRECT EXAMINATION

11  BY MR. SCHECHTER:

12     Q.    Mr. Gopaul, did you have any scuffles with any

13  other inmates while you were in jail?

14     A.    No.

15             THE COURT:  Okay, you can have a seat.

16             (Witness excused.)

17             THE COURT:  Mr. Schechter --

18             MR. SCHECHTER:  May it please the Court, your

19      Honor, I understand the reason for your Honor's

20      questions regarding the outcry of Mr. Gopaul when he

21      was at the facility in the Bronx.

22             The question really -- with all due respect,

23      your Honor, no allegation has been made that Mr. Gopaul

24      suffered lasting or permanent injuries.

25             Rather, the proffer has been made that the

Proceedings                    339

1    police officers set upon him and at the time they set

2    upon him he was pulled, prodded, scratched, bruised,

3    bent and suffered these injuries and under compulsion

4    made these -- waived his rights and made these

5    statements.

6              There's never been any allegation that the

7    injuries he sustained were permanent.  It doesn't have

8    to be permanent.

9              As a matter of fact, the police are very

10   well-schooled in how to utilize physical force to

11   extract confessions or to extract what they want to

12   extract without causing observable injuries.

13             THE COURT:  If I could just interrupt you.

14             My question to you was, and maybe I wasn't

15   clear, are you resting?

16             MR. SCHECHTER:  I rest.

17             THE COURT:  Okay.  So now you're making

18   closing arguments?

19             MR. SCHECHTER:  I am.

20             THE COURT:   Go ahead.

21             MR. SCHECHTER:  If it please the Court, your

22   Honor, it is respectfully submitted that the statements

23   that were extracted from my client were extracted from

24   him after protracted, protracted, delays.

25             As a matter of fact, I still haven't

Proceedings                    340

1      gotten -- and I ask the Court to draw an unfavorable

2      inference against the prosecution because of the

3      failure to provide the required discovery material,

4      namely the early entries of that log that we had

5      already requested and based upon what counsel said

6      there has been no equivocation about us wanting that

7      log.

8              They have been stonewalling us with officers,

9      stonewalling us with information, stonewalling us with

10     discovery information from the Police Department.

11             Your Honor, my client testified he was at

12     that precinct approximately 2:30, that when he got to

13     the precinct he was set upon by approximately nine to

14     ten officers who manhandled him, threw him against the

15     rail, threw him against the wall, scratched him in the

16     course of having him handcuffed and searched and then,

17     shortly thereafter, Detective Shulman came and took him

18     upstairs, threw him up the steps, he almost fell, but

19     he did not fall, went into the room.  Detective Shulman

20     grabbed him by the collar, threw him against the wall

21     and pushed him back.

22             If your Honor looks at that, as I'm sure you

23     did because I drew your Honor's attention to it in the

24     video, my client's collar is quite distended and it's

25     very consistent that the distension of his collar is

                                                           ws

1    consistent with someone who grabs someone, spreads the

2    collar, throws him and pushes him back.   There's no

3    reason for his collar to look like that absent somebody

4    using that kind of force against him.

5              It is apparent, your Honor, that my client

6    was the victim of force.   Police officers, for their

7    own particular reasons or prejudices, felt that they

8    needed to act forcefully against my client.

9              It was in that atmosphere that Detective

10   Shulman, who also acted forcibly against my client,

11   attempted to extract a confession from him.

12             After he then physically abuses him he then

13   gives him the life preserver.   This is the technique

14   called the Reid technique that is used by the police

15   departments, even though he denied its use.   You first

16   act violently, make the person desperate, then you

17   throw out the life preserver.   The life preserver is

18   you make a confession, you're going home.

19             Everybody, especially those who are not

20   familiar with the criminal justice system, everyone

21   grabs for that life preserver.   They'll say anything

22   they want them to say thinking they're going home.

23   That's what Detective Shulman did to my client.

24             Thereafter, with that in mind,

25   Detective Shulman wanted to keep that going so that

Proceedings                342

1      when my client was about to give the video statement

2      Detective Shulman promised him, "Look, all you got to

3      do is tell that same thing to the DA you told me."

4                  You get a cop -- rather, "You get an

5      attorney, then we're going back to square one and

6      you're not getting out of here.  I'm just warning you

7      right now before you go and speak to the District

8      Attorney."

9                  So that force, those actions by the

10     detective, were not in any way ameliorated or had any

11     kind of separation from the initial physical abuse that

12     my client suffered.  There's not been any attenuation

13     of that because Detective Shulman saw that there was

14     not going to be an attenuation by continuing the abuse

15     and the threats and the life preserver, namely that my

16     client, if he makes a statement to the District

17     Attorney, will be released.

18                 That was the atmosphere under which he gave

19     the statements.  They were statements which were forced

20     out of him.  They were extracted out of him at pointed

21     fists, not by reason, not by an intelligent waiver.

22                 He had requested an attorney.  Those requests

23     were completely tossed aside by Detective Shulman.  My

24     client, as he said, was going to call his wife to get

25     an attorney.

                                                        ws

Proceedings                    343

1           He did not, at that point, know he had -- an

2      attorney would be appointed for him because by that

3      time Detective Shulman said, "You're not getting any

4      attorney," so he had no expectation of getting an

5      attorney and for that reason he, at that time, felt

6      isolated, he felt alone, which is what they want to do.

7           He was kept, your Honor, from 2:30 in the

8      morning on June 24th until the following night, until

9      around a quarter to 9.  That's a long time to be in

10     custody, Judge, especially with no sleep, no food and

11     one bathroom break.

12          Now, under those circumstances the

13     confessions that were extracted from him were done

14     absent a reasonable and thoughtful and unforced waiver.

15          The consents obtained to search his vehicle

16     were extracted in the same methodology.  He gave those

17     with the same abuse in his mind.

18          Therefore, the consents to search were also

19     not done properly and they were extracted violently and

20     for those reasons I'm respectfully asking that the

21     Court suppress the statements that were made by my

22     client, suppress the evidence seized from his vehicle

23     and from his house, and for those reasons I

24     respectfully ask the Court grant that relief.

25          THE COURT:  People, before you begin, I am

Proceedings                    344

1      directing you -- because I had my law secretary check

2      to see if, perhaps, somebody faxed over the first sheet

3      of that log sheet.

4              I am asking to you produce that for

5      Mr. Schechter.

6              And, Mr. Schechter, if need be, if you need

7      to make whatever application you feel you need to make

8      upon reviewing it, I'll let you.

9              He's entitled to it and, quite frankly, I

10     think he should have had it already.

11             Do you want to say anything?

12             MS. JOHNSON:  I do.  I don't know if you

13     wanted me to make a phone call.

14             THE COURT:  You can do it after, because

15     obviously we're not going to get it before 4:35.

16             MS. JOHNSON:  And if I have it after the

17     close of business of court, I'll fax it to Court and

18     counsel.

19             Your Honor, it's our position, and the

20     evidence has shown beyond a reasonable doubt, that not

21     only did the defendant knowingly, voluntarily and

22     intelligently waive his Miranda rights, his right to

23     counsel, but he also was adequately advised of his

24     Miranda rights.

25             I'll first address counsel's arguments.

                                                    ws

1          Your Honor, this is an issue of credibility

2     as to whether or not the Court is going to believe what

3     the defendant says or whether or not the Court is going

4     to believe what the detective says.

5          In order to believe what the defendant says,

6     that he was roughed up by nine police officers, that

7     they slammed him against the wall, they slammed him in

8     the interview room, they slammed him against the

9     counter, it belies logic.

10          When the court looks at the very photographs

11     that the defendant has submitted, there is no injury on

12     the defendant's face.

13          There is a scratch on his body and there's a

14     bruised belly button from a previous hernia surgery.

15          Not only did the defendant's own pictures not

16     comport with his own testimony, but the very video that

17     was played in court, the defendant is lifting his arms,

18     moving his arms, making hand gestures, able to answer

19     questions, no injury on his face.  The defendant even

20     admits there's no injury on his hands.

21          The defendant's own video, the capturing of

22     his own image, both by himself and by the videographer,

23     let's just say, doesn't even comport with his own

24     testimony as to what happened.

25          In fact, Judge, he never made any complaints

ws

Proceedings                           346

1    to anybody about any injury.  He never made any

2    complaints on the video, never asked to speak to an

3    attorney on the video.

4              I think that the very tone of how the video

5    was taken, the conversational aspect of it between the

6    defendant and the DAs and the defendant and even

7    Detective Shulman, it belies logic that the defendant

8    was even laid a hand on by any members, much less nine

9    officers or Detective Shulman.

10             Be that as it may, Judge, the Court has seen

11   the Miranda form signed by the defendant on 5:15 -- at

12   a 5:15.  Detective Shulman testified he read it to the

13   defendant, he himself indicated yes and the defendant

14   signed, initialed, this document.

15             It was dated.  It was timed.

16             Detective Shulman's testimony should be

17   deemed by the Court as credible that the defendant not

18   only wrote his name, but signed his name after the

19   Miranda warnings were issued.

20             We submit to the Court that this is an

21   adequate issuance of Miranda rights.  The defendant

22   knowingly waived it.  He was read these rights.  He was

23   provided the copy of it.  He signed it.

24             There was no indication, no testimony from

25   Detective Shulman, that at any time was his gun

                                              ws

Proceedings                    347

1      present, that the defendant asked to speak to an

2      attorney, that the defendant asked to cease the

3      interview.

4                In fact, Detective Shulman indicated the

5      defendant was quite cooperative with him.  He was not

6      handcuffed.  There was no force used upon him nor any

7      threats.

8                In fact, Judge, the defendant was provided --

9      as far as the written statements go, the defendant was

10     provided a blank piece of paper to make two statements

11     to Detective Shulman in his own handwriting where the

12     defendant himself provided his own information, the

13     date, the time.

14               It belies logic that Detective Shulman, who

15     testified that his gun was fully secured,

16     Officer Alfaro, who corroborated Detective Shulman that

17     it's Police Department police to secure their weapon --

18     none of the People's witnesses indicated that any

19     threats any force or any coercion was used upon this

20     defendant to sign a true statement in the defendant's

21     own words as to what happened with his daughter at the

22     fair.

23               Detective Shulman indicated unequivocally

24     that at no time did the defendant have any questions.

25               In fact, the defendant made his own changes

                                                    ws

Proceedings                    348

1     on one of the documents when he changed the date.  He

2     changed the date from the 22nd to the 21st.

3              At no time did he ask to speak to an

4     attorney, did he indicate he wanted to cease the

5     interview or that he had any questions.

6              There was no language barrier.  There was a

7     conversation and, in fact, a tone of cooperativeness

8     with Detective Shulman that continued onto the video.

9              After the Miranda was issued, after the first

10    statement was signed, after both consent forms were

11    signed by the defendant -- which I'll actually note,

12    your Honor, not one question out of defense counsel's

13    mouth to Detective Shulman was about the consent forms

14    signed by the defendant.  Nothing was questioned of

15    Detective Shulman about the defendant being provided

16    the consent forms, being read the consent form or even

17    signing it.

18             The second statement, we submit to the Court,

19    just like the first one, was a knowing, voluntarily,

20    intelligently-obtained statement.

21             This defendant again was provided a pen and a

22    piece of paper.

23             Detective Shulman indicated no threats were

24    made to the defendant, no promises were made, no gun

25    was present, no coercion was used and, again, the

Proceedings                         349

1    defendant was handcuffed -- the defendant was

2    handcuffed, in fact, brought to the restroom at the

3    defendant's own request.

4             As to the question and answer and the

5    photograph that was drawn by the defendant after

6    Miranda was issued, after Miranda was waived, again,

7    Detective Shulman indicated that the defendant drew

8    this picture, never asked to speak to an attorney,

9    never asked to cease the interview, that there was, in

10   fact, a rapport between the two of them and the

11   defendant was willing to speak to him.

12            I think, your Honor, the video speaks for

13   itself.  At no time during the video were any weapons

14   present.  At no time were any physical force, threats

15   coercion or any physical tactics used upon the

16   defendant.

17            In fact, counsel said and the defendant said

18   that the detective told the defendant that all he had

19   to do was repeat what he told Detective Shulman in the

20   video.

21            If the Court looks at the video, that's not

22   even what happened.  The defendant gave more

23   information, more details and expanded his statement,

24   so obviously it belies logic that the detective would

25   have told the defendant that he must repeat what he

                                                        ws

Proceedings                    350

1    gave the detective when the defendant himself gives

2    more information on the video.

3           Your Honor, we have the luxury of having an

4    actual videotaped statement here rather than simply

5    relying on what I do submit to the Court is credible

6    testimony by the detective.

7           At no point does the defendant complain of

8    any injury, ask to cease the interview, ask to speak to

9    an attorney.  He's provided Miranda warnings again,

10   he's read them by the District attorney.

11          In fact, he continues his conversation with

12   Detective Shulman on the video when Detective Shulman

13   asks him questions in the presence of the District

14   Attorney -- in fact, both Assistant District Attorneys.

15          We would submit to the Court, your Honor,

16   that based on the fact that the Miranda warnings were

17   knowingly, voluntarily, intelligently waived,

18   adequately supplied, adequately read, the defendant not

19   only orally waived them, but waived them in writing and

20   at no time invoked his right to counsel.

21          We would submit to the Court that the

22   statements, the two written statements, the question

23   and answer, as well as the video that was subsequent to

24   another Miranda warning, as well as the property that

25   was received, we submit that all of that should be

Proceedings                    351

1    permitted to be introduced by the People on our direct

2    case.

3              THE COURT:  All right, speaking of the video,

4    is the waiver form that was signed in that video, I'm

5    assuming that's separate and distinct from the one that

6    Detective Shulman referred to at the -- when he

7    initially met the defendant?

8              MS. JOHNSON:  That is what my understanding

9    is by looking at the video, your Honor, because when

10   the Assistant District Attorney gives the video to --

11   gives the Miranda form to the defendant, I believe he

12   addresses again that, "This is a Miranda form similar

13   to the one that had been provided to you before," and

14   the defendant is observed on the video signing it yet

15   again.

16             MR. SCHECHTER:  I don't think it was offered

17   in evidence, Judge.

18             THE COURT:  That's my point.  I've only seen

19   one Miranda waiver form that's allegedly signed by the

20   defendant.

21             In other words, my question is, there appears

22   to be a separate Miranda form that was produced during

23   the beginning -- during the videotaped confession

24   that's referred to by the assistant DAs from Queens, is

25   there not?

ws

Proceedings                    352

1      MS. JOHNSON:  There is, your Honor, and the

2  substance of that video that is read again to the

3  defendant and the defendant orally, on the video,

4  waives those rights yet again and is observed on the

5  video signing that document again.

6      THE COURT:  Right, but do we know where that

7  document is?

8      MS. JOHNSON:  I believe it was already

9  provided.

10      THE COURT:  Well, in any event, Ms. Johnson,

11  you're relying upon the video and -- with respect to

12  the waiver insofar as the videotaped confession is

13  concerned.

14      MS. JOHNSON:  I am relying on both the

15  Miranda warnings that were issued by Detective Shulman

16  that continued and I'm also relying on the additional,

17  sort of like a belts and suspenders, that was issued to

18  the defendant on the video.

19      It's our position, your Honor, that the

20  waiver that was signed by the defendant in the presence

21  of Detective Shulman was still sufficient on the video.

22  We rely on that and we also rely on the additional

23  Miranda given on the video by the prosecutor.

24      MR. SCHECHTER:  The best evidence of the

25  waiver is the document itself, Judge, which was never

ws

Proceedings                    353

1    produced or admitted.

2           THE COURT:  Well, that's why I asked if the

3    People are relying upon what -- I mean, obviously the

4    videotape is in evidence and I assume that that's what

5    they're relying upon.

6           All right, I'm going to reserve decision

7    until tomorrow at this point.  It's getting a little

8    late.

9           Just a couple of matters before we go.

10          I have ordered a panel for tomorrow

11   afternoon.  It's my hope that we'll begin jury

12   selection at some point tomorrow afternoon.

13          After my decision tomorrow we need to

14   address, counsel, your motion in limine.

15          MR. SCHECHTER:  Yes.

16          THE COURT:  People, I've not received any,

17   although -- and I trust that you'll have case law for

18   the Court as well as counsel.

19          MS. JOHNSON:  Yes, Judge.

20          THE COURT:  That you provide it to us as soon

21   as possible because I want to get that out of the way

22   before, obviously, jury selection starts.

23          Mr. Schechter, I know my law secretary has

24   been looking at some of these documents I indicated

25   that we received in response to the subpoenas.

                                                    ws

Proceedings                        354

1              I would like to take a look at them myself.

2      Hopefully, I'll be able to do it this evening.   I

3      haven't had a chance, obviously, today, and as soon as

4      I can I will provide them to you.

5              MR. SCHECHTER:  Thank you, Judge.

6              THE COURT:  Just in terms of as you leave, in

7      terms of jury selection, Mr. Schechter, I know you

8      haven't tried a case in front of me.

9              I don't know, Ms. Johnson, if you have.

10             MS. JOHNSON:  We were in the midst of it last

11     time.

12             THE COURT:  So you are somewhat familiar.

13             I don't use a questionnaire, Mr. Schechter.

14     I do cover topics with the jurors myself about

15     background, law enforcement, victim of a crime,

16     testifying in the grand jury or criminal/civil

17     proceeding.

18             I do cover rather extensively beyond a

19     reasonable doubt in my pre-charge, police witnesses,

20     that they should be treated like anybody else, burden

21     of proof as well as presumption of innocence.

22             I mean, there may be something I may be

23     missing from here.

24             If you want me to charge that no inference,

25     adverse inference, is to be drawn with respect to your

                                                        ws

Proceedings    .        355

1    client should he choose not to testify, please remind

2    me of that tomorrow.

3            MR. SCHECHTER:  I do, your Honor.

4            As a matter of fact, if my client doesn't

5    testify I do request that that be charged to the jury.

6            THE COURT:  Just let me know before we begin,

7    this way I'm alerted to it.

8            MS. JOHNSON:  Are we reporting here tomorrow?

9            THE COURT:  You're going to be reporting here

10   at least in the morning.  Where I'll be in the

11   afternoon is anybody's guess.

12           Twenty minutes the first round, 15 minutes

13   each succeeding round.

14           What we usually do is get about 75 people in

15   so, you know, by the time the second round is done

16   everybody has kind of heard each of your respective

17   voir dires.

18           MR. SCHECHTER:  My concern, your Honor, I

19   respect that kind of analysis, however under the facts

20   of this case, because of the nature of the charges and

21   because of the type of community we have here out in

22   Nassau County, the predispositions or the possible

23   prejudices of the individual jurors vis-a-vis the

24   allegations, which based upon what I know about the

25   case, could result in some inflammatory testimony on

                                                    ws

Proceedings                    356

1    the part of the complainant, I need to try to ascertain

2    from the individual jurors whether the fact of the

3    allegations of a case are such that they would not be

4    able to be fair and impartial and that's a subjective

5    issue.

6              THE COURT:  Well, of course it's a subjective

7    issue what I generally do is I usually -- I should have

8    prefaced my comments with regard to jury selection

9    saying I generally pre-charge -- not pre-charge, I

10   pre-screen.

11             I'm going to tell the jurors to expect to be

12   here for at least two weeks, that if anybody has a

13   planned vacation, medical procedure, business trip, any

14   issue with health care or elder care, that they can't

15   sit, that we get rid of them, if you will.  So the

16   panel of people that we have are people that we know at

17   least can sit.

18             And I generally will ask the jurors -- I'll

19   tell them a little bit about the case.  Obviously, I'm

20   not going to say too much and essentially say is there

21   anybody here, because of the nature of the charges,

22   feels that they cannot be fair and impartial.

23             I mean, obviously you can explore that in

24   your jury selection.

25             MR. SCHECHTER:  Okay.

ws

Proceedings                   357

1          THE COURT:  I'm not going to do an individual

2    questioning of the 14 prospective jurors as to their

3    subjective beliefs.  I think we'll know pretty quickly

4    who's willing to sit on this kind of case and who's

5    not.

6          All right, Ms. Johnson, please call this

7    detective.

8          MS. JOHNSON:  I will, Judge.  I have his cell

9    phone number, I'll call him.

10         THE COURT:  And get this time log here and

11   I'll see all of you here tomorrow about 10 o'clock.

12         MR. SCHECHTER:  Thank you, Judge.

13         (Proceedings adjourned to Wednesday, May 6th,

14   2009 at 10 o'clock a.m.)

15

16

17

18

19

20

21

22

23

24

25

                                                        ws

358

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF NASSAU : CRIMINAL TERM PART 80

3   -------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,   :  Indictment

4                                    :  No. 2415N/08
          -against-               :

5

6     HAROLD GOPAUL,                  :  Sex Abuse 1
                                     :

7                       Defendant.     :  Huntley/Mapp
     -------------------------------------------X  Hearings

8                        May 6, 2009

9                        252 Old Country Road
                        Mineola, New York

10

11   B E F O R E:

12              HONORABLE JAMES P. McCORMACK,
                   Acting Supreme Court Justice

13

14   A P P E A R A N C E S:

15          (As previously noted.)

16

             *     *     *     *     *

17

18         THE CLERK:  This is the continued hearing,

19   the People against Harold Gopaul, Indictment 2415N of

20   2008.

21         MS. JOHNSON:  For the People, Jamie Johnson.

22         MR. SCHECHTER:  On behalf of the defendant,

23   Harold Gopaul, Donald R. Schechter, 80-02 Kew Gardens

24   Road, Kew Gardens, New York.

25         THE COURT:  As I indicated at our bench

Proceedings                    360

1           MS. JOHNSON:  Yes, Judge.

2           With regards to the People's Molineaux

3    application, the People seek to introduce on our direct

4    case evidence surrounding the physical and sexual abuse

5    of the victim in this matter by this defendant that

6    occurred in Queens County that involves not only

7    slapping and hitting the victim, but particularly with

8    regards to the sexual abuse involving touching of her

9    vagina, touching --

10          THE COURT:  I'm sorry to interrupt you, just

11   give me one minute.

12          MS. JOHNSON:  Sure.

13          (Pause in the proceedings.)

14          THE COURT:  I'm sorry, go ahead.

15          MS. JOHNSON:  Your Honor, with regards to the

16   sexual abuse allegations the People seek to admit

17   evidence on our direct case regarding particular

18   instances of sexual abuse and the general course of

19   abuse between this defendant and the victim;

20   specifically, touching of her breasts, touching of her

21   vagina, instances of force, including threats, force

22   including physical abuse, as well as displaying of

23   weapons to the complainant.

24          Your Honor, it is our position, and the case

25   law we believe supports us, that this -- these prior

ws

1   bad acts of sexual abuse and physical abuse, not only

2   the circumstances surrounding them, but the threats

3   that accompany them, are relevant and probative and

4   permissible under Molineaux.

5           With regards to motive, intent, absence of

6   mistake by the defendant, we submit that it is

7   admissible to explain all those factors.

8           It is also admissible to show the narrative

9   of the events that occurred in Nassau County as well as

10  why the victim disclosed the abuse when she did, how

11  she disclosed it, who she disclosed it to, the timing

12  of her disclosure and to explain the relationship she

13  had with this defendant.

14          As the Court's aware, the 14 counts in the

15  indictment all have an element of force that the People

16  have to prove beyond a reasonable doubt, the element of

17  force being in the mind of the victim, how she felt and

18  her state of mind regarding why she feared the

19  defendant.  Not only why she feared him at the time of

20  each instance, but how that fear progressed.

21          So, first, with regards to motive and intent,

22  I provided counsel and the Court with two cases,

23  People v. Jackson and People versus Brown, where

24  particularly in sex abuse cases - and you'll excuse me,

25  I'm just going to pull that out now - in

1    People v. Jackson the court held that in sex crimes

2    where there is prior sexual abuse against a particular

3    victim, when a defendant expresses his desire to engage

4    in future sexual misconduct with that same victim, it

5    is evidence of that -- such as that to establish the

6    defendant's motive and the defendant's intent.

7              Here, the defendant himself on video and the

8    victim herself will testify that the defendant

9    expressed to her that he wished for her to -- that he

10   wished that he be the one and that he wished to

11   escalate their relationship to future sexual contacts,

12   particularly sexual intercourse.

13             We submit that People v. Jackson and

14   People versus Brown supports our introduction of that

15   statement and the testimony surrounding his future

16   intent to engage in additional sex abuse with her.

17             People v. Jackson is a Court of Appeals case

18   from 2007 where, in a rape prosecution, evidence of

19   prior uncharged sexual assaults against even another

20   person was admitted appropriately to demonstrate

21   defendant's future intent to rape the victim in that

22   particular trial.

23             There was a statement that the witness was

24   able to testify to where the defendant expressed his

25   future intent to her for his intent to engage in a sex

Proceedings                363

1     crime against her.

2            That's exactly the situation we have here.

3     We don't even have speculation as to whether or not the

4     victim knew about that intent.  The defendant himself

5     on the video and the victim herself heard the

6     defendant's statement of the future intent as he

7     expressed it directly to her.

8            With regards to People versus Brown, that is

9     a Third Department case from 2007.  In

10    People versus Brown the court held where there was

11    statements of future intent by the defendant against

12    the very same victim, the court ruled, and the

13    Appellate Division upheld, that this was probative and

14    admissible to establish a future intent to have sexual

15    contact with the victim as well as to show the threat

16    of the defendant's future desires.

17           Not only did the court rule that it was

18    probative and admissible for intent, but the court also

19    indicated that it was relevant background information

20    to explain the events that were the subject of the

21    trial.

22           Your Honor, even more importantly, not only

23    the statement of his future intent, but it is the

24    circumstances surrounding it that the jury must be made

25    to understand.

Proceedings                    364

1           None of the defendant's statements of future

2      intent or his threats to her or the force occurred in a

3      vacuum.  They all occurred during other instances of

4      sexual conduct and sexual abuse.

5           It is not as though the defendant simply

6      pulled her to the side during dinner and said, "You're

7      going to be the one and we're going to have sex on a

8      particular date."

9           It was during other instances of abuse where

10     he was touching her vagina, placing his mouth on her

11     vagina, touching her breasts and having her touch his

12     penis that these conversations took place.

13          As to absence of mistake, your Honor,

14     People versus Young, which is a case from 1984, touches

15     upon not only in sex crimes why this type of testimony

16     is evidence to show lack of mistake, but the court even

17     goes so far to explain that in situations where there

18     is an intimate relationship, and I don't mean a sexual

19     relationship, a relationship of trust and a

20     relationship of authority, the trier of fact must

21     understand how it is that the defendant, when there's

22     an element of force, exerted his control and exerted

23     his authority to engage in the sexual abuse.

24          In People versus Young, that's a

25     Fourth Department case from 1984, the court goes

ws

Proceedings                    365

1   through all the elements of Molineaux and goes so far

2   as to say, "Where evidence of the prior uncharged

3   sexual contacts between the defendant and his daughter

4   was directly probative of the crime charged and was

5   necessary to aid the fact finder in determining the

6   defendant's intent, it was admissible."

7           The court even says that in situations to

8   convict a father of an intimate caressing touch, even

9   of a sexual part, the court must be careful to have

10  clear and convincing evidence beyond a reasonable doubt

11  of the defendant's intent.

12          And it was because of the court's concern

13  about the intimate authority relationship and

14  father-figure relationship in Young that the court

15  allowed evidence of the defendant's prior touching to

16  show that it wasn't simply a mistake of a

17  father-daughter relationship, it was actually to show

18  the motive and to show the intent and to show the lack

19  of mistake because of the prior abuse.

20          THE COURT:  Wait, let me just interrupt you

21  for a moment.

22          You started off by saying that you're looking

23  to show prior instances of sexual abuse as well as a

24  course of history of sexual abuse between the defendant

25  and the complainant.

                                                        ws

Proceedings                    366

1           Obviously, there comes a point, I think you

2      would agree with me, that in terms of the number of

3      instances you're looking to elicit that are not part of

4      your indictment, there's going to come a point where

5      the scale is going to tip to the point where the

6      evidence is going to become more prejudicial than its

7      probative value for the reasons that you're looking to

8      introduce.

9           You've mentioned on a number of occasions an

10     incident where you claim that your complainant said

11     that the defendant here told her, "I want to be the

12     one," and had spoke of a future date in which he was

13     going to have sexual intercourse with the complainant.

14          And I think if I understand your theory of

15     your case, that's what prompted her to go to the police

16     or leave the house, whatever the circumstances may be.

17          I would hope that you're not looking to

18     introduce every prior act that he's charged with in

19     Queens County.  I don't know how many there are.  From

20     speaking to both you and Mr. Schechter it's obvious

21     that there's more instances -- and maybe I'm wrong, but

22     it sounded as though there's more instances he's

23     currently facing charges on in Queens as opposed to

24     this court.

25               MS. JOHNSON:  That's correct.  We are not

                                                      ws

Proceedings                    367

1      looking to introduce every single instance in Queens,

2      we're looking for the appropriate balance so the jury

3      can understand.

4                  THE COURT:  I know what you're espousing

5      here, but for me to be able to give a ruling and for

6      Mr. Schechter, obviously, to be able to respond, what

7      instances are you -- instead of telling me

8      generalities, what is it are you looking to elicit?

9                  MS. JOHNSON:  We're looking to elicit when it

10     was that the abuse began.

11                 THE COURT:  In terms of the time?

12                 MS. JOHNSON:  Correct.

13                 The nature of the progress of it without even

14     particularizing dates, your Honor.  If she can even

15     say, "While I was a certain age," or over the course of

16     a year it progressed from a touching to a kissing to

17     more invasive touching, that type of conduct.

18                 We're not looking for the victim to take the

19     witness stand and make out, beyond a reasonable doubt,

20     all the elements of the Queens indictment.  That's not

21     what the purpose of this is.

22                 The purpose is so that the jury is not seeing

23     a girl on the witness stand saying that her step-father

24     or father abused her without understanding that this is

25     not just something that happened in a vacuum.

Proceedings                    368

1              In fact, there was a grooming process in

2    Queens County and a grooming process where this

3    behavior not only escalated, but the threats escalated,

4    the abuse escalated and the relationship changed.

5              I think it's important that the jury

6    understand --

7              THE COURT:  Well, relationship changed in

8    what sense?

9              From father-daughter to sexual encounters

10   that did not have the element of force, then at some

11   point -- I don't know.

12             MS. JOHNSON:  Yes, Judge.

13             THE COURT:  At some point there was an

14   element of force that was introduced into it?

15             MS. JOHNSON:  Yes, Judge.  At first there was

16   not an element of force and the touching was, I hate to

17   say, as a statutory, but there was no threat, there was

18   no coercive environment.  It was not a threat as we

19   have in this environment, but a threat in the course of

20   environment simply based on the father figure

21   relationship and where it occurred and how it occurred.

22             The defendant would say to this girl, to his

23   daughter, don't tell anybody.  Whether that would rise

24   to the level of force is certainly an argument, but

25   that type of coercive environment was how the

                                                    ws

Proceedings                    369

1    relationship began and how it progressed into actual

2    force, both expressed and implied, and it is because it

3    started out as don't tell anybody, happening in

4    private, happening in their own home, in the safety of

5    her home, which is why she didn't disclose and she

6    trusted him and why the relationship was able to

7    escalate.

8             There is a specific instance that occurs in

9    the bathroom, for example, in Queens County where they

10   were in the bathroom together.  The defendant is making

11   comments about her breasts, making comments about her

12   body, picks her up, puts her on the sink and puts his

13   mouth on her vagina and begins performing oral sex on

14   her while her own mother is in the home.

15            We're not here to litigate those instances,

16   we're here to have the victim explain that it is this

17   type of behavior that put in her mind a fear to even

18   tell her mother what was going on because it was during

19   that type of abuse that the defendant said to her,

20   "Don't tell anybody.  You have to be quiet.  Nobody is

21   allowed to know about this."

22            It's very difficult --

23            THE COURT:  Is that coupled with some overt,

24   or perhaps not overt, threat of force?

25            MS. JOHNSON:  That particular instance was

ws

Proceedings                    370

1      not a direct threat of force, but there were instances

2      in Queens where the defendant did threaten her with a

3      knife and threatened to cut her finger off.

4              That force that occurred that is part of a

5      charge in Queens is certainly relevant and probative to

6      establish the force elements that we have in these

7      charges because, we may cross county lines, but the

8      threat in her mind began in Queens and the threats of

9      him cutting her finger off began in Queens during other

10     sexual abuse.

11             As to the narrative aspects of how the abuse

12     took place, certainly it's relevant and probative to

13     explain how her relationship with the defendant

14     escalated, how he escalated the abuse, how it was that

15     he was able to progress the relationship from touching

16     to kissing, to touching under the clothes, to touching

17     with force.

18             That escalation is necessary for the jury to

19     explain that one day he just doesn't pick her up, drive

20     her to Nassau County and start touching her vagina.

21     That's not what happened here and we're unfortunately

22     in a position here -- and I believe it is unfortunate

23     that we are trying to case before the Queens case is

24     being tried and we're in a position where, because

25     we're trying this case first, it's even more important

Proceedings                  371

1   for the jury to understand what happened preceding what

2   happened in Nassau County.

3         THE COURT:  Well, quite frankly, I think that

4   if you were trying -- the Queens case had already been

5   tried, obviously -- or the incidents here had predated

6   the Queens case, I don't think I would be entertaining

7   your application at this point.

8         MS. JOHNSON:  If the Queens incidents

9   occurred after this case I agree with your Honor, it

10  might not be relevant and probative to her state of

11  mind because her state of mind wouldn't have had -- she

12  wouldn't have known about the force and she wouldn't

13  have known about the threats because it happened after.

14        THE COURT:  Because obviously I'm thinking,

15  should I grant your application, that I have to

16  obviously limit the number of instances.

17        MS. JOHNSON:  I agree with your Honor.

18        THE COURT:  So what is it that you're

19  proposing?

20        MS. JOHNSON:  We would ask that the victim be

21  able to testify as to when the abuse began, what type

22  of touching and what type of contact occurred in Queens

23  County, what type of threats and how the threats

24  occurred, under what circumstances.

25        Obviously, if I was to ask her on the witness

                                                    ws

Proceedings                372

1    stand, "When was the first -- how did the relationship

2    change," I would obviously prepare my witness not to

3    get up on the witness stand saying on this date and

4    this date this is how it began.

5              It would be a narrative of, "He began

6    touching me when I was 13 or 14 in my home and the

7    touching escalated to kissing, it escalated to under

8    the clothing."

9              And I would ask her, similar to how the

10   questions were sort of posed to her in the grand jury,

11   "And were you in fear of him," an element which I must

12   prove.

13             "Why was it that you were in fear of him?"

14             "Because he had threatened me before.  And he

15   had threatened me before when he was touching me.  He

16   threatened to cut my fingers during other instances

17   when he was touching me," that type of questioning,

18   your Honor, because that is how the background

19   information should come in and, obviously, as your

20   Honor has the ability to, which most of the cases

21   reference, the Court has the ability to fashion a

22   curative instruction to the jury as to how they are to

23   consider this evidence, be it as narrative, be it as

24   motive, be it as intent.

25             And we would agree with the Court that the

Proceedings                    373

1    Court should fashion for the jury so that they do

2    understand why the information is being offered.  I

3    would agree and I'm assuming Mr. Schechter would make

4    this argument, the Court has the ability to give the

5    curative to the jury, not only before the witness

6    testifies, but after she testifies and even during the

7    jury charge.

8              But we're in a situation here where, as an

9    element we must prove being force, the prosecution

10   should not be hampered because that force occurred

11   during other bad acts that are charged in another

12   indictment.

13             It is the very reason that it is probative,

14   because it occurred during other sexual abuse, during

15   other instances for which he's charged.

16             Your Honor, the Court had provided -- and I'm

17   going to get to the Leeson case in a moment, but also

18   with regard to prompt outcry and the timing of her

19   disclosure, I don't believe it's in question at this

20   point that the victim did not disclose the abuse for

21   several years.  It began and it escalated and finally

22   at the point where the defendant had said to her that

23   she was going to be the one -- that he was going to

24   have sexual intercourse with her, that she decided to

25   run away from home.

                                                    ws

Proceedings                        374

1              In People versus Archibald, which is a 2007

2       case I provided to the Court, that is a

3       First Department case, the court held that evidence of

4       prior sexual abuse is relevant to explain the timing of

5       the victim's reporting and why she waited more than a

6       year to report.

7              Here she not only waits to report because

8       she's in fear, but because there was a relationship of

9       trust and she was afraid to tell anybody what, not a

10      stranger, but what her own father was doing to her.

11             THE ATTORNEY:  Objection, that's a

12      mischaracterization of the relationship.

13             MS. JOHNSON:  Stepfather, that he's raised

14      her since three years old, which the defendant on the

15      video refers to her as his daughter anyway, but not

16      blood, a stepfather.

17             Here, where the abuse takes place over years

18      and the threats occur during other instances, that is

19      relevant to why she disclosed and when she disclosed

20      because certainly she's going to be able to testify

21      that she didn't outcry to her best friend, she didn't

22      outcry to her mother and she didn't feel safe outcrying

23      to either one of them for quite a long period of time.

24             THE COURT:  Let me ask you, when does she --

25      when you talk about the allegation that the defendant

Proceedings                    375

1    claimed he wanted to be the one, is that -- in terms of

2    context, does that also happen when he allegedly says

3    to her, "We're going to have sexual intercourse on a

4    particular date?"

5              I mean, I may be incorrect in my knowledge,

6    but I thought that he had, according to your

7    allegations, picked a certain date that he was going to

8    have these -- have this sexual intercourse with her and

9    that's what prompted her to leave the house.

10             MS. JOHNSON:  He did, Judge, he did.  He gave

11   her a date and he gave her a specific date that they

12   were going to have intercourse and I believe days

13   before that was going to happen, or if not a day

14   before, that she packs her bags and runs away.  But it

15   is that progression up to that point of where he

16   threatens that they're going to have intercourse that

17   all those acts occur in Queens County during other

18   instances of sexual abuse.

19             But, more importantly, even more so with the

20   element of force, as the jury charge reads, it is the

21   state of mind of the victim that controls.

22             It is not whether or not the defendant was

23   going to have sex with her or even really planned on

24   having sex with her, which we believe he was, but,

25   either way, People versus Thompson, which I've provided

                                                      ws

Proceedings                            376

1    to the Court, outlines -- that's a Court of Appeals

2    case from 1988, outlines what it is that must be

3    established in order to establish this element of force

4    and as the court says, "Whether threats amount to

5    forcible compulsion or not is not what the defendant

6    would or could have done, but it is the victim

7    observing the defendant's conduct, fearing he would or

8    might -- "  " -- what he might do if she did not comply

9    with his demands."

10              It is exactly that fear and exactly the

11   defendant's conduct that is relevant here and that

12   conduct occurred in Queens during other instances of

13   sexual abuse.

14              In fact, the court in Thompson says that

15   where the defendant is -- was more than twice the

16   victim's age and was in a position of power, this

17   evidence was even more so relevant and probative.

18              Here there is no question there was an

19   authority figure in possession of power.  It was her

20   stepfather, somebody who has raised her since she's

21   three years old.

22              People versus Thompson also says that these

23   prior instances are relevant and probative to show what

24   the victim believes and what her fear was and what her

25   state of mind was at the time that she not only

                                                    ws

Proceedings                          377

1     disclosed, but how it was that that fear escalated and

2     how that fear came to be.

3              People versus Sehn, a case I provided to the

4     court as well, very similar to the situation we have

5     here, your Honor, where the defendant and the victim --

6     defendant was a caregiver of the victim and an element

7     the People had to prove beyond a reasonable doubt was

8     forcible compulsion.  The court says, this is a

9     Third Department case from 2002, "In this case it is

10    undisputed that the defendant was substantially older

11    and larger than the victims and they looked up to him

12    as an authority figure and a caregiver."

13             And it was because of that intimate

14    relationship that the court held that the state of mind

15    produced in the victim to establish the elements of

16    force was even more so relevant because of the nature

17    of the relationship between the parties.

18             THE COURT:  Ms. Johnson, let me ask you, what

19    instance in Queens that you can make a good-faith

20    argument for with respect to an allegation of force are

21    you looking to put forward?

22             MS. JOHNSON:  The defendant threatens to cut

23    her fingers off if she tells and while he's abusing

24    her.

25             THE COURT:  All right, my law secretary has

Proceedings                    378

1      given me the grand jury minutes.

2                  MS. JOHNSON:  Which, the Queens or Nassau?

3                  THE COURT:  October -- Nassau, it appears.

4                  MS. JOHNSON:  Okay.

5                  THE COURT:  And it's on Page 24 of October

6      15th, 2008.

7                  MS. JOHNSON:  Your Honor, I'm going to just

8      ask the Court -- I have the Rosario being copied so I

9      don't have the minutes with me.

10                 THE COURT:  From looking at it here it

11     appears as though there's questions being asked of her

12     of times that she was threatened in Nassau County and

13     in that, in one of her responses, she talks about

14     having her -- that he was going to cut her finger off.

15                 Now, that's Nassau County.

16                 MS. JOHNSON:  Yes.

17                 THE COURT:  So you're saying there's

18     something in Queens?

19                 MS. JOHNSON:  Yes, Judge, he had threatened

20     her in Queens as well.  I do not have the grand jury

21     minutes from Queens County for your Honor, they're

22     being copied, but the force began in Queens, him

23     threatening to cut her fingers off, threatening to bury

24     her and tell her where she was going to be buried, that

25     all happens in Queens as an ongoing pattern of sexual

                                                    ws

Proceedings                    379

1    abuse.

2              There are instances charged in this

3    indictment --

4              THE COURT:  Let me ask you this.

5              How -- in terms of recency, how soon or how

6    close in time, should I say, is the incident that

7    you're looking to elicit in Queens to the incidents in

8    Nassau County?

9              MS. JOHNSON:  You know what, I would have to

10   take a look -- are you talking about the specific

11   instance where he threatens to cut her fingers off?

12             THE COURT:  I'm talking about whatever

13   incident of force that you alleged has occurred in

14   Queens County that you're looking to elicit as part of

15   your Molineaux application.

16             MS. JOHNSON:  Well, there is force in the

17   expressed threat, your Honor, and there's force in the

18   coercive aspect.

19             The force in the coercive aspect is the times

20   where he tells her, "Do not tell anybody.  Let's keep

21   this a secret," and he tells her to shh (ph), in those

22   exact words, and what that's what her testimony in

23   Queens is.

24             The incidents of actual force, physical force

25   with the threat of cutting her finger, occurs, I

                                               ws

Proceedings                    380

1    believe, a year before.  It's at least while she's in

2    high school and it occurs, I believe, in their kitchen

3    in their home in Queens.

4                    But what --

5                    THE COURT:  A year before the incident in

6    Nassau County?

7                    MS. JOHNSON:  I would have to take a look at

8    the grand jury minutes, your Honor.  I'm sorry, I don't

9    have them, I have them being copied, the Queens County

10   grand jury minutes, because I specifically --

11                   THE COURT:  I mean -- off the record.

12                   (Discussion held off the record.)

13                   THE COURT:  Back on the record.

14                   MS. JOHNSON:  But with regards to the force,

15   it's not just -- and when you read the charge of force

16   it's not just the expressed threat it's also the

17   implied threat and an implied threat is not something

18   that just happens on a one-time event.

19                   An implied threat is the progression of him

20   telling her, "Do not tell anybody.  Do not tell your

21   mother.  Do not tell anybody what's going on."

22                   In fact, the defendant admits it himself on

23   the video that he told her not to tell anybody and he

24   says he did it in private so nobody would see.

25                   I think it's even more relevant in this case,

Proceedings                    381

1   Judge, because none of the crimes charged in the

2   indictment of statutory, none of them have to do with

3   age.

4           Every single crime, every single charge in

5   the indictment requires us to prove that element of

6   forcible compulsion.

7           It would hamper the People and it would

8   hamper the prosecution and misguide the jury to believe

9   that the force just occurred in Nassau on these

10  particular dates.  They need to be made to understand

11  that this force, both expressed and implied that was in

12  her mind in Nassau, occurred during particular

13  instances of abuse in Queens.

14          THE COURT:  Well, in the counts of the

15  indictment in this case is it a question of express

16  force that you've alleged?

17          MS. JOHNSON:  In certain instances there was

18  express force with the weapon.  In other instances it

19  was the implied force, which is why she testifies in

20  the grand jury that he had threatened her before and

21  that fear continued during the abuse in Nassau County.

22          It is not during each instance and the way

23  the indictment is charged, there's particular dates and

24  there's time frames.

25          More importantly, during those time frames we

                                                        ws

Proceedings                    382

1    are not alleging that on each date he threatened her

2    with a knife.

3            What we are alleging and what we have pled is

4    that during those time frames where she admits that

5    there wasn't always a knife and he didn't always

6    threaten her with a knife, it was her mind and her fear

7    that had begun in Queens that was the force that she

8    felt and the threat that she felt in Nassau during the

9    periods of the abuse.

10           THE COURT:  And your example of implied force

11   that occurred in Queens was allegations that he told

12   her don't tell anybody?

13           MS. JOHNSON:  Even more than that, when he

14   threatens to cut her --

15           THE COURT:  That's express, I would say,

16   threat of force, would you agree?

17           MS. JOHNSON:  I would agree with that, Judge.

18           But as to the implied, I believe that it's

19   implied in the nature of their relationship.  When a

20   father tells his daughter during a course of abuse,

21   course of sexual abuse, not to tell anybody and that

22   he's going to either bury her or show her where he's

23   (sic) buried or this is their secret, that is certainly

24   implied force, based on not only what he says and

25   implies to her, but based on their relationship.

Proceedings                    383

1          Even the fact that he tells her that she is

2    going to be the one and he wants to take the

3    relationship further, that, I would submit to the

4    Court, is also implied force and implied coercion

5    because it is an authority figure in a position of

6    power that's saying this to her.

7          .       THE COURT:  All right, anything else you want

8    to tell me?

9          MS. JOHNSON:  There was two other cases I

10   handed to the Court, People versus Chaffee and

11   People versus Cooke.

12          Your Honor, in anticipation of what the

13   defense is going to be, I would venture to guess it's

14   going to be one of two things; it either didn't happen

15   and, if it did, it was consensual.  I can't, in my

16   mind, think of another avenue that they would go, but

17   I'm obviously not -- that's my best guess.

18          People versus Chaffee and People versus

19   Cooke, the court held that prior convictions for

20   sexually abusing the same very victim, admissibility of

21   that, outweighed any prejudice, particularly when the

22   defense was that it never occurred or the allegation is

23   a lie.

24          Here, where we anticipate that one of those

25   two things is going to be the defense, certainly it

ws

Proceedings                        384

1    would be admissible.

2              Your Honor, we seek to admit this evidence on

3    our direct case both through her testimony and through

4    the video, through the defendant's own statements on

5    the video.

6              I don't know if the Court wants to address

7    the issue of the video now because we haven't heard

8    your Honor's decision on the hearing, but one factor

9    that the Court, I believe, needs to consider is that

10   assuming your Honor allows the video to come into

11   evidence, we would argue to your Honor that the

12   entirety of the video would be admissible to show his

13   motive, to show his intent, not just from her mouth,

14   but it's certainly relevant and probative out of his

15   own mouth.

16             And one of the things that -- one of the

17   burdens that the People have is to prove the

18   voluntariness of a confession to the jury, to the fact

19   finder, beyond a reasonable doubt.

20             The entirety of that video, we submit to the

21   Court, shows the voluntariness of his statement.  It

22   would certainly hamper the People, and I believe it

23   would be patently unfair, for the Court to allow part

24   of a video to come in whereas the totality of the video

25   is what the jury must look at to determine the

                                              ws

Proceedings                385

1    voluntariness of his statements.  They can see him with

2    his own eyes (sic) and determine for themselves that he

3    wasn't coerced, an issue that the jury has to consider

4    on their own.

5              So --

6              THE COURT:  For all those reasons.

7              MS. JOHNSON:  -- in sum, Judge, we would

8    submit that both the victim's testimony and the video

9    are admissible under Molineaux to show not only his

10   motive, his intent, but it's absolutely necessary

11   background material, it is imperative to the issue of

12   force that we have to prove beyond a reasonable doubt

13   and this jury must be made to understand that these

14   actions did not occur in a vacuum, there was a grooming

15   process going on here, there was additional abuse that

16   caused her the fear and it goes directly to her

17   credibility because it goes directly to why she

18   outcried, who she outcried to and what her state of

19   mind was.

20             THE COURT:  Mr. Schechter?

21             THE ATTORNEY:  May it please the Court, your

22   Honor, I think that counsel has, in fact, put the cart

23   before the horse simply because all of her Molineaux

24   application relates to what the cases have showed from

25   the last hundred years or 80 years since Molineaux has

                                              ws

Proceedings                    386

1     been decided and that is prior uncharged crimes.

2          My client is currently being charged in

3     Queens County with not only forcible crimes, but

4     statutory crimes against the same victim.

5          As such, your Honor, the cases hold -- and I

6     cited Bennett and Betts in my motion in limine.  The

7     cases hold that you cannot place an accused person in

8     the position of having to make a Hobson's choice.

9          In the event this material comes into

10    evidence, he's in the impossible position of having to

11    decide, "If I testify to defend myself of what I'm

12    being accused of her, including the things I'm being

13    accused of in Queens, then I'm going to be

14    incriminating myself in Queens County."

15         "However, if I do not testify, then the

16    allegations of the complainant regarding what happened

17    in Queens County go unchallenged and go unexplained,"

18    and  therefore I am hamstrung and he is hamstrung

19    because he can't -- there's no way to make a decision

20    here.  It's between whether you're going to get eaten

21    by a tiger eaten by a lion and the law protects him

22    from that.  That's why Molineaux is restricted to prior

23    uncharged crimes.

24         So everything counsel said, and I'm going to

25    get to the applicability of Molineaux in a second, is

                                                    ws

1    completely in opposite because the defendant's right to

2    be protected against self-incrimination outweighs the

3    desire of the People to basically show propensity

4    evidence.

5            What they're trying to do, they make all

6    these nice pronouncements; a limiting instruction could

7    be made from the Court to the jury.

8            Your Honor, and I have been around a long

9    time, you cannot get a jury to ignore, "I've been

10   abused for four years.  I've been -- he's taken his

11   mouth on me and by force.  He threatened me with this

12   in Queens.  He did this in the house in front of the

13   kids.  He did this -- " how are you going to ask a jury

14   to disregard the nitty-gritty of those statements, only

15   to be utilized to determine his intent here?

16           My client made a confession and on the

17   confession - which we haven't gotten a determination

18   yet, but assuming, arguendo, that the Court grants the

19   People the right that that confession is admissible -

20   my client made statements on that tape concerning these

21   instances and Queens, they overlap, although he did on

22   one instance say, "400 Community Drive we did this,"

23   and so on and so forth, denied the force.

24           However, the People have represented that the

25   complainant is going to testify that in Nassau County

ws

1    force was utilized.  They went out of their way to get

2    this knife, supposedly that was in the car.  They

3    allege that he said, "I'm going to bury you here,"

4    whatever, that these threats were made, they were in

5    her head.

6              The fact is, he is being charged in

7    Queens County with violent and statutory crimes.

8              How can I, as his lawyer, put him on the

9    witness stand and incriminate him in a case for which

10   he stands to get 25 years consecutively with this?

11             How is he going to defend himself?

12             THE COURT:  Let me ask you this.

13             Who says or why do you pose it as though he

14   has to defend himself from those Queens charges in this

15   case?

16             MR. SCHECHTER:  Because if the People --

17             THE COURT:  That's a decision that you and

18   him --

19             MR. SCHECHTER:  No, your Honor, with all due

20   respect --

21             THE COURT:  No, it's a decision,

22   Mr. Schechter, that you and him will have to make.

23             Obviously, if I allow the People to introduce

24   this evidence in their direct case and should your

25   client testify, I'm certainly not going to allow the

Proceedings                    389

1    People to cross-examine your client with regard to the

2    Queens incidents unless he makes a choice that he's

3    going to refute those charges here.  This jury is not

4    going to be considering whether he's guilty or not

5    guilty of the Queens charges.

6           MR SCHECHTER:  With all due respect, your

7    Honor, it renders the proscriptions of Bennett and

8    Betts moot.

9           THE COURT:  Well, let's get to that because

10   I'm glad you bring that up.

11          If you take a look, Mr. Schechter, and I have

12   looked at these cases, one thing that you'll notice

13   that with respect to the decisions both in Bennett and

14   Betts, in the context of how the Court of Appeals ruled

15   in those cases, it deals with the proscription of

16   cross-examining a defendant regarding pending charges

17   for credibility purposes only.

18          In other words, it comes up in the context of

19   a Sandoval ruling, would you agree?

20          MR SCHECHTER:  Yes.

21          THE COURT:  As opposed to a Molineaux ruling.

22          MR SCHECHTER:  They touch on that, but please

23   proceed, your Honor.

24          THE COURT:  Now, if you see in the case that

25   came out just this week, and I gave it to both counsel

Proceedings                          390

1     a day or two ago, People versus Leeson, it's clear that

2     in these types of cases - and when I say these types of

3     cases, cases involving allegations of sexual

4     misconduct - particularly as here where it relates to

5     the same complainant and the same defendant, the

6     Court of Appeals has said that so long as the evidence

7     is not for propensity purposes, that the prior bad acts

8     will be admissible for purposes that bear -- for

9     purposes that are material to the issues that a jury is

10    going to consider.

11              So obviously the Court of Appeals is saying

12    that even these prior bad acts is admissible on the

13    People's direct case, so long as it's not for

14    propensity purposes.

15              My question to you is how, then, do you

16    reconcile the fact that the Court of Appeals is saying

17    this type of evidence is admissible with the Betts and

18    the Bennett cases?

19              Because in the Betts and Bennett cases it

20    talks about, unless I'm misreading the cases, where a

21    DA is looking to cross-examine the defendant regarding

22    pending criminal charges for credibility purposes as

23    opposed to Molineaux issues.

24              So, while the Betts and Bennett cases are

25    instructive with regard to some of the things that you

ws

Proceedings                    391

1   bring up, there is, in my view, a rather significant

2   distinction in the way those cases are decided as

3   opposed to what we're dealing with here.

4            MR SCHECHTER:  I respectfully take --

5   disagree with the Court in this sense.

6            The court dealt with the uncharged crimes in

7   those two cases with respect to cross-examination of a

8   defendant on the witness stand in order to prevent him,

9   basically, from incriminating himself.

10           The same issue goes -- relates in this case

11  under a Molineaux theory because it would take all of

12  the steam and protections out of that ruling to permit

13  the District Attorney to go backdoor here and offer on

14  her direct case evidence of those crimes.

15           We would be, then, in a position to have to

16  defend those crimes here as well as Queens County, your

17  Honor, because the jury, and with all due respect, no

18  matter what limiting instruction the Court gives, no

19  matter what the Court says, this jury is going to then

20  be shown by the District Attorney, through the

21  testimony of the complaining witness and through this

22  admission, that the complaining witness has been -- my

23  client is being charged, rather, with crimes in

24  Queens County for which he's indicted, crimes for which

25  he is not charged here and I respectfully submit it's a

ws

Proceedings                    392

1      68 count indictment in Queens County, there's no other

2      reasonable view of this evidence other than the

3      People's desire to show propensity here.

4              The defendant would then have to take the

5      witness stand or elect not to take the witness stand

6      because he then has to face B felonies in

7      Queens County, he takes the witness stand regardless of

8      any desire to -- or limitation of the Court's --

9      limiting the People to cross-examining my client, the

10     other material comes in.  It's going to come in

11     regardless.

12             So whether he takes the stand here or doesn't

13     take the stand here, he either incriminates himself in

14     Queens County or he's going to incriminate himself in

15     this case and it just makes no sense, Judge.

16             THE COURT:  Your concern, and that's what the

17     concern of the Court of Appeals was in the Betts and

18     Bennett cases, is a defendant waiving his

19     self-incrimination rights regarding a pending criminal

20     charge and, again, and it bears repeating, that in that

21     particular case the People were looking to

22     cross-examine the defendant regarding pending charges

23     in another county for credibility purposes.

24             I can assure you, and that's what your

25     concern is, that your client, by testifying here in

ws

Proceedings                    393

1      this case, is going to be giving up or foregoing his

2      Fifth Amendment right to not testify with regard to the

3      Queens charges, but I say to you that the only way that

4      that would happen would be if he decided to testify in

5      this case regarding the criminal charges or the acts

6      that are pending in Queens because certainly I'm not

7      going to allow the People to cross-examine him about

8      those Queens instances, should he take the stand here,

9      unless, again, unless he brings -- he opens the door,

10     if you will, as we all know, to that.

11            MR SCHECHTER:  Your Honor, hypothetically --

12            THE COURT:  And I think that protects your

13     client's Fifth Amendment rights with regard to the

14     Queens case and it preserves his right to refute, if

15     you will, the charges that this jury is going to

16     consider here.

17            MR SCHECHTER:  With all due respect, it does

18     not, your Honor, because.

19            THE COURT:  How does it not?

20            MR SCHECHTER:  Because if he's not going to

21     be cross-examined, if he's not going to be examined

22     about the cases in Queens County, then the jury is

23     going to hear the complainant's testimony

24     uncontradicted, he will be then -- they will assume he

25     will have to, if he's on the witness stand, refute

                                                        ws

Proceedings                          394

1    those charges, because if he doesn't refute the charges

2    they're going to absolutely draw an inference that he

3    must be guilty of those charges and we're going to be

4    in the same position.

5              It's a backdoor desire by the prosecution to

6    get un -- inadmissible, rather, evidence before this

7    jury which is in the nature of proclivity evidence,

8    that he is predisposed to commit this crime.

9              THE COURT:  That's a different argument in

10   itself.  That's an argument against a Molineaux

11   application.

12             MR SCHECHTER:  But what I'm saying is,

13   they're related.

14             Utilizing this vehicle to get this evidence

15   before this jury is a backdoor way of violating Betts

16   and Bennett.  That's what they're trying to do.

17             The fact that Betts and Bennett spoke of

18   cross-examination of a defendant taking the witness

19   stand does not, in any way, limit the prejudice to my

20   client in the event this material comes in because then

21   he's faced with this -- still going to be faced with

22   this obstacle and he has to make a decision, "Do I get

23   on that witness stand and risk incriminating myself in

24   Queens or do I keep quiet and risk that the jury hears

25   this material and it's unrefuted?"

                                                    ws

Proceedings                    395

1              That is not a choice, I respectfully submit,

2     that the Court of Appeals says a defendant should make.

3              I would also like to quote from some of the

4     cases that counsel has, in fact, cited.

5              And the Molineaux issue, obviously, overlaps

6     to some degree, Judge.

7              Firstly, your Honor, she cites - when I say

8     she I mean Ms. Johnson - People v. Alvino.  It's the

9     first case that she cites here.

10             Now, on Page 17 in the dissent, which also

11    reiterates some of the theory that the majority

12    utilized, the dissent says, that's Page 17, the second

13    paragraph on the left two-thirds down the page, "The

14    suggestion that evidence could not be received to show

15    that the same man picked the pocket of the same person

16    on several successive occasions here together does not

17    apply to this case," meaning this particular case, "but

18    implicit is the fact that the court does not permit

19    this kind of inquiry," and they justify it by saying

20    the pickpocket knows when he steals, there could be no

21    mistake about it, whereas here there could have been a

22    mistake.  There's no allegation of a mistake.

23             How is it going to be a mistake?

24             Is there a mistake whether you sexually

25    abused another person?

                                                        ws

Proceedings   396

1          No, either you did or didn't, period.

2          Now, that's one.

3          She also cites People versus Marji.

4          There is nothing here with respect to the

5     relationship.  The relationship is conceded.  They know

6     about the relationship.  She says she wants to show a

7     relationship between the two of them.  That's already

8     conceded.  He concedes it in his statement and she's

9     going to testify to that.

10          The only real difference is was forced used,

11     assuming that statement comes in, and I'm going to ask,

12     again, that be limited as part of my application.

13          She also cites People v. Jackson as she

14     indicated before.

15          Jackson again says in a rape prosecution

16     evidence of a prior uncharged sexual assault,

17     uncharged, Judge.

18          And the court says in that case, "The

19     uncharged rape in itself was inadmissible under

20     People v. Molineaux, but I conclude that the trial

21     court had discretion to admit evidence of the rape to

22     give meaning to the statement."

23          The statement was made, basically, in the

24     course of the current rape.  When he was raping her he

25     says, "Well, I did this, this and the other thing."

Proceedings                    397

1              Yeah, that's a res gestae statement.   That's

2       completely different.

3              So the statements -- the cases that counsel

4       is citing in support of her Molineaux application are

5       in apposite, Judge.

6              Here the most important right is my client's

7       right against self-incrimination.

8              They have a witness that's going to testify

9       as to the specifics of the sexual abuse.   The Court has

10      already been given a brief photocopy from counsel's

11      statements of how she intends to prove the force

12      occurred.

13             There is no reason whatsoever, short of

14      trying to show propensity, for counsel to be able to

15      elicit information concerning charged -- a charged

16      indictment in Queens County, even with the same

17      complainant.

18             I believe that the courts over this century

19      have purposefully stayed away from that red elephant in

20      the room and that is charged crimes because they were

21      jealously (sic) trying to protect defendant's right

22      against self-incrimination.

23             And to permit the People to go into these

24      charged crimes in Queens puts him in the situation

25      where he's unable to defend himself.

                                                    ws

Proceedings                                398

1           I respectfully submit it violates due

2    process, it violates equal protection, it violates the

3    law.

4           THE COURT:  Let me propose this to you,

5    Mr. Schechter.

6           What if I am of the opinion that the words

7    charged or the fact that your client is facing charges

8    in Queens is not brought out in front of this jury, but

9    rather the underlying acts for which form the basis of

10   the charges because, quite frankly, I'm not going to

11   allow the People in this case to talk about a pending

12   Queens indictment with regard to your client --

13          MR SCHECHTER:  It's not only --

14          THE COURT:  -- does that mollify your

15   concern?

16          MR SCHECHTER:  No, because it's not only that

17   the jury will hear that he's charged in another body, a

18   grand jury indicted him, whoops, for a crime.  That's

19   not the real prejudice here.

20          The prejudice here is due process; that

21   these, are, in fact, in fact, charges he's facing in

22   Queens County and the decision -- the determination

23   will have to be made by him to either incriminate

24   himself in Queens County or to try to ameliorate the

25   prejudice that the People have caused by these alleged

                                                    ws

Proceedings                          399

1    prior acts being introduced.

2              That prejudice, that issue, will never go

3    away, Judge.

4              THE COURT:   I'm listening to you.

5              MR SCHECHTER:   Additionally, your Honor, with

6    respect to the statement, the statement itself contains

7    overlaps, contains sexual acts that were alleged to

8    have occurred in Queens.

9              So the statement itself would also have to be

10   redacted to some degree so that prejudice doesn't

11   eventuate to here.

12             The People knew when they charged my client

13   in Nassau County -- they knew he had been indicted

14   Queens.   They knew that he was charged in Queens

15   because some of the same because some of the same acts

16   he's charged with here.   They knew that.

17             As such, they elected to bring this

18   prosecution.   They cannot be permitted a benefit from

19   trying to get two shots at him for the same acts,

20   Judge, and that's what they're trying to do.

21             THE COURT:   All right, it would appear to

22   this Court that the -- and, again, as recently as this

23   week the Court of Appeals has indicated that in these

24   types of cases, specifically when it deals with courses

25   of conduct or periods of time when there's allegations

                                                      ws

Proceedings                    400

1    of sexual misconduct between the same complainant and

2    the same defendant and as recently as in the Leeson

3    case that came out this week similar to the situation

4    here in this case, the Court of Appeals there

5    essentially said that prior bad acts, if you will, in

6    an adjoining county, not the county for which the

7    defendant was on trial for, were admissible in that

8    particular case since it had a bearing on the nature of

9    the -- and background, if you will, the relationship

10   between the complainant and the defendant and placed,

11   and I'm quoting from the Leeson case, "placed the

12   charged conduct in context."

13            Obviously, these decisions are decisions of

14   discretion as far as the trial court is concerned.

15            MR SCHECHTER:  May I please interrupt the

16   Court for a second?

17            THE COURT:  Yes.

18            MR SCHECHTER:  I think the determination is

19   one of law with respect to Molineaux.  I think the

20   courts held that it's a question of law and not fact or

21   discretion.

22            The other thing is, because I don't think I

23   fully addressed ed the Molineaux issue and I would like

24   to do that so the record is complete, I do not believe

25   based on the proffers of Ms. Johnson that she has

                                                      ws

Proceedings                    401

1    demonstrated sufficient, under Molineaux, to offer on

2    direct examination or through other -- direct testimony

3    or through any other evidence, including videotape,

4    that the prejudice that will be -- that will result

5    from the introduction of this material would outweigh

6    its probative value.

7              I further don't think that she came in under

8    any of the exceptions listed under Molineaux, mistake,

9    intent -- there's no mistake.

10             Intent is a question of fact for the jury

11   that the complainant will testify to and that's

12   something that will be resolved by them after they hear

13   the evidence.

14             Mistake, identity, is not an issue and common

15   plan and scheme is not an issue because this is not a

16   larceny crime or some kind of guesswork puzzle.

17          There's only one real issue, did he forcefully

18   have sex with her, that's the issue.

19             As such, it's not rocket science and the only

20   purpose for her doing this is for propensity purposes,

21   Judge.

22             So she has failed, I respectfully submit, to

23   come in with any exceptions to Molineaux.

24             Additionally, the prejudice will outweigh its

25   probative value and for those reasons, in addition, I

                                                    ws

Proceedings                           402

1     respectfully ask the Court deny the application, both

2     because of my client's violation of his right against

3     self-incrimination, due process, and because Molineaux

4     has not fully been complied with.

5                THE COURT:  As I was saying, the Court of

6     Appeals, on this particular issue, has directed trial

7     courts, in its discretion, to balance the probative

8     value of these uncharged or charged acts as to whether

9     or not their probative value outweighs any prejudicial

10    effect.

11                And, as you indicated, Mr. Schechter, there

12    are certain enumerated areas for which the court has

13    indicated that these items of uncharged prior acts or

14    criminal acts, bad acts, if you will, may be relevant

15    in a particular prosecution.

16                And, as I was indicating to you a moment ago,

17    in this particular type of setting what the -- not only

18    the Court of Appeals, but certainly many cases out of

19    the Second Department involving either sexual

20    allegation -- allegations of sexual conduct between the

21    same defendant -- between the same complainant and

22    defendant and it's certainly been seen in domestic

23    violence cases as well, that in terms of the

24    admissibility of these particular prior uncharged

25    criminal acts, one of the areas that the courts,

Proceedings                    403

1    including the Leeson Court of Appeals case, indicated

2    is that such evidence can be relevant to provide

3    necessary background information on the nature of the

4    relationship and I think for that reason, perhaps more

5    than any other, I think some of the incidents in Queens

6    are relevant.

7              I would agree that they're not relevant for

8    purposes or for absence of mistake, I would agree with

9    you with respect to that, but I certainly think they

10   are relevant with respect to explaining the nature of

11   the relationship between the defendant and the

12   complainant, the background of the relationship.

13             It certainly appears, as well, to have some

14   bearing on intent, particularly as it deals with the

15   issue of the element of force that's charged in this

16   particular case.

17             Insofar as your argument that your client's

18   Fifth Amendment or self-incrimination rights would be

19   compromised, as I indicated to you during the course of

20   our discussion, that only becomes an issue if -- should

21   he take the stand and discuss and, if you will, open

22   the door to those Queens acts.

23             It's certainly my intention not to allow the

24   DA to cross-examine, for example, for credibility

25   purposes, on the pending criminal acts, certainly that

                                                    WS

Proceedings                    404

1       would be precluded by the Betts and Bennett cases that

2       you've given.

3                But, again, the Betts and Bennett cases deal

4       with an issue that was posed in terms of a Sandoval

5       application and, again, as I indicated, the Court of

6       Appeals has quite clearly said that this type of

7       evidence in these circumstances, provided that if it's

8       not unduly prejudicial, can be admissible and is

9       relevant and for that reason, for those reasons, I

10      should say, I'm going to grant the People's application

11      to this extent.

12               First and foremost, I'm going to direct the

13      People not to elicit anything from any of the -- from

14      the complainant or, for that matter, any of their

15      witnesses regarding any pending Queens charges or the

16      reference to a Queens indictment, number one.

17               Number two, I am going to allow them to

18      elicit from the complainant when this -- the nature of

19      this, if you will, sexual relationship began with the

20      defendant.

21               I am going to elicit -- allow the People to

22      elicit when the, in terms of an instance, if you will,

23      when the complain -- when the relationship went from

24      what appeared to sound as though -- with the absence of

25      force to the use of force by the defendant.

                                                      ws

Proceedings                    405

1          And I will allow the People to elicit

2    testimony with respect to the alleged statement by the

3    defendant that he wanted to be the one, and I'm

4    assuming that this is what the testimony will be, that

5    there was some indication by the defendant that he

6    wanted -- or he picked, chose, if you will, a certain

7    date that he was to have sexual intercourse with the

8    complainant.

9          I see no reason to make any redactions from

10   the defendant's written statements -- well, let me take

11   that back.

12         I haven't made a ruling with respect to both

13   the written and the videotaped statement.  Should I

14   allow those items to be introduced by the People, I

15   would not -- I would not redact any portions of either

16   the written or the videotaped statement.  I think that

17   insofar as particularly the videotaped statement is

18   concerned, I think that my ruling with respect to what

19   the People will be allowed to elicit is consistent with

20   what the defendant is alleged to say on the -- on that

21   videotaped statement.

22         And I think that, quite frankly, in those

23   limited circumstances I think that this evidence would

24   be admissible.  I don't think that its probative value

25   is outweighed by any prejudice.

ws

Proceedings                    406

1              MS. JOHNSON:  May I ask the Court a question?

2              THE COURT:  Yes.

3              MS. JOHNSON:  With regards to the Court's

4    ruling about admitting -- allowing the People to elicit

5    testimony regarding when the sexual relationship began,

6    is the Court allowing the People to elicit testimony

7    regarding the time or is it the circumstance?

8              THE COURT:  I would indicate the time and

9    circumstance and, as I indicated, when the relationship

10   changed from an unforced, if you will, relationship to

11   one of force.

12             MS. JOHNSON:  And that also includes the time

13   and the circumstance?

14             THE COURT:  Time and circumstance, a

15   circumstance.

16             MS. JOHNSON:  The particular circumstance.

17             THE COURT:  Yes.

18             MS. JOHNSON:  And with regards to when the

19   defendant indicates he wants to be the one, is the

20   Court saying the victim would be able to testify that

21   it occurred during a period of sexual abuse, without

22   specific instance of it, but during sexual abuse that

23   that statement was uttered?

24             THE COURT:  Yes.  And I think that critically

25   in this case, most of these allegations are obviously

                                                    ws

Proceedings                              407

1   intertwined with each other, both what occurred in

2   Queens and Nassau, and obviously the instances that I

3   am allowing all, if you will, lead up to the instances

4   in Queens -- instances in Nassau, I should say, right

5   up until the time the defendant is arrested.

6            So that's my ruling with respect to the

7   Molineaux application.

8            People, have you -- I assume, Mr. Schechter,

9   you're excepting to my ruling.

10           MR SCHECHTER:  I do except to each and every

11  aspect of your Honor's ruling and I don't believe your

12  Honor addressed the due process argument I made

13  concerning -- that the District Attorney is not

14  permitted to go into charged acts by virtue of

15  violating my client's due process and violation against

16  self-incrimination.

17           THE COURT:  I thought I had, but if I didn't,

18  just so both of you are clear, the People are not

19  permitted to cross-examine the defendant with regard to

20  the pending Queens charges, should he testify, unless

21  he opens the door to that and I will assiduously

22  protect, Mr. Schechter, your client's Fifth Amendment

23  rights with regard to that Queens matter, but bear in

24  mind I can only do so to the extent that your client

25  himself does not open the door, if you will, and

Proceedings                              408

1        testify to these Queens matters.

2               MR SCHECHTER:  Your Honor, the Queens matters

3        would already have been coming into evidence so he

4        would have no choice but to testify to the Queens

5        matters because the People are going to be bringing

6        them in and that's the very nature of my argument

7        against self-incrimination and due process.

8               So if he testifies and will be opening the

9        door if he goes into what's already been offered, it's

10       academic.

11              THE COURT:  His Fifth Amendment rights are

12       protected insofar as the Queens case is concerned,

13       provided that he doesn't himself, as a witness -- he

14       can't, to be -- I don't want to be simplistic about it,

15       but it is somewhat of a two-way street; if he doesn't

16       open the door to that obviously his Fifth Amendment

17       rights are protected.

18              This jury is not going to be considering

19       those Queens matters, they're not going to be hearing

20       about a Queens indictment or Queens charges, so this

21       jury, obviously, is not concerned about the matters in

22       Queens and certainly if he doesn't testify to the

23       matters in Queens then his Fifth Amendment  rights with

24       respect to those charges are protected.

25              MR SCHECHTER:  May I ask a hypothetical

                                                        ws

Proceedings                          409

1    question to the Court?

2            Let's say the complainant gets on the witness

3    stand and testifies contrary to the way she testified

4    in Queens County.  Of necessity and in order to

5    authenticate the inconsistency I would have to refer to

6    the grand jury minutes in Queens County.

7            As such, how now am I going to do that

8    without letting the cat out of the bag, basically

9    prejudicing my client because in order to defend him I

10   have to go into the Queens matters?

11           THE COURT:  Well, one might say to the

12   complainant, "Do you remember testifying at a prior

13   proceeding on this particular day?  And did you -- were

14   you asked this question and did you give this answer?"

15           MR SCHECHTER:  Let's proceed.

16           "I don't recall.  What proceeding?  I don't

17   recall that.  Oh, and that was when it was in Queens?

18           I mean, that's the problem with these kinds

19   of things, Judge.  That's my concern.  It can come out

20   even indirectly from the complaining witness.

21           THE COURT:  The only thing I can tell you,

22   Mr. Schechter, and, believe me, I can appreciate your

23   position, I will do my best to preserve your client's

24   Fifth Amendment rights to the extent that I can and,

25   again, as I said, it would appear that based upon the

Proceedings                    410

1      case law that's in its current state, that this

2      evidence is admissible and I will do my best to make

3      sure that your client's right, not only in this trial

4      but with respect to any future rights he may have in

5      Queens are protected.

6                MS. JOHNSON:  And, your Honor, I've never

7      tried a full case before the Court, but I will give the

8      Court my representation that during preparation of

9      testimony with the victim and with any other witnesses

10     that testified in the grand jury I will make it very

11     clear to them that in no uncertain terms are they to

12     mention any of this information and to be very

13     conscious of the fact that if testimony comes up about

14     what they testified to in Queens, that they are not to

15     make reference to it at the peril of their own trial,

16     your Honor, and this is important to everybody,

17     including the victim, and she is a smart intelligent

18     girl, your Honor.  I truly believe that my cautionary

19     warnings to her and to the other victims (sic) will be

20     certainly honored before the jury -- witnesses.

21                THE COURT:  I would hope that that's the case

22     but certainly there's been many, many, many an instance

23     where, notwithstanding the best of intentions, things

24     sometimes happen.

25                MS. JOHNSON:  Absolutely.

                                                    ws

Proceedings                    411

1           MR SCHECHTER:  Please let the record reflect

2    that I have an exception to the -- to your Honor's

3    entire ruling.

4           THE COURT:  People, it would be -- I would

5    love to hear that this logbook has managed to make its

6    way to your office.  I've asked my law secretary to

7    call your office.

8           MS. JOHNSON:  Okay.

9           Can I make a call?

10           THE COURT:  Yes.

11           MS. JOHNSON:  I'm assuming she was

12    unsuccessful?

13           THE COURT:  I haven't heard from her.

14           (Brief recess in the proceedings.)

15           MS. JOHNSON:  I would like the record to be

16    complete, your Honor.

17           THE COURT:  Yes.

18           MS. JOHNSON:  Can I see that first?

19           Can I just see it?

20           MR SCHECHTER:  Sure.

21           (Shown to counsel.)

22           MR SCHECHTER:  Based upon my review of the

23    log that we requested from the police, which does

24    contain the entries from midnight through the time my

25    client is allegedly placed under arrest, there's

Proceedings                    412

1    material -- I don't see any material that would be

2    useful for cross-examination on the -- of the officers.

3              THE COURT:  Anything you want to add to your

4    argument in light of that, that you haven't made?

5              MR SCHECHTER:  No.

6              THE COURT:  One -- just before we get to the

7    decision after hearing, one thing, Mr. Schechter, I

8    neglected to add.

9              Obviously, with respect to any of this

10   Molineaux evidence, it would be my intent to give a

11   curative instruction to the jury, both before, after

12   and during my closing remarks, during my charge.

13             If there's anything you want me to consider

14   in terms of that charge, by all means, please give it

15   to us well enough in advance that I can review it with

16   my law secretary and obviously I trust you will give a

17   copy to the DA.

18             MR SCHECHTER:  Well, I should like to say

19   parenthetically, your Honor, in my view there could be

20   no curative charge that would overcome the immense

21   prejudice that would result from the jury hearing about

22   all of these prior instances that have no relation to

23   this whatsoever, as I indicated before, so I don't

24   believe there can be any curative instruction that

25   would overcome that prejudice.

                                             ws

Proceedings                          413

1           THE COURT:  All right.

2           And I take it by that you're not asking for

3      one?

4           MR SCHECHTER:  No.

5           THE COURT:  If you change your mind,

6      obviously, please do so before the complainant should

7      testify.

8           MR. SCHECHTER:  With that in mind, I call

9      for all Rosario material concerning the complainant's

10     testimony in Queens County.

11          THE COURT:  I see Ms. Johnson shaking her

12     head in the affirmative.

13          MS. JOHNSON:  Yes, Judge, I would have turned

14     over her grand jury minutes anyway.

15          Actually, hopefully to expedite things for

16     Mr. Schechter to have the Rosario by tomorrow, it's

17     being photocopied as we speak by my parallel.

18          And any handwritten notes between the

19     prosecutor in Queens and the victim, I had requested

20     everything, so I don't believe that there's anything

21     from the Queens case that he wouldn't have as Rosario

22     in this matter.

23          MR SCHECHTER:  Additionally, I neglected,

24     unfortunately, to ask this, did Officer Alfaro testify

25     in the grand jury, either in Queens County or in

                                              ws

Proceedings                              414

1    Nassau County?

2              MS. JOHNSON:  She did not in Nassau.

3              I have already obtained copies of all the

4    witnesses' grand jury testimony in Queens, including

5    Officer Alfaro.  That's being copied as we speak.

6              MR SCHECHTER:  I did not have

7    officer Alfaro's grand jury testimony when she

8    testified.  I will examine it to see if there's any

9    material that I find pertinent and if that's the case I

10   will seek permission from the Court.

11             THE COURT:  It seems as though the beat goes

12   on.

13             Anything else we need to take up?

14             MS. JOHNSON:  Just scheduling.

15             THE COURT:  We will deal with that later.

16             Can I have the exhibits from the hearing?

17             MS. JOHNSON:  Sure.

18             MR SCHECHTER:  Mine, too?

19             THE COURT:  Yes.

20             MS. JOHNSON:  Do you want the video?

21             THE COURT:  No.

22             MS. JOHNSON:  Your Honor, can I keep a copy

23   of that logbook so I have it for the file and I'll give

24   Mr. Schechter a copy this afternoon?

25             THE COURT:  Yes.

                                                      ws

Proceedings                    415

1          (Shown to counsel.)

2          MS. JOHNSON:  Your Honor, when we do discuss

3    scheduling I will have so-ordered subpoenas for your

4    Honor, if the Court would assist the People for

5    witnesses for trial?

6          MR SCHECHTER:  Would the Court check to see

7    if it has the photographs?

8          Because I looked in the file where I normally

9    keep them and the photographs I have here, which are

10   basically duplicative, I don't see, as well as the

11   medical record.

12         MS. JOHNSON:  I'll double check my file, but

13   I know I don't have them.

14         MR SCHECHTER:  No, wait, here it is, I have

15   the medical record.

16         (Pause in the proceedings.)

17         THE COURT:  All right, with respect to

18   People versus Harold Gopaul, this matter was sent to

19   this Court to conduct a Mapp/Huntley Hearing.  I think

20   this hearing was directed as a result of a decision and

21   order by Judge Calabrese of this court.

22         It does bear noting that there was not any

23   type of Dunaway or probable cause portion of the

24   hearing.

25         The hearing began on April 30th, continued to

                                            ws

Proceedings                    416

1    May 1st, May 4th, May 5th and concluded today, May 6th.

2            The People produced two witnesses, a

3    Detective Shulman from the 105th Squad, if you will,

4    and a Police Officer Alfaro from the 105th Precinct as

5    well.

6            The defendant also, in addition to

7    introducing a number of exhibits, predominantly

8    photographs, defendant's medical records, the defendant

9    himself testified with respect to issues that are

10   pertinent to the hearing.

11           The Court credits the People's -- testimony

12   of the People's witnesses and makes the following

13   findings of facts and conclusions of law.

14           On or about June 23rd into June 24th, 2008

15   Detective Leonard Shulman of the 105th Precinct, a

16   ten-year police officer and five-year detective, was

17   working a 4:30 p.m., June 23rd, 2008 to 1 a.m. tour in

18   the early morning hours of June 24th, 2008.

19           At some point before his tour was to end

20   between midnight and 1 a.m. he was assigned to

21   investigate a sex abuse allegation.  He was notified

22   that a female complainant was physically in the

23   105th Precinct being interviewed by police officers as

24   well as a representative, I believe, of the ACS, New

25   York City ACS or in Nassau County what I would think

                                                    ws