Proceedings                                    417

1     would be the equivalent of the Child Protective

2     Services Bureau.

3               He was -- he interviewed -- or

4     Detective Shulman, I should say, had interviewed the

5     complainant in an interview room at the 105th Precinct.

6               At one point at approximately, according to

7     the detective, 4:45 a.m. he was advised by

8     Sergeant O'Hagan that the defendant had arrived at the

9     105th Precinct, that he was there to report his

10    daughter was missing.

11              The defendant, it would appear to this Court,

12    was at some point placed in custody prior to

13    Detective Shulman seeing him at approximately 5:10 in

14    the morning, according to Detective Shulman, in one of

15    the interview rooms at the 105th Squad.

16              Prior to going into that room the detective

17    indicated that he had secured his gun in a desk drawer

18    where his office was outside of the interview room.

19              He indicated that he came into the interview

20    room.   The defendant had already been placed in that

21    room by another officer.   Detective Shulman indicated

22    that he introduced himself to him as a detective with

23    the 105th Precinct and he told him that prior to

24    speaking to him he would be required to read him what's

25    referred to as his Miranda warnings.

                                                            ws

1          Detective Shulman indicated that he had

2     obtained a Miranda -- a preprinted Miranda warning form

3     from his desk drawer.  It's been marked, or a copy of

4     the one used, was marked as People's Exhibit Number 1

5     in evidence.  It's referred to as a PD 244-149A form.

6          He -- Detective Shulman indicated that he

7     began to read aloud the questions that were contained

8     in that form which contained the six rights and

9     admonitions with regard to a suspect's Miranda

10    warnings.  He read them aloud.

11         After each one -- each warning, if you will,

12    is followed by a question mark according to the form

13    that's in evidence.  The detective read these -- each

14    of these warnings and rights to the defendant.  He

15    indicated that the defendant answered yes to each of

16    them.  He indicated that the defendant spoke and

17    understood the English language.

18         After the defendant answered yes to each of

19    the six rights or warnings contained in the form

20    Detective Shulman had affixed or wrote the word yes

21    after each question.  He then gave the form to the

22    defendant and -- well, actually, prior to that the

23    detective had the defendant sign his name, print his

24    name and Detective Shulman had wrote the location and

25    date that the Miranda warnings were administered, which

ws

Proceedings                    419

1   were approximately 5:15 a.m. on June 24, 2008.  He gave

2   the form to the defendant, according to the detective,

3   indicated to him to read the rights and warnings, asked

4   if his answers to those questions that had been -- he

5   had verbally indicated yes to a few moments earlier

6   were still the same, at which point the defendant,

7   according to the detective, said yes.

8           He then asked the defendant then to affix his

9   initials after the word yes on the six different --

10  after the six different questions that were posed.

11          The defendant then wrote his initials,

12  according to the -- according to Detective Shulman,

13  after the words yes six times.  As I indicated

14  previously, the defendant signed his name and the form

15  itself is signed by Detective Shulman with his -- with

16  his shield number as well.

17          Subsequently, subsequent to this,

18  Detective Shulman then indicated that he asked the

19  defendant to -- if he would be willing to consent to a

20  search of his motor vehicle which detective indicated

21  was -- had been -- was at the 105th Precinct parked

22  outside the 105th Precinct.

23          According to Detective Shulman defendant

24  indicated that he did -- he would consent to that.

25          Again a preprinted consent search form was

Proceedings                    420

1    then produced by Detective Shulman.  Detective Shulman

2    then indicated he read from the form, which has been

3    entered into evidence as People's Number 2, and this is

4    with respect to his home at 242-10 89th Avenue in

5    Bellerose, Queens County.  He read the form to the

6    defendant.  He then gave the defendant the form to

7    read.

8             He indicated if the defendant was willing to

9    consent to that form, to sign in the space provided

10   which, according to Detective Shulman, the defendant

11   did affix his signature as the person giving consent.

12   That form was signed, according to Detective Shulman,

13   approximately 5:20 a.m. on the morning of June 24th,

14   2008.

15            According to Detective Shulman, in addition

16   to the defendant signing or affixing his signature on

17   the form, it was the defendant that had placed the time

18   and date on the form itself.

19            The next form that was given to the defendant

20   or was -- there was a conversation between the

21   detective and the defendant, was a consent form to

22   search his vehicle.  Again, that is the vehicle that

23   was parked at the side of the 105th Precinct.

24            The detective went over the consent form,

25   read the consent form aloud to the defendant.

                                                      ws

Proceedings                        421

1          The defendant indicated to Detective Shulman

2     that he, likewise with the house, would be willing to

3     consent to the search of his vehicle.  This form was

4     received in evidence as People's Number 3.

5          According to Detective Shulman, the defendant

6     signed his name on the form, affixed the date and time

7     on the form.  This form also has the signature of

8     Detective Shulman as well as a shield number that's on

9     the form and the form identifies the VIN number as well

10    as the license plate of the vehicle that the defendant

11    had driven to the 105th Precinct that morning.

12          After the forms were then signed

13    Detective Shulman indicated he took a break.  He left

14    the defendant inside the interview room.

15          It bears noting that during this time the

16    only police personnel that was inside the interview

17    room with the defendant was Detective Shulman.

18          He indicated he went back --

19    Detective Shulman indicated he went back and spoke to

20    the complainant further, who was in another room within

21    the 105th Squad during this time.

22          At approximately 6:20 a.m. Detective Shulman

23    re-entered the room where the defendant was located.

24    During this time or throughout this time he indicated

25    that the defendant was not handcuffed.

                                                    ws

Proceedings                     422

1          The defendant then -- or the detective,

2     actually, asked the defendant if he knew what he was

3     under arrest for and the defendant replied to him that

4     he had slapped his daughter regarding -- as a result of

5     a previous argument that he had had with her at an

6     amusement park, I believe the weekend before.

7          Detective Shulman asked the defendant if he

8     would be willing to make a written statement concerning

9     what he had just said.  Defendant indicated that he

10    would.

11         He gave the defendant a -- what would appear

12    to be, although this is a photocopy, and this is

13    People's 5 in evidence, a yellow pad, a blank yellow

14    pad, in which the defendant wrote out his name, his

15    address, the date, which was June 24th, 2008, the time,

16    which was approximately 7:30 a.m.

17         According to Detective Shulman the defendant

18    then -- strike that.

19         Actually, the first -- is there -- this first

20    statement was actually People's 4 in evidence.  The

21    reference to Number 5 is incorrect.  The first

22    statement that the defendant wrote was People's

23    Number 4 in evidence.

24         Again, he gave this blank piece of paper to

25    the defendant.  The defendant then wrote out a written

                                                        ws

Proceedings                          423

1       statement in his own words, in his own handwriting, as

2       to what he had just told Detective Shulman.

3                   Indeed, according to Detective Shulman,

4       defendant had corrected the date initially where it

5       said Saturday 6/21 or 6/22, the defendant changed that

6       date.

7                   That statement was done at 6:25.  As I

8       indicated, it is approximately a one and one-quarter

9       page statement on a yellow legal pad.

10                  The detective testified that he then

11      confronted the defendant with allegations that his

12      stepdaughter had claimed that there was a -- there had

13      been some inappropriate sexual conduct between him and

14      his stepdaughter.

15                  Prior to that, actually, the defendant was

16      allowed to use the restroom -- was then handcuffed,

17      taken to a restroom and then returned back to the

18      interview room.

19                  As I indicated, at approximately 7:25 a.m.

20      the detective went back into the interview room and sat

21      across from the defendant in the interview room and

22      that -- indicated to the defendant that the

23      stepdaughter had made allegations of an inappropriate

24      nature.

25                  Detective Shulman wouldn't indicate to the

                                                      ws

1    defendant the details of the allegations that were

2    being made at that time by the stepdaughter in a

3    separate room.

4              He then asked if he would like to make a

5    second statement.  According to Detective Shulman the

6    defendant stated that he felt bad about it and would

7    like to make a statement.

8              Again the defendant was offered a blank

9    yellow pad and a piece -- and a pen at which time the

10   defendant then, in his own handwriting, wrote a second

11   statement - and, again, this is now People's 5 in

12   evidence - dated June 24th, 2008, the time is

13   approximately 7:30 a.m., in which the defendant then

14   wrote a second statement in response to the allegations

15   that had been made by the complainant as told to him by

16   the detective.

17             On both of these statements the defendant's

18   signature appears on the statement, the date and time.

19             The second statement was -- it appears was

20   begun at 7:30 a.m. and was completed, according to the

21   bottom portion, at 8:30, approximately one hour later.

22             Both statements bear the defendant's

23   signature as well as Detective Shulman's signature as

24   well.

25             During the course of this period of time

Proceedings                               425

1    Detective Shulman testified that no threats or force or

2    promises of leniency were made to the defendant, that

3    he did not have his weapon with him.

4           According to Detective Shulman, he was the

5    only one present in the interview room during the

6    course of these two statements.  In both instances,

7    according to Detective Shulman, the defendant was

8    offered the opportunity to read the statements after he

9    wrote them out and asked if he wanted to make any

10   changes that he could.  According to Detective Shulman,

11   the defendant did not make any changes.

12          Throughout the course of these two statements

13   Detective Shulman indicated that the defendant at no

14   time wished to invoke his right to remain silent or to

15   speak with a lawyer.

16          At one point during the course of the

17   interview after these statements the defendant was

18   asked by Detective Shulman if he had any vibrators in

19   his car.  According to the detective, defendant said he

20   had a body massager in the car and a vibrator in the

21   house.

22          At that point -- just off the record one

23   moment.

24          (Discussion held off the record.)

25          THE COURT:  According to Detective Shulman,

                                                      ws

Proceedings                          426

1     after speaking to the defendant as to his possession of

2     any vibrators, Detective Shulman indicated that --

3     Detective Shulman then wrote down -- as opposed to the

4     two other statements, Detective Shulman then wrote down

5     his question to the defendant and the defendant's

6     answer, it's in Detective Shulman's handwriting, in

7     which the defendant indicated to him that there were

8     multiple vibrators in the house.  They are white and

9     looked the same, they are in a cabinet in the bedroom

10    in the house, and he has a white fold-up massager in

11    the car that he uses for his neck.  He claims to have

12    never have used it on his daughter.

13         That oral conversation was reduced to writing

14    by Detective Shulman.  There's also -- and this is,

15    again, People's 6 in evidence that was introduced

16    during the hearing.

17         According to Detective Shulman, the defendant

18    then drew a picture in his own handwriting of what

19    appears -- what appeared to Detective Shulman to be the

20    vibrator that the defendant was referring to in terms

21    of its dimension and its shape.

22         After this had taken place, according to

23    Detective Shulman, he then spoke to Police Officer

24    Alfaro who told her that there was some, what he

25    believed to be, items of evidence in the home and in

                                                    ws

Proceedings                    427

1    the defendant's car that was pertinent and related to

2    this case.

3                   Detective Shulman then contacted the DA's

4    Office.  He had asked the defendant if he would be

5    willing to make a videotaped statement.  That statement

6    was introduced into evidence as People's Exhibit 7.

7                   The videotaped statement was played for the

8    jury.  The video -- for the Court.  The videotaped

9    statement was played for the Court.  The videotaped

10   statement was taken at the Queens -- at the

11   105th Precinct in a different room than that which the

12   defendant was -- had been questioned by Detective

13   Shulman.

14                  The videotaped statement that was entered

15   into evidence both audibly and visually depicted two

16   Assistant District Attorneys from Queens, the

17   defendant, the videographer and Detective Shulman in

18   the -- in this second interview room.

19                  Preliminarily, the defendant's Miranda

20   warnings were then administered to him at now a second

21   time by one of the Assistant DAs on the videotape.

22                  On the videotape the defendant is clearly

23   seen to be acknowledging his Miranda warnings, waiving

24   his rights with respect to his Miranda warnings and

25   affixing his initials similarly to the way he did in

Proceedings                    428

1       front of -- with Detective Shulman after the

2       Assistant DA wrote the words yes to each of the six

3       questions that were posed to him.

4               During the course of the videotaped statement

5       the defendant did not indicate that he wished to no

6       longer give a statement or speak to a lawyer or, for

7       that matter, invoke his right to remain silent. In the

8       videotaped statement the defendant is shown without

9       handcuffs in the interview room.

10              After the videotaped statement was played

11      defendant was then bought -- brought, I should say, for

12      booking at central booking in Queens.

13              In looking at the videotaped statement it

14      appeared to be done on the afternoon, late afternoon,

15      of June 24th, 2008, somewhere between the hours, I

16      believe, of 4 and 5 in the afternoon.  The videotaped

17      statement is approximately 30 to 40 minutes in length.

18              Detective Alfaro from the 105th precinct

19      testified that she was -- worked a tour of duty on

20      June 24th, 2009 from 11:15 to 5:40 p.m. -- 11:15 a.m.

21      to 5:40 p.m.; that she was asked if she wanted an

22      arrest -- she was asked by one of her supervisors if

23      she wanted an arrest, which she agreed to; that

24      Detective Shulman had then directed her to process the

25      arrest.

                                                        ws

1          She assisted in the processing of the arrest,

2     including the interviewing -- some interviewing of the

3     complainant and doing an online booking paperwork.

4          According to Police Officer Alfaro she took

5     the defendant downstairs from the upstairs area where

6     defendant had been in the squad room with

7     Detective Shulman.  He was brought downstairs

8     handcuffed where his arrest was processing.

9          He was then placed in a cell area behind the

10    front desk of the 105th Precinct where pedigree

11    information was taken from him.

12         According to Officer Alfaro, her weapon was

13    locked in a locked area throughout this time.

14         During the course of her interaction with the

15    defendant, which was now in the early morning or

16    mid-morning hours of June 24th, the defendant did not

17    make any complaints of pain or request any medical

18    attention.

19         While officer Alfaro was with the defendant

20    the defendant did not interact with any other police

21    officers she did not see any other police officers go

22    into the cell after the defendant was placed in the

23    cell by Officer Alfaro.

24         At one point she was asked by

25    Detective Shulman to take the complainant in this case

ws

Proceedings                    430

1    to the vehicle where -- that the defendant had brought

2    to the 105th Precinct in an effort to secure certain

3    property that was, according to the defendant, located

4    in the car.  This was an Ecolab truck that the

5    defendant used for work purposes that was parked next

6    to the 105th Precinct.

7              According to Officer Alfaro, the complaining

8    witness took her to a vehicle and directed her to a

9    compartment inside the vehicle, I believe, where a meat

10   clever was recovered as well as a white massager.

11             Those items of property were then invoiced

12   and vouchers were prepared and also Officer Alfaro went

13   to the defendant's home on June 24th, 2008 where she, I

14   believe, met the mother of the complainant, the wife of

15   the defendant, at 242-10 89th Avenue in Queens and

16   indicated to her to search the home.  Officer Alfaro

17   indicated she had the consent search form which had

18   previously been signed by defendant with her.

19             She indicated defendant's wife allowed her

20   inside the home and that a search was done of the

21   master bedroom in the home that the defendant shared

22   with his wife and according to Officer Alfaro she

23   recovered a white and gray massager that was under the

24   bed in the defendant's master bedroom.

25             The defendant himself testified in this

                                                    ws

1    hearing.  He indicated that he's 51 years of age,

2    worked as an Ecolab worker involved in pest

3    elimination.  He testified that he had no injuries

4    prior to June 24th, 2008.  He made reference to a prior

5    hernia operation.

6            He testified that he had last eaten on June

7    22nd, 2008, which, I believe, was a Sunday, and worked

8    the entire day on Monday day and at approximately 1:45

9    a.m. on June 24th, 2008 he noticed that his daughter

10   was not -- the complainant in this case was not home,

11   noticed the back door unlocked, thought that his

12   daughter had ran away or was missing, drove to the

13   105th Precinct at approximately 2:30 a.m.

14           He indicated that when he went into the

15   precinct he was met by an officer and he told that

16   officer he came to report his daughter was missing.

17           He indicated that nine or ten officers

18   surrounded him, that they then began to grab him by his

19   hand or his arm and slammed him into a wall, that

20   officers were -- surrounding officers were shouting for

21   another officer to cuff him, put a cuff on him.  He

22   indicated that officers were pushing him, grabbing him,

23   in essence, physically throwing him around.

24           He indicated at some point that he began to

25   ask if he could be allowed to have a phone call for his

                                                    ws

1    wife.  He was told that he was not going to get a phone

2    call, that he was then eventually handcuffed and pushed

3    up a flight of stairs by Detective Shulman, taken to a

4    location, the interview room that he referred to as the

5    box.

6              He indicated that Detective Shulman

7    initially, when entering the room, grabbed him by his

8    collar and pushed and pulled him around throughout the

9    course of this, using language that he described as

10   foul.

11             He indicated that he was never advised of his

12   Miranda rights.

13             He indicated at one point

14   Detective Shulman came in with papers saying that it

15   contained statements by his daughter accusing him of

16   inappropriate sexual activity.

17             The detective said, "You want me to tell --

18   you want to tell me anything else?"

19             Defendant requested he wanted to speak to his

20   wife and, alternatively, a lawyer.  Detective Shulman

21   indicated he was not going to get either.

22             He indicated that the Miranda sheet that's

23   been entered into evidence had the words yes already

24   written on it, that the detective had made threats for

25   him to place initials on it, that the detective came

ws

Proceedings                    433

1    back with the notepad, pen and paper.

2              The defendant wrote what had occurred at the

3    fair.  He acknowledged writing what occurred at the

4    fair.

5              Detective Shulman told him that he was going

6    to be put away for a long time, made him sign a

7    confession that he abused his daughter.  He told --

8    according to the defendant, Detective Shulman told him

9    that he was going to take it to his supervisor and that

10   once he does that that he would be going home soon.

11             The defendant also said that the detective

12   asked him to do a videotape.  He said he kept on asking

13   for a lawyer, was denied access to a lawyer, denied

14   access to a phone call.  He said that after he signed

15   his Miranda rights for the DA he would then be going

16   home.

17             He says he did not, was deprived of sleep

18   from Sunday through Tuesday afternoon with the

19   exception of a bottle of water given to him by the DA

20   during the course of the videotape, that he had nothing

21   to eat or sleep for approximately 15 hours.

22             Upon his release from jail after being

23   arraigned he went to his attorney's office and then

24   thereafter went to Long Island Jewish Hospital on

25   June 26th, 2008 for treatment of his injuries.

1            He introduced photographs in evidence,

2       People's G through J that he indicates --

3            MR SCHECHTER:  Defendant's G through J.   I

4       think you said People.

5            THE COURT:  Defendant's G through J,

6       indicating what he described as injuries that were

7       inflicted -- or healing injuries that were inflicted at

8       the hands of the police officers at the 105th Precinct

9       as well as the hospital records from Long Island Jewish

10      that were entered into evidence in which he complained

11      of pain, body aches, abdominal pain that he, according

12      to the records, indicated -- was inflicted at the hands

13      of the police officers.

14           I should also indicate that the defendant

15      also introduced photographs into evidence depicting the

16      outside of the 105th Precinct, C,D,E and F in evidence,

17      as well as the interrogation area that was acknowledged

18      by Detective Shulman as the location where the

19      interviewing of the defendant took place.

20           The Court makes the following conclusions of

21      law:

22           With respect to the Huntley issues, as I

23      indicated, the Court does credit the testimony of the

24      police officers, Detective Shulman in this particular

25      case.

                                                         ws

Proceedings                                    435

1          The Court finds that in the first instance

2     that the statements were voluntarily given under oath,

3     CPL 60.45, that these statements were voluntarily made,

4     that the defendant made a knowing, intelligent and -- a

5     knowing, intelligent and voluntary waiver of his

6     Miranda rights both prior to giving the written

7     statements to the police officer, or the detective, I

8     should say.

9          Court also finds that the People have met

10    their burden with respect to the consent searches that

11    were executed by the defendant; that based on the

12    totality of the circumstances here that these consent

13    searches -- or consent forms allowing the search of

14    both his vehicle and his home, again, were voluntarily

15    made after the defendant was advised orally by

16    Detective Shulman of his rights and with respect to

17    both of these consent searches, as well as being given

18    the opportunity to read both of these consent search

19    forms prior to signing them, and therefore the property

20    that was recovered, both in the car and the home, as a

21    result of these search forms was properly obtained.

22          Insofar as the statements are concerned,

23    Court finds that contrary to the defendant's

24    assertions -- primarily when viewing the videotape that

25    was seen by the Court in this case, the Court,

                                                          ws

Proceedings                                436

1       notwithstanding the defendant's assertions in this

2       case, would credit the evidence that was presented

3       during the course of this case to the degree that the

4       People, in this Court's view, have satisfied beyond a

5       reasonable doubt that these statements were voluntarily

6       made and that they were the product of knowing,

7       intelligent and voluntary waivers of the defendant's

8       Miranda rights and, accordingly, the defendant's motion

9       to suppress both the statements -- written statements,

10      videotaped statements, as well as any other evidence

11      that was recovered is hereby denied.

12                  MR SCHECHTER:  Respectfully except.

13                  THE COURT:  Yes.

14                  MR SCHECHTER:  Question, your Honor?

15                  With respect to the videotape, is the Court

16      making a determination that the warnings given ab

17      initio by the detective were the warnings that were

18      allocable, the Miranda warnings, allocable to my

19      client's statement or is the Court determining that the

20      verbal warnings given by, I believe, either the

21      District Attorney at the video statement, that those

22      were, in fact, the proper Miranda warnings because no

23      waiver -- notwithstanding a waiver form was signed on

24      the videotape, there was none that was put into

25      evidence.

Proceedings                    437

1          So I would like to know which Miranda waiver

2     the Court is determining with respect to the videotape

3     and its admissibility.

4          THE COURT:  Well, at a minimum, I think that

5     the Miranda warning that was executed by the defendant

6     during his interaction with Detective Shulman clearly

7     applied not only to the written statements, but later

8     to the videotaped statement.

9          There was no evidence in the record to

10    suggest that there was any invocation by your client or

11    by the defendant of his right to remain silent or his

12    right to speak with an attorney at any point in time

13    during the course of his interaction with the police.

14    Although the -- and I would say that applies to the

15    videotaped statement as well.

16         I would just also add that I think an

17    inference secondarily could be drawn from the

18    videotaped statement that it would appear from --

19    although the form wasn't introduced, that the defendant

20    was advised of his Miranda warnings a second time

21    during the course of that videotape and that clearly in

22    that instance he also made an intelligent, knowing and

23    voluntary waiver of his rights during the prior --

24    immediately prior to the videotape.

25         MR SCHECHTER:  The oral administration of the

                                                    ws

Proceedings                        438

1    rights.

2              THE COURT:  Yes.

3              All right, obviously I went a little bit

4    longer than I anticipated.  I'm going to ask everybody

5    to come back at 2:30.  I would ask you to come here.  I

6    don't even know, as I sit here now, whether or not --

7    we can't be here to begin jury selection.  We're going

8    to have to be somewhere else.  I don't know where that

9    is.

10             THE CLERK:  Judge Sullivan.

11             THE COURT:  My clerk is telling me we're

12   going to be right down the hall in Judge Sullivan.

13   He's on the courtroom on the left.  Report there at

14   2:30.

15             MR SCHECHTER:  Should we leave our stuff or

16   take it?

17             THE COURT:  Take it.  We won't be here this

18   afternoon.

19             MS. JOHNSON:  I'll have a witness list at

20   2 o'clock for the prospective panel.

21             (The luncheon recess was taken at this time.)

22                  *    *    *    *

23

24

25

                                                      ws

439

I N D E X

|                            | DIRECT | CROSS | REDIRECT | RECROSS |
|----------------------------|--------|-------|----------|---------|
| People's Witnesses:        |        |       |          |         |
| 1. Det. Leonard Schulman   | 22/ 96 | 175/ 255 | 230   | 231     |
| 2. P.O. Celica Alfaro      | 239    | 252   | 272      | 272     |
| Defendant's Witnesses:     |        |       |          |         |
| 1. Harold Gopaul           | 276    | 305   | 338      |         |

E X H I B I T S

|                                      | FOR IDENTIFICATION | IN EVIDENCE |
|--------------------------------------|--------------------|-------------|
| People's Exhibits:                   |                    |             |
| 1. Miranda warnings                  | 33                 | 36          |
| 2. Consent to search home            | 45                 | 47          |
| 3. Consent to search vehicle         | 49                 | 51          |
| 4. Defendant's statement (6:30)      | 58                 | 99          |
| 5. Defendant's statement (8:30)      | 109                | 112         |
| 6. Defendant's statement             | 115                | 124         |
| 6A. Original of Exhibit 6            | 117                |             |
| 7. Videotaped statement              | 117                | 132         |
| Defendant's Exhibits:                |                    |             |
| A. Memo book (Alfaro)                | 183                |             |
| B. Follow-up index sheet             | 185                | 187         |
| C. Photo                             | 198                | 200         |
| D. Photo                             | 198                | 200         |
| E. Photo                             | 198                | 200         |
| F. Photo                             | 198                | 200         |
| G. Photo                             | 299                | 301         |
| H. Photo                             | 299                | 301         |
| I. Photo                             | 299                | 301         |
| J. Photo                             | 299                | 301         |
| K. LIJH records                      | 304                | 305         |

ws

CA-132-10

1

copy

1   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF QUEENS :  CRIMINAL TERM :  PART K-12
2   ---------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK
3                                    Indictment No.
                                     2065-2008
4
                -against-
5                                         Hearing

6
    HAROLD GOPAUL,
7
                    Defendant.
8   ---------------------------------------X

9                          Supreme Courthouse
                           125-01 Queens Boulevard
10                         Kew Gardens, New York 11415
                           June 8, 2009
11
    B E F O R E:
12                    HONORABLE JOSEPH A. GROSSO,
                          Justice of the Supreme Court.
13
    A P P E A R A N C E S:
14
            FOR THE PEOPLE:
15                      RICHARD A. BROWN, ESQ.
                        District Attorney, Queens County
16               BY:  JARED ROSENBLATT, ESQ.
                        Assistant District Attorney
17
            FOR THE DEFENDANT:
18                      DONALD SCHECHTER, ESQ.
                        80-02 Kew Gardens Road
19                      Kew Gardens, New York 11415

20

21

22

23

24                      HELEN BOUKAS
                        Senior Court Reporter
25

                                                hb

- PROCEEDINGS -                                    2

```
1                  COURT OFFICER:  Coming out.

2                  (Defendant is present.)

3                  THE CLERK:  6 on the calendar.  2065 of '08.

4       Harold Gopaul.

5                  MR. SCHECHTER:  For Harold Gopaul, Donald R.

6       Schechter, 80-02 Kew Gardens Road, Kew Gardens, New

7       York.

8                  THE COURT:  Sir, good morning.

9                  MR. ROSENBLATT:  For the People, Assistant

10      District Attorney, Jared Rosenblatt.

11                 THE COURT:  Sir, good morning.

12                 MR. ROSENBLATT:  Good morning, your Honor.

13                 THE COURT:  Okay.  We conferenced this case.

14      Mr. Rosenblatt, do you have an application

15      before we start this hearing?

16                 MR. ROSENBLATT:  Yes, your Honor, I have.

17                 MR. SCHECHTER:  Your Honor, before that, I

18      respectfully ask, with respect to bail condition, that

19      my client be put on one-dollar bail, his bail be

20      exonerated, that one-dollar bail be instituted.  He is

21      here from Nassau on a writ.

22                 MR. ROSENBLATT:  Your Honor, his bail is three

23      hundred thousand over one hundred fifty.  I ask that he

24      be remanded in this case.  He has been convicted of

25      seven counts of criminal sex act in Nassau County.
```

hb

1              THE COURT:  He should be remanded in Nassau

2      County, and I am not going to change the bail here.  I

3      am simply not going to do it for the following reason.

4              A dollar bail is, in my opinion, only

5      appropriate where I would intend to R.O.R. somebody on

6      the charges that I have in front of me.

7              This is one of those cases, given the volume

8      of fifty plus charges in an indictment that I don't

9      believe the reduction of bail to one dollar be

10     appropriate under those circumstances.

11             So I am keeping the bail where it is.  And I

12     am not going to remand.  I will keep the bail where it

13     is with the understanding that the defendant had been

14     remanded post conviction in Nassau County.

15             So the bail is not going to be exonerated.  I

16     will not set the dollar bail.  He will receive credit on

17     this case, on the 300 over the 150.  It's that simple.

18             MR. SCHECHTER:  Okay.

19             THE COURT:  Because -- I won't change the bail

20     because, simply, I simply don't know what would happen

21     in Nassau County, whether or not your client -- I

22     understand that he was convicted of D violent felonies

23     in Nassau County.

24             The sentence range there goes anywhere from

25     time served and probation to a six-month split sentence

1    to a definite period of incarceration of one year, City

2    time, or up to seven years' incarceration on a violent

3    felony offense on each count.

4              MR. SCHECHTER:  He's facing seven counts,

5    seven separate counts, seven years each in Nassau County

6    which could theoretically amount to 49 years in prison.

7              THE COURT:  Indeed, but I don't know what the

8    sentencing Judge is going to impose.  And until that's

9    known, I don't know if it's -- Is it likely that he

10   would receive a probationary sentence?

11             I've been around the block once or twice; the

12   answer is no.  I don't think that's likely.  I don't

13   think that that would be likely.  But I don't know.  And

14   until I do, I am not changing the bail status at all.

15   Simple as that.

16             Next point?

17             MR. ROSENBLATT:  Your Honor, the case is on

18   for hearings today, and I'm asking the Court to adjourn

19   this case to a trial part because all of the issues in

20   this case in regards to the Mapp and in regards to the

21   Huntley have already been heard in Nassau County Supreme

22   Court before Justice McCormack.  The same exact issues

23   apply.

24             Therefore, the doctrine of estoppel should be

25   applied in this case.  We can't relitigate the same

                                                    hb

1    issues twice, and I would ask this case to be adjourned

2    to a trial part.

3               MR. SCHECHTER:  May it please the Court?

4               THE COURT:  Absolutely, sir.

5               MR. SCHECHTER:  With respect to the submitted,

6    we are entitled to a hearing and, namely, Mapp Hearing

7    and Huntley Hearing in this matter, because the charges

8    are much different here.

9               The charge is a B felony here, for which my

10   client can receive up to 25 years.  And theoretically,

11   25 years times 58 counts is an inordinate amount of jail

12   time.  It's consecutive with Nassau County.

13              However, that fact said, the parties are not

14   the same.  Mr. Rosenblatt was not the Assistant District

15   Attorney.  I wasn't the attorney representing Mr. Gopaul

16   in that matter.  The Court and Judge in Nassau County

17   heard those issues.

18              I respectfully submit that collateral estoppel

19   does not apply here.  Nor does any res ajudicata apply

20   here with respect to these issues.

21              I believe the Court is not foreclosed from

22   rehearing them.  I think that since there is B felonies

23   here, that they are not the same parties here, that the

24   rudiments of collateral estoppel have not been made out

25   nor was res ajudicata made out.  If res ajudicata was

                                                    hb

1    made out we would not try this case here.

2              THE COURT:  Absolutely, I agree with that

3    proposition.

4              With respect to collateral estoppel, though, I

5    disagree.  Collateral estoppel deals with the identity

6    of issues.  Not the identity of charges.

7              Clearly you have two separate jurisdictions so

8    people are going to be different.

9              But I have reviewed the decision by Judge

10   McCormack in Nassau County, and it appears from what was

11   represented to me that there is an identity of issues

12   that were fully and fairly litigated before a Judge of

13   collateral jurisdiction.  That Judge determined that the

14   admissibility of evidence was to be permitted in the

15   Nassau County trial.

16             I take note that the witnesses who testified

17   were police officers or detectives from Queens County as

18   well as the so-called Central Booking interview taken

19   here in Queens County.

20             In my opinion, the doctrine of collateral

21   estoppel was satisfied by the full litigation of the

22   identical issues in Nassau County.

23             There is no need for a hearing in my opinion

24   in this case on the issues that were already previously

25   litigated by the Nassau County Judge.  So --

- PROCEEDINGS -                                    7

1          MR. SCHECHTER:  We are dealing here, so the

2     record is clear, with Huntley issues, we are dealing

3     with Mapp issues.

4          THE COURT:  Yes, sir.

5          MR. SCHECHTER:  And those related cases that

6     relate to voluntariness, we are dealing with all those

7     issues.

8          THE COURT:  Those issues were, from what I

9     read in the Judge's decision, the issues were fully

10    litigated in Nassau County.

11         This case is now in a trial posture, unless

12    there is an offer that's too good to be refused today.

13         MR. SCHECHTER:  The District Attorney has

14    communicated to me that, if my client were so disposed

15    to take a plea, he would receive, I believe, five years

16    straight time concurrent with the time my client is to

17    receive if any in Nassau County.

18         I have communicated the offer to my client.

19    My client, although not having rejected the offer, does

20    wish the Court and the District Attorney to allow us

21    sufficient time to think about it.

22         We're scheduled for sentence, according to my

23    records, June 15th in Nassau County.

24         I therefore respectfully ask this matter be

25    put on for the next occasion either for trial or

                                                        hb

- PROCEEDINGS -                8

1    disposition, and that would be in the middle of July.

2              MR. ROSENBLATT:  Judge, my recommendation of

3    concurrent time ends today.

4              MR. SCHECHTER:  May I have a moment?

5              (Whereupon, defendant and defense attorney

6    confer off the record.)

7              THE COURT:  Mr. Schechter and Mr. Rosenblatt,

8    I do have to exonerate the old bail because bail was

9    posted in this case.

10             I am exonerating the old, resetting it to

11   three hundred thousand over one hundred fifty thousand

12   dollars.

13             Let me see if there are any endorsements with

14   respect to bail sufficiency.  No, there are not.

15             I am exonerating the old and resetting the

16   amount.  This case goes to TAP-A.

17             MR. SCHECHTER:  TAP-A?

18             THE COURT:  Yes.  It will be referred from

19   TAP-A out for trial.

20             MR. SCHECHTER:  Today?

21             THE COURT:  It will go to TAP A on whatever

22   date is picked.  That would be a trial date.

23             MR. SCHECHTER:  May I have a moment?

24             (Whereupon, defendant and defense attorney

25   confer off the record.)

                                                    hb

1              MR. SCHECHTER:  Your Honor, my client has

2    respectfully asked if I would ask the District Attorney

3    to please hold that offer open so that he can at least

4    be sentenced in Nassau County.

5              We are not going to lose anything on the next

6    date simply because if we don't take the disposition we

7    would be prepared to go forward with the trial.

8              MR. ROSENBLATT:  Judge, I am offering no

9    courtesies to this defendant.  This complaining witness

10   has testified in two Grand Juries and at a trial.  There

11   are no courtesies to be offered to him.

12             (Whereupon, defendant and defense attorney

13   confer off the record.)

14             THE COURT:  What's a good trial date, please?

15   That's it.  What's a good trial date?

16             MR. SCHECHTER:  How about July 13th which is a

17   Monday?

18             THE COURT:  Good.

19             MR. ROSENBLATT:  The 20th --

20             MR. SCHECHTER:  20th?

21             MR. ROSENBLATT:  -- is a better date.

22             MR. SCHECHTER:  20th is fine.

23             THE COURT:  7/20, TAP-A.  Mark your case for

24   trial.

25             Mr. Rosenblatt, the minutes of the hearing, I

                                                    hb

1          am returning to you, sir.

2                    We are done.  Take charge.

3                    MR. ROSENBLATT:  Thank you, your Honor.

4
                  *********************************
5    CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF THE
     ORIGINAL STENOGRAPHIC MINUTES TAKEN OF THIS PROCEEDING.
6
                         _____
7                        HELEN BOUKAS
                         Senior Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CA#

1

132/10

Copy

1  SUPREME COURT OF THE STATE OF NEW YORK.

2  COUNTY OF QUEENS: CRIMINAL TERM: PART TAP-D

3  ------------------------------------------X
   THE PEOPLE OF THE STATE OF NEW YORK     :   Indictment
4                                           :   No. 2065/08
                                            :
5            -against-                       :
                                            :
6                                           :
   HAROLD GOPAUL,                           :
7                                           :
                       Defendant.           :   CRM SX ACT 1
8                                           :
   ------------------------------------------X JURY TRIAL
9
                          125-01 Queens Boulevard
10                        Kew Gardens, New York
                          July 6, 7, 8, 9, 2010
11
   B e f o r e:
12
                   HONORABLE GREGORY L. LASAK,
13
                        Supreme Court Justice
14
   A p p e a r a n c e s:
15
            HONORABLE RICHARD A. BROWN
16              District Attorney, Queens County
            BY:  JARED ROSENBLATT, ESQ.
17

18          STANFORD BANDELLI, ESQ.
                Attorney for Defendant
19              16 Court Street
                Brooklyn, New York
20

21

22              *          *          *

23                        SHERYL FITZPATRICK, RPR CSR
                          Official Court Reporter
24

25

                                                      slf

2

Proceedings

1          THE CLERK:  Added on the calendar, Indictment 2065

2   of 2008, People versus Harold Gopaul.

3          Let the record reflect the defendant is before the

4   Court.

5          Counsel, your appearances.

6          MR. BANDELLI:  Stanford Bandelli, 16 Court Street,

7   Brooklyn, New York.

8          THE COURT:  Good afternoon, Mr. Bandelli.

9          MR. ROSENBLATT:  For the People Assistant District

10   Attorney Jared Rosenblatt.

11          THE COURT:  Is the Defendant ready for trial?

12          MR. BANDELLI:  There are several applications I

13   need to make before we get started, but after that I don't

14   see why not.

15          THE COURT:  What are your applications?

16          MR. BANDELLI:  Well, first off there was a

17   subpoena that I served several months ago on ACS or CPS

18   Administration for Children's Services.  I know that the

19   Court had received the paperwork because I received

20   correspondence from legal counsel, but I never received any

21   of the paperwork that was provided to the Court.

22          I believe some of that -- at least some of that

23   paperwork contains statements taken from the People's

24   witnesses in this case because on the police reports that

25   were previously provided it indicates that the complainant

slf

Proceedings

1   was interviewed by ACS.  So, the CPL authorizes me to have

2   access to that paperwork, and I'm more than happy to take it

3   down, Judge.

4           THE COURT:  What do you know about this?

5           MR. ROSENBLATT:  That's the first I've heard of a

6   subpoena, Judge.  I believe it was served ex parte.  I

7   anticipate in the material that I will turn over to the

8   defense for it to contain some records from ACS.  I don't

9   know what was done ex parte, but I can certainly assure the

10  Court that there are records that will be turned over as

11  part of my obligations.

12          THE COURT:  Where did this come from?  Judge

13  Buchter?

14          MR. ROSENBLATT:  No.  Judge Kron.

15          MR. BANDELLI:  Judge Buchter actually issued the

16  subpoena, but it moved to Judge Kron afterwards.

17          THE COURT:  I'll see if that paperwork is in the

18  courthouse.

19          What is your next application?

20          MR. BANDELLI:  The next application is I haven't

21  received any Rosario material from the district attorney.

22  This case is quite old.  There have been several lawyers

23  that appeared on behalf of Mr. Gopaul before I was retained.

24  I came in in October of 2009, and initially Mr. Rosenblatt

25  was, I guess, reluctant to turn over the paperwork because

Proceedings

1    he had given it to the other lawyers, and the reality is we

2    were hoping that maybe we could resolve this with a

3    disposition.  That has not come to pass.  So, I haven't

4    gotten anything from the ADA.

5                MR. ROSENBLATT:  I have a slightly different

6    version of events.  The defendant was tried in Nassau for

7    acts on the same complaining witness, Judge, and everything

8    was turned over to prior counsel in Nassau.  I informed

9    Mr. Bandelli to let me know what he had and didn't have.  He

10   said he had all sorts of different documents.

11               I have prepared a new packet currently being

12   indexed so I can have an exact record of what is being

13   turned over.  It should be done before lunch, and then

14   Mr. Bandelli will have everything that I believe his prior

15   counsel had and additional stuff that I'm not sure whether

16   they had or didn't have, but he will have everything before

17   lunch.

18               THE COURT:  Good.

19               What's your next issue?

20               MR. BANDELLI:  Next issue, Judge, I had been

21   making efforts to review the file, the Court file, in this

22   matter because I wanted to calculate the speedy trial time,

23   and unfortunately Judge Kron's part did not have that file

24   until the most recent court appearance which was just about

25   three weeks ago.

Proceedings

1     Having had an opportunity to review it, I have

2     prepared a 30.30 speedy trial motion which I'm going to

3     submit to your Honor and turn over to the prosecutor at this

4     time.

5          THE COURT:  This case was sent here as a ready

6     trial.

7          MR. BANDELLI:  I told the judge before it got sent

8     out that I had applications to make.  He was in the middle

9     of a trial.

10         Can we approach briefly?

11         THE COURT:  Approach.

12         (Side-bar discussion held off the record.)

13         THE COURT:  You wanted to make a record,

14    Mr. Bandelli?

15         MR. BANDELLI:  Yes, your Honor.

16         As I stated at the bench conference, I'd like to

17    make an application to preclude any testimony or evidence

18    regarding counts of the indictment which cover a period

19    greater than 30 days because they lack sufficient

20    specificity or specificity.  CPL 200.50 Subdivision 6

21    states, "An indictment must contain a statement in each

22    count that the offense charged therein was committed on, or

23    on or about, the designated date or during a designated

24    period of time."

25         There have been a series of cases where the Courts

slf

Proceedings

1   have interpreted this particular section of the CPL.  The

2   guiding case is People versus Morris, 61 NY 2d 290 and

3   People versus Keindel, 68 NY 2d 410.  I'll just quote some

4   of the language from there.

5            "An indictment must provide the accused with fair

6   notice of the charges against him and of the manner, time

7   and place of the conduct underlying the accusations so as to

8   enable him to answer to the charges and to prepare an

9   adequate defense.  The interval time set in each count must

10   reasonably serve the function of protecting defendant's

11   constitutional right to be informed of the nature and cause

12   of the accusation so as to enable to him to prepare a

13   defense and to plead the judgment in bar of any further

14   prosecution for the same crime."

15            There are certain factors that the Courts

16   highlight should be considered in considering the

17   sufficiency of the span of time set forth and the knowledge

18   the People have or should have of the exact date or dates of

19   the crime.  Other factors include the age and intelligence

20   of the victim or witnesses, the surrounding circumstances

21   and the nature of the offense.

22            If you look at the indictment, it has 55 counts,

23   Judge.  Essentially what the DA's office has done, it's

24   taken a three-year period or a 39-month period of time and

25   broken it up into four month blocks alleging one act

slf

Proceedings

1    occurred during one four-month block, another act occurred

2    during another four-month block, maybe another act occurred

3    during a third four-month block and so on and so forth.

4         My position, Judge, is that this is really just an

5    attempt to try and get it within the dictates of other cases

6    that have decided, Well, four months can be reasonable or

7    two months can be reasonable or six months can be

8    reasonable, but the bottom line is when you indict and

9    charge like that, how do you really distinguish, for

10   instance, whether or not -- whether or not something

11   happened if it's charged between, say, September 1, 2006 and

12   December 31, 2006.  That's a block of time.  How do you know

13   it didn't happen on August 28 of 2006, whether it didn't

14   happen on January 5 of 2007?

15        There is a problem here, Judge, and it undermines

16   the defendant's ability to defend himself.  We are talking

17   about three and a half years.  How can he say that one count

18   occurred during one four-month block period and then another

19   act occurred during another four-month block period?  How do

20   you know that both acts didn't occur during the other four

21   month block period?

22        You sort of got your hands tied behind your back

23   as a defense attorney in terms of preparing the defense and

24   in terms of complying with the CPL.

25        What I would note is that there are certain acts

slf

8

Proceedings

1      towards the end that the DA encompasses in a 30-day period.

2      From what I see in the cases, 30 days is okay, but what's

3      interesting about this case as opposed to those cases, where

4      they said 30 days was okay or two months was okay,

5      frequently the reason why there is a time issue is because

6      the complainant is either less than 11 years old or

7      suffering from some disability where time -- you know, they

8      may not be able to calculate time or remember a particular

9      date.

10             When this young woman disclosed this some three

11     and a half years after it allegedly started, she was 17

12     years old, maybe 18 years old, I think.  She was 18 years

13     old at that time.  No.  She was 17 years old.  I apologize.

14     So, she doesn't fall into that category of people who are

15     incapable of remembering a particular date or remembering a

16     particular time.

17             I don't think that the case law supports their

18     position in this particular case, and I'd like to make a

19     record, as I am, and object to the introduction of any

20     evidence that encompasses a period of 30 days or more.

21             THE COURT:  Mr. DA.

22             MR. ROSENBLATT:  Judge, there's a great deal of

23     case law that permits this type of charging by the district

24     attorney's office, and I could provide it to you after

25     lunch.

slf

9

Proceedings

1            THE COURT:  The first count you are charging that

2     on or about what?  Between May 1, 2005 and August 31, 2005

3     how many acts occurred?  One?

4            MR. ROSENBLATT:  One.  All of the time periods,

5     Judge, the testimony will be that there was one act during

6     those time periods.

7            THE COURT:  How do you pick that type of time

8     period?

9            MR. ROSENBLATT:  I'm sorry, Judge.  How did I

10    determine it?

11           THE COURT:  How did you determine the time period?

12           MR. ROSENBLATT:  I used my discretion, Judge.

13           THE COURT:  How did you determine the time period

14    besides using your discretion?

15           MR. ROSENBLATT:  Based upon my conversations with

16    the complaining witness.

17           THE COURT:  The first eight counts you talk about

18    a four-month time period and then the ninth you are talking

19    about a two-month time period.

20           MR. BANDELLI:  What happens, Judge, is you go

21    further along.  It goes back into the four-month time

22    period.

23           THE COURT:  The tenth you are talking about a

24    month.  The 11th, a month.

25           MR. ROSENBLATT:  Once we get closer, Judge, to the

Proceedings

1   day she reports it, her ability to recall the events are

2   clearer and better.  You know, obviously her memory is

3   fresher in June of '08 when she reports the crime.  So, when

4   we get to '08, her ability to say it occurred once in that

5   month, I can attest, say to a jury with certainty, that

6   that's what happened.  When we go back to '05 I use a

7   greater time period to make sure that we cover it happened

8   one time.

9          THE COURT:  Do you have any case law?

10          MR. ROSENBLATT:  Judge, I will provide case law

11   after lunch.

12          THE COURT:  Do you want to move the case to trial?

13          MR. ROSENBLATT:  Yes, your Honor.  Under

14   Indictment 2065 of 2008, the People of the State of New York

15   move the case against Harold Gopaul to trial.

16          THE COURT:  All right.  2:15.

17          MR. BANDELLI:  Thank you, Judge.

18          THE COURT:  Thank you.

19          MR. ROSENBLATT:  Can I borrow the Court's file,

20   your Honor, for a few minutes?

21          (Recess taken.)

22          *          *          *

23          THE CLERK:  Case on trial, People versus Harold

24   Gopaul.  Let the record reflect the defendant is before the

25   court.  All parties are present, your Honor.

11

Proceedings

1        THE COURT:  I received the People's response to

2    the defense's 30.30 motion.  Did you receive a copy of it?

3        MR. BANDELLI:  I did, your Honor.

4        THE COURT:  Any further argument by either side on

5    the 30.30?

6        MR. ROSENBLATT:  No.

7        THE COURT:  Mr. Bandelli.

8        MR. BANDELLI:  As far as the July 20, 2009 date

9    when the case was on in TAP-A, and the DA indicates that the

10   Court file says that the time is excludable, I don't see a

11   basis for that time to be excludable when, you know, he was

12   supposed to be here for trial.  They had sufficient notice

13   that he was supposed to be here for trial, and they knew

14   that he was in Nassau County.  I don't know how July 20

15   through September 6 is excludable at this point.

16       As far as the June 8 date, I didn't have the

17   transcript minutes that ADA Rosenblatt supplied along with

18   his response.  The file wasn't clear what had happened on

19   that date.  I relied on the file in preparing my motion, and

20   it looks like both sides were asking for an adjourned date.

21   I don't know that the DA was in fact ready to proceed on

22   June 8, 2009.  So, with regard to those two timeframes,

23   Judge, I would still argue that they are not excludable

24   under 30.30.

25       THE COURT:  Thank you.

slf

Proceedings

1       Defense application to dismiss the indictment

2   pursuant to CPL Section 210.20 Subsection 1-G and 30.30 is

3   denied.

4       Defense application to dismiss for lack of

5   specificity in the indictment is also denied.

6       MR. BANDELLI:  Note my exception, Judge.

7       THE COURT:  You have your exception for the

8   record, Mr. Bandelli.

9       Are you ready to proceed with the Sandoval

10  application?

11      MR. ROSENBLATT:  Yes, Judge.

12      THE COURT:  What, if any, prior bad acts and/or

13  convictions do you wish to cross-examine the defendant about

14  should he decide to take the witness stand in his own

15  defense?

16      MR. ROSENBLATT:  I wish to cross-examine the

17  defendant on the fact that he was convicted by a jury in

18  Nassau County.  I'm not seeking to introduce the nature of

19  those allegations.  I'm not interested in bringing up the

20  facts of the case.  I'm asking for a compromise from your

21  Honor to bring out that the defendant was convicted of

22  numerous felonies.  I'm not asking to bring out the fact

23  that they were sexual in nature.  I'm not asking that it be

24  brought up that it was his stepdaughter, but that he was

25  convicted in Nassau county in 2009.  I'm asking that I

Proceedings

13

1    should be permitted to cross-examine on that.

2              THE COURT:  What's the date of the conviction,

3    Mr. DA?

4              MR. ROSENBLATT:  The date of the conviction is

5    May, according to Nassau County, May 15, 2009 the was day

6    the jury reached a verdict.

7              THE COURT:  What was he convicted of?

8              MR. ROSENBLATT:  He was convicted of seven counts

9    of sex abuse one.

10             THE COURT:  What was the time period of those

11   incidents?

12             MR. ROSENBLATT:  Those incidents were in May of

13   2008 and June of 2008.

14             THE COURT:  Do you wish to be heard, Mr. Bandelli?

15             MR. BANDELLI:  Yes, Judge.

16             I would oppose any cross-examination on a

17   conviction that is so closely related to the facts of this

18   case.  Number one, it's the same complainant.  Number two,

19   although the charges were alleged to have happened in Nassau

20   County, the charges are identical.  They are going to bring

21   forward evidence that he was engaged in acts in Queens the

22   same time of these particular charges in Nassau County.  I

23   don't think that it serves any probative purpose at this

24   point.

25             It's my understanding that he was arrested on

                                                          slf

Proceedings

14

1    those charges subsequent to being indicted on the charges in

2    this case.  To permit the DA to cross-examine him with

3    respect to whether or not he was convicted of a crime in May

4    of 2009 offers nothing in terms of probative value, Judge,

5    but it is extremely prejudicial to my client.  He has a

6    right to testify at this trial.  This is a case that is

7    going to be based solely on the testimony of the complainant

8    and a video statement and written statements taken of my

9    client.  To permit him to be cross-examined concerning a

10   conviction that comes from the same case would undermine

11   ability to effectively represent him in terms of being

12   permitted to put him on the witness stand.

13        So, your Honor, I would argue that this is a

14   person who has been out of trouble for 99 percent of his

15   life.  In other words, there is no criminal history aside

16   from this.  There is nothing about his past behavior that

17   would demonstrate that this is somebody whose credibility

18   should be questioned based on past criminal acts.  Whether

19   or not he is credible should be based on cross-examination

20   as to the facts of this particular case.

21        So, your Honor, I vehemently oppose permitting the

22   DA to cross-examine concerning a conviction which is

23   essentially a conviction in the same matter.  You know, he

24   is supposed to be getting a new trial here.

25        THE COURT:  Thank you.

15
Proceedings

1    MR. ROSENBLATT:  Judge, I would just note one

2    inconsistency with what Mr. Bandelli said to what is

3    actually true, and that would be the fact that the defendant

4    does have prior arrests.  In fact, the defendant has two

5    prior arrests unrelated to these allegations involving his

6    stepdaughter.  I'm not seeking to go into those two

7    incidents in Nassau County where the defendant was -- excuse

8    me, three incidents -- two incidents, rather -- my

9    apologies -- where in Nassau County in 2002 he was arrested

10   for endangering the welfare of a child and petit larceny and

11   ultimately convicted of a violation, as well as the year

12   earlier in 2001 where he was arrested for patronizing a

13   prostitute.  I'm not looking to go into those facts, but I

14   would note for the record he does have prior contacts.

15        This does go to the heart of his ability to put

16   his interests above those of society, and it goes to

17   credibility which I believe the jury should be entitled to

18   hear.

19        THE COURT:  So, you are not seeking to go into

20   those other two cases.

21        MR. ROSENBLATT:  That's correct, Judge.  I just

22   want the Court to be aware of them should the defendant

23   testify and open the door.

24        THE COURT:  I'll reserve decision on that.

25        Any other matters before I bring in the jury

slf

Proceedings

1   panel?

2           MR. ROSENBLATT:  Well, I have a few matters.

3           First, I'm turning over to counsel all of the

4   Rosario material.  I've provided a list to the Court.

5           THE COURT:  Are you providing a copy of the

6   Rosario material to the Court?

7           MR. ROSENBLATT:  I can provide a copy to the

8   Court.  That copy is redacted, your Honor.  It's my

9   experience that the Court doesn't prefer to have redacted

10  versions, so I'm putting together an unredacted copy for,

11  your Honor.

12          THE COURT:  Thank you, Mr. Rosenblatt.

13          Do you have a witness list?

14          MR. ROSENBLATT:  I do.

15          THE COURT:  Do you have a proposed witness list,

16  Mr. Bandelli?

17          MR. BANDELLI:  Not at this point, Judge.

18          MR. ROSENBLATT:  Judge, even though my witness

19  list is comprised of ten names, I don't believe that I'm

20  going to call all of these individuals.  I believe some of

21  them, their names may come up during the course of the

22  trial, but I do want to reserve that right to call some of

23  these individuals, but I just wanted the Court to be aware

24  of that.

25          THE COURT:  242-10 89 Avenue is the location of

17

Proceedings

1    all of these incidents in the indictment?

2            MR. ROSENBLATT:  Correct, your Honor.

3            MR. BANDELLI:  That's not completely correct.  It

4    is also alleged there were incidents that occurred by a

5    school on Commonwealth Boulevard; is that right?

6            THE COURT:  Is that true, Mr. Rosenblatt?

7            MR. ROSENBLATT:  I just want to double check, your

8    Honor.

9            Yes.  I'm sorry.  My apologies.  There are a few

10   of the incidents occurred at 74-20 Commonwealth Boulevard.

11           THE COURT:  That's also in the Bellerose section?

12           MR. ROSENBLATT:  Yes.

13           THE COURT:  And the time period is from January 1,

14   2005 to June 21, 2008?

15           MR. ROSENBLATT:  May of 2005 is when it begins,

16   Judge, and it ends June 23, 2008 under the endangering

17   count.  The last sex crime is alleged to have occurred

18   between June 1 and June 20 of 2008.

19           THE COURT:  Anything else before we bring in the

20   panel?

21           MR. BANDELLI:  My client has executed the

22   Antommarchi.

23           THE COURT:  Thank you, Mr. Bandelli.

24           MR. ROSENBLATT:  The last two things, as I brought

25   forth to the Court's attention, I'm asking the defendant --

slf

18

Proceedings

1    well, I'm asking, your Honor, to sign a so-ordered subpoena

2    for the defendant's medical records which I believe could be

3    at issue in this case based upon his prior testimony, and

4    based upon my dealings with Long Island Jewish Hospital,

5    that's Northshore LIJ, I'm asking the defendant to sign a

6    HIPAA release as well.  The hospital is giving my office

7    numerous problems with turning over medical records without

8    HIPAA releases.

9         THE COURT:  What's your objection on that,

10   Mr. Bandelli?

11        MR. BANDELLI:  I'm not going to recommend that he

12   sign a HIPAA release at this time, Judge.

13        THE COURT:  Mr. Gopaul, I have this form in front

14   of me.  It's a waiver of defendant's presence at voir dire

15   side-bar conferences.  Is that your signature on this,

16   Mr. Gopaul?

17        THE DEFENDANT:  Yes, your Honor.

18        THE COURT:  Did you discuss this with Mr. Bandelli

19   before you signed it?

20        THE DEFENDANT:  Yes, your Honor.

21        THE COURT:  Did you understand those discussions?

22        THE DEFENDANT:  Yes, your Honor.

23        THE COURT:  You signed this under your own free

24   will?

25        THE DEFENDANT:  Yes, your Honor.

slf

Proceedings

1      THE COURT:  All right.  This will be become Court

2  Exhibit No. 1, the Antommarchi waiver.

3      (Antommarchi waiver was marked Court Exhibit

4  No. 1.)

5      THE COURT:  Bring in the jury panel.

6      MR. ROSENBLATT:  The last thing -- I'm sorry --

7  that I wanted to just make sure your Honor was aware about,

8  I mentioned to the Court earlier that I have one witness who

9  is going on vacation beginning on Monday of next week for

10  two weeks, and my readiness was based upon the fact that

11  this witness would finish testifying at the end of this

12  week.

13      THE COURT:  Oh, yeah?

14      MR. ROSENBLATT:  I had informed Judge Kron of

15  that.  His clerk informed me that he would then alert

16  whoever was sending us out that that would be acceptable

17  with the trial Court.  If we begin picking today, I see no

18  reason why that would be an issue.

19      THE COURT:  That's all up to you.

20      MR. ROSENBLATT:  Very well.

21      THE COURT:  Bring in the panel, please.

22      MR. ROSENBLATT:  I'm asking the defendant to sign

23  the HIPAA waiver.  Without it, the hospital will refuse to

24  turn over the medical records.  If he plans on testifying,

25  it's going to be a break in the trial because they are not

slf

Proceedings

1      going to give me the records.

2                THE COURT:  He doesn't want to sign it.

3                MR. ROSENBLATT:  Then I mean no disrespect to the

4      Court, but Northshore is refusing to turn over records based

5      on the judge's signature.

6                THE COURT:  Did you hear what I said?

7                MR. ROSENBLATT:  I understand that, Judge, and I

8      will plan on using that during cross-examination.

9                THE COURT:  Plan on using what?

10               MR. ROSENBLATT:  I'm sorry.

11               THE COURT:  Plan on using what?

12               MR. ROSENBLATT:  The fact that he refused to sign

13     a HIPAA waiver in order for me to obtain his medical

14     records.

15               THE COURT:  We will deal with that if he decides

16     to take the witness stand.

17               Bring in the panel, please.

18               (Panel of prospective jurors enters the

19     courtroom.)

20               THE CLERK:  Case on trial.  People versus Howard

21     Gopaul all parties are present, your Honor.

22               THE COURT:  Good afternoon, ladies and gentlemen,

23     and welcome to an American court of law.  I'm justice

24     Gregory Lasak.  I'll be presiding over this trial which is a

25     trial of a criminal matter entitled the People of the State

                                                              slf

21
Proceedings

1    of New York against Harold Gopaul, the defendant, charging

2    him with various counts of criminal sexual act in the first

3    degree, sexual abuse in the first degree, criminal sexual

4    act in the second degree and third degrees, assault in the

5    third degree and endangering the welfare of a child.

6              Before we go any further, I'm going to ask that

7    the clerk please swear you in.

8              THE CLERK:  Will all members of the panel please

9    rise and raise your right hand.

10             (Panel sworn in by the clerk of the court.)

11             THE COURT:  Please fill up the jury box.

12             THE CLERK:  If your name is called, follow the

13   instructions of the court officer.

14             Nancy E. Rudolph, R-u-d-o-l-p-h, seat number one,

15   please.

16             Kevin Leong, L-e-o-n-g, seat number two, please.

17             Michael Falci, F-a-l-c-i, seat number three.

18             Timothy J. Luke, L-u-k-e, seat number four,

19   please.

20             Ramon Cruz, C-r-u-z, seat number five, please.

21             Jerin Varghese, J-e-r-i-n, V-a-r-g-h-e-s-e, seat

22   number six, please.

23             Michele L. Manisoff, M-a-n-i-s-o-f-f, seat number

24   seven, please.

25             Janessa Martinez, M-a-r-t-n-e-z, seat number

slf

Proceedings

1    eight, please.

2            Nancy D. Rokano, R-o-k-a-n-o, seat number nine,

3    please.

4            Cynthia G. Suarez, S-u-a-r-e-z, seat number ten.

5            Mustafizur Rahman, M-u-s-t-a-f-i-z-u-r, last name

6    R-a-h-m-a-n, seat number 11, please.

7            Urmrula M. Lackhan, U-r-m-r-u-l-a, last name

8    L-a-c-k-h-a-n, seat number 12, please.

9            Luis A. Perez, P-e-r-e-z, seat number 13, please.

10           Leidy Polanco, L-e-i-d-y, last name P-o-l-a-n-c-o,

11   seat number 14, please.

12           Gibson S. Pereira, P-e-r-e-i-r-a, seat number 15,

13   please.

14           Nicholas Singh, S-i-n-g-h, seat number 16, please.

15           THE COURT:  I'm going to be addressing the 16

16   prospective jurors who are seated in the jury box, but I'd

17   like everybody out there to please pay attention because you

18   will be coming up here next.

19           We are going to be selecting a jury on this case,

20   and the purpose of jury selection is to impanel a jury that

21   can be fair and impartial to both sides and that represents

22   a good cross-section of our community here in Queens County,

23   and by the looks of this jury panel I can see it does

24   represent a good cross-section of our community here in

25   Queens County.

Proceedings

23

1      As you know, or should know, the district attorney

2   of this county is Richard Brown, and he appoints assistant

3   district attorneys to represent him and the People of the

4   State of New York in these criminal trials here in Kew

5   Gardens, and representing the People in this case will be

6   Assistant District Attorney Jared Rosenblatt.

7      Would you stand up, please?

8      MR. ROSENBLATT:  Good afternoon.  Good afternoon.

9      THE COURT:  I said the defendant is Harold Gopaul.

10   He is seated at the table in the white shirt, and

11   representing him is his attorney Mr. Stanford Bandelli.

12      Would you please stand up.

13      MR. BANDELLI:  Good afternoon, ladies and

14   gentlemen.  Good afternoon, everybody.

15      THE COURT:  I'm going to read you a list of

16   prospective witnesses or people whose names may come up

17   during the course of this trial to see if you are familiar

18   with them or you are familiar with any of the parties

19   involved in this case.

20      Sana Awan, Denise Alioto, Christine Alioto,

21   Detective Lennard Schulman, ADA Brian Hughes, Police Officer

22   Celica Alfaro, Police Officer Sara Morris, Barbara

23   Heffernan, and Dr. Done Lewittes.

24      If anyone is familiar with those names or parties

25   involved, just let me know while you are seated in the box.

slf

Proceedings

1          The time period we are going to be concerned with

2     is May 2005 to June 2008, and the locations we are going to

3     be concerned with are 242-10 89 Avenue and 74-20

4     Commonwealth Boulevard.  Those locations are in the

5     Bellerose section of eastern Queens.

6          Is anyone in the jury box familiar with any of

7     those names?  Please raise your hand.  Okay.  That's good.

8          Serving on a jury is part of your obligation as

9     citizens of this county here in Queens.  It's also a

10    privilege to sit as a juror on a criminal case.  We are

11    going to be asking you various questions about your

12    background to see if you are qualified to sit as jurors in

13    this case.  I just want to tell you I believe you are all

14    here on your first day of jury service; is that correct?

15         All right.  This trial will not last longer than

16    your two-week commitment for jury service in case any of you

17    have any vacation plans or any commitments.  It's not going

18    to go beyond two weeks if anyone has a concern with that.

19         I'm going to start by giving you three basic

20    principles of law that apply to every criminal case in New

21    York State regardless of what the charges are, and these

22    basic principles of law apply to every criminal case in New

23    York State since we started New York State hundreds of years

24    ago, and they are:

25         Number one, the defendant is presumed innocent;

Proceedings

1    Number two, the DA has the burden to prove him
2    guilty beyond a reasonable doubt.  I'll explain that term to
3    you later on during the course of the trial in more detail,
4    and if the defendant decides not to testify in his own
5    behalf, that's not a factor from which you can draw an
6    inference unfavorable to him.
7    Anyone here in the jury box have a problem
8    understanding those basic principles or understanding
9    English, raise your hand.  Everyone here is totally fluent
10   in English?  If you have a problem understanding English,
11   let me know right now.
12   Again, as I said, this is part of your obligation
13   as citizens of Queens to sit as jurors.  I know we take you
14   away from your lives for a short period of time every number
15   of years, but don't try to get out of jury duty here because
16   I'm not going to be too happy about that.  You understand
17   that?  This is an obligation that you have.
18   Miss Rokano, do you want to come up here, please?
19   (The following proceedings took place at
20   side-bar.)
21   THE COURT:  Good afternoon, Miss Rokano.
22   PROSPECTIVE JUROR:  Good afternoon.
23   THE COURT:  You have a problem understanding?
24   PROSPECTIVE JUROR:  I understand just a little,
25   not too much, and I don't think so it's not enough.

slf

26

Proceedings

1           THE COURT:  What?

2           PROSPECTIVE JUROR:  I think it's not enough

3    understand.

4           THE COURT:  How long have you been in this

5    country?

6           PROSPECTIVE JUROR:  Nine years.

7           THE COURT:  Nine years?

8           PROSPECTIVE JUROR:  Yes.

9           THE COURT:  Are you working?

10           PROSPECTIVE JUROR:  No.

11           THE COURT:  It's very important for a juror on a

12    criminal case to understand English a hundred percent;

13    otherwise, it wouldn't be fair.  So, I appreciate your

14    coming in as a good citizen, but if you don't understand

15    English a hundred percent, it wouldn't be fair to either

16    side.  You understand that right?

17           PROSPECTIVE JUROR:  Yes.

18           THE COURT:  We are going to let you go back home,

19    okay?

20           PROSPECTIVE JUROR:  Okay.

21           THE COURT:  Thank you very much.  The officer will

22    give you a slip.

23           Miss Rokano is excused consent of both sides?

24           MR. ROSENBLATT:  Yes.

25           MR. BANDELLI:  Yes.

slf

27

Proceedings

1          THE COURT:  Miss Suarez.  Good afternoon,

2     Miss Suarez.

3          PROSPECTIVE JUROR:  Hi.

4          THE COURT:  You have a problem understanding

5     English?

6          PROSPECTIVE JUROR:  I speak English, but only

7     legal terms you are using I can't understand everything, and

8     I understand what's going on but not everything what you

9     say.

10         THE COURT:  Okay.  How long have you been in this

11    country?

12         PROSPECTIVE JUROR:  Sixteen years.

13         THE COURT:  Sixteen?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  Are you working?

16         PROSPECTIVE JUROR:  Yes.

17         THE COURT:  What do you do?

18         PROSPECTIVE JUROR:  Roosevelt Hotel server/

19    waitress.

20         THE COURT:  Okay.  Do you speak English during the

21    day there?

22         PROSPECTIVE JUROR:  Yes, all day.  I don't

23    understand all the legal terms you use.

24         THE COURT:  Okay.

25         PROSPECTIVE JUROR:  But I understand.

slf

Proceedings

1           THE COURT:  You see, in a criminal case it's very

2    important for a juror to understand English a hundred

3    percent; otherwise, it wouldn't be fair to either side here.

4    So, we appreciate your being a good citizen and coming in to

5    serve as a juror, but we are going to excuse you from this

6    case.  Okay?

7           PROSPECTIVE JUROR:  Okay.

8           THE COURT:  You will be able to go back to work

9    tomorrow if you like.

10           PROSPECTIVE JUROR:  Okay.

11           THE COURT:  The officer will give you the slip.

12           Prospective juror Miss Suarez is excused consent

13    of both sides?

14           MR. ROSENBLATT:  Yes, sir.

15           MR. BANDELLI:  Yes, sir.

16           THE COURT:  Anyone else?

17           (In open court.)

18           THE CLERK:  Andrew T. Fishtein, F-i-s-h-t-e-i-n,

19    seat number nine, please.

20           Justin S. Marks, M-a-r-k-s, seat number ten,

21    please.

22           THE COURT:  Good afternoon, Mr. Fishtein and

23    Mr. Marks.  Did you both hear those basic principles I just

24    stated?

25           PROSPECTIVE JUROR:  Yes.

Proceedings

29

1        PROSPECTIVE JUROR:  Yes.

2        THE COURT:  Either of have you a problem

3    understanding them?

4        PROSPECTIVE JUROR:  No.

5        PROSPECTIVE JUROR:  No.

6        THE COURT:  Now that I know everyone in the jury

7    box understood those three basic principles, anyone have a

8    problem following them?  Please raise your hand.

9        See, if you are selected as a juror, you become

10   what we call the judge of the facts, and I'm the judge of

11   the law, and you must accept the law as I give it to you and

12   will continue to give it to you during the course of this

13   trial.  That's my job.  You must accept it even if you

14   disagree with it.  Do you understand that?  Good.

15       I'm going to ask you a series of questions, and

16   you will respond by raising your hand.

17       Anyone in the jury box ever served as a juror

18   before on a criminal case and actually sat and listened to

19   testimony as a juror on a criminal case?  Please raise your

20   hand if you have done that in the past.

21       Mr. Cruz.

22       PROSPECTIVE JUROR:  Yes.

23       THE COURT:  About how many years ago was that?

24       PROSPECTIVE JUROR:  Six years ago.

25       THE COURT:  Six years ago?

Proceedings

1      PROSPECTIVE JUROR:  Yes.

2      THE COURT:  And without telling me what it was,

3  were you able to reach a verdict?

4      PROSPECTIVE JUROR:  We actually didn't go to the

5  full extent.  I think he copped a plea, and we were

6  dismissed after that.

7      THE COURT:  All right.  What was the charge in

8  that case?  Do you remember?

9      PROSPECTIVE JUROR:  Vehicular manslaughter.

10     THE COURT:  All right.  Did anyone else have their

11  hand up?

12     Next question.  Any of you been the victim of a

13  crime?  If you have been the victim of a crime, please raise

14  your hand.  Have your car stolen or somebody hurt you in

15  some way that you called the police.  Someone broke into

16  your home.  Anything like that.  No one here?

17     Mr. Varghese.

18     PROSPECTIVE JUROR:  Yes.  I just wanted to make it

19  clear, my family went through identity theft but that --

20     THE COURT:  What?

21     PROSPECTIVE JUROR:  Identity theft.

22     Would that be considered --

23     THE COURT:  Yes.  That's a crime.

24     Did you call the police?

25     PROSPECTIVE JUROR:  Yes.

Proceedings

1    THE COURT:  Was anyone arrested?

2    PROSPECTIVE JUROR:  No.  There was just an

3    investigation.

4    THE COURT:  How long ago was that?

5    PROSPECTIVE JUROR:  There was two.  One one year

6    ago and another about ten years ago.

7    THE COURT:  The one a year ago, is that still

8    going on?

9    PROSPECTIVE JUROR:  I'm not sure right now.

10    THE COURT:  That's a real headache.

11    PROSPECTIVE JUROR:  Yes.  Absolutely.

12    THE COURT:  I'm sure you agree that has nothing to

13    do with this case and this defendant.

14    PROSPECTIVE JUROR:  Sure.

15    THE COURT:  You can be fair to both sides?

16    PROSPECTIVE JUROR:  Yes.

17    THE COURT:  Thank you.

18    Mr. Singh.

19    PROSPECTIVE JUROR:  Yes.  Wife was stalked.

20    THE COURT:  Your wife was stalked?

21    PROSPECTIVE JUROR:  Yes.

22    THE COURT:  Was that in Queens --

23    PROSPECTIVE JUROR:  Yes.

24    THE COURT:  Did you call the police?

25    PROSPECTIVE JUROR:  Yes.

slf

Proceedings

32

1 THE COURT:  Was anyone arrested?

2 PROSPECTIVE JUROR:  No.

3 THE COURT:  Anything about that that would give

4 you a problem sitting as a fair juror here?

5 PROSPECTIVE JUROR:  I'm not sure I could answer

6 that question until I hear the facts of the case.

7 THE COURT:  Well, would you agree with me that

8 that has nothing to do with this case?

9 PROSPECTIVE JUROR:  Again, I can't say unless I

10 hear the facts of the case.

11 THE COURT:  Come up, Mr. Singh.

12 (The following proceedings took place at

13 side-bar.)

14 THE COURT:  You don't think this defendant had

15 anything to do with your incident; do you?

16 PROSPECTIVE JUROR:  The man that stalked my wife

17 was never found.  It went on for about nine months to a

18 year.

19 THE COURT:  That's not the question.  I said do

20 you think he has anything to do with your incident.

21 PROSPECTIVE JUROR:  Well, like I said, I haven't

22 heard the facts of his case.  I can't clearly say yes or no.

23 THE COURT:  All right.  So, we can't talk about

24 the facts of the case during jury selection, so you think

25 that might be a problem?

slf

Proceedings

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Would it help if I told you that there

3    is no stalking involved in this case?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  There is no stalking involved here, is

6    there, Mr. DA?

7          MR. ROSENBLATT:  No.

8          THE COURT:  Okay.  Does that relieve your concern?

9          PROSPECTIVE JUROR:  There is no concerns.

10          THE COURT:  You could be fair to both sides?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Okay.  Thank you very much.

13          (In open court.)

14          THE COURT:  Anybody else have their hand up now

15    that you have had time to think about it?

16          No one had their car stolen or house broken into?

17    Good.

18          Next question, any of you in the jury box or

19    anyone close to you, whether it's a close friend, relative,

20    ever been arrested or accused of a crime?

21          Have any of you or anyone close to you ever been

22    arrested or accused of a crime?  Please raise your hand.

23          Mr. Cruz, come up, please.

24          (The following proceedings took place at

25    side-bar.)

Proceedings

34

1          THE COURT:  Who do you know that was arrested?

2          PROSPECTIVE JUROR:  I was.

3          THE COURT:  How long ago?

4          PROSPECTIVE JUROR:  About six years ago.

5          THE COURT:  Was that in Queens?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  What were you charged with?

8          PROSPECTIVE JUROR:  Simple assault.

9          THE COURT:  Was it somebody that you knew?

10         PROSPECTIVE JUROR:  It was -- I'm president of my

11    co-op, and it was a tenant tried to assault me.

12         THE COURT:  What precinct was involved?

13         PROSPECTIVE JUROR:  What?

14         MR. BANDELLI:  You said he tried to assault you

15    and you were arrested?

16         PROSPECTIVE JUROR:  That's correct, yes.

17         THE COURT:  What precinct was that?

18         PROSPECTIVE JUROR:  109.

19         THE COURT:  In Flushing?

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  And what happened to the charges?

22         PROSPECTIVE JUROR:  They were sealed.  I was never

23    told by my attorney.

24         THE COURT:  How many times did you have to go to

25    court?

slf

Proceedings

1          PROSPECTIVE JUROR:  About 16 times.

2          THE COURT:  And was it dismissed and sealed?

3          PROSPECTIVE JUROR:  If I knew that I would tell

4     you, your Honor.

5          THE COURT:  Okay.  Do you think you were treated

6     fairly or unfairly by the criminal justice system?

7          PROSPECTIVE JUROR:  Unfairly.

8          THE COURT:  Any bad feelings towards the Police

9     Department or the DA?

10         PROSPECTIVE JUROR:  Well, I served on the Police

11    Department for 20 years.

12         THE COURT:  As a police officer?

13         PROSPECTIVE JUROR:  Yes.  Retired from there 21

14    years ago.

15         THE COURT:  Where did you work?

16         PROSPECTIVE JUROR:  I worked in the 30 Precinct.

17         THE COURT:  Manhattan?

18         PROSPECTIVE JUROR:  Yes, your Honor, Sugar Hill.

19    I was also in the Air Force for 30 years, too, running both

20    things concurrently.

21         THE COURT:  What are you doing now?

22         PROSPECTIVE JUROR:  Retired fully.

23         THE COURT:  So, any bad feelings towards the

24    criminal justice system in Queens?

25         PROSPECTIVE JUROR:  Well, I have doubts about the

slf

36

Proceedings

1    system.  Yes, I do.  Like I said, I was assaulted, and yet I

2    was arrested and the other individual was not.

3            THE COURT:  You think that might affect your

4    ability to be fair in this case?

5            PROSPECTIVE JUROR:  Well, I have my doubts, like I

6    say, about the system.

7            THE COURT:  Okay.  What happened to you may come

8    into play?

9            PROSPECTIVE JUROR:  It certainly might.

10           THE COURT:  It may affect your ability to be fair?

11           PROSPECTIVE JUROR:  That's correct.

12           THE COURT:  All right.  We are going to excuse you

13   from this case, Mr. Cruz.  Go to central jury to sit on

14   civil cases.

15           PROSPECTIVE JUROR:  No problem.

16           THE COURT:  Thank you for your honesty.

17           Prospective jurors Cruz is excused on consent of

18   both sides?

19           MR. BANDELLI:  Yes.

20           MR. ROSENBLATT:  Yes.

21           THE COURT:  Mr. Singh, who do you know that was

22   arrested?

23           PROSPECTIVE JUROR:  I was.

24           THE COURT:  About how long ago?

25           PROSPECTIVE JUROR:  Once in 1999 and once in 2002.

slf

Proceedings

1      THE COURT:  What happened in '99?  What were you

2  charged with?

3      PROSPECTIVE JUROR:  Underage possession of

4  alcohol.

5      THE COURT:  Where was that?  In Queens?

6      PROSPECTIVE JUROR:  Florida.

7      THE COURT:  Florida?

8      PROSPECTIVE JUROR:  Yes.

9      THE COURT:  Were you actually arrested, or did

10  they give you a summons?

11      PROSPECTIVE JUROR:  I believe I was arrested.

12      THE COURT:  What happened to the case?

13      PROSPECTIVE JUROR:  Paid a summons.  Paid $400

14  fine.

15      THE COURT:  The one in 2002, you said.

16      PROSPECTIVE JUROR:  Yes.  Loitering.

17      THE COURT:  Where was that?

18      PROSPECTIVE JUROR:  Queens, Bayside.

19      THE COURT:  What were the circumstances behind

20  that?

21      PROSPECTIVE JUROR:  Outside of a high school for

22  too long, and he arrest me and took me to local jail, local

23  precinct.

24      THE COURT:  The 111 Precinct?

25      PROSPECTIVE JUROR:  Yes, 111, Northern Boulevard.

slf

Proceedings

1      THE COURT:  What happened to your case?

2      PROSPECTIVE JUROR:  Went to court three or four

3   times and was found innocent.

4      THE COURT:  You went to trial?

5      PROSPECTIVE JUROR:  Yes, because they said if I

6   didn't and if I paid the $25 fine, I would have a record

7   because I was over the age of 18.

8      THE COURT:  You actually had a jury trial or a

9   judge trial?

10      PROSPECTIVE JUROR:  Judge.

11      THE COURT:  Do you feel that you were treated

12   fairly by the system?

13      PROSPECTIVE JUROR:  Unfairly.

14      THE COURT:  Unfairly?

15      PROSPECTIVE JUROR:  Yes.

16      THE COURT:  In both of those cases?

17      PROSPECTIVE JUROR:  No.  In the second case.  I

18   was treated fairly in the first.

19      THE COURT:  That case, the second one, was

20   prosecuted by the Queens DA's office?

21      PROSPECTIVE JUROR:  Yes.

22      THE COURT:  Do you have any bad feelings based

23   upon the feelings that you were treated unfairly?

24      PROSPECTIVE JUROR:  In terms of the policeman,

25   yes, I was treated unfairly.  I was profiled.

slf

Proceedings

1    THE COURT:  You think that might affect your

2    ability to be fair in this case?

3    PROSPECTIVE JUROR:  Again, I'm on the fence.  It's

4    hard for me.  I've since joined the clergy.

5    THE COURT:  Congratulations.

6    PROSPECTIVE JUROR:  I'm a person that I cannot

7    answer without knowing facts.

8    THE COURT:  Okay.  You see, this is the only time

9    that we can talk to each other.  If there a possibility that

10   your feelings towards police may come into play when you are

11   making a decision on this case, you have to let me know now

12   if there is a possibility.

13   PROSPECTIVE JUROR:  There is a possibility.

14   THE COURT:  Okay.

15   PROSPECTIVE JUROR:  Based on prior knowledge.

16   THE COURT:  Okay.  We are going to excuse you from

17   this case.

18   PROSPECTIVE JUROR:  Okay.  We will have you sit on

19   civil cases.  Thank you for your honesty.  Have a nice day,

20   sir.

21   Mr. Singh is excused consent of both sides?

22   MR. ROSENBLATT:  Yes.

23   MR. BANDELLI:  Yes.

24   (In open court.)

25   THE CLERK:  Carroll Mohammed, M-o-h-a-m-m-e-d,

Proceedings

1    please take seat number five.

2              Brian M. Lall, L-a-l-l, seat number 16.

3              THE COURT:  Good afternoon, Miss Mohammed and

4    Mr. Lall.  Did both of you hear those three basic principles

5    of law?

6              PROSPECTIVE JUROR:  Yes.

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  Either of you have a problem

9    understanding them?  Please raise your hand.  Either of you

10   have a problem following them?  You have to speak.

11             PROSPECTIVE JUROR:  No.

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  Okay.

14             Either of you ever served as a juror before in a

15   criminal case?

16             PROSPECTIVE JUROR:  No.

17             PROSPECTIVE JUROR:  No.

18             THE COURT:  Either of you been the victim of a

19   crime?

20             PROSPECTIVE JUROR:  No.

21             PROSPECTIVE JUROR:  No.

22             THE COURT:  Either of you or anyone close to you

23   ever been arrested or accused of a crime?

24             PROSPECTIVE JUROR:  No.

25             PROSPECTIVE JUROR:  Yes.

Proceedings

41

1      THE COURT:  Come up, Mr. Lall.

2           (The following proceedings took place at

3      side-bar.)

4           PROSPECTIVE JUROR:  Hi.

5           THE COURT:  Who do you know that was arrested?

6           PROSPECTIVE JUROR:  One of my friends from high

7      school.  He was accused of stealing a bicycle, but it was

8      dismissed because they had a security camera, and they

9      thought it was him, but he was at work, so he got his time

10     sheet when he clocked in for the trial, and it was

11     dismissed.

12          THE COURT:  What high school?

13          PROSPECTIVE JUROR:  John Adams.

14          THE COURT:  You think that he was treated fairly

15     or unfairly by the system?

16          PROSPECTIVE JUROR:  He was held overnight in

17     booking right here, Central Booking, and I thought that was

18     unfair because he had to stay the whole night for something

19     that he didn't do.

20          THE COURT:  They let him go the next day, right?

21          PROSPECTIVE JUROR:  Yeah.

22          THE COURT:  You think what happened to your friend

23     would affect your ability to be fair?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  That has nothing to do with this case?

slf

Proceedings

42

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  You can be fair to both sides?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  You can take a seat.

5          (In open court.)

6          THE COURT:  You heard me read the list of charges

7     in the indictment.  They are of a sexual nature, and they

8     involve a family member.

9          Anything about the nature of those charges that

10    give you a problem sitting on this trial?  Raise your hand.

11         Mr. Luke.

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  Come up here, please.

14         (The following proceedings took place at

15    side-bar.)

16         THE COURT:  Why would it give you a problem?

17         PROSPECTIVE JUROR:  One of my best friends was

18    sexually abused at the age of seven, and the abuse continued

19    until she was a teenager.

20         THE COURT:  You think based on what happened to

21    your friend you would have a problem being fair in this

22    case?

23         PROSPECTIVE JUROR:  I might.

24         THE COURT:  All right.  I'm going to excuse you

25    from this case.  We will have you sit on civil cases.  Okay?

slf

Proceedings                                      43

1              PROSPECTIVE JUROR:  Thank you.

2              THE COURT:  Thank you for your honesty, Mr. Luke.

3      Mr. Luke is excused consent of both sides?

4              MR. ROSENBLATT:  Yes.

5              MR. BANDELLI:  Absolutely.

6              THE COURT:  Michele Manisoff, why would you have a

7      problem with the charges?

8              PROSPECTIVE JUROR:  Well, I do work with children.

9      I feel --

10             THE COURT:  You what?

11             PROSPECTIVE JUROR:  I work with children.  I feel

12     very strongly about helpless people being attacked, and I

13     could feel myself getting kind of emotional about the

14     subject, so I didn't know how fair I could be.

15             THE COURT:  All right.  What do you with children?

16             PROSPECTIVE JUROR:  I work in the schools as an

17     occupational therapist.

18             THE COURT:  In the City system?

19             PROSPECTIVE JUROR:  Yes, but not for the City

20     system.  I work in the City system.

21             THE COURT:  Based upon your job, you think that if

22     you heard charges involving a young person --

23             PROSPECTIVE JUROR:  Well --

24             THE COURT:  -- those charges would give you a

25     problem being fair?

                                                          slf

Proceedings

1      PROSPECTIVE JUROR:  I feel very emotional about it

2  whether or not I was working in the field.  If helpless

3  people are possibly being attacked, I think it would I would

4  be very emotionally clouded.  Whether or not I worked with

5  children really doesn't have that much to do with it, but it

6  sort of brings it to my attention a little more.

7      THE COURT:  So, because of these charges you would

8  have a problem?

9      PROSPECTIVE JUROR:  Possibly.  It might be harder

10  to be fair.

11      THE COURT:  We are going to have you sit on civil

12  cases.  I appreciate your honesty.  Thank you, ma'am.

13      Miss Manisoff is excused on consent of both sides?

14      MR. ROSENBLATT:  Yes.

15      MR. BANDELLI:  Yes.

16      (In open court.)

17      THE COURT:  Fill the seats, please.

18      THE CLERK:  Nandinee Singh, N-a-n-d-i-n-e-e, last

19  name S-i-n-g-h, seat number four, please.

20      Jennifer L. Chen, C-h-e-n, seat number seven,

21  please.

22      THE COURT:  Good afternoon, Miss Singh --

23      PROSPECTIVE JUROR:  Yes.

24      THE COURT:  -- and Miss Chen.

25      Did you both hear these three basic principles of

Proceedings

1      law?

2                     PROSPECTIVE JUROR:  Yes.

3                     THE COURT:  Either of have you a problem

4      understanding them?

5                     PROSPECTIVE JUROR:  No.

6                     THE COURT:  Either of you have a problem following

7      them?

8                     PROSPECTIVE JUROR:  No.

9                     THE COURT:  Either of you ever been the victim of

10     a crime?

11                    PROSPECTIVE JUROR:  No.

12                    THE COURT:  Either of you ever served as a juror

13     before in a criminal case?

14                    PROSPECTIVE JUROR:  No.

15                    THE COURT:  Either of you or anyone close to you

16     ever been arrested or accused of a crime?

17                    PROSPECTIVE JUROR:  No.

18                    PROSPECTIVE JUROR:  Yes.

19                    THE COURT:  Come up, Miss Singh.

20                    (The following proceedings took place at

21     side-bar.)

22                    THE COURT:  Who do you know that was arrested?

23                    PROSPECTIVE JUROR:  My husband's nephew.

24                    THE COURT:  About how long ago?

25                    PROSPECTIVE JUROR:  A couple of years ago.

Proceedings

1          THE COURT:  Was that in Queens?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  What was he charged with?

4          PROSPECTIVE JUROR:  Fighting in school.

5          THE COURT:  Fighting?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Was that in high school?

8          PROSPECTIVE JUROR:  High school.

9          THE COURT:  What high school was that?

10          PROSPECTIVE JUROR:  The one by Parsons Boulevard.

11          THE COURT:  Hillcrest High School.

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  And what happened to his case?

14          PROSPECTIVE JUROR:  It was jail.

15          THE COURT:  He went to jail?

16          PROSPECTIVE JUROR:  He went to jail, but he is out

17   now.  He served a couple of months.

18          THE COURT:  Did you visit him in jail?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  And how is he doing now?

21          PROSPECTIVE JUROR:  He is okay.

22          THE COURT:  No problems?

23          PROSPECTIVE JUROR:  No.  He is married, has kids,

24   a wife.

25          THE COURT:  Was he the only one arrested, or was

Proceedings

1    anyone arrested with him?

2              PROSPECTIVE JUROR:  I don't know the details of

3    the case.

4              THE COURT:  Do you think that he was treated

5    fairly or unfairly by the criminal justice system?  Do you

6    think he was treated fairly or unfairly?

7              PROSPECTIVE JUROR:  Unfair because kids, they

8    fight, they tease and, you know.

9              THE COURT:  Okay.  Was the person hurt badly do

10   you know?

11             PROSPECTIVE JUROR:  No.  No.

12             THE COURT:  No?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  Was it just a fight with fists?

15             PROSPECTIVE JUROR:  It was a fist fight.

16             THE COURT:  No weapons?

17             PROSPECTIVE JUROR:  Probably a knife I think.

18             THE COURT:  A knife?

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  Your nephew had a knife?

21             PROSPECTIVE JUROR:  I think so, yeah.

22             THE COURT:  And did he tell you that he didn't do

23   it?

24             PROSPECTIVE JUROR:  No, I didn't talk.  No.  I

25   don't know anything about the story.  No.

Proceedings

1      THE COURT:  So, why do you think he was treated

2   unfairly?

3      PROSPECTIVE JUROR:  When you go to school kids,

4   they fight, they tease you and stuff like that.

5      THE COURT:  They were teasing him?

6      PROSPECTIVE JUROR:  Black boys, yes.

7      THE COURT:  Do you think what happened to your

8   nephew might give you a problem sitting as a juror here?

9      PROSPECTIVE JUROR:  Not really.

10      THE COURT:  You could be fair to both sides?

11      PROSPECTIVE JUROR:  Yeah, but I have a problem by

12   myself.  I'm using lexapro, and I'm like nervous and

13   anxious, anxiety problem.

14      THE COURT:  Oh, are you feeling anxious now?

15      PROSPECTIVE JUROR:  Yes.  Nervous and -- yeah.

16      THE COURT:  Do you think that would give you a

17   problem paying attention here?

18      PROSPECTIVE JUROR:  Yes.  Yes.

19      THE COURT:  You would be very nervous and anxious?

20      PROSPECTIVE JUROR:  I am nervous, yes.

21      THE COURT:  We don't want you to get sick.  We are

22   going to excuse you.

23      PROSPECTIVE JUROR:  Thank you.

24      THE COURT:  Thank you for your honesty.  Excused

25   from jury duty.

Proceedings

49

1          Miss Singh is excused consent of both sides?

2          MR. ROSENBLATT:  Yes.

3          MR. BANDELLI:  Yes.

4          THE COURT:  Miss Martinez.

5          PROSPECTIVE JUROR:  Yes.  I've been arrested

6    before.  I've been arrested before.  I didn't know if it was

7    a misdemeanor or a felony or both in the same.

8          THE COURT:  When were you arrested?

9          PROSPECTIVE JUROR:  2005 July, Atlanta, Georgia.

10         THE COURT:  What were you charged with?

11         PROSPECTIVE JUROR:  DUI.

12         THE COURT:  Were you involved in an accident or a

13   traffic stop?

14         PROSPECTIVE JUROR:  No.  A traffic stop.

15         THE COURT:  What happened to your case?

16         PROSPECTIVE JUROR:  I pleaded guilty, and I served

17   my time not in the jail but, I mean, you know, like I did

18   community service and all.

19         THE COURT:  Were you going to school?

20         PROSPECTIVE JUROR:  I paid my fines.

21         THE COURT:  Were you going to school down there?

22         PROSPECTIVE JUROR:  No.  I was working.

23         THE COURT:  Do you think they treated you fairly

24   down there?

25         PROSPECTIVE JUROR:  Yes, sir.

slf

Proceedings

1    THE COURT:  No bad feelings towards law

2    enforcement?

3    PROSPECTIVE JUROR:  Not a problem.  No, not at

4    all.

5    THE COURT:  Can you be fair to both sides?

6    PROSPECTIVE JUROR:  Absolutely.

7    THE COURT:  Thank you, Miss Martinez.

8    (In open court.)

9    THE COURT:  Anyone else have their hand up?

10    Mr. Rahman, come up.

11    (The following proceedings took place at

12    side-bar.)

13    THE COURT:  How are you this afternoon?

14    PROSPECTIVE JUROR:  I have a doctor appointment,

15    endoscopy, tomorrow morning.

16    THE COURT:  Endoscopy tomorrow morning?

17    PROSPECTIVE JUROR:  Yes.

18    THE COURT:  Well, that's important.  We don't want

19    you to miss that.  Okay.  We are going to excuse you.

20    Excused from jury duty.

21    Mr. Rahman is excused consent of both sides?

22    MR. ROSENBLATT:  Yes.

23    MR. BANDELLI:  Yes.

24    (In open court.)

25    THE COURT:  Ladies and gentlemen, during the

51
Proceedings

1    course of the trial every time jurors leave the courtroom I

2    have to give certain, what we call, admissions.  They are

3    that you are not to discuss this case among yourselves or

4    with anyone else.  If anyone tries to discuss it with you,

5    you are to bring it to my attention immediately.  You are

6    not to visit any location that's been mentioned so far, and

7    you are not to form any opinion as to whether or not you

8    feel the defendant is guilty or not guilty of the crimes

9    with which he is charged.

10       We are going to recess for the evening.  We are

11   going to resume jury selection tomorrow morning at 9:30.

12   Follow the instruction of the court officers.  Don't anyone

13   start moving around.  If you should see any of the parties

14   in the hallway or in the elevator or out in the street,

15   don't try to engage them in any conversation because, for

16   obvious reasons, they are not allowed to talk to jurors

17   during the course of the case that they are trying.  You all

18   understand that?

19       Have a good evening.  Get home safely.  Follow the

20   instruction of the court officer.

21            (Panel of prospective jurors exits the courtroom.)

22            (Continued on next page.)

23

24

25

52

Proceedings

1          THE COURT:  Any matters before we recess?

2          MR. BANDELLI:  No.

3          MR. ROSENBLATT:  I have none.

4          THE COURT:  All right.  Try to get here by quarter

5     to ten.  Have a good evening.

6               *          *          *

7          (Whereupon, the trial was adjourned to Wednesday,

8     July 7, 2010.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

slf

1  SUPREME COURT OF THE STATE OF NEW YORK.

2  COUNTY OF QUEENS: CRIMINAL TERM: PART TAP-D

3  ----------------------------------------X
   THE PEOPLE OF THE STATE OF NEW YORK      :   Indictment
4                                           :   No. 2065/08
                                            :
5            -against-                      :
                                            :
6                                           :
   HAROLD GOPAUL,                           :
7                                           :
                        Defendant.          :  CRM SX ACT 1
8                                           :
   ----------------------------------------X JURY TRIAL
9
                            125-01 Queens Boulevard
10                          Kew Gardens, New York
                            July 7, 2010
11
   B e f o r e:
12
                    HONORABLE GREGORY L. LASAK,
13
                            Supreme Court Justice
14
   A p p e a r a n c e s:
15
            HONORABLE RICHARD A. BROWN
16               District Attorney, Queens County
            BY:  JARED ROSENBLATT, ESQ.
17

18          STANFORD BANDELLI, ESQ.
                 Attorney for Defendant
19               16 Court Street
                 Brooklyn, New York
20

21

22               *          *          *

23                          SHERYL FITZPATRICK, RPR CSR
                            Official Court Reporter
24

25

slf

54
Proceedings

1          THE CLERK:  Case on trial, People versus Harold

2     Gopaul.  Let the record reflect the defendant is before the

3     Court.

4          Counsel, your appearances, please.

5          MR. BANDELLI:  Stanford Bandelli on behalf of

6     Harold Gopaul.

7          Good morning.

8          MR. ROSENBLATT:  For the People Assistant District

9     Attorney Jared Rosenblatt.

10          Your Honor, I'm turning over one additional page

11     of notes from ADA Hughes to Mr. Bandelli.

12          MR. BANDELLI:  Judge, I had an opportunity to go

13     over some of the stuff that Assistant DA Rosenblatt provided

14     yesterday.  It's about 3 or 400 pages, so I can't say that,

15     you know, it's everything that I need, but I will note this.

16     It looks like there are three or four pages that they

17     provided from ACS, and my understanding, based upon my

18     experience with these things, is that there is usually a

19     substantial amount more that's done in terms of the

20     investigator's reports and progress notes, etc., etc., and I

21     believe based upon my correspondence from Barbara Mandel,

22     who is counsel for ACS, that a package was sent to this

23     Court.  So, I'm still going to need that stuff before the

24     kid takes the stand.

25          The other thing is there was, I guess, a log

Proceedings

1    report from the precinct that was turned over for the date

2    that my client had surrendered himself or actually didn't

3    know he was surrendering himself at the time but when he

4    showed up at the precinct.  There has been an issue all

5    along, apparently this was going on in Nassau also, about

6    who was the officer that actually arrested him and how long

7    was he there before the detective, Detective Shulman,

8    questioned him; and what I received from ADA Rosenblatt in

9    that package was a log report for the date that he came in,

10   but it's only from, I guess, 8 o'clock in the morning on,

11   which would be after pretty much everything happened.

12            So, the part of the log report that's really

13   critical to the defense of Mr. Gopaul is the part of the log

14   report that precedes that; in other words, from midnight on.

15   Apparently the complainant came in after midnight or just

16   before midnight, and again there is a question mark as to

17   the time that my client got there.

18            So, while I appreciate that he turned over the one

19   page, the significant information in terms of the defense is

20   contained on the page that precedes that page.  So, I would

21   ask that they make best efforts to obtain that and turn it

22   over to me.

23            MR. ROSENBLATT:  Judge, just so I'm clear, your

24   Honor, the logbook --

25            THE COURT:  You got a problem with your feet?

slf

56

Proceedings

1    MR. ROSENBLATT:  No, your Honor.  My apologies.

2    The logbook that was turned over is dated 0558

3    through 0845, and counsel is requesting from midnight to

4    0558 from June 23 just so I understand correctly.

5    THE COURT:  You just said "date" 0558.  You mean

6    the time?

7    MR. ROSENBLATT:  The time was 0558.

8    THE COURT:  On June 23.

9    MR. ROSENBLATT:  No.  The log I turn over is

10   June 24, 2008.  The time 05:58 through 08:45.

11   THE COURT:  What was your question, Mr. Bandelli?

12   You want to know who arrested your client?  Didn't you have

13   a hearing on this case?

14   MR. BANDELLI:  Just so you understand, it's kind

15   of a unique set of circumstances.  It might shed some

16   insight for your Honor.  The complainant had gone to the

17   precinct.  She was brought there by neighbors.  My client

18   showed up looking for her when she wasn't at home.  When he

19   arrived at the precinct sometime after midnight, the

20   investigation had already started.  He was looking to file a

21   missing person's report, and he gets arrested, and there are

22   allegations that he was roughed up by some of the police

23   officers, and he has testified to that at a suppression

24   hearing.

25   THE COURT:  What precinct is it?

slf

57

Proceedings

1       MR. BANDELLI:  It's the 105, right?

2       MR. ROSENBLATT:  Yes.

3       MR. BANDELLI:  What had happened, Judge Lasak, is

4   that while his case was being tried in Nassau County, his

5   attorney had requested that the judge out there, Judge

6   McCormick, turn over -- have the DA turn over the log

7   report, which the judge ordered.  The only thing that I have

8   though from ADA Rosenblatt, and I don't have it from the

9   other case either or from the other defense attorney, is the

10  time after everything had happened.  In other words, that

11  time between midnight and 6:00 in the morning isn't there.

12  I know --

13      THE COURT:  On what date?  June 24?

14      MR. BANDELLI:  Yes.  It would be June 24, Judge.

15      THE COURT:  What log book are you talking about?

16  The detective's sign in?  The movement log in the

17  detective's --

18      MR. BANDELLI:  It's the one that the desk sergeant

19  has when you first come in.  They have to log everybody who

20  first comes into the place.  It's going to list on that

21  logbook who is working and, you know, what happened in terms

22  of people coming into the precinct, so --

23      THE COURT:  You want the sergeant's desk book?

24      MR. BANDELLI:  Yes.  Essentially that's -- I think

25  that's the one that's going to answer the question.

58

Proceedings

1          THE COURT:  Is that the page you turned over?

2          MR. ROSENBLATT:  I turned over, correct, that

3     page.

4          THE COURT:  Turn over the previous six hours.

5          MR. ROSENBLATT:  I was just asking what he wants.

6     Not a problem.

7          MR. BANDELLI:  Thank you, Judge.

8          THE COURT:  Anything else?

9          MR. BANDELLI:  With the exception of the ACS

10    records, that's all I could think of at this time.

11         THE COURT:  I can have my clerk check the 7th

12    floor to see if those records were delivered up there.

13         MR. BANDELLI:  Thank you, sir.

14         THE COURT:  Bring in jury panel, please.

15         MR. ROSENBLATT:  May I just briefly look at the

16    court board?

17         THE COURT:  You want the board?

18         MR. ROSENBLATT:  Please.

19         THE COURT:  Hand this to the DA.

20         MR. ROSENBLATT:  Thank you, your Honor.

21         THE COURT:  You're welcome.

22         (Panel of prospective jurors enters the

23    courtroom.)

24         THE CLERK:  Case on trial.  All parties are

25    present, your Honor.

slf

Proceedings

1      Zalena Saliman, first name Z-a-l-e-n-a, last name

2  S-a-l-i-m-a-n, seat number four, please.

3      Mary Helen McCarthy, M-c-c-a-r-t-h-y.  Seat number

4  11, please.

5      THE COURT:  Good morning, ladies and gentlemen.

6  We will now continue with the jury selection.

7      Miss Saliman and Miss McCarthy, did you both hear

8  those three basic principles of law I stated yesterday?

9      PROSPECTIVE JUROR:  Yes.

10      PROSPECTIVE JUROR:  Yes.

11      THE COURT:  Either of you have a problem

12  understanding them?

13      PROSPECTIVE JUROR:  No.

14      PROSPECTIVE JUROR:  No.

15      THE COURT:  Either of you have a problem following

16  them?

17      PROSPECTIVE JUROR:  No.

18      PROSPECTIVE JUROR:  No.

19      THE COURT:  Either of you ever served as a juror

20  before?

21      PROSPECTIVE JUROR:  No.

22      PROSPECTIVE JUROR:  No.

23      THE COURT:  Either of you been the victim of a

24  crime?

25      PROSPECTIVE JUROR:  No.

slf

60

Proceedings

1          THE COURT:  You are thinking about it?

2          PROSPECTIVE JUROR:  My mom, yes.

3          THE COURT:  Have you ever been the victim of a

4     crime?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  And either of you or anyone close to

7     you ever been arrested or accused of a crime?

8          PROSPECTIVE JUROR:  No.

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  You are all caught up.

11         Now I ask all of you the fact that the charges

12    involve -- they are of a sexual nature involving a family

13    member, that wouldn't give you a problem sitting on this

14    jury; would it?

15         Give you a problem, Miss Saliman?

16         PROSPECTIVE JUROR:  Yes.

17         THE COURT:  Come up.

18         (The following proceedings took place at

19    side-bar:)

20         THE COURT:  What would be your problem?

21         PROSPECTIVE JUROR:  My mom was raped.

22         THE COURT:  Your mother?

23         PROSPECTIVE JUROR:  By two men, yeah.  They broke

24    in the home.

25         THE COURT:  I'm sorry.

61

Proceedings

1          PROSPECTIVE JUROR:  She was raped at knife point.

2          THE COURT:  How long ago did this happen?

3          PROSPECTIVE JUROR:  24 years ago.

4          THE COURT:  Where did it happen?

5          PROSPECTIVE JUROR:  At home.

6          THE COURT:  Where is home?  Queens?

7          PROSPECTIVE JUROR:  Guyana.

8          THE COURT:  All right.  We are going to excuse you

9    from this case.  Okay?  I'm sorry we brought up a bad

10   memory.  We are going to have you sit on civil cases only.

11   Go back to central jury.  Thank you for your honesty.

12          Miss Saliman is excused consent of both sides?

13          MR. ROSENBLATT:  Yes.

14          MR. BANDELLI:  Yes.

15          (In open court.)

16          THE COURT:  Fill that seat, please.

17          THE CLERK:  Dana M. Caraballo, C-a-r-a-b-a-l-l-o,

18   seat number 4, please.

19          THE COURT:  Good morning, Miss Caraballo.

20          PROSPECTIVE JUROR:  Good morning.

21          THE COURT:  Were you able to hear these three

22   basic principles?

23          PROSPECTIVE JUROR:  Yes.

24          THE COURT:  Any problem following them?

25          PROSPECTIVE JUROR:  No.

slf

Proceedings

1          THE COURT:  Ever serve as a juror before?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  Ever been the victim of a crime?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Have you or anyone close to you ever

6    been arrested or accused of a crime?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  All right.  Come on up, please, ma'am.

9          (The following proceedings took place at

10   side-bar:)

11         THE COURT:  Who do you know that was arrested?

12         PROSPECTIVE JUROR:  One of my friends got arrested

13   for DWI.

14         THE COURT:  DWI?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  How long ago?

17         PROSPECTIVE JUROR:  Like a couple of months ago,

18   and then my father was reported for domestic violence, but

19   he wasn't arrested.

20         THE COURT:  Okay.  Now, your friend -- was your

21   friend involved in an accident, or was it just a traffic

22   stop?

23         PROSPECTIVE JUROR:  It was a traffic stop, and

24   then I had another one that got caught with weed with him.

25         THE COURT:  He had what?

slf

63

                              Proceedings

1           PROSPECTIVE JUROR:  Weed with him.

2           THE COURT:  Weed with him.

3           His case is still pending?

4           PROSPECTIVE JUROR:  He is on probation.

5           THE COURT:  On probation.  All right.

6           Is he a good friend of yours?

7           PROSPECTIVE JUROR:  Yes.

8           THE COURT:  Boyfriend?

9           PROSPECTIVE JUROR:  So so.

10          THE COURT:  Do you think he was treated fairly or

11     unfairly by the police?

12          PROSPECTIVE JUROR:  I would say fairly.

13          THE COURT:  Fairly?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  He had weed on him, right?

16          PROSPECTIVE JUROR:  Uh-huh.

17          THE COURT:  He was drinking?

18          PROSPECTIVE JUROR:  No.  That was another one.

19          THE COURT:  Another one?

20          PROSPECTIVE JUROR:  Yeah.

21          THE COURT:  How many times was he arrested?

22     Twice?

23          PROSPECTIVE JUROR:  Which one?  The one -- the DWI

24     or the weed one?

25          THE COURT:  Is that the same person or --

                                                              slf

Proceedings

1          PROSPECTIVE JUROR:  It's two different people.

2          THE COURT:  Okay.  How long ago was the weed?

3          PROSPECTIVE JUROR:  Like I would say the end of

4    last year.

5          THE COURT:  Last year?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  He is on probation?

8          PROSPECTIVE JUROR:  Uh-huh.

9          THE COURT:  What about the DWI?

10         PROSPECTIVE JUROR:  He is in jail till December.

11         THE COURT:  Till December?

12         PROSPECTIVE JUROR:  He got caught in Nassau

13   County.

14         THE COURT:  Oh, Nassau County.

15         Do you think that he was treated fairly?

16         PROSPECTIVE JUROR:  I guess so, yeah.

17         THE COURT:  And the other fellow, you think he was

18   treated fairly, too?

19         PROSPECTIVE JUROR:  Yeah.

20         THE COURT:  With the weed.

21         PROSPECTIVE JUROR:  Yeah.

22         THE COURT:  Was he in the car?

23         PROSPECTIVE JUROR:  Yeah.  He was driving.

24         THE COURT:  And your father, when was he reported

25   for domestic violence?

Proceedings

1      PROSPECTIVE JUROR:  2005, and he was reported

2   previously before that with his ex-wife.  That was in Nassau

3   County or Suffolk, one of them.

4          THE COURT:  Okay.  How is he doing now?

5          PROSPECTIVE JUROR:  He is still crazy.

6          THE COURT:  You are not living with him I take it.

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  Do you think he was treated fairly by

9   the criminal justice system?

10         PROSPECTIVE JUROR:  No.  I think my mom should

11  have locked him up.

12         THE COURT:  Anything about all of those incidents

13  that would give you a problem sitting as a fair juror here?

14         PROSPECTIVE JUROR:  With this one, yeah.  I

15  already disagree with his.  I already think he guilty.

16         THE COURT:  You haven't heard anything.

17         PROSPECTIVE JUROR:  I know, but you said third

18  degree charges.  That's a high charge.

19         THE COURT:  Okay.  Well, if you already feel he is

20  guilty, then you couldn't be fair.  We are going to have you

21  sit on civil cases.  Okay?

22         PROSPECTIVE JUROR:  Okay.

23         THE COURT:  We appreciate your honesty.  Have a

24  nice day.  Follow the instruction of the court officer.

25             Miss Caraballo is excused consent of both sides?

slf

Proceedings

1          MR: ROSENBLATT:  Yes.

2          MR. BANDELLI:  Yes.

3          (In open court.)

4          THE CLERK:  Ira Friedman, F-r-i-e-d-m-a-n, seat

5     number four, please.

6          THE COURT:  Good morning, Mr. Friedman.

7          PROSPECTIVE JUROR:  Good morning.

8          THE COURT:  Were you able to hear the three basic

9     principles of law?

10         PROSPECTIVE JUROR:  Yes.

11         THE COURT:  Any problem following them?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  Ever been the victim of a crime?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  What happened to you?

16         PROSPECTIVE JUROR:  Four break-ins.  Three car

17    thefts.

18         THE COURT:  The four break-ins, when was the most

19    recent one?

20         PROSPECTIVE JUROR:  Nothing within the last ten

21    years.

22         THE COURT:  Did you move to another place?

23         PROSPECTIVE JUROR:  I live in Queens.  Yeah.  They

24    were all different places in Queens.

25         THE COURT:  Did you call the police on those?

slf

Proceedings

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Anyone arrested?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Okay.  I'm sure you would agree with

5     me that they have nothing to do with this case.

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  You could be fair to both sides?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  All right, and have you or anyone

10    close to you ever been arrested or accused of a crime?

11         PROSPECTIVE JUROR:  No.

12         THE COURT:  Ever been a juror before on a criminal

13    case?

14         PROSPECTIVE JUROR:  No.

15         THE COURT:  You are all caught up.

16         I think I asked the entire panel the charges here

17    involve -- they are of a sexual nature involving a family

18    member.  Anyone have a problem sitting on a case like that?

19         Mr. Varghese.

20         PROSPECTIVE JUROR:  Yes.  Can we speak in private?

21         THE COURT:  Sure.  Come up.

22         (The following proceedings took place at

23    side-bar:)

24         PROSPECTIVE JUROR:  The locations where you

25    stated --

slf

68

Proceedings

1          THE COURT:  I can't hear you.

2          PROSPECTIVE JUROR:  The locations where you

3    stated, that's where I live, and my sister goes to school in

4    that area, and I don't feel comfortable being involved in

5    this case.  I feel like I'll definitely be biased towards

6    convicting him.  This is around my area and my sister --

7          THE COURT:  You haven't heard anything about the

8    case.

9          PROSPECTIVE JUROR:  I'm sorry.

10          THE COURT:  You haven't heard anything.

11          PROSPECTIVE JUROR:  Well, it's about sexual abuse.

12    Isn't that what you said the charges are?

13          THE COURT:  I also said the defendant is presumed

14    innocent.

15          PROSPECTIVE JUROR:  Yes, but that's what I'm

16    saying.  I feel like I won't judge fairly, especially if

17    it's around my sister.

18          THE COURT:  Because it's near your neighborhood

19    you couldn't be fair?

20          PROSPECTIVE JUROR:  Because I recognize the

21    street, and that's one block away from where my sister goes

22    to school.

23          THE COURT:  You couldn't be fair?

24          PROSPECTIVE JUROR:  I can't be fair in this case.

25          THE COURT:  We are going to have you sit on civil

slf

69

Proceedings

1    cases.  Follow the instructions of the court officer.  Thank

2    you for your honesty.

3             Miss Chen, come up here, please.  Come up.  Don't

4    be afraid.  I understand that you told one of the court

5    officers that you were a student.

6             PROSPECTIVE JUROR:  Yes.

7             THE COURT:  And when do you have to go to class?

8             PROSPECTIVE JUROR:  I have class Monday,

9    Wednesday, Thursday from 10:30 to 12:10, and then I have

10   class from 1:20 to 3 o'clock for the next two weeks until

11   July 22.  That's when classes end.

12            THE COURT:  All right, and you can't miss those

13   classes, right?

14            PROSPECTIVE JUROR:  Well, I have two quizzes left

15   and two homeworks to hand in, two exams and two finals.

16            THE COURT:  We are going to excuse you from jury

17   duty --

18            PROSPECTIVE JUROR:  Okay.

19            THE COURT:  -- so you can take care of your school

20   matters.  Good luck to you, Miss Chen.

21            PROSPECTIVE JUROR:  Thank you.

22            THE COURT:  Miss Chen is excused consent of both

23   sides?

24            MR. ROSENBLATT:  Yes.

25            MR. BANDELLI:  Yes.

70

Proceedings

1          THE COURT:  Off the record.

2          (Discussion held off the record.)

3          (In open court.)

4          THE COURT:  Fill those two seats, please.

5          THE CLERK:  Kevin L. Pegram, P-e-g-r-a-m, please

6     take seat number six.

7          Robert Ramos, R-a-m-o-s, please take seat number

8     seven.

9          THE COURT:  Good morning, Mr. Pegram.

10          PROSPECTIVE JUROR:  Good morning.

11          THE COURT:  And Mr. Ramos.

12          PROSPECTIVE JUROR:  Good morning.

13          THE COURT:  Did you both hear those three basic

14     principles?

15          PROSPECTIVE JUROR:  Yes.

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Either of have you a problem following

18     them?

19          PROSPECTIVE JUROR:  No.

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  Either of you served as a juror before

22     in a criminal case?

23          PROSPECTIVE JUROR:  Yes.

24          PROSPECTIVE JUROR:  Grand jury.

25          THE COURT:  All right.  How long ago was it,

71
Proceedings

1    Mr. Pegram?

2            PROSPECTIVE JUROR:  I guess about 15 years ago.

3            THE COURT:  All right, and without telling me what

4    it was, were you able to reach a verdict?

5            PROSPECTIVE JUROR:  Yes.

6            THE COURT:  Were you satisfied with that verdict?

7            PROSPECTIVE JUROR:  Yeah.

8            THE COURT:  What was that person charged with?

9            PROSPECTIVE JUROR:  It was drunk driving.

10           THE COURT:  Pardon me?

11           PROSPECTIVE JUROR:  They seemed to all be drunk

12   driving crimes back then.

13           THE COURT:  Thank you, and you served an a grand

14   jury before?

15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  All right.  How long ago?

17           PROSPECTIVE JUROR:  Six to eight years ago.

18           THE COURT:  All right, and that's a whole

19   different formality than this.

20           PROSPECTIVE JUROR:  Yes.

21           THE COURT:  Thank you very much.

22           Have either of you or anyone close to you ever

23   been arrested or accused of a crime?

24           PROSPECTIVE JUROR:  My uncles.

25           THE COURT:  All right.  Come up, Mr. Ramos.

slf

Proceedings

1              (The following proceedings took place at

2       side-bar:)

3                   THE COURT:  Did you say your uncles?

4                   PROSPECTIVE JUROR:  Yes.

5                   THE COURT:  How many of them?

6                   PROSPECTIVE JUROR:  Two.

7                   THE COURT:  How long ago?

8                   PROSPECTIVE JUROR:  They just got released within

9       the last five years.

10                  THE COURT:  What were they charged with?

11                  PROSPECTIVE JUROR:  One was charged with attempted

12      murder.  The other one was charged with drunk driving.

13                  THE COURT:  All right.  What county was that?

14                  PROSPECTIVE JUROR:  Both New York.

15                  THE COURT:  Manhattan?

16                  PROSPECTIVE JUROR:  I think so.

17                  THE COURT:  Okay.  Did they go to trial or did

18      they plead guilty?

19                  PROSPECTIVE JUROR:  They went to trial.

20                  THE COURT:  Okay, and how many years ago was that?

21                  PROSPECTIVE JUROR:  They served a long time, so

22      probably over ten years ago.

23                  THE COURT:  Okay, and do you feel that they were

24      treated fairly or unfairly by the system?

25                  PROSPECTIVE JUROR:  They did the crime.  They did

73

Proceedings

1     the time.

2              THE COURT:  Okay.  No bad feelings towards the

3     Police Department?

4              PROSPECTIVE JUROR:  No bad feelings.

5              THE COURT:  Can you be fair to both sides?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  Thank you.

8              (In open court.)

9              THE COURT:  Mr. Pegram and Ramos, either of you

10    been the victim crime?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  What happened to you?

13             PROSPECTIVE JUROR:  Two car thefts.

14             THE COURT:  That's it?

15             PROSPECTIVE JUROR:  Yeah.

16             THE COURT:  All right.  Did you call the police?

17             PROSPECTIVE JUROR:  They recovered the car both

18    times.  Well, I don't know.  The car was recovered.  Let's

19    put it that way.

20             THE COURT:  Okay.  That wouldn't give you a

21    problem sitting as a fair juror here; would it?

22             PROSPECTIVE JUROR:  No.

23             THE COURT:  What happened to you, Mr. Ramos?

24             PROSPECTIVE JUROR:  I got mugged twice.

25             THE COURT:  What?

Proceedings

1           PROSPECTIVE JUROR:  I got mugged twice.

2           THE COURT:  All right.  Did you call the police?

3           PROSPECTIVE JUROR:  Yes, I did.

4           THE COURT:  Was either of those with a weapon?

5           PROSPECTIVE JUROR:  Yes, it was.

6           THE COURT:  Out on the street or in a business?

7           PROSPECTIVE JUROR:  One was in a street and one

8    was in a business.

9           THE COURT:  How many years ago?

10          PROSPECTIVE JUROR:  The business was over ten

11   years.  Both over ten years ago.

12          THE COURT:  What type of business?

13          PROSPECTIVE JUROR:  Retail.

14          THE COURT:  Okay.  Was anyone arrested?

15          PROSPECTIVE JUROR:  Yes, for the retail.  No, for

16   the other.

17          THE COURT:  Did you have to testify?

18          PROSPECTIVE JUROR:  No.  There were a lot of

19   witnesses.

20          THE COURT:  As you see, we come into this

21   courtroom with various experiences, hopefully most of them

22   good, and some of them bad like what happened to you,

23   Mr. Ramos.  We don't expect you to forget about them.  All

24   we ask is that you place your memory of them aside and base

25   your verdict only on the evidence that you see and hear in

slf

Proceedings

1    this courtroom because otherwise that wouldn't be fair.  You

2    would have no problem doing that; would you?

3              PROSPECTIVE JUROR:  No.

4              THE COURT:  Thank you.

5              Next question.  Anyone here in the jury box or

6    anyone very close to you, whether a relative or a friend

7    work in law enforcement?  That is has a job as a police

8    officer, correction officer, court officer, FBI agent, DA.

9    Anyone here or anyone close to you have any jobs like that?

10   Please raise your hand.

11             Miss McCarthy.

12             PROSPECTIVE JUROR:  My brother works for Assistant

13   Commissioner Ray Kelly.  My cousin is a federal marshal.

14             THE COURT:  Your brother is a police officer?

15             PROSPECTIVE JUROR:  He is.

16             THE COURT:  And the reason I ask that is that we

17   may have, as you can see from the list, a police officer

18   testifying here.  At the end of the case I give certain,

19   what we call you, instructions on the law, and one of them

20   is that you are to evaluate a police officer's testimony the

21   same as a civilian.  That is if someone comes up here

22   wearing a uniform or a badge, you are not going to

23   automatically believe everything they say, and you are not

24   automatically going to disbelieve everything they say.  You

25   are going to sit, listen to what they have to say and make

slf

Proceedings

1    your determination on it.  You would have no problem doing

2    that; would you?

3              PROSPECTIVE JUROR:  (Shakes head.)

4              THE COURT:  You have to speak.

5              PROSPECTIVE JUROR:  Sorry.

6              No.

7              THE COURT:  Anyone else have their hand up?

8              Now we come to the second part of my questions

9    which is your background.  I'm going to ask you all the same

10   questions, so that by the time I get to you, Mr. Friedman,

11   you will have all of the information and everyone after you

12   will have all of the information so I don't have to ask

13   everyone the same questions.  Okay?

14             Miss Rudolph, what part of Queens do you live in?

15             PROSPECTIVE JUROR:  Bayside.

16             THE COURT:  How long have you lived in Bayside?

17             PROSPECTIVE JUROR:  Three years.

18             THE COURT:  Where did you live before that?

19             PROSPECTIVE JUROR:  Manhattan.

20             THE COURT:  For how long in Manhattan?

21             PROSPECTIVE JUROR:  Five years.

22             THE COURT:  Where did you live before that?

23             PROSPECTIVE JUROR:  Yonkers.

24             THE COURT:  All right.  Is that where you are

25   from?

77

Proceedings

1        PROSPECTIVE JUROR:  No.  I'm from upstate New

2    York.

3        THE COURT:  Upstate?

4        PROSPECTIVE JUROR:  Yes.

5        THE COURT:  What city upstate?

6        PROSPECTIVE JUROR:  Middletown, New York.

7        THE COURT:  Marital status?  Any children?

8        PROSPECTIVE JUROR:  Married and an infant son four

9    and a half months.

10        THE COURT:  Are you working?

11        PROSPECTIVE JUROR:  Yes.

12        THE COURT:  What do you do?

13        PROSPECTIVE JUROR:  I'm a claims adjuster for an

14    insurance company.

15        THE COURT:  Okay, and do you own your own home or

16    rent in Bayside?

17        PROSPECTIVE JUROR:  Own.

18        THE COURT:  Thank you very much.

19        Mr. Leong, what part of Queens do you live in?

20        PROSPECTIVE JUROR:  East Elmhurst.

21        THE COURT:  How long have you lived in East

22    Elmhurst?

23        PROSPECTIVE JUROR:  Like 20 years.

24        THE COURT:  Marital status.  Any children?

25        PROSPECTIVE JUROR:  No.

78

Proceedings

1          THE COURT:  Okay, and are you working or going to

2     school?

3          PROSPECTIVE JUROR:  School.

4          THE COURT:  What are you studying?

5          PROSPECTIVE JUROR:  Accounting.

6          THE COURT:  Accounting?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Okay.  I'll take this opportunity you

9     deal with balance sheets, correct?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  In accounting --

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  -- two columns.  One is assets.  One

14     is liabilities.

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Are you following me, Mr. Leong?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  At the bottom of those columns you

19     have numbers, right?

20          PROSPECTIVE JUROR:  Yeah.

21          THE COURT:  What are they supposed to do?

22          PROSPECTIVE JUROR:  They are supposed to add up.

23          THE COURT:  They are supposed to equal?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  How many years have you been studying

Proceedings

1    accounting?

2            PROSPECTIVE JUROR:  I just started.

3            THE COURT:  Okay.  I didn't mean to pick on you.

4    I don't mean to pick on you.  I just want to make a point.

5            Those columns have to equal.  Assets have to equal

6    liability otherwise you have to find out what the problem

7    is.  You have to go back over your numbers, right?

8            PROSPECTIVE JUROR:  Yes.

9            THE COURT:  She is taking down everything you say.

10   Okay?

11           PROSPECTIVE JUROR:  Yes.

12           THE COURT:  That is proof to a mathematical

13   certainty.  Everybody understand that?

14           As I said, the second basic principle of law is

15   that the DA has the burden to prove the defendant guilty

16   beyond a reasonable doubt.  I'll explain it to you later on,

17   but it's not proof to a mathematical certainty.  Okay?  You

18   all understand that?

19           In dealing with human affairs, we know nothing

20   with absolute certainty.  I'll explain that to you again at

21   the end of the case.

22           I take it you live with your parents.

23           PROSPECTIVE JUROR:  Yes.

24           THE COURT:  Thank you.  I didn't mean to pick on

25   you.  Okay?

Proceedings

1         Mr. Falci, what part of Queens do you live in?

2         PROSPECTIVE JUROR:  Middle Village.

3         THE COURT:  How long?

4         PROSPECTIVE JUROR:  Twelve years.

5         THE COURT:  Where did you live before that?

6         PROSPECTIVE JUROR:  Ridgewood.

7         THE COURT:  The Brooklyn side?

8         PROSPECTIVE JUROR:  Yeah.  Near closer to Brooklyn

9    side, yeah.

10        THE COURT:  And marital status.  Any children?

11        PROSPECTIVE JUROR:  No.  Single.

12        THE COURT:  Okay, and are you working?

13        PROSPECTIVE JUROR:  Yes.

14        THE COURT:  What do you do?

15        PROSPECTIVE JUROR:  Peer administrator for Tishman

16   Speyer.

17        THE COURT:  Do you own your own home or rent?

18        PROSPECTIVE JUROR:  Live with my parents.  They

19   own a home.

20        THE COURT:  Thank you.

21        Mr. Friedman.

22        PROSPECTIVE JUROR:  Yes.

23        THE COURT:  You heard the questions.  Give me the

24   information.

25        PROSPECTIVE JUROR:  I might be able to do that.

Proceedings

1    Jamaica Estates/Kew Gardens.  Single.  No children.  Not

2    working now.

3              THE COURT:  When you do work, what do you do?

4              PROSPECTIVE JUROR:  Manufacture custom-made window

5    treatments.

6              Did I leave anything out?

7              THE COURT:  Own your own home or rent?

8              PROSPECTIVE JUROR:  Own.

9              THE COURT:  Okay.  Very good.  You did good,

10   Mr. Friedman.

11             Miss Mohammed.

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  Go ahead.

14             PROSPECTIVE JUROR:  I live in Richmond Hill.

15             THE COURT:  Speak louder.

16             PROSPECTIVE JUROR:  I live in Richmond Hill.

17             THE COURT:  Good.

18             PROSPECTIVE JUROR:  I work at White Castle.  Two

19   children.

20             MR. BANDELLI:  Where does she work?

21             THE COURT:  Lives in Richmond Hill.  She owns her

22   own house.

23             PROSPECTIVE JUROR:  No.  I rent.  I have two girls

24   and one boy.

25             THE COURT:  Are you working?

Proceedings

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  What do you do?

3          PROSPECTIVE JUROR:  I do team member from register

4     to floor.

5          THE COURT:  Okay.  You said you rent, right?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Okay.  Thank you, Miss Mohammed.

8          Mr. Pegram.

9          PROSPECTIVE JUROR:  Live in Forest Hills Gardens.

10    I own the home 12 years.  Before that I lived in Hollis,

11    Queens.  I'm not married, but I live with a woman.  I have

12    for the last 20 years.  You could say essentially I'm

13    married.

14          THE COURT:  We won't get into that.

15          PROSPECTIVE JUROR:  I'm semi-retired.  If I find a

16    job, I would be unretired.  So, I worked as a financial

17    controller.

18          THE COURT:  Okay.  You covered everything.  Thank

19    you very much, sir.

20          Mr. Ramos.

21          PROSPECTIVE JUROR:  I live in Elmhurst, Queens.

22    I've been there for one year.  Before that I lived in

23    Jackson Height for one year.  Before that I lived in south

24    Richmond Hill for two years.  I'm an engineer employed by

25    Marriott.  Also a fire safety director for them.  I'm

83

Proceedings

1    single.

2              What else?

3              THE COURT:  Own your own home or rent?

4              PROSPECTIVE JUROR:  I rent.

5              THE COURT:  Okay.  You covered everything.  Thank

6    you.

7              Miss Martinez.

8              PROSPECTIVE JUROR:  Hi.  I live currently in Long

9    Island City for the past three years.  Before that I lived

10   in Atlanta, Georgia for four.  Originally from Miami,

11   Florida before that.

12             I am a journalist for CNN.  I've been with the

13   company about eight years.

14             Single.  No children, and I rent.

15             What else?  I'm sorry.

16             THE COURT:  You covered everything.

17             You are a journalist?

18             PROSPECTIVE JUROR:  Yes, sir.

19             THE COURT:  What type of news do you cover?

20             PROSPECTIVE JUROR:  Everything.

21             THE COURT:  Everything?

22             PROSPECTIVE JUROR:  Yeah.

23             THE COURT:  Do you go on air?

24             PROSPECTIVE JUROR:  It's behind the scenes.

25             THE COURT:  Behind the scenes?

Proceedings

1           PROSPECTIVE JUROR:  Yes.

2           THE COURT:  Who is taking over for Larry King?

3           PROSPECTIVE JUROR:  Right now they have a few, but

4    I'm not allowed to say.

5           THE COURT:  Thank you, Miss Martinez.

6           PROSPECTIVE JUROR:  You are welcome.

7           THE COURT:  Mr. Fishtein.

8           PROSPECTIVE JUROR:  20 years old.  I live in

9    Little Neck.

10          THE COURT:  Did I ask anyone their ages?  You are

11   giving me too much information.

12          PROSPECTIVE JUROR:  I live in Little Neck for 20

13   years.  I go to school, and I work also at Staples.  I'm

14   single, and I live with my parents.

15          THE COURT:  What are you studying in school?

16          PROSPECTIVE JUROR:  Now marketing and advertising.

17          THE COURT:  Okay.  Good luck to you.

18          PROSPECTIVE JUROR:  Thank you.

19          THE COURT:  Thank you.

20          Mr. Marks.

21          PROSPECTIVE JUROR:  Yes.  I live in Astoria.  I

22   have for the last five years.  Prior to that I lived for a

23   year in Nassau County in Long Beach.  Prior to that I lived

24   in Vancouver, Canada even though I'm originally from

25   Manhattan.

Proceedings

1              THE COURT:  You were born in Manhattan?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  How did you like Vancouver?

4              PROSPECTIVE JUROR:  Nice.

5              THE COURT:  How did you like Long Beach?

6              PROSPECTIVE JUROR:  Also very nice.  That's where

7       I work now.

8              THE COURT:  Okay.  What do you do?

9              PROSPECTIVE JUROR:  I work as an export manager

10      for a company that manufactures medical devices.  I've done

11      that for the last six years.  It's a family-owned business.

12             THE COURT:  Do you rent or own?

13             PROSPECTIVE JUROR:  Rent.

14             Single.  No children.

15             THE COURT:  Okay.  Thank you, Mr. Marks.

16             Miss McCarthy.

17             PROSPECTIVE JUROR:  I'm from Jackson Heights.

18      Been there my whole life.  Kindergarten teacher.  Engaged,

19      and I rent an apartment.

20             THE COURT:  All right.  Do you teach in the city

21      system?

22             PROSPECTIVE JUROR:  No.  Catholic schools.

23             THE COURT:  In Jackson Heights?

24             PROSPECTIVE JUROR:  Uh-huh.

25             THE COURT:  St. Joan's.

Proceedings

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Thank you very much.

3          Miss Lackhan.

4          PROSPECTIVE JUROR:  I've lived in Queens for 15

5   years.  Prior to that I lived in Jamaica -- I'm sorry, in

6   Richmond Hill.  I'm single.  Two children.  I'm a customer

7   care representative.  I rent.

8          THE COURT:  What is your occupation?

9          PROSPECTIVE JUROR:  Customer care representative.

10         THE COURT:  Thank you very much.  That wasn't

11  hard; was it?

12         Mr. Perez.

13         PROSPECTIVE JUROR:  I lived in Flushing for about

14  27 years.  I lived in Forest Hills for about four or five

15  years give or take.  I was a public school teacher, but I

16  quit, and I became -- well, I work like in an office in

17  Queens College right now, the Office of Verging Technology

18  because that's what I'm aiming for now, the studies I'm

19  pursuing, and I am single.  That's it.

20         THE COURT:  All right.  What level of school did

21  you teach at?

22         PROSPECTIVE JUROR:  I got my Masters in elementary

23  ed, so I was an elementary school teacher like from

24  kindergarten to sixth grade.  Mainly I was a technology

25  teacher.

Proceedings

1      THE COURT:  All right.  How many years did you

2   teach?

3      PROSPECTIVE JUROR:  Full time about three and a

4   half, and I did almost about ten years of subbing.

5      THE COURT:  Didn't like it?

6      PROSPECTIVE JUROR:  No.  I finally decided I

7   wanted to go with technology.  That's why I'm in that office

8   right now.  Part of the time I work the help desk and the

9   other half I do input/output work.

10      THE COURT:  What type of field?  What kind of

11   technology did you say?

12      PROSPECTIVE JUROR:  The Office of Emerging

13   Technology.  I help the technicians once in a while when

14   they are short staffed.  I go up and do requests.

15      THE COURT:  All right.  Very good.  Thank you very

16   much.

17      Miss Polanco.

18      PROSPECTIVE JUROR:  I live in Flushing for five

19   years.  Prior to that I lived in another country.  I'm a

20   student, and I work as a retail sales associate.  I'm

21   single, no children, and I live with my parents.

22      THE COURT:  All right.  Where did you say you

23   live?

24      PROSPECTIVE JUROR:  Flushing.

25      THE COURT:  What country are you from?

Proceedings

1          PROSPECTIVE JUROR:  Dominican Republic.

2          THE COURT:  Thank you very much.

3          Mr. Pereira.

4          PROSPECTIVE JUROR:  I live in Forest Hills 12

5    years.  Before that in India.  Married.  Two children.

6    Presently working for New York City Transit.

7          THE COURT:  What you to do with Transit?

8          PROSPECTIVE JUROR:  I'm in engineering department

9    for the signal railroad switches.

10          THE COURT:  Thank you very much.

11          Did you say you own your own home?

12          PROSPECTIVE JUROR:  Yes.  Own, yes.

13          THE COURT:  Thank you.

14          Mr. Lall.

15          PROSPECTIVE JUROR:  I live in South Ozone Park 21

16   years.  Live with my parents.  I'm a teller in a bank.  Not

17   married.  No children.

18          THE COURT:  All right.  Thank you very much,

19   Mr. Lall.

20          Mr. DA, you may inquire.

21          MR. ROSENBLATT:  Thank you, your Honor.

22          Good morning.  As the judge introduced me

23   yesterday, my name is Jared Rosenblatt.  I'm an attorney in

24   the Special Victims Bureau, and I represent the People of

25   the State of New York in the county of Queens.  The purpose

Proceedings

1    of jury selection is not to pry or embarrass you.  We are

2    just looking for a fair and impartial jury, both to the

3    defendant and for the People.

4           As the judge already told you, if there is

5    anything that comes up that is personal, raise your hand.

6    Let us know, and we can approach at side bar.  Those members

7    in the back, soon you, too, will be seated here as you have

8    seen.

9           I ask you to pay attention.  Things that I'm

10   saying to the ladies and gentlemen in the jury panel now

11   will soon be asked of you, too.

12          The judge already told you that this case is

13   different than many others that are looking for jurors in

14   this courthouse today.  The defendant, as the judge told

15   you, is charged with sexually abusing his stepdaughter over

16   a period of time.

17          THE COURT:  Sustained.  Let's not get into the

18   facts.

19          MR. ROSENBLATT:  Your job, if chosen as a juror in

20   this case, is the same as if you were chosen as a juror in a

21   case where the defendant is charged with stealing a hammer

22   from Home Depot, robbery, assault.  Every case the burden of

23   proof is the same.  Can you appreciate that?

24          PROSPECTIVE JUROR:  Yes.

25          MR. ROSENBLATT:  The burden of proof doesn't go up

Proceedings

1    or down based on the nature of the charges.

2                    Mr. Leong, do you understand that?

3                    PROSPECTIVE JUROR:  Yes.

4                    MR. ROSENBLATT:  Mr. Falci, the fact that the

5    defendant is charged with the crimes that the judge told you

6    about doesn't change the burden of proof.  Can you

7    appreciate that?

8                    PROSPECTIVE JUROR:  Yes.

9                    MR. ROSENBLATT:  Everyone here understand that?

10                   Your job is to listen to the facts and make a

11   decision, Is the witness telling the truth?  Do you believe

12   her?  Does what she is telling you make out the crimes, the

13   elements of the crimes that the judge is going to instruct

14   you beyond a reasonable doubt to your satisfaction?

15                   Miss McCarthy, can you do that?

16                   PROSPECTIVE JUROR:  Yes.

17                   MR. ROSENBLATT:  Mr. Friedman?

18                   PROSPECTIVE JUROR:  Yes.

19                   MR. ROSENBLATT:  Miss Martinez?

20                   PROSPECTIVE JUROR:  Yes.

21                   MR. ROSENBLATT:  Anyone here have any religious,

22   moral or ethical beliefs that they feel they can't sit,

23   listen to the facts and make a determination of the facts?

24   Anyone here?

25                   Now, how many people here have kids?  Anybody have

slf

Proceedings

1    teenagers?

2              Miss Lackhan.

3              PROSPECTIVE JUROR:  Yes.

4              MR. ROSENBLATT:  How old are your children?

5              PROSPECTIVE JUROR:  My eldest son is 14, and my

6    youngest is four.

7              MR. ROSENBLATT:  Four?

8              PROSPECTIVE JUROR:  Yes.

9              MR. ROSENBLATT:  You promise that notwithstanding

10   the fact that you have a teenage kid, you could put that

11   aside and judge this case fairly?

12             PROSPECTIVE JUROR:  I will try.

13             MR. ROSENBLATT:  You told the judge you can be

14   fair before, correct?

15             PROSPECTIVE JUROR:  Yes.

16             MR. ROSENBLATT:  And you can be fair based upon

17   your common sense and your life experiences, correct?

18             PROSPECTIVE JUROR:  Yes.

19             MR. ROSENBLATT:  Everyone here promise to use your

20   God given common sense, your life experience and not walk

21   into this courtroom and push that aside?  And that's just

22   what we are asking you to do, Miss Lackhan.  I'm not asking

23   you to disregard the testimony or not be sympathetic if

24   that's how you feel, but when coming to -- reaching a

25   verdict, you have to put sympathy and prejudice and emotion

Proceedings

92

1   aside and just base it upon the facts.  You can do that,

2   right --

3          PROSPECTIVE JUROR:  I can.

4          MR. ROSENBLATT:  All right.  Miss Martinez, I'm

5   going to pick on you for a moment.  You work in TV.  How

6   many people watch shows like Law and Order or CSI?  Anybody?

7   They are the top shows on TV.  I'm sure somebody is watching

8   them.

9          This isn't anything like television.

10  Unfortunately for you, I'm not Jack McCoy or Denny Crane or

11  your favorite TV lawyer.  This is real life.  TV is

12  completely different than reality, right, Miss Martinez?

13         PROSPECTIVE JUROR:  Correct.

14         MR. ROSENBLATT:  In a courtroom -- how many people

15  have ever been in a real courtroom?  Only the two gentlemen

16  who have been on grand jury and jury duty before.

17         Anybody here ever testified?  Watched a trial?

18  Been in a real courtroom before today?

19         This is totally unlike TV.  TV, one of those shows

20  like Law and Order, CSI, within an hour, if you take out

21  commercials 40 minutes, the guilty are proven, the innocent

22  are exonerated, and it's done through science, right?

23  Sometimes they have that fancy purple light.  They plug it

24  into the computer.  It prints out a receipt, and you know

25  who did it.

slf

Proceedings

1      In this case you are going to hear from witnesses

2   who get on the witness stand, tell you what they saw, what

3   they heard.  There is not going to be any scientific

4   evidence.  There is not going to be any DNA.  No fancy

5   lights.  That science may exist.  Some of it may be real,

6   some of it may be fake that you see on TV, but you are not

7   going to see any of it in this case.

8      In this case you are going to hear testimony.  You

9   are going to see physical evidence, and you are going to be

10  asked to make a determination based on the testimony of

11  witnesses and evidence that you see and hear without any use

12  of science.

13     Mr. Marks, do you have any problem doing that?

14  Anyone here think that listening to witnesses, without any

15  use of science, anyone have a problem determining whether

16  the witnesses are telling you the truth, whether they are

17  lying, whether they are mistaken?  Anyone going to have a

18  problem with that?  No.  Okay.

19     Who here works alone?  Anyone work alone?

20     Mr. Perez, when you are doing computer work, do

21  you ever work on a computer by yourself?

22     PROSPECTIVE JUROR:  Occasionally I do.

23     MR. ROSENBLATT:  Mr. Friedman, I ask you to follow

24  along as I talk to Mr. Perez.  Okay?

25     PROSPECTIVE JUROR:  Yes.

slf

Proceedings

1      MR. ROSENBLATT:  Mr. Perez, you are working alone

2   at night on a computer and an individual walks into the

3   computer room where you are working by yourself.  The lights

4   are on, and a man approaches you with a purple tie, white

5   shirt, wearing a suit and his hair is falling out real

6   quick, receding hairline, about this tall (indicating).

7      He approaches you, and he points a gun at you and

8   says, Give me your money, and you turn.  You give the man

9   your money, and the man walks out.  You call the police.

10   You describe the man.  He was wearing a gray suit, a white

11   shirt, purple tie, glasses, and the police come to you.  You

12   see him outside.  He is walking to a car.  You say, That's

13   the man, and the police say to you, Mr. Perez, do you have

14   any witnesses, and, Mr. Friedman, Mr. Perez says to the

15   police, It's just me.  That's the man.  If you look at him,

16   he has a gun.  He has a hundred dollars in his pocket.  It's

17   mine, and the police say to him, Sorry, sir.  You have no

18   witnesses.  Is that fair?  Is that reasonable?

19      PROSPECTIVE JUROR:  I'm not sure I understand.

20      MR. ROSENBLATT:  The police are saying to

21   Mr. Perez, Excuse me.  I'm sorry, sir.  We can't help you.

22   If you have no other witnesses.  It's just your word.

23   That's not enough.

24      PROSPECTIVE JUROR:  No.

25      MR. ROSENBLATT:  Is that fair?

slf

Proceedings

1      PROSPECTIVE JUROR:  No.

2      MR. ROSENBLATT:  Do you think that's fair,

3   Miss Mohammed?

4      PROSPECTIVE JUROR:  No.

5      MR. ROSENBLATT:  Mr. Pegram, do you think that's

6   fair?

7      PROSPECTIVE JUROR:  If he said he has a hundred

8   dollars on him, anybody could have that.  It's your word

9   against his, but if he has a gun on him, it's not fair.

10     MR. ROSENBLATT:  I'm saying is it fair, when

11  Mr. Perez tells the police, That's the man, he says, Sorry,

12  we can't help you.  It's your word.  You don't have any

13  witnesses.

14     PROSPECTIVE JUROR:  If he tells the cop he has a

15  gun --

16     MR. ROSENBLATT:  The cop says, I'm not willing to

17  help.  You have no witnesses.

18     PROSPECTIVE JUROR:  That's a problem.

19     MR. ROSENBLATT:  Mr. Ramos, do you think that's

20  reasonable?

21     PROSPECTIVE JUROR:  I think it's a problem.  You

22  were involved in a crime, and you are telling the police

23  right there this is the man that attached you.

24     MR. ROSENBLATT:  Here is what I'm getting at.  In

25  this case most of the evidence is going to come from one

slf

Proceedings

1    witness.  One witness is going to tell you what happened to

2    her.

3              MR. BANDELLI:  Objection, Judge.

4              THE COURT:  Sustained.

5              MR. ROSENBLATT:  You are going to be asked in this

6    case to determine the defendant's guilt or non-guilt based

7    on primarily the testimony of one of the witnesses.  If you

8    only hear it from one witness in this case -- I put on one

9    witness.  After you hear from her I rest.  That means I have

10   no further witnesses.  That's the only witness you hear

11   from.  Assume, Mr. Friedman, that that witness convinces you

12   to your satisfaction beyond a reasonable doubt of all of the

13   elements of the crimes that the judge is going to instruct

14   you on.  If the judge instructs you on the law, and you

15   believe just one witness, what would your verdict be?

16             PROSPECTIVE JUROR:  If I believe the witness,

17   that's enough information for me.  If it adheres to the law

18   that --

19             MR. ROSENBLATT:  So, what would your verdict be if

20   that witness convinces you to your satisfaction?

21             PROSPECTIVE JUROR:  Well, you are not telling me

22   if the witness is reaching the guilty or the not guilty.

23             MR. ROSENBLATT:  The witness -- okay.  I

24   understand what you are saying.  If the witness convinces

25   you, Mr. Marks, to your satisfaction and proves the

slf

Proceedings

1    defendant guilty, makes out all of the elements that the

2    judge will eventually instruct you on, that witness is the

3    witness that you hear from, what would your verdict be?

4            PROSPECTIVE JUROR:  Guilty.

5            MR. ROSENBLATT:  Anyone have a problem if I

6    present to you one witness and I say, I rest.  I'm done.  I

7    have no further witnesses, and that witness convinces you.

8    Mr. Perez, would your verdict be guilty as well?

9            PROSPECTIVE JUROR:  If enough evidence is provided

10   to make that statement, then yes.

11           MR. ROSENBLATT:  Okay.  Anyone have a problem with

12   that?

13           Miss Rudolph.

14           PROSPECTIVE JUROR:  No.

15           MR. ROSENBLATT:  Miss Polanco.

16           PROSPECTIVE JUROR:  No.

17           MR. ROSENBLATT:  Mr. Pereira.

18           PROSPECTIVE JUROR:  No.

19           MR. ROSENBLATT:  Miss Martinez, any problem?

20           PROSPECTIVE JUROR:  No.

21           MR. ROSENBLATT:  Now, the judge touched on it

22   briefly when we talked about accounting.  The judge is going

23   to instruct you on the law at a later time.  He touched on

24   it briefly that reasonable doubt is not beyond a

25   mathematical certainty.  Okay?

Proceedings

1      Miss McCarthy, did you ever have an occasion where

2    you are out, and you see somebody that you may have seen --

3    you see somebody that you may not have seen for a while.

4    You go home, and you call up your soon to be husband and you

5    say, You won't believe who I saw.  I saw Mike and Jane, and

6    your husband says, Well, I don't believe you.  Do you have a

7    photograph?  I'm telling you, I saw Mike and Jane.  They

8    were on the street.  They stopped.  I spoke to them.  He

9    says, Did you take their bag and swab it for DNA to see if

10   it matches.  Would that make sense?

11      PROSPECTIVE JUROR:  No.

12      MR. ROSENBLATT:  My point is in a courtroom we

13   don't take away our common sense, our life experiences and

14   expect something different just because we are in a

15   courtroom.  You use your common sense and life experiences

16   the same way you would do at home, at work in our everyday

17   life.

18      Miss Rudolph, do you appreciate that?

19      PROSPECTIVE JUROR:  Yes.

20      MR. ROSENBLATT:  Would you have any elevated

21   expectations because you are taken out of your everyday life

22   and put in a courtroom?

23      PROSPECTIVE JUROR:  What do you mean?

24      MR. ROSENBLATT:  Would you expect scientific

25   evidence if you wouldn't expect that in everyday life?

Proceedings

1           PROSPECTIVE JUROR:  No.

2           MR. ROSENBLATT:  You can listen to testimony and

3     make a determination based upon people and what they tell

4     you, right?

5           PROSPECTIVE JUROR:  Yes.

6           MR. ROSENBLATT:  Miss Lackhan, would you agree

7     that some adults lie?

8           PROSPECTIVE JUROR:  Yes.

9           MR. ROSENBLATT:  Would you agree with me than some

10    children lie?

11          PROSPECTIVE JUROR:  Yes.

12          MR. ROSENBLATT:  And you would also agree that

13    some adults tell the truth.

14          PROSPECTIVE JUROR:  Yes.

15          MR. ROSENBLATT:  And some children tell the truth,

16    too, right?

17          PROSPECTIVE JUROR:  Yes.

18          MR. ROSENBLATT:  As a general statement, all

19    children don't lie and all adults don't lie, right?

20          PROSPECTIVE JUROR:  Right.

21          MR. ROSENBLATT:  When you talk to your child at

22    home, your 14 year old, you can make a determination based

23    on what they are saying if it makes sense, right?

24          PROSPECTIVE JUROR:  Yes.

25          MR. ROSENBLATT:  Mr. Fishtein, did you ever talk

slf

Proceedings

1    to children?  Do you have cousins, sisters, brothers?

2              PROSPECTIVE JUROR:  Yeah.  They are older though.

3              MR. ROSENBLATT:  I'm sure at your work sometimes

4    younger people come in.  They want to buy school supplies.

5    They ask you questions, right?

6              PROSPECTIVE JUROR:  Yes.

7              MR. ROSENBLATT:  In your everyday life, if you are

8    talking to somebody who is younger than you, say a teenager,

9    and they are telling you something about what happened, and

10   you have to make a determination if they are telling you the

11   truth, what are some of the things that you would do to see

12   if what they are telling you makes sense?

13             PROSPECTIVE JUROR:  Ask like more questions, I

14   guess, and try to put two and two together.

15             MR. ROSENBLATT:  What do you think about that,

16   Miss Rudolph?

17             PROSPECTIVE JUROR:  Same.  I agree, yes.

18             MR. ROSENBLATT:  How about if other evidence is

19   consistent with that?  If other people say things that

20   corroborate that, would that be one of the factors that you

21   would consider?

22             PROSPECTIVE JUROR:  Yes.

23             MR. ROSENBLATT:  Who reads the newspaper?  Anyone

24   like to read the sports section?

25             Mr. Falci.

slf

101

Proceedings

1          PROSPECTIVE JUROR:  Yes.

2          MR. ROSENBLATT:  Which paper do you read?

3          PROSPECTIVE JUROR:  Daily News.

4          MR. ROSENBLATT:  Mr. Marks.

5          PROSPECTIVE JUROR:  Newsday once in a while.

6          MR. ROSENBLATT:  Say you are reading about the

7     Yankee game in the Daily News, and you are reading about it

8     in Newsday, and say you both watched it the night before.

9     The News reports the reason why the Yankees won is because

10    A. Rod hit two home runs, and, Mr. Marks, the Newsday reads

11    same replay of the game, and they say it was pitching.

12    Without the pitching, the Yankees would have lost.

13         You both watched it, and you believe it was

14    something else.  You believe it was the defense.  Jeter made

15    a good play in the third inning.  Whatever it was, you have

16    two people, professionals at their job, writers, different

17    views of the game.  They both watched the game.  Their

18    analysis is different.

19         You also watched the game.  Your analysis is

20    different from the two of them.  Three views of the game or

21    four, and four potentially different versions of what

22    happened.  Does it mean any of you are lying?

23         MR. BANDELLI:  Judge, he is doing a lot of

24    hypotheticals, and I'm going to object.  I thought it was to

25    determine whether or not they can be fair and impartial

Proceedings

1    jurors.

2          THE COURT:  Well, he has another minute.

3          MR. BANDELLI:  Okay.

4          THE COURT:  All right.  While he is reviewing the

5    sports section.

6          MR. ROSENBLATT:  Mr. Falci, does that mean that

7    either one of you or the writers are lying?

8          PROSPECTIVE JUROR:  No.

9          MR. ROSENBLATT:  Mr. Marks.

10         PROSPECTIVE JUROR:  No.

11         MR. ROSENBLATT:  Would you agree that when you

12   retell a story, when you retell an event that happened,

13   whether it's a sports event, an event in your past,

14   somebody's wedding, birthday party, when you retell it, you

15   are not going to retell it the same every time.  Fair to

16   say?

17         MR. BANDELLI:  Objection.

18         THE COURT:  Overruled.

19         MR. ROSENBLATT:  When a reporter is doing their

20   analysis of the game, writing what they observed, what they

21   saw, two professionals at their own job can report something

22   different, correct?

23         Miss Martinez, does it mean either reporter is

24   lying?

25         PROSPECTIVE JUROR:  No.

slf

103

Proceedings

1        MR. ROSENBLATT:  Or mistaken?

2        PROSPECTIVE JUROR:  No.

3        MR. ROSENBLATT:  It just means they had a

4    different interpretation.

5        PROSPECTIVE JUROR:  Different viewpoints.

6        MR. ROSENBLATT:  Right.

7        Is there anything that I haven't covered or that

8    either I or the judge asked about that at this point you

9    think you need to bring to the Court's attention because,

10    once I sit down and if Mr. Bandelli chooses to question you

11    he sits down, this is the only time we get to speak to you.

12    After today we don't get to speak until after the trial is

13    over.  Anything you need to bring to the Court's attention

14    at this time?

15        PROSPECTIVE JUROR:  Can I ask a question?

16        MR. ROSENBLATT:  Sure.

17        PROSPECTIVE JUROR:  Are we allowed to know the age

18    of the child that he sexually assaulted?

19        THE COURT:  We are not getting into the facts of

20    the case.

21        Okay.  Thank you, Mr. DA.  You may sit down.

22        Mr. Bandelli.

23        MR. BANDELLI:  Thank you, Judge.

24        Good morning, ladies and gentlemen.  Is it still

25    morning?  Good morning, ladies and gentlemen.

Proceedings

1      My name is Stanford Bandelli. I represent Harold

2  Gopaul. This is kind of a tough process for everybody. You

3  are all sitting here, with the exception of people who have

4  done this before, and getting asked questions by people you

5  don't know in an unfamiliar setting. It's personal stuff,

6  and I just want to tell you there is a reason that we do

7  this, and the reason what we do this is we want to make sure

8  that whoever is selected, and it's an honor to be selected,

9  whoever is selected is a person who is a good candidate to

10  sit and make a decision, a fair and impartial decision, on

11  the outcome of the case.

12      I'm going to try to speak loud enough so everybody

13  can hear me. As the judge said and ADA Rosenblatt said,

14  there is a good chance many of you are going to be up here,

15  also. You saw people coming in and out the whole time.

16  Listen up. If something comes up while you are up here, you

17  may want to cut it short and say, I have an issue with that,

18  or I didn't understand that.

19      I try not to ask personal questions, but you are

20  going to be in an incredibly important position here. It's

21  a huge responsibility. It's kind of obvious. All right?

22  This is an extremely sensitive type of case. I'm not at

23  liberty to discuss the facts now, but the judge told you the

24  charges. They are sexual abuse charges. Okay? They

25  involve a child and a stepfather, and you are going to have

Proceedings

1    to make a decision at the end --

2              THE COURT:  Mr. Bandelli, I told both of you not

3    to go into the facts of the case.

4              MR. BANDELLI:  I understand, but he brought that

5    up.  I can't just ignore that he brought it up, Judge.  I

6    won't go into the facts.

7              THE COURT:  All right.  I don't want to tell both

8    of you again.

9              MR. BANDELLI:  Understood.

10             The bottom line is you are going to have to make a

11   decision at the end of this thing.  You are going to have to

12   make a determination based on what you believe in terms of

13   who is telling the truth, who is not telling the truth, who

14   has a motive to lie, who doesn't have a motive to lie, and

15   you know that testimony is all going to come -- where is the

16   witness box in this courtroom?  It's all going to come from

17   right here (indicating).  You are going to be able to see

18   the person as they testify.  You are going to be able to

19   look at their body language.  Do they seem nervous because

20   they are in this big courtroom with the judge sitting next

21   to them and have a lawyer that's going to answer questions

22   and try to make them look like they are lying, or do they

23   seem nervous because maybe they are not telling the truth?

24             I can't tell you right now what is going to

25   happen.  I haven't had an opportunity to question any of

Proceedings

1    these people yet, but I do intend to question them, and, as

2    you know, one of the witnesses is a teenage girl.

3              MR. ROSENBLATT:  Objection.

4              THE COURT:  Mr. Bandelli.

5              MR. BANDELLI:  What?

6              THE COURT:  The last time.  Do not go into the

7    facts of the case.  What don't you two understand?

8              MR. BANDELLI:  Well, Judge --

9              THE COURT:  Approach the bench.

10             (Side-bar discussion held off the record.)

11             MR. BANDELLI:  Getting back to what I was saying,

12   I'm going to have to question the victim, and I'm going to

13   have to question the victim hard.  Okay?  If any of you were

14   sitting in my client's chair right there charged with these

15   offenses --

16             MR. ROSENBLATT:  Objection.

17             THE COURT:  Read it back.

18             (Whereupon, the requested portion of the record

19   was read back by the court reporter.)

20             THE COURT:  Overruled.  He can ask that one time.

21             MR. BANDELLI:  Thank you, Judge.

22             If any of you were sitting in that chair charged

23   with these offenses, I would hope that you would want for me

24   to question the victim hard.

25             Is there anybody sitting here who feels

Proceedings

1   uncomfortable with the fact that I plan to mount an

2   aggressive defense here?  Does anybody feel uncomfortable

3   with that?

4            Ma'am, I'm going to apologize for not knowing your

5   name.  I'm so busy paying attention to everything that's

6   said and people moving in and out, but I'm more focussed on

7   listening to what you say.  Please, I apologize for not

8   knowing your names now.

9            I see you looking down, ma'am.  That gives me a

10  message.  That gives me a sign.  I'm just wondering what you

11  think.

12           PROSPECTIVE JUROR:  I actually just have a

13  headache.

14           MR. BANDELLI:  I'm sorry.

15           There is nothing about my doing a

16  cross-examination -- if it was you or a family member

17  sitting there, you would want nothing less from me, right?

18           PROSPECTIVE JUROR:  I want you to go as hard as

19  you can.

20           MR. BANDELLI:  Thank you.

21           Anybody feel differently than Miss Polanco?

22  Anybody feel differently than Miss Polanco, that, you know,

23  I just don't have the stomach for this.  I can't sit here

24  and listen to this attorney do this.  This is horrible.

25  This is upsetting.  I just don't know.

slf

Proceedings

1          Miss Rudolph.

2          PROSPECTIVE JUROR:  I'm not sure.

3          MR. BANDELLI:  Good.  Well --

4          PROSPECTIVE JUROR:  I have an infant son.  I'm a

5     new mother, so I don't know.

6          MR. BANDELLI:  Well, I appreciate that you are

7     being honest with me.  That's part of the reason we are

8     doing this.  To the extent that you withhold information,

9     it's better to get it out now.  God forbid you get picked

10    and you decide, I can't do this.

11         Do you feel you might not be up to, you know,

12    sitting on this --

13         PROSPECTIVE JUROR:  I feel it's difficult for me.

14    I'm a new mother.

15         MR. BANDELLI:  Who is staying up with the four and

16    a half month old at night if you are going to be on a jury?

17         PROSPECTIVE JUROR:  Well, he is luckily sleeping

18    through the night.

19         MR. BANDELLI:  You are very lucky.

20         PROSPECTIVE JUROR:  I only just went back to work

21    on Thursday.

22         MR. BANDELLI:  Congratulations.

23         PROSPECTIVE JUROR:  Thank you.

24         MR. BANDELLI:  Anybody else feel the same as

25    Miss Rudolph, that they are not comfortable?

109
Proceedings

1        THE COURT:  Sustained.

2        Listen.  Nobody is comfortable in a courtroom,

3    okay?  This is not a volunteer army here.  You have an

4    obligation to sit on these cases here.  If somebody has a

5    problem with the nature of the charges, and you all said you

6    didn't, you can tell me that.  Okay?  That's why the

7    attorney is not allowed to go into the facts of the case.

8    We don't try the case during the voir dire.  That comes out

9    after the jurors are selected.  Do you all understand that?

10        Otherwise, it wouldn't be fair to be trying a case

11    during the voir dire.  Okay?  Anyone have a problem sitting

12    on this case?  Raise your hand right now.  Okay.  Thank you.

13        MR. BANDELLI:  Thank you, Judge.  Okay.  One of

14    the big issues in this case is going to be credibility.  You

15    are going to have to make a judgment call on who you

16    believe.  Do you believe the person that's telling you that

17    X, Y, Z happened, do you not believe that person?

18        I know that both of you probably had an

19    opportunity to gauge people's credibility because you sat on

20    either grand juries or, you know, in a criminal matter on a

21    jury case, and there were witnesses that were called up to

22    the stand, and you had to sit there and listen to what they

23    said and listen to all after the evidence and make a

24    determination whether or not you believed them.  Is that

25    accurate?  Is that right?

slf

110

Proceedings

1   PROSPECTIVE JUROR:  Yes.

2   MR. BANDELLI:  What were the factors?  Mr. Pegram,

3   what were the factors that you used to the evaluate the

4   credibility of a witness?

5   PROSPECTIVE JUROR:  Whether or not it was

6   convincing when he told a story.  Whether the answers

7   corroborated with the other evidence.  Listen to what he

8   said.  Mathematically what he said had to be true.  Whether

9   or not he was telling the truth.

10   MR. BANDELLI:  So, what you did, you matched up

11   what this witness said with other evidence in the case --

12   PROSPECTIVE JUROR:  Of course.

13   MR. BANDELLI:  -- that supported it.

14   PROSPECTIVE JUROR:  Of course.

15   MR. BANDELLI:  That's corroboration.  That's one

16   thing.

17   Mr. Ramos, I don't mean to make you nervous.  I've

18   got to get this right, okay?  Tell me, what did you rely on?

19   PROSPECTIVE JUROR:  Testimony of the witnesses and

20   any evidence that was brought forward.

21   MR. BANDELLI:  Okay.  When you say the testimony

22   of the witnesses, suppose the witness had said one thing on

23   one particular date and then said something different on

24   another particular date, whether or not they made an

25   inconsistent statement or at some point changed their

slf

Proceedings

1    statement.  Is that something that you might consider in

2    terms of whether or not he was being truthful or not?

3         PROSPECTIVE JUROR:  Yes, but you also have take

4    the information from the other people that were brought into

5    the area and what they have said to try and get all of the

6    information.

7         MR. BANDELLI:  Well, you know, what?  I'm not done

8    with the point I'm making right now, but you brought up

9    something else.  You said you would look at the information

10   that other people were bringing to the table.

11        As the judge told everybody, later on the

12   defendant has an absolute right not to testify.  He can sit

13   there the whole time, and I can sit there the whole time and

14   we cannot say anything.  You can't hold that against him.

15        The truth is it's a crazy concept.  I think most

16   people feel if you didn't do something, you would get up

17   there and say, I didn't do it.  It wasn't me.  This is all

18   wrong.  That's common sense.  Why wouldn't you get up there

19   and say you didn't do it if you didn't do it?

20        Not in a court of law.  Not in a court of law.

21   Okay?  The bottom line is he has an absolute constitutional

22   right to sit there.  Okay?  And I need to know, because you

23   said that you would want to listen to what other people say,

24   if my client doesn't testify in this case, are you going to

25   hold that against him?