Proceedings

264

1          THE COURT:  Before that?

2          PROSPECTIVE JUROR:  I worked in security before

3    that, communications, and before that the 114 Precinct in

4    Queens.

5          THE COURT:  What years were you in the 114

6    Precinct?

7          PROSPECTIVE JUROR:  '85 to '87 -- no, not '87.  To

8    like '90, but then I went -- there was like all different

9    precincts.

10         THE COURT:  Okay.  The reason I ask this question

11   is, as you could see by that list, there's going to be

12   probably a police officer testifying here.

13         PROSPECTIVE JUROR:  Well, the only thing I was

14   thinking now I work in the substance abuse field, and there

15   is a lot of cases where there is sexual abuse that I deal

16   with.  A lot of my patients -- I'm a certified alcohol and

17   drug counselor, but I don't know if that would pose a

18   problem, but I do deal with that a lot.

19         THE COURT:  All we want to know is if you can

20   listen to the evidence.

21         PROSPECTIVE JUROR:  Right.  Right.

22         THE COURT:  Base your verdict only on that and not

23   on other things that you may see.  You would have no problem

24   with that; would you?

25         PROSPECTIVE JUROR:  Again, I don't believe so.

Proceedings

1      THE COURT: Okay. Again, as I was saying, there's

2  going to be a police officer testifying. At the end of the

3  case I give certain, what we call, instructions on the law,

4  and one of them is that you are to evaluate the testimony of

5  a police officer witness the same as a civilian. What that

6  means is if someone come in here wearing a uniform, that

7  doesn't mean you are automatically going to believe

8  everything they say.

9      On the other hand, it doesn't automatically mean

10 you are going to disbelieve everything they say. You will

11 sit, listen to what they have to testify to and make a

12 judgment as you would any other witness. You would have no

13 problem doing that; would you, Miss Wallace?

14      PROSPECTIVE JUROR: No.

15      THE COURT: Miss Brown?

16      PROSPECTIVE JUROR: No, I don't believe so.

17      THE COURT: Everyone else could do that, right?

18      Now we come to the second part of my questioning

19 which is your backgrounds. By time I get to Mr. Sherazi,

20 you have all of the information because I'm going to ask you

21 all of the same questions. Everybody after you will have

22 all of the information, so I don't have to ask the same

23 questions to everybody. Pay attention, please.

24      Mr. Nazario, what part of Queens do you live in?

25      PROSPECTIVE JUROR: Ozone Park.

Proceedings

1     THE COURT:  How long have you lived there?

2     PROSPECTIVE JUROR:  Three years.

3     THE COURT:  Where did you live before that?

4     PROSPECTIVE JUROR:  Florida.

5     THE COURT:  And where are you from originally?

6     PROSPECTIVE JUROR:  Half Puerto Rican, half

7  Dominican.

8     THE COURT:  And are you working?

9     PROSPECTIVE JUROR:  Yes.

10     THE COURT:  What do you do?

11     PROSPECTIVE JUROR:  Diesel mechanic.

12     THE COURT:  And marital status.  Any children?

13     PROSPECTIVE JUROR:  No, sir.  No children.

14     THE COURT:  Do you own or rent?

15     PROSPECTIVE JUROR:  No.  I live with my moms.

16     THE COURT:  You still live at home?

17     PROSPECTIVE JUROR:  Yes.

18     THE COURT:  That wasn't bad; was it?

19     PROSPECTIVE JUROR:  No.

20     THE COURT:  Miss Declementi, what part of Queens

21  do you live in?

22     PROSPECTIVE JUROR:  Howard Beach.

23     THE COURT:  How long have you lived there?

24     PROSPECTIVE JUROR:  47 years.

25     THE COURT:  Marital status.  Any children?

Proceedings

1          PROSPECTIVE JUROR:  Divorced.  No children.

2          THE COURT:  Are you working.

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  What do you do.

5          PROSPECTIVE JUROR:  Northshore Long Island Jewish.

6     I'm a supervisor for the laboratories.

7          THE COURT:  Do you own your own home or rent?

8          PROSPECTIVE JUROR:  I own my own home.

9          THE COURT:  Thank you.

10          Mr. Salvit, what part of Queens do you live in?

11          PROSPECTIVE JUROR:  Forest Hills.

12          THE COURT:  How long have you lived there?

13          PROSPECTIVE JUROR:  Four, five years.

14          THE COURT:  Before that?

15          PROSPECTIVE JUROR:  In the city, Manhattan.

16          THE COURT:  Marital status.  Any children?

17          PROSPECTIVE JUROR:  I'm single.  I do not have any

18     children.

19          THE COURT:  Are you working?

20          PROSPECTIVE JUROR:  I am.  I work as a management

21     consultant.

22          THE COURT:  What type of management consultant?

23          PROSPECTIVE JUROR:  Within the technology field.

24          THE COURT:  And do you own or rent?

25          PROSPECTIVE JUROR:  I own.

Proceedings

1          THE COURT:  Thank you very much.

2          Mr. Sherazi.

3          PROSPECTIVE JUROR:  Yes, sir.  I live in Queens,

4   Jamaica, and before I live in Kings Highway Precinct, and

5   I'm working as a bus driver.

6          THE COURT:  For the City?

7          PROSPECTIVE JUROR:  No, para transit.

8          THE COURT:  And marital status.

9          PROSPECTIVE JUROR:  Divorced.  I have two

10  childrens.

11         THE COURT:  Do you own or rent your own home?

12         PROSPECTIVE JUROR:  Right now I'm in a shelter.

13         THE COURT:  You live --

14         PROSPECTIVE JUROR:  In a shelter.

15         THE COURT:  What part of Queens is it that you

16  live in?

17         PROSPECTIVE JUROR:  Jamaica, Queens, right here.

18         THE COURT:  Thank you, sir.

19         Mr. Berman.

20         PROSPECTIVE JUROR:  Yes.  I live in Forest Hills

21  for going on five years.  I'm a clinical psychologist.

22  Single.  No kids.

23         THE COURT:  Own your own home or rent?

24         PROSPECTIVE JUROR:  Own.

25         THE COURT:  Okay.  Thank you very much.

269
Proceedings

1          Miss Basdeo.

2          PROSPECTIVE JUROR:  I live in Ozone Park for eight

3     years.  I'm originally from Guyana.

4          THE COURT:  Indiana?

5          PROSPECTIVE JUROR:  Guyana.

6          THE COURT:  Marital status.  Any children?

7          PROSPECTIVE JUROR:  Married.  Three children.

8          THE COURT:  Do you own your own home or rent?

9          PROSPECTIVE JUROR:  No, rent.

10          THE COURT:  And you are you working?

11          PROSPECTIVE JUROR:  Cashier supervisor JFK.

12          THE COURT:  Okay.  Thank you.

13          Miss Lotito.

14          PROSPECTIVE JUROR:  I live in Bayside, Queens for

15     52 years.  I'm divorced, have two children.  Own my own

16     home, and I work for the Department of Education as a budget

17     analyst.

18          THE COURT:  Thank you very much.

19          Mr. Manini.

20          PROSPECTIVE JUROR:  I live in Bayside as well for

21     six years.  Before that I lived in New Jersey.  I own my own

22     home.  I'm a portfolio manager.  I work in finance.

23          THE COURT:  Thank you very much.

24          Miss Wallace.

25          PROSPECTIVE JUROR:  I lived in Queens, East

Proceedings

1     Elmhurst for 25 years.  I'm originally -- I was born in

2     Jamaica.

3                MR. BANDELLI:  I'm having a hard time.

4                THE COURT:  She lives in East Elmhurst.

5     Originally born in Jamaica.

6                PROSPECTIVE JUROR:  I'm married with one child.

7     I'm a recent graduate, so I work as a part-time college

8     assistant for CUNY.

9                THE COURT:  Miss Kavon.

10               PROSPECTIVE JUROR:  I live in Middle Village.

11    I've lived there for 15 years.  Before that I lived in the

12    Bronx.  I'm a news researcher for CNN.  I'm married.  No

13    children.  We rent.

14               THE COURT:  Thank you very much.

15               Mr. Walters.

16               PROSPECTIVE JUROR:  I live in Corona.  I living

17    there for 18 years.  Originally from Jamaica.  I work for

18    Rite-Aid, store manager.  I'm married.  One child.

19               THE COURT:  How come you never have anything on

20    the shelves that you have advertised?

21               You own your own home?

22               PROSPECTIVE JUROR:  Rent.

23               THE COURT:  Okay.  Thank you very much.

24               Miss Freeman.

25               PROSPECTIVE JUROR:  I'm originally from Guyana.  I

Proceedings

1   work information technology radiology.  I live in Queens

2   Village.  I'm divorced, and I have two kids.

3              THE COURT:  Do you own or rent?

4              PROSPECTIVE JUROR:  No.  I rent.

5              THE COURT:  Thank you, ma'am.

6              Mr. Leona.

7              PROSPECTIVE JUROR:  I live on Hillside Avenue in

8   Jamaica.  I lived there for 20 years, born and raised.  I'm

9   currently a full-time student at York College.  I'm single,

10  and I have no children.  I live with my parents.

11             THE COURT:  What are you studying?

12             PROSPECTIVE JUROR:  Premed.

13             THE COURT:  Good luck to you.

14             PROSPECTIVE JUROR:  Thank you.

15             THE COURT:  Miss Brown.

16             PROSPECTIVE JUROR:  I've lived in Bayside 39

17  years.  Prior to that I lived in the Bronx.  I'm a retired

18  police officer for six years.  I presently work part time

19  for the Long Beach Medical Center detox and also part time

20  with Catholic Charities in Woodmere.  I have one daughter, a

21  college student.  I'm married, and I own my own home.

22             THE COURT:  Thank you.

23             Miss Demarco.

24             PROSPECTIVE JUROR:  I live in Bayside for 25

25  years.  I'm married, three children.  We own our home, and

Proceedings

1      I'm a parochial school teacher.

2                  THE COURT:  Thank you very much.

3                  Mr. DA, you may inquire.

4                  MR. ROSENBLATT:  Thank you, your Honor.

5            Good morning.  As the judge introduced me earlier,

6      I'm Jared Rosenblatt.  I'm an assistant district attorney

7      here in Queens.  I work in the Special Victim's Bureau.  In

8      this case I represent the People of the State of New York

9      here in the county of Queens.

10           The judge briefly told you about the jury

11     selection process.  We are looking for fair and impartial

12     jurors.

13           Some of you have that little jury book in your

14     hands.  There is no instruction on how to be a juror.  You

15     use your common sense.  You use your life experience.

16     Everyone comes in with a different background.

17           How many people were born in New York?

18           How many people were born in a different country?

19           Everybody comes in with a wide range of life

20     experiences, work experiences and familial experiences, and

21     you have to use that during this trial when you listen to

22     the testimony and the evidence.

23           The burden of proof, as the judge briefly touched

24     on earlier, is beyond a reasonable doubt.  The burden of

25     proof in a criminal case doesn't change based upon the

273

Proceedings

1    nature of the charges, and what I mean by that, Mr. Nazario,

2    is the judge told you these crimes were sexual in nature.

3    If the defendant was charged with stealing a hammer from

4    Home Depot or DWI or assault, the burden of proof is always

5    beyond a reasonable doubt.  It doesn't go up or down based

6    on the nature of the allegations.  Do you have a problem

7    with that?

8              MR. BANDELLI:  Objection, Judge.

9              THE COURT:  What's the basis of your objection?

10             MR. BANDELLI:  He is instructing them on the law.

11             THE COURT:  Sustained.

12             MR. ROSENBLATT:  Do you have any problem with

13    that?

14             MR. BANDELLI:  Objection.  He is asking the

15    question again.  You just sustained it.

16             THE COURT:  Mr. DA.

17             MR. ROSENBLATT:  I'll rephrase.

18             THE COURT:  Ask proper questions relevant to their

19    qualifications.

20             MR. ROSENBLATT:  Miss Declementi, can promise to

21    hold me to the burden of proof the judge will instruct you

22    on, nothing more, nothing else?

23             PROSPECTIVE JUROR:  Yes.

24             MR. ROSENBLATT:  Mr. Salvit, promise the same?

25             PROSPECTIVE JUROR:  Yes.

Proceedings

1          MR. ROSENBLATT:  I want to talk to you about your

2    prior jury service.  Was that in Manhattan?

3          PROSPECTIVE JUROR:  No.  It was in Queens.

4          MR. ROSENBLATT:  Tell us about that experience.

5          PROSPECTIVE JUROR:  Sure.

6          As I mentioned before, it's a grand larceny case,

7    and it was for -- they were trying to prove that the person

8    had stolen an expensive computer, but the DA was not --

9          MR. ROSENBLATT:  Don't give us the verdict.

10         PROSPECTIVE JUROR:  I'm sorry.  Forget it.  After

11   numerous --

12         MR. ROSENBLATT:  You deliberated?

13         PROSPECTIVE JUROR:  Exactly.  After interviews we

14   deliberated and we came to a close.

15         MR. ROSENBLATT:  All right.  This case is

16   obviously different.  If you are chosen as a juror, you

17   can't compare evidence from the two cases.  You understand

18   that, right?

19         PROSPECTIVE JUROR:  Sure.

20         MR. ROSENBLATT:  In this case the testimony is

21   going to come primarily from the witness stand.  What I mean

22   by that is it will be primarily testimonial in nature.

23         Who watches Law and Order, CSI, Boston Legal?  On

24   those shows it's criminal justice through science.  Within

25   40 minutes you take out the commercials, the guilty are

Proceedings

1    proven, the innocent are exonerated, and it's primarily

2    through scientific evidence, some of it which is real, some

3    which isn't.

4           In this case most of the evidence is going to come

5    from testimony.  Witnesses are going to come in, tell you

6    what they saw and did.  In this case there is going to be no

7    science.  You are not going to be able to rely your verdict

8    on scientific evidence.  It's going to be using your common

9    sense, your life experiences and judge the testimony as you

10   see it, as you hear it.

11          Do you need scientific evidence to be convinced

12   that something happened or something didn't happen?

13          PROSPECTIVE JUROR:  No.

14          MR. ROSENBLATT:  Miss Declementi.

15          PROSPECTIVE JUROR:  No.

16          MR. ROSENBLATT:  Mr. Salvit.

17          PROSPECTIVE JUROR:  I don't need it but --

18          MR. ROSENBLATT:  I'm not saying it doesn't help.

19   It assists us.  It would be great if we had it, but we don't

20   in this case.

21          PROSPECTIVE JUROR:  I work in the technology

22   field.  Our job is to use science, so it's what I look for,

23   but as you said, we have to deal with what they have.

24          MR. ROSENBLATT:  What do you think, Mr. Sherazi?

25          PROSPECTIVE JUROR:  I agree.

276

Proceedings

1          MR. ROSENBLATT:  Mr. Berman?

2          PROSPECTIVE JUROR:  Dr. Berman.

3          MR. ROSENBLATT:  Dr. Berman.  My apologies.  What

4     do you think about that?

5          PROSPECTIVE JUROR:  About the nature of witness

6     testimony?

7          MR. ROSENBLATT:  Yes.  Using testimony at evidence

8     without the aid of science.

9          PROSPECTIVE JUROR:  It's not as reliable but, you

10    know --

11         MR. ROSENBLATT:  Well, in your field you listen to

12    people come into your office, correct?

13         PROSPECTIVE JUROR:  Correct.

14         MR. ROSENBLATT:  And if a patient comes into your

15    office and tells you that last night they had an experience

16    with their spouse, and they were sitting over a cup of and

17    discussing what had happened at work, and you said to them,

18    Well, I'm not sure I believe you.  Do you have that cup of

19    coffee to swab it for DNA evidence?  Would you do that?

20         PROSPECTIVE JUROR:  It's different at work.

21         MR. ROSENBLATT:  Well, because we enter the

22    criminal justice system, because we are in a courtroom, we

23    don't forget our common sense and life experiences.  If you

24    wouldn't do it at home, would you expect it when you are

25    hearing and listening to testimony and trying to reach a

Proceedings

1    verdict based on the evidence presented to you free from

2    speculation, free from hindsight and not basing it on a

3    whim, just basing it on the evidence?

4              PROSPECTIVE JUROR:  I'm not saying I'm biased

5    because of the difference.  I understand that there is a

6    difference.

7              MR. ROSENBLATT:  What do you mean by that?

8              PROSPECTIVE JUROR:  Well, you know, witness

9    testimony is not empirical unless somebody witnessed the --

10             MR. ROSENBLATT:  Other than science, there are

11   very few things in life that are absolutely certain.  Other

12   than pure accounting numbers, nothing in life is absolutely

13   certain.

14             MR. BANDELLI:  Objection.  What does that mean,

15   nothing in life is absolutely certain?  I don't even

16   understand what he is saying.

17             THE COURT:  What does that mean?

18             MR. BANDELLI:  Yes.  What does that mean?

19             THE COURT:  Move on.

20             MR. ROSENBLATT:  Dr. Berman, you would agree that

21   very few things, other than death and taxes, is absolutely

22   certain in life, right?

23             PROSPECTIVE JUROR:  That's true, but sometimes we

24   try to get out of both of them.

25             MR. ROSENBLATT:  We do.  We do.

278

Proceedings

1      Miss Basdeo, you understand my situation that I'm

2 explaining with Dr. Berman here.  You are going to be asked

3 in this case to base your verdict based upon testimony

4 without the aid of science.  If I presented to you just one

5 witness -- and follow along with me, Mr. Nazario.  You work

6 as a mechanic alone or with a group of people?

7      PROSPECTIVE JUROR:  A company.

8      MR. ROSENBLATT:  Do you ever work by yourself?

9      PROSPECTIVE JUROR:  Yes.

10      MR. ROSENBLATT:  Follow along with my example of

11 using Mr. Nazario, okay?  Mr. Nazario is working alone on

12 his car by himself, and it's the end of the day.  Everyone

13 is cleared out.  He is finishing his work by himself.  An

14 individual approaches him while at work.  He is wearing a

15 dark gray suit, a white shirt and a reddish tie and wearing

16 glasses.  He approaches Mr. Nazario, points a gun at him,

17 demands his money.  Mr. Nazario gives the man his money and

18 calls the police.

19      As the police arrive, the man in the gray suit,

20 the red tie is walking down the street.  He points him out.

21 He says, That's the man who robbed me.  He has a gun and my

22 money.

23      Mr. Nazario talks to the police and the police

24 say, Well, do you have any witnesses?  No.  I'm working by

25 myself.  Do you have any videotape?  No.  There is no

slf

Proceedings

1   surveillance in here.  I'm working on a car by myself.  The

2   police say, Well, you don't have any witnesses.  You don't

3   have any scientific evidence.  You don't have any video

4   statement of the crime.  We are not going to assist you,

5   sir.

6           Is that fair to Mr. Nazario?

7           PROSPECTIVE JUROR:  No.

8           MR. ROSENBLATT:  Would that be fair to you, sir?

9           PROSPECTIVE JUROR:  No.

10          MR. ROSENBLATT:  Miss Declementi, would that be

11  reasonable?

12          PROSPECTIVE JUROR:  No.

13          MR. ROSENBLATT:  Mr. Salvit.

14          PROSPECTIVE JUROR:  No.

15          MR. ROSENBLATT:  Mr. Salvit, if you are a juror in

16  this case and Mr. Nazario testifies as to what happened to

17  him and he describes the individual and points to me as the

18  individual who did it to him, there is no scientific

19  evidence or video statement, no DNA.  It's Mr. Nazario's

20  testimony alone.  That's the only witness you hear.  If he

21  convinces you to your satisfaction beyond a reasonable doubt

22  of all of the elements, what the judge will tell you in that

23  scenario, what would your verdict be?

24          PROSPECTIVE JUROR:  As you said, if he convinces

25  me beyond a reasonable doubt, then we have no choice.

slf

280

Proceedings

1          MR. ROSENBLATT:  What do you think about that,

2   Mr. Nazario?

3          THE COURT:  Mr. ADA, you have one more minute?

4          MR. ROSENBLATT:  Thank you, Judge.

5          What do you think about that?

6          PROSPECTIVE JUROR:  I got to prove it depending.

7   I have to prove that that happened to me.

8          MR. ROSENBLATT:  Do you think that if you were a

9   juror in this case, taking yourself out as the victim, would

10  you have any problem basing it just on testimony?

11         PROSPECTIVE JUROR:  I have to go by what I hear.

12         MR. ROSENBLATT:  If you are chosen as a juror, do

13  you promise not to speculate?

14         PROSPECTIVE JUROR:  No.

15         MR. ROSENBLATT:  Miss Declementi, can you do that

16  if you were a juror in that type of case?

17         PROSPECTIVE JUROR:  Yes.

18         MR. ROSENBLATT:  Any problem?

19         PROSPECTIVE JUROR:  No.

20         MR. ROSENBLATT:  Miss Basdeo --

21         PROSPECTIVE JUROR:  Yes.

22         MR. ROSENBLATT:  -- you can do it?

23         PROSPECTIVE JUROR:  Yes.

24         MR. ROSENBLATT:  Miss Lotito.

25         PROSPECTIVE JUROR:  Yes.

Proceedings

1      MR. ROSENBLATT:  Mr. Manini, what do you think?

2  Can you judge the case based upon testimony, not base it on

3  speculation or hindsight or what evidence you wish they had?

4      PROSPECTIVE JUROR:  I believe I can.

5      MR. ROSENBLATT:  You could be fair in this case;

6  can't you?

7      PROSPECTIVE JUROR:  I think so.

8      MR. ROSENBLATT:  Anyone have any problem with the

9  example I used using Mr. Nazario?  Anyone at all?

10      Miss Kavon.

11      PROSPECTIVE JUROR:  Yes.  I just wonder whether do

12  these two people have any relationship at all.

13      MR. ROSENBLATT:  In my hypothetical they were

14  strangers.  That's the example I was using.  Just strangers,

15  and nobody is willing to help because it's only one witness.

16      PROSPECTIVE JUROR:  Obviously not applicable in

17  this case.

18      MR. ROSENBLATT:  Right, but I'm using a

19  hypothetical.  If I presented one witness and -- I presented

20  you, to your satisfaction, one witness as to what the crime

21  was, can you base your verdict, if it convinces you, that

22  one witness convinces you, to your satisfaction beyond a

23  reasonable doubt of the elements that the judge says, would

24  you have a problem reaching a verdict?

25      PROSPECTIVE JUROR:  No.

Proceedings

1        THE COURT:  Thank you, Mr. DA.

2        MR. ROSENBLATT:  Thank you, your Honor.  Thank you

3    for your time.

4        THE COURT:  Mr. Bandelli.

5        MR. BANDELLI:  Thank you, Judge.  It's still

6    morning, so good morning, everybody.  Good morning.

7        Anybody else out here a part of this panel, or is

8    everybody up here?  So, you don't have to listen out there.

9    I'm talking to everybody over here.

10       We have had full courtrooms the last couple of

11   days.  My name is Stanford Bandelli.  I'm defense counsel

12   for Harold Gopaul.  As everybody said to you, this is jury

13   selection.  It's about picking fair and impartial jurors.

14   It's a huge responsibility.  Okay?

15       I don't have a lot of time to get to really know

16   you, and I have to make an important decision in terms of

17   whether or not you would be a good candidate to sit on this

18   case because at the end, as you know, you are going to go

19   back into a room and you are going to have to deliberate

20   with other jurors.  You are going to have to make an

21   incredibly important decision.  In a short period of time

22   you have to figure this out.

23       We are allowed to ask you questions.  It's not

24   personal.  I don't want to make you feel uncomfortable.  The

25   idea is to figure out is this a case for you because once

Proceedings

1    you are on, it's too late then.  You can't say, I didn't

2    expect to hear that.  Judge, Mr. Bandelli, Mr. Rosenblatt, I

3    shouldn't be on this case.  Now is the time.  Okay?

4              Is there anything that anybody hasn't said that

5    they might feel they should say before I go any further?

6    No.  Good.

7              You have an advantage over everybody here not just

8    because you were a juror but you sat on a sexual abuse case.

9              PROSPECTIVE JUROR:  Yes.

10             MR. BANDELLI:  I would imagine that you were

11   required to the evaluate the credibility of a witness, of

12   somebody who was sitting over here (indicating).

13             PROSPECTIVE JUROR:  Yes.

14             MR. BANDELLI:  What were the factors?

15             PROSPECTIVE JUROR:  In that case?

16             MR. BANDELLI:  No.  What were the factors that you

17   relied on in reaching a decision whether or not, you know, a

18   witness was believable or not believable?

19             PROSPECTIVE JUROR:  Paying close attention to them

20   and the other witnesses.  There were quite a few witnesses.

21             MR. BANDELLI:  So, the fact there was more than

22   one witness and that maybe other witnesses could corroborate

23   or disprove something, that is helpful.

24             PROSPECTIVE JUROR:  Right.  That was very helpful.

25             MR. BANDELLI:  I bet it was.

Proceedings

1        They only have one witness in this case.  You are

2    not going to have the benefit of three or four people coming

3    in.

4            THE COURT:  Sustained.

5            MR. BANDELLI:  I'm just following up on what he

6    said.

7        What if the witness said one thing one time and

8    said something different later?  Would that be a factor that

9    would influence whether or not you believed the witness was

10   being truthful?

11           PROSPECTIVE JUROR:  I guess depending on what they

12   said and how different their testimony was.

13           MR. BANDELLI:  What if it was, Yes, it's true.

14   No, it's not true.  They said, Yes, it's true.  Then they

15   said, No, it's not true.  Would that influence?

16           PROSPECTIVE JUROR:  That would be very difficult.

17           MR. BANDELLI:  Right.  Anybody disagree that if

18   somebody says one thing one time and something else at

19   another time that that is or isn't a factor that should be

20   considered when determining whether or not somebody is

21   credible or truthful?

22       Sir, is that a factor you would consider?

23           PROSPECTIVE JUROR:  Well, I believe everything a

24   person says on evidence has everything to do with the case.

25           MR. BANDELLI:  Okay.  That makes sense.

Proceedings

1        PROSPECTIVE JUROR:  I would be suspicious of it.

2        MR. BANDELLI:  Does that have to do with your

3   training as a police officer?

4        PROSPECTIVE JUROR:  Well, yeah, I think so.  That

5   coupled with counseling, too.

6        MR. BANDELLI:  I bet because you are dealing

7   with --

8        PROSPECTIVE JUROR:  I'm dealing with people that

9   have been sexually abused.  The majority -- half of the

10  population of substance abuse cases have been molested.

11       MR. BANDELLI:  You have a very, very sensitive

12  type of job.

13       PROSPECTIVE JUROR:  Yes.

14       MR. BANDELLI:  I would imagine frequently you are

15  in a position --

16       PROSPECTIVE JUROR:  A lot of the time a lot of the

17  female patients, they don't even want a male counselor.

18       MR. BANDELLI:  They feel more comfortable speaking

19  to a woman.

20       PROSPECTIVE JUROR:  Yes.

21       MR. BANDELLI:  Especially if it's a young girl.  I

22  understand that.

23       Mr. Rosenblatt came up with this hypothetical

24  about -- I don't know if he was supposed to have robbed

25  somebody or somebody was supposed to rob somebody, but they

slf

Proceedings

1    were dressed like him.  The bottom line is he was trying to

2    get to a point about whether or not one witness would be

3    enough for you to render a verdict either way, right?

4              Then one of the things that he said was that he

5    said -- were you the victim?

6              PROSPECTIVE JUROR:  Yes.

7              MR. BANDELLI:  He said you called the police,

8    right?

9              PROSPECTIVE JUROR:  Yes.

10             MR. BANDELLI:  You called the police right after

11   it happened.

12             PROSPECTIVE JUROR:  Yes.

13             MR. BANDELLI:  Say you called the police a year

14   after it happened.

15             MR. ROSENBLATT:  Objection.

16             MR. BANDELLI:  This is based on his hypothetical.

17             THE COURT:  What's the basis of your objection?

18             MR. ROSENBLATT:  Going into facts of the case,

19   your Honor.

20             MR. BANDELLI:  I'm going into his hypothetical.

21             THE COURT:  Don't go into the facts of this case.

22             MR. BANDELLI:  Judge, was there a ruling?

23             THE COURT:  Don't go into the facts of this case.

24             MR. BANDELLI:  Absolutely not.

25             If the phone call was made a year after it

slf

Proceedings

1    happened --

2             MR. ROSENBLATT:  Objection.

3             THE COURT:  Approach the bench please.

4             (Side-bar discussion held off the record.)

5             MR. BANDELLI:  I'm back.  Getting back to my

6    point, and I'm not going to belabor it, but his hypothetical

7    was you called right after it happened, and you reported it

8    to the police.  Say you hadn't called for a year, and you

9    reported it to the police then.  Would that be a factor in

10   terms of determining whether or not he was telling truth

11   about what had happened, a delay between the time of the

12   occurrence and the time of reporting it?  Anybody?

13            PROSPECTIVE JUROR:  No.  That wouldn't be logical,

14   a year after.

15            MR. BANDELLI:  Right?  That wouldn't make sense.

16            Go ahead, Doctor.

17            PROSPECTIVE JUROR:  But if somebody felt scared of

18   the person, if the person said, If you call the police I'll

19   kill you or if --

20            MR. BANDELLI:  You are good.  Good.  Good.

21            PROSPECTIVE JUROR:  Some people have shame and

22   guilt and --

23            MR. BANDELLI:  Exactly.  That's the key.  You

24   can't rely on these hypotheticals.  You have to listen to

25   what they say over here.  So, if they are able to explain it

Proceedings

1    was this or that, you might consider that; but if they

2    explain it in a way that you are like, You know what?  I'm

3    not buying that.  It's not logical.  Then you are going to

4    see it the other way, right?

5            One of the things we didn't go over and we went

6    over it with the other panel, in every case, okay -- and the

7    judge will charge you on this -- the defendant has an

8    absolute right not to testify.  It's kind of like a funky

9    thing.  If you watch the shows, you know all about it,

10   right?

11           The bottom line is a person doesn't have to get up

12   there.  My client, Harold, doesn't have to get up there and

13   say, Oh, that's not what happened.  I didn't do it.  I know

14   most people would feel like, Wait a second.  If I was

15   sitting there charged with a crime, I would get up there and

16   say I didn't do it.  That's not what happened.

17           Does anybody have a concern about whether or not,

18   you know, they are going to need to hear from the other

19   side?

20           In other words, they are going to need to hear

21   what my client, Mr. Gopaul, has to say about what happened.

22           Ma'am, you sat as a juror.  You went through all

23   of this.  Was that a factor for you?

24           PROSPECTIVE JUROR:  No, it was not.

25           MR. BANDELLI:  You would rule it out, right?

Proceedings

1          PROSPECTIVE JUROR:  Yes.

2          MR. BANDELLI:  Does anybody feel -- you are

3    raising your hand?

4          PROSPECTIVE JUROR:  No.

5          MR. BANDELLI:  Speak to me.  Do you have something

6    to say?

7          PROSPECTIVE JUROR:  No.  I mean, I'm a fair

8    person, you know.

9          MR. BANDELLI:  No.  No.  I don't think you are

10   unfair.  I'm just trying to figure out whether or not this

11   is something that would be important.  I mean, it's common

12   sense.  You know, it's funny.  When I talk to my children, I

13   want to hear what they have to say if somebody says

14   something.  What's your side of it?  What's your side of it?

15         THE COURT:  Let me interrupt you for a second,

16   Mr. Bandelli.

17         Ladies and gentlemen, as you heard, one of those

18   three basic principles, the defendant does not have to do

19   anything in this case.  All right?  In life you like to hear

20   both sides of a story.  That's natural, but in the American

21   criminal justice system, it's not like that.  The DA brings

22   the charges, and the DA must prove the charges beyond a

23   reasonable doubt.  Many times you don't hear from the

24   defense at all.  That's just the way it is.

25         Anyone here have a problem with that?  That's the

Proceedings

1     way the system is.  DA brings the accusation.  He must prove

2     the accusation beyond a reasonable doubt.  You may not hear

3     anything from the other side.  Everyone comfortable with

4     that?  Good.

5               You have one more minute, Mr. Bandelli.

6               MR. BANDELLI:  Thank you, Judge.

7               You know what?  Like I said, it's a really short

8     time that I have a chance to talk with you, and the DA and

9     the judge, and, you know, I apologize if I didn't call on

10    somebody individually.  No insults are intended.  I'm trying

11    to get as much information as I can.  Does everybody feel

12    that if they were chosen in this particular case to sit as a

13    juror, if I chose you, you know what?  I want this person on

14    this jury because I think they can be fair and impartial.

15    Anybody here feel, you know what?  You got it wrong,

16    Bandelli.  I couldn't do it.

17              Sir?

18              PROSPECTIVE JUROR:  Fine.

19              Ma'am?

20              PROSPECTIVE JUROR:  Fine.

21              MR. BANDELLI:  Doctor?

22              PROSPECTIVE JUROR:  I can do it.

23              MR. BANDELLI:  Ma'am?

24              PROSPECTIVE JUROR:  Yes.

25              MR. BANDELLI:  Ma'am?  Sir?

Proceedings

1          PROSPECTIVE JUROR:  Yes.

2          PROSPECTIVE JUROR:  Yes.

3          MR. BANDELLI:  Are you sure?

4          PROSPECTIVE JUROR:  I'm a fair person.

5          MR. BANDELLI:  That's it.  Say it with confidence.

6     Don't make we wonder.  Bold language tells us something.

7     Okay?

8              Ma'am?

9          PROSPECTIVE JUROR:  Yes.

10         MR. BANDELLI:  Ma'am?

11         PROSPECTIVE JUROR:  I'm in the middle.

12         MR. BANDELLI:  In the middle.  You don't know if

13    you can be fair and impartial in this case; do you?  It's

14    okay.  We are better off knowing now.

15         PROSPECTIVE JUROR:  I'm in the middle.

16         MR. BANDELLI:  Sir.

17         PROSPECTIVE JUROR:  I can do it.

18         MR. BANDELLI:  Ma'am.

19         PROSPECTIVE JUROR:  I can do it.

20         MR. BANDELLI:  Sir.

21         PROSPECTIVE JUROR:  Yes.

22         MR. BANDELLI:  Ma'am.

23         PROSPECTIVE JUROR:  I would have a hard time

24    without Mr. Gopaul testifying because I'm in news research.

25    This is what I spend my whole day doing is finding out what

Proceedings

1    people don't want to say.  I think I would have a hard time

2    restraining myself from trying to find out more.

3            MR. BANDELLI:  I understand that.  That's why it's

4    a crazy system.  People are saying, Well, we all operate

5    this way, and so I appreciate your honesty.

6            I saw you shaking your head.

7            PROSPECTIVE JUROR:  I agree with her, but based on

8    what needs to be done, that's what I would have to base.

9            MR. BANDELLI:  You could be fair and impartial?

10           PROSPECTIVE JUROR:  Yes.

11           MR. BANDELLI:  I'm going to be okay.

12           PROSPECTIVE JUROR:  Yes.

13           MR. BANDELLI:  Thank you very much.

14           THE COURT:  Please come in the back when you are

15   both ready.

16           (Pause in proceedings.)

17           (The following proceedings took place in the jury

18   room.)

19           THE COURT:  Alternate seat number one, People, any

20   challenge for cause as to Nazario or Declementi?

21           MR. ROSENBLATT:  No.

22           THE COURT:  Any challenge for cause,

23   Mr. Bandelli --

24           MR. BANDELLI:  No.

25           THE COURT:  -- as to Nazario or Declementi?

Proceedings

1              MR. BANDELLI:  No.

2              THE COURT:  Any perempt, People?

3              MR. ROSENBLATT:  No.

4              THE COURT:  Nazario or Declementi.

5              MR. BANDELLI:  Number two.

6              THE COURT:  Defense challenges Barbara Declementi.

7              Christopher Nazario is acceptable to both sides?

8              MR. ROSENBLATT:  Yes.

9              MR. BANDELLI:  Yes.

10             THE COURT:  He becomes alternate number one.

11             For alternate seat number two, the People, any

12     challenge for cause as to Salvit or Sherazi?

13             MR. ROSENBLATT:  No.

14             THE COURT:  Any cause challenge?

15             MR. BANDELLI:  No.

16             THE COURT:  People, any challenge as to Salvit or

17     Sherazi?

18             MR. ROSENBLATT:  Mr. Salvit.

19             THE COURT:  Thank you.  Okay.  People challenge

20     Jordan Salvit.

21             Any challenge as to Sherazi?

22             MR. BANDELLI:  Yes.

23             THE COURT:  Okay.  Defense challenges Hasnain

24     Sherazi.

25             You both have one more challenge left for

                              Proceedings

1       alternate seat number two.

2                  Mr. ADA, any cause challenge as to Berman or

3       Basdeo.

4                  MR. ROSENBLATT:  No.

5                  THE COURT:  Any cause challenge?

6                  MR. BANDELLI:  No.

7                  THE COURT:  Any perempt, People, as to Berman or

8       Basdeo?

9                  MR. ROSENBLATT:  Mr. Berman.

10                 THE COURT:  The People challenge Brady Berman,

11      prospective juror number five.

12                 Any challenge as to Basdeo, Mr. Bandelli?

13                 MR. BANDELLI:  Yes.

14                 THE COURT:  Defense challenge Bhanwati Basdeo.

15                 You have no more challenges left for the second

16      seat.

17                 Any challenge for cause, People, as to Lotito or

18      Manini?

19                 MR. ROSENBLATT:  No.

20                 THE COURT:  Any cause challenge?

21                 MR. BANDELLI:  No.

22                 THE COURT:  You both used your two challenges for

23      alternate seat number two.

24                 MR. ROSENBLATT:  I did, too.

25                 THE COURT:  Right.  I said you both used it.

Proceedings

```
 1              MR. BANDELLI:  Yes, you did.

 2              THE COURT:  Did I misspeak?

 3              MR. BANDELLI:  No.

 4              THE COURT:  Paula Lotito is acceptable to both

 5    sides?

 6              MR. ROSENBLATT:  Yes.

 7              MR. BANDELLI:  Yes, she is.

 8              THE COURT:  She becomes alternate number two.

 9              Daniel Manini acceptable to both sides?

10              MR. BANDELLI:  Yes.

11              MR. ROSENBLATT:  Yes.

12              THE COURT:  He becomes alternate number three.

13              For alternate seat number four, any challenge for

14    cause as to Wallace or Kavon?

15              MR. ROSENBLATT:  Miss Kavon said she can't be

16    fair.

17              THE COURT:  Miss who?

18              MR. ROSENBLATT:  Number 11, Kavon.

19              THE COURT:  Shira.

20              MR. BANDELLI:  She did.

21              THE COURT:  Consent?

22              MR. BANDELLI:  Yes.

23              THE COURT:  Shira Kavon is excused consent of both

24    sides.

25              All right.  Do you have any challenge for cause as
```

296

Proceedings

1      to Georgia Wallace, Mr. Bandelli?

2                  MR. BANDELLI:  No.

3                  THE COURT:  Any perempt, People, as to Wallace?

4                  MR. ROSENBLATT:  No.

5                  MR. BANDELLI:  No.

6                  THE COURT:  All right.  Georgia Francis Wallace is

7      acceptable to both sides?

8                  MR. BANDELLI:  Yes.

9                  MR. ROSENBLATT:  Yes.

10                 THE COURT:  She becomes alternate number four.

11     Okay.  We have a jury.

12                 (In open court.)

13                 THE CLERK:  Of the jurors seated in the jury box,

14     will the following four people remain seated:

15                 Christopher Nazario, Paula M.  Lotito, Daniel T.

16     Manini and Georgia A. Francis Wallace.  You four, remain

17     seated.  Everybody else return to central jury now.

18                 Jurors, please step out to your right.

19                 Will our four new jurors rise and raise your right

20     hand.

21                 (Selected jurors sworn in by the clerk of the

22     court.)

23                 (Panel of sworn jurors enters the courtroom.)

24                 THE CLERK:  Will all of the jurors please rise one

25     more time and raise your right hand.

Proceedings

1          (Jury sworn in as a whole by the clerk of the

2     court.)

3          THE CLERK:  Members of the jury, at this point I'm

4     required by law to instruct you generally concerning your

5     basic function, duties and conduct as jurors.  I'll acquaint

6     you in a general way with the trial procedure and certain

7     rules which apply to every jury trial.

8          As you know, this is a criminal case which has

9     been brought by the People upon an indictment accusing the

10    defendant of various crimes of criminal sexual act in the

11    first degree, sexual abuse in the first degree, criminal

12    sexual act in the third degree and other charges.

13         Please keep in mind that the indictment is not

14    evidence.  It's merely the device used by law to bring the

15    charges against the defendant to trial as we are doing here

16    today.

17         According to the law, the People have the burden

18    of proving beyond a reasonable doubt each element of the

19    crimes charged in the indictment.  The defendant does not

20    have to prove anything.  He is presumed innocent of the

21    charges.

22         The trial has started with the selection of you as

23    the jury.  The next step in the trial will be an opening

24    statement by the People represented by Assistant District

25    Attorney Jared Rosenblatt during which he is required by law

Proceedings

1     to indicate to you what he intends to prove by way of

2     evidence to support the charges in the indictment.

3              After that Mr. Bandelli, if he desires, may also

4     make an opening statement.  There is no requirement that

5     defendant make an opening statement.

6              What counsel for either party says in an opening

7     statement is not evidence.  You may consider the opening

8     statement as a preview of what the DA intends to prove, an

9     outline of the nature of the charges and how the People

10    expect to prove the charges set forth in the indictment.

11             The ADA will present a witness or witnesses who

12    will be questioned by him.  That's called direct

13    examination.  After the DA completes his questions, defense

14    counsel will be given an opportunity to question the

15    witness.  That's called cross-examination.

16             After the People have concluded calling their

17    witnesses and the introduction of any exhibits which are

18    admissible into evidence, the defendant may, if he chooses

19    to do so, offer evidence in his defense but again is not

20    require to do so.

21             Following the presentation of evidence, if any, by

22    the defendant, the People may offer evidence in rebuttal of

23    the defense evidence.  The defendant then may offer evidence

24    in rebuttal of the People's rebuttal evidence.

25             After the defendant rests and the People rest, the

Proceedings

1    defendant may make a closing argument, following which the

2    People may make a closing argument.  Under our law the

3    defense attorney must sum up first and assistant DA must sum

4    of last.  Please remember that what a lawyer says in

5    summation is not evidence.  Summations, however, provides

6    each lawyer an opportunity to review the evidence presented

7    and submit for your consideration the facts, inferences and

8    conclusions which they contend may be properly drawn from

9    the evidence.

10            I will then charge you on law, and you will retire

11   to deliberate for the purpose of reaching a verdict.  That's

12   a statement of the trial procedure.

13            For the most part, evidence consists of testimony

14   of witnesses under oath and exhibits which are introduced

15   into evidence.  Questions in and of themselves are not

16   evidence.  Therefore, you cannot infer any fact from the

17   mere asking of a question.  It's the answer couple with

18   question that constitutes evidence in this case.

19            During the course of the trial either attorney, DA

20   or defense attorney, may object to a question or an answer

21   on the ground that somehow it is legally improper or

22   inadmissible.  If I sustain the objection, that means that I

23   have determined that the question or an answer was in some

24   manner improper; therefore, in the first instance, the

25   question may not be asked and, in the second instance, if an

Proceedings

1    answer has already been given, I will say, That is stricken

2    from the record, and, therefore, the answer is not evidence

3    in the case.

4         However, if I overrule the objection, then it

5    means that the question is proper, and I will permit it to

6    be answered or, if it's already been answered, I will allow

7    the answer to stay as evidence in the case.

8         Please do not resent the fact that either side

9    makes objections.  That's their duty.  Don't hold it against

10    them if I rule against them.

11        Exhibits, such as photos, documents or other

12    tangible objects presented by either counsel during the

13    course of the trial will be first marked for identification

14    only.  Such exhibits are not evidence until and unless they

15    are received in evidence by the Court.  If I believe, under

16    our rules of evidence, that such exhibit may be received in

17    evidence, then only does it become evidence for your

18    consideration.

19        As I'll explain to you in my charge later on, you

20    are the judges of the fact, and I'm the sole judge of the

21    law, and you must accept the law as I give it to you

22    throughout the course of this trial without hesitation or

23    reservation even if you privately disagree with me.

24        It's my function to make rulings and charge you on

25    the law.  You must neither offer nor express an opinion as

slf

Proceedings

1    to the guilt or lack of guilt of the defendant until I

2    finally give the case to you at the end.  You are not to

3    attempt to research any fact, issue or law related to this

4    case whether by discussion with others, by research in a

5    library or on the internet or by any other means.  You must

6    not visit or view any location mentioned during the course

7    of this trial, and you must promptly report to the Court any

8    incident within your knowledge involving any attempt by any

9    person to attempt to improperly influence any member of the

10   jury.

11            You are not to take any notes during course of

12   this trial.  Please bear in mind that during course of your

13   deliberations at the end of the case you can have any

14   testimony read back to you in the courtroom while you are

15   deliberating on this case.

16            As I told you before, you may run into the parties

17   during the course of this trial out on the street or in the

18   elevator or in the hallways.  Don't attempt to engage them

19   in conversation.  You are not allowed to talk to them.  They

20   are not allowed to speak to you during the course of the

21   trial.

22            The first juror sworn, Mr. Kevin Leong, is the

23   foreman of this jury.  That doesn't give his vote any more

24   weight when it comes to deciding this case, but it gives him

25   an extra duty.  During the course of your deliberations, the

Proceedings

1     jury communicates with the Court, that is with me, through

2     written notes, and those notes have to be signed by the

3     foreman, Mr. Leong.

4           I want to thank you again for your cooperation

5     during jury selection, and thank you for fulfilling your

6     obligation as citizens of this county as jurors in this

7     case, and we will proceed to the next stage which will be an

8     opening statement by the assistant district attorney,

9     Mr. Jared Rosenblatt, and you will hear that after lunch.

10    We are going to recess give you a few extra minutes for

11    lunch today.

12          Do not discuss the case among yourselves or anyone

13    else.  If anyone tries to discuss it with you, you are to

14    bring it to my attention immediately.  You are not to visit

15    any locations mentioned, and you are not to form any opinion

16    as to wether or not you feel the defendant is guilty or not

17    guilty of the crimes with which he is charged.

18          Enjoy your lunch.  Come back here at 2 o'clock.

19    We will hear the opening statements.  Thank you very much.

20    Follow the instruction of the court officer.

21              (Panel of sworn jurors exits the courtroom.)

22              THE COURT:  2 o'clock.  Please put Mr. Gopaul back

23    in.

24              (Recess taken.)

25          *               *               *

Proceedings

1     THE CLERK:  Case on trial.  All parties are

2  present, your Honor.

3     MR. ROSENBLATT:  Judge, I turned over another copy

4  of the medical records to Mr. Bandelli.  When I looked

5  through our Rosario material earlier, I realized it was not

6  included.  I'm not sure if he had it before that, but just

7  to be certain, I've turned over another copy.

8     THE COURT:  Thank you, Mr. DA.

9     My ruling on the Sandoval issue is as follows:

10     The DA may ask defendant, if he decides to take

11  the witness stand on his own behalf, about the fact that he

12  was convicted of numerous felonies on May 15, 2009.  The ADA

13  may not ask about the underlying facts of those convictions,

14  may not ask about the particular charges he was convicted

15  of.  Those charges are similar to the charges for which the

16  defendant is standing trial right now.  He cannot ask about

17  the sentences that were imposed on those.  He can only ask

18  about the fact that the defendant was convicted of numerous

19  felonies on May 15, 2009.

20     MR. BANDELLI:  Judge, if I may, first off, note my

21  exception, but what is the relevance in terms of credibility

22  of that conviction?  I don't understand.  I thought the

23  relevance in Sandoval had to do with particular crimes

24  somebody was convict of.

25     THE COURT:  That's my ruling.  You have your

1    exception.

2              MR. BANDELLI:  Yes, sir.

3              THE COURT:  Bring in the jury, please.

4              COURT OFFICER:  Jury entering.

5              (Panel of sworn jurors enters the courtroom.)

6              THE CLERK:  Case on trial.  All parties are

7    present, your Honor.

8              Do both sides stipulate that all jurors are

9    present and properly seated?

10             MR. ROSENBLATT:  Yes.

11             MR. BANDELLI:  Yes.

12             THE COURT:  I will now proceed with next stage in

13   this trial which will be an opening statement by the

14   assistant district attorney Mr. Rosenblatt.

15             MR. ROSENBLATT:  Thank you, your Honor.

16             THE COURT:  You may proceed.

17   OPENING STATEMENT

18   BY MR. ROSENBLATT:

19             MR. ROSENBLATT:  May it please Court, members of

20   the jury.  In May of 2005 Sana Awan was 14 years old.  Her

21   body began to develop.  She no longer looked like a child.

22   She began to appear as a young woman, and the defendant,

23   Harold Gopaul, her stepfather, took notice.  He began to

24   find her sexually attractive.

25             In May of 2005, the defendant was 47 years old,

slf

Opening-People

1    and the defendant lived at 242-10 89 Avenue here in the

2    county of Queens in Bellerose.  The defendant lived there

3    with his wife, Merlin, and their two children, Kaitlin, who

4    was six, and Darian, who was five, and their step-daughter,

5    Merlin's daughter from a different father, Sana Awan.

6            On a date between May 1, 2005 and August 31, 2005,

7    inside that residence in Bellerose, the defendant forever

8    altered his fatherlike relationship to his stepdaughter,

9    Sana Awan.  He changed his role of father figure to sexual

10   abuser, and between May and August in 2005, on one date when

11   Sana was 14 years old, she exited their shower inside their

12   home.  Her mother was asleep.  The kids were asleep, and her

13   stepfather, the defendant, was present inside of the

14   bathroom.  As Sana exited the shower, he told her to remove

15   her towel.  He told her to be quite.  He told her to shoosh

16   and not to say anything.

17           He grabbed her, her 14 year old body,

18   approximately 90 pounds and under five feet tall, and told

19   her to sit on their hamper.  She tried to push her

20   stepfather away.  She told him, No.  He physically resisted

21   her attempt to push him away.  He forced open Sana's legs,

22   and she tried to close them.  She was 14 year old and not

23   strong enough to push back her 47 year old stepfather.

24           The defendant forced open her legs, put his head

25   on her vagina and licked her vagina.  She tried to push him

slf

Opening-People

1    away and he continued.

2            Sana was 14 years old and had been living with the

3    defendant since she was approximately three or four years

4    old.  He helped raise her.  This was the beginning of how

5    the defendant began an abusive sexual relationship with his

6    stepdaughter Sana Awan.

7            Members of the jury, as a result of the way this

8    defendant violated sexually his stepdaughter, a grand jury

9    comprised of citizens like yourself from this county

10   indicted the defendant on a litany of charges.  He was

11   indicted for criminal sexual act in the first degree.  That

12   is one count for each time that he forcibly engaged in oral

13   sex with his stepdaughter, Sana Awan.  That is every time

14   his mouth touched her vagina he is charged with criminal

15   sexual act in the first degree.

16           These acts begin in May of 2005, between May 1 and

17   August 31 and continue through June of 2008.  He was

18   indicted for sexual abuse in the first degree.  That is his

19   hand touched her vagina.  He forcibly took his hand and

20   touched her vagina.  He was indicted for sexual abuse in the

21   first degree for how he forced his hands onto Sana's breasts

22   beginning -- withdrawn.

23           He was also indicted for sexual abuse in the first

24   degree for how he grabbed Sana's hands and forced it onto

25   his penis forcing her to jerk him off.

Opening-People

1    He was also indicted for criminal sexual act in

2    the second degree, a statutory crime, and unlike the

3    criminal sexual act in the first degree, which I told you

4    requires me to prove force, criminal sexual act in the

5    second degree he was indicted for based upon his age and

6    based upon Sana's age because at that time she was under the

7    age of 15.

8    He was also indicted for criminal sexual act in

9    the third degree, another statutory crime based upon his age

10   and when Sana was under the age of 17.  Those are for every

11   time his mouth touched her vagina, and he was also indicted

12   for assault in the third degree because in June of 2008 he

13   hit her about her arms and her body; and, lastly, the

14   defendant was indicted for endangering the welfare of a

15   child.

16   Now, during your selection the judge told you many

17   times that that was not the time to discuss evidence, but

18   now is that time.  This is my opportunity to discuss with

19   you how I will prove the defendant guilty of each and every

20   charge of the indictment.  I will prove to you how he

21   forcibly took advantage of his stepdaughter, Sana Awan,

22   beginning when she was 14, when she was a young teenage girl

23   who trusted the defendant, a grown man, someone she

24   considered her father.  I will prove to you how he did this.

25   I will prove to you how he took his

Opening-People

1    father-daughter relationship and transformed it into a

2    sexual one to satisfy his sexual desires.

3            Here is how I will prove the defendant guilty

4    during this trial:

5            When Sana Awan was approximately three or four

6    years old and around 1994, Sana's mother and the defendant

7    began living together.  From that point on the defendant was

8    the primary father figure in Sana's life.  For approximately

9    the next ten years, Sana, the defendant and Sana's mother

10   lived together, and eventually the defendant and Sana's

11   mother had their own two children, Kaitlin and Darian, and

12   although Sana did not choose for the defendant to be her

13   stepfather, they grew to have a strong relationship.  Sana

14   even call him "dad."

15           Until 2005, they had a normal parent-daughter

16   relationship.  They went together on vacation.  He took her

17   out in public.  He helped her with her homework, and until

18   that time between May and August of 2005, Sana had every

19   reason to trust the defendant, but unfortunately Sana did

20   not have the closest relationship with her mother.  The

21   defendant filled that parental role primarily for Sana.  The

22   defendant was a man Sana looked up to.  She admired him and

23   trusted him until he violated that trust.

24           They lived together in Bellerose, the five of

25   them, and they had one bathroom for the five of them.

Opening-People

1    During the course of the trial you are going to learn that

2    many times when one person was in the shower, another person

3    would come in and use the sink to brush teeth or wash their

4    face.  They had an open relationship with the bathroom.

5    They shared their space.

6           The defendant took this trust as a father and he

7    broke it.  The man who had raised Sana since she was

8    approximately three years old was unable to resist his

9    sexual attraction to his stepdaughter.  He used a

10   combination of threats and force to continue his sexual

11   relationship over time.

12          During this trial, members of the jury, you will

13   learn that the betrayal of trust can be more dangerous than

14   a weapon.  You will see during the course of this trial,

15   through the testimony of witnesses, how the defendant's

16   betrayal of trust cast a world of confusion on Sana.  It

17   confused her emotions.  It confused her way of thinking.

18          Sometime between May and August of 2005, Sana

19   doesn't remember the exact date, but during that time period

20   when this first began began this transformation.  Sana 's

21   breasts began to develop.  She had pubic hair that began to

22   show, and early one morning when she woke up, she went to

23   take that shower.  This is when the sexual relationship

24   began.

25          She will tell you during course of this trial that

Opening-People

1    she loved the defendant up to that point, that she trusted

2    him and felt him to be a role model for her.  She trusted

3    him for the 11 years, up until the approximate ten to 11

4    years up until that point, and on that date, between May and

5    August, he ignored her requests to stop.  He told her to

6    stop.  She tried to close her legs, and the defendant

7    ignored Sana.

8              During this trial you are going to hear from Sana

9    Awan.  She is no longer 14 years old.  She is now 19 years

10   old.  She no longer lives with or has any contact with her

11   mother or stepfather.  She is now a stronger and more

12   courageous girl than she was previously, and she is going to

13   come into this courtroom during the course of this trial and

14   speak to you, 16 strangers who she has never met, and

15   describe to you how the defendant took advantage of her

16   sexually.  She will rehash the embarrassing details of a

17   secret she held for years, a secret she held onto and didn't

18   tell anyone until 2008.

19             She is going to be asked to retell the

20   embarrassing details of how the defendant forced his mouth

21   onto her vagina, how he grabbed her breasts with his hand,

22   how he forced her to touch his penis.  She will tell you how

23   he threatened her with a knife.  For three years

24   continuously, from 2005 through 2008, he forced his body

25   onto her.  He told her to keep it a secret.  He told her he

Opening-People

1    would get in trouble if she told anyone, and Sana kept it a

2    secret for three years.  From May of '05 until June of 2008

3    Sana did not tell a sole.  She did not tell her mother.  She

4    did not tell her siblings.  She did not tell her closest

5    friends how the defendant sexually abused her.

6           In public the defendant tried to act normal

7    towards his stepdaughter.  She was scared to tell her

8    mother.  She was scared for many reasons.  The defendant was

9    the only one who was working in the home.  He was the only

10   one bringing home money.  Sana was scared.  What would

11   happen to the family if they lost the financial support of

12   the only one providing money to her and her brother and

13   sister?

14          She didn't have a relationship with her mother

15   where she felt that she could entrust her to tell her this

16   secret, a bond that many mothers and daughters have.  Sana

17   did not have that type of relationship.

18          The acts didn't end after August of 2005.  They

19   continued.  After that first act between May and August of

20   2005, the defendant continued this conduct over the next

21   three years.  She continued to have fear.  She continued to

22   have fear of what would happen if the defendant wasn't there

23   to support her brother and sister.  She was afraid of no one

24   believing her.  She was afraid if she told anyone, what they

25   would say if they didn't believe her and made her go back to

Opening-People

1     the man who was abusing her.

2          She remained quiet, and she complied with the

3     defendant's demands from '05 through '08.  His behavior

4     continued into '08.  Between January and February of 2008,

5     the defendant continued his sexual relationship with his

6     stepdaughter.  Between January and February of 2008, on one

7     date, the defendant forced his mouth on her vagina.  He

8     forced his hands onto her breasts.  He forced her to grab

9     his penis with his hand, telling her what to do and what

10    would happen if she didn't.

11         In one month in March -- excuse me.  On one date

12    in March, on one date in April and on one date in May, the

13    defendant continued this same abuse, forcing his hand on her

14    breasts, vagina, forcing her hands onto his penis and

15    forcibly licking her vagina.

16         In May of 2008 when the defendant picked up Sana

17    from school, he came to observe Sana talking to a classmate

18    of hers, a boy, and when the defendant came to school and

19    observed that, he became even more abusive to Sana.  In

20    fact, he picked her up and dropped her off on a daily basis

21    after he observed her talking to this boy outside the

22    school, and in May and June of 2008, the defendant would

23    take Sana to school early, and he would drive her to the

24    vicinity of 74-20 Commonwealth Boulevard, in the vicinity

25    around there, which is in the heart of Queens, near Sana's

slf

Opening-People

1   school, before school, inside the car, the defendant

2   threatened Sana with a knife.

3            He threatened to cut off Sana's fingers with a

4   knife that he had in his car.  He did this in the vicinity

5   near her school.  He parked the car and did it inside the

6   car.  He told her, I'm going to show you how serious I am,

7   pointing the knife at her, threatening to cut off her

8   fingers.

9            In May and June of 2008, on one date inside that

10  car, near the school, he forced his hands onto her vagina

11  and breasts and forced her to touch his penis inside the car

12  in the vicinity of that school.

13           During this trial you are going to see that knife

14  which was recovered by members of the Police Department

15  during their investigation of the defendant.

16           May of 2008 has pretty strong significance to Sana

17  Awan because in May of 2008, the defendant tried to advance

18  the relationship even further.  In fact May 14, 2008 is a

19  day that will forever remain in Sana's mind.  Many of the

20  dates she doesn't remember.  You are going to hear during

21  the course of this trial that when the abuse occurs, over

22  time the memories tend to blend together, and an individual

23  has difficulty picking out when incidents occurred when they

24  occur the same way over a period of time; but Sana remembers

25  May 14, 2008, because on May 14, 2008, that was day that the

1    man she called dad, the defendant, the man who raised her,

2    the man who fathered her siblings, the man who used to help

3    her with her homework made Sana promise him something.

4         On May 14, 2008 the defendant made Sana promise

5    that he would be the one.  Well, what's "the one"?  Well,

6    the defendant wanted to be the one that would take the

7    virginity away from his stepdaughter because he told her

8    that in one month we are going to have sex.

9         During the month of June, on one date, the

10   defendant again forced his hand on her vagina, forced his

11   hand on her breast, forced his mouth to her vagina, forced

12   her to touch his penis inside of their home in Bellerose.

13   When June 14 came and went, Sana felt a sense of relief.

14   She thought it had been forgotten or it was over, but it

15   wasn't because days after June 14, the defendant again

16   reminded Sana that the day had passed, the date that he had

17   selected, and he picked a new date, Wednesday, June 25.

18        As the 25th approached, Sana's nerves increased.

19   Her thought that the defendant had forgotten that date

20   wasn't going to come true.  She had planned to run away, and

21   she was trying to figure out how and when she would do it.

22        On Saturday, June 21, 2008, Sana woke up again to

23   be abused by the defendant.  He took her into his bedroom,

24   and he used a vibrator that him and his wife had in the

25   home, and rubbed it over her clothing near her vagina, and

1    Sana began to cry, and he grew frustrated and he got mad,

2    and he hit her, and then when Sana was crying inside of that

3    bedroom in Bellerose, the defendant had the audacity to ask

4    her why she was crying.  Why she was so upset.

5         Later that day the defendant took Sana and her

6    brother and sister, a friend and Sana's mother went to a

7    local fair at a church where they had rides and games, and

8    while at the fair Sana was waiting on line for a ride called

9    the Zipper with her friend.  As they waited on line and Sana

10   got closer to front of the line, there was a person, a kid,

11   near the front by himself, and the person running the ride

12   told him he needed two people to go on the ride.  Sana's

13   friend indicated she would go on the ride with the kid

14   waiting by himself.

15        Well, this did not fly with the defendant.  He got

16   angry because his wife apparently had some sort of

17   toothache, and it bother him that he had to wait a little

18   longer for Sana and her friend to be considerate and help

19   this young boy on the ride.  He yelled at Sana at the fair.

20   He screamed at her.  He told her to get off the line.  He

21   didn't want to wait anymore, and Sana grew upset and began

22   to cry at the fair, began to cry at home, and eventually

23   back inside of their home in Bellerose, after the fair, the

24   defendant's anger continued, and he slapped Sana and hit her

25   on her arms and face -- excuse me -- on her arms and face

1    leaving bruises on her arms.

2         June 25 was approaching, and Sana knew she had to

3    do something.  The defendant had just gotten violent with

4    her.  He had remembered the date had passed and was planning

5    to engage in sexual intercourse with his stepdaughter.  She

6    knew that the next day, which was Sunday, everyone was going

7    to be home, so she couldn't run away that date because there

8    would be too many people there.  So, Sana packed up her

9    belongings in a bag and hid them inside a closet so her bags

10   would be ready to go for the right time.

11        That time was Monday June 23, 2008.  Sana waited

12   until her mother went to sleep.  She waited for her younger

13   brother and sister to fall asleep.  It was the middle of

14   June.  It was hot.  The air conditioners were on.  There was

15   noise in the home.  After her mother, brother and sister

16   went to bed, Sana called her best friend at the time, a girl

17   by the name of Christine Alioto, and Sana told Christine she

18   was going to run away.  Christine asked why, and Sana, after

19   three years of being abused by the defendant, three years of

20   keeping his secret, she finally told somebody what had

21   happened, and she told Christine that her father was abusing

22   her and that her father was planning to rape her.

23        Christine went and wanted to tell her mother,

24   Denise.  You will see that Christine's relationship with

25   Denise is totally different than that of Sana and her

slf

Opening-People

1    mother.  Christine and Denise have a really close

2    relationship, and Christine immediately handed the phone to

3    her mother and said, Sana wants to tell you something, and

4    Sana went on to tell Denise that the defendant had been

5    abusing her for years and that she was running away.

6           Denise and Christine got in a car and picked up

7    Sana after she ran out of her house a few blocks away, and

8    when Denise and Christine finally had Sana in their car

9    safe, away from the defendant, Denise didn't know what to

10   do, so she called family members and asked where she should

11   take her.

12          After speaking to members of her family, Denise

13   took Sana straight over to the 105 Precinct in Queens where

14   they reported what had been going on for the last three

15   years.

16          Quite ironically, while Sana was upstairs in the

17   105 Precinct telling a member of the Police Department what

18   had been going on for the last three years, the defendant

19   walked into the precinct because when he went home to check

20   on his daughter from work, she wasn't in her bed, and as he

21   walked in, they immediately recognized him as the man who

22   had been abusing Sana.  They had provided a description, and

23   someone pointed him out as Harold Gopaul, the individual who

24   was wanted in regards to the child abuse case upstairs in

25   the Detective Squad.

1          On June 24, 2008, the defendant was brought

2     upstairs from where patrol is to the Detective Squad where

3     he was brought into a room and he met a detective by the

4     name of Lennard Shulman.  Detective Shulman, a veteran of

5     the 105 Precinct, asked the defendant if he would be willing

6     to talk to him about allegations made against him by Sana,

7     and he answered, Yes.

8          The defendant was read his Miranda warnings off a

9     sheet of paper.  The defendant acknowledged those warnings.

10    He signed that sheet of paper, and he went on to write a

11    written statement, a statement which you will see, a

12    statement which he made not knowing what Sana had said, and

13    he told the police that he had an argument with his

14    daughter, and he slapped her.

15         Detective Shulman the left room, came back a short

16    time later and informed the defendant that his daughter had

17    made allegations against him that he was acting

18    inappropriately to her, and on June 24, 2008 the defendant

19    was asked again if he wanted to make a statement.  The

20    defendant again said, Yes.

21         Detective Shulman gave him a pad and a pen, and

22    the defendant wrote out a second statement in his own

23    handwriting, like the first, without knowing what Sana had

24    said, and the defendant wrote down in his own handwriting,

25    which you will see during this trial, that he had a sexual

Opening-People

1    relationship with his daughter where he would touch her

2    vagina, where he would touch her breasts, where she would

3    touch his penis, where they would kiss.

4         He wrote, in his own handwriting in June of 2008,

5    that this happened around five or six times; that he knew it

6    was wrong, and that he needed help.

7         Members of the jury, during the course of this

8    trial and when you deliberate and you evaluate these

9    statements which you will get to see and hold in your own

10   hands, I'm going to ask you to examine it and look at it not

11   because what is contained in it is completely truthful,

12   believable or accurate, I'm going to ask you to look at it

13   to examine it because what it says about the defendant's

14   relationship with his stepdaughter, what he was willing to

15   say to the police when confronted without ever knowing what

16   Sana had already told the detective.

17        I will prove to you that during these two

18   statements, the defendant tries to keep himself out of

19   trouble, tries to minimize his responsibility, and on

20   June 24, 2008, the defendant was asked by Detective Shulman,

21   later that day, if he would like to discuss his relationship

22   with Sana with members of the district attorney's office,

23   and the defendant again stated, Yes.  He agreed that he

24   would be willing to speak to members of my office; and on

25   June 24, 2008, Assistant District Attorney Brian Hughes, a

Opening-People

1  member of the Domestic Violence Bureau, and myself responded

2  to the 105 Precinct to speak to the defendant.

3          You will see on the video with your own eyes

4  defendant what he said two years ago before he had ever

5  heard Sana Awan testify, before he ever sees police reports.

6          He was read his Miranda warnings again by

7  Assistant District Attorney Brian Hughes, and what did the

8  defendant say on video?

9          Well, during this trial you are going to see that

10  the defendant admitted on June 24, 2008, in his own words,

11  how his relationship with his daughter changed.  How he

12  began to touch her.  How he began to touch her breasts, her

13  vagina.  How he would take her hands and put it on his

14  penis.  He admitted on video how he engaged in these sex

15  acts with his daughter.  He admitted on video how he became

16  sexually attracted to his daughter.  He got that attraction

17  when she began to grow.  Those are his words, and you will

18  get to see it during this course of this trial.

19          He liked how she began to look.  He found his

20  stepdaughter attractive.  He admitted that he told his

21  stepdaughter that it needed to be a secret because if anyone

22  found out, he would get in trouble.  The defendant knew it

23  was wrong, and he did not care.  He admitted on video how he

24  took Sana's hand and told her that she wanted to feel his

25  penis.  How he would take her hand and put it on his -- how

Opening-People

1    he would take her hand, put it on his penis and had her jerk

2    him off; and finally, members of the jury, also on video the

3    defendant discussed how he spoke to his daughter and asked

4    her, Can I be the one?  Can I be one to have sexual

5    intercourse with you?  You will hear those words spoken by

6    him two years ago before he ever knew the allegations before

7    him.

8                 You are going to hear how the defendant wanted to

9    take the virginity of the girl he raised.  He admitted on

10   video how he slapped her after the fair.  Those were his

11   words, and you will get to see it during this trial on

12   video.  Again, when you review video, I submit it's for the

13   same purpose, not because what the defendant admits on that

14   day is completely honest and forthright.  I submit it so you

15   can see how he tries to make it seem that Sana was the one

16   who thought it was okay.  He makes it seem that she wanted

17   to do this.

18                 You will learn through the testimony of witnesses,

19   through that video, at the end of this trial you will see

20   how that betrayal of trust, that which a father has over his

21   daughter, can be far more dangerous than any weapon or any

22   threat, how the betrayal of trust casts doubt on a child's

23   beliefs, their thoughts, their emotions and their ideas; and

24   at the conclusion of this trial I'm going to come before you

25   once again during my summation, after you have heard all of

Opening-Defendant

1    the testimony and you have seen all of the evidence, the

2    knife, written statements, the video statement, the

3    testimony of Sana Awan, I'm going to ask you reach the only

4    verdict that's consistent with the evidence you have seen,

5    the only verdict free from sympathy or prejudice; that the

6    defendant is guilty of each and every count that he is

7    charged with.

8            Thank you very much.  Thank you, your Honor.

9            THE COURT:  Thank you, Mr. Rosenblatt.

10           Mr. Bandelli, do you wish to make an opening

11   statement on behalf of the defendant?

12           MR. BANDELLI:  I do, Judge.

13           THE COURT:  You may proceed.

14   OPENING STATEMENT

15   BY MR. BANDELLI:

16           MR. BANDELLI:  Your Honor, ADA Rosenblatt,

17   Mr. Foreperson, ladies and gentlemen of the jury.  This is

18   my opening statement.  Harold Gopaul never, never sexually

19   abused his stepdaughter, Sana Awan.  In fact, he loved her

20   as if she was his own child, as if she was his own flesh and

21   blood.  He provided her with a home.  He provided her with a

22   family with the biological mother Janet Merlin.  They had a

23   boy and a girl, Sana's little brother and little sister.

24           He emphasized certain things to Sana.  He

25   emphasized schoolwork and good grades.  He emphasized their

Opening-Defendant

1     heritage as West Indians.  He emphasized being a good

2     person, being respectful, respecting authority.

3                He discouraged certain things.  He discouraged her

4     from dating boys, dating older boys, from behaving like

5     Brittany Spears, from behaving like the girls you see on

6     MTV.  He discouraged her from smoking.  He wanted her to

7     focus on her schoolwork.  He wanted her to have a good life.

8     He was proud of her.  Everything he did was consistent with

9     the pride that he had in her.

10                He had rules.  He was a strict disciplinarian.  He

11     was also a friend, friend to this girl.  He was a typical

12     dad.  Rules, love, discipline, wanting the best for his

13     daughter.

14                At some point the relationship changed.  As she

15     became a teenager, in her teenage years, she become defiant.

16     She became provacative.  She didn't want to follow the rules

17     anymore.  She didn't want to be controlled by her parents.

18     She wanted to date boys, one older boy in particular.  She

19     wanted to hang out.  She wanted to socialize.  She didn't

20     want to be restricted by her cultural environment.  She

21     didn't want to be confined.  She wanted her independence,

22     and so tension began to develop, tension between the

23     parents, between my client and his wife and their daughter.

24     I don't want you to see this boy, but I want to see this

25     boy.  I don't want you to go out with those girls, but I

Opening-Defendant

1    want to go out with those girls.

2              Tension, a tug of war, and eventually it erupted.

3    It erupted after a fair at which my client publicly

4    humiliated his daughter and some of her friends.  The ADA

5    told you about that.  The fair at St. Gregory.  Sana's

6    mother had suffered a very serious oral infection, very

7    serious.  As a matter of fact, she was hospitalized for a

8    week because of it, a week.  Okay.  She could have died, and

9    they were at this fair, and the father was feeling the

10   pressure from the mother to leave the fair.

11             Anybody who is in a relationship knows sometimes

12   you experience other people's anxiety.  You experience their

13   concerns.  You experience their tension.  Mom said she

14   doesn't feel good.  She wants to go home.  Sana doesn't want

15   to go home.  Her friend's there.  She is having fun.  I

16   don't want to listen to you guys anymore.  I'm done with

17   this.  I'm done with this.

18             They go home, and it gets worse.  An argument.  A

19   huge argument.  The whole family is present for the

20   argument.  My client, Harold, physically disciplines his

21   daughter.  Is that a crime?  I don't know.  I don't know.

22   How do you feel about parental punishment?  What do you do

23   when a teenager is yelling and cursing at you unwilling to

24   listen to you?  He hit her.  He hit her in the arm and leg.

25   There were welts, red welts.  Is that okay?  I don't know.

Opening-Defendant

1    Is that a crime?  I'm not sure, but I know that parents have

2    different rules about how they discipline their children,

3    and I can't speak for somebody else in that regard, but it

4    was a very, very upsetting experience for everybody.  For my

5    client, for the mother, for Sana, for the two little kids.

6    They were all traumatized by this, and at that point Sana

7    decided, I'm out of here.  I'm out of here.  I'm done.  This

8    family is not going to control me.  It's not going to be

9    like this.  I don't want it, and within three days -- within

10   three days of that happening, for the first time when she is

11   talking to her friend Christine on the phone she says.  Oh,

12   I've been sexually abused.  First time.  On the heels of

13   everything that's going on.  On the heels of mom and dad

14   don't want you to date this boy.  Mom and dad don't want you

15   to hang out with these children.  Mom and dad want you to

16   follow the rules.  Go to school.  We want you to be behave.

17   On the heels of that, on the heels of this, all of a sudden,

18   Boom.  I've been sexually abused.

19         Three years.  Three years of opportunity to tell

20   people.  She goes to school.  She has friends.  You know, at

21   the school the teachers are actually trained to recognize

22   when a person is abused in some way, right?  There is

23   behavior patterns that they demonstrate.  A teacher is

24   paying attention.  A guidance counselor is paying attention.

25   Nobody ever said, Sana is being abused.  Nobody.  Within

Opening-Defendant

1    three days of reporting that, she was out of the house, and

2    she moved in with her friend Christine and her mother.  She

3    got what she wanted.  She was out.  She was free.  She was

4    able to date her boyfriend.  She was able to hang out with

5    the friends she wanted to.  She had what she wanted.  She

6    had her independence.

7         That's what this is about by the way.  That's what

8    this whole thing is about.

9         Now, the DA, he is going to make a big point out

10   of these statements, statements that he made to Detective

11   Shulman, statements that he made to ADA Rosenblatt,

12   statements that he made to ADA Hughes.

13        Let me tell you something.  They are all

14   worthless.  All right?  My client showed up at 3 o'clock in

15   the morning at the 105 Precinct looking for his daughter to

16   file a missing person's report.  Had he been sexually

17   abusing her for the past three years, is that where he would

18   go?  You would run from the precinct, not go to the

19   precinct.

20             MR. ROSENBLATT:  Objection.  Argumentative.

21             THE COURT:  Mr. Bandelli, this is an opening

22   statement.

23             MR. BANDELLI:  Well, I'm opening, Judge.

24             THE COURT:  An opening statement, as you know, is

25   what you think the evidence will show.  You will get your

slf

Opening-Defendant

1    chance to argue in summation.

2              MR. BANDELLI:  This is what I think the evidence

3    will show, that my client showed up at the precinct that

4    night and was beaten by police officers, was put in a room

5    they call the box for 15 hours until he and his partner

6    showed up to take a statement from him.  Fifteen hours in a

7    box, not allowed to call his wife, not allowed to call his

8    family.  Actually, the detective purposely isolated him from

9    everybody.  The mother came to the precinct.  She knew he

10   went to report the daughter missing.  She shows up at the

11   precinct 8 o'clock in the morning.  Has anybody seen my

12   husband?  He came here.  I don't know where my daughter is.

13   What's going on?  What's going on?

14             We can't help you.  Hold on.  I don't know where

15   your husband is.  He is up in the box.  He is up in the box

16   being coerced, being told what to say, being told, Hey, if

17   you say this and say that, you can walk out of here.  You

18   can leave here.  This is over.  Just say this and say that

19   and sign this, sign that; you can go.  It's over.  You are

20   out of here.

21             These were not voluntary statements.  These were

22   not truthful statements.  These were statements made by a

23   man who was desperate, afraid, in fear for his safety and

24   wanted to go home.  He came there to find his daughter, and

25   instead he was treated like an animal.

1          Harold Gopaul never, never sexually abused Sana

2     Awan.  He is not guilty of these crimes.  This was a lie to

3     get what she wanted.  To get out.  To get free.  It's too

4     late now to go back.  You, ladies and gentlemen, have the

5     power to fix this, to correct this, to write this horrible

6     wrong, and I'm confident that at the end you will do that.

7          Thank you.

8          THE COURT:  Mr. DA, you may call your first

9     witness.

10         MR. ROSENBLATT:  Your Honor, the People call

11    Detective Lennard Shulman.

12         COURT OFFICER:  The People call Detective Lennard

13    Shulman, S-h-u-l-m-a-n, shield 6387, 105 Squad, NYPD.

14         MR. ROSENBLATT:  May I inquire, your Honor?

15         THE COURT:  You may proceed.

16         MR. ROSENBLATT:  Thank you.

17    L E N N A R D     S H U L M A N , Detective, having stated

18       his shield number as 6387 and his command as the 105

19       Squad, New York City Police Department, having been duly

20       sworn, took the witness stand and testified as follows:

21    DIRECT EXAMINATION

22    BY MR. ROSENBLATT:

23    Q     Good afternoon, Detective.

24    A     Good afternoon.

25    Q     Tell the members of the jury, how long have you been

Shulman-People-Direct

1    employed by the New York City Police Department?

2        A    Next month will be 17 years.

3        Q    When were you promoted to the rank of detective?

4        A    June 4 of 1999.

5        Q    How long have you been assigned as a detective to the

6    105 Precinct?

7        A    Since April of 2002, so a little over eight years.

8        Q    Prior to your assignment as a detective at the 105

9    Detective Squad, where were you assigned?

10       A    I spent almost five years in the citywide Anti-Crime

11   Unit.

12       Q    Can you tell us what are the duties and

13   responsibilities of a detective in the 105 Precinct?

14       A    We assist patrol officers in enhancing cases and crimes

15   that have been committed, and we also do follow-up

16   investigations on crimes and incidents that are reported to the

17   Police Department.

18       Q    Can you describe to the members of the jury the

19   difference between a patrol officer and a detective?

20       A    Primarily a patrol officer would be uniformed and would

21   be a first responder upon someone having contact with the Police

22   Department.  A detective investigator in the Detective Squad

23   would be a second responder to an incident and be responsible

24   for follow-up investigations to determine the facts and

25   circumstances of incidents and crimes.

Shulman-People-Direct

1    Q    And can you tell us where the 105 patrol officers are

2    located in relation to the Detective Squad inside of the 105

3    stationhouse?

4    A    The patrol officers are primarily on the first floor of

5    the building, and the Detective Squad is on the second floor of

6    the building in the 105 Precinct.

7    Q    When you say the first floor, you are talking about the

8    ground level?

9    A    That's correct.

10    Q    I want to turn your attention to June 24 of 2008.  Were

11    you working on that date?

12    A    Yes, I was.

13    Q    And when you work, do you wear a suit and tie as you

14    are wearing today, or do you wear a uniform?

15    A    I wear business attire generally, a suit and tie.

16    Q    And at approximately 2:30 in the morning on June 24,

17    2008, were you at work?

18    A    Yes, I was.

19    Q    Where were you at work?

20    A    I was inside the 105 Detective Squad.

21    Q    Did there come a point in time at 2:30 in the morning

22    on that date when you were assigned to assist in the

23    investigation of a sexual abuse involving a complainant victim

24    by the name of Sana Awan?

25                  MR. BANDELLI:  Objection, your Honor.  Leading.

                                                                slf

Shulman-People-Direct

1           THE COURT:  Overruled.

2       A    Yes, I did.

3       Q    Without telling us what was said to you, tell the

4  members of the jury what happened at approximately 2:30 in the

5  morning.

6       A    I received a phone call in the 105 Detective Squad from

7  a detective from Detective Borough Queens, Detective Matthews,

8  informing me that he had received notification from the

9  Detective Borough Special Victim's Unit that there was a victim

10  in the 105 Precinct and that there was some kind of sexual abuse

11  allegation being made regarding an incident --

12           MR. BANDELLI:  Objection.  This is all hearsay.

13           MR. ROSENBLATT:  I'm not offering it for the

14       truth, your Honor.

15           THE COURT:  Sustained.

16           MR. ROSENBLATT:  Judge --

17           THE COURT:  Sustained.

18       Q    You mentioned that you received a call from Detective

19  Borough Queens.

20       A    Yes.

21       Q    What is Detective Borough Queens?

22       A    Detective Borough Queens is the parent supervisory

23  office for the Queens detectives.

24       Q    Okay.

25           So, Detective Borough Queens supervises a detective

slf

Shulman-People-Direct

1  squad at each local precinct?

2     A    That's correct.

3     Q    And after you received that call, without telling us

4  what was said, did you assist an officer with your

5  investigation?

6     A    I did.

7     Q    Who was that officer?

8     A    Officer Alfaro.

9     Q    And is Officer Alfaro a member of the 105?  Is she a

10 member of the 105 Precinct patrol?

11    A    Yes, she is.

12    Q    Can you tell the members of the jury at 2:30 in the

13 morning when you began to assist Officer Alfaro, what did you

14 do?

15    A    I contacted Sergeant O'Hagan who at that time was the

16 desk officer inside the precinct that night.  I inquired to him

17 in regards to the call I had gotten from the Detective Borough.

18 He did indicate to me that there was a victim in the precinct --

19         MR. BANDELLI:  Objection as to what was said by

20    Sergeant O'Hagan.

21         THE COURT:  Sustained.

22    Q    Don't tell us what was said.  Tell us what you did

23 after speaking to Sergeant O'Hagan.  What did you say to him?

24    A    I requested that an ACS worker, a case worker from

25 Administration For Children's Services, and the victim in the

slf

Shulman-People-Direct

1   case be brought to my office to be interviewed.

2        Q    And did that happen?

3        A    Yes, it did.

4        Q    How long after --

5             MR. ROSENBLATT:   Withdrawn.

6        Q    Approximately how long after you had that conversation

7   with Sergeant O'Hagan did you speak to the ACS worker --

8        A    It was --

9        Q    -- approximately?

10       A    It was about 2:45 in the morning when I spoke to the

11  ACS worker.

12       Q    And did you speak to the ACS worker in the presence of

13  anybody else or did you do that alone?

14       A    Privately.  Alone.

15       Q    After you spoke to the ACS worker, what happened next?

16       A    About 3 -- I believe it was about 3:20 in the morning,

17  I had an opportunity to meet and interview Sana Awan who was the

18  victim in the case.

19       Q    When you met with Sana Awan, where did you meet with

20  her?

21       A    She was in an interview room in the Detective Squad.

22       Q    Was anyone else present in that room other than Sana

23  and yourself?

24       A    No, there was not.

25       Q    Was she at the precinct alone or with other

Shulman-People-Direct

1    individuals?

2       A    She was with one of her friends and her friend's mom.

3       Q    Do you remember their names?

4       A    I don't know the friend's name offhand.  I know the

5    friend's mom's first name was Denise.

6       Q    Do you remember if the last name was Alioto?

7       A    If I can just -- I'm going to refer to my case folder,

8    please.

9            MR. ROSENBLATT:  With your Honor's permission.

10           THE COURT:  Yes.  You may look at it to refresh

11       your recollection.  Don't read from it.  Just tell us what

12       you are specifically looking at.

13           THE WITNESS:  Yes, your Honor.

14       A    (Referring)  I'm referring to a yellow sticky note that

15    I have attached to my case folder, and Alioto was the last name

16    of the friend's mom.

17       Q    Okay.

18           And you told us that at around 3:20 you spoke to Sana

19    Awan.

20       A    That's when I had interaction with her, yes.

21       Q    Without telling us what she told you, tell the members

22    of the jury what happened as you were speaking to Sana.

23       A    Upon initially introducing myself and speaking to her,

24    I was able to observe that on her left and her right arms that

25    she had red welt marks on both arms.  She seemed to be

Shulman-People-Direct

1    visibly -- in my opinion she seemed to be somewhat distraught

2    and upset, and her being upset continued as we talked and she

3    related information to me.

4         Q    While you spoke to her and you mentioned she was

5    upset --

6         A    Yes, she was.

7         Q    -- did you take a break from speaking to her that hour

8    sometime between 3:00 and 4:45 in the morning?

9         A    I mean we talked and we stopped and we talked and we

10   stopped as she was able to talk to me.

11        Q    Okay.

12             At approximately 4:45 in the morning, on June 24, 2008,

13   did you receive a notification from the patrol desk sergeant

14   again?

15        A    Yes, I did.

16        Q    Without telling us what the sergeant said to you, what

17   did you say to the sergeant?

18        A    Based on what my conversation with the sergeant was, I

19   indicated to him that I would want to speak to the gentleman

20   Harold Gopaul who was in custody in the stationhouse.

21        Q    Okay, and what did you say to him in regards to

22   Mr. Gopaul?

23        A    I requested that Harold Gopaul be brought up and placed

24   in the first interview room in the Detective Squad so that I

25   could speak to him.

Shulman-People-Direct

1    Q    The individual you are referring to as Harold Gopaul,

2  do you see him in the courtroom today?

3    A    Yes, I do.

4    Q    Can you point to him and identify an article of

5  clothing he is wearing?

6    A    He is the gentleman sitting on the left side of the

7  table wearing a white striped dress shirt and a dark colored

8  tie.

9         THE COURT:   The record will indicate the witness

10       has identified the defendant.

11        MR. BANDELLI:   Indicating the defendant.

12   Q    You said you had asked for him to be brought up into a

13  separate interview room.

14   A    Yes.

15   Q    Was Sana still in the other interview room?

16   A    Yes.

17   Q    Did you remain with Sana as the defendant was brought

18  upstairs from the patrol office to the Detective Squad?

19   A    I believe so.

20   Q    At any point in time did the defendant, that you

21  observed, have any interaction with Sana?

22   A    No.

23   Q    Now, after the defendant was brought upstairs at

24  approximately 4:45 in the morning, did you eventually have an

25  opportunity to speak to him?

1    A    Yes, I did.

2    Q    At approximately what time did you speak to the

3    defendant in the Detective Squad upstairs?

4    A    My initial conversation with him was at about 5:10 in

5    the morning.

6    Q    Okay.

7         Tell the members of the jury what happened at 5:10 in

8    the morning when you entered the room to speak to Mr. Gopaul.

9    A    At about 5:10 in the morning I walked into the

10   interview room that Mr. Gopaul was in in my office.  He was

11   seated in a chair sitting at a table in the interview room.  He

12   was wearing a blue uniform-type clothing.  I believe that it had

13   an Ecolab patch on one of the shoulders.  He was awake.  He was

14   coherent.  He appeared alert.

15        I introduced myself to him.  I indicated to him that I

16   was going to read him what is called Miranda warnings.  I

17   explained to him that I needed him to answer clearly yes or no

18   that he understood what I was reading to him, and then I wrote

19   down the time on the top of the Miranda warnings, and I noted it

20   was 5:10, and then I individually began reading the Miranda

21   warnings to him.

22   Q    I want to back up just a moment to the point in time

23   where you entered the interview room where Mr. Gopaul was

24   located.  When you entered the room, was he handcuffed?

25   A    No, he was not.

Shulman-People-Direct

1    Q    Did he remain unhandcuffed inside that room when you

2   spoke to him?

3    A    Yes, he did.

4    Q    Did he appear awake to you when you first entered?

5    A    Yes.

6    Q    How would you describe his appearance?  Was there

7   anything remarkable about how he appeared?

8    A    No.

9    Q    When you entered the room --

10        MR. ROSENBLATT:  Well, withdrawn.

11   Q    Do you carry a firearm?

12   A    I do.

13   Q    When you entered the room, did you have your firearm

14  with you?

15   A    I did not.

16   Q    Where was it?

17   A    It was locked in my desk.

18   Q    Why is that?

19   A    Mr. Gopaul was under arrest, and it's common practice

20  when you interview somebody under arrest not to have your weapon

21  with you.

22   Q    And while you spoke to Mr. Gopaul on June 24, did you

23  ever bring your firearm into that room with you?

24   A    No, I did not.

25   Q    When you told the members of the jury that you recited

slf

Shulman-People-Direct

1   Miranda warnings to the defendant, did you do that from memory

2   or off of a preprinted form?

3       A    I had a preprinted form that's maintained in my office.

4            MR. ROSENBLATT:   Your Honor, may I approach the

5       witness and ask this be marked People's Exhibit 1 for

6       identification?

7            THE COURT:   Hand that to the officer.   It will be

8       marked People's 1 for identification only.

9            (Miranda form was marked as People's Exhibit 1 for

10      identification.)

11      Q    Detective, take a look at what is in front of you

12  marked as People's Exhibit 1 for identification purposes.   Do

13  you recognize that?

14      A    Yes, I do.

15      Q    What is it?

16      A    It's the original Miranda warning that was used to read

17  to Mr. Gopaul his Miranda warnings.

18      Q    When you say that it's the original, how do you

19  recognize that to be the original?

20      A    Some of the handwriting is my own handwriting.   My

21  signature and my shield number that I affixed on it as well as

22  the dates and times that I affixed on it are present.

23      Q    There are two holes punched on the top of that.   Can

24  you tell the members of the jury how two holes got on that?

25      A    Subsequent to conducting my investigation in this

slf

Shulman-People-Direct

1    matter, a case folder was created, and the paper is hole punched

2    for the purpose of securing it with fasteners into the case

3    folder.

4        Q    And you told us that's the form that you used in June

5    of 2008 when you read the Miranda warnings to Mr. Gopaul; is

6    that correct?

7        A    That is correct.

8               MR. ROSENBLATT:  At this time I would offer what's

9         been marked as People's Exhibit 1 for identification

10        purposes into evidence as People's Exhibit 1.

11              THE COURT:  Please show it to Mr. Bandelli.

12              MR. BANDELLI:  Thank you, Judge.

13              Just a couple of brief questions.

14              THE COURT:  You may proceed.

15   VOIR DIRE EXAMINATION

16   BY MR. BANDELLI:

17       Q    This Miranda warning form, this is a standard form that

18   they keep in your office?

19       A    Yes.

20       Q    So, there are like a thousand of these --

21              MR. ROSENBLATT:  Objection, your Honor.

22              THE COURT:  I didn't hear.

23       Q    There is a file cabinet somewhere in the office that

24   has a stack of these?

25              THE COURT:  Do you have a stack of those?

slf

Shulman-People-Direct

1          THE WITNESS:  There is a bunch.  I don't know how

2     many I would say, but their routinely kept in the office.

3     Q     And this is where you go to get the forms when you

4     interview somebody, that file cabinet, and you take a form out

5     like this?

6     A     Yes.

7               MR. BANDELLI:  I'm going to object, Judge.

8               THE COURT:  What's the basis of the objection?

9               MR. BANDELLI:  Well, I'm objecting to the

10     introduction of any statements.  I'm alleging they were

11     taken involuntarily.

12               THE COURT:  What's your objection to People's 1

13     for identification?

14               MR. BANDELLI:  Well, it is what it appears to be,

15     but on the grounds I'm objecting to the introduction of any

16     of the statements --

17               THE COURT:  This is not a statement.

18               MR. BANDELLI:  Well --

19               THE COURT:  It's a Miranda form.

20               MR. BANDELLI:  But he said my client initialled

21     those things.

22               THE COURT:  Your objection is overruled.  People's

23     1 is received in evidence.

24               (People's Exhibit 1, previously marked for

25     identification, was marked and received in evidence.)

Shulman-People-Direct

1          COURT OFFICER:  People's 1 marked and received.

2     CONTINUED DIRECT EXAMINATION

3     BY MR. ROSENBLATT:

4          MR. ROSENBLATT:  May I proceed, your Honor?

5          THE COURT:  You may proceed.

6     Q    Detective, you can just hold that up for the members of

7     the jury and just explain to them how you read these warnings to

8     the defendant and what you did as you read them to him.

9     A    Initially the page was blank.  After introducing myself

10    to him, to Mr. Gopaul, and explaining that I was going to read

11    the Miranda warnings, I wrote 0510 in the top right corner

12    indicating what time it was.  I then read question number one to

13    him.

14    Q    Go ahead.

15    A    I read, "You have the right to remain silent and refuse

16    to answer questions.  Do you understand?"

17         Mr. Gopaul orally said to me, "Yes," that he

18    understood.

19         I then read question number two.  "Anything you do say

20    may be used against you in a court of law.  Do you understand?"

21         Mr. Gopaul said, "Yes," that he understood.

22         I then read question number three.  "You have the right

23    to consult an attorney before speaking to the police and to have

24    an attorney present during any questioning now or in the future.

25    Do you understand?"  Mr. Gopaul indicated, "Yes," orally that he

Shulman-People-Direct

1    understood.

2         I then read question four.  "If you cannot afford an

3    attorney, one will be provided for you without cost.  Do you

4    understand?"  Mr. Gopaul orally stated, "Yes," that he

5    understood.

6         I then read question number five.  "If you do not have

7    an attorney available, you have the right to remain silent until

8    you have an opportunity to consult with one.  Do you

9    understand?"  Mr. Gopaul orally stated, "Yes," that he

10   understood.

11        I then read question number six.  "Now that I have

12   advised you of your rights, are you willing to answer

13   questions?"  Mr. Gopaul orally stated, "Yes."

14        Now, as I read each one of these questions and

15   Mr. Gopaul was orally giving me the "yes" answer, I was writing

16   that answer down next to each question.

17   Q    In your own handwriting?

18   A    In my handwriting.

19        Upon completion of the six questions and my writing of

20   the six answers, I then gave the piece of paper to Mr. Gopaul.

21   I said, Please read this to yourself that you understand the

22   questions that I asked you and that you are answering.  He

23   looked it over, read the questions to himself and affirmed to me

24   that "yes" was his answer to each of these questions and that he

25   was willing to speak to me.

344

Shulman-People-Direct

1    Q    When he told you that he was willing to speak to you,

2   did he make any notations on that document?

3    A    I then asked him to initial each one of the answers as

4   being the response that he had given to me, and I asked him to

5   print and sign his name on the bottom portion that he was

6   acknowledging his rights.

7    Q    Did you observe him initial each question?

8    A    Yes.

9    Q    Did you observe him sign and print his name on the

10  bottom of that form?

11   A    I did.

12   Q    Is your name signed and printed on that form as well?

13   A    Yes, it is.

14   Q    What time did you conclude the Miranda warnings,

15  reading to him and having him sign and you sign that document?

16   A    5:15.

17   Q    Detective, prior to reading Miranda, those warnings, to

18  him, did you make any threats to the defendant about signing

19  that document?

20   A    No, I did not.

21   Q    Did you make him any promises as to what would happen

22  if he did sign that document?

23   A    No, I did not.

24   Q    At any time when you read those warnings to him, did he

25  request to speak to an attorney?

Shulman-People-Direct

1     A    No, I did not.

2     Q    At any point in time when you read those warnings to

3     him, the defendant, did he indicate he no longer wished to speak

4     to you?

5     A    No, he did not.

6     Q    Did he remain responsive to you while you read each one

7     of these questions to him?

8     A    Yes, he did.

9     Q    Did he appear to understand English when you read those

10    to him?

11    A    Yes, he did.

12    Q    Did he appear intoxicated or under the influence of

13    drugs or alcohol as you read them to him?

14    A    No, he did not.

15    Q    When you read him those Miranda warnings, did he have

16    any questions to you regarding the document that you read to

17    him?

18    A    No, he did not.

19    Q    After you finished those Miranda warnings at 5:15 in

20    the morning, what's the next thing that you did in regards to

21    the course of your investigation?

22    A    I then took out a consent to search a home form that

23    again is kept in my office, and I explained to Mr. Gopaul that I

24    was going to read that form to him, and then I read that form to

25    him to get consent to search his home.

Shulman-People-Direct

1    Q    Explain for the members of the jury what is a consent

2    to search form.

3    A    It's permission being given by a homeowner or legal

4    custodian of a property to allow the police or authorization for

5    an authorized agent of the police to conduct a search of that

6    location.

7              MR. ROSENBLATT:  Your Honor, may I show the

8         detective this document and ask that it be marked as

9         People's Exhibit 2 for identification?

10             THE COURT:  Please mark that People's 2 for

11        identification only.

12             (Consent to search home was marked as People's

13        Exhibit 2 for identification.)

14             COURT OFFICER:  People's 2 marked for ID only.

15    Q    Detective, take a look at the item that's in front of

16   you that's been premarked as or been marked now as People's

17   Exhibit 2 for identification purposes.  Do you recognize that

18   document?

19   A    Yes, I do.

20   Q    Tell the members of the jury what is that document.

21   A    It's the original consent to search form that I

22   prepared in the confines of the 105 Detective Squad on June 24

23   of 2008 that was read to Mr. Gopaul.

24   Q    Is your handwriting on that document?

25   A    Yes, it is.

Shulman-People-Direct

1   Q    Is Mr. Gopaul's signature on that document as well?

2   A    Yes, it is.

3   Q    The two holes on the top of that document, was that

4   again filed away in your case folder?

5   A    That is correct.

6            MR. ROSENBLATT:  Your Honor, I would offer what's

7        been marked as People's Exhibit 2 for identification into

8        evidence at this time.

9            THE COURT:  Please show it to Mr. Bandelli.

10           MR. BANDELLI:  Thank you, Judge.

11           (Pause in proceedings.)

12           MR. BANDELLI:  Just a brief question.

13           THE COURT:  You may proceed.

14           MR. BANDELLI:  Thank you, your Honor.

15  VOIR DIRE EXAMINATION

16  BY MR. BANDELLI:

17   Q    This is just another standard form that you have a

18  stack of in the file somewhere in your office that you took out

19  and you used?

20   A    That's correct.

21           MR. BANDELLI:  All right.  Same objection as

22       before, Judge.

23           THE COURT:  Objection overruled.  People's 2 is

24       received in evidence.

25           (People's Exhibit 2, previously marked for

slf

Shulman-People-Direct

1     identification, was marked and received in evidence.)

2              COURT OFFICER:   People's 2 marked and received.

3    CONTINUED DIRECT EXAMINATION

4    BY MR. ROSENBLATT:

5     Q    Detective, can you explain to members of the jury what

6    happened when you brought that form into the room to where

7    Mr. Gopaul was in June of 2008?

8     A    Again, I had the blank form that was kept in my office.

9    As I was sitting in front of Mr. Gopaul, I indicated to him that

10   I was going to request his consent to search his home, and that

11   I was going to go through the rights, read this form to him, if

12   he was going to allow me consent or not.

13            I then sat down with him, and as I started to read it,

14   I wrote his name in.  It says, "I," and there was a blank line.

15   As I was sitting with him, I wrote, "Harold Gopaul, having been

16   requested to consent to a search of my," again there was a blank

17   line, and I wrote in the word, "home, located at 242" -- again,

18   there was a blank line, and I wrote in his address, "242-10 89

19   Avenue, Bellerose, New York 11426," and, "Having been duly

20   advised of my Constitutional rights to," I then read, "A, refuse

21   such consent; B, to require that a search warrant be obtained

22   prior to any search; C, that if I do consent to a search, any

23   evidence found as a result of such search can and will be used

24   against me in any civil or criminal proceedings; D, that I may

25   consult with an attorney of my choosing before or during a

Shulman-People-Direct

1   search and that; E, I may withdraw my consent to a search at any

2   time prior to its conclusion."

3        I then read to Mr. Gopaul the following part, "After

4   having been advised of my Constitutional rights, I hereby

5   knowingly, intelligently and voluntarily waive my above rights

6   and consent to search."

7        I then asked him, Would you consent to me to search?

8   He indicated, "Yes."  I gave him an opportunity to read over the

9   form.  He read through each one of the items and again indicated

10  that he would consent to search.  I wrote it on a blank line

11  that he was authorizing myself or an authorized representative

12  of the NYPD to conduct the search.

13       Then Mr. Gopaul signed it.  He placed the time and the

14  date, and then I signed it and placed my shield next to my

15  signature as witness.

16  Q    Okay.

17       At what time did you conclude filling out that form

18  with the defendant?

19  A    About 5:20 a.m.

20  Q    After you completed the consent to search his home

21  which he signed and gave you permission to do, what was the next

22  step in your investigation with regard to Mr. Gopaul?

23  A    I took out a consent to search a vehicle form in

24  regards to Mr. Gopaul's work vehicle.

25  Q    Okay.

Shulman-People-Direct

1          What was the work vehicle?

2     A    I think it was an '06 truck of some sort.

3              MR. ROSENBLATT:  Your Honor, may I approach the

4     witness and ask this be marked People's Exhibit 3 for

5     identification purposes?

6              THE COURT:  Please mark that People's 3 for

7     identification only.

8              (Consent to search vehicle form was marked as

9     People's Exhibit 3 for identification.)

10             COURT OFFICER:  People's 3 marked for ID only.

11    Q    Detective, do you recognize the item that's been marked

12    as People's Exhibit 3?

13    A    Yes, I do.

14    Q    What is it?

15    A    It's a consent form to search a vehicle which was

16    prepared by me in June 2008 with Mr. Gopaul.

17    Q    Is that the exact form that you used the original on

18    June 24 of 2008 when you sought consent to search the

19    defendant's work vehicle?

20    A    Yes, it is.

21    Q    Again, the same two holes from your file?

22    A    That is correct.

23             MR. ROSENBLATT:  At this time I would offer

24    People's 3 into evidence.

25             THE COURT:  Please show that to Mr. Bandelli.

351

Shulman-People-Direct

1          MR. BANDELLI:  Thank you, Judge.

2          (Pause in proceedings.)

3          MR. BANDELLI:  Brief question.

4          THE COURT:  You may proceed.

5    VOIR DIRE EXAMINATION

6    BY MR. BANDELLI:

7       Q    This is one of the standard forms you keep in the file

8    cabinet of your office?

9       A    That's correct.

10      Q    You use these in all of your cases where you are going

11   to get consent, right?

12      A    If it was a consent for a vehicle, then yes.

13      Q    Yes, right?

14          So, if you are going to get consent for a vehicle, you

15   go to the file cabinet and take out the consent for a vehicle

16   form, right?

17      A    Yes.

18          MR. BANDELLI:  Okay.

19      Q    It's not a tough question.

20          MR. ROSENBLATT:  Objection.

21          THE COURT:  Mr. Bandelli.

22          MR. BANDELLI:  Okay.

23          It's an easy one.

24          THE COURT:  Don't make comments like that in front

25      of the jury, please.

slf

Shulman-People-Direct

1    Q    This is mostly your handwriting on this form?

2    A    Could I see it?

3    Q    Sure.

4    A    The date, time.  Mr. Gopaul's handwritten and signed

5    name are in his handwriting, and the additional stuff is in my

6    handwriting.

7    Q    So, with the exception of on very bottom where he wrote

8    his name and signed, all of that other stuff, is that your

9    handwriting?

10   A    The stuff on the top portion is in my handwriting.

11             MR. BANDELLI:  The same objection, Judge.

12             THE COURT:  Objection overruled.  People's 3

13        received in evidence.

14             (People's Exhibit 3, previously marked for

15        identification, was marked and received in evidence.)

16             COURT OFFICER:  People's 3 marked and received in

17        evidence.

18   CONTINUED DIRECT EXAMINATION

19   BY MR. ROSENBLATT:

20   Q    Detective, when you used both the consent to search the

21   home form and the consent to search the car form in your

22   questioning of the defendant, did you make him any promises

23   during that time?

24   A    No, I did not.

25   Q    Did you make any threats?

Shulman-People-Direct

1      A     No, I did not.

2      Q     At any point in time when you went through both of

3  those forms with him, did he ask to speak to an attorney?

4      A     No, he did not.

5      Q     At any point in time did he tell you he no longer

6  wished to speak to you?

7      A     No, he did not.

8      Q     By the way, that Miranda form that you used earlier,

9  did you use one of those when you questioned Sana Awan?

10     A     I did not.

11     Q     You didn't ask her -- you didn't read her the Miranda

12 warnings, correct?

13     A     I did not.

14           MR. BANDELLI:  Objection.  What's the relevance?

15           THE COURT:  Sustained.

16     Q     The consent forms that Mr. Bandelli asked if you used

17 in every case, did you use that when questioning Sana Awan?

18     A     I did not.

19           MR. BANDELLI:  Well, did you go into Sana Awan's

20     vehicle?  What's the point of that?  Objection, your Honor.

21           MR. ROSENBLATT:  Objection, your Honor.

22           THE COURT:  Mr. Bandelli, you have an objection,

23     you stand up and object.

24           MR. BANDELLI:  Objection.

25           THE COURT:  Don't make any speeches.  Don't

slf

Shulman-People-Direct

1    attempt to question the witness.  Okay?  You will get your

2    chance.  You know better than that.  Please.

3              MR. BANDELLI:  Yes, sir.

4              THE COURT:  Counsel, objection is sustained.

5              Approach the bench.

6              (Side-bar discussion held off the record.)

7              THE COURT:  You may proceed.

8              MR. ROSENBLATT:  Thank you, your Honor.

9    Q    Detective, after you completed --

10             MR. ROSENBLATT:  -- withdrawn.

11   Q    After you obtained both of those consent forms, what

12   did you do?

13   A    I explained to Mr. Gopaul that I would be back briefly

14   to speak to him, and I stepped out of the room for a little

15   while.

16   Q    Did there come a point in time you went back into the

17   room?

18   A    Yes, I did.

19   Q    Around what time was that?

20   A    About 6:20 in the morning.

21   Q    And when you entered the room --

22             MR. ROSENBLATT:  -- withdrawn.

23   Q    When you entered the room at 6:20, how did the

24   defendant appear?

25   A    He was sitting in a chair at the table.  He was awake,

Shulman-People-Direct

1    appeared alert, and looked up at me.

2        Q    Okay.

3            What did you say to him when you entered the room?

4        A    I walked in.  I sat down.  I asked him if he knew why

5    he was in custody and under arrest, and he indicated to me that

6    there was an incident with his daughter on the Saturday, that he

7    had slapped her in discipline, and I asked him if he would want

8    to make a written statement about it, and he indicated that he

9    would.

10       Q    When he indicated that he would, what did you do?

11       A    I gave him a pad and a pen.  I asked him if he could

12   put his name and his address and stuff on the top and to write

13   what he wanted to write on the paper about what had happened.

14       Q    Did he do that?

15       A    Yes, he did.

16       Q    Were you present when he made that statement?

17       A    Yes, I was.

18           MR. ROSENBLATT:  Your Honor, may I approach and

19       ask this be marked People's Exhibit 4-A and B?

20           THE COURT:  Please mark these two pieces of paper

21       People's 4-A and 4-B for identification only.

22           (Two-page statement was marked as People's

23       Exhibits 4-A and 4-B for identification.)

24           COURT OFFICER:  People's 4-A and B marked for ID

25       only.

Shulman-People-Direct

1    Q    Detective, do you recognize those two items?

2    A    I do.

3    Q    Tell the members of the jury what are 4-A and 4-B

4    marked for identification.

5    A    It's a written statement written on June 24 of 2008 by

6    Mr. Gopaul.

7    Q    And whose handwriting are those two pages in?

8    A    Mr. Gopaul's handwriting.

9    Q    While he was writing those two pages, did you observe

10   him the entire time?

11   A    I did.

12   Q    Are those the originals of his statements that he made

13   back from June of 2008?

14   A    Yes, it is.

15            MR. ROSENBLATT:  Your Honor, I would offer 4-A and

16   B into evidence at this time.

17            THE COURT:  Please show them to Mr. Bandelli.

18            (Pause in proceedings.)

19            THE COURT:  Do you wish a voir dire, Mr. Bandelli?

20            MR. BANDELLI:  Briefly.

21   VOIR DIRE EXAMINATION

22   BY MR. BANDELLI:

23   Q    Where was this kept?

24   A    When?

25   Q    Where did you get this from?

Shulman-People-Direct

1          THE COURT:  Mr. Bandelli -- sustained.

2     Mr. Bandelli, you want to ask him where it's been since June

3     of 2008, ask him.

4          MR. BANDELLI:  Sure.

5     Q    Where has it been since June of 2008?

6          MR. ROSENBLATT:  Judge, can we approach?

7          THE COURT:  Approach the bench.

8          MR. BANDELLI:  Withdrawn.  Withdrawn.  Withdrawn.

9          I have the same objection.

10          THE COURT:  Approach the bench.  Approach the

11     bench.

12          (The following proceedings took place at

13     side-bar:)

14          THE COURT:  Let me see this.  Off the record.

15          (Discussion held off the record.)

16          THE COURT:  What's your objection?

17          MR. BANDELLI:  Well, there is a chain of custody

18     issue.

19          THE COURT:  There is no chain of custody on a

20     written statement.

21          MR. BANDELLI:  It sounds like the DA --

22          THE COURT:  It's not fungible evidence such as

23     bags of cocaine.

24          MR. BANDELLI:  I object to the introduction of any

25     of this evidence because my position was it was taken

Shulman-People-Direct

1    involuntarily.

2              THE COURT:  All right.  Based on that objection,

3    objection is overruled.

4              MR. BANDELLI:  Is everything else going to be

5    from --

6              MR. ROSENBLATT:  I'm sorry.  I was just saying

7    it's a slippery slope if he asks him where the document came

8    from.

9              THE COURT:  Slippery slope.  This guy is going to

10   say it was in a Nassau County Court?

11             MR. ROSENBLATT:  He could say I left it -- I

12   didn't prep him to say where he got it from.  His answer is

13   going to be the truth.  I left it in Nassau County Supreme

14   Court when I was on trial with him the last time.

15             THE COURT:  Off the record.

16             (Discussion held off the record.)

17             (In open court.)

18             THE COURT:  Objection is overruled.  People's 4-A

19   and B are received in evidence.

20             (People's Exhibit 4-A and 4-B, previously marked

21   for identification, were marked and received in evidence.)

22             COURT OFFICER:  People's 4-A and B marked and

23   received in evidence.

24   CONTINUED DIRECT EXAMINATION

25   BY MR. ROSENBLATT:

Shulman-People-Direct

1       Q      Detective, if you could read that statement, that

2    two-page statement, to the members of the jury.

3       A      "One of two" is written on the top of the first page.

4              "Harold Gopaul, 242-10 89 Avenue, Bellerose, New York

5    11426.  Phone number (718) 470-0899.  Cell (917) 392-8334."  On

6    right side of the top, "6/24 of '08, 6:25 a.m.," and then it

7    reads, "Saturday 6/21/08 my family had gone to St. Gregory fair

8    to have some fun.  My eldest daughter was in line for a ride

9    called Zipper.  After about 20 or 25 minutes my daughter and

10   friend's turn came.  There was a single lad in front of the

11   line.  The operator told the lad two people need to go on for

12   one basket.  So, her friend decided to go with the lad so my

13   daughter will have to wait for other ride and only if she got a

14   partner.

15             "Previous to going to the fair, my wife very bad pain

16   on a root canal she did few years ago and was ready to leave the

17   fair.  She was also having problem to speak, so I called my

18   daughter out the line because I thought it was not fair to wait

19   another 20 or 25 minutes for a ride knowing her mother was in

20   pain.

21             "After calling my daughter out the line, she was really

22   upset.  When we went home, my daughter started to argue and I

23   thought it was wrong, and I put a few slaps on her as a little

24   discipline.

25             "Sunday everything was okay.  We all work in the

slf

Shulman-People-Direct

1   backyard putting up a fence.  I left my house on Monday 6/23

2   like 6:30 a.m. and returned about 2:30 a.m.

3          "Tuesday after work my daughter was missing and back

4   door of the house was open.  I came" -- then the signature of

5   Harold Gopaul and he wrote, "To be continued on second page."

6          On the top of Page 2 it's written, "2 of 2."  He wrote

7   his name, "Harold Gopaul," and he wrote the date, "6/24 of '08,"

8   and then he wrote, to the district precent or precinct.  It

9   looks like p-r-e-c-e-n-t, "and I was held and searched.  Also I

10  was read to me and asked to sign three sets of documents, also

11  to write this report.  I was read my rights and was asked what

12  happened with my daughter," and then the signature of Harold

13  Gopaul and then my signature and shield number and the date of

14  June 24 of '08 at 6:45 is written.

15      Q    Detective, after you observed the defendant write that

16  statement, did you, yourself -- you said you, yourself, signed

17  that statement?

18      A    After he wrote it and said he was complete with writing

19  it, I asked him to read it over to make sure it was what he

20  wanted to say, I asked him if there was anything he wanted

21  crossed out or added, and after reviewing it he indicated there

22  was nothing he wanted to change, and he placed his signature and

23  then I placed my signature as a witness.

24      Q    After the defendant finished writing out that statement

25  and he signed it and you signed it, what did you do?

Shulman-People-Direct

1    A    Mr. Gopaul asked for a bathroom break.  The interview

2   was concluded at that moment, and he was brought to use the

3   facilities, to use the bathroom.

4    Q    Who brought him to use the bathroom?  Was it you?

5    A    Honestly, I don't recall.

6    Q    Was he brought to the bathroom?

7    A    He was brought to the bathroom.

8    Q    After he used the bathroom, where was he brought?

9    A    He was brought back to the interview room.

10    Q    What happened next?

11    A    I was doing some other things, and at some point in

12   time, I believe it was about 7:20 in the morning, I went back to

13   speak to him again.  When I went back to speak to him again, he

14   was sitting at the table.  He was awake.  He was alert.  He

15   looked up and waited to hear what I had to say to him.  I

16   indicated to him that his daughter had made some allegations

17   that there was inappropriate behavior involving him and if he

18   wanted to address that.

19    Q    What did he say to you?

20    A    He asked me what she had said.  I indicated to him that

21   I wouldn't tell him what she had said, but he had the option of

22   making a statement about it if he would like to.  He indicated

23   that he wanted to make a statement.  He felt bad about it, about

24   what was going on, and he wanted to talk about it, and I asked

25   him if he would want to write a statement out as to what he

Shulman-People-Direct

1    wanted to tell me, and he again said, Yes, he would.

2        Q    Did you provide him with another sheet of paper or pad

3    and pen?

4        A    I did.

5             MR. ROSENBLATT:   I ask that the witness be shown

6        this and have it marked as People's Exhibit 5 for

7        identification purposes, please.

8             THE COURT:   Please mark that People's 5 for

9        identification only.

10            (Statement was marked as People's Exhibit 5 for

11       identification.)

12            COURT OFFICER:   People's 5 marked for ID only.

13       Q    Detective, do you recognize that document?

14       A    I do.

15       Q    What is it?

16       A    It's the original written statement that Mr. Gopaul

17   prepared on June 24 of '08.

18       Q    And in whose handwriting is that statement in?

19       A    My signature appears on the bottom as witness, but the

20   rest of the statement is in Mr. Gopaul's handwriting.

21       Q    Other than those two holes at the top, is that document

22   in the same condition or substantially the same condition as it

23   was back in June of 2008?

24       A    Yes, it is.

25            MR. ROSENBLATT:   Your Honor, I would offer

1    People's Exhibit 5 into evidence at this time.

2              THE COURT:  Please show it to Mr. Bandelli.

3              MR. BANDELLI:  Thank you, Judge.

4              (Pause in proceedings.)

5              MR. BANDELLI:  I have no questions, but I do have

6    the same objection I've had all along.

7              THE COURT:  Thank you, Mr. Bandelli.

8              The objection is overruled.  You have an exception

9    for the record.  People's 5 is received in evidence.

10             (People's Exhibit 5, previously marked for

11   identification, was marked and received in evidence.)

12             COURT OFFICER:  People's 5 marked and received.

13   Q    Detective, what time did the defendant finish writing

14   that statement?

15   A    8:30 a.m.

16   Q    Okay.

17        Can you read that statement, the contents of that

18   statement, to the members of the jury?

19   A    Yes.

20        On the top he wrote, "Harold Gopaul, 242-10 89 Avenue,

21   Bellerose, New York 11426."  He wrote the date, "6/24/08, 7:30

22   a.m."

23        Mr. Gopaul then wrote, "I, Harold Gopaul, is writing

24   this of my own free will.  The accusation that was made toward

25   me and my daughter, it started about the end of 2006 where we

Shulman-People-Direct

1   both got into a relationship where I would touch her vagina and

2   breast, and she would touch my penis, and we will both kiss.   It

3   happened about five or six times total, once at 400 Community

4   Drive and in our home.

5           "I want you to know I wish it had never happened.   I am

6   a hard working husband and father.   I work sometimes 80 to 95

7   hours per week to keep my family together.   I admit what

8   happened was very, very wrong.   Also admit I need help.

9   Something happened that should never happen.   I am very sorry.

10  I will accept any help I can get.   I don't want to be away from

11  my family.   My daughter, Sana Awan, is the person I am talking

12  about."

13          Harold Gopaul's signature appears and then my

14  signature and the date and time.

15      Q   Detective, after you completed that statement sometime

16  after 8 o'clock in the morning, was Sana still present inside of

17  the 105 Precinct?

18      A   Yes, she was.

19      Q   And without telling us what she said, did you speak to

20  her again?

21      A   I did.

22      Q   And did there come a point in time around 11:30 in the

23  morning where she was transported from the precinct to somewhere

24  else?

25      A   There did come that time, yes.

Shulman-People-Direct

1    Q    Where was she taken?

2    A    I believe she was taken to North Shore University

3    Hospital Center.

4    Q    Okay.

5         During the course of the morning into the afternoon,

6    did you contact the District Attorney's office?

7    A    I did.

8    Q    Can you tell the members of the jury why you did that?

9    A    The District Attorney's office has a riding program

10   where district attorneys from different boroughs within the

11   Queens District Attorney's office are notified in certain cases

12   to be given information that's going on in a particular case.

13   Q    And did you reach out to the person from the District

14   Attorney's office who was riding, as you said, for the Special

15   Victim's Bureau or the Special Victim's cases?

16   A    I reached out I believe it was to the Special Victim's

17   Bureau.  I'm not positive if that's the bureau but --

18   Q    Did you speak to a particular assistant district

19   attorney?

20   A    Ultimately I was able to speak to ADA Hughes.

21   Q    Okay, and don't tell us what ADA Hughes said to you,

22   but what did you tell ADA Hughes?

23             MR. BANDELLI:  Objection.  Why don't they call ADA

24        Hughes?

25             MR. ROSENBLATT:  I'll withdraw the question, your

Shulman-People-Direct

1    Honor.

2        Q    Did there come a point in time when Assistant District

3    Attorney Hughes and myself responded to the 105 Precinct?

4        A    Yes, there did.

5        Q    And was somebody else from the office also present?  A

6    videographer?

7        A    Yes.

8        Q    Can you tell the members of the jury what happened

9    leading up to ADA Hughes, myself and the videographer arriving

10   at the precinct?

11       A    I had asked Mr. Gopaul if he would be willing to make a

12   videotaped statement in the presence of the Queens District

13   Attorney's Office in regards to the statement he was telling us

14   had occurred.  Mr. Gopaul indicated he would be willing to do

15   that, and I relayed that to the District Attorney's office prior

16   to ADA Hughes, yourself and the videographer arriving at the

17   precinct approximately five p.m.-ish.

18       Q    Okay.

19            During course of your investigation on June 24, 2008,

20   did you have an opportunity to observe the defendant's vehicle?

21       A    Yes, I did.

22       Q    Could you tell the members of the jury about that?

23       A    Mr. Gopaul was the legal custodian of a work vehicle

24   that was a 2006 Dodge Ram truck with "Ecolab" written on the

25   outside.  It was a work-type truck that was parked outside the

Shulman-People-Direct

1    precinct.  I went outside the precinct with Officer Alfaro, and

2    I observed the vehicle, and I looked from outside the windows

3    and I was present ultimately when Officer Alfaro went into the

4    vehicle.

5        Q    And did you observe her enter that vehicle?

6        A    I did.

7        Q    During the course of your investigations and

8    conversations with the defendant, did you come to learn his date

9    of birth?

10       A    I did.

11       Q    Can you tell the members of the jury what is his date

12   of birth?

13            THE WITNESS:  If I could just refer to my

14       paperwork.

15            THE COURT:  Sure.  Just tell us what paperwork you

16       are looking at.

17       A    (Referring)  I'm referring to a computer check that I

18   had in my case folder that I had obtained.

19            THE COURT:  All right.

20       A    (Continuing)  It was February 28 of 1958.

21       Q    I forgot to ask you, Detective -- my apologies -- after

22   you finished taking that second statement in regards to what's

23   in evidence now as People's Exhibit 5 that concluded at 8:30 in

24   morning, did you speak to the defendant again prior to ADA

25   Hughes and myself arriving at the 105 Precinct in regards to

Shulman-People-Direct

1    something else?  Did you speak to him again at 8 -- shortly

2    after 8:30 in the morning?

3       A    Yes.

4       Q    And what was that conversation about?

5       A    Upon completion of this --

6            MR. BANDELLI:  Objection, your Honor.

7       A    -- this written statement --

8            THE COURT:  What's the basis of the objection?

9            MR. BANDELLI:  Which conversation is he referring

10   to now?  A conversation with my client?

11           THE COURT:  Yes.

12           MR. BANDELLI:  Okay.  No objection.

13           THE COURT:  Thank you.

14      A    (Continuing)  After Mr. Gopaul completed this written

15   statement that's marked 5, I then asked him a question, to which

16   he gave me an answer.

17      Q    Was that documented on another sheet of paper?

18      A    Yes, it was.

19           MR. ROSENBLATT:  May I approach the witness and

20      ask this be marked as People's Exhibit 6 for identification,

21      please?

22           THE COURT:  Please mark that People's 6 for

23      identification only.

24           (Question and answer was marked as People's

25      Exhibit 6 for identification.)

Shulman-People-Direct

1          COURT OFFICER:  People's 6 marked for ID only.

2     Q    Detective, take a look at what has been marked as

3   People's Exhibit 6 for identification.  Do you recognize that?

4     A    I do.

5     Q    What is it?

6     A    It's an original question and answer that I wrote on

7   June 24 of '08 while I was speaking to Mr. Gopaul.

8     Q    Whose handwriting is on People's Exhibit 6 for

9   identification purposes?

10    A    Primarily my handwriting with the exception of a

11  drawing and Mr. Gopaul's signature.

12    Q    Is that document in the same or substantially the same

13  condition as it was back on June 24, 2008 when that document was

14  produced?

15    A    Yes.

16    Q    Other than those two holes, have there been any

17  alterations to that document?

18    A    No.

19         MR. ROSENBLATT:  I would offer People's Exhibit 6

20     into evidence at this time.

21         THE COURT:  Show it to Mr. Bandelli, please.

22         MR. BANDELLI:  Thank you, Judge.

23         (Pause in proceedings.)

24         MR. BANDELLI:  Just one question.

25  VOIR DIRE EXAMINATION

1  BY MR. BANDELLI:

2      Q    Detective, most of this is in your handwriting; is that

3  correct?

4      A    Yes.

5              MR. BANDELLI:  Okay.  Same objection, Judge.

6              THE COURT:  Objection overruled.  You have your

7      exception.  People's 6 is received in evidence.

8              (People's Exhibit 6, previously marked for

9      identification, was marked and received in evidence.)

10             COURT OFFICER:  People's 6 marked and received.

11 CONTINUED DIRECT EXAMINATION

12 BY MR. ROSENBLATT:

13     Q    Can you describe to the members of the jury what is

14 contained on that document?

15     A    I wanted to ask Mr. Gopaul a specific question.  I

16 wrote down, "0830 hours," meaning 8:30 a.m.  I wrote down the

17 date of 6/24 of '08, and then I wrote "Q," short for question,

18 and I wrote down, "Do you have any vibrators in the car?"  And I

19 asked that question to Mr. Gopaul.  Mr. Gopaul orally answered

20 me and he stated that he had multiple vibrators in the house.

21 Two were white and looked the same.  They're in a cabinet in the

22 bedroom at the house.  He has a white fold-up massager in the

23 car that he uses for his neck.  He claims never to have used it

24 on his daughter.  As he said it, I wrote it down on the piece of

25 paper.

1          Mr. Gopaul said he could draw a picture of what he was

2    describing the vibrators as, and I gave him the piece of paper.

3    He drew a picture on the left corner of the page and gave me the

4    piece of paper back.

5          I wrote underneath that in my handwriting an arrow

6    pointing to it, and I noted that "subject," meaning Mr. Gopaul,

7    had drawn that picture as the shape of the white vibrators he

8    was describing.

9          Q     Did you sign that document?

10         A     Well, first, you know, I showed him what I had written

11   in regards to my question and his answer.  I asked him if that

12   was accurate as to what the question and answer was.  He

13   indicated, Yes, and I asked him to sign it as to the accuracy of

14   that, and I signed it as witness.

15              MR. ROSENBLATT:  Your Honor, I have no further

16         questions for this witness.  Thank you very much.

17              THE COURT:  Thank you.

18              Mr. Bandelli.

19   CROSS-EXAMINATION

20   BY MR. BANDELLI:

21         Q     Detective Shulman, my name is Stanford Bandelli.  I

22   represent Howard Gopaul.  I have some questions for you.  If you

23   don't know the answer, just say you don't know the answer.  If

24   you don't understand the question, tell me you don't understand

25   the question.  I'll rephrase it.  All right?

Shulman-People-Cross

1      A     All right.

2                  THE COURT:  Mr. Bandelli, you conduct your

3      examination from the end of the jury box.

4                  MR. BANDELLI:  Really?

5      Q     What was your tour of duty on June 24, 2008?

6      A     I believe I was working from 4 p.m. on June 23 to 1

7      a.m. on June 24 was my scheduled tour of duty.

8      Q     So, your shift would have ended at 1 a.m. on the 24th;

9      is that correct?

10     A     Yes.

11     Q     What time did Harold Gopaul arrive at the precinct?

12     A     I believe it was about 4:45 in the morning.

13     Q     Really.

14           Why do you believe it was at 4:45 in the morning?

15     A     Because very briefly after that I was told he was in

16     the precinct.

17     Q     So, you were told that he was at the precinct at 4:45

18     in morning, that he had just come into the precinct; is that

19     correct?

20     A     That's correct.

21     Q     Who told you that?

22     A     The desk officer from precinct.

23     Q     And who was that?

24                 MR. ROSENBLATT:  Objection, Judge.

25                 THE COURT:  What's the basis of your objection?

slf

Shulman-People-Cross

1    MR. ROSENBLATT:  This is hearsay.

2    THE COURT:  Overruled.  You can answer that,

3 Detective, if you know.

4 A Sergeant O'Hagan was the 105 Precinct desk officer.

5 Q How did he contact you?

6 A He either called me up in my office or came up to my

7 office.  I don't recall.

8 Q Is there any notes you might have about how he

9 contacted you?

10    THE WITNESS:  Could I refer to my followup

11 reports, your Honor?

12    THE COURT:  You can look at your file.

13 A (Referring)  I don't have a notation as to whether or

14 not he came up to my office or called me.  I'm not sure.

15 Q So, Sergeant O'Hagan called you or comes up to your

16 office and says what?

17    MR. ROSENBLATT:  Objection.

18    THE COURT:  Overruled.

19 A He told me that Mr. Harold Gopaul, who was the listed

20 perpetrator on the Complaint Report that had been prepared, had

21 come into the precinct and was in custody.

22 Q Why did he tell you he came into the precinct?

23 A Pardon me?

24 Q Why did he tell you Harold Gopaul had come into the

25 precinct?

Shulman-People-Cross

1          THE COURT:  Did you say "why"?

2          MR. BANDELLI:  Yes.

3     Q     What did he tell you was the reason that Harold Gopaul

4     came into the precinct?

5          THE COURT:  Sustained.

6     Q     Isn't it true that Harold Gopaul came into the precinct

7     to file a missing person's report for his daughter?

8          MR. ROSENBLATT:  Objection.

9          THE COURT:  Sustained.

10         Mr. Bandelli, you think this is funny?

11         MR. BANDELLI:  Not at all, Judge.

12         THE COURT:  Please.  Please.

13         MR. BANDELLI:  It's kind of --

14         THE COURT:  Don't speak in front of jury.  I just

15     asked if you thought this was funny.

16         MR. BANDELLI:  There is absolutely nothing funny

17     about this, your Honor.

18         THE COURT:  Good.

19    Q     So, at 4:45 a.m. you learned that he was in custody; is

20    that correct?

21    A     Within moments of that, minutes, maybe.

22    Q     No.  No.  You said that Sergeant O'Hearne (sic) told

23    you that Harold Gopaul came in the precinct and he was in

24    custody; is that correct?

25    A     Yes.

1    Q    So, that doesn't mean that Harold Gopaul came into the

2  precinct at 4:45; does it?

3    A    I don't understand what you are asking me.  I'm saying

4  that I was told by Sergeant O'Hagan that at approximately 4:4 5

5  Harold Gopaul had come into the precinct and was arrested.

6    Q    What was the basis for arresting Harold Gopaul at that

7  time?

8              MR. ROSENBLATT:  Objection.

9              THE COURT:  Did you arrest Mr. Gopaul?

10             THE WITNESS:  I did not.

11             THE COURT:  Sustained.

12   Q    Who arrested Mr. Gopaul?

13   A    Officer Alfaro was the arresting officer in the case.

14   Q    What is Officer Alfaro's first name?

15   A    I'm not sure.

16   Q    Do you have notes somewhere that will tell you?

17   A    (Referring)  I'm referring to an arrest report of

18  Harold Gopaul that shows that Officer Alfaro's name is Celica.

19   Q    She is the arresting officer, not you; is that correct,

20  Detective?

21   A    That's correct.

22   Q    You are saying she placed him under arrest at 4:45; is

23  that correct?

24   A    I'm saying he is arrested at 4:45, and she was the

25  arresting officer.  I don't know --

slf

Shulman-People-Cross

1    Q    You are saying she is the arresting officer, and he is

2    placed under arrest at 4:45, right?  So, she would have placed

3    him under arrest at 4:45; is that correct?

4    A    I wasn't present when he was arrested, so I don't know.

5    Q    You just testified that Officer Alfaro was the

6    arresting officer, right?

7    A    That's correct.

8    Q    You just testified that Mr. Gopaul was placed in

9    custody at 4:45; is that correct?

10   A    That's what I was told.  Again, I was not present when

11   it was done.

12   Q    Well, what did Officer Alfaro tell you?

13            MR. ROSENBLATT:  Objection.

14            THE COURT:  Sustained.

15   Q    So, you don't know who placed Harold Gopaul under

16   arrest; do you, other than what you were told?

17   A    I was not present for it.

18   Q    And you weren't present when Harold Gopaul walked into

19   the precinct; were you?

20   A    Not downstairs, no.

21   Q    That's right.

22        So, you don't know, in fact, other than what you were

23   told, what time Harold Gopaul came into the precinct; do you?

24   Yes or no.

25   A    I didn't know if that was a statement or a question.

Shulman-People-Cross

1       Q    It's a question.

2       A    It's a question?

3       Q    Yes.

4       A    No, I was not present, so I could not attest to what

5    was happening when I was not there.

6       Q    Okay.

7            Do you know when Harold Gopaul came into the precinct?

8    That's a question.

9       A    Only based on what I was told.

10      Q    Okay.  We are going to circles.

11           Do you know, other than what you were told, what time

12   Harold Gopaul came into the precinct?

13                MR. ROSENBLATT:  Objection.

14                THE COURT:  Overruled.

15      A    No.

16      Q    Do you know, other than what you were told, why Harold

17   Gopaul came into the precinct?

18      A    No.

19      Q    Now, you said this was first brought to your attention

20   around 2:30 in the morning; is that correct?

21      A    That is correct.

22      Q    Who brought it to your attention?

23      A    Detective Matthews from the Detective Borough Queens.

24      Q    Okay, and is Detective Matthews at the 105 Precinct,

25   also?

Shulman-People-Cross

1      A      No, he is not.

2      Q      Did Sana Awan come into the 105 Precinct?

3      A      She did.

4      Q      Okay.

5             Did she come into the 105 Precinct before or after you

6      heard from Detective Matthews?

7      A      Before.

8      Q      She came into the 105 Precinct before.  What time did

9      she come into the 105 Precinct?

10     A      I believe it was sometime around 11 p.m.

11     Q      What is that belief based upon?

12     A      Information I was told.

13     Q      By who?

14     A      Officer Morris of the 105 Precinct.

15     Q      Office Morris told you that Sana Awan came into the

16     precinct around 11 o'clock in the evening.  Is that what your

17     testimony is?

18     A      I wasn't told at 11 o'clock she was there.  I learned

19     later from Officer Morris that Sana had come in 11 o'clock in

20     the evening on the night of the 23rd.

21     Q      When did you learn that?

22     A      During the course of the morning of the 24th.

23     Q      Here is the problem.  I wasn't there, okay, and I'm

24     trying to figure out --

25             MR. ROSENBLATT:  Objection as to the comments.

slf

Shulman-People-Cross

1            THE COURT:  You know the proper way to conduct

2       cross-examination, Mr. Bandelli.

3            MR. BANDELLI:  Yes, sir.

4       Q    Who did Sana Awan meet with when she first came into

5       the precinct, the 105 Precinct?  Was it Officer Morris?

6       A    Who was her first contact?

7       Q    Yes.

8       A    I was not present.  I don't know.

9       Q    You have no idea who she first met with?

10      A    I was not present downstairs when she came in.

11      Q    I'm not asking where you were.  I'm asking if you know

12      who it was she first came in contact --

13           THE COURT:  Mr. Bandelli, the detective has

14      testified he is on the second floor.  If people come in on

15      the first floor, unless you are on the first floor, you

16      don't know when they come in, correct?

17           THE WITNESS:  Correct.

18           THE COURT:  All right.

19           MR. BANDELLI:  Well, Judge --

20           THE COURT:  Mr. Bandelli.

21      Q    Well, didn't you interview Sana Awan?

22      A    Ultimately, yes.

23      Q    Okay.

24           Did you say, Who did you talk to when you first got

25      here?

slf

1      A      No, I did not.

2      Q      Okay.

3             Did you ask her what time she came in?

4      A      No, I did not.

5      Q      Okay.

6             Oh, that's right.  When you first met Sana Awan, she

7      was sitting alone in a room on the second floor; is that

8      correct?

9      A      That's correct.

10     Q      So, you just happened to walk in.  Somebody told you

11     she was in this room on the second floor; is that correct?

12     A      I was told about what was going on.  I requested that

13     she be brought to the Detective Squad so I could interview her

14     and that she be put into an interview room so I could privately

15     interview her.

16     Q      You wanted to privately interview her?

17     A      Yes.

18     Q      They contacted you after, you know, the fact.  You are

19     on the second floor.  You don't know what is going on

20     downstairs.  Why are they reaching out to you after your shift

21     is over?

22             MR. ROSENBLATT:  Objection.

23             THE COURT:  Mr. Bandelli, sustained.

24     Q      Well, what was the purpose -- what time did your shift

25     end?

slf

Shulman-People-Cross

1    A    My scheduled tour or my shift?

2    Q    Your scheduled shift, scheduled tour.

3    A    My scheduled shift would have been 0100, 1 o'clock in

4    the morning.  I was still at work at 2:30 in the morning.

5    Q    What was the purpose of your being contacted after your

6    tour is over?

7    A    Because I was still working as a detective in the 105

8    Detective Squad, and there was a matter that needed to be

9    investigated by a detective.

10   Q    What about Detective Matthews?  Why wasn't he

11   contacted?

12   A    He was contacted and he --

13   Q    Why didn't he conduct --

14        MR. ROSENBLATT:  Objection, Judge.  I ask the

15   witness be permitted to answer the question.

16        THE COURT:  The question is sustained.

17   Q    Well, were there any other detectives that were working

18   after 1 o'clock in the morning at the 105 Precinct other than

19   yourself?

20   A    Not that I recall.

21   Q    What about Detective Matthews?  You just said he

22   notified you there was that person.  He was working.  He wasn't

23   working.  He was working --

24        THE COURT:  Mr. Bandelli, I believe he testified

25   that Detective Matthews worked out of the Detective Borough

slf

1    Queens; is that correct?

2                    THE WITNESS:  That is correct, your Honor.

3    Q    So, how did Detective Matthews get notified of this?

4                    MR. ROSENBLATT:  Objection.

5                    THE COURT:  Sustained.

6                    Unless, Detective, were you there when Detective

7    Matthews was notified of this?

8                    THE WITNESS:  No, I was not, your Honor.

9                    THE COURT:  Okay.

10                   Geographically where, if you know, was Detective

11   Matthews?

12                   THE WITNESS:  My belief is that he was at the

13   Detective Borough Queens or that he would be in Forest Hills

14   where the Detective Borough was located in the 112 Precinct.

15                   THE COURT:  Thank you.  Does that clear that up,

16   Mr. Bandelli?

17                   MR. BANDELLI:  Not really, Judge, but --

18   Q    Okay.

19        So, between 1:00 and 2:30, are you working on anything

20   other than -- well, what are you working on between 1:00 and

21   2:30?

22                   MR. ROSENBLATT:  Objection.

23                   THE COURT:  Sustained.

24   Q    Well, what are you doing at the 105 Precinct then

25   between 1:00 and 2:30 after your shift is over?

Shulman-People-Cross

1          MR. ROSENBLATT:  Objection.

2          THE COURT:  Overruled.

3     A     My shift was not over.  My scheduled tour might have

4     passed, but I was still working.

5     Q     Well, who makes the determination when your shift is

6     over then?

7     A     If there is nothing going on, then when my shift is

8     over I go home.  If I'm in the course of conducting some sort of

9     investigation into any of the cases that are assigned to my

10    office, then I would remain for the purpose of conducting that

11    investigation.

12    Q     What investigation were you working on at that time?

13         MR. ROSENBLATT:  Objection.

14         THE COURT:  Overruled.

15    A     I don't know specifically.

16    Q     Well, do you have notes that might help you?

17    A     I do not.

18    Q     You don't?

19    A     I don't.  I was working on any number of cases that

20    were assigned to the 105 Precinct Detective Squad on that

21    particular date.

22    Q     But you don't know which one you were working on when

23    you were there?

24    A     I don't recall.

25    Q     You don't recall.  Okay.

Shulman-People-Cross

1          After you spoke to -- who did you speak to first?

2    Detective Matthews or Sergeant -- what was his name?   Sergeant

3    O'Hearne?

4        A    O'Hagan.

5        Q    O'Hagan, yeah.

6             Who did you speak to first?

7        A    Detective Matthews.

8        Q    Detective Matthews, and he told you that he wanted you

9    to participate in an investigation involving Sana Awan; is that

10   correct?

11       A    I don't know if he used her name, but he indicated that

12   there was an investigation that I needed to be involved in.

13       Q    Okay, and why did he feel that you needed to be

14   involved in it?

15            MR. ROSENBLATT:   Objection.

16            THE COURT:   Sustained.

17       Q    Okay.

18            So, you get that phone call, and then you are notified

19   that someone from ACS is also present there?

20       A    Yes.

21       Q    Okay.

22            Who is the person from ACS that was present there?

23       A    If I can refer to my case, your Honor.

24            (Referring)   Mr. Musa LaMonte was the ACS case worker

25   that was present in the 105 Precinct that morning.

Shulman-People-Cross

1    Q    Okay.

2         When did you meet with Musa LaMonte?

3    A    At about 2:45 in the morning.

4    Q    Okay.

5         Where did you speak with him?

6    A    Up in the 105 Precinct Detective Squad.

7    Q    And how long did you speak with him for?

8    A    Maybe 20 minutes, 15 minutes.

9    Q    And had Mr. LaMonte already spoken with Sana Awan?

10   A    To some extent.

11   Q    Okay, and you decided after that that you wanted to

12   speak to Sana Awan.  Is that how it worked?

13   A    Pardon me?

14   Q    Did you decide after you spoke to the ACS worker that

15   you wanted to meet with Miss Awan?

16   A    I knew before I spoke to the case worker that I would

17   need to speak to Sana Awan.

18   Q    So, how come you spoke to the ACS worker first then?

19              MR. ROSENBLATT:  Objection.

20              THE COURT:  Overruled.

21   A    I was aware that the ACS worker had had some sort of

22   conversation with Sana Awan, and I wanted to find out from that

23   case worker what the substance of that conversation was.

24   Q    Isn't it true that the ACS worker wanted to have

25   somebody dispatched to Mr. Gopaul's home at some point, and you

slf

Shulman-People-Cross

1    had told the ACS worker that you didn't want them to do that?

2                    MR. ROSENBLATT:  Objection.

3                    THE COURT:  Sustained.

4                    MR. BANDELLI:  What's the basis, Judge?

5                    THE COURT:  Sustained.

6       Q    How long did you speak to Sana Awan for?

7       A    I spoke to her on and off over the course of the day

8    many times.

9       Q    How many times?

10      A    I don't know exactly how many times.  Many times during

11   course of the day.

12      Q    How long did you speak to her the first time at 2:30 in

13   the morning?

14      A    I didn't speak to her until about 3:20 in the morning

15   was the first time I spoke to her, and at that particular time I

16   probably spoke to her for, you know, almost an hour and a half,

17   give or take.

18      Q    When you spoke to her, she was already in the second

19   floor room on your floor; is that right, and you spoke to her

20   for a half hour you said; is that right?  I'm just trying to --

21      A    The part about her being in my office --

22      Q    Yes.

23      A    -- that part is correct.  I didn't say that I only

24   spoke to her for half an hour.

25      Q    At that time.  I know you spoke to her throughout the

Shulman-People-Cross

1    night or morning, but at that time.

2        A    Again I say at that time that I only spoke to her for

3    half an hour.

4        Q    How long did you talk to her for?

5        A    Roughly about an hour and a half.

6        Q    So, you would have spoken to her then from 3:20 till

7    about 4:50, right?

8        A    Just shy of that.  I mean shortly after 4:45 I was

9    aware that Mr. Gopaul was downstairs.  So, it would have been

10   right around that timeframe.

11       Q    So, you concluded your interview right at the time that

12   you learned that Harold Gopaul was in the precinct and he was in

13   custody; is that correct?

14       A    I don't know that I would say I concluded.  I

15   interrupted it.

16       Q    Why did you interrupt it?

17            MR. ROSENBLATT:  Objection, Judge.

18            THE COURT:  Overruled.

19       A    There were other things going on that needed to be

20   addressed at that particular moment that I took a break from

21   that interview knowing that I could go back and talk to her

22   again.

23            THE COURT:  Mr. Bandelli, I don't believe you are

24       going to complete your cross-examination today.

25            MR. BANDELLI:  I don't even think we are going to

Proceedings

1    be close, Judge.

2              THE COURT:  All right.  Then it's a good time to

3    interrupt the cross-examination.

4              Members of the jury, we are going to recess for

5    the evening.  Remember you are not to discuss this case

6    among yourselves with anyone else.  If anyone tries to

7    discuss it with you, bring it to my attention immediately.

8              You are not visit any location that's been

9    mentioned, and you are not to form any opinion as to whether

10   or not you feel the defendant is guilty or not guilty of the

11   crimes with which he is charged.

12             Get home safely.  Come back here tomorrow morning

13   9:30.  We will continue the cross-examination of the

14   detective.

15             Please follow the instruction of the court

16   officer.  Thank you.

17             (Panel of sworn jurors exits the courtroom.)

18             THE COURT:  9:45 tomorrow morning.

19             Detective, you are not to discuss your testimony

20   with anyone during the course of the recess.

21             (Continued on next page.)

22

23

24

25

slf

Proceedings

389

1        THE WITNESS:  Yes, your Honor.

2        THE COURT:  Tomorrow morning 9:45.  Have a good

3    night.

4        THE WITNESS:  Thank you.

5        *          *          *

6        (Whereupon the trial was adjourned to Friday,

7    July 9, 2010.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

slf

Proceedings

390

```
 1   SUPREME COURT OF THE STATE OF NEW YORK.

 2   COUNTY OF QUEENS: CRIMINAL TERM: PART TAP-D

 3   -----------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK    :   Indictment
 4                                          :   No. 2065/08
                                            :
 5              -against-                   :
                                            :
 6                                          :
     HAROLD GOPAUL,                         :
 7                                          :
                         Defendant.         :   CRM SX ACT 1
 8                                          :
     ---------------------------------------X JURY TRIAL
 9
                              125-01 Queens Boulevard
10                            Kew Gardens, New York
                              July 9, 2010
11
     B e f o r e:
12
                     HONORABLE GREGORY L. LASAK,
13
                         Supreme Court Justice
14
     A p p e a r a n c e s:
15
                 HONORABLE RICHARD A. BROWN
16                   District Attorney, Queens County
                 BY:  JARED ROSENBLATT, ESQ.
17

18               STANFORD BANDELLI, ESQ.
                     Attorney for Defendant
19                   16 Court Street
                     Brooklyn, New York
20

21

22           *           *           *

23                   SHERYL FITZPATRICK, RPR CSR
                     Official Court Reporter
24

25
```

slf

Proceedings

1          THE CLERK:  Case on trial, People versus Harold

2     Gopaul.  Let the record reflect the defendant is before the

3     Court.

4          MR. ROSENBLATT:  For the People Assistant District

5     Attorney Jared Rosenblatt.

6          MR. BANDELLI:  For the defendant Stanford

7     Bandelli.

8          Good morning.

9          THE COURT:  Good morning.

10         (Witness resumes the stand.)

11         MR. ROSENBLATT:  I turned over the memo book of

12    Police Officer Sarah Morris.

13         THE COURT:  Okay.  We are going to bring the jury

14    in now.

15         MR. BANDELLI:  I like having my client stand up

16    when the jury is brought in.  They didn't let him do that

17    yesterday.  It's just proper respect.

18         THE COURT:  He will remain seated.

19         COURT OFFICER:  Jury entering.

20         (Panel of sworn jurors enters the courtroom.)

21         THE CLERK:  Case on trial.  All parties are

22    present, your Honor.

23         Do both sides stipulate that all jurors are

24    present and properly seated?

25         MR. ROSENBLATT:  Yes.

Shulman-People-Direct

1          MR. BANDELLI:  Yes, Judge.

2          THE CLERK:  Detective, you are reminded that you

3     are still under oath.

4          THE COURT:  Good morning, ladies and gentlemen.

5          Mr. Bandelli.

6          MR. BANDELLI:  Thank you, Judge.

7          Good morning, ladies and gentlemen.  How are you?

8     No podium today?

9  L E N N A R D    S H U L M A N, Detective, having been

10     previously sworn, resumed the witness stand and

11     testified as follows:

12  CONTINUED CROSS-EXAMINATION

13  BY MR. BANDELLI:

14     Q    Good morning, Detective Shulman.

15     A    Good morning.

16     Q    How are you?

17     A    Okay.

18     Q    Okay.

19          You know, there were a few rules or a few instructions

20  I gave at the beginning yesterday.  I just want to repeat them

21  because it seems like it got a little confusing at a certain

22  point.

23          MR. ROSENBLATT:  Objection, Judge.

24          THE COURT:  Yes.  Mr. Bandelli, if you have

25     questions, ask the witness.

Shulman-People-Direct

1           MR. BANDELLI:  I do, Judge.

2           THE COURT:  There are no rules in your questions.

3           MR. BANDELLI:  Okay.

4      Q    When we finished off yesterday, you had or when you

5   testified yesterday, just so I understand, you were working a

6   tour from 4 p.m. June 23, 2008 till 1 a.m. June 24, 2008; is

7   that correct?

8      A    Yes.

9      Q    And at approximately 2:30 in the morning, about one and

10  a half hours after your tour was over, you were notified by

11  Detective Matthews that Sana Awan was in your precinct, correct?

12     A    Part of what you said is correct.

13     Q    Which part is incorrect?

14     A    The part about my tour being over.

15     Q    Well, your tour actually ended, but you were continuing

16  to do investigative work beyond your tour, right?

17     A    That is correct.

18     Q    All right.

19          Now, you testified that you believed that Sana Awan

20  arrived at your precinct at approximately 11 p.m. on the 23rd

21  and was initially interviewed by a Police Officer Morris,

22  correct?

23     A    That's my belief, yes.

24     Q    Okay.

25          Could it be that Sana Awan actually got to the precinct

slf

Shulman-People-Direct

1    at 10 o'clock in the evening and spoke with Police Officer

2    Morris then?

3        A    I can't testify about things I don't know.

4        Q    So, you don't know the answer to what time actually

5    Sana Awan got to the precinct; is that correct?

6        A    It's my belief she got there approximately 11 p.m.

7    Outside of that -- I can't testify to anything outside of that.

8        Q    Do you know -- do you know whether or not Sana Awan --

9    forget your belief.  Do you know whether or not Sana Awan got to

10   the precinct, your precinct, prior to 11 o'clock?

11       A    I don't know.

12       Q    You testified that you met with an ACS worker, Mr. Musa

13   LaMonte, at around 2:45 in the morning who had also interviewed

14   Miss Awan; is that correct?

15       A    That is correct.

16       Q    Finally, you met with Miss Awan on the second floor of

17   your precinct at about 3:20 in the a.m. and spent approximately

18   one and one half hours interviewing her; is that correct?

19       A    Approximately, yes.

20       Q    Okay.  Good.

21            Now, after you interviewed her, did you go to her home

22   at 240-10 89 Avenue in Bellerose to investigate this matter

23   further?

24       A    I did not go to her home, no.

25       Q    You did not.

slf

Shulman-People-Direct

1          You didn't go into the house where she said this

2   alleged sexual abuse took place?

3       A    I did not.

4       Q    You didn't go to the house to arrest my client, Harold

5   Gopaul?

6               MR. ROSENBLATT:  Objection.  Asked and answered.

7               THE COURT:  Sustained.  He said he didn't go to

8       the house.

9               MR. BANDELLI:  Okay.

10      Q    Did you at any time send another officer to the house?

11      A    I did not.

12      Q    At some point in time you learned that my client,

13  Harold Gopaul, showed up at the 105 Precinct on his own and was

14  placed under arrest; is that correct?

15      A    That is correct.

16      Q    And according to your testimony yesterday, it was

17  Sergeant O'Hagan that was the source of this information,

18  correct?

19      A    That is correct.

20      Q    You have no independent knowledge, do you, Detective,

21  of when my client, Harold Gopaul, was placed under arrest; do

22  you?

23      A    I was not present when he was taken into custody, no.

24      Q    So, you don't know at what time he walked into the

25  precinct; do you?

Shulman-People-Direct

1        MR. ROSENBLATT:  Objection.

2        THE COURT:  Sustained.

3        Please, let's not belabor this point.  Get to

4    another line of questioning.

5        MR. BANDELLI:  With all due respect, Judge, I

6    think this is a very important --

7        THE COURT:  Get to another line of questioning.

8    We covered this yesterday.

9        MR. BANDELLI:  Okay.

10   Q    Is there a logbook maintained at the 105 Precinct that

11   would identify the time a civilian comes into the precinct?

12   A    No.

13   Q    No?

14   A    You have to be more specific in your question.

15   Q    Is it police procedure, NYPD patrol procedure, to

16   maintain a logbook at the precinct to identify individuals that

17   come into the precinct to report complaints or missing persons?

18   A    No.

19   Q    No?

20   A    No.

21   Q    You are sure of that?

22   A    Not to my knowledge.

23   Q    Okay.

24        If you wanted to determine the exact time that Harold

25   Gopaul got into the precinct, how would you do that?

Shulman-People-Direct

1            MR. ROSENBLATT:  Objection.

2            THE COURT:  Sustained.

3            MR. BANDELLI:  May we approach, Judge?

4            THE COURT:  Sustained.

5            All right.  Come on up.  Come up.

6            (The following proceedings took place at

7      side-bar:)

8            THE COURT:  You asked to come up.

9            MR. BANDELLI:  Yes.  The time that Harold Gopaul

10     came into the precinct is critical.

11           THE COURT:  The reason we come up to the side-bar

12     is so the jury can't hear it.

13           MR. BANDELLI:  The time that Mr. Gopaul came to

14     the precinct is critical in this case because my client's

15     position is that he did not --

16           THE COURT:  Did you hear what I just said?  If you

17     want to do this in front of the jury, we will do it in front

18     of the jury.

19           MR. BANDELLI:  When my client showed up at the

20     precinct is very relevant to the argument and his position

21     that the statements were involuntarily made.  Okay?  There

22     were other police officers that had contact with him.  I

23     need to know who those officers were, and I need to know

24     when he got to the precinct.  If this officer has any

25     information on that, I am entitled to that.

Shulman-People-Direct

1        THE COURT:  He said clearly yesterday and today

2    that he does not know what time your client got there

3    because he wasn't downstairs.  He was upstairs.  Any

4    information this detective has was given to him by Sergeant

5    O'Hagan who was the desk sergeant downstairs.

6        MR. BANDELLI:  I understand that.

7        THE COURT:  You asked him -- the last question was

8    if he wanted to find out what time Mr. Gopaul got to the

9    precinct, how would he do that.

10        MR. BANDELLI:  Yes.

11        THE COURT:  And I sustained that objection.

12        MR. BANDELLI:  It's not an unreasonable question,

13    Judge.

14        THE COURT:  If you ask it again I'll sustain it

15    again.

16        MR. BANDELLI:  Fine.  Note my exception.

17        THE COURT:  Okay.  You have an exception.

18        (In open court.)

19        THE COURT:  You may proceed, Mr. Bandelli.

20        MR. BANDELLI:  Thank you, Judge.

21    Q    Detective, do you know how many police officers had

22    contact with Mr. Gopaul before you were notified that he was in

23    custody?

24    A    I don't.

25    Q    Okay.

slf

Shulman-People-Direct

1       Do you know if any police officers interrogated my

2   client before he was brought to the second floor?

3       A    Not to my knowledge.

4       Q    Do you know if any police officers gave Mr. Gopaul his

5   Miranda warnings before he was brought to the second floor?

6       A    Not to my knowledge.

7       Q    Do you know whether or not he requested to have a

8   lawyer present before he was brought to the second floor?

9       A    Not to my knowledge.

10      Q    Do you know if any of the officers who initially had

11  contact with Mr. Gopaul assaulted him in any way?

12      A    I don't believe so.

13      Q    Do you know?

14      A    I can't answer things when I'm not present, but I don't

15  believe so.

16      Q    Do you know?  Yes or no.  Do you know, or don't you?

17           MR. ROSENBLATT:  Objection.  Asked and answered.

18           MR. BANDELLI:  "I don't believe so" is not an

19      answer.

20           THE COURT:  Sustained.  Sustained.

21      Q    You testified yesterday that Celia Alfaro was the

22  arresting officer in this case, correct?

23      A    Celica Alfaro is listed as the arresting officer.

24      Q    Celica.  Thank you.

25           You also testified that you didn't know if Celica

Shulman-People-Direct

1    Alfaro had actually placed Mr. Gopaul under arrest; is that

2    correct?

3         A    I wasn't present when he was placed under arrest, so I

4    don't know who physically placed him in custody.  She is the

5    arresting officer of record, though.

6         Q    So, you have no idea then what officer placed

7    Mr. Gopaul in physical custody.

8                   MR. ROSENBLATT:  Objection.

9                   THE COURT:  Sustained.  Sustained.

10        Q    You tested it was about 5:10 a.m. when you find

11   Mr. Gopaul sitting in a room by himself on the second floor; is

12   that correct?

13        A    It was 5:10 a.m. when I went into one of my interview

14   rooms to speak to him and he was sitting at a table, yes.

15        Q    By himself, right?

16        A    Yes.

17        Q    Do you know who brought him up there?

18        A    I do not know.

19        Q    Do you know how he got up there?

20        A    I had requested he be brought up to my office to be

21   interviewed, and I asked that he be placed in my interview room,

22   and I was told he was in my interview room.

23        Q    You didn't go downstairs and get him yourself?

24        A    No.

25        Q    Who did you make the request of?

Shulman-People-Direct

1    A    Sergeant O'Hagan.

2    Q    Who notified you when Mr. Gopaul was in the room?

3    A    I don't recall specifically.  It might have been

4    Sergeant O'Hagan.  I'm not sure.

5    Q    Did somebody knock on your door?  Did somebody call you

6    on phone?

7    A    I don't recall specifically.

8    Q    How did you determine which room he would be placed in?

9    A    I have two interview rooms.  The victim, Sana Awan, was

10   in one room, and I asked he be placed my other interview room.

11   Q    Isn't it a fact when Mr. Gopaul was brought upstairs

12   that Sana Awan wasn't in an interview room?  She was outside in

13   a hallway?

14   A    No.

15   Q    She didn't see her dad when he came upstairs?

16   A    No.

17   Q    All right.

18        Did my client at any point request a meeting with you?

19   A    Pardon me?

20   Q    Did my client ever ask to meet with you?

21   A    I don't know.

22   Q    You don't know.

23        Well, how about when he was sitting there?  Did he say,

24   Well, it's good to meet you.  I was wanting to meet with you,

25   Detective Shulman?

slf