Shulman-People-Direct

1    A    Not that I recall, no.

2    Q    No?

3         Can you describe for the jury and for the record the

4    dimensions of the room my client was sitting in?

5    A    I've never used a tape measure to the room, but I would

6    speculate that maybe it's eight or nine feet by ten feet.

7    Q    Okay, and is there a window in there?

8    A    There is a door with a glass window in the center of

9    it.

10   Q    Where is the door located?

11   A    Centered on the room, and there's a window and a

12   doorway similar to the windows on the upper part of the

13   courtroom doors, similar dimensions.

14   Q    Can you see -- if you are inside the room, can you see

15   outside the window if you are sitting in the room?

16   A    If it's not obstructed, yes.

17   Q    Obstructed by what?

18   A    If there is nothing blocking that window you can see

19   out.

20   Q    Well, what would be blocking that window?

21   A    Depends on the circumstances.

22   Q    Well, explain that to me.  I don't understand.

23   A    There's times that that window gets covered because we

24   don't want witnesses and people to see each other, and there's

25   times that it's not covered.

Shulman-People-Direct

1   Q   Was it covered at this time?

2   A   I don't recall.

3   Q   Why not?

4   A   Because it really was not a concern of mine.

5   Q   So, you didn't care if Mr. Gopaul and his daughter saw

6   each other?

7            MR. ROSENBLATT:  Objection.

8            THE COURT:  Sustained.

9   Q   Is there any furniture in the room?

10  A   There is a table and several chairs.

11  Q   How many chairs?

12  A   Two or three.

13  Q   Okay, and how big is the table?

14  A   Two feet wide by maybe three feet long.

15  Q   Okay.

16       So, just for purposes of the record, if you are sitting

17  on the one side of the table and I'm sitting on the other side

18  of the table, tell me how far apart we would be.  Would we be

19  this close?

20  A   Shorter.

21  Q   Would we be this close?

22  A   Close.  Maybe a couple of inches more.

23            MR. BANDELLI:  I'd say I'm approximately 2 and a

24  half feet from the witness at this time.  Is that accurate,

25  Judge?

slf

404

Shulman-People-Direct

1          THE COURT:  It's a little more than 2 and a half

2     feet.

3          MR. BANDELLI:  Is it?

4     A    (Continuing)  The table itself is not that long unless

5     you are sitting on top of the table.

6     Q    Is there a clock in the room?

7     A    There is not.

8     Q    There is not?

9     A    There is not.

10    Q    So, if you are sitting in that room, there is no way to

11    tell what time it is?

12    A    You have a watch on.

13    Q    But if you don't.

14    A    No.

15    Q    If you don't have a watch on, can you tell what time it

16    is when you are sitting in that room?

17    A    There is not a clock in the room.

18    Q    Before you went into that room, you were familiar with

19    the allegations against my client, Gopaul; is that correct?

20    A    To some extent, yes.

21    Q    Well, you spent an hour and a half with the alleged

22    victim.  You spent time talking with the ACS worker.  You spent

23    time talking with Detective Matthews.  How much more information

24    did you need to be familiar with the allegations?

25          MR. ROSENBLATT:  Objection.

slf

Shulman-People-Direct

1      THE COURT:  Sustained.

2  Q    Well, what didn't you know at that time?

3      MR. ROSENBLATT:  Objection.

4      THE COURT:  Sustained.

5  Q    How much did you know at that --

6      THE COURT:  Mr. Bandelli, how can he testify as to

7  what he didn't know?

8      MR. BANDELLI:  I'm saying, How much did you know?

9  I'm not saying what didn't you know.  I'm saying how much

10  did you know at that time?

11      THE COURT:  Sustained.

12  Q    You were aware that she was making allegations of a

13  sexual abuse nature against her stepfather; is that correct?

14  A    That is correct.

15  Q    And when Mr. Gopaul was in that room as you testified

16  earlier, the decision was already made that he be placed in

17  custody; that?

18  A    Repeat that question, please.

19  Q    The decision had already been made that he would be

20  placed in custody before you even went into that room, correct?

21  A    He was already under arrest prior to my speaking to

22  him, yes.

23  Q    At the point that you went into the room, a

24  determination had already been made that he was going to be

25  charged with these crimes; is that correct?

Shulman-People-Direct

1       MR. ROSENBLATT:  Objection.

2       THE COURT:  Sustained.

3    Q    When you went into the room to talk to Mr. Gopaul, you

4  went in there with the idea of getting evidence from him; is

5  that correct?

6    A    Potentially.

7    Q    You went in there with the idea of getting evidence

8  from him; is that correct?

9    A    Again, potentially.

10   Q    You were hopeful that you would get evidence from him;

11 is that correct?

12      MR. ROSENBLATT:  Objection.

13      THE COURT:  Sustained.

14   Q    Did you go in there to clear my client, Detective

15 Shulman?  Did you go in there to rule out the charges that were

16 made against him by the stepdaughter?

17   A    I went in there to seek the truth and try to

18 investigate a crime.

19   Q    Well, he was already under arrest, so you went in there

20 to find out if he didn't do it.  Is that what you are saying?

21   A    I went in there to get his version of events, if he was

22 willing to tell me, and try to determine the arrest.

23   Q    He was already under arrest, so hadn't the truth

24 already been determined?

25      MR. ROSENBLATT:  Objection.

Shulman-People-Direct

1        THE COURT:  Mr. Bandelli, sustained.

2    Q    So, you give him the Miranda warnings -- did you

3    introduce yourself when you went in?

4    A    I did.

5    Q    Did you say, Good morning -- I guess it's five in the

6    morning.  Good morning, Mr. Gopaul?

7         What do you say?  I'm Detective Shulman.  I'm here to

8    get to the truth of what happened.  Is that what you said to

9    him?

10   A    Are you asking me or telling me?

11   Q    I'm asking you is that what you said to him.

12   Mr. Gopaul, I'd like to introduce myself.  I'm Detective

13   Shulman.  I know you are under arrest, but I'm here to get to

14   the truth of what happened.  I want to hear your side.  Is that

15   what you said to him?

16            MR. ROSENBLATT:  Objection.

17            THE COURT:  What did you say to him?  Do you

18       remember?

19            THE WITNESS:  Word for word, no, but something

20       along the lines of, I'm Detective Shulman.  I'm going to

21       speak to you.  I'm going to read you your Miranda warnings.

22       I need you to answer yes or no clearly that you understand

23       what I'm reading to you.

24            MR. BANDELLI:  Can I see what the People had -- I

25       guess it's 1, 2, 3, 4 in evidence or 1, 2, 3.

408

Shulman-People-Direct

1          THE COURT:  What items do you want?  The rights

2      forms and statements?

3          MR. BANDELLI:  I guess whatever he testified he

4      advised my client to during that first initial interview at

5      5:10 in the morning -- between 5:10 and 5:30 which, I

6      believe, is the Miranda and the two consent forms.

7      Q    How was my client dressed when you saw him?  What was

8  he wearing?

9      A    I believe it was a blue work uniform that had an

10  "Ecolab" patch on it.

11     Q    So, he was in his work clothes when you met with him,

12  right?

13     A    Yes.

14     Q    And then you gave him his Miranda warnings, right?

15  "You have the right to remain silent and refuse to answer

16  questions.  Do you understand?"  Right?

17     A    I did read that to him, yes.

18     Q    But you are the one who signed it "yes," right?  You

19  are one who wrote in "yes," right?

20     A    As Mr. Gopaul answered my question with the word "yes,"

21  I then wrote the word "yes."

22     Q    So, as you asked the question and got the answer, you

23  wrote in the answer, correct?

24     A    That is correct.

25     Q    "Anything you say may be used against you in a court of

slf

409

Shulman-People-Direct

1   law.  Do you understand?"  And then you write in "yes" again

2   right after he answered?

3       A    Correct.

4       Q    "You have the right to consult an attorney before

5   speaking to the police and to have an attorney present during

6   any questioning now or in future.  Do you understand?"  And he

7   said, "Yes" and you wrote a "yes."

8       A    Correct.

9       Q    He didn't want a lawyer with him, right?  He wanted to

10  talk to you.

11      A    I asked him Miranda warning questions.  He answered

12  "yes," that he understood his rights, and after reading question

13  six, "Now that I have advised you of your rights, are you

14  willing to answer questions," he again answered "yes," that he

15  was willing to answer questions.

16      Q    Do you have a personal relationship with Mr. Gopaul?

17      A    No.

18      Q    Are you a friend of his?

19      A    No.

20      Q    He just met you at 5 o'clock in morning sitting in this

21  room, and he is telling you, yeah, Officer.  I don't need a

22  lawyer here.  I want to talk to you, right?

23               MR. ROSENBLATT:  Objection.

24               THE COURT:  Sustained.

25      Q    Well, then you ask him another question about a lawyer.

slf

Shulman-People-Direct

1    "If you cannot afford an attorney, one will be provided for you

2    without cost.  Do you understand?"  You write in "yes" after he

3    answered "yes," right?

4         A    Yes.

5         Q    Again, he has no interest in a lawyer, right?

6              THE COURT:  Sustained.

7         Q    Five, "If you do not have an attorney available, you

8    have the right to remain silent until you have an opportunity to

9    consult with one.  Do you understand?"  You write in "yes."  He

10   said, "Yes," right?

11        A    Again, after I asked him the question and he answered

12   "yes," I wrote his answer.

13        Q    And he is very clear he doesn't want to talk to an

14   attorney, right?

15             MR. ROSENBLATT:  Objection.

16             THE COURT:  Mr. Bandelli.

17             I'll allow you to answer that question, Detective.

18        Go ahead.

19        A    Again, he answered "yes" that he understood what I read

20   him, and I proceeded to the next question on Miranda warnings.

21        Q    And then you date it, put the location as 105 Precinct

22   and put in the time of 5:15, and I assume you were wearing a

23   watch at that time.  That's where you got the time from, right?

24        A    Correct.

25        Q    Okay.

Shulman-People-Direct

1          Now, after you did that, you had him sign another form

2     that you filled out, right?  You wanted to search his house,

3     right?  You wanted him to consent to the search of his house,

4     right?

5     A     Is all of what you just said a question or is the end

6     part just the question?

7     Q     You wanted him to consent to a search of his house,

8     right?

9     A     I asked him if he would consent to search his house,

10    yes.

11    Q     Did you ask him that because you wanted him to consent

12    to the search of his house?

13    A     I asked if he would consent.  He acknowledged it and

14    gave consent.

15    Q     So, you just said, Oh, by the way, you don't mind if we

16    search your house, right?

17              MR. ROSENBLATT:  Objection.

18              THE COURT:  You can answer.  Answer it.

19    A     I read to him what is a preprinted consent to search

20    form.

21    Q     Why did you decide to read him what was on this form?

22    A     Because an allegation was made that a crime had been

23    committed in his house.  Therefore, there was the potential for

24    evidence, and I read him a consent search request.

25    Q     Earlier you said you didn't even go to the house.

Shulman-People-Direct

1    A    Which is why the form says, "Authorizing Detective

2    Shulman or an authorized representative of the NYPD to conduct

3    such search."

4    Q    Why were you asking for the consent when you are not

5    even going to the house?

6    A    I was the person speaking to Mr. Gopaul, so I asked if

7    he would consent.

8    Q    I apologize.  I didn't want to cut you off.

9         Why wasn't the person who was going to go search the

10   house asking for the consent?

11   A    Because I had already done it.

12   Q    Last form.

13        You asked him to consent to the search of a Dodge Ram

14   with the license plate number 22726JV and a VIN number.  Where

15   did you come up with that information?

16   A    At some point in time I was given some information as

17   to what Mr. Gopaul's vehicle was.

18   Q    That's a lot -- well, where -- where did you get it

19   from?

20   A    I don't recall specifically.

21   Q    Well, who gave it to you?

22   A    I don't recall.  I know prior to going in and speaking

23   to him I had it with me.

24   Q    Where was the vehicle located?

25   A    On the side of the precinct.

Shulman-People-Direct

1    Q    It was located at the precinct?

2    A    Yes.

3    Q    Do you know that Mr. Gopaul drove to the precinct?  You

4    are aware of that, right?

5    A    That's my belief.

6    Q    You don't know it, but that's your belief.

7    A    Again, I wasn't there when he drove there, but I

8    believe that he drove there.

9    Q    Because his vehicle was parked besides the precinct,

10   right?

11   A    Right.

12   Q    You reached a conclusion.  That makes sense.

13        So, you spent --

14        MR. BANDELLI:  Here.  You can have this back,

15   officer (handing).  Thank you.

16   Q    So, you spend all of this time talking with my client

17   getting him to waive his rights, have him sign consent forms to

18   search his house, his vehicle and then you leave the room?

19        MR. ROSENBLATT:  Objection.

20   Q    Is that your testimony?

21        MR. ROSENBLATT:  Compound.  It's four questions in

22   one, Judge.

23        THE COURT:  Sustained.

24   Q    After you completed that process of having him waive

25   his Miranda rights, of having him consent to the search of his

slf

Shulman-People-Direct

1    house, of having him consent to the search of his vehicle, you

2    leave the room; is that correct?

3        A    I indicated to Mr. Gopaul that I would be back to speak

4    to him shortly, and I left the room, yes.

5        Q    Well, he just told you he wanted to talk to you, and

6    you decided you were going to leave?

7                    MR. ROSENBLATT:  Objection.

8                    THE COURT:  Sustained.

9        Q    What was it that you had to do that you decided to

10   leave Mr. Gopaul at that time?

11       A    I don't know if there is any one specific thing that I

12   had to do.  I made a decision to step out and leave the room.

13       Q    Well, you testified that you had Mr. Gopaul in there to

14   get to the truth of what happened, right?  And there he is.  He

15   is sitting there telling you, I'm going to tell you the truth.

16   I'm going to let you go in my car and in my house, and then you

17   walked out because you had to do something else, and you don't

18   even know what that was?

19                   MR. ROSENBLATT:  Objection.

20                   THE COURT:  Sustained.

21       Q    How long were you gone before you returned to the room

22   that Mr. Gopaul was sitting in?

23       A    I came back in at about 6:20 in the morning.

24       Q    An hour later?

25       A    About 50 minutes.

Shulman-People-Direct

1    Q    50 minutes.

2         What did you do during that 50 minutes?

3    A    I don't know specifically.  I'm sure I dealt with some

4    of my paperwork.  I'm sure I spoke to Miss Awan briefly, and I'm

5    sure I spoke to some of the patrol officers briefly in that

6    timeframe.

7    Q    Which patrol officers did you speak to?

8    A    I don't know specifically in that timeframe but --

9    Q    Well, which patrol officers were present?  Did you

10   speak to patrol officers on the second floor or on the first

11   floor?

12   A    At that time I believe in my office on the second

13   floor.

14   Q    Okay.  Who was on the second floor at that time?

15   A    Again, I don't recall specifically who was there.

16   There's different things going on in my office.

17   Q    Well, you weren't talking about this case.  You were

18   talking about other cases while he was sitting in the room?

19   A    I'm sure I was talking about this case.  I don't know

20   specifically at that point in time specifically what my

21   conversations were.

22   Q    Who were the officers you were talking about this case

23   with?  That's what I'm asking.

24   A    Again, I don't know specifically at that particular

25   time.

slf

Shulman-People-Direct

1    Q    Well, did you take any notes?  Did you write anything

2  down, Spoke with patrol officer so and so about Mr. Gopaul?

3  Spoke to patrol officer so and so about Miss Awan?

4         No notes?

5    A    Not in that window of time, no.

6    Q    Why did you decide to go back in the room 50 minutes

7  later?

8    A    Because I was going to speak to Mr. Gopaul.

9    Q    Well, you were just speaking to him an hour ago when

10  you left.  Why are you going back there again?

11              MR. ROSENBLATT:  Objection.

12              THE COURT:  Mr. Bandelli, sustained.

13              MR. BANDELLI:  Could I have the next exhibit,

14     please?  I think it's Exhibit No. 4.

15    Q    What did you say to Mr. Gopaul when you walked back in

16  there at 6:10 in the morning?

17    A    I believe it was about 6:20 in the morning when I went

18  back in to Mr. Gopaul.  I asked him if he knew why he was in

19  custody and why he was under arrest, and he indicated that, you

20  know, he had an incident on that Saturday prior with his

21  daughter Sana at a carnival; that he had laid some slaps on her

22  as discipline, and that's what his belief was that it was about.

23         I asked him if he would like to make a written

24  statement about what had occurred, and he indicated that he did.

25    Q    Okay, and what he said about the fair, was that

417

1   something that Sana Awan had told you, also?

2            MR. ROSENBLATT:  Objection.

3            THE COURT:  Overruled.

4   A    Yes.

5   Q    Okay.

6            So, you asked him if he wanted to make a statement.

7   Did you come in there with a pad or something like that?

8   A    I did.

9   Q    You had a pad with you, so you went in there thinking

10  you were going to get a statement from him at that time; is that

11  correct?

12           MR. ROSENBLATT:  Objection.

13           THE COURT:  Sustained.

14  Q    What did you have the pad for?

15           MR. ROSENBLATT:  Objection.

16           THE COURT:  Overruled.

17  A    I had a pad in case I needed to write anything or in

18  case Mr. Gopaul wanted to write anything.

19  Q    Did you write anything?

20  A    At that particular moment, no.  He wrote something at

21  that moment.

22  Q    Okay, and he wrote that after you requested -- you

23  asked him if he wanted to write something.  That's when the

24  wrote it, right?

25  A    Yes.

Shulman-People-Direct

1    Q    I notice on top of it he has his name, his address, his

2  phone number.  Did he put that all down there on his own?

3    A    I asked him -- when he agreed to make a statement I

4  asked him before he wrote out what had happened if he would

5  write his name, address and phone numbers.

6    Q    You asked him to place certain information on there; is

7  that correct?

8    A    I asked him if he would put his name, address and his

9  phone numbers as identifying the statement.

10    Q    So, you asked him to write certain things on the paper,

11  right?

12    A    Yes.

13    Q    And on this particular piece of paper, the first page,

14  he talks about what happened at the fair, right?

15    A    Yes.

16    Q    Right.

17         He says, We had a tuff time.  Sana wanted to get on a

18  ride.  My wife was sick.  I wanted to leave, and it got tense

19  and it wound up turning into something where I physically

20  disciplined her; is that correct, in sum and substance?

21    A    In sum and substance, I guess.

22    Q    Did he tell you that before he wrote that down?

23    A    No.

24    Q    He just wrote it down first.  He didn't discuss it with

25  you before he wrote it down.

Shulman-People-Direct

1      A     What he told me before he wrote is that they had a

2   thing at the fair and that he laid some slaps on her.

3      Q     So, you had the conversation and then he wrote it down,

4   right?

5      A     Yes.

6      Q     Now, on the second page it says, "To the district

7   precinct and I was held and searched.  Also I was read to me and

8   asked to sign three sets of documents, also to write this

9   report.  I was read my rights and was asked what happened with

10  my daughter.  Harold Gopaul."

11           Did you ask him to write that?

12     A     No.

13     Q     He wrote that on his own, right?

14     A     Yes.

15     Q     Did you videotape this interview and this statement?

16     A     I did not.

17     Q     You didn't.  Why not?

18     A     My office --

19           MR. ROSENBLATT:  Objection.

20           THE COURT:  Overruled.

21     A     My office is not equipped to videotape interviews.

22     Q     Really.

23           Well, didn't the DAs come by later and conduct a

24  videotaped interview of Mr. Gopaul?

25     A     They did.

Shulman-People-Direct

1    Q    In that same precinct, right?  On the second floor?

2    A    Yes.

3    Q    So, you can videotape things on the second floor of

4  that precinct; is that correct?

5    A    Again, my office is not equipped to video interviews of

6  people.  The district attorneys came, and they brought their own

7  videographer to the precinct with them to conduct that

8  videotaped statement.

9    Q    But if you wanted to video it, you could have done the

10  same thing.  Got a videographer in and --

11           MR. ROSENBLATT:  Objection.

12           THE COURT:  Sustained.

13           He said his office is not equipped to do that.

14           MR. BANDELLI:  I understand that, Judge.

15           THE COURT:  He is not talking about the building.

16           Does the Police Department have a videotape in

17     that particular precinct Detective Squad?

18           THE WITNESS:  No, they do not.

19    Q    But a videotaped statement was taken on the second

20  floor in that squad; is that correct?

21    A    Yes.

22           MR. BANDELLI:  Can I have -- I guess it would be

23     Exhibit No. 5, please?

24    Q    When did you leave Mr. Gopaul after he finished making

25  the statement we just discussed about the fair?  What time?

Shulman-People-Direct

421

1       A     I think it was approximately 6:45 in the morning when

2    he had finished his statement and asked to use the bathroom.

3       Q     Okay.

4             Is there anyplace that you would have made an entry

5    that, you know, the interview ended and he was going to the

6    bathroom?

7       A     Yes.

8       Q     Do you have -- do you have it with you?

9       A     Yes.

10      Q     Can I see it?

11            This is a complaint followup information report that

12   you had prepared in connection with this case?

13      A     It is.

14      Q     This seems to be like a summary of everything that

15   happened --

16            MR. ROSENBLATT:  Objection.

17      Q     -- is that correct?

18            THE COURT:  Basis of your objection.

19            MR. ROSENBLATT:  The document is not in evidence,

20       Judge.

21            THE COURT:  Sustained.

22            MR. BANDELLI:  I'm going to hand it back.

23      Q     So, the interview would have ended then when he asked

24   to go to the bathroom after he finished making that second

25   statement; is that correct?

Shulman-People-Direct

1    A    That particular session of interview was interrupted to

2   allow him to use bathroom, yes.

3    Q    It was a session of interviews, right?

4    A    After he asked to use the bathroom, we took a break so

5   he could use the restroom.

6    Q    You said after that particular session of interviews he

7   asked to take a break.  So there were a session of interviews,

8   correct?

9    A    Maybe the word "session" is not appropriate.  I spoke

10  to him.  He asked to the use bathroom.  We breaked, and then I

11  spoke to him again at a later time.

12   Q    Why isn't that word appropriate?

13            MR. ROSENBLATT:  Objection.

14            THE COURT:  Sustained.

15   Q    Statement number three.  How long before or how long

16  after he went into the bathroom was it that you decide you are

17  going to go back for the next session of the interview?

18   A    Again, I don't know if "session" would be a word I

19  would use, but I believe it was about 7:20 in the morning when I

20  went in to speak to Mr. Gopaul again.

21   Q    Well, I didn't use the word "session."  You used it.

22            MR. ROSENBLATT:  Objection, Judge.

23            THE COURT:  Sustained.

24   Q    So, you went back in there at 7:30 a.m. or what time

25  was it?

Shulman-People-Direct

1    A    It was about 7:20 or 7:25 in morning.

2    Q    So, that's another 45 minutes that had passed from the

3    time you went to the bathroom to the time you went back in

4    there; is that correct?

5    A    30, 35 minutes.

6    Q    What were you doing at that time?

7    A    Again, I'm sure I was speaking to some of the patrol

8    officers.  I'm sure I had a conversation with Miss Awan during

9    that timeframe.

10    Q    What prompted you to go back into the room with

11   Mr. Gopaul?  He had already given you his written statement.

12    A    He had discussed an assault that happened over the

13   weekend in regards to a fair.  He had not discussed other

14   allegations that were being made against him.

15    Q    And?

16    A    And I went to go spoke to him about those other

17   allegations.

18    Q    So, you went in to talk to him about sex abuse, right?

19    A    Yes.

20    Q    You went in there telling him, Yeah.  You didn't tell

21   me about sex abuse, right?

22    A    That's what I said.

23    Q    You said he told you about the fair.  He didn't tell

24   you about allegations of sexual abuse, right?

25               MR. ROSENBLATT:  Objection.

Shulman-People-Direct

1        THE COURT:  Sustained.

2    Q    Okay.

3        You went back in there, and you didn't have the

4    statement that you wanted, right?

5        MR. ROSENBLATT:  Objection.

6    Q    You didn't get what you wanted the first time; is that

7    right?

8        MR. ROSENBLATT:  Objection.

9        THE COURT:  Overruled.

10   A    No, that's not correct.

11   Q    That's not correct.

12       So, you had what you wanted; is that correct?

13       MR. ROSENBLATT:  Objection.

14       THE COURT:  Sustained.

15       MR. BANDELLI:  Well, he said it wasn't correct.

16   How do I know what is correct then?

17       THE COURT:  Mr. Bandelli.

18   Q    You went back into the room the second time.

19       THE COURT:  Mr. Bandelli, just ask questions.

20       MR. BANDELLI:  I'm asking questions.

21       THE COURT:  Don't argue with the Court.

22       MR. BANDELLI:  Yes, sir.

23   Q    You went back into the room the second time because you

24   wanted him to talk about sexual abuse; is that correct?

25       MR. ROSENBLATT:  Objection.

425
Shulman-People-Direct

1        THE COURT:  Sustained.

2    Q    You weren't satisfied with the first statement; were

3    you?  Correct?

4        MR. ROSENBLATT:  Objection.

5        THE COURT:  Sustained.

6    Q    So you go back in there, and you tell Mr. Gopaul, You

7    are going to tell me the truth now; is that correct?

8    A    No, that's not correct.

9    Q    It's not correct?

10       You didn't put him up against the wall and say,

11   Mr. Gopaul --

12       THE COURT:  Mr. Bandelli.

13   Q    -- you are going to tell the truth now?

14       THE COURT:  Mr. Bandelli, stay back at the end of

15   the rail and conduct your cross-examination from the end of

16   the rail, please, right where your papers are.

17   Q    Is that correct?

18   A    No, that's not correct.

19   Q    So, you just went back in there and said what to him?

20   A    I went back in and I said to Mr. Gopaul, Your daughter

21   Sana is making an allegation that there has been inappropriate

22   activity between you, and do you want to speak to me about it?

23   And he indicated to me that he did want to speak to me about it,

24   and he felt bad about it, and he would want to speak about it.

25   Q    He told you, You know what?  We don't know each other,

Shulman-People-Direct

1   but I want to talk to you about sexually inappropriate behavior

2   while I'm sitting there in that room by myself for the last four

3   hours.  Is that your testimony?

4                    MR. ROSENBLATT:  Objection.

5                    THE COURT:  Is that what he said to you?

6                    THE WITNESS:  No, that's not what he said to me.

7                    THE COURT:  Okay.  Continue.

8                    MR. BANDELLI:  Thank you, Judge.

9       Q    So, he wanted to talk to you about this, right?  Is

10  that your testimony?

11      A    He said he felt bad about what had happened, and he

12  wanted to speak about it.

13      Q    Okay.

14           What did he say to you?

15      A    I asked him if he would make -- if he wanted to make a

16  written statement about what he wanted to tell me.  He indicated

17  that he did.

18      Q    Did you discuss what he was going to write on a piece

19  of paper before he wrote it down?

20      A    Other than asking him to -- after he agreed to make a

21  statement, again, I asked him to put his name and address on the

22  top which he did.

23      Q    Well, I thought, according to your testimony, in the

24  first interview he talked about the fair and that he slapped

25  her, you know, and then he wrote a statement.

Shulman-People-Direct

1          This time there was no conversation?  He just started

2    putting pen to paper.  Is that your testimony?

3       A    No, that's not what I said.

4       Q    Okay.

5          So, what did you discuss before he started writing it

6    down?

7       A    Again, I said, Your daughter made an allegation that

8    there has been inappropriate activity between you two, and do

9    you want to speak about it?

10         Again, he indicated, Yes, he did want to speak about

11   it, and he felt bad about what's been happening, and he wanted

12   to speak.

13      Q    So, what did he say?

14      A    At that point I asked him if he wanted to write out

15   what happened, and he said, "Yes."

16      Q    So, you didn't want to hear him speak when he said, I

17   want to speak?  You didn't want to hear what he had to say?

18      A    I asked him if he would be willing to write a

19   statement.  He said, Yes.  I afforded him a pen and paper to do

20   that.

21      Q    You just said you asked him to speak about his

22   daughter's allegations, correct?

23      A    Yes.

24      Q    He said he wanted to speak about it.  What did he say?

25         MR. ROSENBLATT:  Objection.

Shulman-People-Direct

1      THE COURT:  Sustained.

2      Q    So, you went back in there this time, and you had a pad

3  with you, too, right, or did you leave the pad behind when you

4  left?

5      A    No.  I'm sure I brought it with me and brought it back

6  with me.

7      Q    So, you came back with the pad, and you had a pen,

8  right?

9      A    Yes.

10      Q    You told Mr. Gopaul, Don't speak about it.  Just write

11  it down, right?

12          MR. ROSENBLATT:  Objection, Judge.  Asked and

13      answered.

14          THE COURT:  Sustained.

15      Q    I notice at the top it says, "I, Harold Gopaul, am

16  writing this" -- excuse me.  "I, Harold Gopaul, is writing this

17  of my own free will."

18          Did you tell him to say that?

19      A    No.

20      Q    So, he just decided on this particular statement,

21  unlike the first statement, to say "I am writing this of my own

22  free will"?

23      A    What's your question, Counselor?  I don't understand

24  the question.

25      Q    Well, on the first statement we just went over he

Shulman-People-Direct

1    didn't say at the very top, "I'm writing this of my own free

2    will," but on the second statement it starts off, "I, Harold

3    Gopaul, is writing this of my own free will."  Did you tell him

4    to say that?

5         A    No, I did not.

6         Q    So, he just decided on his own to add this to this

7    particular statement; is that correct?

8                   MR. ROSENBLATT:  Objection.

9                   THE COURT:  Sustained.

10        Q    He goes on and he gives the statement that was read

11   into evidence by you and talks about needing help, how something

12   horrible happened.  Did you tell him to say, You know what?  If

13   you tell me you need help, they are going to go easier on you?

14   Did you tell him that?

15        A    No, I did not.

16        Q    You didn't tell him that?

17        A    No, I did not.

18       · Q    Did you tell him, You know what?  If you don't write

19   this down, Mr. Gopaul, I'm going to send you away for 20 years?

20   Did you tell him that?

21        A    No, I did not.

22        Q    He is just writing away about what happened between him

23   and his daughter, and he needs help; is that correct?

24        A    He wrote down what he wanted to write down.  I can't

25   account for what was going through his mind.

Shulman-People-Direct

1    Q    So, he gives this whole statement, and then in the last

2    line he says, "Sana Awan is the person I am talking about,"

3    right?

4         You knew he was talking about Sana Awan, right?  The

5    whole question and answering, the whole talk, the whole thing

6    was about Sana Awan, right?  Correct?

7    A    To my knowledge.

8    Q    You were there --

9         MR. ROSENBLATT:  Objection.

10   Q    -- correct?

11        THE COURT:  Overruled.

12   A    I knew what case I was investigating.  Again, I can't

13   account for what is going through Mr. Gopaul's mind at any given

14   moment.

15   Q    Did you expect that Harold Gopaul was talking about

16   some other person he was having an inappropriate relationship

17   with?

18   A    I didn't write the statement.  He wrote the statement.

19   He chose his words however he chose his words.

20   Q    So, his words were he tells the whole thing, and then

21   at the end he says, "Sana Awan is the person I'm talking about."

22   I guess he just wanted to clarify it.  Is that what it was?

23        MR. ROSENBLATT:  Objection.

24        THE COURT:  Sustained.

25   Q    You told him what to write in this statement; didn't

Shulman-People-Direct

1   you?

2       A    No.

3       Q    Of course you did.  You went in there with the

4   paperwork.  You interviewed Sana.  You said, Look.  You are

5   done.  You are going to jail.  I'm putting you away for 20

6   years.  You better say what I want you to say; otherwise, it's

7   over; isn't that true?

8                MR. ROSENBLATT:  Objection.

9                THE COURT:  Overruled.

10      A    No, that's not what I said to him.

11      Q    Isn't it true that you told him if he gave a statement

12  he would be able to leave?  He would be able to go home.  He

13  wouldn't go to jail.  Isn't that true?

14      A    No, that's not true.  I had already come in and asked

15  him if he knew why he was under arrest.  So, how would I come

16  in, say to somebody, You are going to go home, if I already said

17  he was under arrest.

18      Q    He told you why he was there in the first place with

19  the fair, and then all of a sudden two hours later he is talking

20  about a whole other thing.  How did that happen?

21                MR. ROSENBLATT:  Objection.

22                THE COURT:  Sustained.

23      Q    Did you videotape this statement?

24      A    No, I did not.

25      Q    At some point my client's wife showed up at the

Shulman-People-Direct

1    precinct, Jenny Gopaul; is that correct?

2        A    I don't know her first name, but Mrs. Gopaul at some

3    point was at the precinct somewhere during the course of the

4    day.

5        Q    That was at around 8:00 in the morning; wasn't it?

6        A    I don't know what time of day she got there.  I know

7    some point that day I spoke to her.

8        Q    Well, did somebody notify you when Miss Gopaul got at

9    the precinct?

10       A    I don't recall being told specifically like she just

11   got here or anything like that.

12       Q    How did you learn she was at the precinct?

13       A    At some point during the course of the day somebody

14   told me she was there, and I went and had a conversation with

15   her.

16       Q    Who?

17       A    I don't recall.

18       Q    You don't know who told you the mother of the victim,

19   the wife of the accused, when she got there, you have no idea

20   who told you that?

21            MR. ROSENBLATT:  Objection.

22            THE COURT:  Sustained.

23       Q    So, you wouldn't know then if in fact his wife was at

24   the precinct at 8 o'clock in the morning; is that correct?

25            MR. ROSENBLATT:  Objection.

Shulman-People-Direct

1          THE COURT:  Sustained.

2     Q     Do you know or don't you?

3               MR. ROSENBLATT:  Objection.

4               THE COURT:  Sustained.

5     Q     Did you have another session with Mr. Gopaul after the

6  session where you took the statement that he was inappropriate

7  with her, where he identified her as the person he was

8  inappropriate with?

9               THE COURT:  Sustained as to the word "session."

10              MR. BANDELLI:  Judge, those were his words.

11              THE COURT:  Sustained as to the word "session."

12    Q     Did you interview my client again?

13    A     At the completion of that statement that you made

14 reference to, immediately following that statement, I then asked

15 him another question.

16    Q     Hold on.

17          That last statement was at 7:30, right -- in the

18 morning, right?  The last statement we were just going over, the

19 one where he identified his daughter as the person he was

20 inappropriate with, that was 7:30 in the morning, right?

21    A     That's when he started.

22    Q     When did it finish?

23    A     8:30 in the morning.

24    Q     It finished 8:30 in the morning?

25    A     Yes.

Shulman-People-Direct

1    Q    Immediately upon finishing that statement, you started

2  writing this statement because this is timed at 8:30.

3    A    Yes.

4    Q    You finished that statement you said.  Instead of

5  having it on that statement, you started a new statement right

6  after; is that your testimony?

7    A    Mr. Gopaul finished writing the statement he was

8  writing.  I had a question I wanted to ask him which wasn't part

9  of his written statement that I wrote down when it was asked.

10   Q    By who?  You asked it?

11   A    I asked it and I wrote down what question I asked and

12 what the answer I got in response was.

13   Q    Did you read his statement first before asking that

14 question?

15   A    I reviewed his statement, I signed it, and I noted the

16 time that I was completed reading it and signing it.

17   Q    When you finished reading his statement, you noticed

18 there was something that wasn't on the statement that was

19 important, right?

20   A    A question I wanted to ask, and I asked that question.

21   Q    So, your question at 8:30 in the morning, you wrote it

22 out, right?  You wrote out the answer, and then he signs off on

23 it; is that correct?

24   A    I asked the question orally.  He answered the question

25 orally.  I documented what question I had asked, what answer he

1   had replied.

2       Q    Did you write "question" before you asked the question

3   or after you asked the question?

4       A    I don't know if I asked it and then wrote down what I

5   just asked him or if I wrote it and then asked him.  I don't

6   recall in which order.  It was a matter of, you know, of a

7   couple of minutes of conversation.

8       Q    Well, you read the other statement over.  You see there

9   is something missing, and then you ask him a question about what

10  is missing, right?

11               MR. ROSENBLATT:  Objection.  Asked and answered.

12               THE COURT:  Sustained.

13      Q    And this isn't on videotape either; is it?

14      A    No.

15               MR. BANDELLI:  Thank you.

16      Q    When did you speak to my client's wife?

17      A    Sometime during the course of day of June 24.  I don't

18  know exactly what time of the day I spoke to her.

19      Q    Was it in the morning?

20      A    I don't believe it was in the morning.  It was -- I

21  believe it was sometime in the afternoon.

22      Q    Did you insult her when you spoke with her?

23      A    No.

24      Q    Didn't you say, How could you be married to a man like

25  this?

Shulman-People-Direct

1      A      No.

2      Q      You didn't.

3             At some point you notified the DA's office, correct?

4      A      Correct.

5      Q      When was that?

6      A      I don't know specifically what time it was.

7      Q      Is there anything that would refresh your recollection

8  with regard to that?

9      A      No.

10     Q      You didn't jot that down, Notified riding ADA at a

11 particular time, nowhere?

12     A      I don't know specifically what time the DA's office was

13 called.

14     Q      Well, how did you determine that you were going to

15 notify the DA?

16     A      Based on the nature of the allegations at hand, I made

17 a decision that we were going to reach out to the Special

18 Victim's Bureau of the DA's office and consult with them.

19     Q      How did you go about doing that?

20     A      I called the ADA squad that has in place an ability to

21 beep or reach out to a riding district attorney to have them

22 call us so we could provide them with information of an active

23 case.

24     Q      At what point in time did you make the determination

25 that you were going to reach out to them?

Shulman-People-Direct

437

```
 1        A    I'm sure early on in the hearing of the allegation of
 2   what the crime was I probably had in my head that I would reach
 3   out to them.
 4        Q    Did you reach out to them before you took the first
 5   statement from my client?
 6        A    I don't believe so.
 7        Q    Did you reach out to them before you took the second
 8   statement from my client?
 9        A    I don't believe so.
10        Q    Did you reach out to them before you took the third
11   statement from my client?
12        A    I don't believe so.
13        Q    What time did the DA's office actually show up, ADA
14   Rosenblatt and his colleague ADA Hughes, at the 105 Precinct?
15        A    I believe it was approximately 5 p.m.
16        Q    5 p.m.
17             You had finished questioning my client at 8:30 in the
18   morning, and they didn't show up for over eight hours later; is
19   that your testimony?
20        A    Yes.
21             THE COURT:  Sustained as to form.
22        Q    Where was Mr. Gopaul kept during that eight-hour
23   period?
24        A    He was in the interview room in my office unless he was
25   taking a bathroom break or something to that effect.
```

slf

Shulman-People-Direct

438

```
 1      Q     So, he sat in that same room all day, right?

 2      A     Except when he asked to have a break to use the

 3  restroom, yes.

 4      Q     So, from 5 o'clock in morning to 5:30 when the DAs show

 5  up, he is sitting in that room; is that correct?

 6      A     Say that again.

 7      Q     From 5:00 or 5:10 in the morning, from that point,

 8  until the time the DA's office showed up at 5:30, he is in that

 9  room, correct?

10      A     Except when he asked to use the restroom, yes.

11      Q     How many times did he ask to use the restroom?

12      A     I know of at least one.  I don't know the rest.

13      Q     With the exception of the one time he went to the

14  restroom, he was essentially in that room for 12 hours; is that

15  correct?

16      A     Unless he used other times to use the restroom.

17      Q     But you don't know.

18      A     Right.

19      Q     You said you can't testify about things you don't know,

20  right?

21                  MR. ROSENBLATT:  Objection.

22                  THE COURT:  Sustained.  Jurors, disregard it.

23                  Just ask questions, Mr. Bandelli.

24                  MR. BANDELLI:  One moment, your Honor.

25                  THE COURT:  Take your time.
```

slf

Proceedings

439

1            MR. BANDELLI:  Thank you, Judge.

2            Nothing further, Judge.

3            THE COURT:  Thank you.

4            MR. ROSENBLATT:  I have no further questions, your

5       Honor.

6            THE COURT:  Thank you.  You may step down,

7       Detective.

8            THE WITNESS:  Thank you, your Honor.

9            THE COURT:  Have a good day.

10           (Witness excused.)

11           THE COURT:  Counsel, approach, please.

12           (Side-bar discussion held off the record.)

13           THE COURT:  Ladies and gentlemen, I have some good

14      news for you.  The Court has to handle another matter, and I

15      think it's a good idea that we recess for the weekend now.

16      I hope you don't mind.

17           All right.  Remember, you are not to discuss this

18      case among yourselves or with anyone else.  If anyone tries

19      to discuss it with you, you are to bring it to my attention

20      immediately.  You are not to go by any locations that have

21      been mentioned so far, and you are not to form any opinion

22      as to whether or not you feel the defendant is guilty or not

23      guilty of the crimes with which he is charged.

24           Get home safely.  Enjoy the weather and your

25      weekend.  Come back Monday morning 9:30.  We will continue

Proceedings

1    with testimony in this case.

2              Thank you.  Follow the instructions of the court

3    officer.

4              (Panel of sworn jurors exits the courtroom.)

5              THE COURT:  Any matters before we recess for the

6    weekend, Mr. DA and Mr. Bandelli?

7              MR. BANDELLI:  Excuse me, Judge.  My client was

8    talking.

9              THE COURT:  Any matters before we recess?

10             MR. BANDELLI:  Absolutely not, Judge.  Have a nice

11   weekend.

12             THE COURT:  You, too.  9:45 Monday morning.

13             MR. ROSENBLATT:  I expect to have a full day.

14             MR. BANDELLI:  Could I ask who we can expect on

15   Monday?  Sunday night when I'm watching the ball game, I

16   know what I'm preparing for.

17             THE COURT:  Which ball game are you going to be

18   watching?

19             MR. BANDELLI:  I'm a Mets fan, not a Yankees fan.

20             MR. ROSENBLATT:  I'm not sure if the complainant

21   is going to be on Monday, but it's going to be both Aliotos,

22   the complainant, Police Officer Alfaro and potentially the

23   nurse, my next five witnesses.

24             THE COURT:  Is the complainant going to testify

25   Monday?

Proceedings

1      MR. ROSENBLATT:  I'm not sure if she is going to

2  testify Monday or Tuesday.

3      MR. BANDELLI:  She would be the last witness to go

4  on Monday?

5      MR. ROSENBLATT:  Again, it depends on a lot of

6  scheduling issues.

7      MR. BANDELLI:  I would just ask that he call me on

8  my cell phone.  I'll give him my cell phone over the

9  weekend.

10      THE COURT:  He has no obligation, but as a

11  courtesy, the complainant is a main witness.  If you let him

12  know if she is going to testify Monday or not, the Court

13  would appreciate it.

14      MR. BANDELLI:  Thank you, your Honor.  I

15  appreciate that.

16      THE COURT:  Please put Mr. Gopaul back in.

17          *              *              *

18      (Whereupon, the trial was adjourned to Monday,

19  July 12, 2010.)

20

21

22

23

24

25

slf

COPY

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF QUEENS:  CRIMINAL TERM, PART TAP-D
 2    -------------------------------------X
      THE PEOPLE OF THE STATE OF NEW YORK,
 3                                          Ind. No.
                                            2065/08
 4              -against-
                                            Jury Trial
 5    HAROLD GOPAUL,

 6                         Defendant.
      -------------------------------------X
 7

 8                              July 12,13,14,15,16, 2010
                                Queens Supreme Court
 9                              125-01 Queens Boulevard
                                Kew Gardens, New York 11415
10

      B E F O R E :
11          GREGORY L. LASAK,
                                Supreme Court Justice
12

13
      A P P E A R A N C E S :
14

      For the People:
15
            THE HONORABLE RICHARD A. BROWN,
16          District Attorney, Queens County
            BY: JARED ROSENBLATT, ESQ.
17          Assistant District Attorney

18
      For the Defendant:
19
      BY:  STANFORD BANDELLI, ESQ.
20
                                John Cardillo
21                              Gail Neufeld
                            Senior Court Reporters
22

23

24

25
```

jc

Proceedings                      443

```
 1                COURT OFFICER:  Coming out.
 2                THE CLERK:  Case on trial.  People versus Harold
 3      Gopaul.  Let the record reflect the defendant is before the
 4      Court.  Your appearances, please.
 5                MR. BANDELLI:  Stanford Bandelli on behalf of
 6      Harold Gopaul.  Good morning.
 7                MR. ROSENBLATT:  For the People, Assistant District
 8      Attorney Jared Rosenblatt.  Good morning Judge, can I step
 9      out for one moment before I call my first witness?
10                THE COURT:  You need some time?  Take ten minutes.
11                MR. ROSENBLATT:  I don't even time that much.  I
12      need two minutes.
13                (Pause in proceedings.)
14                COURT OFFICER:  Jury enterings.
15                (Whereupon, the jurors enter the courtroom and the
16      following occurred:)
17                THE CLERK:  Case on trial.  All parties present,
18      your Honor.  Do both sides stipulate that all jurors are
19      present and properly seated?
20                MR. ROSENBLATT:  Yes.
21                MR. BANDELLI:  Yes, your Honor.
22                THE COURT:  Good morning, ladies and gentlemen.
23                JURORS:  Good morning.
24                THE COURT:  Mr. DA, you may call your next witness.
25                MR. ROSENBLATT:  Your Honor, the People call Sana
```

jc

Proceedings                    444

1    Awan.

2              COURT OFFICER:  Witness entering.

3              S A N A    A W A N, having been called as a witness

4    by and on behalf of the People in this case, having first

5    been duly sworn was examined and testified as follows:

6              COURT OFFICER:  People call Sana Awan.  First name

7    S-A-N-A.  Last name.  A-W-A-N.  Resident of Queens County.

8              THE COURT:  You may proceed, Mr. DA.

9              MR. ROSENBLATT:  Thank you, your Honor.

10   DIRECT EXAMINATION

11   BY MR. ROSENBLATT:

12        Q    Sana, tell the members of the jury how old you currently

13   are.

14        A    Nineteen.

15        Q    What is your date of birth?

16        A    March 1st, 1991.

17        Q    Where were you born?

18        A    Bellerose, Queens.

19        Q    What county do you currently live in?

20        A    Queens.

21        Q    And who do you currently live with?

22        A    I live alone.

23        Q    Do you currently work?

24        A    Yes.

25        Q    And do you currently go to school?

jc

Sana Awan - People - Direct                    445

1    A    Yes.

2    Q    Where do you go to school?  What area?

3    A    Queens.

4    Q    What level of school are you at?

5    A    College.

6    Q    And what year are you in college?

7    A    Going to be a Sophomore.

8    Q    I want to talk to you just about your family life prior

9  to June 23rd, 2008.  Prior to June 23rd, 2008, where did you

10  live?

11   A    In Bellerose.

12   Q    And is that here in the County of Queens?

13   A    Yes.

14   Q    And when you were living back in Bellerose prior to June

15  of 2008, was that on 89th Avenue?

16   A    Yes.

17   Q    Do you remember your address?

18   A    Yes.

19   Q    Tell the members of the jury where you used to live in

20  Bellerose.

21   A    242-10 89th Avenue.

22   Q    What type of home is that?

23   A    Private.

24   Q    When you lived in Bellerose prior to June 23rd of 2008,

25  who did you live with?

1   A   My mom, my step-father, my brother and sister.

2   Q   What was your mom's name -- or what is your mom's name?

3   A   Merlyn Ali Gopaul. Jennie.

4   Q   Jennie was her nickname?

5   A   Yes.

6   Q   And you told us that you have siblings.

7   A   Yes.

8   Q   What are their names?

9   A   Caitlin Gopaul and Darien Gopaul.

10  Q   And since June 23rd, 2008, do you have regular contact

11  with your siblings?

12  A   No.

13  Q   Do you have regular contact with your mother?

14  A   No.

15  Q   Merlyn or Jennie Gopaul, is that your biological mother?

16  A   Yes.

17  Q   Was there a man that lived in your house prior to

18  June 23rd, 2008?

19  A   Yes.

20  Q   What was his name?

21  A   Harold Gopaul.

22  Q   Do you see Mr. Gopaul in the courtroom today?

23  A   Yes.

24  Q   Can you point to him and identify him by an article of

25  clothing he is wearing?

Sana Awan - People - Direct                    447

1       A     The red tie.

2             MR. BANDELLI:  Judge, indicating my client.

3             THE COURT:  The record will indicate the witness

4       has identified the defendant.

5       Q     What was your relationship, if any, to the defendant?

6       A     He was like my father figure.

7       Q     Approximately how old were you when he began living with

8       you and your mom, if you remember?

9       A     I think I was three.

10      Q     And since the age of three until June 23rd, 2008, did

11      the defendant live with you?

12      A     Yes.

13      Q     Can you describe what his role was in your life up until

14      June 23rd, 2008?

15            MR. BANDELLI:  Objection, your Honor.

16            THE COURT:  Overruled.

17      A     He was like the provider of the family.

18      Q     What does that mean?

19      A     He was the only one with a job.

20      Q     And what role -- withdrawn.

21            You told us that you also lived with your mom.

22            Can you describe what your relationship was with your

23      mother prior to June 23rd, 2008?

24      A     I wasn't that close with her.

25      Q     What do you mean by that?

                                    jc

Sana Awan - People - Direct                    448

1              MR. BANDELLI:  Objection, your Honor.

2              THE COURT:  Overruled.

3      A     I couldn't really confide in her. I didn't really tell

4      her things.  She never asked.

5      Q     How about your relationship with your father up until

6      May of 2005?

7              MR. BANDELLI:  Objection, your Honor, what is the

8      relevance?

9              THE COURT:  Overruled.

10     A     I was closer to him, and he was the one that would ask

11     about my school and how I was doing.

12     Q     How did you refer to Harold Gopaul up until June 23rd,

13     2008?

14     A     Dad.

15     Q     Was he somebody that you trusted?

16             MR. BANDELLI:  Objection, your Honor, leading.

17             THE COURT:  Sustained.

18     Q     Can you describe what role he played in your home life?

19             MR. BANDELLI:  Objection, your Honor.

20             THE COURT:  Overruled.

21     A     Regarding?

22     Q     What was his role inside the home to you prior to

23     June 23rd, 2008?

24     A     My father.

25     Q     And can you describe his role in regards to your

                              jc

Sana Awan - People - Direct                449

1    schoolwork?

2        A     He was pretty strict.

3        Q     What does that mean?

4        A     He made sure I handed in everything on time, made sure

5    my work was done.

6        Q     And did your mother play a role in that?

7        A     No.

8        Q     What was his role in regards to rules imposed in the

9    house?

10       A     He was strict with that too.

11       Q     What do you mean by that?

12       A     I wasn't allowed to go anywhere after school except like

13   clubs in school.  I never -- like I couldn't go out with my

14   friends.  He was strict.

15       Q     Can you describe what his role was in your social life

16   prior to June 23rd, 2008?

17             MR. BANDELLI:  Objection.

18             THE COURT:  Overruled.

19       A     Like I said, strict.

20       Q     I want to talk to you -- I want to turn your attention

21   rather to around May of 2005.  In the month of May of 2005, what

22   grade were you in?

23       A     Eighth.

24       Q     And how old were you in May of 2005?

25       A     Fourteen.

1      Q    Did there come a point in time, when you were 14, around

2    May of 2005 when your relationship changed with the defendant?

3      A    Yes.

4      Q    Can you describe for the members of the jury how that

5    relationship changed?

6      A    Do you want me to describe the incident?

7      Q    Yes.

8      A    In the mornings when I would be in the bathroom he would

9    come in and he started touching me.

10     Q    Let me stop you there.

11          I want to talk to you specifically about the first

12   incident that ever happened.

13          Do you remember approximately what months it occurred

14   between?

15     A    Between May and June.

16     Q    Between May and June of 2005?

17     A    Yes.

18     Q    Can you describe for the members of the jury the first

19   time that this happened where your relationship changed?

20     A    The bathroom door was unlocked, because we only have one

21   bathroom in the house.  I was taking a shower.  When I came out

22   he pulled off my towel.  He told me to sit on the hamper, and

23   then, he put his mouth to my vagina.

24     Q    I want to back up.  When you come out of the shower, did

25   you observe him in the bathroom?

Sana Awan - People - Direct                451

1      A     Yes.

2      Q     And where in the bathroom was he?

3      A     On the toilet.

4      Q     What was he doing on the toilet?

5      A     Using the bathroom.

6      Q     And when he finished using the toilet, what were you

7   doing?

8      A     Coming out of the shower.

9      Q     And you told us that you had a towel on.

10     A     Yes.

11     Q     What happened to the towel?

12     A     He took it away from me.

13     Q     What did he do with it?

14     A     He hung it back on the rack.

15     Q     When he removed the towel from your body, did you have

16  any clothes on underneath the towel?

17              MR. BANDELLI:  Objection, leading, your Honor.

18              THE COURT:  Overruled.

19     A     No.

20     Q     When he removed the towel, were you completely naked?

21     A     Yes.

22     Q     What did he say to you when he removed the towel?

23     A     I remember him saying to come over, and every time he

24  made like --

25              MR. BANDELLI:  Objection, your Honor.

jc

Sana Awan - People - Direct                    452

1                    THE COURT:  Overruled.

2     A     -- made any noises he would tell me to hush.

3     Q     What type of noise did you make that he told you to

4     hush?

5     A     I told him to stop.

6     Q     When you told him to stop, where was his hands?

7     A     He was putting --

8                    MR. BANDELLI:  Objection, your Honor, leading.

9                    THE COURT:  Overruled.

10    A     Putting me onto the hamper.

11    Q     When you say putting you onto the hamper, how was he

12    doing that?

13    A     He pushed me back so I would sit.  He had his hands on

14    my legs.

15    Q     Did he say anything to you when his hands were on your

16    legs?

17    A     Told me to behave.

18                   THE COURT:  What did you say?

19                   THE WITNESS:  Behave.

20    Q     When he told you to behave, what did you do?

21    A     I listened.

22    Q     When you were on the hamper and his hand was on your

23    legs, where was his body?

24    A     In front of me.

25    Q     And how was he positioned in front of you?

Sana Awan - People - Direct                    453

1     A    He was like bent down in front of me.

2     Q    Were his knees touching the ground?

3     A    Yeah.

4              MR. BANDELLI:  Objection, leading, Judge.

5              THE COURT:  Try not to lead the witness.

6     Q    Were his knees touching the ground?

7              MR. BANDELLI:  Objection.

8     A    Yeah.

9              MR. BANDELLI:  Leading, Judge.

10    Q    Where were his knees?

11    A    On the ground.

12    Q    And when you're on the hamper and his knees are on the

13    ground, what did he do?

14    A    Put his mouth to my vagina.

15    Q    Can you describe the position of your legs when you were

16    on the hamper?

17    A    He is holding them open with his hands.

18    Q    When he was holding your legs open, what were you doing?

19    A    I just sat there and I was pushing his head away with my

20    hands.

21    Q    How did you try that?

22    A    I was pushing his head away.

23    Q    And when you tried to push his head away, what did he

24    do?

25    A    He continued.

                                    jc

Sana Awan - People - Direct                454

1     Q     And when you were trying to push his head away, did his

2     mouth remain on your vagina?

3     A     Yes.

4                 MR. BANDELLI:  Objection, your Honor, leading.

5                 THE COURT:  Overruled.

6     A     Yes.

7     Q     Did he say anything to you when his mouth was on your

8     vagina?

9     A     No.

10    Q     When you came out of the shower you and you were

11    completely nude did his hand touch any other parts of your body?

12    A     My breast.

13    Q     Can you describe to the members of the jury how that

14    happened?

15    A     He was -- when he was putting me to sit back on the

16    hamper, he was touching my breast.

17    Q     And when his hands touched your breasts, what did you

18    do?

19    A     I moved my hands over them.

20    Q     And when you did that, did the defendant say anything to

21    you?

22    A     Told me to behave.

23    Q     At some point after his knees were on the ground and his

24    mouth was touching your vagina, did he get up?

25    A     Yeah.

jc

Sana Awan - People - Direct                    455

1    Q    And what did he say to you when he got up from the

2  ground --

3              MR. BANDELLI:  Objection, your Honor.

4    Q    -- if anything?

5              THE COURT:  Overruled.

6    A    Nothing.

7    Q    Did you say anything to him?

8    A    No.

9    Q    That time, sometime between May and June of 2005, when

10  this happened, do you remember the exact date?

11   A    No.

12   Q    Do you remember the approximate time of the incident?

13   A    The morning.

14   Q    And do you remember where -- withdrawn.

15        Do you remember whether it was a weekday or a weekend?

16   A    Weekday, because it was before school.

17   Q    When you say the morning, what were you doing in the

18  bathroom in the morning on that weekday?

19   A    Getting ready, showering, getting ready for school.

20   Q    Where was your mother, if you are aware, when you were

21  in the bathroom?

22   A    In her room sleeping.

23   Q    And your brother Darien, where was he?

24   A    In the room with her, sleeping.

25   Q    Your sister Caitlin, where was she?

jc

Sana Awan - People - Direct                456

1    A     Sleeping at that time.

2    Q     Can you tell the members of the jury when he was doing

3    those things to you in the bathroom how you felt?

4              MR. BANDELLI:  Objection, your Honor.

5              THE COURT:  Overruled.

6    A     I was scared.

7    Q     Sana, this incident that you described, the first

8    incident that he ever put his mouth on your body, did it

9    continue?

10   A     Yes.

11   Q     And was this the only time that his hand touched your

12   breasts?

13   A     The only time?

14   Q     Between May of 2005 until 2008 is that the only time his

15   hands touch your breasts?

16             MR. BANDELLI:  Objection, your Honor.

17   A     No.

18             THE COURT:  Overruled.

19   Q     Did that continue as well?

20   A     Yes.

21   Q     I want to turn your attention to September of 2005.  It

22   was the beginning of a new school year.  Do you remember what

23   grade you were starting?

24   A     Ninth.

25   Q     And was that in the same school or a different school

Sana Awan - People - Direct                    457

1    than eighth grade?

2       A    A different school.

3       Q    When and what high school was that?

4       A    Queens High School of Teaching.

5       Q    When you began Queens High School For Teaching, in

6    September of 2005, between September of 2005 and the end of

7    December, 2005, did the defendant continue to put his mouth on

8    your vagina?

9       A    Yes.

10      Q    Did he continue to touch your breasts?

11      A    Yes.

12      Q    Did those acts continue in January of 2006?

13      A    Yes.

14      Q    Did they continue through the summer of 2006?

15           MR. BANDELLI:  Judge, I am going to object,

16      because --

17           THE COURT:  Are you objecting?

18           MR. BANDELLI:  I am objecting.

19           THE COURT:  Would you like a side bar?

20           MR. BANDELLI:  Sure.

21           THE COURT:  Come on up.

22           (Whereupon, there was a sidebar discussion at the

23      bench between the Court and Counsels on the record.)

24           MR. BANDELLI:  On the indictment the Prosecution

25      charges one act for each four-month period.  And now, he is

                                jc

Sana Awan - People - Direct                    458

1      asking the witness whether or not the acts continued after

2      the initial period with you.  He is not specifying the amount

3      of times.  I am suggesting to the jury that it happened more

4      than one time than what was alleged in the indictment.  There

5      has to be more specificity.

6                  THE COURT:  Sustained.

7                  MR. ROSENBLATT:  Judge, under the endangering count

8      it is a continuing course of crimes.

9                  THE COURT:  You can't make it look like it is

10     happening every day.

11                 MR. ROSENBLATT:  Judge, most respectfully --

12                 THE COURT:  Was it happening every day?

13                 MR. ROSENBLATT:  No, I didn't ask her if it

14     happened every day.  I asked her if it continued.

15                 THE COURT:  Did you ask the frequency?

16                 MR. ROSENBLATT:  I will ask the frequency.

17                 THE COURT:  How often?

18                 MR. ROSENBLATT:  I can do that but certainly it

19     doesn't imply that it happened daily, and if that is the

20     objection he is certainly free to cross examine on that.

21     That is not the implication at all.

22                 THE COURT:  What is the implication of your

23     question how often is this happening?

24                 MR. ROSENBLATT:  I am going to ask her if she can

25     remember specifically any specific incidents between these

Sana Awan - People - Direct                459

1    time periods, and I think she is going to tell the Court, no,

2    she didn't.  At which point I am going to continue.

3              THE COURT:  It happened once every four months.

4              MR. BANDELLI:  That is what --

5              MR. ROSENBLATT:  No.

6              MR. BANDELLI:  That is what they alleged in the

7    indictment.

8              THE COURT:  How often did it happen?

9              MR. ROSENBLATT:  She is going to say it happened

10   every few weeks.

11             MR. BANDELLI:  We got a real problem here.

12             MR. ROSENBLATT:  We are not going to have a real

13   problem.  The counts going to the jury are not going to

14   charge one specific act.

15             MR. BANDELLI:  You can't raise prior uncharged

16   crimes before the jury like this.  I move for a mistrial.

17             MR. ROSENBLATT:  It is charged under the

18   endangering charges.

19             MR. BANDELLI:  I move for a mistrial.

20             THE COURT:  Application for a mistrial is denied.

21   I don't want this jury to think this was happening every day.

22             MR. BANDELLI:  No problem.  I will continue on,

23   Judge.

24             THE COURT:  Continue.

25             (Side bar over.)

jc

Sana Awan - People - Direct                    460

1        MR. ROSENBLATT:  May I proceed, your Honor?

2        THE COURT:  Yes, you may.

3   Q    Sana, between January of 2006 and April 30th of 2006,

4   did the defendant's mouth touch your vagina on one time -- one

5   date inside your home in Bellerose?

6   A    Yes.

7   Q    And between May through the end of August of 2006 on one

8   date, did he continue on one date to put his mouth on your

9   vagina?

10  A    Yes.

11  Q    And did it continue on one date from September through

12  the end of September of 2006 when you started the 10th grade?

13       MR. BANDELLI:  Objection to the use of the language

14   did it continue.

15       THE COURT:  Overruled.

16  A    Yes.

17  Q    And between January of '07 through April of 2007 on one

18  date, did the defendant force his mouth on your vagina?

19  A    Yes.

20  Q    And did his hand touch your breasts on one date during

21  that time period inside your home in Bellerose?

22  A    Yes.

23  Q    Through May and August of 2007 and through September and

24  December of 2007, on one date during both of those time periods

25  when you were in 11th -- when you were finish being 10th grade

jc

Sana Awan - People - Direct                461

1    and starting 11th grade, did his mouth touch your vagina?

2              MR. BANDELLI:  Objection.  What time periods is he

3        talking about?

4              THE COURT:  He said May to August 2007, September

5        to December 2007.

6              MR. BANDELLI:  And the question is did it happen

7        one time during each of those periods?

8              THE COURT:  That's what your question was, wasn't

9        it, Mr. DA?

10             MR. ROSENBLATT:  Yes, it was, your Honor.

11   A    Yes.

12   Q    Sana, as you sit here today, do you remember any

13   specific act between 2006 through 2007 of the defendant

14   committing a sex act on you?

15   A    Yes.

16   Q    Can you tell the members of the jury about the specific

17   act you remember between '06 and '07?

18             MR. BANDELLI:  Objection, between when in '06 and

19       when in '07?

20             MR. ROSENBLATT:  I'll withdraw the question.

21             THE COURT:  Can you narrow it down to months?

22   Q    Can you remember a specific time period, a month, that

23   it occurred in?

24   A    In the summer.  So May.

25   Q    And was that May of '07?

jc

Sana Awan - People - Direct                    462

1    A    Well, May of '06.

2    Q    May of '06 you remember?

3    A    Yes.

4    Q    Tell the members of the jury what you remember in May of

5    2006.

6    A    I was in my room, and he came in and told me to lay down

7    on the bed, and he took my pants off, and he put his mouth to my

8    vagina.

9    Q    When he told you to take your pants off on this day you

10   are describing in May of 2006, what did he say to you?

11   A    I don't remember him saying anything.  He just told me

12   to hush.

13   Q    When he removed your pants, what did you do?

14   A    I tried to fight back.

15   Q    How did you do that?

16   A    Pushing him away.

17   Q    When you tried to push him away in May of 2006, what did

18   he do?

19   A    He continued.

20   Q    Continued what?

21   A    To do what he was taking off my pants.

22   Q    Did his hand touch anywhere on your body?

23   A    Yeah.

24   Q    What part of your body did his hand touch?

25   A    My legs, because he was holding them open, and my

Sana Awan - People - Direct                    463

1     breast.

2     Q    And ultimately on that date in May that you remember in

3     2006, his mouth touched your vagina?

4     A    Yes.

5          MR. BANDELLI:  Objection, your Honor, leading.

6          THE COURT:  Overruled.

7     Q    I'm sorry.

8     A    Yes.

9     Q    And that's the address -- withdrawn.

10         What was the location of where that occurred?

11    A    The Bellerose address.

12    Q    The one you described earlier.

13    A    Yes.

14    Q    As you sit here today, do you remember any specific

15    other acts and the specific dates that they occurred between '06

16    and '07?

17    A    It happened many times.  So --

18         MR. BANDELLI:  Objection, your Honor.

19         THE COURT:  What's the basis of your objection?

20         MR. BANDELLI:  This isn't what is alleged in the

21    indictment, Judge.

22         THE COURT:  Overruled.  Overruled.

23    Q    I want to turn your attention now to the time period

24    between January and February of 2008.

25         During that time period between January and February of

                                    jc

Sana Awan - People - Direct                    464

1    2008, were you still living in Bellerose?

2        A    Yes.

3        Q    And was your brother, your sister and your mother still

4    living there, as well?

5        A    Yes.

6        Q    During that time period, do you remember an incident

7    that occurred on one date inside your home in Bellerose with

8    your step-father?

9        A    Yes.

10       Q    Can you tell the members of the jury about that

11   incident?

12       A    I was downstairs doing homework, and there was a front

13   room at the computer.  It is next to the living room, and when I

14   was done I was going upstairs, and my step-father was watching

15   porn downstairs, and he told me -- he didn't let me go upstairs.

16   He told me to sit down, and then, he tried to make me watch it,

17   and then, he took off my pants, and he made me sit on his lap

18   and he was touching me.

19       Q    I just want to back up.

20            This incident that you remember, between January and

21   February of 2008, that is between January 1st and the end of

22   February 2008, do you remember what day -- what specific day it

23   was?

24       A    It was a weekday.

25       Q    And do you remember what time of day it was?

                                    jc

Sana Awan - People - Direct                    465

1     A     Around eight.

2     Q     Sometimes in the a.m. or the p.m.?

3     A     P.m.

4     Q     Sometime in the evening on a weekday?

5     A     Yes.

6     Q     When you told us earlier that he didn't let you go
7   upstairs.  Can you describe for the jury what he did to prevent
8   you from going upstairs?

9     A     He grabbed my hand and he told me to sit down, and he
10  was showing me what was on the TV, and I kept turning away.  He
11  told me to sit down.  He was holding me on his lap.

12    Q     What did he say to show you what was on the TV?

13    A     He kept saying look, and turning my head towards it.

14    Q     Did he say anything about what was on the TV?

15    A     No.

16    Q     Did you see what was on the television?

17    A     Yeah.

18    Q     What was on the television?

19    A     He was watching porn.

20    Q     You told us earlier that he tried to make you watch it
21  and put you on his lap.

22          How did he do that?

23    A     He was holding me on his lap.

24    Q     And when he was holding you on his lap, what part of his
25  body touched what part of your body?

                              jc

Sana Awan - People - Direct                    466

1        MR. BANDELLI:  I am going to object and ask that

2    the prosecutor not repeat her answer every time he asks a

3    question.

4        THE COURT:  Overruled.

5    Q    When you were on his lap, what part of his body touched

6    what part of your body?

7    A    He touched my breast and vagina.

8    Q    And how did he do that?

9    A    Over and under my clothing.

10   Q    What part of his body touched your breasts?

11   A    His hands.

12   Q    And you said it was over and under the clothing?

13   A    Yeah.

14   Q    What part of his body touched your vagina?

15   A    Hands.

16   Q    Was that over or under the clothing?

17   A    Both.

18   Q    During this incident between January and February of

19   2008, at any point in time did his mouth touch your vagina?

20   A    Yes.

21   Q    Can you describe to the members of the jury how he did

22   that?

23   A    On the living room couch.

24        (At this time Gail Neufeld relieved John D.

25   Cardillo as the official court reporter of record.)

                              jc

1    DIRECT EXAMINATIÖN

2    BY MR. ROSENBLATT:

3        Q    You told us earlier that your birthday is March 1st.

4        A    Yes.

5        Q    Okay.  So I want to talk to you about after your

6    birthday in the month of March 2008.

7        A    Uh-huh.

8        Q    How old did you turn in March of 2008?

9        A    17.

10       Q    And do you remember your birth date, birth day in March

11   of 2008?

12       A    Yeah.

13       Q    Tell the members of the jury what happened on your

14   birthday in March of 2008.

15       A    My family and I went out to Hempstead to get cake.

16            When we came back and we --

17            MR. BANDELLI:  I am going to object to the

18       relevance.

19            THE COURT:  Overruled.

20       A    -- put it on a plate and they sang happy birthday to

21   me.

22            And then my stepfather told me to put on this outfit

23   that I got from someone in his family and we took pictures.

24       Q    Okay.  Can you describe the outfit that he asked you to

25   put on?

SANA AWAN - People - Direct                    468

1       A    It was a purple, like skirt and top.

2       Q    And when you say he asked you to take photos, can you

3  describe the photographs that he asked you to take?

4       A    He told me to put my leg up on the chair and push my

5  butt out.

6       Q    And did you do that?

7       A    Yeah.

8       Q    I want to talk to you about a specific date that you

9  remember in March of 2008 after your birthday in the dining

10 room.

11          Did an incident occur in the dining room between

12 March 1st and March 31st of 2008?

13      A    Yes.

14      Q    Can you describe that specific date that you remember

15 to the members of the jury?

16      A    It was late in the evening and he told me to come into

17 the dining room and he was, um, he was trying -- he was touching

18 me and I was trying to go upstairs.

19          And then he made me get down on the floor and he was

20 holding me down and he put his mouth on my vagina.

21      Q    Let's back up a moment.

22          I don't mean to be repetitive, but Sana, when you talk

23 about your stepfather, are you talking about the defendant?

24      A    Yes.

25      Q    And every time earlier you mentioned your stepfather,

gjn

SANA AWAN - People - Direct                469

1    you are speaking about the defendant?

2        A    Yes.

3        Q    On that evening that you remember in March of 2008 when

4    you were in the dining room, you said that he was touching you?

5        A    Yeah.

6        Q    Was anyone else present in the room?

7        A    No.

8        Q    Do you know where they were?

9        A    Upstairs.

10       Q    Approximately what time of day was it?

11       A    Late evening.

12       Q    And when you said that he was touching you, where was

13   he touching you?

14       A    With his mouth to my vagina and he was holding me down.

15       Q    Can you describe to the members of the jury what

16   happened right before that that led up to the incident that you

17   just described?

18            What were you doing in the dining room, if you

19   remember?

20       A    I don't remember what I was doing, but I was going

21   upstairs.

22       Q    And where was he?

23       A    Downstairs.

24            Well, we were in the living room, then he told me to

25   come into the dining room.

SANA AWAN - People - Direct                    470

1      Q    Did his hands touch any other parts of your body other
2  than what you described?
3      A    No.
4      Q    I want to talk to you about the time period,
5  specifically between April 1st and April 30th of 2008.
6           By the way, what grade were you in at that time?
7      A    2008, a junior.
8      Q    And this is the end of your junior year?
9      A    Yeah.
10     Q    And sometime between April 1st and April 30th, do you
11  remember a specific incident occurring with the defendant,
12  Mr. Gopaul, when your mother was outside gardening?
13     A    Yes.
14     Q    Can you describe to the members of the jury the
15  incident that you remember that occurred in April of 2008?
16     A    I was sent inside to get something.
17     Q    By who?
18     A    I'm not sure which one, but one of them sent me inside
19  to get something in the basement.
20          And I went downstairs to get it and he followed me
21  inside.
22          And when I was coming up by the stairs, the freezer was
23  there.  He told me to step up on the freezer and he put his
24  mouth to my vagina.
25     Q    I want to back up a moment.

gjn

1          When you went downstairs to the freezer, was -- did he

2     follow you down there?

3          A     Not directly.  After a little while.

4          Q     And when you got downstairs and he told you to get on

5     the freezer, what did you do?

6          A     I got on it.

7          Q     Did you say anything?

8          A     No.

9          Q     How come?

10               MR. BANDELLI:  Objection, your Honor.

11               THE COURT:  Sustained.

12         Q     Do you remember what type of clothes you were wearing;

13    pants or shorts?

14         A     No.

15         Q     Do you remember, you said at some point his mouth was

16    on your vagina?

17         A     Yeah.

18         Q     Do you remember how, whatever clothing you were

19    wearing, came off?

20         A     No.

21         Q     When he did that to you in April of 2008, did he say

22    anything?

23         A     Not that I remember.

24         Q     I want to talk to you about May of 2008.

25               In May of 2008, did you tell your parents?

1          MR. ROSENBLATT:  Withdrawn.

2     Q    Did you tell your father about a boy in school?

3     A    Yeah.

4     Q    Tell the members of the jury about what happened when

5  you told your father about a boy in school.

6     A    My daddy picked me up.  My stepfather picked me up

7  after school and saw me walk out with this other guy and he kept

8  asking me who it was.  And at first I said it was a friend, but

9  they kept asking, so then I said it was my boyfriend, and they

10 got upset and they yelled at me, and that's it.

11    Q    At some point after you admitted to your father and

12 your mother, was it --

13    A    Yeah, she was there too.

14    Q    About this boy -- How often did the defendant pick you

15 up from school?

16    A    Every day.

17    Q    And prior to you telling your father about this boy,

18 how often would he pick you up from school?

19    A    Two to three times a week.  When I have late, like

20 afterschool, when I was there late.

21    Q    And if you weren't?

22    A    I would take the bus home.

23    Q    So at some point when he began to pick you up every

24 day, did something happen with him in regards to -- in the car

25 when he picked you up from school?

gjn

SANA AWAN - People - Direct                    473

1        A     What was in the car?

2                 MR. ROSENBLATT:  Actually, withdrawn.

3                 My apologies, your Honor.

4        Q     I just wanted to back up a minute, Sana.

5              When you told them about the boyfriend, were there any

6     new rules imposed by your mother or your father?

7        A     They said that they didn't want me going to the class

8     anymore.  I told them that I couldn't drop out of it because

9     it's for credit.

10       Q     Do you remember what class that was?

11       A     Math.

12       Q     Did there come a point in time inside the car when your

13    father picked you up in May of 2008 that he said something to

14    you about -- something in the car?

15                MR. BANDELLI:  Objection, your Honor.

16                THE COURT:  Overruled.

17                MR. BANDELLI:  Leading.

18                THE COURT:  Overruled.

19       A     He didn't say it in the car.

20       Q     Where?  Tell the members of the jury --

21                MR. BANDELLI:  Objection, your Honor.

22                THE COURT:  Overruled.

23       Q     Tell the members of the jury what happened in May of

24    2008.

25                MR. BANDELLI:  Objection, your Honor.

gjn

SANA AWAN - People - Direct                    474

1              When in May of 2008?

2              THE COURT:  Overruled.

3    A    So there was a knife under the radio in his car.

4              THE COURT:  What did you say?  In the what?

5              THE WITNESS:  A knife.

6              THE COURT:  A knife.

7    A    And I saw it in the beginning of May.

8         Then one day I came downstairs in the morning to go to

9    school and he was sharpening it.  And when he came out, he said:

10   I bought this for you.  And he said that it could cut clean

11   through anything.

12        Then, after that, I always saw it in the car.

13   Q    And do you remember when in May this happened; on a

14   weekday or a weekend?

15   A    Weekday.

16   Q    And do you remember who was -- what part of May it was

17   that this happened?

18   A    A few days after I had told him I had a boyfriend.

19   Q    And was that in early May or late May?

20   A    Early May.

21             MR. ROSENBLATT:  Your Honor, I ask this be marked

22   People's Exhibit 7.

23             THE COURT:  It's marked as People's 7 for

24   identification only.

25             (Whereupon, the item referred to was marked for

1          identification as People's  Exhibit 7 by the Court

2          Reporter.)

3                    THE OFFICER:  People's 7 marked for ID only.

4          Q    Sana, if you can take a look at what's been marked as

5     People's Exhibit 7, please, for identification purposes.

6               Do you recognize that?

7          A    This (indicating)?

8          Q    Yes.

9          A    The knife in the car.

10         Q    And is that in the same or substantially the same

11    condition as the last time you saw it inside the defendant's

12    car?

13         A    Yes.

14                   MR. ROSENBLATT:  Your Honor, I would offer it into

15         evidence at this time as People's Exhibit 7.

16                   THE COURT:  Please show it to Mr. Bandelli.

17                   MR. BANDELLI:  One question, Judge.

18                   THE COURT:  You may proceed.

19                   MR. BANDELLI:  Good morning, Ms. Awan -- sorry,

20         Sana.

21    VOIR DIRE EXAMINATION

22    BY MR. BANDELLI:

23         Q    How do you know that's the same knife?

24         A    'Cuz it looks the same.  It's the same one I remember.

25         Q    It looks the same, but you don't know that it's exactly

gjn

1      the same knife, do you?

2          A     No.

3                    MR. BANDELLI:  Objection, your Honor.

4                    THE COURT:  Objection is sustained.

5      CONTINUED DIRECT EXAMINATION

6      BY MR. ROSENBLATT:

7          Q     Sana, I want to talk to you about May of 2008.

8                    Sometime in May, between May 1st and May 31, 2008,

9      after the incident in the kitchen that you described about the

10     knife sharpening, I want to talk to you about a specific date

11     where your father drove you to school, okay?

12                   In the month of May, what school were you going to,

13     again?

14         A     Queens High School of Teaching.

15         Q     And was that school in or about the area of 74-20

16     Commonwealth Boulevard?

17         A     Yes.

18         Q     And inside the car on the way to school in May of 2008,

19     on the morning, tell the members of the jury what happened in

20     regards to the knife you described earlier.

21         A     What day was this?

22         Q     Sometime in May of 2008, on the way to school.

23         A     We were on the way to school and there is like an

24     overpass right behind my school.  So he pulled over there and he

25     wanted me to perform oral on him.  And then I said no and then

1    he decided he would bargain with me.  He told me to kiss him

2    instead and I wouldn't have to do it.  So I did it and he said I

3    wasn't doing it right and he said he would cut off my finger

4    because I wasn't behaving.

5        Q    And after you kissed him in the car in May of 2008, did

6    he ask you to touch him in any way?

7        A    No.

8        Q    Did he touch you in any way?

9        A    Yeah.

10       Q    Okay.  Can you describe for the members of the jury

11   what happened in the car around Commonwealth Boulevard?

12       A    He was touching my breast.

13       Q    What did he say to you?

14       A    Nothing.  I don't remember him saying anything.

15       Q    And that Commonwealth Boulevard, that area near your

16   school; is that here in Queens?

17       A    Yes.

18       Q    Did his hand touch anywhere else?

19       A    No.

20       Q    I want to talk to you about May 14th of 2008.

21            Do you remember that specific date?

22       A    Yes.

23       Q    Tell the members of the jury what happened on May 14,

24   2008.

25       A    He picked me up after school and I had to go to work

1    with him.  So he drove out to this building on Commack Boulevard

2    or -- I mean Community Drive, and it's like a black glass

3    building.

4          He parked in the back and then he told me to lay down.

5    Q    Let me stop you there.

6          I want to talk about -- I want to talk about specific

7    statements that he made to you on May 14, 2008.

8    A    When we were leaving, he told me --

9          MR. BANDELLI:  Objection, your Honor.

10         THE COURT:  Approach the bench, please.

11         (Whereupon, a conference was held between all

12    counsel and the Court on the record at the side-bar.)

13         MR. ROSENBLATT:  Judge, I stopped her.

14         THE COURT:  You objected?

15         MR. BANDELLI:  Yes, I did.

16         THE COURT:  Okay.  What's the basis of your

17    objection?

18         MR. BANDELLI:  Whole host of reasons, Judge.

19         One, he is bringing up evidence of a crime that

20    was jurisdiction -- charged in another jurisdiction, that

21    was the basis for a conviction in another jurisdiction.

22         It will prejudice the jury in this matter too.

23         There is no -- there is no hearsay exception I can

24    think of that permits these statements to come in.  These

25    were allegedly made in May of 2008.  She didn't disclose the

1          crime until June of 2008.

2                          Those are the primary objections, Judge.

3                          THE COURT:  Testimony, what testimony are you

4          attempting to elicit from the witness?

5                          MR. ROSENBLATT:  The defendant promised to have

6          sex with her in one month.

7                          THE COURT:  Where was this statement made?

8                          MR. ROSENBLATT:  The statement is made in the car.

9                          THE COURT:  Where?

10                         MR. ROSENBLATT:  Somewhere between Community Drive

11         and Queens.  But the jurisdiction of the statement is

12         irrelevant to the fact it's an admission by the defendant.

13         A statement made by the defendant is not based on the

14         location in which it was made.

15                         THE COURT:  It's an admission of what?

16                         MR. ROSENBLATT:  An admission of -- by the

17         defendant.

18                         THE COURT:  Admission as to what?

19                         MR. ROSENBLATT:  It's an admission as to --

20                         THE COURT:  Admission as to what?

21                         MR. ROSENBLATT:  As to the endangering the welfare

22         of a child.  That's a continuing course, and it implies as

23         to the --

24                         THE COURT:  What testimony are you attempting to

25         elicit, that he said what to her?

SANA AWAN - People - Direct                    480

1          MR. ROSENBLATT:  On May 14th, he told her he

2    wanted to have sex with her, he wanted to be the first one

3    to have sex with her, and he made her promise he would be

4    the first one to do that.

5          THE COURT:  So you think that's an admission?

6          MR. ROSENBLATT:  Yes.

7          THE COURT:  Maybe a declaration of future attempt,

8    it's not an admission.

9          MR. ROSENBLATT:  Okay.  I believe it comes into

10   evidence, Judge.

11         On a side note, Judge, while we are up here, if

12   counsel is going to object as to this knife coming in, then

13   I am going to be forced to call the district attorney in

14   Nassau County who prosecuted this case to lay the proper

15   foundation.  She will say she introduced it into evidence

16   and held on to it.

17         Is that what he is seeking to do by making these

18   objections to the knife?

19         THE COURT:  Calm down, Mr. DA.

20         You haven't laid a proper foundation.

21         MR. ROSENBLATT:  Because it's a chain of custody

22   issue.

23         THE COURT:  This is not a chain of custody issue.

24         MR. ROSENBLATT:  Okay.

25         THE COURT:  You did not lay a proper foundation

1          about her identifying of the knife.

2                    There is no chain of custody issue on this knife.

3                    MR. ROSENBLATT:  Okay.

4                    THE COURT:  You are free to continue, but your

5          attempt to lay a foundation as to identification --

6                    MR. ROSENBLATT:  Okay.

7                    THE COURT:  But you're not going to bring any DA

8          from Nassau County in here.

9                    MR. ROSENBLATT:  Okay.

10                    THE COURT:  That's ridiculous, okay?

11                    As far as your objection, Mr. Bandelli, as to the

12          statement that the DA is attempting to elicit from this

13          witness, I will allow it.

14                    MR. BANDELLI:  Note my exception, Judge.

15                    THE COURT:  You have your exception.

16                    MR. BANDELLI:  It doesn't fall under any exception

17          I am aware of.

18                    THE COURT:  You have your exception.

19                    MR. BANDELLI:  Hearsay, your Honor.

20                    THE COURT:  You have your exception for the

21          record.

22                    (Whereupon, all parties returned from the sidebar

23          and the following took place:)

24     CONTINUED DIRECT EXAMINATION

25     BY MR. ROSENBLATT:

                                                  gjn

SANA AWAN - People - Direct                482

1      Q     Sana, back to where we left off before we approached

2   the judge.

3            On May 14, 2008, did you have a conversation with the

4   defendant?

5      A     Yes.

6                  MR. BANDELLI:  Objection, Judge.

7                  THE COURT:  Overruled.

8      Q     And I want -- specifically want to talk to you about

9   the conversation you had with him about his future plans with

10  you.

11           Do you remember that?

12                 MR. BANDELLI:  Objection, Judge.

13                 THE COURT:  Overruled.

14     A     Yes.

15     Q     Tell the members of the jury about that conversation.

16                 MR. BANDELLI:  Objection, Judge.

17                 THE COURT:  Mr. Bandelli, you have your exception

18     for the record.  I made my ruling.

19                 MR. BANDELLI:  I understand, Judge.

20                 THE COURT:  Proceed.

21     A     He made me promise to have sex with him in a month.

22     Q     What did he say to you?

23     A     He said, well, he asked me when I wanted to do it and I

24  said I don't know, and then he gave me -- he was like:  A week,

25  a month; so I said a month.

SANA AWAN - People - Direct                    483

```
 1      Q    Why did you say a month?

 2      A    Because it was the furthest away.

 3      Q    And when you said a month, what did he say to you?

 4      A    He said okay.  He asked if I was really promising.  I

 5  said, just, yeah.

 6      Q    Were you promising?

 7      A    No.

 8      Q    Did you want to have sex with him in a month?

 9      A    No.

10      Q    How did the conversation end?

11      A    That was it.  I didn't say anything else.

12      Q    I want to talk to you about this time period between

13  May 1st and May 31st of 2008.

14           Specifically I want to talk to you about an incident

15  inside your home during that month of May in the kitchen.

16           Calling your attention to that specific time, describe

17  to the members of the jury what happened inside your kitchen

18  during the month of May of 2008.

19      A    He called me into the kitchen and he went on his knees

20  and he told me to stay on my legs and he told me, well, I kept

21  moving my feet together and he kept saying:  Put this one over

22  here and he kept moving them apart.

23           THE COURT:  Sana, do me a favor, please slow down

24      a little bit, please.

25           THE WITNESS:  Okay.
```

gjn

SANA AWAN - People - Direct                    484

1              THE COURT:  Could you repeat that?

2              THE WITNESS:  He told me to spread my legs, and I

3    kept moving my feet together, so he was pulling my foot and

4    telling me where to put it and then he was going to perform

5    oral on me, but I kept moving to stop him.

6              And then he grabbed a kitchen utensil.  I think it

7    was a knife or a fork, and he said:  I'm going to stick this

8    up there if you don't behave, so I just listened and I let

9    him do it.

10   Q     Where were you before you were in the kitchen; do you

11   remember?

12   A     Downstairs.

13   Q     And when you entered the kitchen on this date in May of

14   2008, was the defendant in the kitchen?

15   A     No, he brought me into the kitchen.

16   Q     And what happened -- And when he brought you into the

17   kitchen, where did he put you in the kitchen?

18   A     We were standing right by the door against the wall.

19   Q     And when you say the kitchen, is this inside your home

20   in Bellrose?

21   A     Yes.

22   Q     When he was on his knees as you described earlier, what

23   part of his body touched what part of your body?

24   A     His mouth to my vagina.

25   Q     And during that incident in May of 2008 inside your

                                                            gjn

SANA AWAN - People - Direct                    485

1    home in Bellrose, did any part, any other part of his body touch

2    any part of your body?

3        A    No.

4        Q    I want to talk to you about the month of June of 2008.

5             You are finishing 11th grade?

6        A    Yeah.

7        Q    And school ends in June of 2008?

8        A    Yeah.

9        Q    As school is ending in June of 2008, I want to talk to

10   you about a specific time between June 1st and June 20th of 2008

11   inside your home in Bellrose.

12            Do you remember a specific date, a specific time in

13   June of 2008 with the defendant?

14       A    Yeah.

15       Q    Okay.  Describe that for the members of the jury.

16       A    Wait.  Which incident are you talking about?

17       Q    I am asking you:  Is the last time in June of 2008, the

18   last month, do you remember anything occurring on a weekend in

19   your bed in June of 2008?

20            MR. BANDELLI:  Objection.  Objection, leading.

21            THE COURT:  Overruled.

22       A    I was in my room.  It was in the morning.  My mom was

23   in the shower and he came to the room and tried touching me

24   under the covers.

25       Q    Was anyone --

1          MR. ROSENBLATT:  Well, withdrawn.

2     Q    You said your mother was in the shower?

3     A    (Nodding.)

4     Q    You have to answer yes or no.

5     A    Yes.

6     Q    And when he came into the bedroom, you said -- what did

7     he begin doing?  What part of his body, what part of his body

8     touched what part of your body?

9     A    His hands to my breast and vagina.

10    Q    Do you remember if he said anything?

11    A    No.

12         MR. BANDELLI:  Objection your Honor.

13         THE COURT:  Overruled.

14    Q    When he touched your breast and your vagina, did you

15    say anything to him?

16    A    No, I just kept moving around so I could stop him.

17    Q    What was the purpose of moving around?

18         MR. BANDELLI:  Objection, your Honor.

19         THE COURT:  Overruled.

20    A    I couldn't push him off.  The only thing I do, could

21    try to do, was cover myself.

22    Q    Were you successful in covering yourself?

23    A    No.

24    Q    And at some point, did his -- any part of his body

25    touch any part of your body other than his hands touching your

gjn

1    breast and your vagina?

2        A    No.

3        Q    I want to talk to you about June 14, 2008, that was one

4    month after the conversation about the promises he made you make

5    on June 14, 2008.

6             Did you engage in sexual intercourse with the

7    defendant?

8        A    No.

9        Q    Did anything happen the days following June 14th of

10   2008?

11       A    Well, I think there was a funeral or something so we

12   didn't have any time for him to do anything to me because we

13   were always with my mom.

14             MR. BANDELLI:  Objection, your Honor.

15             THE COURT:  Overruled.

16       A    So the next time that we went out there after school

17   was June 19th.

18       Q    Okay.  I only want to talk to you about the

19   conversation on June 19th of 2008.

20       A    Okay.  So then he said --

21             MR. BANDELLI:  Objection, your Honor.

22       A    He promised --

23             THE COURT:  Approach the bench, please.

24             (Whereupon, a conference was held between all

25   counsel and the Court on the record at the side-bar.)

Sidebar Conference                                   488

1          THE COURT:  What's the basis?

2          MR. BANDELLI:  Judge, there is an awful lot of

3   hearsay coming in.  It's being offered for the truth of the

4   matter asserted.  There is no exception that I am aware of

5   that any of this stuff would be come in.  I object, Judge.

6          THE COURT:  What testimony are you attempting to

7   elicit from this witness?

8          MR. ROSENBLATT:  This is a follow-up of the

9   conversation that occurred earlier.  He asks her if she

10  remembers the promise and then he tells her to pick a new

11  date, which leads into her running away to the Aliotos.

12         MR. BANDELLI:  There is nothing that establishes

13  the reliability or, you know, resolving any of the issues

14  that make hearsay objectionable in the first place.  I mean,

15  allowing stuff like this in that can't be substantiated in

16  any way, where time has passed.  I strongly object to this

17  line of questioning and I would ask that the jury be, you

18  know, that the other information be stricken from the record

19  at this point and the jury be charged.  None of this should

20  be coming in, Judge.

21         THE COURT:  What's the exception to the hearsay

22  ruling you are attempting to get this in under?

23         MR. ROSENBLATT:  It fits under the same objections

24  we discussed earlier, that it's both an admission and, as

25  your Honor pointed out, the defendant's future intent.

                                                      gjn

1           Additionally, I still submit to the fact that it

2    is an admission by defendant.

3           THE COURT:  Admission under what charge?

4           MR. ROSENBLATT:  Of the endangering.

5           THE COURT:  All right.  Going to take a short

6    recess now anyway.  Go ahead.

7           MR. ROSENBLATT:  Okay.

8           THE COURT:  Take a ten minute recess.

9           MR. ROSENBLATT:  Thank you, Judge.

10          MR. BANDELLI:  Thank you.

11          (Whereupon, all parties returned from the sidebar

12   and the following took place:)

13          THE COURT:  Members of the jury, we are going to

14   take a short recess to allow you to use the facilities.

15          Remember, you are not to discuss this case among

16   yourselves or with anyone else.  If anyone tries to discuss

17   it with you, you are to bring it to my attention.  You are

18   not to form any opinion as to whether the defendant is

19   guilty or not guilty of the crimes with which he is charged.

20          Please follow the instructions of the court

21   officer.

22          (Whereupon, the jury exited the courtroom and the

23   following occurred:)

24          THE COURT:  We will take a ten minute recess.

25          You may step down, ma'am.  Be back in ten minutes.

gjn

SANA AWAN - Proceedings                    490

1                      Please put the defendant back in.

2                      (Whereupon, the witness left the witness stand, a

3       recess was taken, after which the following occurred.)

4                      THE CLERK:  Case on trial.  All parties present,

5       your Honor.

6                      THE COURT:  Mr. DA.

7                      MR. ROSENBLATT:  Yes, your Honor.

8                      THE COURT:  I was looking at the 53rd count of

9       your indictment.

10                     MR. ROSENBLATT:  Yes.

11                     THE COURT:  I believe the testimony you elicited

12      from this witness was that she turned 17 on March 1st?

13                     MR. ROSENBLATT:  Yes.

14                     THE COURT:  2008?

15                     MR. ROSENBLATT:  Yes.

16                     THE COURT:  Your endangering count starts with

17      June 24, 2006 and goes to June 23, 2008.

18                     MR. ROSENBLATT:  Yes, it does, your Honor.

19                     I move to orally amend it to end on February 29,

20      2008.

21                     THE COURT:  Pursuant to?

22                     MR. BANDELLI:  Looking to dismiss -- that's not

23      how it went before the grand jury.

24                     THE COURT:  Pursuant to what section of the CPL?

25                     MR. BANDELLI:  I don't have the CPL in front of me

                                                        gjn

SANA AWAN - Proceedings                    491

1      right now.

2                  THE COURT:  No, I am asking the DA.

3                  MR. ROSENBLATT:  I don't have that in front of me

4      either, Judge.

5                  I can provide the case that you -- that states I

6      am permitted to amend it at this time.

7                  THE COURT:  All right.  I've sent the jury to

8      lunch.

9                  Tell them to come back -- officer, tell them to

10     come back at 2 o'clock.

11                 This will give you time, Mr. Bandelli, to read the

12     material that you subpoenaed.

13                 MR. BANDELLI:  Thank you, Judge.

14                 THE COURT:  And give you time, Mr. DA, to make

15     your motion to amend the indictment.

16                 And I will hear from both sides at 2 o'clock.

17                 MR. BANDELLI:  Thank you, Judge.

18                 THE COURT:  All right.  2 o'clock.

19                 (Whereupon, a luncheon recess was taken at this

20     time.)

21                        *         *         *

22                 A F T E R N O O N   S E S S I O N

23                        *         *         *

24                 (The following then occurred in open court out of

25     the presence of the jury:)

                                                        gjn

SANA AWAN - Proceedings                    492

1              THE CLERK:  Case on trial, People versus Harold

2      Gopaul.

3              All parties present, your Honor.

4              THE COURT:  Before we broke for lunch, Mr. DA, you

5      were talking about an application to amend the 53rd count of

6      the indictment?

7              (No response.)

8              THE COURT:  Mr. DA?

9              MR. ROSENBLATT:  Yes.  If I could just have one

10     moment, please, your Honor -- your Honor, please.

11             THE COURT:  Take your time.

12             MR. ROSENBLATT:  Thank you.

13             (There was a brief pause in the proceedings.)

14             MR. ROSENBLATT:  Yes, your Honor.

15             I have some case law here that provides that CPL

16     200.70 permits the People, upon motion to the Court on

17     notice to the defendant, either before or even during trial,

18     to amend the indictment.

19             I would note that in this case, even though the

20     statute indicates the wrong end date, the beginning date was

21     correct.

22             THE COURT:  That's the statute or the indictment?

23             MR. ROSENBLATT:  Sorry, the indictment indicates

24     the incorrect last date.

25             The statute provides that I am permitted, upon

                                                        gjn

1      motion to the Court, to amend the indictment.  Even though

2      the grand jury was given the wrong date, they were informed

3      as to the law as it applies to this case and they were

4      informed during the testimony that the complainant's date of

5      birth is March 1st; therefore, when they apply the facts of

6      the case to the law that I charged them in the grand jury,

7      the law does permit me to amend the indictment.

8                    THE COURT:  Amend it to what?

9                    MR. ROSENBLATT:  To end February 29, 2008.

10                   THE COURT:  Mr. Bandelli.

11                   MR. BANDELLI:  Judge, I am aware of the CPL

12     provision.  Normally, it's the DA who makes the application

13     on a motion to conform or to change the indictment.  You

14     know, the reality is it did come from the DA.  I can

15     normally ask --

16                   THE COURT:  The DA is making an application.

17                   MR. BANDELLI:  I understand.

18                   The other thing, Judge, is while I am permitted by

19     statute to request an adjournment to respond to this, I am

20     not going to do that, Judge.  I would like to go forward

21     with the trial.

22                   THE COURT:  So what is your position?

23                   MR. BANDELLI:  Well, I object, your Honor.

24                   THE COURT:  Okay.  People's application pursuant

25     to Criminal Procedure Law 200.70 to amend the 53rd count of

                                                          gjn

1    the indictment to read:  That the defendant, on or about and

2    between June 24, 2006 and, instead of June 23rd 2008 -- the

3    amended date would be February 29, 2008, to reflect the

4    testimony before the grand jury is granted.

5            The 53rd count will read as follows:  The

6    defendant, on or about and between June 24, 2006 and

7    February 29, 2008 in the county of Queens, knowingly acted

8    in a manner likely to be injurious to the physical, mental

9    or moral welfare of a child less than 17 years old.

10           Anything else?

11           MR. ROSENBLATT:  I have nothing else at this time,

12   your Honor.

13           THE COURT:  Mr. Bandelli?

14           MR. BANDELLI:  Not at this time, Judge.

15           THE COURT:  Thank you.

16           Please bring the witness in.

17           (Whereupon, the witness entered the witness

18   stand.)

19           THE COURT:  Bring in the jurors, please.

20           (Whereupon, the jury entered the courtroom and

21   upon taking their respective seats, the following occurred:)

22           THE CLERK:  Case on trial.  All parties present,

23   your Honor.

24           Both sides stipulate that all jurors are present

25   and properly seated?

1          MR. ROSENBLATT:  Yes.

2          MR. BANDELLI:  So stipulated, your Honor.

3          THE CLERK:  Ma'am, you are advised you are still

4     under oath.

5          THE WITNESS:  (Nodding.)

6          THE COURT:  Members of the jury, during the course

7     of the trial, there are times when legal issues must be

8     discussed outside your presence, and that's what occurred

9     before.  You were given a little extra time for lunch.

10         We will now continue with the testimony of Sana

11    Awan.

12         You may proceed your direct examination, Mr. DA.

13         MR. ROSENBLATT:  Thank you, your Honor.

14   DIRECT EXAMINATION

15   BY MR. ROSENBLATT:

16    Q    Sana, when we left off before lunch, you were telling

17   the jury about the days after June 14, 2008 at around June 19,

18   2008.

19         Do you remember that date?

20    A    Yes.

21    Q    Okay.  I wanted to talk to you specifically about a

22   conversation that you had with the defendant on June 19th,

23   around that date.

24         MR. BANDELLI:  Objection, your Honor.

25         THE COURT:  Basis for your objection?

                                                      gjn

1            MR. BANDELLI:  It's hearsay, Judge.

2            THE COURT:  Overruled.

3      Q    Can you tell the jury about a conversation that you had

4   with the defendant on June 19, 2008 about the promise that he

5   asked you to keep on May 14, 2008?

6      A    He asked me if I remembered my promise.  I said yes,

7   and he said how long has it been.  And I said five days.  And

8   then he said, so when are you going to do it, and I said, I

9   don't know, and then he said, well, you have to pick a date this

10  week, so I said Friday.

11     Q    And why did you pick Friday?

12     A    Because it was the end of the week and I figured -- it

13  was the end of the week.

14     Q    And that was a promise -- excuse me -- that was a

15  conversation that you had on June 19, 2008?

16     A    Yes.

17     Q    And that Friday, what day was that?

18     A    27th?

19     Q    Okay.  I want to talk to you about a few days after

20  June --

21            MR. ROSENBLATT:  Withdrawn.

22     Q    Between June 1st of 2008 and June 20, 2008, did the

23  defendant continue to drive you to school?

24     A    Yes.

25     Q    Okay.  And approximately how many days a week would the

1    defendant drive you to school?

2        A    Five.

3        Q    And how many days would he pick you up?

4        A    Five.

5        Q    Prior to the incident that you described with your

6    boyfriend, approximately how many days a week would the

7    defendant drive you to school, about?

8        A    Three.

9        Q    And how many days, approximately, would he pick you up?

10       A    Three.

11       Q    Did there come a point in time between June 1, 2008 and

12   June 20, 2008 on your way to school on Commonwealth Boulevard

13   from your house in Bellrose, that the defendant said something

14   to you about the knife in the car?

15                   MR. BANDELLI:  Objection your Honor.

16                   THE COURT:  Overruled.

17       A    Yes.

18       Q    Can you tell the members of the jury about that

19   conversation?

20       A    He said he was going to cut off my finger if I didn't

21   behave.

22       Q    And what had happened before that, that he had said

23   that to you?

24                   MR. BANDELLI:  Objection, your Honor.

25                   THE COURT:  Overruled.

                                                              gjn

1      A     I wasn't doing what he told me to do in the car.

2      Q     And what was that?

3      A     He wanted me to perform oral on him.

4      Q     Did you do that in the car?

5      A     No.

6      Q     When he said that to you in regards to you'd better

7   behave, did he say what he wanted you to do after that?

8      A     No.

9      Q     Okay.  I want to talk to you specifically about May --

10  just to back up a moment -- between May 1st and May 31, 2008

11  inside your home.

12            You had told us earlier about contact involving the

13  defendant to you, but on the date you described earlier between

14  May 1st and May 31, 2008 in your home, did you touch the

15  defendant during the date that you described this morning?

16     A     Yes.

17     Q     Can you describe that to the members of the jury?

18     A     He told me to hold his penis and -- over the garbage

19  can -- but I let go, then he ejaculated into the garbage.

20     Q     During this incident in May of 2008?

21            THE COURT:  Excuse me.

22            I didn't hear that, Ms. Awan.

23            THE WITNESS:  He told me to hold on to his penis

24  over the garbage, then he ejaculated into the garbage.

25     Q     This incident that you described in May earlier

gjn

SANA AWAN - People - Direct          499

1    involving the kitchen, this was the same date?

2        A    Yeah.

3        Q    Okay.  And just to be clear, all of the incidents that

4    you described on direct examination this morning involving your

5    stepfather, that's the defendant, Harold Gopaul, correct?

6        A    Yes.

7        Q    The incident that you just told us about, did the

8    defendant say anything about what to do when your hand was on

9    his penis?

10       A    Told me to move it up and down.

11       Q    And did you do that?

12       A    No.

13       Q    Did he say anything to you when you didn't?

14       A    No.

15       Q    Okay.  Okay.  I want to talk to you now about the days

16   following that conversation that you had on June 19th,

17   specifically on June 21, 2008.

18            Do you remember that day?

19       A    Yes.

20       Q    Can you tell the members of the jury what happened on

21   June 21, 2008 when you spoke up in the morning?

22       A    My mom, brother and sister were downstairs.  They were

23   outside.  My dad came up, told me to come into my mom's room.

24            And he had a vibrator under the bed.  He told me to lay

25   down and he put it between my legs and turned it on.  And I was

gjn

1    trying to fight with him but he would push me on the bed.   Then

2    I started crying so he slapped me and then left the room.

3         Q    Okay.  Let's back up.

4              Back when you say he was restraining you, can you

5    describe for the members of the jury what he was doing to

6    restrain you?

7         A    He had his arm on my shoulders.  He was holding me down

8    on the bed.

9         Q    Did you try to get up?

10        A    Yeah.

11        Q    And what happened when you tried to do that?

12        A    He just held me down.

13        Q    Did he say anything?

14        A    Told me to behave.

15        Q    This was inside your mom's bedroom in Bellrose?

16        A    Yes.

17        Q    When he said to behave, did you say anything back to

18   him?

19        A    No.

20        Q    And when he placed this vibrator, what part of your

21   body was it over?

22        A    My vagina.

23        Q    Did he say anything to you when the vibrator was over

24   your vagina?

25        A    No.

SANA AWAN - People - Direct                501

1          MR. BANDELLI:  Objection, your Honor, this is

2     leading.

3          THE COURT:  Overruled.

4     A    No.

5     Q    Was the vibrator on?

6     A    Yes.

7     Q    After he slapped you, you said you began to cry?

8     A    I was crying already, and then he slapped me.

9     Q    What happened when he slapped you?

10    A    He just left the room.

11    Q    I'm sorry?

12    A    He left the room.

13    Q    What did you do?

14    A    I left the room too.

15    Q    Can you describe what the vibrator looked like for the

16    members of the jury?

17    A    It's about, like twelve inches long, the handle, and

18    there is like a round head on top.  It's gray and it has like

19    three lines and the handle is white and it has a cord.

20         MR. ROSENBLATT:  Your Honor, I would ask that this

21    be marked as People's Exhibit 8.

22         THE COURT:  Please mark that People's 8 for

23    identification only.

24         (Whereupon, the item referred to was marked for

25    identification as People's  Exhibit 8 by the Court

                                                    gjn

1          Reporter.)

2                    THE OFFICER:  People's 8 marked for ID only.

3          Q    Sana, if you can take a look at what's been marked as

4     People's Exhibit 8 for identification purposes and tell us:  Do

5     you recognize that?

6          A    Yep.

7          Q    What do you recognize that to be?

8          A    The vibrator under the bed.

9          Q    And does that vibrator -- is that the vibrator that was

10    used on you on June 21, 2008?

11         A    Yes.

12         Q    Did there come a point in time after June 21, 2008 that

13    you saw the vibrator again?

14         A    Yes.

15         Q    When was that?

16                   MR. ROSENBLATT:  Well, withdrawn.

17         Q    Did there come a point in time in the precinct or in

18    your home immediately thereafter that you saw the vibrator

19    again?

20         A    Yes.

21         Q    And when was that?

22         A    When an officer came in to get it out from under the --

23    took it out from under the bed.

24         Q    And were you present and did you observe that officer

25    remove the vibrator from the home?

                                                         gjn

1      A     Yes.

2      Q     And in regards to People's Exhibit 7 that you saw

3   earlier --

4               MR. ROSENBLATT:  If this can be shown to the

5         witness, please (handing).

6      Q     Sana, some time after May of 2008, did you see the item

7   that's been marked as People's Exhibit 7, that item you

8   described as a knife, again in June of 2008?

9      A     Yes.

10      Q     And did you see it -- where did you see it in June of

11   2008?

12      A     When I came out of the precinct with an officer, the

13   car was parked, or the van was parked outside, so I showed it to

14   him through the window.

15      Q     And did you observe the officer recover that knife from

16   the van outside the precinct?

17      A     Not in my presence.

18      Q     Okay.  Did there come a point in time after it was

19   recovered that you saw it again?

20      A     Yes.

21      Q     Can you describe the van for the members of the jury?

22      A     It's an Ecolab truck.

23      Q     Is that E-C-O-L-A-B?

24      A     L-A-B.

25      Q     Truck?

1       A    Yeah.

2       Q    And it was parked outside?

3       A    Of the precinct.

4       Q    Had you seen that truck before?

5       A    Yes.

6       Q    What is that truck?

7       A    That's his work vehicle.

8       Q    When you say "his," who are you talking about?

9       A    Harold.

10      Q    The defendant?

11      A    Yes.

12           MR. ROSENBLATT:  Your Honor, I would ask this be

13      marked People's Exhibit 9 for identification purposes,

14      please.

15           THE COURT:  You can mark that People's 9 for

16      identification only.

17           (Whereupon, the item referred to was marked for

18      identification as People's  Exhibit 9 by the Court

19      Reporter.)

20           THE OFFICER:  People's 9 marked for ID only.

21      Q    Sana, take a look at what's been put in front of you,

22   what's marked People's 9 for identification purposes.

23           Tell the jury:  Do you recognize that?

24      A    Yes.

25      Q    What do you recognize that to be?

                                                    gjn

1      A      The Ecolab van.

2      Q      Is that a photograph of the Ecolab van?

3      A      Yes.

4      Q      And is that a fair and accurate depiction of the lab

5      truck as it appeared in June of 2008 when you saw it parked

6      outside the precinct?

7      A      Yes.

8              MR. ROSENBLATT:  Your Honor, I would offer

9      People's Exhibit 9 previously marked for identification

10     purposes into evidence at this time.

11             THE COURT:  Please show it to Mr. Bandelli.

12             THE OFFICER:  (Complying.)

13             MR. BANDELLI:  Thank you, Judge.

14             THE COURT:  Do you wish a voir dire?

15             MR. BANDELLI:  Yes.

16     VOIR DIRE EXAMINATION

17     BY MR. BANDELLI:

18     Q      Mr. Awan, you didn't take this photograph, did you?

19     A      No.

20     Q      Do you know where this photograph was taken?

21     A      Yes.

22     Q      Was it outside the 105 precinct?

23     A      Yes.

24     Q      And it was some time in the morning or the afternoon

25     after you had come to the precinct; do you know?

1      A     No.

2                  MR. BANDELLI:  You don't know, okay.

3                  No objection, Judge.

4                  THE COURT:  There being no objection, People's 9

5      is received in evidence.

6                  (Whereupon, the item referred to was marked for

7      evidence as People's Exhibit 9 by the Court Reporter.)

8                  THE OFFICER:  People's 9 marked and received.

9      CONTINUED DIRECT EXAMINATION

10     BY MR. ROSENBLATT:

11     Q     I just want to back up now where we left off on June

12     21, 2008 after the incident that occurred inside your mother's

13     bedroom.

14                What happened later in the day?

15     A     My stepfather wanted to go to the fair so we all went.

16     My mom, me, my brother sister and him.

17                And when we were there, I went with my friend to go on

18     to a ride and we were waiting on line and someone cut ahead of

19     us.

20                Well, they were ahead of us and she went with him.  And

21     my stepfather was watching and he said that I was letting people

22     cut ahead of us and he got mad and told me to leave.

23                And then when we were walking home, I started crying.

24                Then we got back to the house.  I went upstairs to my

25     room and my brother and sister and my mom downstairs, and he

                                                          gjn

1         came upstairs after me and he started hitting me.

2         Q    Okay.  Let's back up to the fair.

3              You mentioned that at some point you were on line?

4         A    Yeah.

5         Q    Do you remember what ride that was?

6         A    The Zipper.

7         Q    And you said at some point while you were on line, your

8    friend went with somebody else on the ride?

9         A    The guy ahead of us.

10        Q    Okay.  How come?

11        A    Needed to go -- it was partners, so she said I'll go

12   with you when I get off, I would go on with her.

13        Q    And you said at some point your father, the defendant,

14   pulled you off that line?

15        A    Yes.

16        Q    And what happened at the fair when he pulled you off

17   the line?

18        A    We went back.  My mom, my brother and sister were

19   playing a game, so I waited for them to finish and then we went

20   home.

21        Q    And you said at some point when you got home you were

22   upset?

23        A    Yeah.

24        Q    Why were you upset?

25             MR. BANDELLI:  Objection, Judge.

                                                         gjn

1            THE COURT:  Overruled.

2        A    'Cuz he said that I was being inconsiderate.  My mom

3    had a toothache and he said I was letting people cut ahead of

4    me.

5            But it wasn't my decision for my friend to go ahead

6    with him, with the guy ahead of us.  And then I got embarrassed

7    because all my other friends were there and people saw me and

8    'cuz I was crying when I was leaving.  It was just embarrassing.

9        Q    Okay.  And at some point you get back to the house and

10   you go into your room?

11       A    Yeah.

12       Q    And you said -- what happened?

13           Well, tell the jury what happens when your father comes

14   into your bedroom on June 21, 2008.

15       A    I was sitting on my bed crying by my dresser and he

16   came into the room.  He kept saying why are you crying, and then

17   he just started hitting me.

18       Q    Where did he hit you?

19       A    Everywhere; on my arms, on my face, and then I fell

20   into my bed, on my legs.

21       Q    Can you describe --

22           MR. ROSENBLATT:  Well, withdrawn.

23       Q    Did it hurt?

24       A    Yeah.

25       Q    Can you describe the pain that you felt to the members

SANA AWAN - People - Direct                509

1    of the jury?

2         A    It's -- When you get hit, it just hurts in your arms.

3         Q    And you said he hit you on both arms and your face?

4         A    My face.

5         Q    Did it leave any marks?

6         A    Yes.

7         Q    Can you describe that for the members of the jury?

8         A    I had black and blues on my arms and I had one on my

9    ear.

10        Q    Do you remember what day of the week the fair was?

11        A    Saturday.

12        Q    And that weekend, the next day, Sunday, June 22nd, did

13   anything happen on that day?

14        A    No.

15        Q    At some point during that weekend, did you pack a bag?

16        A    Yeah.

17             MR. BANDELLI:  Objection, your Honor, leading.

18             THE COURT:  Don't lead the witness.

19        Q    Can you tell the members of the jury what, if anything,

20   happened over the weekend in regards to a bag?

21             MR. BANDELLI:  Objection, your Honor.

22             THE COURT:  Overruled.

23        A    I packed a bag with my clothes and I hid it in my

24   closet because I was planning to run away.

25        Q    What was the purpose of running away?

SANA AWAN - People - Direct                    510

1          A     Because I promised to have sex with him and I didn't

2     know what else to do.

3          Q     Did you run away on Sunday, June 22nd?

4          A     No.

5          Q     How come?

6          A     Because everyone was home.

7          Q     What happened the next day, on Monday, June 23rd?

8          A     We were all home and then my dad went to work that

9     night.

10         Q     Do you remember if that was a steady workday for him?

11         A     Um, I don't know.

12         Q     Okay.  Do you remember approximately what time that he

13    had gone to work?

14         A     I think it was in the afternoon.

15         Q     What happened in the early evening of June 23, 2008?

16         A     I called.

17         Q     Who did you call?

18         A     My stepfather.  I told my sister to call him and ask

19    him what time he is coming home.

20         Q     And did you come to learn what time he would be home?

21         A     No.  He just told her "later," and to go to sleep.

22         Q     What did you do at approximately 8:00 to 8:30 P.M. on

23    June 23rd?

24         A     I got up.

25               My brother and my mom were asleep in the other room,

gjn

1    the door was closed because they had the AC on.

2            My sister was asleep next to me, so I got up and I

3    called my friend Christine.

4        Q    What's Christine's last name?

5        A    Alioto.

6        Q    And what phone did you use?

7        A    My cell phone.

8        Q    What happened when you called your friend Christine?

9        A    I told her that I was running --

10               MR. BANDELLI:  Objection, Judge.

11               THE COURT:  Overruled.

12        A    -- I told her that I was running away.

13        Q    And without telling us what she said to you, what did

14    you say to her?

15               MR. BANDELLI:  Objection, Judge.

16               THE COURT:  Overruled.

17        A    I said that I was being molested.

18        Q    And after you spoke to your friend Christine, did you

19    speak to somebody else on the phone on June 23, 2008?

20        A    Her mom.

21        Q    Was that the same phone call?

22        A    Yes.

23        Q    And what happened when --

24               MR. ROSENBLATT:  Well, withdrawn.

25        Q    What's Christine's mother's name?

1       A    Denise Alioto.

2       Q    And did there come a point in time when Denise got on

3  the phone?

4       A    Yes.

5       Q    What did you say to Denise on June 23, 2008?

6       A    I told her the same thing.

7            I might have said that I thought I was going to be

8  raped.

9       Q    After the conversation that you had with Christine and

10  her mother Denise, what did you do?

11       A    Denise went to meet me.  She was going to pick me up,

12  so I grabbed my stuff and I left through the back door and I

13  walked across the street and ran down to the avenue going

14  towards her house, and they were pulling up right as I made it

15  there.

16            So I got into the car with them and they went to

17  Hollywood Video.  Denise was on the phone.  Then me and

18  Christine went into the store and I started crying in the store

19  and came back out.

20            I talked to them, to Denise, and then we decided to go

21  to the police.

22       Q    Do you know the reason why you and Christine went

23  inside the video store?

24            MR. BANDELLI:  Objection, your Honor.

25       A    I think --

SANA AWAN - People - Direct                    513

1              THE COURT:  Sustained.

2        Q    When you went inside the video store, what was Denise

3   doing?

4        A    She was on the phone.

5        Q    You told us that at some point you went to the

6   precinct?

7        A    Yes.

8        Q    Do you remember approximately what time you arrived at

9   the precinct on Sunday, June 23rd?

10       A    Between 9:00 and 10:00 P.M.

11       Q    And when you arrived at the precinct, what happened?

12       A    Denise went in first and me and Christine waited in the

13  car.

14            Then Denise came back out and I went in with her.  We

15  all went back inside and we spoke.

16       Q    Let me just stop you.

17            When you say Denise went in and then Denise came out.

18  When Denise came back out of the precinct to where you and

19  Christine were in the car, was she with anybody?

20       A    An officer.

21       Q    And do you remember that officer's name?

22       A    I think it was Morris.

23       Q    All right.  And when Officer Morris and Denise came

24  back to the car, what happened?

25       A    They told me to come inside.  And I came in.

                                                          gjn

SANA AWAN - People - Direct                   514

1              We went into a room and then I told her what happened

2      and I wrote a statement.

3         Q    Okay.

4         A    That's it.

5         Q    When you spoke to Police Officer Morris on June 23,

6      2008, do you remember where you were in the precinct?

7         A    Yes.

8         Q    Where were you?

9         A    On the first floor, across from the entrance.

10        Q    When you say the first floor, are you referring to the

11     ground level?

12        A    Ground level.

13        Q    And do you remember if there came a point in time when

14     somebody else came and spoke with you on the ground level after

15     Police Officer Morris?

16        A    An ACS person.

17        Q    Do you know what ACS stands for?

18        A    The Child Service.

19        Q    And did there come a point in time when you were

20     brought from the ground level up to the second floor?

21        A    Yes.

22        Q    And when you reached the second floor of the precinct,

23     who did you speak to?

24        A    Detective Shulman.

25        Q    And when you spoke to Detective Shulman on the second

SANA AWAN - People - Direct                    515

1    floor, do you have any idea what time it was?

2        A    No.

3        Q    At some point the next morning --

4             MR. ROSENBLATT:  Well, withdrawn.

5        Q    You say you got to the precinct between 9:00 and 10:00

6    in the evening?

7        A    Yes.

8        Q    Okay.  Were you at the precinct consecutively?  By

9    that, I mean you didn't leave from 9:00 or 10:00 P.M. until

10   11 o'clock the following morning?

11       A    Yes.

12       Q    And at around 11:00 A.M. that morning, where did you

13   go?

14       A    To North Shore.

15       Q    What's North Shore?

16       A    A hospital.

17       Q    And tell the members of the jury what happened when you

18   got to North Shore.

19       A    They sent me into like a checkup and got examined.

20       Q    Can you describe that examination for the members of

21   the jury?

22       A    I just had to take everything off and put on a -- the

23   robe, and I sat down on a chair and put my legs up.

24       Q    Had you ever received that type of exam before June 24,

25   2008?

gjn

1      A    No.

2      Q    What part of your body were they examining?

3      A    Vagina.

4      Q    All right.  And when you say your legs were up, can you

5    describe how they were positioned?

6               MR. BANDELLI:  Objection, your Honor, that's

7         irrelevant.

8               THE COURT:  Overruled.

9      A    They had me bend your knees and put them up on like to

10    the chair, kind of, but there is like a footrest thing.

11     Q    And you were in that position, they examined your

12    vagina?

13     A    Yes.

14     Q    After you were examined at North Shore, did you --

15    where were you brought?

16     A    Back to the precinct.

17     Q    And from the point in time that you left the hospital

18    to the point in time when you went back to the precinct, did you

19    make any stops at home?

20     A    No.

21     Q    And sometime after 3:30, between 3:30 and 5:00 P.M.,

22    when you were back at the precinct, who was there?

23     A    Denise.

24     Q    Denise Alioto?

25     A    Yeah.

gjn

1    Q    And did there come a point in time late in the

2    afternoon that members of the district attorney's office

3    arrived?

4    A    Yes.

5    Q    And do you remember who from my office arrived?

6    A    No.

7         Well, at the hospital, I spoke to Margaret and Brian.

8    Q    Okay.  That's two members of the district attorney's

9    office?

10   A    Yeah.

11   Q    Okay.  And do you remember if either of them were at

12   the precinct in the evening?

13   A    No, I don't remember.

14   Q    Okay.  Now did there come a point in time after you are

15   back at the precinct that you spoke to a Police Officer Alfaro,

16   do you remember that name?

17   A    Yeah, but I think I spoke to her when -- before, when I

18   first went in, when she took me out from the car.

19   Q    Okay.  Let's talk about the time you spoke to Police

20   Officer Alfaro by the car, all right?

21        Where did Officer Alfaro bring you; from where to

22   where?

23   A    From the precinct out to the car.

24   Q    And what did you tell her when you got to the car?

25   A    I showed her where the knife was under the radio and I

1    pointed out one of the vibrators, but we didn't find the one,

2    the other one.

3                    MR. BANDELLI:  Judge, can we have a time frame for

4        this, by any chance?

5                    THE COURT:  Mr. DA?

6                    MR. ROSENBLATT:  Sorry, your Honor?

7                    THE COURT:  What time are you talking about?

8    Q    Sana, did this happen on June 24, 2008 when you were

9    outside the car at the police car at the precinct?

10   A    The 23rd.

11   Q    The 23rd?

12   A    Yeah.

13   Q    Let's back up.

14        On the 23rd at 8:00 P.M., between 8:00 and 8:30, you

15   left your house; is that what you said earlier?

16   A    Yeah.

17   Q    Okay.  And now we are into the next day after midnight,

18   we go to June 24th.

19        Do you remember when on June 24th, when you were at the

20   precinct, when you went outside to the Ecolab truck and pointed

21   out the knife?

22   A    It had to be like after 9:00.

23   Q    Okay.  Sometime after 9:00 A.M.?

24   A    In the morning, yeah.

25   Q    Sana, prior to that phone call that you had between

                                                        gjn

1   8:00 and 8:30 P.M. with Christine Alioto, had you ever told

2   anybody what had happened over the last three years with the

3   defendant, your stepfather?

4        A    No.

5        Q    Can you describe what your relationship was back then,

6   on June 23, 2008, what your relationship was with Christine

7   Alioto?

8        A    She was my best friend.

9        Q    And how did you meet Christine?

10       A    In school.

11       Q    At any point in time from May of 2005 through June 23,

12   2008, did you ever tell your mother about what was going on with

13   the defendant?

14       A    No.

15       Q    How come?

16            MR. BANDELLI:  Objection, Judge.

17            THE COURT:  Overruled.

18       A    I didn't think I could confide in her and I didn't know

19   if she would believe me.  And I figured if I had said something

20   like that, she would confront him about it first and then he

21   would just say I was lying and then I would just get in trouble

22   with him and she didn't believe me, then she wouldn't believe me

23   after he said I was a liar.

24       Q    Did there come a point in time now almost twenty-four

25   hours from the point in time when you left your house that you

gjn

1        eventually returned to your home for the first time?

2            A      Yes.

3            Q      And when you returned to your home in Bellrose for the

4        first time, who is there?

5            A      No one.

6            Q      Do you spend the night in your house?

7            A      Yes.

8            Q      What happens the next day?

9            A      My mom tells me to go to Christine's house, so I packed

10       a few -- two outfits, and she said I was going to stay the

11       night.  And she told me to take extra clothes, so I had a bag

12       and -- and I went over to Christine's house.

13               And I called her during the day and she told me to stay

14       with them.  So I went to dinner with them and when we came back,

15       we went back to my house and my stepfather's family was over.

16           Q      Okay.  And approximately how many people were there

17       when you arrived back at your house?

18                       MR. BANDELLI:  Objection, your Honor, relevance.

19                       THE COURT:  Overruled.

20           A      Like ten.

21           Q      And when you entered your house, what happened?

22           A      They came in and someone made a comment about how I

23       messed up everyone's life.

24           Q      And then what happened?

25           A      So I went upstairs and I started crying again.

gjn

1           And then Christine came upstairs with me and she told

2    me to come back -- well, then I saw that my room, it looked like

3    it had been searched.  Stuff was moved out of place.

4        Q    When you say stuff appeared out of place, when you

5    looked in your room that day when you returned, did you notice

6    anything missing?

7        A    Yes.  My diary.

8        Q    That was your personal diary?

9        A    Yeah.

10       Q    Have you seen it again?

11       A    No.

12       Q    Did there come a point in time --

13            MR. ROSENBLATT:  Well, withdrawn.

14       Q    I want to talk to you about July 3, 2008.

15            Do you remember that date?

16       A    Yes.

17       Q    And what happened on that day?

18       A    I was at home so my mom, my brother and sister, my

19   stepfather's brother and his mom, we all went to ACS because

20   they were going to have a visit and --

21            MR. BANDELLI:  Objection, your Honor, relevance.

22            THE COURT:  Mr. DA.

23            MR. ROSENBLATT:  Your Honor, this is the day

24       that --

25            Would you like me to approach?

Sidebar Conference                                      522

1                THE COURT:  Approach the bench.

2                (Whereupon, a conference was held between all

3       counsel and the Court on the record at the side-bar.)

4                MR. ROSENBLATT:  July 3rd is the date that the

5       Aliotos gained custody of Sana.

6                MR. BANDELLI:  He is not charged with -- beyond

7       June 23, 2008, Judge.  It's probative of nothing.

8                THE COURT:  What's the relevance?

9                MR. ROSENBLATT:  I think it goes to the

10      credibility of the outcry witnesses, that they maintain

11      custody over her.  They weren't obligated to do that, but

12      they did that.

13               It's important to let the jury know where this all

14      went after this happened.

15               (Whereupon, a discussion was held off the record.)

16               MR. BANDELLI:  I don't understand why he is

17      bolstering credibility of alibi witnesses at this point.

18               THE COURT:  He said he wanted to establish in

19      front of the jury where the complainant was living after

20      July 3rd.

21               MR. ROSENBLATT:  Well, from where she then lives

22      after that, they take parental rights of her.

23               MR. BANDELLI:  Again, what's the relevance to that

24      in connection with the crime charged up until June 23rd of

25      2008?

1              THE COURT:  Objection is overruled.  I will allow

2       it.

3              You have an exception for the record.

4              MR. BANDELLI:  Thank you, Judge.

5              (Whereupon, all parties returned from the sidebar

6       and the following took place:)

7              MR. ROSENBLATT:  May I proceed, your Honor?

8              THE COURT:  You may proceed.

9       Q    Sana, what happened on July 3, 2008 in regards to

10   Denise and Christine Alioto and you?

11      A    I was -- they became my foster parents, or she became

12   my foster parent.

13      Q    And did you maintain living with them thereafter?

14      A    Yes.

15      Q    Until when?

16      A    February 2009.

17      Q    Sana, as you sit here now in July of 2010, how do you

18   feel about the defendant today?

19              MR. BANDELLI:  Objection, your Honor.

20              THE COURT:  Sustained.

21      Q    And as you sit here today in 2010, do you have any

22   relationship with your mother?

23      A    No.

24              MR. ROSENBLATT:  I have nothing further, your

25       Honor.

gjn

SANA AWAN - People - Cross                524

1              THE COURT:  Thank you.

2              Mr. Bandelli, you may inquire.

3              MR. BANDELLI:  Thank you, Judge.

4              Good afternoon, Ms. Awan.

5              THE WITNESS:  Good afternoon.

6              MR. BANDELLI:  My name is Stanford Bandelli.  I

7     represent your stepfather, Harold Gopaul.

8              I have some questions I am going to ask you.  If

9     you don't know the answer, tell me you don't know; if you

10    don't understand the question, let me know and I will try to

11    rephrase it.  Okay?

12             THE WITNESS:  Okay.

13    CROSS-EXAMINATION

14    BY MR. BANDELLI:

15    Q    Now you testified that the relationship between you and

16    your stepfather began to change between May 1, 2005 and August

17    31, 2005; is that correct?

18    A    Yes.

19    Q    And you were residing in Bellrose at that time; is that

20    correct?

21    A    Yes.

22    Q    And who else lived there with you?

23    A    My mom, my brother and sister and my stepfather.

24    Q    Did you have your own bedroom in the house?

25    A    Yes, but sometimes I shared with my sister.

1    Q    When you say sometimes, how often did your sister sleep

2    in your bedroom with you?

3    A    Sometimes she would just want to go watch TV in my

4    mom's room so she would just decide to go over there.

5    Q    Most times she slept in your bedroom; is that correct?

6    A    Yeah.

7    Q    And where did your brother sleep?

8    A    With my mom.

9    Q    And around this time, I guess you were just finishing

10   middle school, it was before you started at the Queens High

11   School of teaching; is that right?

12   A    Yes.

13   Q    And when exactly did you start the Queens High School

14   of Teaching?

15   A    September.

16   Q    September of?

17   A    '05.

18   Q    2005.

19        Did you graduate Queens High School of Teaching?

20   A    Yes.

21   Q    When did you graduate?

22   A    June 2009.

23   Q    June?

24   A    2009.

25   Q    So you were there for your freshman, sophomore, junior

gjn

SANA AWAN - People - Cross                526

1    and senior year?

2         A    (Nodding.)

3         Q    Is it true from your freshman year of 2005 until 2008

4    when you had reported this incident, your grades had actually

5    improved from a B to an A; is that accurate?

6         A    I guess.

7         Q    Well, if I showed you your transcript and it said you

8    got a B minus in math in 2005 and in May 2008, you got an A in

9    2008; would that be correct?

10                  MR. ROSENBLATT:  Objection.

11                  THE COURT:  Overruled.

12        A    Yes.

13        Q    And the same with English, you improved in English as

14   well, from a B to an A; is that correct?

15        A    Yeah.  It got easier.

16        Q    If it got easier, you improved, you got -- you did

17   better; is that true?

18        A    Yes.

19        Q    And you are attending college now?

20        A    Yes.

21        Q    You are in your second year?

22        A    Yes.

23        Q    You are a sophomore?

24        A    Yes, going to be.

25        Q    You are going to be.

1              So you just completed your freshman year?

2        A     Yes.

3        Q     Did you take any time off between high school and

4     college?

5        A     No.

6        Q     So right from high school to college?

7        A     Yes.

8        Q     And you're working too?

9        A     Yes.

10       Q     Okay.  Full-time, part-time?

11       A     Full-time during the summer.

12       Q     How you doing in college?

13       A     Good.

14       Q     Straight As?

15       A     GPA was 3.5 first semester, 3.1 the second semester.

16       Q     Are you dating anyone presently?

17       A     No.

18              MR. ROSENBLATT:  Objection.

19              THE COURT:  Sustained.

20       Q     Spring of 2008, did you have a boyfriend?

21       A     Yes.

22       Q     Who was that?

23              MR. ROSENBLATT:  I am going to object to the

24     relevance, Judge.

25              THE COURT:  Read the last question back.

1                    (Whereupon, the requested portion of the testimony

2          was read back.)

3                         THE COURT:  Sustained.

4                         MR. BANDELLI:  Well, Judge, he may we approach?

5                         THE COURT:  Approach.

6                         (Whereupon, a conference was held between all

7          counsel and the Court on the record at the side-bar.)

8                         THE COURT:  Yes, Mr. Bandelli.

9                         MR. BANDELLI:  On his direct, Mr. Rosenblatt

10         repeatedly asked about her boyfriend and how it impacted the

11         parents, and that's a critical part of my defense.

12                        MR. ROSENBLATT:  His name?

13                        MR. BANDELLI:  Yeah, who the boy is, exactly,

14         yeah.

15                        MR. ROSENBLATT:  It's irrelevant, Judge.  The name

16         of the boyfriend is absolutely irrelevant.

17                        MR. BANDELLI:  I disagree with you.

18                        MR. ROSENBLATT:  For him and his investigator to

19         go and harass him, it's completely -- I really don't see

20         what it has to do with why the defendant committed any crime

21         to this victim.

22                        MR. BANDELLI:  Actually, it's incredibly relevant

23         because my belief is that the disclosure is based solely on

24         the fact the parents interfered with that relationship, so

25         it goes to the very heart of the defense.

1                       THE COURT:  Well, you are asking the name of the

2       boyfriend?

3                       MR. BANDELLI:  Right.

4                       THE COURT:  Jury already knows there was a

5       boyfriend.

6                       MR. BANDELLI:  Okay.

7                       THE COURT:  The name is not relevant.

8                       Sustained.

9                       MR. BANDELLI:  Note my exception.

10                      THE COURT:  You have your exception.

11                      (Whereupon, all parties returned from the sidebar

12      and the following took place:)

13                      MR. BANDELLI:  May I continue, Judge?

14                      THE COURT:  Yes, you may.

15                      MR. BANDELLI:  Thank you.

16      Q    How old was the boy you were dating in the spring of

17      2008?

18                      MR. ROSENBLATT:  Objection.

19                      THE COURT:  Overruled.

20      A    My age, 18.

21      Q    So he would be 20 now?

22      A    Yes.

23      Q    Do you know when his date of birth is?

24                      MR. ROSENBLATT:  Objection.

25                      THE COURT:  Sustained.

                                                              gjn

1    Q    Did your parents approve of the relationship you had

2    with this 18 year old boy?

3    A    No.

4         But they didn't know him.

5    Q    But they didn't approve?

6    A    No.

7    Q    Well, how did they know about the relationship?

8    A    Because I said that I had a boyfriend.

9    Q    Okay.  And what prompted you to tell them you had a

10   boyfriend?

11   A    Because they were asking who it was.

12   Q    Well, if they didn't know you had a boyfriend, how did

13   they know to ask who it was?

14   A    No, I mean they never like met him, so, I mean they

15   never said I couldn't date and --

16   Q    Okay.  So how did they know you had a boyfriend?

17   A    Because I told them.

18   Q    What prompted you to tell them that you had a

19   boyfriend?

20   A    Because they were asking who that person was.

21   Q    Okay.  And where was it that they asked who that person

22   was?

23   A    After school, and then when I went home.

24   Q    Okay.  Did they see you with this boy after school?

25   A    Like two or three times.

gjn

SANA AWAN - People Defense - Direct Cross        531

1      Q      Okay.  And they questioned you about his identity?

2      A      Yeah.

3      Q      And they didn't want you to see him again?

4      A      Yes.

5      Q      And it was after that that your father started

6    regularly, you know, making arrangements to take you home from

7    school; is that correct?

8      A      Yes.

9      Q      How would you describe your parents' position in terms

10   of your having a relationship with that boy at that time?

11     A      I'm sorry?

12     Q      How would describe your parents' position in terms of

13   your having a relationship with this boy at that time?

14     A      They didn't want it.

15     Q      Okay.  Well, did they feel strongly about it?

16     A      Yes.

17     Q      Okay.  Was there a little like a source of tension in

18   your house?

19     A      Yes.

20     Q      Amongst both of your parents; is that correct?

21     A      More my stepfather.

22     Q      But your mother as well?

23     A      My mom just agreed with him.

24     Q      Okay.  Did your parents try to monitor your behavior as

25   a result of your having a relationship with that boy?

gjn

1        A    How so?

2        Q    In any way; in terms of your activities after school?

3        A    Yes.

4        Q    They did?

5        A    Uh-huh.

6        Q    And did they limit your activities after school as a

7   consequence of your having a relationship with that boy?

8        A    He told me he didn't want me to go to the math class

9   anymore, but I was doing it for credit so I couldn't drop out.

10  But he said that if you sit next to him, I'll come into the

11  school.

12       Q    Okay.  So --

13       A    So he said he'll come to the school and I better not be

14  sitting next to him or close by him.

15       Q    Now after you had moved out of your parents' house and

16  moved in with the Aliotos, were you able to continue that

17  relationship with that boy?

18       A    Yes.

19       Q    Until how long did you continue that relationship with

20  that boy?

21       A    Until February, January.

22       Q    And Ms. Alioto permitted that boy to come into the

23  house; is that correct?

24       A    Yes.

25       Q    You had mentioned that there was an ACS worker at the

1    precinct on the night of June 23rd when you first went in; is

2    that correct?

3        A    Yes.

4        Q    Do you remember if it was a male or a female?

5        A    Yes.

6        Q    Was it a male or female --

7        A    Male.

8        Q    -- do you remember?

9             If not, was his name was Musa Laman (ph)?

10       A    I don't remember his name.

11       Q    Do you remember that he asked you for the identity of

12   the boyfriend and you refused to disclose that?

13                  MR. ROSENBLATT:  Objection.

14                  THE COURT:  Sustained.

15                  MR. BANDELLI:  May we approach, Judge?

16                  THE COURT:  Approach.

17                  (Whereupon, a conference was held between all

18            counsel and the Court on the record at the side-bar.)

19                  THE COURT:  Yes, Mr. Bandelli.

20                  MR. BANDELLI:  You asked me not to do it in front

21            of the jury.

22                  What's the basis of sustaining that objection?

23            It's incredibly relevant to my defense that she is trying to

24            conceal the identity.  I am not asking for the identity, I

25            am asking about her behavior in connection with his identity

1        when they were investigating the sexual abuse allegations.

2                   THE COURT:  Sustained.

3                   MR. BANDELLI:  Note my exception.

4                   THE COURT:  Noted.

5                   (Whereupon, all parties returned from the sidebar

6        and the following took place:)

7        Q    Do you remember who your friends were at the Queens

8    High School for Teaching?

9        A    Yes.

10       Q    Did you have any close friends at that time?

11       A    Yes.

12       Q    Okay.  Was Christine Alioto one of those friends?

13       A    Not my close friend.

14       Q    Not at that time?

15       A    No.

16       Q    Okay.  Did you disclose to any of those friends what

17   was going on in your house?

18       A    No.

19       Q    Do you recall when it was between May 1, 2005 and

20   August 31st of 2005 when this initial incident took place, I

21   think you said in May or June; is that right?

22       A    That May.

23       Q    But you don't remember a specific date?

24       A    No.

25       Q    And you never told anybody?

SANA AWAN - People Defense - Direct Cross        535

1      A     No.

2      Q     You never told any of your girlfriends?

3      A     No.

4      Q     And you never told your mom?

5            MR. ROSENBLATT:  Objection, asked and answered.

6            Judge, she said she never told her.

7            THE COURT:  Sustained.

8      Q     And how about the second incident between September 1,

9      2005 and December 31, 2005, do you remember what date that took

10     place?

11     A     No, not the exact date.

12     Q     Do you remember if it was in September, October,

13     November, December?

14     A     It happened continuously, so --

15     Q     It happened --

16     A     More than once.

17     Q     Continuously, through September, October, November,

18     December?

19     A     More than once.

20     Q     Okay.  Did you tell the DA that?

21     A     Yes.

22     Q     You did?

23     A     What incident are you referring to?

24     Q     Excuse me?

25     A     What incident are you referring to?

1    Q    The one contained in the indictment that says --

2              MR. ROSENBLATT:  Objection.

3              MR. BANDELLI:  She asked me a question.

4              THE COURT:  Sustained, sustained.

5              MR. BANDELLI:  Are you sustaining her question?

6              THE COURT:  Sustained on your question.

7              MR. BANDELLI:  I didn't ask a question, Judge.

8              THE COURT:  In reference to an indictment.

9    Q    Now these incidents that happened in 2005 and 2006, you

10   never told anybody about that either, right?

11   A    No.

12   Q    And according to your testimony, he hadn't threatened

13   you at that time; is that correct?

14   A    Yes.

15   Q    And did your mom live in the same house with you during

16   this time?

17   A    Yes.

18   Q    And you never told her, right?

19   A    No.

20   Q    Isn't it a fact that on January 31, 2009 at the Rocky

21   Hill Pharmacy, you told your mother that the charges were not

22   true that night, and that your stepfather had never touched you?

23   A    No.

24   Q    That's not true?

25   A    No.

gjn

1    Q    You never said that to her?

2    A    She came into my job and --

3    Q    Yes or no?

4              MR. ROSENBLATT:  Objection.

5              THE COURT:  Mr. Bandelli, after you ask the

6    question, give sufficient time for the witness to answer it.

7              MR. BANDELLI:  Absolutely, Judge.

8    Q    You never --

9              THE COURT:  Excuse me.

10              You can finish your answer.

11    A    My mom came to my job when I was working and she

12    started asking me questions and yelling at me, so I just kept

13    saying no, you have to leave, you have to leave.

14              I didn't answer anything.  I was saying -- I was just

15    trying to get her out of my job.

16              And I almost got fired that day.

17    Q    You never told her he never touched you?

18    A    It wasn't a conversation.  I was trying to get her out

19    of my job.

20    Q    Did you ever tell her --

21              MR. ROSENBLATT:  Objection, asked and answered.

22              THE COURT:  Overruled.  You can answer that.

23    Q    Did you ever tell her that your stepfather never

24    touched you?

25    A    No.

                                                        gjn

```
 1       Q    When did your friendship with Christine Alioto start?

 2       A    In my chemistry class.  I think it was my sophomore

 3   year.

 4       Q    So we are talking about 2006 or 2007?

 5       A    2006.

 6       Q    Okay.  And how often did you see each other?

 7       A    Every day.

 8       Q    Every day.

 9            You never said anything to her, did you?

10       A    No.

11       Q    No.  Only after -- only after your parents got upset

12   about the -- with respect your boyfriend; is that correct?

13                 MR. ROSENBLATT:  Objection, asked and answered.

14                 THE COURT:  Sustained.

15                 MR. BANDELLI:  I have nothing further.

16                 THE COURT:  No redirect?

17                 MR. ROSENBLATT:  I have none, your Honor, thank

18       you.

19                 THE COURT:  Thank you.  You may step down.

20                 THE WITNESS:  I'm done?

21                 THE COURT:  Yes.

22                 (Whereupon, the witness left the witness stand.)

23                 THE COURT:  Approach the bench, please.

24                 (Whereupon, a conference was held between all

25       counsel and the Court off the record at the side-bar.)
```

1      THE COURT:  All right, members of the jury, before

2      the next witness will testify, some matters have to be

3      discussed outside your presence, so I have some good news

4      for you.  Rather than start late and keep you late, we are

5      going to recess for the evening, give you a little extra

6      time for yourselves.

7      Remember, you are not to discuss this case among

8      yourselves or with anyone else.  If anyone tries to discuss

9      it with you, you are to bring it to my attention.  Do not

10     visit any locations that have been mentioned so far, and you

11     are not to form any opinion as to whether or not you feel

12     the defendant is guilty or not guilty of the crimes with

13     which he is charged.

14     Enjoy your evenings, get home safely.  Please be

15     back here tomorrow morning at 9:45 and we will resume with

16     the testimony.

17     Please follow the instructions of the court

18     officer.

19     (Whereupon, the jury exited the courtroom and the

20     following occurred:)

21     THE COURT:  As far as scheduling goes, I believe

22     you anticipate resting tomorrow if you have all your

23     witnesses, Mr. DA?

24     MR. ROSENBLATT:  Judge, I have at least four

25     witnesses left.  They will all be here tomorrow, and if we

gjn

1          get through all of them, it's a possibility that I may rest

2     tomorrow.

3               THE COURT:  All right.  Since we are not working

4     Wednesday morning, if we do get that far tomorrow, then you

5     are prepared to call your witnesses Wednesday afternoon?

6               MR. BANDELLI:  Okay.

7               THE COURT:  All right.

8               Any other matters before we recess for the

9     evening?

10              MR. ROSENBLATT:  No.  If we could just --

11              THE COURT:  As far as the expert witness that you

12    are tendering, Mr. Bandelli would like an offer of proof on

13    him.

14              MR. ROSENBLATT:  Yes, Judge.  As I informed him

15    and your Honor off the record, if Dr. Lewittes was accepted

16    as an expert, he would testify that there are known --

17              THE COURT:  Who is this doctor?

18              MR. ROSENBLATT:  Dr. Don Lewittes.

19              THE COURT:  And he is an expert in what field?

20              MR. ROSENBLATT:  Clinical psychology.

21              THE COURT:  And he has --

22              MR. ROSENBLATT:  Forensic psychology.

23              THE COURT:  He has been qualified to testify in a

24    court of law before?

25              MR. ROSENBLATT:  Yes, your Honor.

1          He has testified in multiple counties and multiple

2     states and he has testified in this county in Supreme Court

3     before.

4          He would testify that there is a known research in

5     regards to child abuse cases and that there are -- there is

6     a known pattern of behavior that's seen in child abuse

7     cases, specifically cases involving a member of the family.

8          And he would explain to the jury reasons why a

9     child does not disclose immediately.  He would explain to

10    the jury why that type of disclosure is delayed over a

11    period of time.  He would testify as to how the abuse occurs

12    over a period of time.

13         Is that enough, your Honor, or does the Court

14    prefer more?

15         THE COURT:  Is that all he is going to testify to,

16    or is that most of what you anticipate he is going to

17    testify to?

18         MR. ROSENBLATT:  It's most of it, Judge.

19         He is going to testify as to the concept of

20    blending, which is, when acts occur over a period of time

21    and they occur consistently, that it is difficult for a

22    victim to remember each individual act, specifically when

23    they occurred, the time period.  The peripheral details may

24    be remembered, but the specifics blend together.

25         That's just a general concept of what he would

1          testify to.

2                    THE COURT:  What's your position on that,

3          Mr. Bandelli?

4                    MR. BANDELLI:  First of all, I didn't get

5          anything, any impression from the witness that she couldn't

6          recall more specific times and specific dates.

7                    It seems to me the prosecution put this approach,

8          charging four month blocks for each charge without

9          questioning her further or doing further investigation to

10         pinpoint when exactly these things happened.

11                   As she was testifying, she seemed to be suggesting

12         there were more incidents than one every four months.

13         That's the way she testified on his direct and she brought

14         it up on my cross, so to bring in an expert now to explain

15         away what could have been handled by more investigation by

16         the DA, I think is an inappropriate use of an expert in the

17         first place.

18                   In the second place, I don't know that this

19         science is accepted in the scientific community, and I don't

20         know that this is beyond the -- to use the legal term -- of

21         an ordinary juror to figure out, hey, either she was scared

22         of this guy because he was threatening her and that's why

23         she didn't disclose it, or she wasn't scared of him and

24         there was another reason she didn't disclose it.

25                   You don't need an expert.  Either they buy it or

1    they don't.

2                THE COURT:  When you are referring to "this guy,"

3    you are referring to your client?

4                MR. BANDELLI:  No, Dr. Lewittes.  You don't need

5    an expert.

6                THE COURT:  When you said "scared of this guy."

7                MR. BANDELLI:  "This guy," that would be my

8    client.  That's what they seem to be implying, that there

9    were some sort of threats, so therefore, she was frightened,

10   therefore, she didn't tell anybody.

11               You know, the DA did this wonderful job of asking

12   her why she didn't tell her mother, because she said I

13   didn't feel comfortable confiding in my mother.  He answered

14   all the questions through her.  What do you need the expert

15   for at this point?

16               THE COURT:  I believe most of your

17   cross-examination of the witness involved her not telling

18   anybody about this.

19               MR. BANDELLI:  Most of it, no.  That was

20   definitely a portion of it, absolutely, Judge.

21               THE COURT:  Seemed to me most of it was in that

22   area.

23               MR. BANDELLI:  No, some of it had to do with the

24   boyfriend, Judge; some of it had to do with her school

25   grades; some of it had to do with her relationship with the

gjn

1    Aliotos.  That was the major portion of it, Judge.

2               And the question is whether or not they actually

3    believed she was afraid of this guy.  Why do you need an

4    expert to tell that to them?

5               THE COURT:  Again, for the record, when you are

6    talking about "this guy," you are talking about your client?

7               MR. BANDELLI:  When I say "this guy," I am

8    referring to -- when I am talking about the guy that would

9    have frightened her based on her testimony, I would be

10   referring to Mr. Gopaul.

11              When I say "this guy" in terms of what do we need

12   him to testify for, I would be referring to Dr. Lewittes.

13              THE COURT:  Thank you.

14              I will allow the doctor to testify if he is

15   qualified as an expert in front of me.

16              Anything else?

17              MR. ROSENBLATT:  Judge, I would just note again, I

18   still do not have the dates of birth.

19              MR. BANDELLI:  I will provide that right now.

20              THE COURT:  Anything else before we recess?

21              Mr. DA?

22              MR. ROSENBLATT:  No, your Honor, I have nothing

23   further.

24              THE COURT:  Mr. Bandelli, anything else?

25              MR. BANDELLI:  At this point in time, no.

1                          THE COURT:  All right.  Please put Mr. Gopaul back

2       in.

3                          MR. BANDELLI:  Just let the record reflect that I

4       am providing an updated witness list and I have five dates

5       of birth.

6                          THE COURT:  Thank you, Mr. Bandelli.

7                          10 o'clock tomorrow morning.

8

9                          (The trial was adjourned to July 13, 2010,

10      10:00 A.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF QUEENS:  CRIMINAL TERM, PART TAP-D
 2   ----------------------------------------X

 3   THE PEOPLE OF THE STATE OF NEW YORK,
                                              Ind. No.
 4            -against-                       2065-08
                                              TRIAL
 5   HAROLD GOPAUL,

 6                       Defendant.
     ----------------------------------------X
 7

 8                                   July 13, 2010
                                     125-01 Queens Boulvevard
 9                                   Kew Gardens, New York 11415

10

11   B E F O R E :

12          THE HONORABLE GREGORY L. LASAK,

13                              Justice, Supreme Court

14   A P P E A R A N C E S :

15

16   FOR THE PEOPLE:

17       RICHARD A. BROWN,
         District Attorney - Queens County
18       BY:  JARED ROSENBLATT, ESQ.,
              Assistant District Attorney
19

20   FOR THE DEFENDANT:

21       STANFORD BANDELLI, ESQ.
         16 Court Street
22       Brooklyn, New York

23

24                              Gail J. Neufeld, RPR
                                Official Court Reporter
25
```

gjn

1          THE CLERK:  Case on trial.  People versus Harold

2   Gopaul.

3          Let the record reflect the defendant is before the

4   Court.

5          Counsel, your appearances, please.

6          MR. BANDELLI:  Stanford Bandelli on behalf of

7   Harold Gopaul.

8          Good morning, Judge Lasak.

9          THE COURT:  Good morning.

10          MR. ROSENBLATT:  For the People, Assistant

11   District Attorney Jared Rosenblatt.

12          Good morning, your Honor.

13          THE COURT:  Good morning.

14          MR. ROSENBLATT:  Turning over the CV of my expert,

15   Dr. Lewittes, to counsel.  (Handing.)

16          And I am handing up a copy to the Court as well.

17          MR. BANDELLI:  Judge, I just want to make a record

18   on two things before we bring the jury in.

19          THE COURT:  Go ahead.

20          MR. BANDELLI:  Okay.  Number one, with regard to

21   the records that were turned over yesterday from ACS, I

22   would just note that I had a subpoena signed by Judge

23   Buchter on May the 5th and it was served on ACS on May the

24   5th.  Actually, excuse me, on March the 5th of 2010.  On

25   March 5th of 2010.

1          Then Barbara Mandel, legal counsel for ACS, sent a

2     correspondence acknowledging she had sent out the documents

3     to the Court.

4          I would note that I have been asking for these

5     documents since that time at every court appearance, and I'm

6     not pointing the blame at any particular person, but I would

7     note that for the first time yesterday, on July the 12th,

8     after the DA had opened -- on July the 8th, after the DA had

9     called Detective Shulman and immediately prior to calling

10    the complaining witness, I first received these records.

11         There is information in there that indicates that

12    each of the witnesses that the People have already called

13    and will call were interviewed by ACS, including detective

14    Shulman, including Sana Awan, including -- should have been

15    turned over a long time ago, Judge, and I think the record

16    needs to reflect this was turned over after the opening,

17    after the testimony of Detective Shulman, and that it did

18    impact my ability to adequately prepare the defense in this

19    case.

20         THE COURT:  We subpoenaed those with a Court

21    Ordered subpoena.

22         MR. BANDELLI:  March 5th, Judge.

23         THE COURT:  This case was sent into this part last

24    week.

25         MR. BANDELLI:  Judge, I am not pointing a finger

                                              gjn

1      at anybody.  I had asked for them from the time I appeared

2      before Judge Buchter until the time I appeared before Judge

3      Kron until the time -- until the time -- until the time, so

4      regardless of who is responsible, that's not the issue,

5      Judge.  That's not my concern.  That's not what I am

6      representing.

7              What I am saying is I got them yesterday, after

8      opening, after testimony.

9              THE COURT:  You subpoenaed them, they were sent to

10     the courthouse.  You brought it to my attention, I searched

11     the files, I found the records.  My court attorney redacted

12     the records as per ACS's request and I gave them to you

13     immediately.

14             I don't know what the DA's role in any of this

15     was, if anything.  You directly subpoenaed them from ACS,

16     ACS sent the records to the courthouse.

17             Are you implying that the DA should have turned

18     these over?

19             MR. BANDELLI:  I think the DA has an obligation to

20     turn this stuff over prior to opening according to the CPL,

21     but that's, I guess, subject to interpretation.

22             MR. ROSENBLATT:  Can I be heard, Judge?

23             THE COURT:  Sure.

24             MR. ROSENBLATT:  Part of the material that I

25     turned over included every record that I had from ACS which

gjn

1    included interviews that were conducted on June 24th to the

2    defense attorney prior to my opening.  So the latter

3    material that was turned over by your Honor yesterday was

4    all after June 24th, so for the implication to be on this

5    record --

6              THE COURT:  Hold on a second, all right?  Hold on.

7         The records that were subpoenaed by defense

8    counsel were in the courthouse that the Court turned over,

9    and I believe my court attorney gave you a copy.

10             MR. ROSENBLATT:  She did provide me a courtesy

11   copy, yes, your Honor.

12             THE COURT:  Was that material in your possession

13   before and did you turn that over?

14             MR. ROSENBLATT:  I did not have as many pages as

15   were turned over from ACS.

16        The pages that I turned over were from June 24,

17   2008, June 30th of 2008, September 12th of 2008, December

18   10th of 2008.

19        Those are the pages that I had previously turned

20   over.  Those are the only pages that I had in my possession.

21             THE COURT:  Were those inclusive of the interviews

22   of the witnesses that Mr. Bandelli is referring to?

23             MR. ROSENBLATT:  This includes the interview that

24   was conducted at the 105 precinct on June 4th that he

25   claimed he never had, he had before his opening.  It

                                              gjn

1     includes an interview of Denise Alioto, it includes an

2     interview of the complaining witness.  These were all turned

3     over prior to the opening, your Honor.

4                THE COURT:  Mr. Bandelli.

5                MR. BANDELLI:  Yes, Judge.

6                THE COURT:  What records did you receive based

7     upon the issuance of the subpoena?

8                MR. BANDELLI:  Yes.

9                THE COURT:  The other day that you did not have

10    that contained interviews of witnesses that you just

11    referred to --

12               MR. BANDELLI:  Could you repeat the question,

13    Judge?  I'm sorry.

14               THE COURT:  The DA turned over material he had

15    from ACS before your opening, correct?

16               MR. BANDELLI:  About three or four pages, Judge.

17               MR. ROSENBLATT:  Seven pages.

18               MR. BANDELLI:  Seven pages, maybe.  I think it was

19    three or four, but --

20               THE COURT:  You referred to notes of interviews of

21    witnesses.

22               MR. BANDELLI:  Correct.

23               THE COURT:  What witnesses' notes did you get last

24    week or this week that you did not have from the DA?

25               MR. BANDELLI:  What I got, it was from -- last