1    week was a general summary of three or four pages.  Certain

2    things that happened at the precinct, but it didn't include

3    any -- what was disclosed by the Court yesterday.  This was

4    40 or 45 pages that was turned over.

5            THE COURT:  The DA didn't have those records that

6    you're referring to; is that correct, Mr. DA?

7            MR. ROSENBLATT:  That's correct, your Honor.

8            THE COURT:  Anything else?

9            MR. BANDELLI:  Yeah.  Judge, one other thing.

10           I -- just to follow-up with regard to calling the

11   expert witness, and I just want to understand clearly what

12   he is going to be testifying to.

13           The DA had mentioned something about blending and

14   that there was going to be some scientific explanation for

15   why the victim was unable to recall specific dates.

16           Is that what the DA intends to question

17   Dr. Lewittes about?

18           THE COURT:  Mr. DA.

19           MR. ROSENBLATT:  Your Honor, do you want me to

20   reiterate again what I anticipate Dr. Lewittes testifying to

21   in en todo?

22           THE COURT:  Go ahead.

23           MR. ROSENBLATT:  Judge, I expect him to testify

24   that through his work, that there is a pattern of behavior

25   that's been applied to the evaluation and treatment of those

1    who have been sexually abused, and part of that testimony

2    will include the fact that disclosure in these types of

3    cases is often delayed.

4           He will also talk about what was evidenced during

5    the testimony, the complaining witness's testimony,

6    including a flat affect, that is, why an individual may not

7    cry upon reciting the facts that had previously happened to

8    them.

9           He will talk about the concept of blending, which

10   is the ability to recall specific dates of abuse,

11   specifically when they are over an extended period of time

12   as in this case.

13          THE COURT:  Mr. Bandelli.

14          MR. BANDELLI:  Well, Judge, again, I noted this

15   yesterday when Ms. Awan testified in this case yesterday.

16          And this is just one example:  The DA had asked

17   her whether or not she recalled a particular time she, I

18   guess, May 1st of 2005 to August 31 of 2005, a four-month

19   period.  And she actually reduced the time period to between

20   May and June.  And at some point she reduced the time period

21   to May, and she was able to say it was a weekday and she was

22   able to say it was a school day, so it doesn't seem to me

23   that this witness was incapable of recalling specific dates.

24          I think that the DA did not exhaustive techniques

25   available to him to determine when specifically this

1          happened.  And this goes back to my argument prior to the

2          trial about sufficient specificity in the indictment.  Had

3          the DA chosen to, he could have narrowed down these times to

4          a more specific time, okay?  She clearly was capable of

5          identifying more specific times.  Because the DA chose to

6          approach this in this way and block off the time in

7          four-month periods over a 37-month period, that doesn't open

8          the door for somebody who is going to say he is an expert to

9          say, well, you know, this is why it would be charged in

10         four-month periods.

11                  I think the witness could have told us and it was

12         the DA's obligation to bring that out through the witness

13         and he didn't do that, so now he wants to, you know, fix it

14         through the expert.

15                  Also, in terms of her flat affect?  Well, I don't

16         even understand what he's talking about in terms of her

17         "flat affect."  Did he bring up at all during his direct

18         anything about her affect or why she wasn't crying?  I don't

19         remember anything about it, but now he wants to explain to

20         the jury why she wasn't crying through an expert?  There is

21         some science that explains why she wasn't crying?

22                  So essentially, what the DA wants to do is any

23         mistakes he might have in this case, whether through his

24         failure to properly investigate it or, you know, he didn't

25         ask the right types of questions of his witness, he wants to

                                                           gjn

1    cure them through the expert, and that's really not the

2    purpose of expert testimony.  If there is a science that

3    applies, okay, and a jury can't figure it out from the

4    evidence that was presented, then Richardson's Laws of

5    Evidence permit, but not in this circumstance, Judge, and I

6    strongly object to the calling of this witness.

7              THE COURT:  DA?

8              MR. ROSENBLATT:  I'm not sure any of that merits a

9    response, your Honor.  Your Honor made a ruling and I will

10   stick with your Honor's ruling and my arguments previously

11   made.

12             THE COURT:  Besides the lack of affect, what's the

13   other purpose of calling this expert witness?

14             MR. ROSENBLATT:  Judge, I believe it's important

15   for the jury to hear the reasons why an individual has

16   difficulty explaining the specific time period the victim is

17   unable to tell the jury the exact date that any of these

18   incidents occurred, that occurred over a three-year time

19   period.  People that aren't familiar with sex abuse cases,

20   regular citizens of this county, would have no reason to

21   expect that a victim is unable to say that it happened on X

22   date or during this specific week, and I think it's

23   important for the jury to hear from this expert.

24             MR. BANDELLI:  She didn't say that, Judge.  She

25   didn't say she couldn't give a specific date.

1            MR. ROSENBLATT:  Actually, in fact, she did, and

2       she said it when he cross-examined her and said you can't

3       tell us what date.

4            MR. BANDELLI:  No, she said it was May, it was

5       May.  It wasn't June, it wasn't July, it wasn't August; it

6       was May.  And as a DA, as a former prosecutor, when I sit

7       down and interview that witness before I put her in the

8       grand jury, I don't charge between May and August if she

9       tells me May.

10           MR. ROSENBLATT:  Judge, that's not --

11           MR. BANDELLI:  Let's go through this:  When in

12      May, how do you remember this particular day.

13           THE COURT:  Mr. Bandelli, please.  Please.

14           Who is your next witness?

15           MR. ROSENBLATT:  Police Officer Alfaro.

16           She has since been married since the date of her

17      involvement so it's Police Officer Alfaro Harbus,

18      H-A-R-B-U-S.

19           THE COURT:  Would you get the jurors, please?

20           (Whereupon, the jury entered the courtroom and

21      upon taking their respective seats, the following occurred:)

22           THE COURT:  Good morning, ladies and gentlemen.

23           THE JURY:  Good morning.

24           THE COURT:  DA, call your next witness.

25           MR. ROSENBLATT:  People call Police Officer Celica

                                                        gjn

1          Alfaro Harbus.

2                    (Whereupon, the witness entered the witness

3          stand.)

4    C E L I C A   A L F A R O   H A R B U S , Police Officer, a

5          witness called on behalf of the People, after having been

6          first duly sworn and having stated her shield number as 8867

7          and her command as the 105th Precinct, New York City Police

8          Department, took the witness stand and testified as follows:

9                    THE WITNESS:  Yes.

10                    THE CLERK:  Thank you.  Please be seated.

11                    THE OFFICER:  People call Police Officer Celica

12          Harbus, first name C-E-L-I-C-A, last name H-A-R-B-U-S,

13          shield 8865, 105 precinct NYPD.

14                    THE COURT:  You may proceed.

15                    MR. ROSENBLATT:  Thank you, your Honor.

16                    Good morning, Officer.

17                    THE WITNESS:  Good morning.

18    DIRECT EXAMINATION

19    BY MR. ROSENBLATT:

20          Q    Tell the members of the jury how long have you been a

21    member of the New York police department?

22          A    Nine years.

23          Q    And where are you currently assigned?

24          A    To the 105 precinct.

25          Q    How long have you been assigned to the 105 precinct?

1        A      Eight years.

2        Q      Prior to the 105 precinct, where were you assigned?

3        A      Police academy.

4        Q      What is your current assignment at the 105 precinct?

5        A      Patrol.

6        Q      Tell the members of the jury, what is patrol?

7        A      Consists of writing up company reports, making arrests,

8    getting assigned arrests and answering 911 calls.

9        Q      Do you wear a uniform every day to work?

10       A      Yes.

11       Q      And do you drive a marked or unmarked police vehicle?

12       A      A marked.

13       Q      And as part of your duties as a patrol officer, do you

14   drive within the confines of the 105 precinct and deal with

15   problems contained in that precinct?

16       A      Yes.

17       Q      What part of Queens is the 105 precinct?

18       A      Queens Village.

19              THE COURT:  Officer, do me a favor, could you

20       speak a little louder or closer to the microphone?

21              THE WITNESS:  (Complying.)

22              THE COURT:  Thank you.

23       Q      Back in June of 2008, were you known by Police Officer

24   Harbus, or did you have a different last name?

25       A      Officer Alfaro.

1    Q    And since then, have you gotten married?

2    A    Yes.

3    Q    I want to talk to you about June 24th of 2008.

4         Were you working on that date?

5    A    Yes.

6    Q    And what was your work hours on June 24, 2008?

7    A    11:15 P.M. by 0750 A.M.

8    Q    When you say 11:00 P.M., was that starting on June

9    23rd?

10   A    Yes.

11   Q    And ended on June 24th at what time?

12   A    7:50.

13   Q    That was your scheduled tour?

14   A    Yes.

15   Q    And does there come an occasion when you work that you

16   are required to work overtime as well?

17   A    Yes.

18   Q    I want to talk to you about June 24, 2008, sometime

19   around 4:00 in the morning.

20        Did you receive a call from your sergeant sometime

21   around 4:00 in the morning?

22   A    Yes.

23   Q    And what time was it that you received that call?

24   A    Approximately 4:40.

25   Q    4:40?

1      A     (Nodding.)

2      Q     In the morning?

3      A     Yes.

4      Q     Okay.  And without telling us what was said, what was

5  the purpose of returning back to the precinct?

6      A     An arrest, an open complaint.

7      Q     Say again?

8      A     An open complaint.

9      Q     What does it mean to make an arrest on an open

10  complaint?

11      A     That a complaint had been made, a complaint against

12  another person, and it is processed and it's a complaint that

13  has a person that's wanted.

14      Q     And who did you receive that notification to respond

15  back to the precinct from; who did that come from?

16      A     Can you rephrase the question?

17      Q     Sure.

18            When you received that call at 4:40 in the morning on

19  June 24, 2008, who called you?

20      A     My supervisor.

21      Q     Okay.  And what level rank is your supervisor?

22      A     Sergeant.

23      Q     How did you receive that notification; was it by cell

24  phone or by some other means?

25      A     Cell phone.

1      Q    When you received that notification from your sergeant,

2    what did you do?

3      A    I put myself on the 10-2.

4      Q    Again?

5      A    I put myself on the 10-2.

6      Q    Tell the members of the jury, what is a 10-2?

7      A    Respond back to the station house.

8      Q    And how long did it take you to respond back to the

9    station house?

10     A    Maybe a minute.

11     Q    And when you returned to the station house, were you

12   assigned to make an arrest?

13     A    Yes.

14     Q    Okay.  Whom did you arrest?

15     A    Mr. Gopaul, Harold.

16     Q    Do you see Harold Gopaul in the courtroom today?

17     A    Yes.

18     Q    Can you point and identify an article of clothing that

19   he is wearing?

20     A    (Indicating.)  He is wearing a white button-down shirt.

21          MR. BANDELLI:  Indicating my client, your Honor.

22          THE COURT:  The record will indicate the witness

23     has identified the defendant.

24          MR. ROSENBLATT:  Thank you, your Honor.

25     Q    When you made that arrest sometime after 4:40 in the

1        morning on June 24, 2008, do you recall what the defendant was

2        wearing?

3            A     Yes.

4            Q     What was he wearing?

5            A     A blue uniform.

6            Q     And do you remember any sort of patches or label that

7        was on the uniform?

8            A     I don't recall.

9            Q     Okay.  And as part --

10                  MR. ROSENBLATT:  Withdrawn.

11           Q     After you made that arrest, did you bring the defendant

12       upstairs to a different part of the precinct?

13           A     He was already upstairs.

14           Q     Okay.  I want to talk to you around the time period

15       between 8:00 and 9:00 in the morning on June 24, 2008.

16                  Were you still working at that time?

17           A     Yes.

18           Q     And were you still working that tour that was supposed

19       to end earlier that morning?

20           A     Yes.

21           Q     Did you have a conversation between 8:00 and 9:00 in

22       the morning with someone by the name of Sana Awan?

23           A     Yes.

24           Q     And don't tell us what was said, but did you take her

25       from the precinct to outside of the precinct?

CELICA ALFARO HARBUS - People - Direct          563

1      A    Yes.

2                MR. BANDELLI:  Objection.  Leading, your Honor.

3                THE COURT:  Don't lead the witness.

4      Q    Where did you take Sana Awan?

5      A    To the side of the precinct where a vehicle was parked.

6      Q    I'm sorry?

7      A    Where a vehicle was parked.

8      Q    Can you describe that vehicle for the members of the

9    jury?

10     A    It was a white vehicle with letterings that said EcoLab

11   on it.

12     Q    Okay.

13               MR. ROSENBLATT:  Officer, would you please show

14        the witness what's in evidence as Exhibit 9, please?

15               THE OFFICER:  (Handing.)

16     Q    Officer, take a look at what's in evidence as People's

17   Exhibit 9 and tell us:  Do you recognize that?

18     A    Yes.

19     Q    What do you recognize that to be?

20     A    The defendant's vehicle.

21     Q    When you described the truck earlier that you brought

22   Sana to between 8:00 and 9:00 in the morning, is that that same

23   truck?

24     A    Yes.

25     Q    When you brought her to the truck, what did you ask

1    her, if anything?

2              MR. BANDELLI:  Objection, your Honor.

3              THE COURT:  Overruled.

4        A    If the meat cleaver was inside the vehicle.

5              Where she pointed out a meat cleaver to me that was in

6    the console.

7        Q    It was where?

8        A    Middle console.

9        Q    And did you enter that vehicle?

10       A    Yes.

11       Q    And did you recover anything?

12       A    I recovered the meat cleaver, a mini meat cleaver.

13             MR. ROSENBLATT:  Your Honor, I would ask that the

14   witness be shown People's Exhibit 7 for identification

15   purposes.

16             THE COURT:  Please show it to the witness.

17             THE OFFICER:  (Complying.)

18       Q    Officer, take a look at what's previously been marked

19   as People's Exhibit 7 for identification purposes and tell us if

20   you recognize that item?

21       A    Yes.

22       Q    What do you recognize that item to be?

23       A    The mini meat cleaver that I recovered from the

24   vehicle.

25       Q    When you say you recovered the meat cleaver, what did

                                                        gjn

1   you do after you removed it from the vehicle?

2       A    I vouchered it.

3       Q    Tell the members of the jury what do you mean when you

4   say voucher?

5       A    I took it into police custody as arrest evidence and I

6   placed it into a clear plastic --

7                THE COURT:   Officer, do me a favor:   Speak slower

8       and louder for the jurors, please.

9       A    I took it into police custody.  I vouchered it, put it

10  into the clear plastic envelope and I marked it with the invoice

11  number as P 240069.

12      Q    Is that a unique number that's assigned by the police

13  department?

14      A    Yes.

15      Q    And the item that's in front of you as People's

16  Exhibit 7 for identification purposes, is that the same item

17  that you recovered from the inside of the car back on June 24,

18  2008?

19      A    Yes.

20      Q    After you recovered it, did you show it to the

21  complaining witness?

22      A    Yes.

23      Q    Did you show her any other knife or meat cleaver as you

24  described it on June 24, 2008?

25      A    No.

1            MR. ROSENBLATT:  Your Honor, I would offer

2      People's Exhibit 7 into evidence at this time.

3            THE COURT:  Would you like to see it again,

4      Mr. Bandelli?

5            MR. BANDELLI:  Yes, Judge.

6            THE COURT:  Please show it to Mr. Bandelli.

7            MR. BANDELLI:  Actually, I don't need to see it.

8      I just have a question, if you don't mind.

9            THE COURT:  You may proceed.

10           MR. BANDELLI:  Good morning, Officer Alfaro.

11           THE WITNESS:  Good morning.

12           MR. BANDELLI:  Officer, what's the last name now?

13           THE WITNESS:  Harbus.

14           MR. BANDELLI:  Good morning, Officer Harbus.

15   VOIR DIRE EXAMINATION

16   BY MR. BANDELLI:

17      Q    You don't know who placed that in the vehicle, do you?

18      A    Excuse me?

19      Q    You do not know who placed that meat cleaver or knife

20   in the vehicle, do you?

21      A    No.

22      Q    Okay.  You don't know when it was placed in the

23   vehicle, do you?

24      A    No.

25           MR. BANDELLI:  Nothing further.

                                              gjn

1              I object.

2              THE COURT:  Objection overruled.

3              People's 7 is received in evidence.

4              (Whereupon, the item referred to was marked for

5       evidence as People's Exhibit 7 by the Court Reporter.)

6              THE OFFICER:  People's 7 marked and received.

7    CONTINUED DIRECT EXAMINATION

8    BY MR. ROSENBLATT:

9       Q    Officer Harbus, just to turn your attention to before

10   you observed that vehicle.

11             Did you at any time receive a consent form from

12   officer -- excuse me -- from Detective Shulman?

13      A    Yes.

14      Q    Okay.  And pursuant --

15             MR. ROSENBLATT:  Withdrawn.

16      Q    What type of forms did he give you?

17      A    I would like to refresh my memory and look at my

18   paperwork.

19             MR. ROSENBLATT:  Sure.

20             THE WITNESS:  (Perusing.)

21      Q    Are you looking for the --

22             MR. ROSENBLATT:  Well, withdrawn.

23      Q    What are you looking for?

24      A    The consent form.

25             MR. ROSENBLATT:  Your Honor, with the Court's

1              permission, may the witness be shown People's Exhibits 2 and

2         3 previously received into evidence?

3                    THE COURT:  Please show it to the witness.

4                    THE OFFICER:  (Complying.)

5                    MR. ROSENBLATT:  Thank you very much.

6         Q    Officer Alfaro, please look at what's been previously

7    received into evidence as People's 2 and 3.

8              Please tell the members of the jury if you recognize

9    those two items?

10        A    Yes.

11        Q    Did those two items refresh your recollection as to

12   what you reviewed before searching the defendant's car?

13        A    Yes.

14        Q    All right.  And what is it that you looked at and

15   reviewed before searching his car?

16        A    I read the consent form that was written and typed.

17        Q    Okay.  And after you searched the defendant's car as

18   you described earlier and recovered that knife, did you do

19   another search?

20        A    Yes.

21        Q    Tell the members of the jury what you did next.

22        A    Later on that evening, I went to the defendant's home

23   and recovered a massager.

24        Q    Who --

25                   MR. ROSENBLATT:  Withdrawn.

1      Q      Did you go alone or with others to the home?

2      A      I went with two other officers.

3      Q      And when you went to the defendant's home, do you

4    remember who opened the door for you?

5      A      The defendant's wife.

6      Q      And were you permitted inside the home?

7      A      Yes.

8      Q      Where did you go when you went inside the home?

9      A      I went into the master bedroom.

10      Q      Did you go directly there?

11      A      Yes.

12      Q      And where in the master bedroom did you look?

13      A      Under the bed.

14      Q      I'm sorry?

15      A      Under the bed.

16      Q      Okay.  And when you looked under the bed inside the

17    defendant's home, was that 242-10 89 Avenue?

18      A      Yes.

19      Q      When you looked under the bed inside that home, what

20    did you see?

21      A      A massager.

22      Q      And what did you do with that massager?

23      A      Took it into police custody and vouchered it.

24      Q      And was that assigned a different unique number?

25      A      Yes.

1          MR. ROSENBLATT:  Your Honor, may I show the

2     witness People's Exhibit 8 for identification purposes.

3          THE COURT:  Please show it to the witness.

4          THE OFFICER:  (Complying.)

5     Q    Officer Alfaro, take a look at what's been previously

6     marked as People's Exhibit 8 and tell the members of the jury if

7     you recognize that item?

8     A    Yes.

9     Q    What do you recognize that to be?

10    A    The massager that I recovered from the house.

11    Q    And how do you know that that is in fact the massager

12    that you recovered back in June of 2008?

13    A    I placed it in a security envelope where I had my

14    handwriting on the security envelope.

15    Q    And did you observe your handwriting on that item

16    today?

17    A    Yes.

18         MR. ROSENBLATT:  Your Honor, at this time I would

19    offer People's Exhibit 8 into evidence.

20         THE COURT:  Please show it to Mr. Bandelli.

21         MR. BANDELLI:  I don't need to see that, Judge.

22         THE COURT:  Do you have any questions?

23         MR. BANDELLI:  Yeah.  Just real brief.

24    VOIR DIRE EXAMINATION

25    BY MR. BANDELLI:

1    Q    You recovered that in the master bedroom?

2    A    Yes.

3    Q    Under the mother and father's bed?

4    A    Yes.

5             MR. BANDELLI:  No objection.

6             THE COURT:  Being no objection, People's 8 is

7    received in evidence.

8             (Whereupon, the item referred to was marked for

9    evidence as People's Exhibit 8 by the Court Reporter.)

10            THE OFFICER:  People's 8 marked and received.

11   CONTINUED DIRECT EXAMINATION

12   BY MR. ROSENBLATT:

13   Q    Officer Alfaro, as part of the arrest processing of the

14   defendant, did you photograph him?

15            MR. ROSENBLATT:  Withdrawn.

16   Q    Did you bring him down to the ground level of the

17   precinct to photograph him?

18   A    Yes.

19   Q    And approximately what time on June 24, 2008 did you do

20   that?

21   A    Approximately 2000 hours.

22   Q    When you say 2000 hours, what time is that in regular

23   time?

24   A    8:00 P.M.

25   Q    8:00 P.M. when you photographed the defendant as part

                                                         gjn

CELICA ALFARO HARBUS - People - Direct        572

1    of the arrest processing, did you observe any injuries on him?

2        A    No.

3        Q    Did you observe any scratches on him?

4        A    No.

5                MR. BANDELLI:  Objection, your Honor.

6                THE COURT:  Overruled.

7        Q    Did he request medical treatment?

8        A    No.

9                MR. BANDELLI:  Objection, your Honor.

10               THE COURT:  Overruled.

11       Q    Did you observe any bruises?

12       A    No.

13               MR. ROSENBLATT:  Your Honor, I have no further

14   questions for this witness.

15               THE COURT:  Mr. Bandelli, you may proceed.

16               MR. BANDELLI:  Thank you, Judge.

17               Good morning.

18               THE WITNESS:  Good morning.

19               MR. BANDELLI:  My name is Stanford Bandelli.  I

20   represent Harold Gopaul.

21               I have some questions I'm going to ask you.  If

22   you don't know the answer, just tell me you don't know.  If

23   you don't understand the question, let me know and I will

24   try and rephrase it.

25               THE WITNESS:  Okay.

1    CROSS-EXAMINATION

2    BY MR. BANDELLI:

3        Q    All right.  You work out of the 105 precinct for the

4    past eight years, correct?

5        A    Yes.

6        Q    So at the time of this incident, you had been working

7    there six years; is that correct?

8        A    Yes.

9        Q    And on June 23rd into June 24th, your testimony was

10   that your tour was 11:15 P.M. on the 23rd to 7:50 A.M. on the

11   24th; is that correct?

12       A    Yes.

13       Q    And you testified that you were on patrol and you got a

14   call to come back to the precinct at around 4:40 A.M.?

15       A    Yes.

16       Q    Okay.  And where on patrol were you?

17       A    Excuse me?

18       Q    Where were you?

19       A    On patrol.

20       Q    But where?

21       A    Within the confines of the 105 precinct.

22       Q    How big is the 105 precinct, the confines?

23       A    Approximately thirteen miles.

24       Q    Approximately thirteen miles.

25            And do you know where within that thirteen-mile confine

gjn

1   you were?

2        A    I don't remember.

3        Q    Is there anything that might refresh your recollection?

4        A    Look into my memo book.

5        Q    Okay.

6        A    (Complying.)

7             I am looking into my memo book.

8             I don't recall.

9        Q    You don't know?

10       A    I don't recall.

11       Q    So it could have been anywhere within that

12   thirteen-mile vicinity?

13       A    I don't recall.

14       Q    You arrived at the precinct at 4:41 A.M.; is that your

15   testimony?

16       A    Yes.

17       Q    Okay.  I guess you weren't that far?

18             MR. ROSENBLATT:  Objection.

19       Q    You said you were called back to the precinct to

20   process an arrest; is that correct?

21       A    Yes.

22       Q    And that arrest was of my client, Harold Gopaul; is

23   that correct?

24       A    Yes.

25       Q    And he was already in custody at the time you returned

gjn

1       to the precinct; is that correct?

2           A    I don't recall.

3           Q    You don't recall?

4                Well, you weren't told by the desk sergeant that my

5       client had already been placed in custody prior to your arriving

6       at the precinct?

7                       MR. ROSENBLATT:  Objection.

8                       THE COURT:  Sustained.

9           Q    Do you recall testifying at a hearing around May 5th of

10      2009 and being asked these questions and giving these answers?

11                      "QUESTION:  Well, weren't you told to come back to

12          the station house to take an arrest"?

13                      MR. ROSENBLATT:  I am going to object, your Honor.

14                      THE COURT:  What's the basis of your objection?

15                      MR. ROSENBLATT:  The question contains hearsay,

16          Judge.

17                      THE COURT:  Approach the bench.

18                      (Whereupon, a conference was held between all

19          counsel and the Court on the record at the side-bar.)

20                      THE COURT:  The objection is what?

21                      MR. ROSENBLATT:  The question at the hearing

22          contains hearsay.  At the hearing, it's a different standard

23          than at the trial, obviously, so the questions are permitted

24          at the hearing that contain hearsay; questions at a trial,

25          it's a different.

                                                          gjn

Sidebar Conference                    576

1              THE COURT:  What are you attempting to do?

2              MR. BANDELLI:  Rules of Evidence 101.  It's a

3     prior inconsistent statement.  She doesn't recall what she

4     said.

5              THE COURT:  She doesn't recall.

6              Do you want to refresh her recollection.

7              MR. BANDELLI:  No, I don't need to refresh her

8     recollection.

9              Do you want to look at Richardson's?  It's right

10    here.

11             THE COURT:  Please, please, please, please,

12    please.

13             What did she testify to now that she was

14    inconsistent.

15             MR. BANDELLI:  That he was under arrest when she

16    got there.  He was already in custody.  Now she said she

17    doesn't recall.

18             THE COURT:  You can attempt to refresh her

19    recollection by asking her to read that she is not stating

20    anything inconsistent.

21             MR. BANDELLI:  No, no.

22             THE COURT:  Only that she doesn't recall.

23             MR. BANDELLI:  Actually saying she doesn't recall

24    enough for me to ask the question, Judge.

25             THE COURT:  Mr. Bandelli, it's enough for you to

1       show her the exhibit letter, to read them to herself and ask

2       if it refreshes her recollection.

3               When she said she doesn't know, that's not

4       inconsistent.

5               MR. BANDELLI:  Forgotten matter is, according to

6       Richardson's, it's close enough.

7               THE COURT:  Bring it up here.

8               MR. BANDELLI:  I'll show it to you.

9               Introduction of inconsistent oral statements

10      impeaching evidence requires asking a witness whether the

11      statements were made specifying the time and place person

12      who made and language and substance of the language used.

13              People versus Conception 175 AD 2d.

14              THE COURT:  You don't have to read the whole

15      thing.

16              MR. BANDELLI:  Okay.  It is not necessary in order

17      to admit evidence of inconsistent statements.

18              It's not inconsistent that the witness should deny

19      having made them.  If the witness claims not to remember

20      having made the statements, will neither admit nor deny

21      having made the statements, foundation is sufficiently made

22      in the self-contradictory statements, may be shown to

23      impeach the credibility.

24              MR. ROSENBLATT:  "May be" shown.

25              MR. BANDELLI:  Not to the witness.

                                                        gjn

1          THE COURT:  Mr. Bandelli.  She hasn't testified to

2     anything inconsistent.

3          MR. BANDELLI:  Doesn't matter.

4          THE COURT:  Mr. Bandelli, she said she doesn't

5     recall.

6          MR. BANDELLI:  Right, that's enough --

7          THE COURT:  If you want to show her the minutes

8     and ask her if that refreshes her recollection, you can do

9     that.  She hasn't testified to anything inconsistent that

10    she testified to at the hearing.

11         That's my ruling.

12         MR. BANDELLI:  Note my exception, Judge.

13         THE COURT:  You have an exception.

14         MR. BANDELLI:  And just -- so the case law is Lowe

15    versus New York Central Railroad 161 AD 939 and Handenklerk

16    versus Ehrlich 178 NY 174.  This goes back to the beginning

17    of time.

18         (Whereupon, all parties returned from the sidebar

19    and the following took place:)

20         MR. BANDELLI:  Your Honor, I am going to ask that

21    this be shown to Officer Harbus, and I am going to circle

22    certain portions of it, specifically lines twelve through 20

23    at page 262, and I am going to ask that she review this and

24    ask her whether or not reviewing this refreshes her

25    recollection as to whether or not Mr. Gopaul was in custody

1        at the time she returned to the precinct.

2                    THE COURT:  Please show that to the witness.

3                    THE OFFICER:  (Complying.)

4                    THE WITNESS:  (Perusing.)

5        Q    Does it is refresh your recollection?

6        A    Yes.

7        Q    Was he in custody at the time you returned to the

8   precinct?

9        A    Yes.

10       Q    Thank you.

11            So that isn't consistent with what you testified to --

12                   THE COURT:  Sustained.

13                   MR. ROSENBLATT:  Objection.

14                   THE COURT:  Please.

15                   Jurors, disregard those comments.

16       Q    Who placed Mr. Gopaul in custody?

17       A    I wasn't there.

18       Q    You weren't there.

19            When did Mr. Gopaul get to the precinct?

20       A    I wasn't there.

21       Q    So you have no idea what time he got to the precinct?

22       A    No.

23       Q    You have no idea who placed him in custody?

24       A    No.

25       Q    When you got to the 105 precinct, were there other

                                                        gjn

1    police officers at the precinct?

2         A    I don't recall.

3         Q    You don't recall if there were any other police

4    officers at the 105 precinct?

5         A    I don't recall.

6         Q    Well, how many officers are typically working a tour

7    from midnight to 8:00 or from 11:15 and 7:50 P.M. in your six

8    years working at the 105 precinct?

9         A    Could be up to 15 to 30.

10        Q    15 to 30.

11             And you don't recall if anybody was there?

12        A    Officers that I recall, I don't recall any officers.

13        Q    Were there officers in the precinct when you got back

14   to the precinct?

15        A    Yes.

16        Q    But you don't know who they were?

17        A    No.

18        Q    Was Sergeant O'Hagan there?

19        A    I don't recall.

20        Q    You don't recall Sergeant O'Hagan was there?

21             MR. ROSENBLATT:  Objection.

22             THE COURT:  Sustained.

23        Q    Do you recall Detective Shulman was there?

24        A    Yes.

25        Q    Okay.  Now you testified earlier that when you got to

1    the precinct, my client was already on the second floor; is that

2    correct?

3         A    Yes.

4         Q    So that would have been at around 4:40 in the morning

5    or 4:41 A.M. that he was already on the second floor; is that

6    correct?

7         A    Yes.

8         Q    And that's the detective squad where Detective

9    Shulman's office is located; is that correct?

10        A    Yes.

11        Q    Okay.  Who told you to go up to the second floor?

12        A    I don't recall.

13        Q    Well, how did you know to go up to the second floor?

14        A    Someone told me he was up there, I don't recall who.

15        Q    Someone just said, hey, Officer Alfaro, there is

16   somebody up on the second floor?

17        A    Yeah.

18        Q    Okay.  And you don't know who that was?

19        A    I don't recall.

20        Q    All right.  Where was he when you first saw him?

21        A    In the interview room.

22        Q    Was he in handcuffs?

23        A    No.

24        Q    Was anybody with him?

25        A    He was by himself.

CELICA ALFARO HARBUS - Defense - Cross        582

1      Q    He was by himself in that interview room.

2           There is a door with a window on it?

3      A    Yes.

4      Q    And the window was closed at that time, there was an

5      obstruction in front of the window at that time; is that

6      correct?

7      A    I don't recall.

8      Q    You don't recall that either?

9      A    No.

10     Q    Well, who pointed you to that interview room and told

11     you he was in there?

12     A    Detective Shulman.

13     Q    Oh, you talked to Detective Shulman first; is that

14     correct?

15     A    Yes.

16     Q    Okay.  And after talking to Detective Shulman, who went

17     in the room?

18     A    I don't recall.

19     Q    You don't recall?

20     A    No.

21     Q    Had you spoken to Sana Awan at this point?

22     A    No.

23     Q    No.

24          How long after meeting with Mr. Gopaul did you speak

25     with Sana Awan?

1        A     Don't recall.

2        Q     Was it a half hour, an hour, two hours?

3        A     Approximately forty-five minutes to an hour.

4        Q     So 25 minutes to a half hour after you placed

5   Mr. Gopaul under arrest, you spoke with Sana Awan; is that

6   correct?

7        A     Yes.

8        Q     Okay.  Do you recall testifying before the grand jury

9   in Queens, Officer Alfaro?

10       A     Yes.

11       Q     Okay.  And do you recall being asked these questions

12   and giving these answers?

13              "QUESTION:  Prior to making that arrest on June

14       24, 2008, did you speak to anybody?

15              "ANSWER:  Yes.

16              "QUESTION:  Who did you speak with?

17              "ANSWER:  The complainant.

18              "QUESTION:  What is her name?

19              "ANSWER:  Sana.

20              "QUESTION:  After speaking with her on June 24th,

21       who did you arrest?

22              "ANSWER:  The defendant, Mr. Gopaul."

23       Q     Didn't you just testify that you didn't speak to the

24   complainant until a half hour after you arrested Mr. Gopaul?

25       A     Yes.

1      Q    But in the grand jury, it was different.  In the grand

2    jury, you said you spoke to her and then you placed him under

3    arrest; isn't that correct?

4      A    Yes, yes.

5      Q    So which is it?

6           MR. ROSENBLATT:  Objection.

7           THE COURT:  Overruled.

8      A    I spoke to her after -- after he was placed under

9    arrest.

10     Q    So you lied under oath before the grand jury?

11          MR. ROSENBLATT:  Objection.

12          THE COURT:  Sustained.

13     Q    Did you prepare an online booking sheet in this case?

14     A    Yes.

15     Q    That's one of your duties as the arresting officer, to

16   prepare an online booking sheet, right?

17     A    Yes.

18     Q    And on the online booking sheet, there is a box that

19   asks time of arrest for an individual; is that correct?

20     A    Yes.

21     Q    And that's information that is required to be filled

22   out by the arresting officer; is that correct?

23     A    Yes.

24     Q    Do you have a copy of your online booking sheet in this

25   case?

1      A    Yes.

2           (Perusing.)

3      Q    What time does it indicate you placed Mr. Gopaul under

4  arrest?

5           MR. ROSENBLATT:  Objection.

6      Q    What time?

7           THE COURT:  Overruled.

8           MR. BANDELLI:  Thank you, your Honor.

9      A    0445.

10     Q    It says time of arrest 0445 on the online booking

11 sheet?

12     A    Yes.

13          MR. BANDELLI:  Really.

14          I'll have this marked Defendant's Number 1 for

15 identification and ask that it be shown to the witness.

16          THE COURT:  Please mark that Defense A for

17 identification.

18          (Whereupon, the item referred to was marked for

19 identification as Defendant's Exhibit A by the Court

20 Reporter.)

21          THE OFFICER:  Defense A marked for ID only.

22     Q    Officer, do you recognize that?

23     A    Yes.

24     Q    What do you recognize it to be?

25     A    Online booking sheet.

1    Q    Is that the online booking sheet that you prepared?

2    A    Yes.

3    Q    And you prepared that in the regular course of your

4    duties as a police officer?

5    A    Yes.

6    Q    And it's required to be prepared in accordance with

7    your duties as a police officer; is it not?

8    A    It's not required.

9    Q    The New York patrol volume doesn't require that you

10   prepare --

11   A    It's just a rough draft.

12   Q    It's a rough draft.

13        You prepared that rough draft?

14   A    Yes.

15   Q    Okay.  Okay.  And that rough draft was completely

16   filled out?

17   A    No.

18   Q    It's not, okay.

19        What's missing from it?

20   A    The arrest number.

21   Q    And how about the arrest time?

22   A    The arrest time.

23   Q    Is there an arrest time on that online booking sheet?

24   A    No.

25   Q    No.

gjn

1              When did you put --

2              Can I see the online booking sheet that you referred

3     to?

4        A    (Handing.)

5        Q    This isn't an online booking sheet?

6              MR. ROSENBLATT:  Objection.

7              MR. BANDELLI:  Wow, wow, wow.

8              THE COURT:  It's sustained.

9              MR. BANDELLI:  Hand this back to the witness.

10             THE OFFICER:  (Complying.)

11       Q    What is this that you are referring to as an online

12    booking sheet?

13       A    It's an online, it's an online.

14       Q    Is that the online booking sheet, the arrest booking

15    sheet that was supposed to be filed in this case?

16             MR. ROSENBLATT:  Objection.

17             THE COURT:  Approach the bench, please.

18             (Whereupon, a conference was held between all

19       counsel and the Court on the record at the side-bar.)

20             THE COURT:  You are getting --

21             MR. BANDELLI:  We have an online booking sheet.  I

22       don't know what that is, I asked her --

23             THE COURT:  It's an arrest form.

24             MR. BANDELLI:  It's not an online booking sheet?

25             THE COURT:  It's an arrest form.

gjn

1          MR. BANDELLI:  Judge, we all learned in intake

2     what an online booking sheet is.

3          THE COURT:  Mr. Bandelli, that's an online

4     booking.

5          MR. BANDELLI:  Correct.

6          THE COURT:  And this is an arrest form

7     (indicating).

8          MR. BANDELLI:  So (indicating) --

9          MR. ROSENBLATT:  He is not testifying, okay?

10    What counsel is doing is insinuating to the jury

11    that he is the one who is going to provide the information.

12    He is not providing questions, he is providing answers for

13    the jury.  I am asking the comments stop.

14         THE COURT:  What?

15         MR. ROSENBLATT:  I am asking the comments to the

16    jury stop.

17         THE COURT:  The officer may not know the

18    difference between --

19         MR. BANDELLI:  Well, how do we clarify that,

20    Judge?

21         THE COURT:  See this, "arrest form" on top.

22         MR. BANDELLI:  And I am asking about the online

23    booking sheet, though.

24         THE COURT:  You can proceed without getting too

25    excited about all of this.

1                        Go ahead.

2                        MR. BANDELLI:  I mean, this is --

3                        THE COURT:  Go ahead, proceed.

4                        (Whereupon, all parties returned from the sidebar

5        and the following took place:)

6                        MR. BANDELLI:  May I, Judge?

7                        THE COURT:  Yes, you may.

8        Q    Do you have a copy of your online booking sheet?

9        A    Yes.

10       Q    Can I see it, please?

11       A    (Handing.)

12       Q    Okay.  This is your online booking sheet?

13       A    Yes.  And here is the other half of it (handing).

14       Q    And I'll ask you to note on your online booking sheet,

15       what time did you identify is the time of the arrest of the

16       defendant?

17       A    I don't have it written down.

18       Q    You didn't write it down?

19       A    No.

20       Q    And it's required to be put in there; isn't that

21       correct?

22                        MR. ROSENBLATT:  Objection.

23                        THE COURT:  Let me see that.

24                        THE WITNESS:  (Handing.)

25                        It's a worksheet.

                                                              gjn

1          THE COURT:  (Perusing.)

2          All right.  Officer, this Defendant's Exhibit A is

3     not the final copy, is it?  Is that the final copy?

4          THE WITNESS:  I have to look.

5          MR. BANDELLI:  She has her own copy, Judge.  That

6     was my copy.

7          THE WITNESS:  (Perusing.)

8          THE COURT:  Those copies of each other or is one a

9     finalized copy?

10         THE WITNESS:  It's a copy of each other.

11         THE COURT:  You may proceed, Mr. Bandelli.

12    Q    There was a question asked:  Are you required to put

13    the time of the arrest on the online booking sheet; is that

14    correct?

15    A    It's a worksheet, it's not required.  If you have the

16    hard copy which you put into the computer which is the hard copy

17    which goes into the computer is the final where you get an

18    online, where you get an arrest number.

19    Q    Does it say directly on the online booking sheet this

20    information is required to be provided on this sheet?

21         MR. ROSENBLATT:  Objection.

22         THE COURT:  Let's clear up the other thing.

23         Are those scratch copies?

24         THE WITNESS:  These are scratch copies.

25         THE COURT:  Scratch copies?

1              THE WITNESS:  Yes.

2    Q    Are they signed off by supervisors?

3              THE COURT:  Mr. Bandelli, please.  Mr. Bandelli.

4              MR. BANDELLI:  But they are signed off on.

5              THE COURT:  Please.  Mr. DA, where is the final

6    copy of this online booking sheet?

7              (There was a brief pause in the proceedings.)

8              THE COURT:  Officer, I just want to clarify

9    something:  Those what you call "scratch copies" that you

10   have, Defense A and your own copy, are those duplicates of

11   each other?

12             THE WITNESS:  Yes, they are.

13             THE COURT:  Okay.  Now who inputs these in the

14   computer system in the precinct?

15             THE WITNESS:  Usually it's a PA or an officer, if

16   they have a code.

17             THE COURT:  Then a copy comes out, the final copy

18   comes out in printed form, correct?

19             THE WITNESS:  Yes.

20             THE COURT:  Okay, proceed.

21             MR. BANDELLI:  I would like to see the final copy,

22   Judge.

23             THE COURT:  Do you have a final copy?

24             MR. BANDELLI:  That's all that I was provided

25   with, Judge.  I thought it was a final copy.

                                                          gjn

1           THE COURT:  A final copy is in printed form, the

2      witness said.

3           MR. BANDELLI:  I don't have it.

4           MR. ROSENBLATT:  Printed form, the typed form,

5      Judge?

6           THE COURT:  Yes.

7           MR. ROSENBLATT:  The Omni arrest form, Judge.

8           MR. BANDELLI:  No, the online booking sheet.

9           MR. ROSENBLATT:  Could we approach, Judge?

10          THE COURT:  Approach the bench.

11          MR. ROSENBLATT:  I think we are all talking about

12     different things.

13          THE COURT:  Maybe we are.  Approach.

14          (Whereupon, a conference was held between all

15     counsel and the Court on the record at the side-bar.)

16          MR. ROSENBLATT:  You are confused with what you're

17     asking, Judge.

18          (Whereupon, all parties returned from the sidebar

19     and the following took place:)

20          MR. BANDELLI:  Just a couple of questions and I'll

21     move on.

22     Q    The online booking sheet that was marked as

23     Defendant's A and the copy that you had in your file is

24     identical; is that correct?

25     A    Yes.

gjn

1        Q     At the bottom, that's signed off by a supervising

2    officer; is that correct?

3        A     Yes.

4        Q     Who's it signed off by?

5        A     Sergeant Manglangis.

6        Q     And who else?

7        A     Officer Alfaro, me.

8        Q     Sergeant who?

9        A     Me and Sergeant Manglangis.

10       Q     Who?

11       A     Me and Sergeant Manglangis.

12       Q     You signed off on that after you reviewed it; is that

13   correct?

14       A     Yes.

15       Q     And there is no arrest time in that?

16             MR. ROSENBLATT:  Objection, asked and answered.

17             MR. BANDELLI:  I am just trying to clarify this,

18   Judge.

19             THE COURT:  Sustained.

20       Q     Is there an arrest time on that?

21             MR. ROSENBLATT:  Objection.  Asked and answered.

22             THE COURT:  Overruled.

23       A     Yes -- no, no arrest time.

24       Q     There is not, correct?

25       A     No.

1              MR. BANDELLI:  Thank you.

2              I will take that back.

3              THE OFFICER:  (Handing.)

4        Q    Now you said you spoke to -- you testified here today

5   that you spoke to Ms. Awan about a half hour after you had

6   placed Mr. Gopaul under arrest; is that correct?

7        A    Yeah, about forty-five minutes.

8        Q    Where was that?

9        A    Up in the squad.

10       Q    Up in the squad.

11            Where in the squad?

12       A    In a different interview room.

13       Q    Okay.  Who was present?

14       A    Her mother.

15       Q    Her mother?

16       A    Yes.

17       Q    Okay.  And at some point -- at some point, you went

18   down to -- to inspect my client's automobile; is that correct?

19       A    Yes.

20       Q    And that would have been between 8 o'clock and

21   9 o'clock in the morning; is that correct?

22       A    Yes.

23       Q    Okay.  And you went into the vehicle; is that correct?

24       A    Yes.

25       Q    Okay.  And did you use the keys to get into the

1    vehicle?

2        A    I don't recall.

3        Q    How did you get into the vehicle?

4        A    I don't recall.

5        Q    You don't recall how you got into the vehicle?

6            MR. ROSENBLATT:  Objection, asked and answered.

7            THE COURT:  Sustained.

8        Q    Well, who told you to go down to the vehicle?

9        A    I don't recall.

10       Q    Why did you decide to go down to the vehicle?

11       A    Because the victim said that there was like a meat

12   cleaver that was used.

13       Q    Okay.  And she said that to you forty-five minutes

14   after you arrested Mr. Gopaul which would have been at 5:30 in

15   the morning.

16            Why did you decide to go down there between 8 o'clock

17   and 9 o'clock in the morning?

18            MR. ROSENBLATT:  Objection.

19            THE COURT:  Sustained.

20       Q    Well, why didn't you go down there right after she told

21   you?

22            MR. ROSENBLATT:  Objection.

23            THE COURT:  Sustained.

24       Q    Isn't it a fact Detective Shulman is the one who told

25   you to go down to the vehicle?

CELICA ALFARO HARBUS - Defense - Cross        596

1    A    I don't recall.

2    Q    You don't recall?

3    A    (Nodding.)

4    Q    Isn't it a fact Detective Shulman had the keys to the

5    vehicle?

6    A    I don't recall.

7    Q    The defendant, my client, Mr. Gopaul drove over to the

8    precinct in that vehicle; is that correct?

9              MR. ROSENBLATT:  Objection.

10             THE COURT:  Do you know the answer to that?

11   Q    If you know the answer.

12   A    I wasn't there.

13   Q    So you don't know how the vehicle got there?

14   A    No.

15   Q    Was the vehicle there before you went out on patrol on

16   June 23rd?

17   A    No.

18   Q    It wasn't there, but it was there when you returned at

19   4:41; is that correct?

20   A    Yes.

21   Q    Which means somebody would have given it there; is that

22   correct?

23   A    Yes.

24   Q    Okay.  And did this vehicle require a key to operate?

25   A    I believe so.

1    Q    Okay.  And your testimony is that you have no idea

2    where that key is; is that correct?

3    A    I don't recall if the vehicle was unlocked or if it was

4    locked.

5    Q    Okay.  What happened to the key?

6    A    I don't recall.

7    Q    Well, who had the key to the vehicle?

8    A    I don't recall.

9    Q    Did my client have the key to the vehicle?

10              THE COURT:  Sustained.

11              Mr. Bandelli, she doesn't know where the key is,

12       okay?  Move on.

13              MR. BANDELLI:  Okay.

14    Q    Now, you said later that evening, almost 8 o'clock,

15    9 o'clock at night, almost twelve hours after you had completed

16    your tour, you went over to Mr. Gopaul's house; is that correct?

17    A    I said later that evening.  I don't know approximately

18    what time.

19    Q    Well, you testified -- okay.  Well, when was it, later

20    on that evening, then?

21    A    I don't recall.  It was dark out.

22    Q    Okay.  And this was in June of 2008, right?

23    A    Yes.

24    Q    What time did it start getting dark in June of 2008?

25    A    I don't know.  It was two years ago, so I don't know.

gjn

1     Q    Well, what time, based on your life experience, does it

2   start to get dark in the summer?

3     A    Usually like around 7:30, 8 o'clock.

4     Q    So then you would have gone to the house sometime after

5   7:30, 8 o'clock because it was dark out, right?

6     A    Yeah.

7     Q    Who did you go with?

8     A    Two officers.

9     Q    Okay.  And who was that?

10     A    Officer Morris and Officer Ingrassia.

11     Q    Was that Officer Morris, the officer that initially

12   interviewed Sana when she first came to the precinct?

13     A    Yes.

14     Q    But she awsn't the arresting officer, was she?

15     A    No.

16     Q    And when you got to the house, Mr. Gopaul's wife,

17   Merlin Gopaul, was there at the house; is that correct?

18     A    Yes.

19     Q    Did she let you right into the house?

20     A    Excuse me?

21     Q    Did she let you right into the house?

22     A    Yes.

23     Q    And did you know where the master bedroom was when you

24   came into the house?

25     A    No.

gjn

1    Q    Did you ask her where the master bedroom was?

2    A    Sana showed me.

3    Q    She showed you where it was, right?

4    A    Yes.

5    Q    She said:  Come on up to the master bedroom, right?

6    A    Yes.

7    Q    And you went into the master bedroom and you looked

8    under her bed, right?

9    A    Yes.

10    Q    And that's where you found the massager?

11    A    Yes.

12            MR. BANDELLI:  I have no further questions.

13            MR. ROSENBLATT:  Just briefly, your Honor.

14            THE COURT:  You may proceed.

15            MR. ROSENBLATT:  Thank you.

16    REDIRECT EXAMINATION

17    BY MR. ROSENBLATT:

18    Q    I'm sorry.  Officer Harbus, who showed you where the

19    master bedroom was?  I didn't hear you.

20    A    Sana.

21    Q    Sana?

22    A    Sana.

23    Q    Now there was some confusion earlier about different

24    forms that are filled out in regards to arrest processing?

25    A    Yes.

1      Q      You talked about a scratch copy earlier.

2             Tell the members of the jury what you do with that

3      scratch copy.

4      A      That scratch copy is for my files.  It just writes down

5      basically what the charges are so my supervisor can review, if

6      there is any other charges that need to be added, they could add

7      it or take a charge away if it's not.

8      Q      Go ahead.  I'm sorry.

9      A      And then from there I put it into the computer which is

10     a hard copy and that's the finalized copy.

11     Q      And after you enter that scratch copy into the

12     computer, what's generated?

13     A      An online -- an arrest ID number.

14     Q      All right.  And on that arrest paperwork, is an arrest

15     time generated as well?

16     A      Yes.

17     Q      Okay.  How does that arrest time get generated?

18     A      The officer inputs it.

19     Q      Okay.  Now you told us earlier that you were unsure

20     about the car keys, as to where they came from --

21     A      Yes.

22     Q      -- correct?

23            Did there come a point in time, specifically I am

24     speaking about 9:24 in the evening, that you returned this

25     Ecolab truck back to the company?

                                                        gjn

1          THE WITNESS:  Can I refresh my recollection?

2          MR. ROSENBLATT:  With the Court's permission,

3      absolutely.

4          THE WITNESS:  (Perusing.)

5      A    Yes.

6      Q    Okay.  And at 9:24 in the P.M. on June 24, 2008, how

7  did you return that car back to its -- back to the owner or

8  someone from the company?

9      A    Returned it with the keys and to a representative of

10  the Ecolab company.

11          MR. ROSENBLATT:  I have no further questions, your

12      Honor.  Thank you.

13          THE COURT:  Any recross, Mr. Bandelli?

14          MR. BANDELLI:  Yeah.

15  RECROSS-EXAMINATION

16  BY MR. BANDELLI:

17      Q    Where did you get the keys from?

18      A    I don't recall.

19          MR. BANDELLI:  Nothing further, Judge.

20          THE COURT:  All right.  Thank you, Officer.  You

21      may step down.

22          (Whereupon, the witness left the witness stand.)

23          THE COURT:  All right.  Members of the jury, take

24      a 15 minute recess.  The Court has another matter it must

25      tend to.

                                                        gjn

1          Remember you are not to discuss this case among

2     yourselves or with anyone fellows anyone tries to discuss it

3     with you, you are to bring it to my attention.  And you are

4     not to form any opinion as to whether or not you feel the

5     defendant is guilty or not guilty of the crimes with which

6     he is charged.

7          Please follow the instruction of the court

8     officer.

9          (Whereupon, the jury exited the courtroom and the

10    following occurred:)

11         THE COURT:  Take a 15-minute recess, please.

12         Put Mr. Gopaul back in.

13         (Whereupon, a recess was taken, after which the

14    following occurred.)

15         THE CLERK:  Case on trial.  All parties present,

16    your Honor.

17         THE COURT:  Bring out the jurors, please.

18         (Whereupon, the jury entered the courtroom and

19    upon taking their respective seats, the following occurred:)

20         THE CLERK:  Case on trial.  All parties present,

21    your Honor.

22         Do both sides stipulate all jurors are present and

23    properly seated?

24         MR. ROSENBLATT:  Yes.

25         MR. BANDELLI:  So stipulated, your Honor.

```
 1              THE COURT:  You may call your next witness.

 2              MR. ROSENBLATT:  People call Christine Alioto.

 3              (Whereupon, the witness entered the witness

 4       stand.)

 5  C H R I S T I N E   A L I O T O , after having first been duly

 6       sworn was examined and testified as follows:

 7              THE WITNESS:  Yes.

 8              THE CLERK:  Thank you.  Please be seated.

 9              THE OFFICER:  People call Christine Alioto, last

10       name A-L-I-O-T-O, resident of Queens County.

11              THE COURT:  You may proceed, Mr. DA.

12              MR. ROSENBLATT:  Thank you, your Honor.

13  DIRECT EXAMINATION

14  BY MR. ROSENBLATT:

15       Q     Christine, how old are you?

16       A     19.

17       Q     When were you born?

18       A     June 17, 1991.

19       Q     And do you work or are you in school?

20       A     I'm in school.

21       Q     What type of school do you attend?

22       A     College.

23       Q     And what state do you go to school in?

24       A     Connecticut.

25       Q     What year of college are you currently in?
```

1      A    I just finished my first year.

2      Q    And what high school did you go to?

3      A    I went to Queens High School of Teaching.

4      Q    How did you do in high school?

5      A    I was an honors student.

6      Q    How are you doing in college?

7      A    Pretty good.

8      Q    When you lived in Queens, who do you live with?

9      A    My mother.

10     Q    And what's your mother's name?

11     A    Denise Alioto.

12     Q    Can you describe what your relationship is with your

13  mother?

14     A    She is very supportive of me.  I can confide in her, I

15  can talk to her.

16     Q    Okay.  Do you know someone by the name of Sana Awan?

17     A    Yes, I do.

18     Q    Okay.  I want to talk to you about prior to June 23rd

19  of 2008.

20          What was your relationship with Sana Awan?

21     A    We were classmates.  And through volunteering for

22  teaching at school, we became best friends.

23     Q    Did you go to school together at Queens High School for

24  Teaching?

25     A    Yes.

1      Q      And do you remember when you first met, what year it

2   was in school?

3      A      It was probably junior year.

4      Q      Prior to June 23rd of 2008, had Sana ever been to your

5   home?

6      A      Prior to June -- being -- yes.

7      Q      And prior to June 23rd of 2008, had you ever been in

8   her home?

9      A      Yes.

10     Q      Do you know someone by the name of Harold Gopaul?

11     A      Yes, I do.

12     Q      Who's he?

13     A      He is Sana's stepfather.

14     Q      Do you see him in the courtroom today?

15     A      Yes, I do.

16     Q      Can you identify him by an article of clothing that he

17  is wearing?

18     A      He is wearing a white shirt with pinstripes and a red

19  tie.

20              MR. BANDELLI:  Indicating my client.

21              THE COURT:  Let the record reflect the witness

22        identified the defendant.

23              MR. ROSENBLATT:  Thank you, your Honor.

24     Q      Prior to June 23rd of 2008, approximately how many

25  times had you met Mr. Gopaul, the defendant?

CHRISTINE ALIOTO - People - Direct                    606

```
 1        A    I would say about more than ten times.

 2        Q    Okay.  Whenever he picked you up from school?

 3        A    Yes.

 4        Q    And had he ever driven you to school?

 5        A    No.

 6        Q    I want to talk to you about June 23, 2008 at

 7   approximately 8:00 P.M. in the evening.

 8        A    Okay.

 9        Q    On June 23, 2008 sometime after 8 o'clock in the

10   evening, where were you?

11        A    I was in my room.

12        Q    And what happened on that date?

13        A    I received a phone call from Sana.

14        Q    Don't tell us what she told you, but can you describe

15   the tone of her voice?

16        A    She was very nervous.

17        Q    Had you spoken to her on the phone prior to June 23rd

18   of 2008, have you and her ever spoken on the phone?

19        A    Yes.

20        Q    Was this a normal tone of her voice?

21        A    No.

22        Q    Don't tell us what she said, but what did you say to

23   her?

24             MR. BANDELLI:  Objection, your Honor.

25             THE COURT:  Basis of your objection?
```

gjn

1          MR. BANDELLI:  It's hearsay, what she said

2     previously.

3          THE COURT:  Approach the bench.

4          (Whereupon, a conference was held between all

5     counsel and the Court on the record at the side-bar.)

6          THE COURT:  I will hear you.

7          MR. ROSENBLATT:  Judge, I believe that what this

8     witness is going to say is not hearsay, and even if your

9     Honor determines it is hearsay, it's not got all the

10    requirements that a Court looks to when evaluating

11    testimony.  She can be examined as to what she said.  She is

12    here before the jury for them to evaluate her credibility.

13         MR. BANDELLI:  That's not a basis for the

14    admissibility statement that I can cross-examine her on.

15         THE COURT:  Objection overruled.  You have your

16    exception.

17         MR. BANDELLI:  Thank you.

18         (Whereupon, all parties returned from the sidebar

19    and the following took place:)

20    Q    Do you remember what the question was, or do you want

21    me to repeat it?

22    A    Please repeat it.

23    Q    Don't tell us what Sana said to you, but what did you

24    say to her?

25    A    I said -- has he touched you.  She responded.

gjn

CHRISTINE ALIOTO - People Defense - Direct Cross 608

1           MR. BANDELLI:  Objection.

2     Q    Don't tell us --

3           MR. BANDELLI:  Objection.

4           THE COURT:  Approach the bench.

5           (Whereupon, a conference was held between all

6     counsel and the Court on the record at the side-bar.)

7           THE COURT:  The last answer was there.

8           I will allow the answer to remain as evidence in

9     this case.

10          Your objection is overruled.  Don't ask her to

11    repeat that.

12          MR. ROSENBLATT:  I will not.

13          THE COURT:  It's in the record.

14          MR. ROSENBLATT:  Thank you.

15          THE COURT:  Proceed.

16          (Whereupon, all parties returned from the sidebar

17    and the following took place:)

18          THE COURT:  You may proceed.

19    Q    Christine, after Sana said that to you, what did you

20    do?

21    A    I woke my mother.

22          MR. BANDELLI:  After that, Sana said what to you?

23          MR. ROSENBLATT:  Okay.  Judge, I will withdraw the

24    question.

25    Q    What did Sana say to you?

1              MR. BANDELLI:  Objection.

2              MR. ROSENBLATT:  I will withdraw the question.

3              THE COURT:  Sustained.

4       Q    Without telling what Sana said, what did you do next?

5       A    I woke my mother up.

6       Q    And what did you do in regards to the phone?

7       A    I gave the phone to my mother.

8       Q    And did there come a point in time when your mother

9  hung up the phone?

10      A    Yes.

11      Q    After your mother hung up the phone, what happened?

12      A    We got dressed and we went to go get Sana.

13      Q    When you say you went to get Sana, where did you get

14  her?

15      A    We picked her up a couple blocks away from our house.

16      Q    And approximately how far from your house or her

17  house -- I'm sorry.

18      A    We are not very far from each other, so it was in

19  between.

20      Q    A few blocks from your house and a few blocks from her

21  house?

22      A    Yeah.

23      Q    And how did Sana appear when you picked her up?

24      A    Very nervous.

25      Q    After you picked up Sana, where did you go?

gjn

1    A    We went to the precinct.

2    Q    Prior to arriving at the precinct, did you stop

3    somewhere else?

4              MR. BANDELLI:  Objection.

5              THE COURT:  Overruled.

6    A    We stopped to -- my mom made a phone call and Sana and

7    I left the car and we went into Hollywood Video and so I just

8    saw she was very, very upset.

9    Q    Okay.  Well --

10             MR. BANDELLI:  Objection, your Honor.

11             THE COURT:  Overruled.

12             MR. BANDELLI:  The question is --

13             THE COURT:  Overruled, overruled, overruled.

14   Q    When your mother was on the phone call, you and Sana

15   got out?

16   A    Yes.

17   Q    And then you went to the precinct?

18   A    Yes.

19   Q    Approximately, if you remember, in June of 2008, do you

20   remember what time you arrived at the precinct?

21   A    I would say about, around 9 o'clock.

22   Q    And where in the precinct were you when you got there?

23   A    We were on the ground floor.

24   Q    Okay.  And what happened when you got to the ground

25   level of the precinct?

CHRISTINE ALIOTO - People Defense - Direct Cross 611

1     A     So Sana was taken into a back room.  My mom and I

2     stayed outside and she spoke to police officers.

3     Q     And did there come a point in time when you left the

4     ground level of the 105 precinct?

5     A     Yes.

6     Q     And where did you go?

7     A     We went upstairs.

8     Q     And who did you meet upstairs?

9     A     Detective Shulman.

10    Q     Did there come a point in time when you were in the

11    precinct that you observed anything on Sana?

12    A     Yes, I observed bruises.

13    Q     Where did you observe the bruises?

14    A     On her arms, and there was a cut and bruise on her

15    earlobe (indicating).

16    Q     Do you remember when you were inside the precinct at

17    around 4:00 to 4:30 in the morning?

18    A     Yes.

19    Q     Okay.  What happened between 4:00 and 4:30 in the

20    morning?

21    A     I was told by a police officer that I needed to hide

22    behind a wall because --

23              MR. BANDELLI:  Objection to what she was told by a

24        police officer.

25              THE COURT:  Sustained.

gjn

CHRISTINE ALIOTO - People Defense - Direct Cross 612

1    Q    Well, between 4:00 and 4:30 in the morning, what did

2    you do?

3    A    I went behind a wall.

4    Q    Okay.  Did you see anyone when you were hiding behind

5    the wall?

6    A    No.

7    Q    Between the time that you arrived between, I think you

8    said around 9:00, 9:30 in the P.M. until 4:00 or 4:30 in the

9    morning when you had to hide, did you leave the precinct at all?

10        MR. BANDELLI:  Objection to when she had to hide.

11    What's the relevance?

12        THE COURT:  Mr. Bandelli.

13        MR. BANDELLI:  I want to know.

14        THE COURT:  No speeches in front of the jury.

15        Approach the bench.

16        (Whereupon, a conference was held between all

17    counsel and the Court off the record at the side-bar.)

18    Q    Christine, at approximately 11:00 in the morning, did

19    you leave the precinct?

20    A    Yes.

21    Q    And where did you go?

22    A    Went home just to change our clothes and grab clothes

23    for Sana.

24        MR. ROSENBLATT:  Judge, I have no further

25    questions for this witness.

1          THE COURT:  Thank you.

2          Mr. Bandelli.

3          MR. BANDELLI:  Thank you, Judge.

4          May I inquire, Judge?

5          THE COURT:  Yes, you may.

6          MR. BANDELLI:  Good afternoon, Ms. Alioto.

7          THE WITNESS:  Hi.

8          MR. BANDELLI:  My name is Stanford Bandelli.  I

9     represent Harold Gopaul.

10          I have some questions for you, to ask.  If you

11    don't know the answer, just tell me you don't know.  If you

12    don't understand the question, let me know and I will

13    rephrase it, okay?

14          THE WITNESS:  Okay.

15          MR. BANDELLI:  All right.  If I am not speaking

16    loud enough, let me know.  I don't think that will be a

17    problem.

18          THE WITNESS:  Okay.

19    CROSS-EXAMINATION

20    BY MR. BANDELLI:

21    Q    You described yourself as best friends with Sana; is

22    that correct?

23    A    Yes.

24    Q    Okay.  How long had you been best friends for prior to

25    June 23rd of 2008?

                                                      gjn

1        A    Probably about a year.

2        Q    A year.

3             So that would have taken you into your, I guess the end

4   of your sophomore year?

5        A    Yeah, end of sophomore year.

6        Q    In high school, were there any other girls that were

7   part of yours and Sana's group, any other friends, close

8   friends?

9        A    We had a big group of friends, but I think I was the

10  closest to her.

11       Q    Who are the other girls?

12            MR. ROSENBLATT:  Objection.

13            THE COURT:  Sustained.

14       Q    And did you socialize with the other girls and Sana?

15       A    Yes.

16       Q    Go to parties?

17       A    No.

18       Q    Attended afterschool activities and stuff like that?

19       A    Yeah, basketball games.

20       Q    Did you ever go to the beach or anything like that?

21       A    No.

22       Q    Go to the movies?

23       A    Probably the movies, yeah.

24       Q    And the whole time that this was going on up until June

25  23rd of 2008, Sana never said anything to you about her

1    stepfather, did she?

2         A    No.

3         Q    She was a good student?

4         A    Yes.

5         Q    She had good grades?

6         A    Yes.  She was an honor student.

7         Q    Her father took it seriously too, right?

8                   MR. ROSENBLATT:  Objection.

9                   THE COURT:  Sustained.

10        Q    You had an opportunity to get to know my client,

11   Mr. Gopaul; is that correct?

12        A    I did.

13        Q    He drove you to school?

14        A    He did.

15        Q    How many times did you say?

16        A    Probably more than ten times.

17        Q    Okay.  So you didn't feel unsafe driving with

18   Mr. Gopaul, did you?

19        A    No.

20        Q    Sana had a boyfriend in the spring of 2008; is that

21   correct?

22        A    Yes.

23        Q    Okay.  You know who that boy was?

24        A    Yes.

25        Q    Without identifying him, you know who that boy was?

1       A     (Nodding.)

2       Q     Sana's parents did not approve of that relationship,

3  they objected?

4                 MR. ROSENBLATT:  Objection.

5                 THE COURT:  Sustained.

6       Q     Do you know if Sana's parents objected?

7                 MR. ROSENBLATT:  Objection.

8                 THE COURT:  Sustained.

9       Q     Well, did Sana ever discuss with you her parents'

10  position concerning the relationship between her and this boy?

11                MR. ROSENBLATT:  Objection.

12                THE COURT:  I will allow that to be answered yes

13      or no.

14      A     Yes.

15      Q     And she wasn't happy with her parents' position, was

16  she?

17                MR. ROSENBLATT:  Objection.

18                THE COURT:  Sustained.

19      Q     Did she express to you that her parents were happy with

20  this relationship?

21                MR. ROSENBLATT:  Objection.

22                THE COURT:  Mr. Bandelli, no matter how many ways

23      you try to ask that question, I am going to sustain the

24      objection.

25                MR. BANDELLI:  Note my exception, Judge.

1      Q     Up until June 23, 2008, this never came up; is that

2   correct?

3                   MR. ROSENBLATT:  Objection, Judge.  What?

4                   THE COURT:  Sustained.

5      Q     Up until June 23rd of 2008, you never tried a drink

6   with Sana Awan, did you?

7      A     No.

8                   MR. BANDELLI:  Nothing further.

9                   THE COURT:  Thank you.  You may step down.

10                  THE WITNESS:  Oh, thank you.

11                  THE COURT:  Have a nice day.

12                  (Whereupon, the witness left the witness stand.)

13                  THE COURT:  Ladies and gentlemen, rather than

14      start another witness, we will give you a few extra minutes

15      for lunch.  Thank you.

16                  You are not to discuss this case among yourselves

17      or with anyone else.  If anyone tries to discuss it with

18      you, you are to bring it to my attention immediately.  You

19      are not to visit any locations mentioned and you are not to

20      form any opinion as to whether you feel the defendant is

21      guilty or not guilty of the crimes with which he is charged.

22                  Please follow the instructions of the court

23      officer.  Come back here at 2 o'clock.  Thank you.

24                  (Whereupon, the jury exited the courtroom and the

25      following occurred:)

1          THE COURT:  Any matters before we recess?

2          MR. BANDELLI:  No, Judge.

3          MR. ROSENBLATT:  I have none.

4          THE COURT:  2 o'clock.

5          Please put Mr. Gopaul back in.

6          (Whereupon, a luncheon recess was taken at this

7     time.)

8                    *         *         *

9               A F T E R N O O N   S E S S I O N

10                   *         *         *

11         (Whereupon, the jury entered the courtroom and

12    upon taking their respective seats, the following occurred:)

13         THE CLERK:  Case on trial.  All parties present,

14    your Honor.

15         Do both sides stipulate all jurors are present and

16    properly seated?

17         MR. ROSENBLATT:  Yes.

18         MR. BANDELLI:  So stipulated, Judge.

19         THE COURT:  You may call your next witness,

20    Mr. DA.

21         MR. ROSENBLATT:  People call Denise Alioto.

22         (Whereupon, the witness entered the witness

23    stand.)

24    D E N I S E   A L I O T O , after having first been duly sworn

25    was examined and testified as follows:

                                                  gjn

 1                    THE WITNESS:  I do.

 2                    THE CLERK:  Thank You.  Please be seated.

 3                    THE OFFICER:  People call Denise Alioto, last name

 4          A-L-I-O-T-O, resident of Queens County.

 5                    THE COURT:  You may proceed, Mr. DA.

 6                    MR. ROSENBLATT:  Thank you, your Honor.

 7                    Good afternoon, Ms. Alioto.

 8                    THE WITNESS:  Good afternoon.

 9     DIRECT EXAMINATION

10     BY MR. ROSENBLATT:

11          Q     Tell the members of the jury how long have you lived in

12     Queens?

13          A     45 years.

14          Q     And who do you currently live with?

15          A     My daughter, Christine.

16          Q     How old is Christine?

17          A     19.

18          Q     And is she in college?

19          A     Yes.

20          Q     Do you presently work?

21          A     Yes.

22          Q     What type of work do you do?

23          A     Medical claims.

24          Q     And how long have you been involved in medical claims?

25          A     Twelve years.

1     Q     Do you know someone by the name of Sana Awan?

2     A     Yes.

3     Q     Who's she?

4     A     She is Christine's friend.

5     Q     And prior to June 23, 2008, did you have any

6  relationship with her?

7     A     She was just Christine's friend.

8     Q     Can you describe to the members of the jury the

9  relationship that Christine and Sana had prior to June 23rd?

10                MR. BANDELLI:  Objection, your Honor.

11                THE COURT:  Overruled.

12                MR. ROSENBLATT:  You can answer.

13    A     They were just -- they went to school together.

14    Q     Prior to June 23, 2008, had Sana ever been in your

15  home?

16    A     Twice.

17    Q     And had you ever been inside Sana's home?

18    A     No.

19    Q     Had you ever been outside it?

20    A     Yes.

21    Q     What was that for?

22    A     I dropped her off.

23    Q     Do you know someone by the name of Harold Gopaul?

24    A     Yes.

25    Q     And how do you know him?

1        A     Sana's stepfather.

2        Q     Do you see him in the courtroom today?

3        A     Yes.

4        Q     Can you point and identify an article of clothing he is

5     wearing?

6        A     Striped shirt and dark tie.

7              MR. BANDELLI:  Indicating my client, your Honor.

8              THE COURT:  The record will indicate the witness

9        has identified the defendant.

10             MR. ROSENBLATT:  Thank you, your Honor.

11       Q     Prior to June 23, 2008, did you have any relationship

12    with the defendant?

13       A     No.

14       Q     Have you ever met him?

15       A     Once at school.

16       Q     I want to turn your attention to June 23, 2008 at

17    approximately 8:30 in the evening.

18             Where were you?

19       A     Sleeping.

20       Q     And when you were sleeping, what happened?

21       A     My daughter woke me up.

22       Q     And don't tell us what anyone said, but what did she

23    do?

24       A     She handed me the phone.

25       Q     And who was on the other line?

1      A    Sana.

2      Q    Did you speak to her?

3      A    Yes.

4      Q    Approximately how long were you on the phone with Sana

5   for?

6      A    Less than three minutes.

7      Q    Okay.  After that conversation, what did you do?

8      A    I dressed and left my house.

9      Q    Where did you go?

10     A    To meet Sana.

11     Q    Where did you meet her?

12     A    80th Avenue, 238th Street.

13     Q    How far is that from your home?

14     A    About six blocks.

15     Q    And approximately how far is that from where Sana was

16   living back then?

17     A    It's probably about the same.

18     Q    And when you -- Did there come a point in time when you

19   were at 238th and -- did you say 88th?

20     A    88th Avenue.

21     Q    -- that you observed Sana?

22     A    Yes.

23     Q    And how did she appear when you saw her?

24     A    She was scared.  She was nervous.  Running.  She had a

25   bag with her.

1     Q     Okay.  And when you saw her, what did you do?

2     A     I told her to get inside the car.

3     Q     And did she in fact get in your car?

4     A     Yes.

5     Q     Where did you go?

6     A     I drove to Hillside Avenue and by Hollywood Video,

7  stopped to make a phone call.

8     Q     And who did you call?

9     A     My brother.

10     Q     Okay.  And what was the reason that you called your

11  brother?

12                 MR. BANDELLI:  Objection, your Honor.

13                 THE COURT:  Overruled.

14     A     I called him because I had an underage child, not mine,

15  in the car and I didn't want to be in trouble for it.

16     Q     Okay.  What type of work is your brother in?

17     A     Law enforcement.

18     Q     Did you speak to him?

19     A     No.

20     Q     What did you do after that?

21     A     I called his fiance.

22     Q     And what type of work does she do?

23     A     Federal agent.

24     Q     And did you speak to her?

25     A     Yes.

1          Q     After having that conversation with your brother's

2    fiance, where did you go?

3          A     To the 105 precinct.

4          Q     And do you remember approximately on June 23rd what

5    time you arrived at the precinct?

6          A     Can't be exact, but I'm going to say a little after

7    9:00.

8          Q     Okay.  And when you arrived at the precinct, what did

9    you do?

10         A     I went inside to get a police officer to come talk to

11   Sana in the car.

12         Q     Where was -- Did Sana remain in the car?

13         A     Yes, with Christine.

14         Q     And did there come a point in time when you got an

15   officer and brought her or him to the car where your --

16         A     Yes.

17         Q     -- daughter and Sana was?

18         A     Yes.

19         Q     Do you remember that officer's name?

20               MR. ROSENBLATT:  Well, withdrawn.

21         Q     Was it a male or female officer?

22         A     Female.

23         Q     And when the officer came to the car, what happened

24   then?

25         A     She spoke to Sana, then we all went into the precinct.

1    Q    When you went into the precinct, where did Sana go?

2    A    To the back room on the first floor.

3    Q    Did you go into that room?

4    A    No.

5    Q    Who went into the room?

6    A    Sana went with the officer.  We waited outside.

7    Q    Okay.  And did there come a point in time when you left

8    the ground level of the precinct and went upstairs?

9    A    Yes.

10   Q    And what was the purpose of going upstairs?

11   A    We went up to the detective squad.

12   Q    Okay.  And did you go up there?

13   A    Yes.

14   Q    Do you remember how many hours it was after you were

15   downstairs that you went upstairs, approximately?

16   A    It was a long time.  It was like after 3:00 A.M.

17   Q    Approximately?

18   A    Uh-huh.

19   Q    And when you went up there, who was upstairs?

20   A    Detective Shulman.

21   Q    Was there any other detectives working at around that

22   time?

23   A    Yes.

24   Q    And when you got upstairs you said approximately

25   3:00 A.M., who spoke to Detective Shulman?

                                                          gjn

1      A    Sana.

2      Q    And were you present for that conversation?

3      A    Not for the conversation, no.

4      Q    Okay.  Where did they have that conversation?

5      A    In another room.

6      Q    Okay.  Where did you stay?

7      A    We stayed at one of the detective's desks that were

8   empty.

9      Q    Okay.  Did there come a point in time some time after

10  3:00 A.M. where you left the detective squad and went

11  downstairs?

12     A    Uh-huh.

13     Q    Approximately what time was that?

14     A    It was after 4:00.

15     Q    And what was the purpose after 4:00 in the morning that

16  you left the detective squad office and went downstairs?

17     A    So I could have a cigarette.

18     Q    And when you went downstairs to have a cigarette, tell

19  the jury what you saw.

20     A    I went down with the ACS worker, and as I was turning

21  the corner steps, Mr. Gopaul was coming in.

22     Q    And when you saw Mr. Gopaul coming into the precinct

23  sometime after 4:00 A.M., what did you do?

24     A    I motioned to the police officers that that was him and

25  I stood behind so he didn't see me.

1       Q      And when you motioned to the police officers, what did

2   they do?

3       A      They took Mr. Gopaul and they put him against the wall

4   and they cuffed him.

5       Q      Did you see that?

6       A      Yes.

7       Q      After you saw that sometime after 4:00 in the morning,

8   what did you do?

9       A      I went back upstairs.

10      Q      How come?

11      A      I didn't want him to see me.

12      Q      Okay.  From the time that you arrived in the precinct

13  until approximately 11:00 in the morning the next day, that is

14  June 24, 2008, did you leave the precinct at all?

15      A      I left probably about 7 o'clock to go change and get

16  Sana a change of clothes.

17      Q      Did there come a point in time when you left the

18  precinct again?

19      A      When we --

20      Q      In the afternoon on June 24th?

21      A      When Sana was taken to the hospital.

22      Q      Where did you go?

23      A      To the hospital.

24      Q      Do you remember approximately, if ever Sana's mother

25  arrived at the precinct?

gjn

1    A    Yes.

2    Q    Approximately what time was that?

3    A    It was 9 o'clock.

4    Q    In the morning?

5    A    A.M.

6    Q    On June 24th?

7    A    Uh-huh.

8    Q    Ms. Alioto, did there come a point in time in 2008 when

9  ACS gave you custody of Sana?

10   A    Yes.

11   Q    And do you remember when that was?

12   A    July 3rd.

13   Q    Of 2008?

14   A    Right.

15   Q    And when they gave you custody, what was your title?

16             MR. BANDELLI:  Objection, judge.

17             THE COURT:  Overruled.

18   A    I was her foster mother.

19             MR. ROSENBLATT:  I have nothing further, your

20        Honor.

21             Thank you.

22             THE COURT:  Mr. Bandelli.

23             MR. BANDELLI:  Thank you, Judge.

24             Good afternoon, Ms. Alioto.

25             THE WITNESS:  Hello.

1           MR. BANDELLI:  Hi.  My name is Stanford Bandelli.

2      I represent Harold Gopaul.

3           I have some questions I'm going to ask you.  If

4      you don't know the answer, just tell me you don't know.

5           THE WITNESS:  Uh-huh.

6           MR. BANDELLI:  Okay.  If you don't understand the

7      question, let me know, I'll try to rephrase it; all right?

8           THE WITNESS:  Okay.

9      CROSS-EXAMINATION

10     BY MR. BANDELLI:

11     Q     You testified earlier that you met Mr. Gopaul at the

12     school previously?

13     A     That's right.

14     Q     When was that?

15     A     The kids had a art show or something.  They were

16     juniors, so I don't know when it was.

17     Q     You don't know when it was?

18     A     It was sometime in the spring.  It was their junior

19     year.

20     Q     So it would have been spring of 2008 then?

21     A     No, 2007 -- right, 2008 --

22     Q     When did your daughter graduate high school?

23     A     She graduated last year.  This is her second year going

24     into college.

25     Q     So junior year --

                                                          gjn

1       A    2008.

2       Q    -- would have been 2008, correct?

3       A    2008.

4       Q    When in the spring of 2008 was this art fair?

5       A    I don't remember.

6       Q    You don't remember when in the spring it was?

7                 MR. ROSENBLATT:  Objection, asked and answered.

8       A    No.

9                 THE COURT:  Overruled.

10      Q    What was it actually they were doing with regards to

11      art?

12                MR. ROSENBLATT:  Objection.  Objection as to the

13      relevance, an art show.

14                THE COURT:  Sustained.

15                MR. BANDELLI:  Judge, he brought it up on his

16      direct.  I am certainly allowed the opportunity to explore

17      it.

18                THE COURT:  It's not relevant.

19                MR. BANDELLI:  Well, I would like to make a

20      record, Judge.

21                THE COURT:  At the proper time.

22                Continue your examination.

23      Q    Who else was present with Sana and Mr. Gopaul at the

24      time of this art show?

25      A    The two children, Harold's two children his wife,

                                                        gjn

1    Jenny.

2        Q    Did they seem pretty happy to be there?

3              MR. ROSENBLATT:  Objection.

4              THE COURT:  Did they seem pretty happy to be

5        there?

6        Q    Did they seem happy to be there?

7              MR. BANDELLI:  How is that --

8              THE COURT:  Can you answer that?

9        A    I don't know if they were happy.

10             THE COURT:  Thank you.

11             Next question.

12       Q    Well, did you interact with them?

13             MR. ROSENBLATT:  Objection, Judge.  As to the

14       happiness or unhappiness at an art show.

15             THE COURT:  That's not the question.

16             Did you interact with them?

17             Overruled.

18       A    I just talked to the mom a little bit and then Harold

19       made a comment to me and that was the end of the conversation.

20       Q    Nobody said anything about sexual abuse at that time,

21       did they?

22       A    No.

23       Q    Okay.  Good.

24             Now you said that you made a series of phone calls

25       after you picked Sana up in your car; is that correct?

                                                            gjn

1      A     Two.

2      Q     You said the reason you had made this series of phone

3   calls was you didn't want to get in trouble for having an

4   underage child in the car?

5      A     That's right.

6      Q     Is that correct; Sana was 17 years old at the time?

7      A     Yes.

8      Q     What type of trouble could you be in for driving a 17

9   year old at 9 o'clock at night?

10     A     She is not my child.

11     Q     Okay.

12     A     Okay, so I don't want my child in somebody else's car.

13  I don't know the law and I didn't want her -- I didn't want to

14  be responsible for somebody else's child.

15     Q     Well, didn't you actually take over parental obligation

16  from this family at some point?

17               MR. ROSENBLATT:  Objection.

18               THE COURT:  Sustained.

19     Q     She didn't want to be responsible --

20               THE COURT:  Sustained.

21               MR. BANDELLI:  Judge, can we approach, at least?

22               THE COURT:  Mr. Bandelli.

23               MR. BANDELLI:  Can't we?

24               THE COURT:  Mr. Bandelli.

25               MR. BANDELLI:  Judge, I should be allowed to ask

1      these questions.

2                 THE COURT:  Come up here, please.

3                 (Whereupon, a conference was held between all

4      counsel and the Court on the record at the side-bar.)

5                 THE COURT:  Would you please read back the last

6      two questions and answers?

7                 (Whereupon, the requested portion of the testimony

8      was read back.)

9                 THE COURT:  She just makes a statement like that.

10     I make the rulings.

11                MR. BANDELLI:  I understand.

12                THE COURT:  You don't have to like them, abide by

13     them.  Don't make any statements.

14                MR. BANDELLI:  I should be able to ask those

15     questions.

16                THE COURT:  All right.  Don't question my rulings.

17                MR. BANDELLI:  With all due respect, Judge, there

18     are points that need to be made.

19                THE COURT:  You do not state in front of the jury

20     that you should be able to ask questions.

21                MR. BANDELLI:  I asked --

22                THE COURT:  I made a ruling.

23                MR. BANDELLI:  I asked for a sidebar initially,

24     you told me to move on.

25                THE COURT:  I told you that at the proper time --

1          MR. BANDELLI:  Okay.  I understand your position,

2     Judge.

3          THE COURT:  I don't think you do because you don't

4     say, "I should be able to ask those questions."

5          MR. BANDELLI:  Well --

6          THE COURT:  Do you get it yet?

7          MR. BANDELLI:  I understand exactly what you're

8     saying, Judge.

9          THE COURT:  Don't do it again.

10          MR. BANDELLI:  I understand.

11          THE COURT:  Now you can make your record.

12          MR. BANDELLI:  My record is that she testified

13     that the reason why she made phone calls is that she didn't

14     want to get in trouble for driving around a child.  She

15     didn't know the law and she didn't want to be responsible

16     for somebody else's child.

17          You know, the People's direct, they brought out

18     that she did just the opposite, she took responsibility for

19     this child.

20          THE COURT:  That's a whole different concept.

21          MR. BANDELLI:  In what sense?

22          THE COURT:  That is that she was appointed by ACS

23     as the foster parent sometime in the future, in July.

24          MR. BANDELLI:  A week later.

25          THE COURT:  In July.

1          MR. BANDELLI:  A week later.

2          THE COURT:  She did not know the law about having

3     someone else's child in her car on June 23rd.

4          MR. BANDELLI:  What is the law about having a 17

5     year old kid in your car at 9 o'clock, Judge?

6          MR. ROSENBLATT:  It's irrelevant.

7          THE COURT:  She said she didn't know the law.

8          MR. BANDELLI:  Credibility of this witness.

9          THE COURT:  That is knowing to do --

10         MR. BANDELLI:  Has to do with being truthful about

11    what's going on.

12         THE COURT:  Has nothing to do with the credibility

13    of the witness.

14         MR. BANDELLI:  I respectfully disagree.

15         THE COURT:  I sustained the objection.

16         (Whereupon, all parties returned from the sidebar

17    and the following took place:)

18         MR. BANDELLI:  May I, Judge?

19         THE COURT:  Proceed.

20         MR. BANDELLI:  Thank you, sir.

21    Q    So at some point you head over to the 105 precinct; is

22    that correct?

23    A    Yes.

24    Q    Did you know where the 105 precinct was?

25    A    Yes.

1    Q    How did you know?

2    A    I lived there my whole life.

3    Q    Did you have occasion to go to the 105 precinct in the

4  past?

5              MR. ROSENBLATT:  Objection.

6              THE COURT:  Sustained.

7    Q    You went to the 105 precinct and an officer came out

8  and brought everybody -- you went in first, you went in first

9  and came out with an officer?

10   A    Yes.

11   Q    Is that what happened?

12        Who did you speak to when you went inside?

13   A    Somebody who was at the front desk, an officer at the

14  front desk.

15   Q    Was it a male or female?

16   A    There was one male and one female.

17   Q    Okay.  Do you know anybody's name?

18   A    I don't recall their names.

19   Q    Do you know what time it was?

20   A    It was about ten after 9 o'clock.

21   Q    And then after you walked out, you came out with

22  another officer or --

23   A    Female officer.

24   Q    He followed you out or came out with you?

25   A    Came out with me.

1     Q     Brought Sana back into the precinct?

2     A     Yes.

3     Q     And she brought --

4           Now some time later the next day, early morning, you

5     said that you saw my client, Mr. Gopaul, come into the precinct;

6     is that correct?

7     A     Yes.

8     Q     Did you see him pull up into the lot?

9     A     No.

10    Q     You saw him walking up the stairs into the precinct?

11    A     I was coming down the stairs, he was walking in the

12    front door.

13    Q     Did you say hello?

14    A     No.

15    Q     So you just walked past him and he walked?

16    A     I didn't walk past him.  I stopped on the steps, I went

17    back upstairs after I motioned that that was him.

18    Q     So what you did was you were coming out, then you saw

19    him walking up the stairs, then you went back into the precinct?

20    A     No.  I was up at the detective squad coming down to

21    have a cigarette.

22    Q     Oh, okay.

23    A     And as I turned the corner, that's where the front door

24    is to the 105th, Mr. Gopaul was walking in.  You see two police

25    officers standing right there, it's a desk.  As I'm turning the

gjn

DENISE ALIOTO - Defense - Cross                638

1    corner, I see him.  I motioned that that's Mr. Gopaul, I go back

2    up.

3         Q    Got you.

4              So he was coming in by himself at the time?

5         A    Yes.

6         Q    He wasn't in handcuffs or anything like that?

7         A    No.

8         Q    Was he -- And there were no police officers around when

9    he walked into the precinct; is that correct?

10        A    There was police officers to the side at the desk.

11        Q    In other words, there were no police officers standing

12   on either side of him?

13        A    No.

14        Q    He walked in on his own?

15        A    Yes.

16        Q    You went back and decided to tell who that that was the

17   guy?

18        A    I motioned from the stairs to the police officers at

19   the front desk that that was Mr. Gopaul.

20        Q    Who did you motion to?

21        A    There was police officers standing at the front desk.

22        Q    Did you have an opportunity --

23        A    As he --

24        Q    Did you have an opportunity to speak with those police

25   officers?

                                                          gjn

DENISE ALIOTO - Defense - Cross          639

1      A     No.  I was there all night.  They knew what I was there

2   for --

3      Q     Okay.  So who were they?

4      A     I don't know.  They were police officers that are in

5   the precinct.

6      Q     Okay.  How many police officers were in the precinct?

7      A     How many police officers at the front door?

8      Q     On the ground floor.

9      A     No, right where that area was, probably about four or

10  five.

11     Q     And you said you saw them take him and throw him up

12  against the wall?

13               MR. ROSENBLATT:  Objection.

14               MR. BANDELLI:  That was her testimony.

15               THE COURT:  Sustained.

16     Q     You saw him --

17     A     Put him up against the wall.

18     Q     -- put him up against the wall.

19           How did they grab him, put him up against the wall?

20     A     By the back of his arm.

21     Q     By the back of his arm.

22           How were how many officers grabbed him?

23     A     One.

24     Q     Just one?

25     A     One.

1    Q    You said "officers," you didn't say "officer"?

2              MR. ROSENBLATT:  Objection.

3              THE COURT:  Overruled.  You can answer.

4    A    There was one officer that put him up against the wall

5    and put him in cuffs.

6    Q    Okay.  And what did he do with him after he put him in

7    cuffs?

8    A    I went back upstairs so I don't know where he went from

9    there.

10   Q    You just happened to come downstairs, you saw him walk

11   in (indicating), you just walked off?

12   A    I didn't do it like that, but I came down with the ACS

13   worker to have a cigarette and he walked in.

14   Q    The ACS worker, was this a female or a male?

15   A    A male.

16   Q    Did the ACS worker talk with you about this as well?

17   A    Talk about what?

18   Q    About what was going on?

19   A    No.  He was just escorting me down to have a cigarette.

20   Q    An ACS worker was just --

21   A    It was the middle of the night.  I just said I want to

22   go have a cigarette.  It was not really a big deal to go

23   downstairs.

24   Q    I wasn't there.

25   A    Okay.  It wasn't.

1    Q    So I'm just trying to understand what happened, okay?

2    A    Uh-huh.

3    Q    I apologize.  All right.

4         Now you came downstairs with an ACS worker who was

5    escorting you out to have a cigarette?

6    A    That's right.

7    Q    Now, were you wearing a watch at that time?

8    A    I wouldn't remember.  I don't know.  I always have my

9    cell phone with me.

10   Q    How do you know what time it was when you were walking

11   down the stairs?

12   A    It was after 4 o'clock because I had to get up for

13   work.  That was my time that I get up for work so I knew it was

14   way after 4 o'clock.

15   Q    You were at this precinct from 9 o'clock on, right?

16   A    Yes.

17   Q    You didn't leave the precinct, right?

18   A    No.

19   Q    You don't know if you had a watch with you, right?

20   A    No, I don't remember wearing a watch.

21        THE COURT:  Sustained, sustained.

22   Q    I am trying to understand how you know it's after

23   4 o'clock if you have been at the precinct --

24   A    Because I said to the detective I get up at 4:30 to go

25   to work, I have to go soon.

1       Q     So if the ACS worker said -- the ACS worker said

2     Mr. Gopaul walked into the precinct and came in at 3:30 A.M.,

3     the ACS worker would be wrong?

4                   MR. ROSENBLATT:  Objection.

5                   THE COURT:  Sustained.

6       Q     After you went back upstairs, who did you speak with

7     next?

8       A     Who did I speak with?

9       Q     Uh-huh.

10      A     Detective Shulman.

11      Q     And did you speak to any other detectives up there?

12      A     No.

13      Q     No.

14            The only detective you spoke to was Detective Shulman?

15      A     Basically.

16      Q     Did you tell him also that Mr. Gopaul had just been

17    placed in handcuffs downstairs?

18                  MR. ROSENBLATT:  Objection.

19                  THE COURT:  What's the basis for the objection?

20                  MR. ROSENBLATT:  Calls for hearsay, your Honor.

21                  THE COURT:  Overruled.

22      A     Could you ask me it again?

23      Q     Did you tell Mr. Shulman that you had just seen

24    Mr. Gopaul taken into handcuffs?

25      A     I don't believe I said it like that.  I said Mr. Gopaul

                                                            gjn

1     was here.

2         Q     So you just went in and told him Mr. Gopaul is here.

3               Have you had previous contact with the criminal justice

4     system?

5                    MR. ROSENBLATT:  Objection.

6                    THE COURT:  Sustained.

7         Q     Well, isn't it true that you have an Order of

8     Protection against a man?

9                    MR. ROSENBLATT:  Objection.

10                   THE COURT:  Accused of domestic violence.

11                   Sustained.

12                   MR. ROSENBLATT:  Objection.

13                   MR. BANDELLI:  May we have a sidebar, Judge?

14                   THE COURT:  Approach the bench.

15                   MR. BANDELLI:  Thank you.

16                   (Whereupon, a conference was held between all

17            counsel and the Court on the record at the side-bar.)

18                   THE COURT:  You wanted a sidebar.

19                   MR. BANDELLI:  I am asking for the sidebar.

20                   I think the question is --

21                   THE COURT:  Mr. Bandelli, the reason we have these

22            sidebars is so we do it outside the hearing of the jury.

23                   MR. BANDELLI:  All right.

24                   THE COURT:  If you don't lower your voice, they

25            are going to hear anything you say.  Defeats the purpose of

1      a sidebar.

2              Go ahead.

3              MR. BANDELLI:  Goes to the credibility of this

4      witness whether or not she has any biases, okay?

5              The fact of the matter is she has got a domestic

6      violence incident going on.  It's listed in the information

7      I was provided by ACS.  She has an Order of Protection.

8              I have a right to make an argument that the reason

9      she did this is because of her bias in terms of domestic

10     violence and her feelings about men in general.

11             THE COURT:  Sustained.

12             MR. BANDELLI:  Note my exception.

13             THE COURT:  You have your exception.

14             (Whereupon, all parties returned from the sidebar

15     and the following took place:)

16             THE COURT:  Proceed.

17     Q     At some point, you took legal guardianship of Sana?

18     A     Yes.

19     Q     And she was living at your house?

20     A     Yes.

21     Q     And did her boyfriend come to visit you while she was

22     living there?

23     A     Sometimes.

24             MR. BANDELLI:  Nothing further, Judge.

25             MR. ROSENBLATT:  Just briefly, your Honor.

1          THE COURT:  Briefly.

2    REDIRECT EXAMINATION

3    BY MR. ROSENBLATT:

4          Q    Ms. Alioto, you were just questioned about a boy

5    visiting Sana when you had legal custody?

6          A    Yes.

7          Q    Did you have rules in regards to Sana and the boy that

8    had come to your house back in 2008 into 2009?

9          A    Yes.

10         Q    Tell the members of the jury about those rules.

11         A    There was no -- they weren't allowed to be anywhere but

12   the living room, the dining room, the kitchen.  They weren't

13   allowed to be in my home when I'm not there.  They had to

14   follow -- my daughter included -- there was rules they had to

15   follow, and they did.

16              MR. ROSENBLATT:  I have nothing further.

17              THE COURT:  Any recross?

18              MR. BANDELLI:  Nothing further, Judge.

19              THE COURT:  Thank you, Ms. Alioto.

20              THE WITNESS:  Thank you.

21              THE COURT:  You may step down.

22              (Whereupon, the witness left the witness stand.)

23              THE COURT:  Counsel approach, please.

24              (Whereupon, a conference was held between all

25        counsel and the Court on the record at the side-bar.)

1          THE COURT:  You wanted to make a record about the

2     next witness.

3          Go ahead.

4          MR. BANDELLI:  Judge, just, again, you know, I

5     have emphasized on more than one occasion already, the fact

6     of the matter is they could have done a better job getting

7     more specific dates.

8          You're not supposed to be using an expert to solve

9     the problems in your case, and that's essentially what they

10    are trying to do here.  So, you know, with regard to the

11    blending and the fact -- which also didn't come in during

12    direct or cross -- I don't see that they are worthy of

13    expert testimony at this point.  Just open up a whole

14    Pandora's box of stuff that isn't even an issue in this

15    case.

16         THE COURT:  Mr. DA, do you wish to respond?

17         MR. ROSENBLATT:  No, I believe we be labored this

18    point enough, Judge.

19         MR. BANDELLI:  I could belabor it another half

20    hour if you would like.

21         THE COURT:  I will allow this witness to testify

22    as to the study of victims of this type of abuse.  The fact

23    that there is often a delay in reporting, the fact that

24    there may be a lack of affect when they testify, the fact

25    that they may have a problem remembering dates.

                                                    gjn

1              As far as the term blending --

2              MR. ROSENBLATT:  It's a known term with all

3    psychologists too throughout the city; study of psychology.

4    Judge, it would be like asking a lawyer to explain hearsay.

5    It's a common term.

6              MR. BANDELLI:  I don't think it's quite that

7    common, but --

8              THE COURT:  You go out and tell your expert to the

9    limitations on his testimony.

10             MR. ROSENBLATT:  Just so I understand --

11             THE COURT:  I don't want to hear anything about

12   blending.

13             MR. ROSENBLATT:  Nothing about -- sorry, Judge?

14             THE COURT:  About blending.

15             MR. ROSENBLATT:  You don't want to hear about it.

16             THE COURT:  The jury is not going to hear anything

17   about blending.

18             Okay.  He can testify as to the studies done, that

19   he was aware of about the fact that there is a delay in

20   reporting, there may be a lack of affect when the person

21   testifies and they may have a problem remembering dates.

22             As far as --

23             MR. ROSENBLATT:  The whole concept.

24             THE COURT:  -- as far as blending --

25             MR. ROSENBLATT:  The whole concept of dates is

                                              gjn

Sidebar Conference                    648

1    based upon this idea that events blend together, that's what

2    the study says, that's what the research shows; the events

3    blend together when they happen over time.  When it's the

4    same thing happening over time, the events blend together.

5              THE COURT:  And did your witness have a problem

6    remembering the incidents in front of this jury?

7              MR. ROSENBLATT:  She described the specific -- My

8    witness will testify that you can remember the who, you can

9    remember the what and the where, but you can't remember the

10   specific details.  That's what this is because that's what

11   she testified to.

12             THE COURT:  I don't remember your witness having a

13   problem with defects.

14             MR. ROSENBLATT:  Judge, most respectfully, after

15   June of '06 through 2008, she said she was only able to

16   recall one specific thing which happened in the month of

17   May.  Other than that, she said she doesn't even remember

18   specifics over that entire time period.

19             That's the whole idea.  The reason she is unable

20   to do so is because of that she said it happened over time.

21   It's the same thing.  It happened in her home, that's the

22   idea of blending.

23             THE COURT:  You have 53 counts in this indictment.

24             MR. ROSENBLATT:  Judge 50, we are currently --

25   yes, I do.

                                                          gjn

1        THE COURT:  You feel your witness hasn't made out

2  some of those counts?

3        MR. ROSENBLATT:  Whether I believe that or whether

4  I believe all those counts are going to go to the jury is a

5  different story.  I don't believe I am going to ask the

6  Court to submit all those counts to the jury.

7        THE COURT:  Based on what reason?

8        MR. ROSENBLATT:  Based upon the testimony that

9  came out, her inability to recall specific incidents.  I am

10  going to base the testimony -- base my summation, base the

11  verdict on the specific acts which she described, and if the

12  jury supersedes a count from May to June of 2005 and then

13  there is no count until May of '06 and then no count until

14  January of '08, they are left to wonder what the heck is

15  going on here.

16        MR. BANDELLI:  Judge, just so you know, I don't

17  recall him asking her whether or not she could recall any

18  specific dates.  In fact, the questions were leading and he

19  directed her to specific dates.

20        MR. ROSENBLATT:  Judge --

21        MR. BANDELLI:  If she recalled everything he asked

22  her about.

23        MR. ROSENBLATT:  Judge, what --

24        MR. BANDELLI:  Up until now we are down to more

25  precise dates at times.

                                                    gjn

1           MR. ROSENBLATT:  Judge, were you permitting me to

2     question my witness on the concept of blending?  The ability

3     to recall specific dates and not recall others is blending.

4           I just would like the witness to be able to

5     utilize the terminology that's appropriate with the concept.

6           You are permitting just not the term, and perhaps

7     it's because I didn't explain it clearly enough, but that

8     concept is what you allowed me to do.

9           THE COURT:  That's called blending, the fact the

10    witness can't remember --

11          MR. ROSENBLATT:  Yes.

12          THE COURT:  -- certain dates --

13          MR. ROSENBLATT:  Yes.

14          THE COURT:  -- as opposed to other dates --

15          MR. ROSENBLATT:  Correct.

16          THE COURT:  How long do you anticipate your direct

17    will be with this doctor?

18          MR. ROSENBLATT:  I hope to be under 35 minutes.

19          (Whereupon, a discussion was held off the record.)

20          THE COURT:  I will allow the witness to testify in

21    that manner.

22          MR. BANDELLI:  Please note my exception.

23          THE COURT:  You have your exception.

24          MR. BANDELLI:  Thank you, your Honor.

25          (Whereupon, all parties returned from the sidebar

                                                      gjn

DR. DON LEWITES - People - Direct          651

1        and the following took place:)

2                    THE COURT:  You may call your next witness.

3                    MR. ROSENBLATT:  People call Dr. Don Lewittes.

4                    (Whereupon, the witness entered the witness

5        stand.)

6    D R .   D O N   L E W I T E S , after having first been duly

7        sworn was examined and testified as follows:

8                    THE WITNESS:  I do.

9                    THE CLERK:  Thank you.  Please be seated.

10                   THE OFFICER:  People call Dr. Don Lewittes, last

11       name L-E-W-I-T-T-E-S, resident of Nassau County.

12                   THE COURT:  You may proceed, Mr. DA.

13                   MR. ROSENBLATT:  Thank you, your Honor.

14   DIRECT EXAMINATION

15   BY MR. ROSENBLATT:

16       Q    Doctor, what type of work are you involved in?

17       A    I am a forensic and clinical psychologist.  I work in

18   offices in New York and the City and in Nassau County with

19   specific issues that are involved in legal cases.  That's the

20   forensic side of my practice.

21            I routinely evaluate children and adolescents for

22   the -- for Children Services here in Queens and throughout New

23   York City.

24            In terms of family, issues of allegations of child

25   sexual abuse, I also work in the family courts and also in civil

                                                        gjn

1    courts in the issue where psychologists may have something to

2    offer in a legal matter.

3            Then I also have a clinical practice where it would be

4    more along the lines of what a normal or regular problem in

5    living might be such as anxiety; relationship problems like

6    divorce, depression; childhood issues such as attention deficit

7    disorder.

8            And I am a forensic and clinical psychologist.

9    Q    For how many years have you been involved in this type

10   of work?

11   A    Approximately 30.

12   Q    And can you tell the members of the jury briefly about

13   your educational background?

14   A    I did my undergraduate work at New York University.  I

15   received a Bachelorette degree from NYU majoring in psychology;

16   did graduate level work at the State University of New York at

17   Albany; and I received a Ph.D. in clinical psychology from SUNY

18   at Albany.

19   Q    Have you held any facility appointments?

20   A    Yes.  Following my internship which was at Rutgers

21   Medical School which is in Piscataway, New Jersey, I was

22   licensed.

23           But in terms of faculty appointments, I was a clinical

24   instructor in the department of psychiatry on a full-time basis

25   at Albany Medical School.

DR. DON LEWITES - People - Direct            653

1               I have also been a clinical affiliate professor of

2     psychology here in Queens, New York at St. John's University in

3     the department of psychology.

4               And I have also had a faculty relationship with Malloy

5     College which is in Nassau County where we train professionals

6     in the area of child and adolescent sexual abuse.

7          Q    Doctor, have you had the opportunity over the course of

8     your career to evaluate adolescents who have alleged to have

9     been sexually abused by an adult?

10         A    Yes.

11         Q    And can you approximate how many of those adolescents

12    that you have examined or evaluated?

13         A    Over the past 30 years, it would be over 1000.

14         Q    And have you evaluated both boys and girls?

15         A    Yes, I have, but the majority of both, patients and

16    those who I have evaluated, are as per the literature, within

17    the norms for the majority of females, much lower percentage are

18    males.

19         Q    Have you previously been qualified as an expert in

20    courts of law in both this county and this city in the field of

21    clinical psychology and adolescent sexual abuse?

22         A    Yes, I have been qualified as an expert in all of the

23    counties of New York, as well as outside New York State in

24    various counties.

25         Q    Have you ever been denied expert status by a Court?

HAROLD GOPAUL - Defense - Voir Dire           654

1      A     No.

2                  MR. ROSENBLATT:  Your Honor, at this time I would

3      offer Dr. Lewittes as an expert in the field of clinical

4      psychology and adolescent sexual abuse.

5                  THE COURT:  Do you wish to voir dire?

6                  MR. BANDELLI:  Yes.

7                  THE COURT:  Proceed.

8                  MR. BANDELLI:  Good afternoon, Doctor.

9                  THE WITNESS:  Good afternoon, sir.

10     VOIR DIRE EXAMINATION

11     BY MR. BANDELLI:

12     Q     You said you had evaluated thousands --

13     A     No, I said over 1,000.

14     Q     Over 1,000?

15     A     Uh-huh.

16     Q     More than 1,000?

17     A     Over 30 years, yes.

18     Q     To determine whether or not there was sexual abuse; is

19     that correct?

20     A     No.  Primarily the adolescents who I have evaluated, it

21     was not for any kind of determination, it was a clinical

22     evaluation having to do with a diagnostic issue.

23                There are those who, in the practice for ACS over the

24     last ten years, I have had a contract where they have asked me

25     my opinion about allegations.  But I have never determined

                                                        gjn

1    whether or not sexual abuse occurs because that's a factual

2    matter and I can only give opinions about diagnostic issues or

3    explanatory issues.  I don't talk about facts.

4         Q    So of those more than a thousand studies you've done,

5    you can never say conclusively that there was a finding of

6    sexual abuse; is that correct?

7                   MR. ROSENBLATT:  Objection, Judge.  This is an

8         improper voir dire.

9                   THE COURT:  Sustained.

10                   MR. BANDELLI:  Nothing further, Judge.  I object.

11                   THE COURT:  The witness may testify as an expert

12        in the field of clinical psychology and adolescent sexual

13        abuse.

14                   Proceed.

15   DIRECT EXAMINATION

16   BY MR. ROSENBLATT:

17        Q    Dr. Lewittes, have you treated or examined a child by

18   the name of Sana Awan?

19        A    No.

20        Q    Are you here to diagnose her in the clinical sense?

21        A    No.

22        Q    Are you here to discuss a pattern of behavior that's

23   been applied in the evaluation and treatment of those who allege

24   to have been sexually abused as adolescents?

25        A    In a general sense, in terms of reporting what the

DR. DON LEWITES - People - Direct          656

1    literature talks about, groups of women and adolescents, yes;

2    but nothing specifically having to do with this case or any

3    matter that is concrete.

4        Q    Can you describe the phases or stages that your

5    research speaks of in regards to that pattern of behavior that's

6    applied?

7        A    Well --

8             MR. BANDELLI:   Just, he could specify which

9        research he is referring to.

10            THE COURT:   Tell the jury what research.

11       A    The specific research that I'm identifying is

12   associated with Dr. Susan Sgroi, s-G-R-O-I.   She is one of the

13   forefathers of the field and pattern called the intra --

14   I-N-T-R-A, in the family child and adolescent sexual abuse

15   syndrome.

16            It specifically relates to adolescents where there are

17   allegations that there have been known perpetrators,

18   relationships as opposed to other kinds of sexual assault or

19   abuse.

20       Q    And what are those specific phases or stages that the

21   research speaks of?

22       A    Well, again, the research talks in general terms.

23   Every case is different, but in general, explanatory language,

24   the first phase that is discussed is called the "engagement

25   phase."   That means that in the normal course of business of a

1    family, an adult who has access and opportunity and who has

2    authority and status in that family system doesn't need to be a

3    biological relative, engaged in child -- what would be child

4    protective care.  Obviously, just living together being a

5    parent, being an adult, and they engage them in what was

6    expected by the adolescent to be a positive or a helpful

7    relationship and they change the relationship.  That is, they go

8    from protective to sexually, in some way abusive treatment.  So

9    engagement is where the child or adolescent is tricked, if you

10   will, into believing this person is to be trusted, and after

11   that, they form some kind of sexual contact with the child for

12   the adult's gratification.

13           The sexual content may be more extreme or it may be

14   more superficial such as just fondling or touching, or it may

15   involve some form of actual penetration.  Each case is different

16   the numbers of times, the situations, every case is different.

17           The most important issue in family sexual abuse is

18   usually there is a secrecy stage.  The person who puts

19   adolescents in a situation where nobody else can see or nobody

20   else is there to support them, the adolescent often feels that

21   they have a dirty little secret that they have been dragged in a

22   situation and they are afraid both for themselves and also what

23   it would mean for the family if they told.  In other words, this

24   is a intrafamilial in the family multi-dynamic issue, which is

25   the adolescent is related to people who care about this adult

gjn

1    male and that weighs heavy in terms of talking.  So from

2    secrecy, we get a delay.

3         Normally when we have a trauma, we expect adolescents

4    to cry out.  If an adolescent had their pocketbook stolen, fell

5    down a flight of stairs, physical trauma or some kind of

6    property loss, you would expect immediate cry for help.

7         Sexual trauma is different, especially for young

8    females.  They don't have the worldly experience because they

9    are conflicted about what would happen to them if they did tell.

10   They often don't cry out for help.

11        So delay becomes the next stage which could be years

12   before they will ever tell based upon the psychological

13   intention and pressure they feel in terms of keeping this

14   secret.  For those who actually go through the disclosure

15   phase -- not all of them do -- then there is the issue of how

16   does the family respond to them and how do they feel about the

17   memories; meaning, that sometimes we have flashbacks, we have

18   posttraumatic issues, and that when they think about it and talk

19   about it, they don't want to emote or have that kind of thought

20   and feel connected because it's too upsetting.  It's not just a

21   simple thing to basically talk about and move on.

22        Sexual abuse at the hands of one's relative is often a

23   life-long process that is searing and often comes back in one's

24   mind in very uncomfortable ways.

25        Q    Doctor, I want to talk to you about a few of the things

gjn

1    you just mentioned; one was the secrecy into the disclosure

2    stage.

3            Given your experience and knowledge in the subject, how

4    would asking a victim to promise not to tell anybody affect

5    disclosure?

6                    MR. BANDELLI:  Objection, your Honor.

7                    THE COURT:  Overruled.

8    A    Well, given the hypothetical general literature, if an

9    adolescent, for example, is asked in some way told not to tell,

10   there is a lot of pressure that reinforces their own fears if

11   they do tell, this person will in some way not be supportive,

12   that there may be conflicts in the family, that what would

13   happen to them if the other adults took the adult's side, would

14   they then be, again, vulnerable to this person who is living

15   with them who has an opportunity to continue to hurt them.

16           So telling an adolescent not to tell is a significant

17   event because the words, repeat, because it has meaning when you

18   are told not to tell someone.

19                   MR. BANDELLI:  Judge, if I may, I just -- when he

20       says "adolescent," can we get an age frame that he is

21       talking about?

22                   THE COURT:  What age group you talking about?

23                   THE WITNESS:  I am talking about anybody who has

24       secondary sex characteristics which is puberty, which is, it

25       would be between the ages of twelve and approximately

1        sixteen or seventeen.

2        Q     Doctor, what factors might facilitate or hinder an

3   adolescent moving from that secrecy phase to the disclosure

4   stage?

5        A     Different.  As I said, every case is different.  There

6   are some adolescent females who do not have the self esteem,

7   they don't have the personal ability to confront an issue, they

8   are more submissive, they act submissively to the questions or

9   demands of the sex and also act submissively after the fact.

10        So there could be personality variables; the family is

11   structured such if they did tell, it could have economic bearing

12   on the continuing functioning of the unit.  It could be that the

13   person is frightened, that they may have been hit or they may

14   have seen this person be cruel in other ways and so, therefore,

15   fear is a big factor in not telling.

16        So there are many different family personality traits

17   and characteristics of the alleged offender which could impede

18   crying out for help.

19        Q     Doctor, based upon your expertise and the research, can

20   you explain to the jury how it is difficulty-wise for an

21   adolescent to discuss intimate sexual behaviors with a group of

22   strangers?

23             MR. BANDELLI:  Objection, your Honor.

24             THE COURT:  Overruled.

25        A     In general, adolescents are extremely private, and

DR. DON LEWITES - People - Direct          661

1    that's a stage in development where the discussion of sexuality

2    to strangers is not viewed as something that they would easily

3    do, in general.

4          When it's an embarrassing event, it would make it even

5    more difficult for them.  So from a motivational point of view,

6    an adolescent who in some sense is forced to discuss sexuality,

7    especially sexuality that's embarrassing in particular such as

8    having sex with your mother's father or having sex with your

9    brother, it would be very difficult.  And for them to say it in

10   a public setting or where they don't know if the people are

11   going to be supportive or not, judgmental, which is a big fear,

12   they may try to say what they have to say with a flat or blank

13   emotion, meaning that talking about it they try to basically get

14   it out but they don't want to have a full flush of emotion.

15         When you talk to somebody about something they have

16   enjoyed and there is nothing to prohibit the emotion, you can

17   see the glee; but someone who is having a flashback or

18   remembering something that is an emotional regurgitation, it is

19   certainly an acid-like experience to remember it; therefore,

20   talking about it, you try to hold it together.  Sometimes you

21   don't have any facial emotional affect at all.  You just get it

22   out.

23      Q    Is what you just described known in a clinical sense as

24   a flat affect?

25      A    That's one term, flat affect, yes.  A mask affect, more

DR. DON LEWITES - People - Direct          662

1  mask, like in today's modern days with injections of Botox, you

2  might see an actress or something who has like a mask face

3  because there is no expression because the muscles are

4  paralyzed.  That would be, from a physiological point, but

5  that's a mask.  Face flat affect would be without the emotion,

6  without the animation normally associated with things,

7  especially things that have some emotional content.

8      Q    Doctor, I want to talk to you, based upon your training

9  and experience, and again, your knowledge and research, do the

10  dynamics of victims who are adolescent victims of adolescent

11  sexual abuse, are they able to remember specific dates of abuse

12  when the abuse occurs over an extended period of time?

13                 MR. BANDELLI:  Objection, your Honor.

14                 THE COURT:  Overruled.

15      A    Memory has a twofold process.  First of all, the longer

16  the period of time that's elapsed since an alleged event, the

17  more the memory decays.

18          So the first answer is that it might be very difficult

19  for them to remember what we call peripheral details because

20  there is not that immediacy of question and answer.

21          Secondly, when you are having a traumatic event where

22  as you the accuser and circumstances are similar; the same

23  person is alleged to have done it in the same place, the abuse

24  that a person is attempting to, while it's happening, is how

25  their body is feeling, they don't tend to remember dates and

1    times.  There is no reason to.

2         So what we say is, unless there is a significant date

3    that is -- such as my birthday or a significant circumstance

4    such as it happened in a different place than where it normally

5    happens, we would tend to have what's called blending which is

6    that it's thrown into a blender, and what the adolescent may

7    remember is who did what to whom; that is, who did what to whom

8    and possibly where, but the detail of exactly what happened,

9    especially with similar abuse was the lack of the ability later

10   on to retrieve.

11        When it happened or the peripheral details, for

12   example, was it raining out today, that would be something that

13   would be significant.  If you went on jury duty once in three

14   years, but if you went every day on a Wednesday or Tuesday, you

15   might not remember whether or not it was raining today.

16   Q     Doctor, can you explain why it is that a child would be

17   able to remember the details of the first incident of sexual

18   abuse?

19                MR. BANDELLI:  Objection, your Honor.

20                THE COURT:  What's the basis of your objection?

21                MR. BANDELLI:  Relevance.

22                THE COURT:  Overruled.

23   A     Research in memory shows that primacy and recency.

24   Those are two words that often affect memory.

25        Recency means the most recent event and primacy means

                                                              gjn

1    the first event.  That is, a parent, the first time you were

2    kissed by a boy, so to speak, that's a peg; but, you know, all

3    the makeout sessions in between may get blended a little.

4            I don't know if that's a fair analogy.

5            MR. BANDELLI:  Objection to the use of the term

6        "blending," Judge.

7            THE COURT:  Overruled.

8    A    And I don't mean to minimize anything.  I am just

9    trying to say the first time something happens to you, there is

10   more of a reason to remember it from a developmental, cognitive

11   point of view.

12   Q    Can you explain what you mean by pegs, just a little?

13   A    Peg is something to hang your hat on.  Something that's

14   a cue that reminds you of a distinct issue, and so therefore, if

15   you throw your hat, so to speak, into a group of other hats,

16   there is no distinction.  But if you take a peg that has your

17   name on it -- even in kindergarten, that's, you know, that's the

18   note, that's my name, I know my name, that's my box -- that's

19   what pegging is.  It shows the person that there is a distinct

20   barrier or boundary.  It tells the person:  Focus on this.

21           That's part of what we try to do in terms of teaching

22   children early on that there is those things that you must pay

23   attention to, put those things that are just similar, or there

24   is no importance to it like a fire drill.  Those things are not

25   necessarily committed to memory.  We can never remember all the

gjn

1    information that would be, you know, incorporating noise with

2    important information, and the human brain could never filter

3    out what would be the important detail from the less important

4    if we were aware of everything that ever happened to us like a

5    computer is aware.

6        Q    The last thing, Doctor, that I want to speak to you

7    about, is disclosure.

8            Can you talk briefly about emotional versus accidental

9    disclosure?

10       A    Well, when we say that a person out cries or finally

11   makes the bridge to be able to tell somebody else, an accidental

12   disclosure means that the person didn't go on purpose to tell

13   somebody, meaning they didn't call the police officer, they

14   didn't go to an emergency room, it's because somebody stumbled

15   over it by accident either because somebody questioned them or

16   somebody may have read an e-mail or somebody may have a sexually

17   transmitted disease.  Therefore, people start questioning that,

18   you know, how did this happen.

19           So the person still is not ready to talk themselves,

20   but only discloses after by accident, so to speak, somebody else

21   stumbles across it.

22           Emotional means important event.  We try somehow to get

23   it outside of ourselves and we find it in some senses they were

24   particular to talk to others.  But emotional disclosure means

25   you are talking to others, whoever that other is, to get it off

DR. DON LEWITES - People - Direct          666

1     your chest, to share the information.

2          But there is no strategic element.  It's not telling

3     somebody to go and call the police, it's not going to a hospital

4     and having an examination.  It means catharsis, it means I need

5     to talk about it because holding it in any longer, it's like

6     being super saturated.  After awhile, you can't hold any more

7     water so you talk about it.

8          But that's an emotional disclosure as opposed to

9     strategics or tactical disclosure.  I am telling somebody and I

10    expect the consequence or hope for something to be done.

11              MR. ROSENBLATT:  I have no further questions, your

12        Honor.

13              Thank you.

14              THE COURT:  Thank you.

15              Mr. Bandelli, you my inquire.

16              MR. BANDELLI:  Thank you, Judge.

17              Good afternoon, Doctor.

18              THE WITNESS:  Good afternoon, Counselor.

19              MR. BANDELLI:  My name is Stanford Bandelli.  I

20        represent Harold Gopaul.

21              You don't know who he is, right?

22              THE WITNESS:  No, I do not.

23              MR. BANDELLI:  Never seen him before?

24              THE WITNESS:  Never.

25              MR. BANDELLI:  And I have some questions I'm going

1          to ask you.  If you don't know the answer, simply say you

2          don't know; if you don't understand the question, let me

3          know, I will rephrase it.  Okay?

4                    THE WITNESS:  Yes, sir.

5     CROSS-EXAMINATION

6     BY MR. BANDELLI:

7          Q     All right.  You testified you never met Sana Awan; is

8     that correct?

9          A     Correct.

10         Q     And you said there is a reason for that, but you have

11    no idea at this time whether she was or wasn't the victim of

12    sexual abuse; is that correct?

13         A     Correct.

14         Q     And you are testifying here today on behalf of the

15    prosecution, they called you as an expert in this area of

16    intrafamilial child sexual abuse?

17         A     Correct.

18         Q     And you are getting paid to be here today?

19         A     The amount of time I spend, yes.

20         Q     Okay.  And would you say that testifying as an expert

21    is a source of income to you in terms of your practice?

22         A     Yes.

23         Q     Okay.  You make money from it, right?

24         A     Absolutely.

25         Q     Okay.  You talk about, you had mentioned Susan Santra,

1    a study by her -- I don't know if I got the name right, and I

2    apologize if I messed up the name because I am not an expert in

3    this area -- but would her study have been based on the Roland

4    Summit Study on child sexual abuse accommodations?

5        A    Nothing in common.

6        Q    Well, those areas you describe; secrecy and

7    helplessness and, you know, those different factors, delayed

8    conflicted disclosure, they seem to be pretty similar to the

9    ones you just described?

10       A    Doctor Summit did his own independent work in

11   California and he came up with one of his major stages, it's

12   called recantation.

13       Q    Uh-huh?

14       A    And you talk about conflicted.  The point was he

15   studied children as well, and some of his work is no longer

16   accepted, and that's why I don't talk about him, because some of

17   his work is being questioned at this time.  Dr. Summit worked in

18   Connecticut.  Independent of him, may have discussed similar

19   issues, but is not in any way connected to his work.

20       Q    Well, isn't there a principle flaw in Dr. Summit's work

21   with child sexual abuse syndrome, evidence there is no -- and I

22   am now quoting:  No evidence that it can discriminate between

23   sexually abused children and those who have experienced other

24   trauma?

25                MR. ROSENBLATT:  Objection, your Honor.

DR. DON LEWITES - People - Cross            669

1    Q    Isn't there a principle flaw within the theory you are

2    proposing as a basis for your testimony here?

3                THE COURT:  What's the basis of the objection?

4                MR. ROSENBLATT:  Questioning him on a theory that

5        the witness has stated is improper and of no use.  And he is

6        citing research that it's based on, that so it's an improper

7        question.

8                MR. BANDELLI:  Let him say no, then.

9                THE COURT:  Mr. Bandelli --

10               MR. BANDELLI:  Well, I --

11               THE COURT:  Also, I'm going to tell you --

12               Overruled.

13               You can answer the question, Doctor.

14   A    There is no part of Dr. Summit's work that in any way

15   states that it should be used to diagnose or differentiate

16   children who have -- it's not meant to be a diagnostic tool.

17   It's an explanatory concept which already accepts those people

18   who have been adjudicated to have been abused.  It explains

19   after the fact.  It does not tell you how to determine who is

20   abused.

21               So it's not a flaw at all because it's a syndrome.

22   It's not a basis.  Syndromes by definition do not prognosticate.

23   Q    Well, Doctor, at this point in time, nobody has been

24   adjudicated as sexually abused.

25               MR. ROSENBLATT:  Objection.

                                                        gjn

1    Q    Doesn't that flaw in fact fly to the theory that you

2    just gave to this jury?

3                MR. ROSENBLATT:  Objection.

4                THE COURT:  Sustained.

5    Q    There are symptoms associated with child sexual abuse,

6    is there not?

7    A    Well --

8    Q    Yes or no?

9    A    Yes.

10   Q    Okay.  And one of those symptoms would be problems in

11   school, poor grades; is that correct?

12   A    No, it's not correct.

13   Q    Really?

14               MR. ROSENBLATT:  Objection to the comments, Judge.

15               THE COURT:  Mr. Bandelli.

16   Q    So --

17               THE COURT:  Mr. Bandelli.  You ask questions, you

18   get answers.  You don't comment on the answers and you don't

19   repeat the answers.  Please cease doing that.

20   Q    So school performance has no bearing as a symptom of

21   sexual abuse syndrome as you understand it?

22   A    That's not what I said.

23   Q    Okay.  Well, answer so then -- that's the question.

24   A    Okay.  I would be glad to answer.

25               The question is:  Do all children who indeed have been

1   found to be sexually abused express it in school, the answer is

2   no.

3          Do some children who have been found to be sexually

4   abused do worse in school?  Some.  Especially at a younger age

5   when they have been more violently attacked.

6          Do some children actually do better in school because

7   it's a safe haven and it's a place where they feel people treat

8   them with respect?  Yes, sometimes.

9          So the answer is all of the above, but it's not

10  pathpneumonic.  Means there is no direct cause and effect that

11  we can state because from a statistical point of view, more

12  people vary in terms of ups and downs in school than whatever

13  would correlate with being sexually abused.  So if you find the

14  average person varying in their school, wrongfully, that's going

15  to predict sex abuse because you will be wrong.

16     Q   I am not -- Isn't that a factor that's considered in

17  terms of sexual abuse, and what you seem to answer is that,

18  well, they can do poorly, they can do in the middle, they can do

19  great, so --

20     A   Or they may not have any effects at all.

21     Q   Okay.  So isn't that true then, in any sexual abuse

22  case then, that they could have none of these effects you just

23  spent the last twenty minutes describing to the jury?

24     A   They could not have any effects noticed in school, that

25  is correct.

DR. DON LEWITES - People - Cross                672

1      Q     But could they not have any of the effect or everything
2   else you described, could they not have a flat affect if they
3   have been sexually abused, must very have a flat affect if they
4   have been sexually abused?
5              MR. ROSENBLATT:  Objection, Judge.  It's three
6         questions.
7              THE COURT:  Sustained.  Ask one question at a
8         time.
9      Q     Must receive a flat affect if they have been sexually
10  abused?
11     A     In terms of --
12     Q     Must develop a flat affect if they have been sexually
13  abused.
14     A     In terms of --
15     Q     Did you study Sana Awan's ACS records?
16     A     Not purposefully.
17     Q     Did you study Sana Awan's medical records?
18     A     Not purposefully.
19     Q     Did you study Sana Awan's school records?
20     A     Not purposefully
21     Q     When you say "not purposefully," do you mean
22  intentionally; is what you are saying?  You made a decision that
23  you weren't going to study them; is that correct?
24     A     Because of the conflict, I was going to be called as an
25  expert.

1    Q    Yeah, but don't you think it would be beneficial if you

2    had spoken to these people since -- of what may or may not be

3    reported here?

4    A    Only if I was a juror, not giving an opinion.

5    Q    Okay.  So as a juror, those are important, what these

6    people have; isn't that right?

7                MR. ROSENBLATT:  Objection.

8    Q    Whether this may be further developed, right?

9                THE COURT:  Sustained.

10    Q    Drug or alcohol abuse, symptoms of child abuse?

11                MR. ROSENBLATT:  Objection to relevance.

12                THE COURT:  I will allow it.

13    A    There is no direct symtomtology.  People who have been

14    traumatized, sexually traumatized may or may not develop alcohol

15    and drug problems.

16         The vast majority of people who do develop those

17    problems have never been sexually abused.

18    Q    Is that in fact a fact that has been described in

19    studies as being a symptom of child sexual abuse?

20    A    In those literary works, it's made very clear there is

21    no cause and affect.

22         A trauma may make a person try to develop coping

23    mechanisms which were destructive.  A person who has been

24    sexually abused may show different symptoms as counselor is

25    saying, but you can't use anyone's symptoms to go backwards and

                                                        gjn

1    say that they were sexually abused.  You can't use any

2    psychological symptom to say for a fact that proves sexual

3    abuse.  It's not the proper science.

4         Q    Well, as an expert, though, if you're doing an

5    evaluation, aren't you looking for certain symptoms and making a

6    diagnosis?

7              MR. ROSENBLATT:  Objection.

8         Q    Diagnosis --

9              MR. BANDELLI:  Excuse me?

10             THE COURT:  Sustained.

11        Q    Well, aren't there symptoms you look for in determining

12   whether or not there is child sexual abuse syndrome?

13             MR. ROSENBLATT:  Objection.

14             THE COURT:  Sustained.

15             MR. BANDELLI:  May we approach, Judge?

16             THE COURT:  Approach.

17             (Whereupon, a conference was held between all

18        counsel and the Court on the record at the side-bar.)

19             THE COURT:  Make your record.

20             MR. ROSENBLATT:  Yeah.  Last night I did some

21        research on this, being that I was advised this an expert

22        who is going to testify.  I had an opportunity review --

23             THE COURT:  Mr. Bandelli.

24             MR. BANDELLI:  -- to review --

25             THE COURT:  Mr. Bandelli, there is nothing wrong

gjn

1      with my hearing.

2              Again, we are at a sidebar for a specific --

3              MR. BANDELLI:  I will talk low.

4              THE COURT:  -- for a specific purpose.

5              The jurors can hear you.

6              MR. BANDELLI:  I apologized.  I thought I was

7      talking low.

8              I am being serious.  I apologize.

9              There is symptoms that are identified with the

10     syndrome that he described.  I am certainly allowed to ask

11     him about these symptoms and whether or not they are

12     symptoms that are either consistent or inconsistent, and

13     whether or not this would be considered in making a

14     determination whether or not there is child sexual abuse.

15             The prosecutor can't just limit him to the areas

16     that he wants to; tenderness, et cetera, et cetera.  He

17     opened the door to this stuff.

18             MR. ROSENBLATT:  So, Judge, what Mr. BANDELLI's

19     position is, he is free to cross-examine an expert on

20     anything he sees fit and he is not subject to the Court's

21     ruling.  That's absurd.

22             MR. BANDELLI:  I am not asking about blending.

23             MR. ROSENBLATT:  There are certain rules that an

24     expert in child sexual abuse, one of which prohibits him

25     from diagnosing or examining records pertaining to the

                                                        gjn

1     victim.  He is not permitted under the law to evaluate her

2     records, school records, testimony of any such other

3     diagnosis.

4              That's what he is seeking to do.  He is seeking to

5     have him submit some sort of diagnosis in regards to this

6     victim based upon these factors.  That's impermissible.

7              MR. BANDELLI:  No.  Actually, I am trying to

8     demonstrate that there are factors that are associated with

9     the syndrome that he would be looking for that don't match

10    up with the victim in this case.  Just like he is looking to

11    find ones that are consistent.

12             THE COURT:  He can ask him about the factors in

13    the syndrome.

14             You are asking him about diagnosing a specific

15    case.  You can't do that.

16             MR. BANDELLI:  All right.

17             THE COURT:  The DA brought out a syndrome, you can

18    examine him on the syndrome.  All right?

19             MR. BANDELLI:  Fair enough.

20             (Whereupon, all parties returned from the sidebar

21    and the following took place:)

22             THE COURT:  You may proceed.

23             MR. BANDELLI:  Thank you, Judge.

24    Q    So as I understand it, with drug or alcohol abuse, that

25    may or may not be a symptom of sexual abuse; is that your

DR. DON LEWITES - Defense - Cross          677

1    testimony?

2        A     (Nodding.)

3              MR. ROSENBLATT:  Objection as to the symptoms of

4        abuse, Judge, talking about study.

5              THE COURT:  Sustained.

6        Q    Well, in accordance with the study of drug and alcohol

7    abuse, it may or may not be a symptom of sexual abuse?

8              MR. ROSENBLATT:  Judge, again, we are talking

9        about symptoms.

10             THE COURT:  Curtail your questions to the study.

11             MR. BANDELLI:  I am to the study, Judge.

12       Q    Drug or alcohol abuse a symptom which may or may not be

13   consistent with sexual abuse according to the study?

14       A    Drug and alcohol abuse would not be verbalized as a

15   symptom of sexual abuse.

16             A consequence of any trauma may be coping mechanisms

17   such as eating disorders or gambling disorders, marital

18   disorders.  But there is nothing associated particularly with

19   drug and alcohol abuse that would lead you to the conclusion

20   that the person has been sexually abused, it's not a symptom of

21   sexual abuse.

22       Q    Okay.  So as a consequence of sexual abuse -- to use

23   your words -- then drugs or substance abuse, according to the

24   study, could be identified as being a consequence of sexual

25   abuse; is that correct?

gjn

1      A    It is possible that for some women or men who have been

2   sexually abused, they may become more likely to be addicted to

3   substances, but the vast majority of people who are addicted to

4   substances have never been sexually abused.

5      Q    So then why do they include this in the study?

6              MR. ROSENBLATT:  Objection.

7              THE COURT:  Sustained.

8      Q    How about withdrawal from family and friends or usual

9   activities?

10             Is that a symptom of sexual abuse according to the

11  study you are relying on?

12     A    No.

13     Q    Is it a consequence?

14     A    It's possible, but in an interfamiliarity setting, the

15  general guideline is the child is trapped, so it's very hard to

16  withdraw from your family when you are an adolescent because

17  where are you going to go?  You don't have the kind of

18  resources.  So it's not something we tend to look at, you know,

19  so that would be highly correlated with a person who is still

20  under the legal auspices of a family, that they could withdraw

21  from the family.

22     Q    How about friends or social activities?

23     A    Again, it is nothing specific.  Some people who

24  withdraw from social events because they have social anxiety,

25  which has nothing to do with being sexually abused.

1  Q Okay.  So based on what you are saying then, the source

2 of somebody's behavior could be related to anxiety, not

3 necessarily sexual abuse; is that correct?

4  A I agree.

5  Q Okay.  And the source of somebody's behavior could be

6 related to another type of trauma, not necessarily sexual abuse;

7 is that correct?

8  A I think that's a fair statement.

9     MR. BANDELLI:  Nothing further.

10     Thank you.

11     THE WITNESS:  Thank you.

12     THE COURT:  Thank you, Doctor.  You may step down.

13     THE WITNESS:  Thank you, your Honor.

14     (Whereupon, the witness left the witness stand.)

15     THE COURT:  Mr. DA, you may call your next

16 witness.

17     MR. ROSENBLATT:  Judge, may I approach before I

18 call my next witness?

19     THE COURT:  Approach the bench.

20     (Whereupon, a conference was held between all

21 counsel and the Court off the record at the side-bar.)

22     THE COURT:  All right.  Due to scheduling, we are

23 going to recess for the day.  You are going to come back

24 tomorrow morning -- tomorrow afternoon at 1 o'clock.

25 Tomorrow afternoon.  You'll be able to sleep late tomorrow.

1          Get to the courthouse between 1:00 and 1:30

2   tomorrow morning -- tomorrow afternoon, and the court

3   officer will meet you, and I anticipate we should finish the

4   testimony on this trial tomorrow afternoon, or the latest

5   Thursday morning, just to let you know.

6          All right.  Remember there is no court session

7   tomorrow morning on this case.

8          Not to discuss this case among yourselves or with

9   anyone else.  Anyone tries to discuss it with you, you bring

10  it to my attention immediately.  You are not to view any

11  premises that have been mentioned and you are not to form

12  any opinion as to whether or not you feel the defendant is

13  guilty or not guilty of the crimes with which he is charged.

14         Remember come to the courthouse between 1:00 and

15  1:30 tomorrow.  We will resume with the testimony tomorrow

16  afternoon.

17         Get home safely.  Enjoy your afternoon and

18  evening.  See you tomorrow afternoon.

19         Follow the instructions of the court officer.

20         (Whereupon, the jury exited the courtroom and the

21  following occurred:)

22         THE COURT:  Mr. Bandelli, you have all your

23  witnesses here tomorrow afternoon.

24         MR. BANDELLI:  Yes, sir.

25         MR. ROSENBLATT:  Judge, at this point, I still

gjn

1    have not received all of the dates of birth in regards to

2    the witnesses.  At this point, if he is calling any of those

3    people, I ask the Court to have a reasonable amount of time

4    to go back to my office to do my diligent work to prepare

5    for those witnesses.

6              I have made now my third request for the dates of

7    birth for the missing individuals.

8              MR. BANDELLI:  Which ones don't you have?

9              MR. ROSENBLATT:  You provided me a list and the

10   list was missing dates of birth.

11             MR. BANDELLI:  I know.  There were five, two that

12   didn't tell me.  Which two?

13             MR. ROSENBLATT:  I don't have that list with me,

14   list is back in the office with the paperwork.

15             I believe it's Ms. Paguada, Ms. Reyes and

16   Mr. Sukhram, but again, there was typed up on the list and

17   the list I have is incomplete.  If he has all the dates of

18   birth, I am happy to talk to them at this point, but I still

19   don't have all of them.

20             MR. BANDELLI:  I don't have one of the witness's

21   date of birth, Ms. Cuba, but I will get the other two dates

22   of birth to him, call him.  I will work on it right now.

23             THE COURT:  You said you have all of them except

24   one?

25             MR. BANDELLI:  No, I have five that I have given

gjn

1      to him.  I believe on the sheet he is saying there is three

2      missing.  I thought there was two missing.

3                  MR. ROSENBLATT:  There is eight names on the list.

4                  MR. BANDELLI:  Okay.  I may be mistaken.  I don't

5      have it in front of me right now.  If it would be helpful, I

6      don't want to hold him up with the dates of birth.

7                  THE COURT:  How many witnesses do you intend to

8      call tomorrow?

9                  MR. ROSENBLATT:  Judge, perhaps this is a good

10     time as any then since we have a few minutes to work.

11                  I am going to ask for an offer of proof as to some

12     of these people.  It's clear from the testimony and the

13     allegations that none of these people were present during

14     any of the incidents.

15                  THE COURT:  Mr. Bandelli.

16                  MR. BANDELLI:  Yeah, I am going to have --

17                  THE COURT:  How many you going to call?

18                  MR. BANDELLI:  I can have five tomorrow.  I can

19     tell you, with the exception of character witnesses.

20                  MR. ROSENBLATT:  Judge, most respectfully, I

21     submit that -- well, I am going to ask for an offer of

22     proof.

23                  THE COURT:  He said they are character witnesses.

24                  MR. ROSENBLATT:  As to what character?  There is

25     no character of his at issue.  If he is testifying and these

                                                            gjn

1      are character witnesses as to the defendant's truthfulness,

2      then perhaps that would be a showing for a character witness

3      as to truthfulness.  If these are five individuals who are

4      going to testify that prior to this arrest they discussed in

5      the community the defendant's reputation for not abusing

6      children, then certainly that's a character of which would

7      be relevant; but at this point, I submit unless the

8      defendant is testifying, there is no other character that's

9      become an issue.

10                  THE COURT:  Be prepared tomorrow.

11                  MR. BANDELLI:  Got it, Judge.

12                  THE COURT:  Submit to the offer of proof 2 o'clock

13     tomorrow.

14                  MR. BANDELLI:  Thank you, Judge.

15

16                  (The trial was adjourned to July 14, 2010,

17     2:00 P.M.)

18

19

20

21

22

23

24

25

                                              gjn



684

```
 1   SUPREME COURT OF THE STATE OF NEW YORK.

 2   COUNTY OF QUEENS: CRIMINAL TERM: PART TAP-D

 3   ------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK      :   Indictment
 4                                            :   No. 2065/08
                                              :
 5              -against-                     :
                                              :
 6                                            :
     HAROLD GOPAUL,                           :
 7                                            :
                         Defendant.           :   CRM SX ACT 1
 8                                            :
     ------------------------------------X JURY TRIAL
 9
                             125-01 Queens Boulevard
10                           Kew Gardens, New York
                             July 14, 2010
11
     B e f o r e:
12
                     HONORABLE GREGORY L. LASAK,
13
                             Supreme Court Justice
14
     A p p e a r a n c e s:
15
             HONORABLE RICHARD A. BROWN
16               District Attorney, Queens County
             BY:   JARED ROSENBLATT, ESQ.
17

18           STANFORD BANDELLI, ESQ.
                 Attorney for Defendant
19               16 Court Street
                 Brooklyn, New York
20

21

22               *           *           *

23                           SHERYL FITZPATRICK, RPR CSR
                             Official Court Reporter
24

25
```

slf

Proceedings

1          THE CLERK:  Case on trial.  People versus Harold

2     Gopaul.  Let the record reflect the defendant is before the

3     Court.

4          MR. BANDELLI:  Stanford Bandelli on behalf of

5     Harold Gopaul.

6          MR. ROSENBLATT:  For the People Assistant District

7     Attorney Jared Rosenblatt.

8          Good afternoon, your Honor.

9          THE COURT:  Good afternoon.

10          COURT OFFICER:  Jury entering.

11          (Panel of sworn jurors enters the courtroom.)

12          THE CLERK:  Case on trial.  All parties are

13     present, your Honor.  Do both sides stipulate that all

14     jurors are present and properly seated?

15          MR. ROSENBLATT:  Yes.

16          MR. BANDELLI:  So stipulated, your Honor.

17          THE COURT:  Good afternoon, ladies and gentlemen.

18     I hope you are all well rested.

19          Mr. DA, you may call your next witness.

20          MR. ROSENBLATT:  Your Honor, the People call

21     Assistant District Attorney Brian Hughes.

22          COURT OFFICER:  The People call Assistant District

23     Attorney Brian Hughes, H-u-g-h-e-s, Queens DA's office.

24          MR. ROSENBLATT:  May I inquire, your Honor?

25          THE COURT:  Yes, you may.

Hughes-People-Direct

1          MR. ROSENBLATT:   Thank you.

2  B R I A N   H U G H E S, Assistant District Attorney, called

3      on behalf of the People, having been duly sworn, took

4      the witness stand and testified as follows:

5  DIRECT EXAMINATION

6  BY MR. BANDELLI:

7      Q    ADA Hughes, can you tell the members of the jury how

8  long have you been working for the Queens DA's office?

9      A    I've been with the office three years in August.

10     Q    Where do you currently work?

11     A    I work in the Domestic Violence Bureau which is located

12  at the Family Justice Center.

13     Q    Tell the members of the jury what type of cases you

14  handle in the Domestic Violence Bureau.

15     A    I deal with a felony and misdemeanor case load of about

16  180 cases dealing with incidents in which there were domestic

17  partners who either engaged in physical disputes, violated

18  orders of protection, threatened each other, those types of

19  things.

20     Q    In addition to your role of maintaining a case load, do

21  you also participate in the Special Victim's Bureau's beeper

22  program or riding program?

23     A    Yes, I do.

24     Q    Tell the members of the jury what is the riding program

25  itself in regards to the Special Victim's Bureau.

slf

Hughes-People-Direct

1    A    Well, approximately twice a month an assistant district

2    attorney from either the Domestic Violence Bureau or the Special

3    Victim's Bureau will be on call for a 24-hour period.  If during

4    that 24-hour period there is a significant sex crime which takes

5    place within the county, we may be asked to respond to either

6    conduct interviews at the site or the location of a hospital or

7    precinct, perhaps take a statement from a defendant, write

8    subpoenas, arrest warrants, those type of things.

9    Q    And the Special Victim's riding program that the office

10   has, how many days a year is that program run?

11   A    It's run 365 days a year divided up between each of the

12   assistant district attorneys between the Special Victim's and

13   Domestic Violence Bureau over that period of time.

14   Q    When an attorney like yourself is on beeper, for how

15   long are you on call?

16   A    It's a 24-hour period.  It begins at 9:00 one morning

17   and goes to 9 o'clock next morning.

18   Q    I want to turn your attention to June 24, 2008.  Were

19   you working as a member of the Assistant District Attorney's

20   office on that date?

21   A    I certainly was.

22   Q    And were you assigned to the Domestic Violence Bureau

23   on that date?

24   A    That's correct, I was.

25   Q    And as part of your duties on that date, were you the

slf

Hughes-People-Direct

1    assigned assistant district attorney that was on call for

2    Special Victims?

3        A    That is correct, I was.

4        Q    I want to talk to you about sometime after 11:30 in the

5    morning.  Were you at work?

6        A    Yes.  I was at work at that point in time.

7        Q    And without telling us what was said, tell the members

8    of the jury what happened that morning.

9        A    Well, at approximately 11:30 I received information to

10   suggest I needed to respond to a scene involving a crime that

11   had taken place in Queens County that hd been reported earlier

12   and an arrest had been made.

13       Q    What was the name of the --

14            MR. ROSENBLATT:  -- withdrawn.

15       Q    Do you remember who notified you in regards to that?

16       A    There's an organization -- a division within the

17   District Attorney's office called the hotline in which they

18   received information from precincts, and then those detectives

19   who are manning this hotline will notify the ADAs who are riding

20   ADAs, responding ADAs, and that's how I received this

21   notification.

22       Q    Where did you go?

23       A    I actually proceeded down the hallway to the Special

24   Victim's Bureau to conference the matter with Bureau Chief

25   Marjorie Fisher.

Hughes-People-Direct

1    Q    Before you conferenced the case with Marjorie Fisher,

2  what did you do?

3    A    I proceeded out to the hospital to speak with the

4  victim, and Miss -- ADA Fisher also went to the hospital.

5    Q    When you say you went to the hospital, was that

6  Northshore Hospital?

7    A    It was Northshore Hospital.

8    Q    Who did you speak with at Northshore Hospital when you

9  arrived there on June 24, 2008?

10    A    I conferenced the matter further with Bureau Chief

11  Fisher, then eventually was able to speak to Sana Awan, the

12  complainant in this matter.

13    Q    Did there come a point in time when you were at the

14  hospital that you received another notification from the

15  hotline?

16    A    Yes.  I was in contact with the hotline throughout the

17  course of that day, actually.

18    Q    What happened in regards to receiving an additional

19  notification while at the hospital?

20    A    I received information that the defendant was

21  interested --

22            MR. BANDELLI:  Objection, your Honor.

23            THE COURT:  Sustained.

24    Q    Without telling us what was said to you, what did you

25  do in response to that notification from the hotline?

slf

Hughes-People-Direct

1     A     I advised one of the detectives in our office to

2  proceed to the 105 Precinct to prepare for a video statement.

3     Q     What was the role of that detective who you notified?

4     A     The role of that detective was to set up video

5  equipment at the 105 Precinct so that the defendant could

6  provide a statement regarding his take on the incident.

7     Q     After speaking with Sana at the hospital, approximately

8  what time did you leave the hospital?

9     A     It was probably in the neighborhood of 2:30, 3 o'clock.

10    Q     Where did you go?

11    A     I proceeded to the 105 Precinct.

12    Q     When you arrived at the 105 Precinct, who did you speak

13  with there?

14    A     Well, I spoke to a variety of people there.  I spoke to

15  Detective Shulman.  I spoke to Officer Alfaro.  I actually had

16  further interview with Miss Awan at that point.  Eventually I

17  also spoke to ADA Rosenblatt who responded to the scene

18  eventually as well.

19    Q     At some point on June 24, 2008 I responded to the

20  precinct?

21    A     Yes, you did.

22    Q     Sometime shortly after 5 p.m., tell the members of the

23  jury what happened at the 105 Precinct.

24    A     About 5 p.m. we conducted a video statement which the

25  defendant informed us about his position on the allegations that

slf

Hughes-People-Direct

1     were made against him by Miss Awan.

2        Q     When you say "defendant," who are you referring to?

3        A     Harold Gopaul.

4        Q     Do you see Mr. Gopaul in the courtroom today?

5        A     Yes, I do.

6        Q     Can you identify him by an article of clothing he is

7     wearing?

8        A     Certainly.

9              He is wearing a white shirt, and it looks like a black

10    striped tie.

11             MR. BANDELLI:  Indicating my client, your Honor.

12             THE COURT:  The record will indicate the witness

13        has identified the defendant.

14       Q     Other than what's contained on the video that you

15    described, did you have any conversation with Mr. Gopaul?

16       A     I did not.

17       Q     Prior to the video statement between 2:30 and 5 p.m.,

18    did you ask Detective Shulman to provide anything for the

19    defendant?

20       A     Yes, I did.

21       Q     What did you ask him to provide?

22       A     I made sure that the defendant had water and some type

23    of food.  I believe a bag of chips.

24       Q     When you were in --

25             MR. ROSENBLATT:  -- withdrawn.

Hughes-People-Direct

1    Q    Where did this video interview take place inside the

2    105 Precinct?

3    A    There was an interview room, I believe, available there

4    at that point in time.

5    Q    And when you observed the defendant inside the

6    interview room sometime after 5 p.m. on June 24, did you observe

7    any injuries on him?

8    A    No, no injuries to the defendant.

9    Q    Did you observe any bruises or swelling to his face or

10   body?

11   A    No.  He had no bruises or swelling.

12   Q    Did he appear coherent to you?

13   A    He did.

14            MR. ROSENBLATT:  Your Honor, I ask that this be

15       marked People's Exhibit 10 for identification purposes and

16       shown to the witness, please.

17            THE COURT:  Please mark that People's 10 for

18       identification only.

19            (DVD was marked as People's Exhibit 10 for

20       identification.)

21            COURT OFFICER:  People's 10 marked for ID only.

22   Q    ADA Hughes, take a look at what has been marked as

23   People's Exhibit 10 for identification purposes.  Tell the

24   members of the jury, do you recognize that?

25   A    I do.

slf

Hughes-People-Direct

1    Q    What do you recognize that to be?

2    A    This is a DVD of the statement that the defendant made

3    on that occasion.

4    Q    And have you reviewed that before today?

5    A    I have.

6    Q    And have you indicated in some way that the contents

7    that are on it are a fair and accurate representation of what

8    appeared -- of what took place inside the interview room on

9    June 24, 2008?

10   A    Yes, I have.

11   Q    How have you made that notification?

12   A    I put my initials here it looks like in the top left

13   corner of the DVD after I viewed it to indicate that it was fair

14   and accurate.

15   Q    Does that DVD include all of the conversations that

16   took place between you, myself and the defendant on June 24,

17   2008?

18   A    Yes, it includes everything.

19        MR. ROSENBLATT:  Your Honor, I would offer

20   People's Exhibit 10 into evidence at this time.

21        THE COURT:  Please show it to Mr. Bandelli.

22        MR. BANDELLI:  Thank you, Judge.

23        Just a couple of questions, Judge.

24        THE COURT:  You may proceed.

25        MR. BANDELLI:  Thank you.

Hughes-People-Direct

694

1    VOIR DIRE EXAMINATION

2    BY MR. BANDELLI:

3        Q    Good afternoon.

4        A    Good afternoon.

5        Q    "BH."  Brian Hughes?

6        A    Yes.

7        Q    All right.

8            Who was present during the video?

9        A    That was myself, ADA Rosenblatt, Detective Shulman, the

10   detective who was manning the camera at the time whose name I

11   don't recall.

12       Q    You weren't actually responsible for videotaping it,

13   right?

14       A    No, I was not.

15                MR. BANDELLI:  Objection, Judge.

16                THE COURT:  You are objecting?

17                MR. BANDELLI:  Yes.  On the basis I'm objecting to

18       every statement that was taken in this case.  The same

19       basis, Judge.

20                THE COURT:  Thank you.

21                Objection overruled.  People's 10 is received in

22       evidence.

23                (People's Exhibit 10, previously marked for

24       identification, was marked and received in evidence.)

25                COURT OFFICER:  People's 10 marked and received.

slf

Hughes-People-Cross

1          MR. ROSENBLATT:  With the Court's permission I

2     would ask to play People's Exhibit 10 at this time.

3          THE COURT:  You may proceed.

4          MR. BANDELLI:  Judge, we can't really see it from

5     over here.  Could it be positioned so that my client and I

6     also have an opportunity to see it?

7          (Pause in proceedings.)

8          THE COURT:  Mr. Bandelli, you can come over here.

9     Put the defendant at the end of that table.

10          MR. BANDELLI:  Over here?

11          THE COURT:  Right in front.

12          (People's Exhibit 10 played in open court.)

13          MR. ROSENBLATT:  I have no further questions, your

14     Honor.

15          THE COURT:  Mr. Bandelli.

16          MR. BANDELLI:  Thank you, Judge.

17     CROSS-EXAMINATION

18     BY MR. BANDELLI:

19     Q    Good afternoon, ADA Hughes.

20     A    Good afternoon, Mr. Bandelli.

21     Q    You know my name, so I don't have to say what my name

22     is.  I'm going to ask you some questions.  If you don't know the

23     answer, tell me you don't know.  If you don't understand a

24     question, I'll rephrase it.  Fair enough?

25     A    That's fine.

Hughes-People-Cross

1    Q    Okay.

2         You described the beeper duty as being 24/7; is that

3    correct?

4    A    Well, it's not 24/7 for each individual ADA, but it is

5    covered 24 hours a day 7 days a week 365 days a year by some

6    ADA.

7    Q    You started on the 24th at 9:00 in the morning; is that

8    correct?

9    A    Correct.

10   Q    So, that means there would have been someone working

11   the 24 hours preceding 9 o'clock in the morning; is that

12   correct?

13   A    Yes.

14   Q    Who was that?

15   A    I don't know.

16   Q    Was it an assistant from your office?

17   A    It would be an assistant district attorney from either

18   Domestic Violence or Special Victim's Bureau.  I'm not aware of

19   who it was.

20   Q    If that ADA was notified there was somebody at the 105

21   Precinct that wanted to give a statement, he would have gotten a

22   page?

23   A    If it came in prior to the 9 o'clock shift beginning,

24   in all likelihood they would have, yes.

25             THE COURT:  You received the page when?

slf

Hughes-People-Cross

1          THE WITNESS:  11:30, somewhere in that area.

2     Q     You are aware that my client was in custody since

3  3:30 the night before, correct?

4          MR. ROSENBLATT:  Objection.

5          THE COURT:  Overruled.

6     A     I was aware that he had been arrested the night before.

7  I don't know the specific time.

8     Q     Well, you took some notes when you went down to the

9  precinct; did you not?

10    A     I did.  I'm not sure if all of the notes were taken at

11 the precinct itself.  There were notes taken over the course of

12 the day.

13    Q     You took some handwritten notes throughout the course

14 of the investigation; is that correct?

15    A     That's correct.

16         MR. BANDELLI:  Officer, could I have these handed

17    to the witness?

18    Q     I ask you whether or not it refreshes your recollection

19 as to whether or not my client was in the precinct at 3:30 in

20 the morning.

21         MR. ROSENBLATT:  Objection.

22         THE COURT:  Sustained.

23    Q     Well, if it refreshes your recollection as to whether

24 or not my client was in custody at 3:30 in the morning --

25         MR. ROSENBLATT:  Objection.

Hughes-People-Cross

1    THE COURT:  Sustained.

2    MR. BANDELLI:  Can we have a side bar?

3    THE COURT:  No.

4    MR. BANDELLI:  Well, then we are going to --

5    Q    When did you learn that he was in custody?

6    MR. ROSENBLATT:  Objection.

7    THE COURT:  Overruled.

8    A    I learned he was in custody when I received the

9    notification at 11 o'clock.

10   Q    What time did you learn that he was placed in custody?

11   MR. ROSENBLATT:  Objection.

12   THE COURT:  Sustained.

13   MR. BANDELLI:  Judge, may we have a side bar?

14   THE COURT:  No.  Move on.

15   MR. BANDELLI:  Note my exception, Judge.

16   Q    You have no idea what time he was taken into custody at

17   the precinct?

18   MR. ROSENBLATT:  Objection.  Objection.

19   THE COURT:  He doesn't know.

20   Q    Do you know who the officer was that placed him in

21   custody at the precinct?

22   A    It was either Officer Alfaro or Detective Shulman.  I

23   believe Officer Alfaro was the arresting officer.

24   Q    Do you know who the officer was that placed Mr. Gopaul

25   in custody at the 105 Precinct?

slf

Hughes-People-Cross

1          MR. ROSENBLATT:  Objection.

2          THE COURT:  Overruled.

3    A     I don't specifically know who placed him in custody,

4    no.

5    Q     Now, the pager was working from 4 o'clock in the

6    morning through 9 o'clock the next morning -- well, actually the

7    same morning the pager was working in terms of an ADA in Queens

8    being notified that somebody was at the 105 Precinct and wanted

9    to give a statement; is that correct?

10   A     I have no idea.  I can only testify to 9 o'clock on

11   that day when I was being notified.  I have no --

12   Q     Well, did you ever have a circumstance where you had

13   the pager and the pager wasn't working?

14         MR. ROSENBLATT:  Objection.

15         THE COURT:  Sustained.

16   Q     So, you actually go to the precinct at what time?

17   A     I probably headed to the 105 around 2:30, 3 o'clock,

18   somewhere in that neighborhood.

19         MR. BANDELLI:  Officer, if you don't mind, could I

20     get that paperwork back?

21   Q     You spoke with a Detective Shulman when you got to the

22   precinct?

23   A     Among other people, yes.

24   Q     Detective Shulman told you he had taken statements from

25   my client; is that correct?

Hughes-People-Cross

1          MR. ROSENBLATT:  Objection.

2          THE COURT:  Overruled.

3     A    He did indicate that, yes.

4     Q    And he told you the substance of those statements, is

5    that correct?

6          MR. ROSENBLATT:  Objection.

7          THE COURT:  Overruled.

8     A    He did indicate to me what the statements were about,

9    yes.

10    Q    As a matter of fact, you wrote them down in your

11   handwritten notes; didn't you?

12    A    I believe I summarized them.

13    Q    So, you knew before you went in to talk to my client

14   what he had already said; is that correct?

15    A    I was aware he made written statements to the effect of

16   what I wrote down in my notes.

17    Q    Did you write down five oral sex sessions --

18          MR. ROSENBLATT:  Objection.

19          THE COURT:  Sustained.

20    Q    Well, you knew what he was going to say when you went

21   in there; didn't you?

22          MR. ROSENBLATT:  Objection.

23          THE COURT:  Sustained.

24    Q    You went in, Mr. Rosenblatt went and Detective Shulman,

25   right?