Hughes-People-Cross

1     A     And there was a detective taking the video as well.

2     Q     Why was Detective Shulman in there?

3     A     Detective Shulman was there to assist in the

4     questioning if necessary.

5     Q     Well, hadn't Detective Shulman already questioned my

6     client?

7            MR. ROSENBLATT:  Objection.

8            THE COURT:  Sustained.

9     Q     Well, you are aware that Detective Shulman already

10    questioned my client, correct?

11           MR. ROSENBLATT:  Objection.

12           THE COURT:  Sustained.

13    Q     Well, what's the purpose of Detective Shulman being in

14    that interview room during the videotaped statement?

15           MR. ROSENBLATT:  Objection.  Asked and answered.

16           THE COURT:  Sustained.

17    Q     Isn't it true that Detective Shulman was in there to

18    make sure that my client gave that statement?

19    A     No.

20    Q     No.

21           So, you needed a third person to help you with

22    questioning?

23    A     Detective Shulman was the representative from the New

24    York City Police Department.

25    Q     Well, didn't you -- well, weren't you and ADA

slf

Hughes-People-Cross

1    Rosenblatt also in the room?

2        A    We work for the Queens County District Attorney's

3    office.

4        Q    Did you need anybody else to witness a statement beside

5    you and ADA Rosenblatt?

6                MR. ROSENBLATT:  Objection.

7                THE COURT:  Sustained.

8        Q    Did you and ADA Rosenblatt talk about how you were

9    going to handle the questioning before you went in there?

10       A    I'm sure we discussed it.

11               MR. ROSENBLATT:  Objection.

12               THE COURT:  What was your answer?

13               THE WITNESS:  I'm sure there was a discussion to

14       that effect.

15       Q    And how did you decide who was going to ask what

16   questions?

17       A    I don't think we did decide that specifically.

18       Q    Well, at some point in the video you stopped asking

19   questions and ADA Rosenblatt took over; isn't that true?

20       A    That's correct.

21       Q    You didn't know at what point he was going to take over

22   before you went in there?

23       A    No.

24       Q    You just let him take over whatever time he chose to?

25       A    Yes.

Hughes-People-Cross

1    Q    When Detective Shulman decided he was going to ask

2   questions, there was no discussion about how that was going to

3   invoke, also?

4    A    No.

5    Q    Did you see my client before he went into the interview

6   room?

7    A    No.

8    Q    You first saw him when he was in the interview room; is

9   that correct?

10   A    Yes, when I walked in.

11   Q    He looked exactly as he did with his shirt collar

12  spread open; is that correct?

13   A    As he was on the video, correct.

14   Q    You didn't him adjust his shirt collar when you came

15  into the room; did you?

16   A    Not as far as I recall.

17   Q    By the time you had completed your interview, my client

18  had been in custody for close to 15 hours; is that correct?

19            MR. ROSENBLATT:  Objection.

20            THE COURT:  Do you know the answer?

21            THE WITNESS:  Off the top of my head I don't know

22       how long he had been in custody at that point.

23   Q    Didn't you ask Detective Shulman?

24            MR. ROSENBLATT:  Objection.

25            THE COURT:  Sustained.  He said he didn't --

Hughes-People-Cross

1    Q    Well, aren't you curious as to how long the person you

2    are going to interrogate has been in custody before you

3    interrogate him?

4              MR. ROSENBLATT:  Objection.

5              THE COURT:  Mr. Bandelli, please.

6              MR. BANDELLI:  Your Honor --

7              THE COURT:  Aren't you curious?  Ask proper

8    questions.

9    Q    Don't you think it's important to know --

10             THE COURT:  Mr. Bandelli.

11   Q    Don't you think it's significant how long the person

12   has been in custody before you question him?

13             MR. ROSENBLATT:  Objection.

14             THE COURT:  Sustained.

15   Q    Well, that's not a factor to consider in terms of

16   whether or not to question somebody, how long they have been

17   sitting in an interview room?

18             MR. ROSENBLATT:  Objection.

19             THE COURT:  Sustained.

20   Q    When was the last time he was given a meal besides the

21   potato chips you mentioned?

22             MR. ROSENBLATT:  Objection.

23             THE COURT:  Overruled.

24             Do you know?

25             THE WITNESS:  I don't know.

Hughes-People-Cross

1    Q    When was the last time he was given a cup of water

2    besides the cup of water you mentioned you gave him?

3                MR. ROSENBLATT:  Objection.

4                THE COURT:  Overruled.

5    A    Again, I don't know.

6    Q    How many officers had an opportunity to talk to my

7    client before you, Rosenblatt and Shulman went in there?

8    A    I wouldn't be able to tell you.

9    Q    Why is that?

10               MR. ROSENBLATT:  Objection.

11               THE COURT:  You can answer that.

12   A    I wasn't with your client.  I wouldn't know.

13   Q    You don't know.  You don't know --

14               THE COURT:  Mr. Bandelli.  Mr. Bandelli.  You have

15   a bad habit of repeating answers after --

16               MR. BANDELLI:  I have nothing further for the

17   witness, Judge.  Thank you.

18               THE COURT:  Thank you.

19               You may step down, sir.

20               (Witness excused.)

21               THE COURT:  Mr. DA.

22               MR. ROSENBLATT:  Your Honor, at this time the

23   People rest.

24               THE COURT:  Ladies and gentlemen, as you can see,

25   the People have rested their case.  We need to some legal

slf

Proceedings

1    issues by necessity outside of your presence, so I'm going

2    to give you a 15-minute recess.  Do not discuss this case

3    among yourselves or with anyone else.  You are not to form

4    any opinion as to whether or not you feel the defendant is

5    guilty or not guilty of the crimes with which he is charged.

6            Please follow the instruction of the court

7    officer.

8            (Panel of sworn jurors exits the courtroom.)

9            THE COURT:  Mr. Bandelli, you have your motions at

10   the end of the People's case?

11           MR. BANDELLI:  Yes.  Pursuant to the CPL, I move

12   to dismiss the charges in that the People have failed to

13   satisfy each and every one of the charges presented in this

14   indictment.

15           THE COURT:  Mr. DA.

16           MR. ROSENBLATT:  Your Honor, viewing the evidence

17   in the light most favorable to the non-moving party, we

18   submit that each --

19           THE COURT:  What did you say?  You were mumbling.

20           MR. ROSENBLATT:  I'm sorry.

21           THE COURT:  What did you say?

22           MR. ROSENBLATT:  Viewing the evidence in the light

23   most favorable to the non-moving party, I believe each

24   element of each count of the indictment has been made out,

25   and it should go forward to a jury.

slf

Proceedings

1      MR. BANDELLI:  As I understand it, based on the

2   victim's testimony, again, and I've gone over this ad

3   nauseam, she was able to identify more specific times and

4   dates when asked by the DA during direct and certainly when

5   asked by me during cross-examination.  There was failure by

6   DA to properly investigate this matter to the extent that

7   they could provide more specific times and dates as opposed

8   to charging one act with multiple charges for months over

9   the 39-month period which has made it nearly impossible for

10  my client and myself and his previous lawyers to prepare an

11  adequate defense.  He has no ability to offer an alibi when

12  he has been charged day after day after day after day for 39

13  months, and yet we can't get a specific date.  Clearly that

14  could have been done based on the testimony of the witness.

15      In addition, your Honor, the only time that I

16  heard the witness say that any threats were utilized by my

17  client against her in terms of a knife or cutting her finger

18  came about May of 2008 which would cover the charges in May

19  and June of 2008.  I don't think that evidence that they

20  have presented at this point amounts to forcible compulsion.

21      As I understand it, my client told her to shh and

22  behave.  In that regard, any of the acts, whether sexual

23  abuse or criminal sexual act, up until May or June of 2008

24  should be dismissed because they haven't established that

25  what my client did was forcible.

Proceedings

1                THE COURT:  Mr. DA.

2                MR. ROSENBLATT:  Judge, I would rely on the

3       minutes.  I believe count has been made out.  You don't need

4       a knife or whatever other weapon Mr. Bandelli was discussing

5       earlier in order to make out a forcible compulsion.  The law

6       is pretty clear in regards to that, and I believe the

7       testimony makes out each and every count of the indictment.

8                THE COURT:  There are 53 counts in this

9       indictment, Mr. DA.  How many do you wish to be submitted to

10      this jury?

11               MR. ROSENBLATT:  Judge, when the time comes I

12      think, I believe, I'm going to ask the Court to submit less,

13      but at this point I reserve that decision until the

14      defendant puts on his case as he has advised us that he

15      going to do.

16               THE COURT:  Fine.  The defendant's application is

17      denied.

18               Do you have your witnesses, Mr. Bandelli?

19               MR. BANDELLI:  Yes, I do Judge.  I actually intend

20      to call one witness today, Merlin Ali-Gopaul.

21               I want to go over something before we bring the

22      jury back in.  The DA had made reference earlier that he

23      thought he was entitled to address what had happened in

24      Nassau County through this witness because she may have been

25      present during the actual trial there, and I would submit to

Proceedings

1    your Honor that that is absolutely not a reason for her to

2    be questioned with regarding what happened in Nassau County,

3    and it's an attempt by the defense to use a back door to get

4    in evidence in this case that would be incredibly

5    prejudicial and probably make what we have doing for the

6    last two weeks absolutely moot.

7              If they are going to hear testimony he was

8    convicted in Nassau County of sexual abuse, then we have all

9    been wasting our time.  I prepped my witness in a way that

10   she is not going to make any reference to Nassau County

11   whatsoever, and I would ask your Honor to make a ruling

12   right now whether or not you are going to permit the DA to

13   go into anything about Nassau County during this

14   cross-examination.

15             THE COURT:  Who is this witness?

16             MR. BANDELLI:  The wife.  The mother of the child.

17             MR. ROSENBLATT:  Judge --

18             THE COURT:  What do you intend to elicit from this

19   witness?

20             MR. BANDELLI:  She is going to go over what

21   happened in terms of living in the house, in terms of there

22   are no complaints ever being made, in terms of the child

23   recanting the statement, in terms of Mr. Gopaul going to the

24   precinct, looking for his daughter to file a missing person

25   report.  She is going to testify in a way that is going to

Proceedings

1    impeach the credibility of the victim in this case.  I'm

2    certainly allowed to call the witness and do that.

3              THE COURT:  She was with the defendant when he

4    went to the 105 Precinct?

5              MR. BANDELLI:  She sure was.

6              THE COURT:  Mr. DA.

7              MR. ROSENBLATT:  Well, Judge, my application is

8    two fold.  One, I certainly should be entitled to

9    cross-examine this witness that she has been present for

10   prior proceedings in regards to this case.  She has observed

11   witnesses testify.  She has been present for argument.  She

12   has been present for meetings, I believe, in the courthouse.

13   Certainly that is subject to cross-examination.  If your

14   Honor --

15             THE COURT:  What meetings are you talking about?

16             MR. ROSENBLATT:  Meetings between her the

17   attorney, the husband, other family members in the

18   courthouse in Nassau County.  I'm not saying that I'm going

19   to go into the county of where it occurred, but certainly I

20   should be entitled to cross-examine this witness that she

21   has been privy to certain proceedings in regard to this

22   case.

23             THE COURT:  You want to be able to ask her about

24   what happened at a meeting between defendant and his

25   attorney?

Proceedings

1          MR. ROSENBLATT:  Well, first of all, Judge --

2          THE COURT:  Is that what you want?

3          MR. ROSENBLATT:  No.

4          THE COURT:  What do you want to ask about these

5     meetings?

6          MR. ROSENBLATT:  That she was present at prior

7     proceedings.  She observed witnesses testify.

8          THE COURT:  What about these meetings?  What do

9     you want to ask about a meeting between the defendant her

10    and --

11         MR. ROSENBLATT:  Not the defendant.

12         THE COURT:  Meeting with who?

13         MR. ROSENBLATT:  Meeting between her and another

14    witness.  Not the defendant and an attorney.  That's not

15    subject --

16         THE COURT:  What happened at these meetings?

17         MR. ROSENBLATT:  Judge, most respectfully, Judge,

18    I really don't want to tip my cross-examination off to the

19    numerous people inside of this courtroom to go outside and

20    then tell this witness what my cross-examination is going to

21    be on.  I would be happy to disclose it to the Court at side

22    bar, outside the presence of this open courtroom.

23         I have another application as well, Judge.

24         THE COURT:  What's your other application?

25         MR. ROSENBLATT:  My other application pertains to

Proceedings

1   the cross-examination of character witnesses as well as the

2   defendant.

3           THE COURT:  We are not talking about that now.

4           MR. ROSENBLATT:  Okay.  Well, then my concern

5   yesterday that I made in regards to offer of proof was

6   specifically in regards to character witnesses.  This

7   witness doesn't appear to be a character witness.  Nothing

8   that I'm going to cross-examine her on is subject to any

9   privilege, and I believe that the fact that she was present

10  at prior proceedings, observed witnesses testify, observed

11  argument made in court is subject to cross-examination.

12          THE COURT:  Do you have case law to support that

13  position?

14          MR. ROSENBLATT:  No, Judge.

15          THE COURT:  You need time to find some?

16          MR. ROSENBLATT:  If your Honor wishes me to

17  provide it after she testifies on her direct, then I'm happy

18  to do so.

19          THE COURT:  I'm going to make this ruling before

20  she testifies on her direct.  So, do you need time to find

21  case on law on this.

22          MR. ROSENBLATT:  If I could have a few moments,

23  Judge.

24          THE COURT:  Good luck.  Take a short recess.  Put

25  the defendant back in.

Proceedings

1        (Recess taken.)

2        *           *           *

3        COURT OFFICER:  Jury entering.

4        (Panel of sworn jurors enters the courtroom.)

5        THE CLERK:  Case on trial.  All parties present,

6    your Honor.

7        Do both sides stipulate that all jurors are

8    present and properly seated?

9        MR. ROSENBLATT:  Yes.

10        MR. BANDELLI:  So stipulated, your Honor.

11        THE COURT:  Ladies and gentlemen, rather than keep

12    you any longer while we discuss legal issues, we are going

13    to recess for the evening.  Remember, you are not to discuss

14    this case among yourselves or with anyone else.  If anyone

15    tries to discuss it with you, you are to bring it to my

16    attention.

17        You are not to visit any of the locations

18    mentioned, and you are not to form any opinion as to whether

19    or not you feel the defendant is or not guilty of the crimes

20    with which he is charged.

21        The testimony in this case will finish tomorrow,

22    just so you can plan ahead.  All right?  Get home safely.

23    Come back here tomorrow morning at 10 o'clock.  We will

24    proceed.  Thank you.  Follow the instruction of the court

25    officer.

714

Proceedings

1          (Panel of sworn jurors exits the courtroom.)

2          THE COURT:  Counsel, approach, please.

3          (Side-bar discussion held off the record.)

4          THE COURT:  Any matters before we recess, Mr. DA?

5          MR. ROSENBLATT:  Judge, I would just renew a

6   request that was made in September of 2008 for any

7   reciprocal discovery other than one photograph which

8   Mr. Bandelli showed me today.  There is some indication from

9   the hearing minutes in Nassau County when the defendant

10  testified that there was photographs, but just as a complete

11  blanket renewal of my demand that was made in September of

12  2008 for any reciprocal discovery under 240.30.

13         MR. BANDELLI:  Judge, anything that, you know,

14  comes to my attention that previous counsel used, if I have

15  it, I will turn it over to DA.

16         THE COURT:  Thank you.  If you have any requests

17  for charge, please give them to me tomorrow.

18         MR. BANDELLI:  Judge, as I stated at the bench

19  conference, I will be seeking a missing witness charge.

20         THE COURT:  I'll hear argument on that tomorrow.

21  Thank you both.  10 o'clock tomorrow.

22         Please put Mr. Gopaul back in.

23            *            *            *

24         (Whereupon the trial was adjourned to Thursday,

25  July 15, 2010.)

Proceedings                                    715

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF QUEENS:  CRIMINAL TERM, PART TAP-D
 2   ------------------------------------X

 3   THE PEOPLE OF THE STATE OF NEW YORK,
                                          Ind. No.
 4            -against-                    2065-08
                                          TRIAL
 5   HAROLD GOPAUL,

 6                      Defendant.
     ------------------------------------X
 7

 8                              July 15, 2010
                               125-01 Queens Boulvevard
 9                             Kew Gardens, New York 11415

10

11   B E F O R E :

12        THE HONORABLE GREGORY L. LASAK,

13                              Justice, Supreme Court

14   A P P E A R A N C E S :  (Same as previously noted.)

15

16

17

18

19

20                             Gail J. Neufeld, RPR
                               Official Court Reporter
21

22

23            THE CLERK:  Case on trial, People versus Harold

24       Gopaul.

25                 Let the record reflect the defendant is before the
```

                                          gjn

1      Court.

2                  Counselors, your appearance, please.

3                  MR. BANDELLI:  Stanford Bandelli on behalf of the

4      defendant.

5                  Good morning, Judge Lasak.

6                  THE COURT:  Good morning.

7                  MR. ROSENBLATT:  For the People, Assistant

8      District Attorney Jared Rosenblatt.

9                  Good morning, your Honor.

10                 THE COURT:  Good morning.

11                 Are you ready to proceed with your witnesses?

12                 MR. BANDELLI:  I think there was an application

13     withdrawn that the DA had made.

14                 I just wanted it on the record before we start.

15                 THE COURT:  Would you support your position?

16                 MR. ROSENBLATT:  I withdrew that application

17     yesterday, Judge, and the case law --

18                 THE COURT:  Which one was that?

19                 MR. ROSENBLATT:  That was in regards to

20     cross-examining the defendant's wife on -- to observing

21     prior proceedings.

22                 THE COURT:  What about the opening of the door

23     based on defendant's opening?

24                 MR. ROSENBLATT:  I found case law on that, Judge.

25                 THE COURT:  Oh, you did.

1          MR. BANDELLI:  That has to do with defendant,

2     Judge, right?  That doesn't have to do with the --

3          THE COURT:  Hand up the case law.

4          You ready to proceed?

5          MR. ROSENBLATT:  I am ready, Judge.

6          MR. BANDELLI:  I just want to be clear.

7          THE COURT:  He withdrew his application.

8          MR. BANDELLI:  So there is going to be no

9     cross-examination concerning anything that went on in Nassau

10    County; is that correct, Judge?

11         THE COURT:  As of now, depends on your direct.

12         MR. BANDELLI:  I need a ruling before --

13         THE COURT:  Depends on your direct examination.

14         MR. BANDELLI:  As long as I, in my direct

15    examination, only talk about what happened in Queens, there

16    will be no questions on cross-examination about happened in

17    Nassau; is that correct, Judge?

18         THE COURT:  That's correct.

19         And if the DA wants to go into that, he will

20    request a sidebar in case something comes up during the

21    course of your direct.

22         MR. BANDELLI:  But as long as my direct is limited

23    to what happened in Queens, the ruling is that there is no

24    cross-examination as to what happened in Nassau, Judge; is

25    that correct?

1          THE COURT:  That's correct.

2          MR. BANDELLI:  Relying on that ruling of the

3     Court.

4          I will call a witness.

5          THE COURT:  Who is your witness?

6          MR. BANDELLI:  Merlin Ali-Gopaul.

7          She is also known as Jenny.

8          THE COURT:  Do you intend to call any other

9     witnesses?

10         MR. BANDELLI:  I have to see how this witness

11    does, Judge.

12         THE COURT:  All right.

13         Line the jury up, please.

14         (Whereupon, the jury entered the courtroom and

15    upon taking their respective seats, the following occurred:)

16         THE CLERK:  Case on trial.  All parties present,

17    your Honor.

18         Do both sides stipulate that all jurors are

19    present and properly seated?

20         MR. ROSENBLATT:  Yes.

21         MR. BANDELLI:  So stipulated, your Honor.

22         THE COURT:  Good morning, ladies and gentlemen.

23         THE JURY:  Good morning.

24         THE COURT:  Mr. Bandelli, do you wish to call any

25    witnesses on behalf of the defendant?

 1              MR. BANDELLI:  I most certainly do, Judge.

 2              THE COURT:  You may proceed.

 3              MR. BANDELLI:  Your Honor, at this time I call

 4    Jenny Gopaul to the stand.

 5              (Whereupon, the witness entered the witness

 6    stand.)

 7    M E R L I N   A L I  G O P A U L , after having first been duly

 8    sworn was examined and testified as follows:

 9              THE WITNESS:  Yes.

10              THE CLERK:  Thank you.  Please be seated.

11              THE OFFICER:  Defense calls Merlin Ali-Gopaul.

12    First name M-E-R-L-I-N, next name A-L-I, last name

13    G-O-P-A-U-L, resident of Queens County.

14              MR. BANDELLI:  May I inquire, Judge?

15              THE COURT:  You may proceed.

16              MR. BANDELLI:  Good morning, Jenny.

17              THE WITNESS:  Hi.

18              MR. BANDELLI:  I am going to ask that to the best

19    of your ability, try and speak into that microphone in a

20    loud voice, okay?

21              THE WITNESS:  Okay.

22              MR. BANDELLI:  So everybody can hear you.

23    DIRECT EXAMINATION

24    BY MR. BANDELLI:

25        Q    Could you state your name for the record?

                                                            gjn

1    A    Merlin Ali-Gopaul.

2    Q    And do you have -- do you also go by the name of Jenny?

3    A    Yes.

4    Q    What's your date of birth, ma'am?

5    A    11/23/63.

6    Q    And did you go to high school, Jenny?

7    A    Yes.

8    Q    Did you graduate?

9    A    Yes.

10   Q    Did you go to college?

11   A    Yes.

12   Q    How many years of college?

13   A    About a year and a half.

14   Q    Okay.  Did you ever work, Jenny?

15   A    Yes.

16   Q    Okay.  What did you do?

17   A    Data entry.

18   Q    Okay.  And how long did you do that for?

19   A    About ten years.

20   Q    Okay.  And what year, what time frame would that

21   encompass?

22   A    '89 to '99.

23   Q    Are you a United States citizen, Jenny?

24   A    Yes.

25   Q    Are you presently married?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And who are you married to? |
| 3 | A | Harold Gopaul. |
| 4 | Q | Okay.  And do you see Harold in the courtroom? |
| 5 | A | Yes. |
| 6 | Q | Would you identify, would you describe -- |
| 7 | | MR. ROSENBLATT:  Indicating the defendant. |
| 8 | | MR. BANDELLI:  Indicating the defendant, Judge. |
| 9 | | THE COURT:  Indicating the defendant. |
| 10 | | MR. BANDELLI:  All right. |
| 11 | Q | How long have you been married to Harold for? |
| 12 | A | 14 years. |
| 13 | Q | And do you have any children with him? |
| 14 | A | Yes. |
| 15 | Q | Okay.  What are their names? |
| 16 | A | Darien Gopaul and Kaitlynn Gopaul. |
| 17 | Q | Okay.  And how old are they? |
| 18 | A | Darien is eight, Kaitlynn is ten. |
| 19 | Q | Did you bring a child into the marriage? |
| 20 | A | Yes. |
| 21 | Q | And who is that? |
| 22 | A | Sana Awan. |
| 23 | Q | And how old is Sana? |
| 24 | A | Nineteen. |
| 25 | Q | And where do you presently reside? |

1    A    242-10 89th Avenue, Bellrose.

2    Q    And how long have you lived there?

3    A    16 years.

4    Q    Were you living there in May of 2005?

5    A    Yes.

6    Q    Okay.  And who else was living there at the time?

7    A    Sana, Kaitlynn, Darien and Harold.

8    Q    And can you describe the house or the condition of the

9    house in May of 2005?

10   A    There was a little room to the front in the living

11   room, the dining room, kitchen; and then stairs.  Upstairs,

12   there is a bathroom, Sana's room, master bedroom, and the kids

13   room, Kaitlynn and Darien.

14   Q    It was a three-bedroom house; is that right?

15   A    Yes.

16   Q    All three bedrooms were located like right next to each

17   other on the second floor?

18   A    Yes.

19   Q    There was a bathroom also located on that floor?

20   A    Yes.

21            MR. ROSENBLATT:  Objection to the leading, Judge.

22            THE COURT:  Don't lead the witness.

23            MR. BANDELLI:  Okay, Judge.

24   Q    And the bath, was the bathroom on that floor as well?

25   A    Yes.

1    Q    That was the only working bathroom in the house?

2    A    Yes.

3              MR. ROSENBLATT:  Objection to the leading, Judge.

4    Witness can testify on her own.

5              THE COURT:  Sustained.

6    Q    How many working bathrooms were there in the house?

7    A    One.

8    Q    Where was it located?

9    A    On the main floor, in the second floor.

10   Q    What were the sleeping arrangements at night?

11   A    Kaitlynn and Sana together; Darien, myself and Harold.

12   Q    Okay.  And where did Kaitlynn and Sana sleep?

13   A    In Sana's room.

14   Q    And that would have been in the room between --

15   A    Next to the bathroom.

16   Q    -- your room and the bathroom?

17   A    Yes.

18   Q    Nobody slept in the third room, would have been

19   Darien's bedroom?

20   A    Yes.

21   Q    What was your typical daily routine in the spring of

22   2005?

23   A    When I get up in the morning I would take a shower, get

24   dressed, wake the kids up, get them ready for school, wait for

25   the bus, and when they leave for school, do the housework,

gjn

1    whatever has to be done, and wait for the kids.

2       Q    What time did you typically get the kids up for school?

3       A    Minutes to 7:00.

4       Q    And what time did you normally get up?

5       A    5:30.

6            MR. ROSENBLATT:  Objection as to the general,

7       Judge.  There is a time period.

8       Q    What time did you get up in the spring of 2005?

9            THE COURT:  Mr. Bandelli.

10           Mr. Bandelli, there was an objection.

11           MR. BANDELLI:  I thought I cured his objection.

12           I apologize, Judge.

13           THE COURT:  Always wait for the Court to make a

14      ruling.

15           MR. BANDELLI:  My apologies, your Honor.

16           THE COURT:  Overruled.

17           MR. BANDELLI:  You can answer the question.

18      A    Between 5:30 and 6:00.

19      Q    Were you working at that time?

20      A    No.

21      Q    You were a housewife?

22      A    Yes.

23      Q    Was Harold working at that time?

24      A    Yes.

25      Q    What did he do for a living?

1      A     Pest elimination.

2      Q     Was he an exterminator?

3      A     Exterminator, yes.

4      Q     Was it his own business?

5      A     No.

6      Q     Did he work for a company?

7      A     Yes.

8      Q     Do you know the name of the company?

9      A     Ecolab Pest Elimination.

10     Q     Do you know his work schedule?

11     A     He would get up around 4:30.  He was out until maybe

12   2:00 in the morning the next morning.

13     Q     Okay.  So when you say 4:30, 4:30 in the morning?

14     A     4:30 A.M.

15     Q     Okay.  So it was a long day.

16           Did he ever return home?

17     A     Sometimes he would return home.

18     Q     Did the family schedule change when Sana started high

19   school in September of 2005?

20     A     No.

21     Q     Did Sana's school start -- Well, how about Sana's

22   school schedule; did her school schedule change?

23     A     Yes, Sana's schedule changed.

24     Q     How was that?

25     A     Some classes she had later, sometimes she had to be in

1    school for 7:00.

2        Q    Was Harold's work schedule the same, though?

3        A    Yes, the same.

4        Q    How did Sana get to school?

5        A    She would usually take the bus, get a ride with a

6    friend, or sometime ask Harold to take her.

7        Q    Okay.  And how did she get home from school?

8        A    Same way; bus, friend or walk.

9        Q    Okay.  Did Harold ever take her home from school?

10       A    Yes.  She had a late evening, afterschool math, and he

11   usually picked her up because he didn't want her walking by

12   herself.

13       Q    What time did she normally return home from school

14   during, I guess, September of 2005?

15       A    September of --

16       Q    Or in the fall when she first started high school, what

17   time would she normally get home from school?

18       A    About 2:30.

19       Q    Okay.  Did she have any afterschool activities?

20       A    Sometimes she would have dance programs.

21       Q    Okay.  And what time did she get home after afterschool

22   activities?

23       A    4:00, 4:30.

24       Q    Do you remember any of Sana's friends during that

25   period?

gjn

MERLIN Ali-Gopaul - Defense - Direct       727

1    A    Yes.

2    Q    And what were their names?

3    A    Sana, Saba, Rajinder.  There was a lot of them.  I just

4    don't remember the names right now.

5    Q    Did they ever come over to your house?

6    A    Yes.

7    Q    Did you ever drive Sana to school?

8    A    I wasn't driving at that time.

9    Q    Did you have a driver's license at that time?

10   A    No.

11   Q    Do you have a driver's license now?

12   A    Yes.

13   Q    Family take any vacations in 2005?

14   A    Yes.

15   Q    Okay.  Where did you go?

16   A    Florida, Jersey, Virginia; different places.

17   Q    Did the family take any vacations in 2006?

18   A    Yes.

19   Q    Where did you go?

20   A    Florida.

21   Q    Okay.  And did the whole family go?

22   A    Yes.

23   Q    And how about in 2007, did the family take vacations?

24   A    Yes.

25   Q    And 2008?

1      A    Yes.

2      Q    Who was responsible for supervising the children with

3   their homework?

4      A    Both Harold and I.

5      Q    Was schoolwork a priority in the household?

6      A    Yes.

7      Q    Education was stressed; is that right?

8      A    Yes.

9              MR. ROSENBLATT:  Objection to the leading.

10             THE COURT:  Don't lead the witness.

11     Q    Was education important?

12     A    Yes.

13     Q    If one of the children misbehaved, who was responsible

14   for imposing discipline?

15     A    Both Harold and I.

16     Q    Was there ever any physical discipline imposed?

17     A    Yes.

18     Q    Can you describe it?

19     A    A little smack, smack in the butt.

20     Q    Was that either you or Harold?

21     A    Yes.

22     Q    Did there come a time in the spring of 2008 that you

23   learned Sana had a boyfriend?

24     A    Yes.

25     Q    And how did you learn about that?

1        A    From her friend, Christine.

2        Q    Okay.  And what was your response to that?

3        A    I was upset.

4        Q    Why were you upset?

5        A    'Cuz she was too young and I needed her to finish

6    school, getting good education.

7        Q    Okay.  Did you convey that to her?

8        A    Yes.

9        Q    And what was her response?

10       A    She said she was not serious about him, he was just a

11   friend.

12       Q    Okay.  Did there come a time that you found that she

13   was seeing the boyfriend against your wishes?

14       A    Yes.

15       Q    What happened?

16       A    I confronted her about it and she said that she just

17   met him places.

18            MR. ROSENBLATT:  I am going to object, Judge, as

19       to hearsay.

20            THE COURT:  Sustained.

21            Jurors, disregard it.

22       Q    Well, without saying what you said to her, did you

23   convey your feelings about her seeing this boyfriend against

24   your wishes?

25       A    Yes.

1       Q    Now I am going to direct your attention to June of

2    2008.

3            Was the layout of the house the same?

4       A    No.

5       Q    What was different about it?

6       A    There was no walls.  Front room had no wall; living

7    room, no wall; kitchen area, no wall.

8       Q    Talking about downstairs?

9       A    Yes, the first floor.

10      Q    It was opened up?

11      A    Everything was opened up.

12      Q    Okay.  And how about the second floor, was the layout

13   the same?

14      A    Yes.

15      Q    Okay.  And everybody still slept, had the same sleeping

16   arrangements?

17      A    Yes.

18      Q    I am going to direct your attention to June 21, 2008.

19           How was your health?

20      A    It was bad.  I had root canal that had gone bad

21   (indicating) and it was swollen and painful.

22      Q    Okay.  And were you seeing a doctor because of that?

23      A    Yes.

24      Q    Okay.  And were you prescribed medication as a result

25   of that?

1      A     Yes.

2      Q     And do you remember what type of medication you were

3   taking?

4      A     No, I don't, but it was antibiotics.

5      Q     Were you taking any painkillers?

6      A     Yes.

7      Q     Still, on June 21st of 2008, did the family have an

8   opportunity to go to a fair or festival on that date?

9      A     Yes.

10     Q     What fair or festival was that?

11     A     St. Gregory's.

12     Q     Okay.  And what happened at the fair that day?

13     A     At the fair, about half an hour into being at the fair,

14   I couldn't take the pain anymore so I was crying.

15          I told Harold I was going to go home, get some

16   medicine, maybe come back.

17          Harold told me, do not worry, we will all go home.

18          We left.

19     Q     Was there anything that occurred at the fair prior to

20   you leaving the fair?

21     A     Yes.  Sana was on line for The Zipper ride with a

22   friend, and a boy in front of her did not have a partner so her

23   friend went with the boy, so Sana had to wait for someone to be

24   partners with her and that would take like another fifteen,

25   twenty minutes because everybody went up and she was in front

1     and she had nobody and it would take a long time.

2          So Harold told her that it's time for us to go home

3     because mommy isn't feeling well.

4          She was crying.  She got upset and was crying.

5     Q    Did you say you were crying at the fair?

6     A    Yes.

7     Q    You were in that much pain?

8     A    Yes.

9     Q    What happened when Harold got Sana to leave the fair?

10    A    Well, she started to cry and she got upset.

11    Q    And did she ultimately leave the fair?

12    A    Yes.

13    Q    Okay.  What happened when you got home later?

14    A    So I got home.  I went to the kitchen to get some

15    medication.

16         Harold -- I told Harold to take the kids upstairs.  I

17    told Sana to go take a shower and that was it.

18    Q    Was there a point where there was a conversation in the

19    house -- without going into the conversation -- about what had

20    happened at the fair?

21    A    Yes.

22    Q    Okay.  What happened?

23    A    Sana was fussing upstairs and I guess Harold got upset

24    and he hit her in the arm.

25         So I went upstairs and I told him to stop and he did.

gjn

1      And I told her to go take a shower and she did.

2          Q    Okay.  Were the other kids present when this happened?

3          A    Yes.

4          Q    Were they upset by it?

5          A    Very much.

6          Q    Was very upsetting for everybody?

7          A    Yes.

8                    MR. ROSENBLATT:  Objection to the leading, Judge.

9                    THE COURT:  Sustained.

10         Q    I am going to direct your attention to June 23rd of

11     2008.

12              Do you remember that day?

13         A    Yes.

14         Q    Did the kids have school on that day?

15         A    Yes.

16         Q    Okay.  Which kids had school?

17         A    Kaitlynn and Darien.

18         Q    Okay.  And what time did they have to get up and go to

19     school?

20         A    7:00.

21         Q    And did Harold have work that day?

22         A    Yes.

23         Q    And what time did he leave for work, if you remember?

24         A    Around 4:30.

25         Q    So 4:30 in the morning, again?

1       A     Yes.

2       Q     And what did you do all day?

3       A     Because of the infection, I was in pain, so I took my

4    medication.  I just laid on the couch.

5             Sana was on the computer.  She stayed right next to me.

6             I slept for almost all of the day, on and off.

7             Harold called to check up on me to make sure I was okay

8    but I couldn't talk to him.  So now, just say, you know, in a

9    voice, whatever, he understood what I was saying to him.

10            And then it was time for the kids to come home and Sana

11   helped me with their homework and I turned in around 6:00.  I

12   took more medication and I went to bed.

13      Q     You weren't feeling well?

14      A     Wasn't feeling well.

15      Q     You don't know what time the children went to bed, do

16   you?

17      A     It could be around 7:30.

18      Q     Did there come a point in time when you were awoken

19   after you had fallen asleep?

20      A     Yes.

21      Q     When was that?

22      A     Around 2:30 in the morning.

23      Q     Okay.  And what had happened?

24      A     Harold came into the room and asked me where is Sana.

25            MR. ROSENBLATT:  Objection.

                                                        gjn

1          THE COURT:  Sustained.

2          Jurors, disregard that.

3     Q    Again, without going into what anybody else might have

4 said, just to the best of your ability, describe what happened.

5     A    I got up and started -- looked into her room.  She was

6 not there.

7          Started looking all over the house; outside the garage,

8 anywhere I can find, basement, everywhere, attic, look for her.

9 She was nowhere.

10    Q    Was the determination to go to the 105 precinct?

11    A    Yes.

12    Q    Who went?

13    A    Harold did.

14    Q    Okay.  And how come you didn't go?

15    A    Because I had the two little ones and I was not feeling

16 well, and I wasn't going to leave the kids by themselves.

17    Q    And what was the purpose of Harold going to the 105

18 precinct?

19    A    Because he was worried.

20          MR. ROSENBLATT:  Objection.

21          THE COURT:  Sustained.

22    Q    Approximately what time did Harold leave the house to

23 go to the 105 precinct?

24    A    Between 3:30 and 4:00.

25    Q    How far is the 105 precinct from your house?

1    A    Approximately a mile, maybe less.

2    Q    Did Harold drive there?

3    A    Yes.

4    Q    Did Harold return home?

5    A    No.

6    Q    What did you do?

7    A    I called his cell phone, his beeper, no answers.

8    Q    Okay.  What did you do after that?

9    A    I woke up, got dressed -- showered, got dressed, did

10   the same for the kids and sent them off for school.

11   Q    Okay.  What did you do after you sent the kids to

12   school?

13   A    I walked to the precinct.

14   Q    Okay.  What time was that?

15   A    Around 8:15, 8:20.

16   Q    What happened when you arrived at the precinct?

17   A    I went to the desk and there was a female officer and I

18   told her about my daughter leaving home and my husband coming to

19   make a report.

20   Q    Okay.  What happened after you told her that?

21        Without saying what anybody said to you; that, I don't

22   want.

23   A    I said --

24   Q    I don't want you to say anything that somebody might

25   have said to you while you were there.

1   A    She told me to sit down.

2   Q    Okay.  After she told you to sit down, what happened?

3   A    She went to the back to find out --

4        MR. ROSENBLATT:  Objection.

5   A    -- to get information.

6        THE COURT:  Sustained.

7   Q    Okay.  Did you see her go to the back?

8   A    Yes.

9   Q    Okay.  And did she come back out?

10  A    Little while later, yes.

11  Q    Okay.  And what happened then?

12  A    She told me it takes twenty, twenty-four hours to
13  update the computer so she could not give me information if
14  Harold had been there to make a report.

15       MR. ROSENBLATT:  Objection as to what the officer
16  said, Judge.

17       THE COURT:  Sustained.  It's stricken.

18  Q    After you had spoken -- After she came back, did you
19  know whether or not Harold had been at the 105 precinct?

20  A    No.

21  Q    Were you given an opportunity to see Harold that day?

22  A    No.

23  Q    Do you remember meeting with any particular police
24  officers or detective that day?

25  A    Yes.

1     Q     Who do you remember?

2     A     Detective Shulman.

3     Q     And how did Detective Shulman treat you?

4           MR. ROSENBLATT:  Objection.

5           THE COURT:  Sustained.

6     Q     Well, what was -- What was Detective Shulman's behavior

7     towards you when he met with you?

8           MR. ROSENBLATT:  Objection.

9           THE COURT:  Sustained.

10          MR. BANDELLI:  Well, can we have a sidebar, Judge?

11          THE COURT:  No.

12          MR. BANDELLI:  Well, I would like to make a

13    record, Judge.

14          THE COURT:  I will allow you to do it at the

15    proper time.  Move on.

16          MR. BANDELLI:  Okay.  Note my exception.

17          THE COURT:  You have your exception.

18    Q     So they never let you see Harold at the precinct; is

19    that correct?

20          MR. ROSENBLATT:  Objection to the leading.

21          THE COURT:  Sustained.

22    Q     Did you ever have a chance to see Harold at the

23    precinct?

24    A     No.

25    Q     When was the next time you saw Harold?

```
 1        A    I think it was the 27th at the hospital.  26th or the
 2   27th at the hospital.
 3        Q    Who was at the hospital?
 4        A    I was.
 5        Q    Okay.  Why were you at the hospital?
 6                  MR. ROSENBLATT:  Objection.
 7                  THE COURT:  Sustained.
 8                  MR. BANDELLI:  Well, again, I would like a
 9   sidebar, Judge.
10                  THE COURT:  Sustained.
11                  MR. BANDELLI:  Note my exception, Judge.
12        Q    You just testified --
13                  MR. BANDELLI:  Well, withdrawn.
14        Q    Did Harold discuss with you what had happened at the
15   105 precinct?  Without mentioning what he had said.
16                  MR. ROSENBLATT:  Objection.
17                  THE COURT:  What's the basis of the objection?
18                  MR. ROSENBLATT:  Judge, the answer -- without any
19   context, the question is irrelevant, the answer would be
20   hearsay.  Calls for a context of the conversation.
21                  THE COURT:  Overruled.  I will allow it to be
22   answered yes or no.
23        A    Can you repeat the question?
24        Q    Yes.
25             Did you have a conversation with Harold when you met
```

1   with him at the hospital about what happened at the precinct?

2        A    No.

3        Q    Okay.  At some point, did you have a conversation with

4   him about what happened at the precinct?

5        A    Yes.

6        Q    Okay.  When was that?

7        A    It was maybe on the first of July?

8        Q    Did there come a time where Sana was removed from your

9   house?

10       A    Yes.

11       Q    Do you remember when that was?

12       A    July 3rd.

13       Q    Okay.  How did you feel about that?

14            MR. ROSENBLATT:  Objection.

15            THE COURT:  Sustained.

16       Q    Well, did you find it upsetting she had been taken from

17   the house?

18       A    Yeah.

19       Q    I am going to direct your attention now to January 31st

20   of 2009 at the Rocky Hill Pharmacy.

21            Do you remember that date and being --

22            MR. ROSENBLATT:  Sorry, I missed the date, Judge.

23            MR. BANDELLI:  January 31st of 2009.

24       Q    If you remember that date being at the Rocky Hill

25   Pharmacy on that date?

```
 1      A     Yes.

 2      Q     Why were you there?

 3      A     To pick up medication and to buy mouthwash.

 4      Q     And did you have a conversation with Sana at that time?

 5      A     Yes.

 6      Q     And did she in fact tell you that Harold had never

 7   molested her?

 8                  MR. ROSENBLATT:  Objection.

 9                  THE COURT:  Sustained.

10                  MR. BANDELLI:  Judge, it's a prior -- Judge,

11         that's -- it's a prior inconsistent statement.

12                  THE COURT:  Approach the bench.

13                  (Whereupon, a conference was held between all

14         counsel and the Court on the record at the side-bar.)

15                  MR. ROSENBLATT:  Judge, my objection is to the

16         leading.

17                  THE COURT:  Yes, you are leading the witness.

18                  MR. BANDELLI:  Okay.

19                  We are going into a prior inconsistent statement.

20         I have to present it with the date and the location and what

21         was said.

22                  MR. ROSENBLATT:  You just suggested the answer.

23                  MR. BANDELLI:  I have to ask her.

24                  MR. ROSENBLATT:  No, you don't.  You can ask about

25         the context of the conversation.
```

1          MR. BANDELLI:  Absolutely not.  I am asking about

2     a specific prior inconsistent statement.  That's the purpose

3     of her testimony.

4          You want to go to Richardson's on it?  It's 101.

5          It is.

6          I apologize.  I will keep my voice down.

7          MR. ROSENBLATT:  Judge, he has called the

8     witness's attention to that date.  Now he can ask the

9     witness to explain what happened.

10          MR. BANDELLI:  No, I can ask her:  Isn't it a fact

11     you had a conversation with her and she said that.

12     Absolutely, it's a prior inconsistent statement.  Sana said

13     she never said that.

14          THE COURT:  Let her testify as to the contents of

15     the conversation without leading her.

16          MR. BANDELLI:  Judge, she can -- no, time out.

17     Time out.  Time out.  She can absolutely testify.

18          THE COURT:  We are not playing a basketball game

19     here.

20          MR. BANDELLI:  That's fine, you can --

21          THE COURT:  I made the ruling.

22          MR. BANDELLI:  Yeah, I know, but this is as

23     important --

24          THE COURT:  Do you have a problem with that?

25          MR. BANDELLI:  I do.

                                             gjn

1          THE COURT:  You have an exception.

2          MR. BANDELLI:  I have a major exception to that.

3     I have a real problem with that.

4          THE COURT:  Go back out there.

5          (Whereupon, all parties returned from the sidebar

6     and the following took place:)

7          MR. BANDELLI:  May I inquire, Judge?

8          THE COURT:  Proceed.

9     Q    Again, at the Rocky Hill Pharmacy on January 31st of

10    2009, you had a conversation with Sana?

11    A    Yes.

12    Q    And what did she say about the allegations against her

13    father?

14    A    She said he had never touched her.

15         MR. BANDELLI:  I have nothing further for this

16    witness, Judge.

17         THE COURT:  Mr. DA, you may inquire.

18         MR. ROSENBLATT:  Thank you, your Honor.

19    CROSS-EXAMINATION

20    BY MR. ROSENBLATT:

21    Q    Ms. Gopaul, Sana was born March 1, 1991, correct?

22    A    Yes.

23    Q    And you know the defendant's date of birth?

24    A    Yes.

25    Q    What's that?

1    A    2/28/58.

2    Q    And since Sana was about four, you lived in Bellrose,

3  correct?

4    A    Yes.

5    Q    And that's 242-10 89th Avenue, correct?

6    A    Yes.

7    Q    And sometime when Sana was three or four, Sana began to

8  live -- excuse me -- the defendant began to live with you and

9  Sana, correct?

10   A    Yes.

11   Q    And that's when your marital relationship with the

12 defendant began, correct?

13   A    Yes.

14   Q    And when Sana was a young girl, the defendant

15 established a father figure relationship with her, correct?

16   A    Yes.

17   Q    And he had an active role in raising her?

18   A    Yes.

19   Q    He was the closest thing to a father figure that she

20 had, correct?

21   A    Yes.

22   Q    And Sana had two siblings eventually, correct?

23   A    Yes.

24   Q    And Sana loved her sister Kaitlynn, correct?

25   A    Yes.

1    Q    And she loved her brother Darien, correct?

2    A    Yes.

3    Q    She enjoyed spending time with her sister and brother,

4    correct?

5    A    Yes.

6    Q    And that was something that she really enjoyed, having

7    two younger siblings who she cared for, correct?

8    A    She didn't care for them but --

9    Q    She helped them with homework, no?

10   A    Not really.  Only when I was sick.

11        MR. BANDELLI:  Objection, Judge.  Just let her

12   answer the question.

13        THE COURT:  Finish your answer, ma'am.

14   A    When I was sick, she would help.

15   Q    Oh, that was the only time she helped her siblings?

16   A    Yes.  Because she had homework of her own.

17   Q    And the kids got along, correct?

18   A    Sometimes.

19   Q    And you would agree with me, Sana was a good student,

20   correct?

21   A    Very good student.

22   Q    And Sana did her schoolwork at home, correct?

23   A    Yes.

24   Q    And she volunteered after school for different

25   activities, correct?

gjn

1     A     Yes.

2     Q     She helped teachers after school, correct?

3     A     Yes.

4     Q     And she didn't cut school, correct?

5     A     No.

6     Q     She didn't go out late at night, correct?

7     A     No.

8     Q     She was a very well-behaved girl, correct?

9     A     Yes.

10    Q     There were rules in the house?

11    A     Yes.

12    Q     And she obeyed those rules, correct?

13    A     Yes.

14    Q     She didn't drink alcohol, correct?

15    A     Correct.

16    Q     And if punishment was necessary in the house, you told

17   us that sometimes you would dole out the punishment, correct?

18    A     Yes.

19    Q     And sometimes Mr. Gopaul would dole out that

20   punishment, correct?

21    A     Yes.

22    Q     You would agree with me though, that Sana didn't need

23   to be punished because she was a good kid, correct?

24    A     Yes.

25    Q     And if there was some sort of need for punishment, this

1    punishment wasn't extreme, right?

2        A    No.

3        Q    Nobody hit her with a belt or anything, correct?

4        A    No.

5        Q    You just told took away the TV or sent her to her room,

6    correct?

7        A    Yes.

8        Q    Now on June 23rd, you told us you observed the

9    defendant actually hit Sana, correct?

10       A    I did -- I didn't see him hit her.

11       Q    Well, you told us on direct that at some point he got

12   upset, correct?

13       A    Yes.

14       Q    And you told us on direct that he hit Sana, correct?

15       A    Yes.

16       Q    Okay.  And you heard that, correct?

17       A    Yes.

18       Q    And you got upset, correct?

19       A    Yes.

20       Q    And he was angry, right?

21       A    Yes, he was upset.

22       Q    And you actually told him to stop, correct?

23       A    Yes.

24       Q    Now you also told us on direct that the first

25   conversation that you had with the defendant about what happened

1    was on July 1st of 2008, correct?

2         A    Yes.

3         Q    Okay.  That's not correct, is it?

4         A    It's correct.

5         Q    Well, Ms. Gopaul, some point on June 24, 2008, the

6    defendant was arrested, correct?

7         A    Yes.

8         Q    And you were aware he was arrested, correct?

9         A    Yes.

10        Q    In fact, he called you after he was arrested when he

11   was at central booking, correct?

12        A    Yes.  I'm sorry, I forgot about that.

13        Q    So he called you, right?

14        A    Yes.

15        Q    And when he called you, Ms. Gopaul, he told you what

16   happened, correct?

17        A    Yes.

18        Q    And you asked him why he was arrested, correct?

19        A    Yes.

20        Q    You asked him questions about that arrest, correct?

21        A    Yes.

22        Q    And told you that night, the first night he was

23   arrested --

24             MR. BANDELLI:  Objection.  Objection to what my

25        client did or did not say, that's hearsay.

                                                      gjn

1                    MR. ROSENBLATT:  It's an admission, Judge.

2                    THE COURT:  Please, both of you.

3                    MR. BANDELLI:  Objection, your Honor.

4                    THE COURT:  Please, both of you, no comments in

5          front of the jury.

6                    Objection is overruled.

7     Q    He told you that night what he did, correct?

8     A    I don't remember.

9     Q    You don't remember?

10    A    No.

11    Q    Well, in fact, after that night, you talked about the

12    conversation that you and the defendant had that night in the

13    precinct more than once, correct?

14    A    At the precinct?

15    Q    Let me repeat my question:  Some point after June 24,

16    2008, you talked about the conversation that you had that night

17    on June 24, 2008, correct?

18    A    Yes.

19    Q    Okay.  And you talked about that conversation because

20    you --

21                   MR. ROSENBLATT:  Well, withdrawn.

22    Q    On June 24, 2008, you asked him why he did this and he

23    told you because he is sick, correct?

24    A    I think that's true, yeah.

25    Q    Okay.  Ms. Gopaul, not what you think.

1            On June 24, 2008, the date he was arrested, he called

2   you from central booking, correct?

3       A    Yes.

4       Q    You were at home, correct?

5       A    Yes.

6       Q    And you asked him:  Harold, why did you do this, and he

7   told you:  Because I'm sick; yes or no?

8       A    I don't remember the conversation we had.  I was not

9   feeling well.

10      Q    Okay.  Well --

11      A    I was on medication.

12      Q    Well, we will talk about that for a moment.

13           Some point after June 24, 2008, you spoke about this

14  conversation that you had on June 24th again, correct?

15      A    Yes.

16      Q    Let me call your attention to June 29th of 2009.

17           You were at home in Queens, correct?

18      A    Yes.

19      Q    You are living in Bellrose, correct?

20      A    Yes.

21      Q    He was in Nassau County at that time, correct?

22      A    Yes.

23      Q    And he called you that night at 8:43 in the P.M.,

24  correct?

25      A    I would think so.

1      Q     Okay.  And that night you had a conversation with him,

2   yes?

3      A     Yes.

4      Q     And that night -- you said to him:  Harold, you told me

5   that night why you did this, correct?

6      A     I guess so.

7      Q     Well, not what you guess.

8            You remember having that conversation?

9      A     I don't remember everything I said -- sometimes I was

10  upset with him because our relationship is not the same anymore.

11     Q     You were actually angry with him, correct?

12     A     Yes.

13     Q     You said you told me you did this because you're sick?

14     A     Okay.

15     Q     Correct?

16     A     Okay.

17     Q     And you had seen the video confession of him that he

18  gave to the police, correct?

19     A     Yes, I have.

20     Q     And you said to him:  Harold, people don't confess to

21  something they don't do, correct?

22     A     Yes.

23     Q     You remember saying that, right?

24     A     Yes.

25     Q     And he told you --

1          MR. ROSENBLATT:  Excuse me.  Withdrawn.

2     Q    You told him on June 24th:  Harold, you told me that

3    you needed help, correct?

4     A    Yes.

5     Q    So you would agree with me that on June 24, 2008, the

6    defendant admitted to you that he abused his daughter, Sana,

7    correct?

8     A    Yes.

9     Q    And you knew he had abused her because he admitted it

10   to you, correct?

11          MR. BANDELLI:  Objection, your Honor.

12          THE COURT:  Overruled.

13    Q    Yes or no?

14    A    Can you repeat the question?

15    Q    You knew on June 24, 2008, the date he was arrested, he

16   admitted to you that he had abused her and you knew it, correct?

17    A    Yes.

18          MR. BANDELLI:  Objection, your Honor.

19          MR. ROSENBLATT:  Withdrawn.  I will withdraw my

20    question, Judge.

21    Q    You were aware of what he told you on June 24, 2008,

22   correct?

23    A    Yes.

24    Q    I want to call your attention to July 10th of 2009.

25          He called you on that date, correct?

1      A    Yes.

2      Q    And that when he called you on July 10th, you were

3   angry because he had called you and left 14 or 15 messages that

4   day when you had gotten home, correct?

5      A    I guess so.

6      Q    Do you remember being angry about that?

7      A    I am always angry with him.

8      Q    And he begged you to see him, correct?

9      A    Yes.

10     Q    And he argued with you about the case, correct?

11     A    I guess so.

12     Q    And on that date, you told him that you were aware

13  based upon his prior admissions that he molested Sana, those

14  were your words, correct?

15          MR. BANDELLI:  Objection, your Honor.

16     A    I don't remember.

17          THE COURT:  Overruled.

18     Q    You don't remember that you told him that you knew he

19  molested Sana?

20     A    No, I don't remember.

21     Q    Well, hearing you talk about it would refresh your

22  recollection, correct, if you actually heard the words you used

23  on that date to him; that would refresh your recollection,

24  correct?

25     A    I was always angry with him.

1      Q     That wasn't my question, Ms. Gopaul.

2            My question was:  Would your words on a recording of

3    the conversation that you had with him on that date, in July of

4    2009, refresh your recollection as to whether you told him that

5    he molested Sana and you knew it; yes or no?

6      A     I guess, yes.

7            MR. ROSENBLATT:  Your Honor, with the Court's

8    permission.

9            MR. BANDELLI:  What is that, exactly, so I know

10   what he is -- I can't tell from here.

11           THE COURT:  Is that a computer?

12           MR. ROSENBLATT:  This is a computer, Judge, and I

13   am going to refresh her recollection.

14           MR. BANDELLI:  I am going to object, your Honor.

15           THE COURT:  Approach the bench, please.

16           (Whereupon, a conference was held between all

17   counsel and the Court on the record at the side-bar.)

18           THE COURT:  What's your objection?

19           MR. BANDELLI:  First, I don't know that it's

20   necessary to refresh her recollection.  I don't know that

21   it's admissible for that purpose and I am going -- so I

22   object on that ground.  It's not relevant, and proper

23   foundation hasn't been laid.

24           In addition, I am not -- I don't even know what he

25   is introducing.

gjn

1          MR. ROSENBLATT:  I am not introducing.

2          THE COURT:  He is not introducing.

3          MR. BANDELLI:  Or what he is using.

4          I see there is a computer there.  I don't know

5     what's on it.

6          THE COURT:  I assume, based on his question, he

7     has some kind of recording of the phone conversation.  I see

8     he has headphones attached so the jury won't hear it.

9          MR. BANDELLI:  I haven't had a opportunity to hear

10    the conversation so I don't know what it is.

11         THE COURT:  Mr. DA.

12         MR. BANDELLI:  He has a tape recording of my

13    client that -- he hasn't disclosed that to me.  I have a

14    serious problem with that.

15         THE COURT:  Mr. DA.

16         MR. ROSENBLATT:  I am wondering what the problem

17    is as to a recording.  He said he has a problem.  I want him

18    to finish the objection.

19         MR. BANDELLI:  If he has statements taken from my

20    client that he has recorded, if he has access to recorded

21    statements from my client, he would have been obligated turn

22    that over to me.

23         MR. ROSENBLATT:  Under what?

24         MR. BANDELLI:  Under demand for discovery.

25         MR. ROSENBLATT:  That's not true.

1          MR. BANDELLI:  Well, I am making a record.

2          MR. ROSENBLATT:  Judge, I am going to refresh her

3    memory with a recording of the conversation she had that she

4    just said she didn't remember, which she said this recording

5    would in fact refresh her recollection.

6          So under the Rules of Evidence, I am permitted to

7    have her refresh her recollection based upon the

8    conversation that she said would refresh her recollection.

9          MR. BANDELLI:  Judge, he would have been obligated

10   to disclose these tapes to me prior to the trial.

11         THE COURT:  Under what section of Criminal

12   Procedure Law?

13         MR. BANDELLI:  240.20 demand for discovery.

14         MR. ROSENBLATT:  Only on my direct case.

15         MR. BANDELLI:  He has previously recorded

16   statements of my --

17         MR. ROSENBLATT:  Not used --

18         THE COURT:  Cross-examining one of your witnesses.

19         MR. BANDELLI:  I understand.

20         So what does that have to do with disclosing

21   recordings of my client.

22         THE COURT:  Read the section.

23         MR. BANDELLI:  Okay.

24         THE COURT:  Objection overruled.

25         (Whereupon, all parties returned from the sidebar

gjn

1      and the following took place:)

2                MR. ROSENBLATT:  Ms. Gopaul, if you could put

3      those headphones on, please?

4                THE WITNESS:  (Complying.)

5                MR. ROSENBLATT:  For the record, I am playing the

6      recording for Ms. Gopaul.

7                (Whereupon the tape was played through

8      headphones.)

9      Q     After having an opportunity to listen to that, does

10     that refresh your recollection?

11     A     Yes.

12     Q     In fact, on July 10, 2008, after having your memory

13     refreshed -- excuse me -- on July 10, 2009, the defendant told

14     you -- excuse me -- you told him that he had molested Sana,

15     correct?

16               MR. BANDELLI:  Just -- just -- can we just have

17     clarity on the date?  You said July 10, 2008?

18               THE COURT:  Sustained as to form.

19     Q     Does that refresh your recollection?

20     A     Can you repeat the question?

21     Q     Does that refresh your recollection?

22               THE COURT:  Sustained.

23               Mr. DA, I sustained the objection as to form.

24               Ask the question again.

25               MR. ROSENBLATT:  Oh, my apologies.

1    Q    Isn't it true that on that date you told him that

2    because of what he did, because he molested Sana, he can't come

3    back?

4              MR. BANDELLI:  Objection, your Honor.  What date?

5              MR. ROSENBLATT:  July 10, 2009.

6    A    I was angry, as you can hear from the conversation,

7    because he wanted me to come see him.

8    Q    That wasn't my question.

9         My question is:  Did you say it; yes or no?

10   A    Yes.

11             MR. BANDELLI:  Objection, your Honor.

12             THE COURT:  Overruled.

13   Q    You had a similar conversation on July 29th of 2009,

14   correct?

15   A    I don't remember.

16   Q    Well, would a recording of you --

17             MR. ROSENBLATT:  Well, withdrawn.

18   Q    On July 29, 2009, the defendant and you had a

19   conversation about the case, correct?

20   A    I don't remember.

21   Q    Well, do you remember him asking you --

22             MR. BANDELLI:  Objection, your Honor, she said she

23   doesn't remember having a conversation.

24             MR. ROSENBLATT:  Withdrawn, Judge.  Withdrawn.

25             I will move on.

1       Q     So just to clarify, Ms. Gopaul, on June 25, 2008, that

2  is, the day after that, your husband, the conversation with you

3  from central booking, you gave Sana permission to go to Denise

4  and Christine's home?

5       A     I did not give her permission.

6       Q     You never gave her permission?

7       A     No.

8       Q     Okay.  Well, do you remember having conversations with

9  Child Protective Services in 2008 and telling them that you gave

10  Sana permission to go to Christine and Denise's home on June 25,

11  2008?

12      A     Sana left the house on the 23rd and she went to their

13  house.

14      Q     On June 23rd?

15      A     On June 23rd.

16      Q     And June 24th, Sana was in the hospital, correct?

17      A     Yes.

18      Q     And you went to the hospital, correct?

19      A     Yes.

20      Q     And ADA Hughes was at the hospital, correct?

21      A     I don't recall who was there.

22      Q     Do you remember two members of the district attorney's

23  office being present at that hospital, correct?

24      A     Yes.

25      Q     ADA Hughes and ADA Fisher, correct?

MERLIN ALI-GOPAUL - People - Cross          760

1      A    Okay.

2      Q    Yes or no?  I wasn't there.

3      A    Yes.

4      Q    And when ADA Hughes and ADA Fisher were there, you were

5    at the hospital, correct?

6      A    Yes.

7      Q    Okay.  And you would agree with me that at no point

8    when you were inside the hospital on June 24, 2008, did you

9    console your daughter, Sana?

10                 MR. BANDELLI:  Objection, your Honor.

11                 THE COURT:  Overruled.

12     Q    Yes or no?

13     A    Sana was in a separate room.

14     Q    Well, did you ever ask if you can go in there and be

15   present and hold her hand?

16     A    They told me I had to go in separate room.

17     Q    Did you ever ask the doctors or nurses at the hospital

18   if you can hold the hand of your daughter who was getting a

19   sexual assault examination; yes or no?

20                 MR. BANDELLI:  Objection, your Honor.

21                 THE COURT:  Overruled.

22     Q    Yes or no?

23     A    They told me I had to stay --

24     Q    Yes or no?

25                 MR. BANDELLI:  Objection, your Honor.  First of

1       all, it's argumentative, the way he is questioning this

2       witness.

3                   Let him just ask the questions and give an answer.

4                   THE COURT:  Overruled.

5       Q     Yes or no?

6       A     No.

7       Q     Prior to June 24, 2008, you never brought Sana to a

8       gynecologist before, correct?

9       A     No.

10      Q     And at some point on June 24, 2008 --

11                  MR. ROSENBLATT:  Well, withdrawn.

12      Q     You would agree with me that your husband, prior to

13      June 24, 2008 and for the last number of years, was the sole

14      support of income for your home, correct?

15      A     Yes.

16      Q     After June 24, 2008, Sana -- when Sana was not inside

17      the home, you went into her bedroom, correct?

18                  MR. BANDELLI:  Objection, your Honor.

19                  THE COURT:  Overruled.

20      A     It's my house.  I have to put the clothes, do

21      laundries, I have to put her clothes, yes.

22      Q     Do you remember going through her belongings and

23      looking for a diary?

24      A     No.

25      Q     Do you remember other members of Mr. Gopaul's family

1    being present at the home and you let them into Sana's bedroom

2    to look through her belongings to find her diary?

3         A    I never allowed anyone in the house to look for

4    anything in that house.

5         Q    Well, you would agree with me at some point her diary

6    was taken out of her room and she didn't take it, correct?

7                   MR. BANDELLI:  Objection to whether or not she

8         agrees with the DA.

9                   THE COURT:  Overruled.

10                  You can answer that.

11        A    I don't know what she took from the house.

12        Q    Well, do you remember on June -- the end of June,

13   either June 30th or July 1st, going to an attorney's office with

14   Sana?

15        A    Yes.

16                  MR. BANDELLI:  Objection.  Just what year again?

17                  MR. ROSENBLATT:  2008.

18        Q    Do you remember that?

19        A    Yes.

20        Q    Okay.  And that was about five to seven days after the

21   defendant told you he molested Sana, correct?

22                  MR. BANDELLI:  Objection, your Honor.

23                  THE COURT:  Overruled.

24        Q    Correct?

25        A    Yes.

MERLIN ALI-GOPAUL - People - Cross          763

1     Q     And you took Sana to a lawyer's office and that was the

2   defendant's attorney's office, correct?

3     A     I didn't take her to his office.

4     Q     Oh, no?  Where did you take her?

5     A     No one in the family wanted to keep her and she had to

6   go wherever I want went so --

7     Q     Did you bring her to a lawyer's office seven days after

8   your husband told you that he had molested her; yes or no?

9               MR. BANDELLI:  Objection, your Honor, would he

10          allow the courtesy of allowing her to answer the question

11          before asking the next question?

12              THE COURT:  Just answer the question.

13              MR. BANDELLI:  She just --

14              THE COURT:  Mr. Bandelli.

15              MR. BANDELLI:  Yes, sir.

16              THE COURT:  Don't argue with the Court, all right?

17              MR. BANDELLI:  Uh-huh.

18              THE COURT:  Uh-huh?  Is that:  I understand.

19              MR. BANDELLI:  Yes, sir.

20              THE COURT:  You can answer the question, ma'am.

21    A     She went with me because no one in the family wanted to

22   keep her.

23    Q     Seven days -- Well, she was 17 years old, correct?

24    A     Yes.

25    Q     She had been in the home alone before, correct?

                                                              gjn

1        A     No.

2        Q     Never home alone, a 17 year old girl never having been

3    alone in the house herself?

4        A     No, I don't think so, because we always went everywhere

5    as a family.

6        Q     So seven days after your husband told you he molested

7    your stepdaughter --

8              MR. BANDELLI:  Objection, your Honor.

9        Q     -- your biological daughter --

10             MR. BANDELLI:  Asked and answered.

11             MR. ROSENBLATT:  I am not done with the question.

12             THE COURT:  Finish the question.

13       Q     -- you went to an attorney's office, his attorney's

14   office with your daughter, correct?

15             THE COURT:  Objection is overruled.

16             You can answer that.

17       A     I had to go see the lawyer to pay him some money.

18       Q     And when you were there, you brought Sana so he can

19   speak with her, correct?

20       A     No.

21       Q     Isn't it true you went into the office and let Sana

22   speak to the lawyer, his lawyer that day, and you left the room?

23       A     No.

24       Q     Yes or no?

25       A     No.

1      Q    Isn't it true that same day, that the personal diary of

2  Sana's was given to that attorney?

3      A    I do not know.

4      Q    At some point early on, actually on June 24, 2008,

5  Child Protective Services began playing a role in your life,

6  correct?

7      A    Yes.

8      Q    And you learned early on the importance of Child

9  Protective Services and their role, correct?

10     A    Yes.

11     Q    And they had certain rules that needed to be followed,

12  correct?

13     A    Yes.

14              MR. BANDELLI:  Objection, your Honor.

15              THE COURT:  Overruled.

16     Q    And in fact, early as July -- June 26th, they had

17  explained to you the importance of following all these rules,

18  correct?

19              MR. BANDELLI:  Objection to what they explained to

20     her.

21              THE COURT:  Overruled.

22     A    July 26th?

23     Q    June 26, 2008.

24     A    I was in the hospital.

25     Q    Okay.  Well, you were aware of the rules, though, Child

1   Protective Services?

2       A    No.

3       Q    Okay.  When did you did you get out of the hospital?

4       A    The 29th.

5       Q    Okay.  On July 10th, you were out of the hospital,

6   correct?

7       A    Yes.

8       Q    Excuse me, July 10, 2008, yes?

9       A    Yes.

10      Q    And on July 10, 2008, you were aware of the importance

11  of following Child Protective Services's rules, correct?

12      A    Yes.

13      Q    Okay.  And on July 10, 2008, you were aware they were

14  coming to your house, correct?

15      A    July 10?

16      Q    Yes, July 10, 2008.

17      A    Yes.

18      Q    You had a conversation with them on the phone, correct?

19      A    Yes.

20      Q    And you asked them questions, correct, about what was

21  going to happen?

22              MR. BANDELLI:  Objection, your Honor.  Let her

23      answer the question.

24              THE COURT:  Answer the question.

25      A    Can you repeat, please?

gjn

1      Q     You had asked them questions about what was going to

2  happen?

3      A     About what?

4      Q     About coming to your home on July 10, 2008.

5      A     (No response.)

6      Q     Let me refresh your memory.

7            On July 10, 2008, Child Protective Services told you

8  they were coming to your house with Sana so she can get her

9  belongings; do you remember that?

10     A     Yes.

11     Q     And they told you she was going to come to pack up her

12  stuff, correct?

13     A     Yes.

14     Q     And they told you don't pack her stuff, don't do it,

15  she'll do it herself, correct?

16     A     No.

17     Q     They never told you that?

18     A     No.

19     Q     Well, at some point they told you they were coming,

20  though, right, to the house?

21     A     Yes.

22     Q     And at some point Child Protective Services did arrive

23  at the house, though, correct?

24     A     Yes.

25     Q     But you weren't there?

1       A    Because I had an appointment with someone else.  And I

2    told Ms. Martinez I was not going to be home after 5:30 and she

3    said I can put the stuff outside for Sana.  She agreed.

4       Q    So let me get this straight.

5            Child Protective Services told you that you can put

6    stuff in a bag and leave it outside for Sana; that's what you're

7    saying?

8       A    Not everything.  Sana wanted her pocketbook and she

9    wanted a couple of outfits, which I did put for her.

10      Q    Isn't it true that they told you don't pack up Sana's

11   stuff, we are coming, she is going to pack it up on her own?

12      A    No, they did not.

13           MR. BANDELLI:  Objection.

14      Q    Isn't it true that you in fact received that message,

15   packed up her belongings and left it on the porch for her and

16   then left the home; isn't that true?

17      A    Excuse me?

18      Q    That you packed up certain belongings, put it in a bag,

19   left it on the porch and left your home?

20      A    Yes, because I had an appointment.

21      Q    With who?

22      A    With my lawyer.  My lawyer for the kids.

23      Q    So your biological daughter was coming to get

24   belongings and you didn't change the appointment?

25      A    I could not change the appointment.

1    Q    How could you not change the appointment?

2         MR. BANDELLI:  Objection, your Honor.

3    Q    Did you call and say your --

4         THE COURT:  Sustained.

5    Q    Your daughter is coming to get her stuff?

6         MR. BANDELLI:  Objection, your Honor.

7         THE COURT:  Overruled.

8    Q    Did you call your lawyer and say my daughter is coming

9    to my house to get her belongings from the last 17 years, can I

10   change the appointment?

11        MR. BANDELLI:  Objection, your Honor.  That wasn't

12        her testimony.  She said Sana was coming for a couple of

13        things, not her belongings for the last 17 years.

14        THE COURT:  Sustained.

15   Q    Did you call your lawyer and ask if you can reschedule

16   the appointment so your daughter can come to your home and

17   collect belongings?

18   A    Yes.

19   Q    And what did he -- And he told you no?

20   A    Yes.

21   Q    Isn't it true that you went into her pocketbook that

22   day and removed her phone book?

23   A    No, I did not.

24   Q    Well, someone took her phone book out of her pocketbook

25   that day, correct?

1          MR. BANDELLI:  Objection.  Objection, your Honor,

2     as to whether someone took her phone book out of her

3     pocketbook.

4          THE COURT:  I would allow it.

5          Overruled.

6     Q    Yes or no?

7     A    I don't know.

8          THE COURT:  What was your answer?

9          THE WITNESS:  I don't know.

10    Q    Over the course of the last two years, since June 24,

11    2008, tell the members of the jury how many times you brought

12    Sana to the district attorney's office here in Queens.

13    A    Never.

14    Q    Not one time?

15         MR. BANDELLI:  Objection, your Honor.  Asked and

16    answered.

17         THE COURT:  Sustained.

18    Q    On June 23rd --

19         MR. ROSENBLATT:  Withdrawn.

20    Q    On June 24, 2008, I want to call your attention to the

21    time after the phone call with the defendant.

22         After that phone call, you and the defendant cut off

23    her cell phone, correct?

24    A    I was in the hospital.

25         MR. BANDELLI:  Objection, judge.

1                      What time?  I don't understand.  He said after

2        June 23rd.

3                      MR. ROSENBLATT:  I'm in the next week.

4        Q     You and the defendant made a decision to cut off her

5        cell phone, correct?

6        A     No.

7        Q     You are aware her cell phone was cut off, correct?

8        A     Yes.

9        Q     Did you tell them to leave the cell phone on for your

10       daughter?

11                     MR. BANDELLI:  Tell who?  Objection.

12       A     I was in the hospital.

13                     MR. BANDELLI:  Objection.

14                     THE COURT:  Sustained.

15       Q     How many --

16                     THE COURT:  Mr. DA, calm down.

17                     MR. ROSENBLATT:  My apologies, Judge.

18                     THE COURT:  Calm down, okay?

19       Q     Ms. Gopaul, who cut off the cell phone?

20       A     I don't know.

21       Q     At some point in the next week after June 23rd, someone

22       canceled her driving instructions, correct?

23       A     Her driving instructions?

24       Q     Yeah.  You are aware she was in driver's ed, correct?

25       A     Yes.

1        Q    After June 23, 2008, someone canceled driver's ed,

2   correct?

3        A    No.

4        Q    Is it your testimony that you continued to pay for

5   Sana's driver's ed?

6              MR. BANDELLI:  Objection, your Honor.

7              THE COURT:  What's the basis of your objection?

8              MR. BANDELLI:  First of all, what's the relevance

9        of this, number one; and number two, she already said no,

10       did you cancel her driver's ed.

11             THE COURT:  Sustained.

12       Q    At some point after June 23, 2008, you cut off her

13   health insurance, correct?

14       A    No.

15             MR. BANDELLI:  Objection, your Honor, relevance.

16             THE COURT:  She answered it.

17             MR. ROSENBLATT:  I didn't hear it, Judge.

18             THE COURT:  She said no.

19       Q    You are aware she was no longer given health insurance

20   by you and your family?

21       A    Harold was fired so he had no insurance.  The family

22   had no insurance.

23             THE COURT:  Almost finished, Mr. DA?

24             MR. ROSENBLATT:  Yes, I am, Judge.

25       Q    You testified today that you are currently married; is

                                                        gjn

1     that true?

2          A     Yes.

3          Q     And you testified previously in family court on June

4     30th of 2009, correct?

5          A     Yes.

6          Q     And that was in regards to a proceeding involving

7     children, correct?

8          A     Yes.

9          Q     And on that date, that was in courtroom part Six,

10    correct, in family court here in Queens?

11         A     Yes.

12               MR. BANDELLI:  Judge, objection.

13               I am not quite sure what this has to do with the

14         present matter.

15               THE COURT:  Overruled.

16         Q     And during that testimony, isn't it true that you told

17    family court that your relationship with your husband was over?

18               MR. BANDELLI:  Objection, your Honor.  What's the

19         relevance of that?

20               MR. ROSENBLATT:  It's inconsistent.

21               MR. BANDELLI:  As to whether or not she is

22         married?

23               THE COURT:  Approach the bench.

24               (Whereupon, a conference was held between all

25         counsel and the Court on the record at the side-bar.)

                                                      gjn

1          THE COURT:  Mr. DA, what are you doing here?

2          MR. ROSENBLATT:  Judge, she said she is married.

3   She previously testified she is not married.  She has no

4   relationship with him.  It's inconsistent.

5          I want to find out ask when did she say she wasn't

6   married; either she is married or she is not.

7          THE COURT:  What's in the family court minutes?

8          MR. ROSENBLATT:  That she was no longer with him.

9          MR. BANDELLI:  Is she married?

10          MR. ROSENBLATT:  I will withdraw.  I may have

11   misspoke, Judge.

12          MR. BANDELLI:  Right now, they are married.

13          MR. ROSENBLATT:  I will re-ask the question.

14          Is she separated?

15          MR. BANDELLI:  No, no, no, no.  The question was

16   did you testify that you were married.

17          MR. ROSENBLATT:  I just said I will re-ask the

18   question.

19          THE COURT:  Slow down.

20          (Whereupon, a discussion was held off the record.)

21          THE COURT:  Objection is sustained.

22          MR. BANDELLI:  Thank you, Judge.

23          THE COURT:  You're welcome.

24          (Whereupon, all parties returned from the sidebar

25   and the following took place:)

                                                       gjn

1       Q    Now you told us on direct --

2            MR. ROSENBLATT:  I am going to withdraw that

3       question, Judge.

4       Q    In January of, I think you said 2009, you went to the

5       Rocky Hill Pharmacy, correct?

6       A    Yes.

7       Q    Okay.  And the Rocky Hill Pharmacy is approximately a

8       half mile from your house, correct?

9       A    Yes.

10      Q    And the reason why you were going to the Rocky Hill

11      Pharmacy according to your testimony is you went to fill a

12      prescription, correct?

13      A    Yes, I made a mistake.

14      Q    I'm sorry?

15      A    I made a mistake.

16      Q    What was the mistake?

17      A    I did not go to fill a prescription that day.

18           I went to return some money.

19           Sana had bought candies for the kids.

20      Q    All right.  So you went just -- so I understand

21      correctly -- in January of 2009, you went to the Rocky Hill

22      Pharmacy to give something to Sana?

23      A    Yes.

24      Q    Okay.  And she had purchased presents for the kids?

25      A    She had given them candy.

1      Q     And you didn't want the kids to have the candy that

2    Sana had bought them; is that correct?

3      A     No, that's not what's --

4      Q     But you went to return it?

5      A     No.  She had told some friends that she was struggling

6    with money and I know she is working the job, she said she was

7    just making $3 an hour or $5 an hour, so I just wanted to give

8    her back the money.

9      Q     Okay.  So you did not -- would it be fair to say that

10   you did not go there to pick up a prescription?

11     A     Right.

12           MR. BANDELLI:  Objection, your Honor.  Asked and

13       answered.

14           MR. ROSENBLATT:  Judge, if I can just have a

15       little leeway with this, please.

16           THE COURT:  Overruled.

17     Q     And you did not go there to drop off a prescription,

18   correct?

19     A     No.

20     Q     Well, you are aware, aren't you, when you were in

21   court, in family court, the Honorable Justice Carol Sherman had

22   ordered you to have no contact with Sana Awan in an Order of

23   Protection that was dated December of 2009 --

24           MR. ROSENBLATT:  Excuse me.  Withdrawn.

25     Q     She had, Judge Sherman had signed the Order of

                                                         gjn

1    Protection that said you can have no contact with Sana, correct?

2         A    That's not true.

3         Q    That's not true?

4         A    No.

5         Q    Well, you were permitted to have -- you were permitted

6    to have visitation -- excuse me -- you were permitted to pick up

7    and drop off prescription medications at the pharmacy, correct?

8         A    If I needed to get something at the pharmacy, yes.

9         Q    Okay.  And you were not permitted to talk to Sana,

10   correct?

11        A    I was permitted if she was cashiering.

12        Q    I'm sorry?

13        A    In she was cashing the register.

14        Q    Right.  You were permitted to talk to her about your

15   purchase, but not permitted to talk to her about anything else,

16   correct?

17        A    I would assume.

18        Q    Well, you were present when the judge issued the Order

19   of Protection?

20        A    It was not an Order of Protection.

21             MR. BANDELLI:  Objection, your Honor.

22        A    It was --

23             MR. BANDELLI:  Objection, your Honor.

24             MR. ROSENBLATT:  Okay.  Judge, I am going to ask

25   to approach the witness and have this marked as People's

                                                          gjn

1        Exhibit 11 and ask if the witness recognizes --

2                    THE COURT:  Approach the bench, please.

3                    (Whereupon, a conference was held between all

4        counsel and the Court on the record at the side-bar.)

5                    THE COURT:  What do you have there?

6                    MR. ROSENBLATT:  This is a family court Order of

7        Protection on January 30th of 2009, that ordered her to stay

8        away from Sana.

9                    I just want to ask her if she was aware of it.

10                   MR. BANDELLI:  And he did.

11                   (Whereupon, a discussion was held off the record.)

12                   MR. ROSENBLATT:  Judge --

13                   THE COURT:  Mr. DA, don't talk loud.  The reason

14       we have these sidebars is so the jury can't hear you, all

15       right?

16                   MR. ROSENBLATT:  I apologize, Judge.

17                   I believe I am whispering, but I will whisper

18       quieter.

19                   THE COURT:  I will allow this, but I suggest you

20       wrap up this cross-examination.

21                   MR. ROSENBLATT:  This is the final area, Judge.

22                   MR. BANDELLI:  Note my exception, Judge.

23                   THE COURT:  I note your exception.

24                   Proceed.

25                   (Whereupon, all parties returned from the sidebar

1          and the following took place:)

2     Q    You would agree with me, Ms. Gopaul, that on

3     December 3, 2008, you were present inside the family court down

4     the street in Queens, in Jamaica, and the judge issued an Order

5     of Protection which told you that you can pick up and drop off

6     prescription medication at the pharmacy but you were to stay

7     away from Sana, right?

8     A    It was not an Order of Protection.  It was a revised

9     Order of Protection.

10              MR. ROSENBLATT:  I am going to ask the witness be

11         shown, and ask her to review this document and ask her if

12         this is the Order of Protection that she is referring to.

13              THE COURT:  Please hand it to the officer.

14              MR. BANDELLI:  Note my objection, Judge.

15              THE COURT:  Your objection is noted for the

16         record, Mr. Bandelli.

17              THE OFFICER:  (Handing.)

18              THE WITNESS:  (Perusing.)

19     Q    When you are talking about the Order of Protection, is

20     that the one you're talking about?

21     A    I don't know.  They revised this thing so many times, I

22     don't remember.

23     Q    Well, on January 30th of 2009, the day before this

24     incident, the Order of Protection changed from being allowed to

25     pick up and drop off medication to a complete stay away meaning

MERLIN ALI-GOPAUL - Defense - Cross          780

1    no contact with Sana, correct?

2        A    What date?

3                MR. BANDELLI:  Objection, your Honor.

4                THE COURT:  Overruled.

5        Q    On January 30, 2009.

6        A    I don't know.  I never got a copy.

7                MR. ROSENBLATT:  Do you want to look at this?

8                THE WITNESS:  Yeah.

9                MR. ROSENBLATT:  Sure (handing).

10               THE OFFICER:  (Handing.)

11               THE WITNESS:  (Perusing.)

12               Okay.

13       Q    Do you remember or you don't remember?

14       A    I never got a copy of this.

15               MR. ROSENBLATT:  Okay.  I'll take it back.

16       Q    The pharmacy, how long had Sana worked at that

17   pharmacy?

18       A    I don't know.

19       Q    Was she working there in June of 2008?

20       A    I don't know.  No.

21       Q    Was she working there on June 23, 2008?

22       A    No.

23       Q    Did there come a point in time that you learned that

24   she was working there after that date?

25       A    After, yes.

1      Q     Okay.  That was a pharmacy that you had been going to

2      for years, correct?

3      A     Yes.

4      Q     And that was a pharmacy that once you learned Sana was

5      there, you didn't change pharmacies, correct?

6      A     No.

7      Q     Okay.  You would agree with me that there were ten

8      other pharmacies within a half a mile of your house in Bellrose,

9      correct?

10            MR. BANDELLI:  Objection, your Honor.  What's the

11        relevance?

12            THE COURT:  Overruled.

13      A     No.

14      Q     Well, you know there is a CVS over on 89th Avenue near

15      your house, correct?

16      A     And how far is that?

17      Q     Well, it's a few blocks.  Do you want to take a look at

18      the maps of all the drugstores?

19      A     It's over a mile to walk to CVS.

20            THE COURT:  Sustained, sustained.

21      Q     Prior to today, Ms. Gopaul, you met with Mr. Bandelli

22      before, correct?

23      A     Yes.

24      Q     Okay.  And prior to today, we had never spoken,

25      correct?

gjn

1      A     No.

2      Q     In fact, yesterday --

3      A     Sorry, we have spoken.

4      Q     We have.

5            Yesterday, correct?

6      A     No.

7      Q     When did we speak before today?

8      A     On July -- on June 30th, you called me in my house

9  right after I had come home from the hospital and you cursed me.

10     Q     I'm sorry?

11     A     You cursed me, yelled at me.

12     Q     I did?

13     A     Yes, you did.

14     Q     Yesterday, one of my colleagues in the hall asked if

15  they can speak with you, correct?

16     A     Yes.

17     Q     And they asked if you would talk to him about what it

18  is that you were going to come and testify about, correct?

19     A     He didn't tell me what he wanted to speak to me about.

20  He discussed -- asked I can speak with you.

21     Q     And you refused to speak with him, correct?

22     A     Yes.

23            MR. ROSENBLATT:  I have nothing further.

24            THE COURT:  Mr. Bandelli, any redirect?

25            MR. BANDELLI:  Yes, Judge.

1            Do you need a moment.

2            (There was a brief pause in the proceedings.)

3            THE COURT:  Ms. Gopaul, Ms. Gopaul.

4            THE WITNESS:  Yes.

5            THE COURT:  Would you like to take a recess?

6            MR. BANDELLI:  May I suggest we do that, Judge,

7     please?

8            THE COURT:  We will take a short recess.

9            Ladies and gentlemen, remember, you are not to

10    discuss this case among yourselves or with anyone else.  You

11    are not to form any opinion as to whether or not you feel

12    the defendant is guilty or not guilty of the crimes with

13    which he is charged.

14            Please follow the instruction of the court

15    officer.

16            (Whereupon, the jury exited the courtroom and the

17    following occurred:)

18            THE COURT:  Take a short recess.

19            Please put Mr. Gopaul back.

20            (Whereupon, a recess was taken, after which the

21    witness entered the witness stand.)

22            THE CLERK:  Case on trial.  Ail parties present,

23    your Honor.

24            (Whereupon, the jury entered the courtroom and

25    upon taking their respective seats, the following occurred:)

1          THE CLERK:  Case on trial.  All parties present,

2     your Honor.

3          Do both sides stipulate all jurors are present and

4     properly seated?

5          MR. ROSENBLATT:  Yes.

6          MR. BANDELLI:  So waived, your Honor.

7          THE CLERK:  Ma'am, you are advised you are still

8     under oath.

9          THE COURT:  You may proceed, Mr. Bandelli.

10         MR. BANDELLI:  Thank you, Judge.

11    REDIRECT EXAMINATION

12    BY MR. BANDELLI:

13    Q     Are you all right?

14    A     Yeah.

15    Q     As all right as you can be?

16    A     Uh-huh.

17    Q     This has been a pretty traumatic experience, has it

18    not?

19         MR. ROSENBLATT:  Objection to the comments, Judge.

20         THE COURT:  Ask questions, please.

21    Q     When this was all happening in June of 2008, the

22    allegations, your health issue, that was a very chaotic period;

23    was it not?

24    A     Yes.

25    Q     And the time that's gone on since then with Sana

gjn

1    leaving the house and taking care of your other kids and Harold

2    losing his job, those were all very stressful moments in your

3    life, were they not?

4                    MR. ROSENBLATT:   Objection to the leading, Judge.

5                    THE COURT:   Sustained.

6        Q     Were you having a difficult time during this period?

7                    MR. ROSENBLATT:   Objection.

8        A     Yes.

9                    THE COURT:   Mr. Bandelli.

10                   MR. BANDELLI:   That wasn't leading, Judge.

11                   THE COURT:   Do you have any more questions?

12                   MR. BANDELLI:   Yep.

13                   THE COURT:   Ask them.

14       Q     You were trying to figure out what had happened; is

15   that true?

16                   MR. ROSENBLATT:   Objection to the leading, Judge.

17                   THE COURT:   Sustained.

18                   Don't lead the witness.

19       Q     You have had two years to think about this?

20                   MR. ROSENBLATT:   Objection.

21       A     Yes.

22                   THE COURT:   Sustained.

23                   Answer is stricken.

24       Q     You are here to testify today on behalf of my client

25   Harold; is that correct?

1        A     Yes.

2                        MR. BANDELLI:  Nothing further, Judge.

3                        THE COURT:  Thank you.  You may step down.

4                        THE WITNESS:  Thank you.

5                        (Whereupon, the witness left the witness stand.)

6                        THE COURT:  Counsel, approach, please.

7                        (Whereupon, a conference was held between all

8        counsel and the Court off the record at the side-bar.)

9                        THE COURT:  It's a good time to recess for lunch.

10                       Remember, you are not to discuss this case among

11       yourselves or with anyone else.  If anyone tries to discuss

12       it with you, you are to bring it to my attention.  You are

13       not to visit any of the locations.  You are not to form any

14       opinions as to whether or not you feel the defendant is

15       guilty or not guilty of the crimes with which he is charged.

16                       Enjoy your lunch.  Come back here at 2:15, please.

17       Thank you.

18                       (Whereupon, the jury exited the courtroom and the

19       following occurred:)

20                       THE COURT:  All right, 2:15.

21                       Please bring Mr. Gopaul back in.

22                       (Whereupon, a luncheon recess was taken at this

23       time.)

24                           *          *          *

25                       A F T E R N O O N   S E S S I O N

1                    *        *        *

2                    THE CLERK:   Case on trial all parties present,

3          your Honor.

4                    THE COURT:   Mr. Bandelli, do you have an

5          application?

6                    MR. BANDELLI:   Yes.   Several, Judge, actually.

7                    My first application has to do with the testimony

8          of my client, Jenny Gopaul.

9                    MR. ROSENBLATT:   Judge, before we begin, I ask the

10         witness be --

11                   MR. BANDELLI:   That's fine.

12                   Would you walk Jenny out?

13                   (Whereupon, the witness left the witness stand.)

14                   MR. BANDELLI:   My first application has to do with

15         the cross-examination of the defense witness Jenny Gopaul by

16         the assistant DA.

17                   During the cross-examination, he chose to question

18         her about statements that were made by my client with

19         regards to whether or not he had ever admitted to her

20         whether or not he had committed these offenses.   And my

21         application has to do with several issues in the area.

22                   First off, I would note that I limited my direct

23         examination to specific things as far as her testimony.

24         Number one, I had her testify about her background; number

25         two, I had her testify about the house and the layout of the

gjn

1      house; number three, she testified about what happened on

2      the date of June 23rd in terms of Harold going to the

3      precinct and her going to the precinct the following day;

4      and number four, I had her testify with regard to the

5      recantation right the complainant in this case at the Rocky

6      Hill Pharmacy.

7              At no time did I ask any questions about whether

8      or not she believed my client -- whether or not my client

9      had ever denied doing this to her.  There were no questions,

10     and it was purposeful, there were purposefully no questions

11     asked about her position in terms of my client's innocence

12     or guilt or his role in sexually abusing the girl.

13             And what happened was on Mr. Rosenblatt's's cross,

14     he asked her whether or not it was a fact that my client had

15     admitted it.

16             I can't see under section 6-401 of Richardson's,

17     Impeachment of Witnesses, any basis for him to ask that

18     question.  It is improper cross, and on the grounds that

19     what he brought into this case was so incredibly explosive

20     and prejudicial, I am moving for a mistrial.

21             Secondly, he had asked her, because she didn't

22     recall my client saying, that he asked if he should refresh

23     her recollection with a recording that had been made.  That

24     recording has never been turned over to counsel.  I have

25     never heard it.

gjn

1          I would, I would argue, Judge, that the DA had an

2     absolute obligation to turn that over to me because, unless

3     I'm wrong, that was a tape recording made of a phone call

4     from my client while he was in prison.  It was a phone call

5     that was recorded by law enforcement officials, and I didn't

6     mention this earlier, of a conversation between spouses, a

7     husband and a wife, okay, which never should have been tape

8     recorded in the first place, okay, because there is a

9     privilege that applies there.

10         But in addition to that, he has had this and he

11    never turned it over to me, and under the CPL, I am

12    entitled, prior to opening, of any statements that were

13    recorded by law enforcement officials concerning my client.

14         So for that reason also, your Honor, I am asking

15    for a mistrial with regard to that.

16         As of this moment presently, I still haven't heard

17    this recording, so I am asking that the Court permit me to

18    hear the recording along with my client so we can gauge the

19    accuracy of what was testified to on the witness stand.

20         Other than what Mr. Rosenblatt's said and what

21    Jenny Gopaul heard, nobody heard this, so I have no way to

22    gauge the accuracy or the reliability or existence of what

23    was said on the recording.  I am entitled to that.

24         Timely, Judge, and, well, let me step back for a

25    second.

1          I also would like to hear that tape because it

2     will be a factor in terms of whether or not I am going to

3     have my client take the stand in this matter.

4          According to the DA, there are statements made by

5     my client that were recorded by law enforcement officials to

6     his wife where he may have admitted responsibility for the

7     acts.  I need to know what exactly that recording says

8     before the DA tries to cross-examine my client about it as

9     well and I would be underminded in my ability to defend my

10    client if I were not given the opportunity to hear that tape

11    before making a decision whether or not my client should

12    testify.  So I am asking to hear that tape.

13         And finally, Judge, the DA had asked that he be

14    permitted, if my client should testify, during

15    cross-examination to question him about the underlying acts

16    of his convictions in Nassau County.

17         Your Honor had made a Sandoval ruling earlier in

18    the case and the ruling was that the DA would be allowed to

19    inquire only as to the fact that there was a conviction of

20    multiple offenses or offense in Nassau County in May of, I

21    guess, 2009.  I objected to that, but that was the ruling of

22    the Court.

23         It is my understanding that that still is the

24    ruling of the Court; however, the caveat is my client,

25    should he at any point deny having ever touched his

                                             gjn

1    daughter, ever, or say that he would never do something like

2    that, then that would be perceived or could be perceived as

3    opening the door and then would allow Mr. Rosenblatt to

4    cross-examine him with regard to those offenses in Nassau

5    County.

6              THE COURT:  Starting with your last application.

7              Are you arguing about that?

8              MR. BANDELLI:  I am making a record.

9              THE COURT:  My Sandoval record stands.

10             MR. BANDELLI:  I understand that.  I objected back

11   then, but that's the ruling.

12             THE COURT:  The ruling stands.

13             As far as the DA's application, I don't know if it

14   was discussed on the record or off the record yesterday

15   about whether or not in the opening statement that you gave

16   at the beginning of the trial, whether that would open the

17   door to go into the underlying facts of the Nassau County

18   conviction.

19             It did not.  I am not going to allow the DA to do

20   that with the caveat as you just stated, that unless he

21   tries to give the impression by testifying in front of this

22   jury that he never touched his stepdaughter or would never

23   touch his stepdaughter, any general statement like that,

24   that could be perceived as opening the door.  If his

25   testimony is the denial of the charges in this indictment,

1        then that would be no problem.   If he starts making general

2        statements as you did in the opening statement, that would

3        be a problem.

4                     MR. BANDELLI:   Understood, Judge.

5                     THE COURT:   Now Mr. DA, do you want to be heard on

6        the other issues that were brought up?

7                     MR. ROSENBLATT:   First, Judge, I am permitted to

8        cross-examine the witness on inconsistencies, bias,

9        hostility, specifically in regards to the inconsistency --

10       she stated the first time she ever had a conversation about

11       what happened with the defendant was on July 1st.   That was

12       her testimony on direct and that's patently inconsistent

13       with what she testified on cross.

14                    As to the general manner of the cross-examination

15       in regards to the inconsistency, as well as her bias, I

16       believe what I did was proper.

17                    In regards to the defendant hearing these

18       recordings or actually having been required under the CPL to

19       receive them previously, that is just patently absurd.

20       Quite frankly, Judge, it is a complete misreading of the

21       CPL.   There is nothing under the law that requires me to

22       turn over before today, there is nothing that requires me to

23       turn over right now.   I was free to use it in

24       cross-examination, and quite frankly, Judge, I am not going

25       to unless ordered to provide it to counsel.

1        He is not entitled to hear it.  He is not entitled

2   to listen to it.  The defendant is not entitled to know what

3   I have uncovered during the course of my investigation in

4   regards to his conversations with anybody, so that he is not

5   entitled to.

6        In regards to the privilege, Judge, the case law

7   is very clear in regard to sex abuse cases.  There is no

8   privilege against the testimony, no prejudice ledge against

9   the testimony of confidential communications between husband

10  and wife from prosecution arising out of charges of child

11  abuse.  People v Gomez, Appellate Division Second Department

12  1112 AD 2d 445, People versus Alman, 41 AD 2d 325, as well

13  as v -- not versus -- Social Services Law 383-B(5).  So

14  that's not relevant in this case either.

15       In regards to providing it now, I would oppose

16  that and I would ask the Court to not require me to do that

17  at this time.

18       THE COURT:  All right.  As far as the defense

19  application for a mistrial based upon the cross-examination

20  by the district attorney of the defendant's wife,

21  Ms. Gopaul, that application is denied in all respects.

22       There is no marital privilege for that telephone

23  conversation when the defendant was in prison and called his

24  wife on the telephone and spoke about this incident.

25       DA properly cross-examined the defendant -- I mean

                                              gjn

1      the witness, Ms. Gopaul -- as to those conversations.   There

2      was no privilege.

3                   As far as the DA's obligation, he had no

4      obligation to turn that taped conversation over.

5                   All right.   Your application for a mistrial is

6      denied.

7                   As far as your application to hear the taped

8      conversation, I am overruling the DA's objection.

9                   Do you have that tape here?   Play it right now.

10                  MR. ROSENBLATT:   Judge, just so we are clear, I am

11     going to play the 30 second clip that I played for the

12     witness.

13                  THE COURT:   Yes.

14                  MR. ROSENBLATT:   Nothing more.

15                  THE COURT:   The clip that you played while the

16     witness was on the stand as she heard it.

17                  MR. ROSENBLATT:   Okay.

18                  THE COURT:   With those earphones.   You play that

19     now in open court.

20                  MR. BANDELLI:   I am going to ask, Judge, is the

21     intent to play it when my client testifies?

22                  THE COURT:   Mr. Bandelli.

23                  MR. BANDELLI:   Yeah.

24                  THE COURT:   I have no idea what the DA intends to

25     cross-examine your client on and I'm not going to have him

                                                              gjn

1    disclose his cross-examination.

2         MR. BANDELLI:  Well --

3         THE COURT:  I am going to have him play the same

4    excerpt he played for Ms. Gopaul to see if it refreshed her

5    recollection while she was on the witness stand.

6         MR. BANDELLI:  I understand, but I'm going to make

7    the application before there is any testimony at this time

8    to hear whatever recordings he now has in his possession of

9    my client taken by law enforcement officials of phone calls

10   made from jail between my client and his wife or my client

11   and anybody else that he would choose to use on

12   cross-examination.  I am asking to hear that as well, Judge.

13        THE COURT:  That application is denied.

14        MR. ROSENBLATT:  Judge, I am going to play it.

15   It's as loud as it goes.

16        (Whereupon the CD was played in open court.)

17        MR. ROSENBLATT:  That's the part I played for her,

18   Judge.

19        MR. BANDELLI:  I can't make out anything that was

20   said.

21        MR. ROSENBLATT:  Well, he can come closer and I

22   can play it again, Judge, but that's quite clear for

23   everybody in the courtroom to understand what that was.

24        MR. BANDELLI:  I can't understand.

25        THE COURT:  Play it again.

gjn

1              Mr. Bandelli, you can get closer.

2              (Whereupon the CD was played in open court.)

3              MR. BANDELLI:  He never admitted doing that on

4     that.  He never admitted doing that on that, and the

5     question was:  Didn't he admit doing that.  He never

6     admitted doing that on that.

7              MR. ROSENBLATT:  That's the part that was played

8     for her, Judge.

9              MR. BANDELLI:  That's inaccurate.  It was -- he

10    mischaracterized what was said on that tape to the jury and

11    to the witness.  He never admitted to doing it.

12             Move for a mistrial, Judge.  Really move for a

13    mistrial.  He never admitted to doing it and that's how he

14    handled it during this cross-examination.  The question was

15    didn't he admit to doing it.

16             THE COURT:  Mr. DA.

17             MR. ROSENBLATT:  Judge, I refreshed the witness's

18    recollection with the conversation on that particular date.

19    She was refreshed.  She admitted under oath as well that he

20    admitted it to her previously.

21             The Court asked me to play the recording as to

22    what I played for the witness and I did that.  There is

23    nothing inconsistent.  The witness admitted it under oath.

24             MR. BANDELLI:  He never admitted the abuse.

25             THE COURT:  When did he make the admission,

1    Mr. DA?

2              MR. ROSENBLATT:  Judge, the witness testified that

3    the defendant admitted to her on June 24th.

4              MR. BANDELLI:  I move for a mistrial, Judge.

5              THE COURT:  Mr. DA.

6              MR. ROSENBLATT:  Judge, that's the portion that I

7    played.  That's the portion that she did not remember.  I

8    specifically called her to that date and that time as to

9    whether they were discussing the defendant's prior

10   admission.  She was refreshed, and then she admitted to that

11   and she admitted to the prior conversation.  That's very

12   clear from the questions that I specifically asked her.

13   They were asked in a specific way and that's what she

14   answered.

15             THE COURT:  And when was the admission on the

16   prior date?

17             MR. ROSENBLATT:  When the defendant was in

18   correction's custody at CVQ, made from there to the

19   complainant's home.

20             THE COURT:  And you have no recording of that, do

21   you?

22             MR. ROSENBLATT:  Judge, I really don't want to

23   inform counsel what I do and do not have.  I can have a

24   discussion ex parte in camera, but I am not willing to -- I

25   was instructed to play the specific recording played for the

                                                      gjn

1          witness and I just did that.

2                    This isn't a discovery stage, Judge.  I am not

3          required to do that, Judge, and to require me to make

4          representations as to what I have and don't have on him is

5          completely unfair, Judge.  It's not fair and I shouldn't be

6          required to do it.  He is not required to turn over what he

7          has, I am not required to turn over what I cross-examine on

8          his witnesses.

9                    THE COURT:  That's what you played for the

10         witness?

11                   MR. ROSENBLATT:  That's what I played for the

12         witness.

13                   Judge, if the Court wants to bring her back in to

14         ask her, she is still here.

15                   That's what I played.

16                   THE COURT:  I asked you a question.

17                   MR. ROSENBLATT:  That's what I played for the

18         witness, Judge.

19                   THE COURT:  All right.

20                   I don't expect any comments like that last one you

21         just made --

22                   MR. ROSENBLATT:  My apologies, Judge.

23                   THE COURT:  -- from a district attorney of this

24         county.

25                   MR. ROSENBLATT:  My apologies, Judge.

1          I most respectfully played for the Court what you

2     instructed me to do and that's my representation.

3          THE COURT:  A simple yes would have been

4     sufficient.

5          MR. ROSENBLATT:  My apologies, Judge.

6          That's what I played.

7          THE COURT:  All right.  You're an assistant

8     district attorney.  All right.  Continue to act like one.

9          MR. ROSENBLATT:  Yes, Judge.

10         THE COURT:  Do not make comments like that to this

11    Court.

12         MR. ROSENBLATT:  Yes, your Honor.

13         THE COURT:  Defendant's application for a

14    mistrial, the Court is reserving decision on that.

15         Are you ready to proceed?

16         MR. BANDELLI:  What do we do about the

17    mischaracterization though, that jury is --

18         THE COURT:  No.

19         MR. BANDELLI:  That's not what the jury was led to

20    believe.

21         THE COURT:  Don't tell me to --

22         Wait a second.

23         MR. BANDELLI:  I apologize.

24         THE COURT:  What do you think, this is a forum?

25         MR. BANDELLI:  You're right, Judge.  I apologize.

gjn

1    I apologize.  I do.

2            With all due respect, that jury was led to believe

3    that my client admitted something on that conversation.

4            THE COURT:  No, it was reference to a prior

5    conversation where the admission was made.

6            MR. BANDELLI:  We should get -- I would like to

7    see the cross-examination before I go any further.  This is

8    very important, Judge.

9            (Whereupon, a discussion was held off the record.)

10           THE COURT:  Court will take a 15 minute recess.

11           MR. BANDELLI:  Thank you, your Honor, and I do

12   apologize for speaking in that tone.

13           THE COURT:  Put the defendant back in.

14           (Whereupon, a recess was taken, after which the

15   following occurred.)

16           THE CLERK:  Case on trial.  All parties present,

17   your Honor.

18           THE COURT:  The Court listened to the excerpt of

19   that recorded conversation between Jenny Gopaul and the

20   defendant and then her expletive, excited tirade to her

21   husband.  She stated you -- pardon my language -- you

22   fucking told me that you did it.

23           That was clearly on that tape that I just listened

24   to.

25           What's your application?

gjn

1          MR. BANDELLI:  Okay.  Judge, the representation to

2     the jury was that my client admitted it during that

3     conversation.  He had mischaracterized --

4          THE COURT:  No, it wasn't.

5          MR. BANDELLI:  Oh.

6          THE COURT:  I am going to hand down the page from

7     the cross-examination of your witness, Ms. Gopaul, the

8     cross-examination by the DA, pages 39, 40, 43 and 44 which

9     were the relevant questions and answers relating to that

10    taped conversation.

11         You both can look at it together.  (Handing.)

12         Mr. DA and Mr. Bandelli.

13         (Both attorneys complying)

14         MR. BANDELLI:  So that recording is from July 10

15    of 2000 -- 2009, Judge.

16         THE COURT:  That's the recording that was played.

17         MR. BANDELLI:  Yeah, what I am asking is -- but he

18    is referring to a recording from July.  He is referring to

19    July 10 of 2009.  I believe that recording is from June 24th

20    of 2008.

21         THE COURT:  Mr. DA.

22         MR. ROSENBLATT:  Judge, that recording was from

23    July 10th.

24         THE COURT:  Keep looking at the transcript.

25         MR. BANDELLI:  Judge, just on --

1              THE COURT:  Have you had the opportunity to look

2       at the transcript, Mr. Bandelli?

3              MR. BANDELLI:  Yeah, I have.

4              THE COURT:  Nowhere in that transcript does the DA

5       give the impression that there was an admission on that

6       tape.

7              MR. BANDELLI:  Well, actually, I distinctly recall

8       him asking the question on cross-examination, and after he

9       told you he abused her, now that's four pages, okay, and

10      those questions were --

11             THE COURT:  I have gone beyond --

12             MR. BANDELLI:  Okay.

13             THE COURT:  -- the pale here.

14             All right.  I've got the transcript relevant to

15      the cross-examination at the time that the DA played through

16      earphones that excerpted conversation between the witness

17      and the defendant, and nowhere in there does the DA state or

18      even give the impression that there was an admission on that

19      excerpt conversation.

20             MR. BANDELLI:  On those four pages, absolutely

21      not, Judge.

22             THE COURT:  Your application for a mistrial is

23      denied.

24             Do you need to call any other witnesses?

25             (Whereupon, a discussion was held off the record.)

gjn

1          MR. BANDELLI:  Yes, I am going to call my client,

2     Judge.

3          THE COURT:  Bring out the jury.

4          MR. BANDELLI:  I would request an -- one more

5     time, an opportunity to hear whatever else is on those tapes

6     before my client takes the stand.

7          THE COURT:  I played the excerpt that the DA

8     played for the witness.

9          MR. BANDELLI:  (Nodding.)

10          THE COURT:  There is no obligation for the DA to

11     turn over anything else.

12          MR. BANDELLI:  Okay.  Note my exception, Judge.

13          THE COURT:  You have your exception.

14          MR. BANDELLI:  Thank you.

15          MR. ROSENBLATT:  Judge, I am not sure if we did it

16     on the record, but counsel had an opportunity listen to the

17     recording that was played for the witness, correct?

18          THE COURT:  That's correct.  During the course of

19     the recess, I instructed my court attorney to listen to, and

20     in the presence of both of you, all three of you listen to

21     the excerpted conversation that was played for Ms. Gopaul

22     while Ms. Gopaul was on the witness stand.

23          Is that correct, Mr. DA, Mr. Bandelli?

24          MR. BANDELLI:  Yes, that's correct.

25          MR. ROSENBLATT:  Judge, and I know that the

1     witness who just testified is back in the courtroom.

2              Before -- I am just going to ask that she remain

3     outside.

4              MR. BANDELLI:   Why?   She is done.

5              THE COURT:   Well, due to the nature of the

6     examination that has been conducted and that will be

7     conducted, she is excluded from the courtroom.

8              MR. BANDELLI:   Well, Judge, I object to that.

9     There is no reason.

10             I don't expect to call her again.   As a witness,

11    she is done.   Why doesn't she have the right to be present

12    and see her husband testify?

13             THE COURT:   Mr. DA.

14             MR. ROSENBLATT:   Judge, she is subject to be

15    called on any inconsistencies.   She was limited to the

16    cross-examination.   Should this defendant deny anything, she

17    could be called as a rebuttal witness by the People.

18             There are clear conversations that took place.   If

19    he is to mischaracterize them in any way, I am free to call

20    her as my own.

21             I am asking she be precluded for that reason.

22             MR. BANDELLI:   He can't preclude] her from the

23    courtroom just because he might call her.   This is a public

24    this is a public proceeding.   She testified, she is done.   I

25    am not going to call her as a witness, Judge.

                                                      gjn

1          THE COURT:  The DA stated he may call her as a

2     rebuttal witness.

3          Based upon that, she will be excluded for the

4     testimony of the defendant.

5          MR. BANDELLI:  Objection.

6          THE COURT:  You have your exception for the

7     record.

8          (Whereupon, the jury entered the courtroom and

9     upon taking their respective seats, the following occurred:)

10          THE CLERK:  Case on trial.  All parties present,

11     your Honor.

12          Do both sides stipulate that all jurors are

13     present and properly seated?

14          MR. ROSENBLATT:  Yes.

15          MR. BANDELLI:  So stipulated.

16          THE COURT:  Again, ladies and gentlemen, as I told

17     you previously, during the course of a trial sometimes legal

18     issues have to be discussed outside your presence and that's

19     what was occurring before.

20          Thank you for your cooperation.

21          Mr. Bandelli, do you wish to call any other

22     witnesses?

23          (Whereupon, a discussion was held off the record.)

24          MR. BANDELLI:  Yes.  I am calling my client, your

25     Honor, Harold Gopaul.

```
 1                    (Whereupon, the witness entered the witness
 2           stand.)
 3    H A R O L D   G O P A U L , after having first been duly sworn
 4           was examined and testified as follows:
 5                    THE WITNESS:  Yes, yes.
 6                    THE CLERK:  Please be seated.
 7                    THE OFFICER:  Defense calls Harold Gopaul, last
 8           name G-O-P-A-U-L.
 9                    THE COURT:  You may proceed, Mr. Bandelli.
10                    MR. BANDELLI:  Thank you, Judge.
11                    Good afternoon, Harold.
12                    THE WITNESS:  Good afternoon.
13    DIRECT EXAMINATION
14    BY MR. BANDELLI:
15           Q    For the record, please state your name.
16           A    Harold Gopaul.
17           Q    Okay.  And what's your date of birth?
18           A    2/28/58
19           Q    Are you a United States citizen?
20           A    Yes.
21           Q    And are you a resident of Queens County?
22           A    Yes.
23                    MR. ROSENBLATT:  Judge, could he move closer to
24           the mike, please?  I am having difficulty hearing.
25                    THE WITNESS:  (Complying.)
```

gjn

1                    MR. ROSENBLATT:   Thank you.

2        Q    Are you presently married, Mr. Gopaul?

3        A    Yes.

4        Q    And who are you married to?

5        A    Merlin Gopaul.

6        Q    Speak up louder?

7        A    Merlin Gopaul.

8        Q    Is she also known as Jenny?

9        A    Yes.

10       Q    How long have you been married?

11       A    Approximately 14 years.

12       Q    And how many children do you and Jenny have together?

13       A    Two together.

14       Q    Okay.  And what are their names?

15       A    Kaitlynn Gopaul and Darien Gopaul.

16       Q    And did Jenny bring another child to the marriage?

17       A    Yes.

18       Q    Okay.  What was that child's name?

19       A    Sana Awan.

20       Q    And how old was Sana what you first met her?

21       A    Between three or four years old.

22       Q    Okay.  And how long did you date Jenny before you got

23   married?

24       A    Few months.  Few months, yeah, few months.

25       Q    Did you buy a house together?

1    A    Yes.

2    Q    Where was that?

3    A    In Bellrose.

4    Q    Okay.  Do you know the address?

5    A    242-10 89th Avenue, Bellrose, New York 11426.

6    Q    Is that the only house you and Jenny shared with the

7    children since you've been married?

8    A    Yes.

9    Q    And do you work, Mr. Gopaul?

10        Were you working at some point?

11    A    At that time, yes.

12    Q    Okay.  And what type of work were you doing, let's say,

13    in what type of work were you doing when you first met Jenny?

14    A    I did a lot of things.  I deliver pizza, I deliver

15    food, I deliver auto parts, I work in a print shop.

16    Q    At some point, you started working in extermination or

17    pest control?

18    A    Yes.

19    Q    When was that?

20    A    1999.  1999.

21    Q    And who did you work for?

22    A    Ecolab Pest Elimination.

23    Q    And what were your responsibilities, what were your job

24    duties?

25    A    I was a sewer specialist.

1              I was responsible for the truck that I drove.

2        Q    Okay.  So they gave you a vehicle?

3        A    Yes.

4        Q    And what type of vehicle was that?

5        A    Dodge Ram pickup truck.

6        Q    Was the company's logo on the truck?

7        A    Yes.

8        Q    And did the company also provide you clothing that

9   identified the company as well?

10       A    Yes.

11       Q    And did you wear that clothing when you went to work?

12       A    Yes.

13       Q    I am going to direct your attention to, I guess, around

14   April of 2008, okay?

15            Do you recall that time, do you recall the spring of

16   2008?

17       A    Yes.  Yeah.

18       Q    And you were living in Bellrose at the time?

19       A    Yes.

20       Q    And did you learn at that time that --

21            MR. ROSENBLATT:  Objection to the leading, Judge.

22            THE COURT:  Sustained.

23            MR. BANDELLI:  Okay.  Withdrawn.

24       Q    I am going to direct your attention to June 23, 2009,

25   okay?

gjn

1              Were you working that day?

2    A    Yes.

3    Q    And what time were you working that day?

4    A    I left home between 4:30, 5 o'clock in the morning.

5    Q    Okay.  And what was your time shift?

6    A    I worked through the day.  I work all through the day

7  that Monday and then I work all through Tuesday night.

8    Q    Okay.  And what time did you return home that day?

9    A    Around 2 o'clock, 2:00 A.M. on Tuesday morning.

10   Q    And when you came home, what did you do?

11   A    Well, normally when I come home, I look to see who is

12  asleep and who need covering.  I touch my wife to let her know,

13  she know I'm home.  I kiss my son, my daughter.  I cover them up

14  if I have to.

15             MR. ROSENBLATT:  Objection, Judge.  Nonresponsive.

16             The question is what he did that night.

17             THE COURT:  Overruled.

18             MR. BANDELLI:  Thank you, Judge.

19   Q    You can continue.

20   A    And Sana, I look in, and Sana, she was missing.

21   Q    Which room did Sana normally sleep in?

22   A    The one closest to the bathroom.

23   Q    Okay.  And who did she sleep with?

24   A    With Kaitlynn.

25   Q    Was Kaitlynn in the room?

gjn

1    A    Kaitlynn was in the room.

2    Q    What did you do when you noticed Sana was missing?

3    A    I call my wife.

4    Q    And what happened?

5    A    I told her, I asked her where is Sana.

6         She said Sana is in her bed, and I said that Sana is

7    not in her bed.  She say yes.

8              MR. ROSENBLATT:  Objection to the hearsay, Judge.

9              THE COURT:  Sustained.

10   Q    Without telling us what Jenny had said, what happened?

11   You tell us what happened in your words.

12   A    We went looking for her through the house, even up to

13   the attic, to the other spare room we have.  We went to the

14   basement, through the living room, and when I was going to look

15   to search the garage, the back door was opened, so then we know.

16   Q    At some point, did you decide that you were going to go

17   to the 105 precinct?

18   A    Not at that time.  We decide -- I decide to call her

19   friend, see if she is at the friend house.

20   Q    Who did you call?

21   A    I called Christine.

22   Q    Okay.  Did anybody answer?

23   A    Nobody answer the phone.

24   Q    And after you called, what did you do next?

25   A    Then I talked to my wife.  I said we should go make a

1    report that Sana is missing.  She said --

2                    MR. ROSENBLATT:  Objection to what she said,

3          Judge.

4                    THE COURT:  Sustained.

5          Q    Without saying what Jenny said, okay?  I know it's --

6    just try and tell us the best that you can what happened,

7    without telling us what she said.

8          A    I told her that Sana was missing.

9               I ask her should we make a report, she said okay, and I

10   left her and I went to make the report.

11         Q    And do you remember what time it was when you left the

12   house?

13         A    I left about 25 after 2:00.

14         Q    25 after 2:00?

15         A    Yeah, A.M.

16         Q    And what time did you get to the precinct, about?

17         A    About 2:30.

18         Q    Okay.  And what happened when you got to the precinct?

19         A    I walked through, I walk into the door on the side

20   street.  When I walk in there, officer came up to me, there is a

21   lady sitting on the right of me behind a desk and she asked me,

22   she said can I help.  I said, well, I need to make a report.

23              One officer came up to me, he said:  I'll handle this,

24   and he came on the left side of me.

25         Q    Okay.

HAROLD GOPAUL - Defense - Direct                    813

1      A      And while he was questioning me, a few officers came up

2    again around the area that we was, where we was standing.   We

3    were still in the entrance of the precinct.

4      Q      And then what happened?

5      A      He asked me my name, my address, where I work.

6            He asked me who, what report I want to make.   I said I

7    came to report my daughter is missing.   He asked me who it was,

8    he asked me the date of birth, he asked me the address of her

9    too and he asked me, well, you know, mostly age and stuff like

10   that and what school she goes to.

11           Then he held me by my left hand and slammed me on the

12   wall next to the desk.

13     Q      Can you describe for the jury exactly what was done by

14   this officer?

15           Well, can you show --

16     A      He was standing on this side (indicating).

17     Q      He was standing to your left?

18     A      I was facing this way.   He goes on my left, the other

19   officers are close by and he hold me by this hand (indicating)

20   and he slammed me onto the wall, like this wall (indicating).

21           And the arresting officers came on to me and started to

22   push me and squeeze me to the wall and they started to search my

23   legs and stuff like that to see if I had anything on me.

24     Q      Did they say anything at that time?

25     A      One of the guys say:  Cuff him and take him to the box.

                                                              gjn

1    Q    What happened then?

2    A    After they -- when they finished searching me and

3  squeezing me and stuff, they hold my hand up (indicating) with

4  the handcuff behind my back, had me like tiptoeing around the

5  other side of the building to where the desk was, the long

6  counter.

7    Q    And what happened over there?

8    A    They slammed me onto the counter, pushed me on to the

9  counter, told me not to look around at anybody faces, don't look

10  around at all.

11    Q    When they told you not to look, what exactly did you

12  do?

13    A    I had my hands behind my back and I was like this

14  (indicating), pressing me down.  And the arresting guy was in my

15  pocket, inside my pocket, taking out my stuff.

16          MR. BANDELLI:  Let the record reflect my client

17     demonstrated his hands were behind his back and he was bent

18     down with his face --

19    Q    Was it against the desk; is that what it was?

20    A    Yes.

21    Q    Was somebody holding your face down?

22    A    Not my face, holding my shoulders down, tell me don't

23  turn my head and look at anyone.

24    Q    Okay.  And what happened next?

25    A    After they search, took all my property out from me and

gjn

1    they put it on the desk, then they made a call, and two minutes

2    after, Detective Shulman came downstairs.

3         Q    Now where were you when Detective Shulman came

4    downstairs?

5         A    In the front of the long counter.

6         Q    In the front of the long counter?

7         A    Yeah.

8         Q    Were you in a jail cell at the time?

9         A    No.  I was right on the open door.

10        Q    Were you handcuffed at that time?

11        A    Yes.

12        Q    Were your hands behind your back at that time?

13        A    Yes.

14        Q    What happened when Detective Shulman came down?

15        A    He introduce himself to me.  He said he was Detective

16   Shulman.  He have a few questions to ask and he is going to take

17   me upstairs to his office and talk to me.

18              MR. ROSENBLATT:  I didn't hear, Judge.

19              THE COURT:  Do you want to read that back?

20              MR. ROSENBLATT:  Thank you.

21              (Whereupon, the requested portion of the testimony

22        was read back.)

23              MR. ROSENBLATT:  Thank you.

24        Q    Did you tell Detective Shulman you wanted to talk to

25   him at that time?

```
 1                    MR. ROSENBLATT:  Objection to the leading.

 2                    THE COURT:  Sustained.

 3        Q    Did you say anything to Detective Shulman at that time?

 4        A    I said it's okay.

 5        Q    So he took you upstairs?

 6        A    Yes.

 7        Q    Okay.  How did he do that?

 8        A    Hold me by my arm, start to push me on the steps,

 9   started to push me up, push and stop, push and stop.

10        Q    Okay.  Eventually, you got up the stairs?

11        A    I got upstairs.

12        Q    What happened when you got up there?

13        A    Slammed me onto the wall inside a room.

14        Q    When you say he slammed you on a wall, can you

15   demonstrate exactly what he did?

16        A    When I walked in, he walked into the room, he push me

17   onto the wall, this side of the building (indicating).  This

18   side of the room (indicating,) slam me to the wall and collar me

19   (indicating).

20             He said:  Do you know why you're here?  You know, and

21   he started -- he started to curse at me.

22        Q    And what exactly what did he say?  How did he curse at

23   you?

24        A    He said, you know what you are here for, you fucker.

25   You know what you are here for, you motherfuckers.
```

gjn

1          He slammed me on the other side of the wall.  After

2     this he pushed me on the chair and he told me:  You see, I put

3     away people for twenty years.  I will put you away for a longer

4     time.

5     Q    Did you know what he was talking about at that time?

6     A    I didn't know what he was talking about.

7     Q    Okay.  And where was this happening?

8     A    Upstairs.

9     Q    Upstairs?

10    A    In a room they call "the box."

11    Q    Okay.  And how do you know it's called "the box"?

12    A    They mention it to you -- to me.

13    Q    The other officers?

14    A    They said:  Cuff him and put him in the box.

15    Q    Okay.  And so after, after this happened and he cursed

16    at you and threw you up against the wall and put you in the box,

17    what happened next?

18    A    He took a handcuff off and he left and he went outside

19    and bring a stack of papers, bring some like forms, folder with

20    some papers in it.

21    Q    Okay.  And what happened when he came with the forms

22    and the paper?

23    A    He asked me:  Do you know why you are here.

24         All I know, I am here to make a report of my daughter

25    was missing.  And he said:  Do you know why you're really here?

                                                              gjn

1   Do you know why you're under arrest?  I said I don't know, I

2   came to make a report, my daughter was missing.

3        Q    What happened after that?

4        A    He started telling me my daughter make some accusations

5   against me.  She and her friend came and they make some

6   accusation against me.

7             And I say:  What is it?  It is, he say he can't tell

8   me, so he said:  You need to tell me anything, I said I don't

9   have anything to tell.  I came to make a report.

10            Then he decide to curse me again.  He pulled me over

11  the table, it was a short table, and he pull me over the table,

12  say he going to talk to me, you have to talk to me, and he was

13  cursing, using the F word and, you know, then --

14       Q    But were you afraid of Detective Shulman?

15       A    Yes, I got afraid at that time.

16       Q    Okay.  How tall are you?

17       A    About five-four, five-five.

18       Q    And how much do you weigh?

19       A    Now I weigh 150.

20       Q    How much did you weigh about that time?

21       A    Probably about 145.

22       Q    So what happened after that, after what you described?

23       A    Then he started to go through his notes, started to go

24  through some notes.  Then he told me:  Your daughter make some

25  accusation against you that you were sexually abusing her.  I

gjn

1    said not true.

2         I say, you know, no more, since I don't want to talk to

3    you no more.  I need make a phone call to my wife, let her know

4    what's happened to me.

5    Q    You said you wanted to make a phone call to my --

6              THE COURT REPORTER:  Counselor, can you please

7         slow down?

8              MR. BANDELLI:  She is trying to take this down, so

9         slowly.

10             THE WITNESS:  Okay, sorry.

11   A    I asked the officers who, they put the handcuff on me

12   also, that I needed to make a phone call because I just got home

13   and I left to make a report.  My wife will want to know where I

14   am.  Want to know what's happened to me.

15        They said no fucking phone call for you.  And I told

16   Detective Shulman the same thing, and he said you not going to

17   make a phone call.

18        I need my wife to call a lawyer if you arresting me.

19   He said you get no lawyer here.

20   Q    What happened next?

21   A    After that, he threatened me again.  He said, listen, I

22   am going to put you away for a long time if you don't talk to

23   me.

24        So he went outside and, for a few minutes, again, he

25   came back in with a notepad and a piece of paper.

                                                          gjn

1      Q     Okay.  And what happened after that?

2      A     Then he asked me, he say:  You going to want to give me

3    a statement.  I said, well, why should I gave you a statement.

4    He said because I want you to give a testimonial what the

5    accusation was about.  I say I can't do that, I need a lawyer.

6    I need a lawyer here with me and I need to make a phone call to

7    my wife.

8          He said, again, no, he not going to give me no phone

9    call.  I getting tired of him, getting depressed because I

10   didn't eat anything from Sunday night.  I was hungry and I was

11   tired.

12     Q     Okay.  So what happened after this part of the

13   conversation that you had with Detective Shulman?

14     A     He pull a paper from his folder.  He said it was the

15   Miranda warning or something like that.  He told me, and it had

16   yes on it already.  And he started to read from it saying what

17   this is.  I say, well, it say Miranda warning on it.

18          So he decide to question -- read all the questions for

19   me and he tell me, want me to initial the side of it.  I said,

20   well, why?  He said, well, you giving up your rights from the

21   Miranda warnings.

22     Q     Did you initial it?

23     A     I had to initial it because I was scared of him.

24     Q     What happened next?

25     A     After I did that, he went outside and he took the paper

1     with him, that one piece of paper and his folder with him

2     outside.

3          Q     Okay.  Did he come back?

4          A     He came back awhile after, yes.

5          Q     What happened then?

6          A     When he came back, he bring two other forms and he told

7     me, he started talking about what Sana said and he questioned me

8     about vibrators.  I said I have no vibrators, no.

9                In my truck, I have a massager that I use, so --

10         Q     When you say you have had a massager?

11         A     It's a massager.  I massage my neck because I was in a

12    previous accident.

13         Q     And after you told him about the massager, what

14    happened?

15         A     He asked me --

16               THE COURT REPORTER:  Sir, would you please slow

17         down?  I need to take down everything you're saying.

18               MR. BANDELLI:  Slow down.

19         A     He asked me what, I said, well, yes, I have massagers

20    in the house too.

21               And he told me he want to see if I will give him a

22    authorization to search the house, so I say I'm not going to

23    give you no authorization to search the house.

24               And he asked me if I want, if I will give him the key

25    to my vehicle also.  I said they have my keys downstairs, but I

HAROLD GOPAUL - Defense - Direct          822

1    am not going to allow you to search the vehicle either.

2         Q    Slow down a second.

3              When you said they had your keys were downstairs,

4    how --

5         A    Took it out of my pockets.

6         Q    Who did?

7         A    The officers.  I don't know which one of them, there

8    were so many.

9         Q    How many?

10        A    Approximately eight or nine.

11        Q    So now going back to the conversation with Detective

12   Shulman.

13             You told him that the keys were downstairs, they took

14   them from you, right?

15        A    Yes.

16        Q    Okay.  What happened after that?

17        A    He told me he want me to sign the papers to search the

18   vehicle.  I said I am not going to sign no paper.  I need a

19   lawyer, I need a phone call.  I need to let my wife know what's

20   happening to me so she can call me a lawyer.

21             He said you not going to get no lawyers.  He mention

22   that to me again, so he pulled me over the table again, said if

23   you don't sign the paper, you going be to be in big trouble.  He

24   threaten me again.

25             Because I don't want him to slam me on the wall or hit

1    me, I said okay, I sign the paper to search the vehicle if you

2    want, and I did sign it.

3         Q    You did sign the paper?

4         A    Yes.

5         Q    But that was at out of fear?

6         A    Yes.

7         Q    From Detective Shulman?

8              MR. ROSENBLATT:  Objection as to the leading.

9              THE COURT:  Sustained.

10        Q    After you signed the papers, what happened next?

11        A    He asked me to sign another paper to search my house.

12        Q    And what happened?

13        A    I signed it, signed the paper.

14        Q    Okay.  And what happened after that?

15        A    He went outside.  Every time he go outside, he come out

16   with -- he take some papers back, bring some others.  I don't

17   know what he is bringing out.

18             Then he bring with a pen with the same notepad he had

19   in his hand.  He tell me he want me to write a confession

20   about --

21        Q    Go ahead?

22        A    -- things that Sana said I did to her.  So I said what

23   did she said I did to her?  I didn't know what I did to Sana.

24   I, out of fear, so he asked what happened at the fair, I told

25   him exactly what happened at the fair.

1      Q    Just stop for one second.

2           I will direct your attention to June 21st.

3           Were you at a fair with your family that day?

4      A    Yes.

5      Q    Okay.  And that was the St. Gregory fair?

6      A    St. Gregory.

7      Q    Your whole family was there that day?

8      A    Yes.

9           MR. ROSENBLATT:  Objection.

10           THE COURT:  Sustained.

11      Q    Was your whole family there that day?

12      A    Yes.

13      Q    Was anybody in the family suffering from any health

14   issues?

15           MR. ROSENBLATT:  Objection to the leading.

16      A    Yes.

17           THE COURT:  Mr. Bandelli, ask proper questions.

18      Q    Who had a health issue?

19      A    My wife.

20      Q    What was wrong with her?

21      A    She had a root canal done a few years ago, and at that

22   time it was like a week or two before the fair, it was giving

23   her some problem, and at that point in time it was giving her

24   more and more problems.  She had a lot of pain and it was

25   swelling, it was swollen, so she, at that day we went to the

1    fair, it was getting kind of late and she had a lot of pain with

2    it and she couldn't talk to me.  She started to cry and she

3    wanted to come home.

4         Q    Let's go back to June 23rd.

5              Is that what you were telling Detective Shulman about?

6         A    Yes.

7         Q    Okay.  And happened as you were telling Detective

8    Shulman about that?

9         A    He asked me if I want to write it on a piece of paper,

10   on a notepad for me.  I said yes, I can put that on a notepad.

11   I did that.

12             MR. BANDELLI:  I don't know which exhibit it was,

13        but it was one of the first exhibits by the People, the

14        statements.  I don't know if you have it, Officer.

15             THE OFFICER:  (Handing.)

16        Q    Do you recognize that?

17        A    Yes.

18        Q    Okay.  Is that in your handwriting?

19        A    Yes.

20        Q    And is that the statement you gave to Detective Shulman

21   about the fair?

22        A    Yes.

23        Q    And did you mention anything about sexually abusing

24   Sana in that statement?

25        A    No, no.

                                                      gjn

```
 1              MR. BANDELLI:  You can hand it back to the

 2      officer.

 3              THE WITNESS:  Thank you.

 4      Q    After you had given Detective Shulman that written

 5      statement, did you think it was over, that this was done?

 6      A    Yes.

 7              MR. ROSENBLATT:  Objection to the leading.

 8              THE COURT:  Sustained.

 9              Please.

10      Q    What happened next?

11              THE COURT:  That's stricken from the record.

12      A    After that, he took the sheet, this notepad with the

13      statement and he went outside and take another ten, fifteen

14      minutes, and he came back inside.

15      Q    What happened when he came inside this time?

16      A    Came back with a notepad and he asked me, tell me he

17      want to take a statement about things that I said Sana, did to

18      her.

19              I said I not going to do that.  I can't do that.  That

20      never happened.  The only thing that happened was at the fair.

21      Q    Okay.

22      A    So then he is calling me again, pulling me by my

23      shoulder again.  You are going to do it, otherwise you going to

24      get a beat up.

25              I said, do you know what?  I better do it if he beat me
```

1    up.

2         I sign a paper, this thing he was reading from the

3    paper, from the accusations.  He told me a few of them, told me

4    to write up at the bottom of it, state that I need help, I am

5    sick and I need help.

6         Take it to his supervisor downstairs and the supervisor

7    going to read it and he is going to release me, because I was

8    tired and hungry and I need to go home.

9    Q    Detective Shulman told you what to write on that second

10   statement; is that your testimony?

11   A    Yes.

12         MR. BANDELLI:  Do you have that one?

13         THE OFFICER:  (Handing.)

14         MR. BANDELLI:  Could you show it to the witness?

15         THE OFFICER:  (Complying.)

16   Q    Harold, do you recognize that?

17   A    Yes.

18   Q    And is that the statement you were just referring to?

19   A    Yes.

20   Q    Are you sure?

21   A    Yes.  I don't have my glass with me.

22   Q    Well, just look closely and make sure.

23   A    I have to go far (indicating).

24         Yeah, this is it.

25   Q    Okay.  And those were his words that were written on

                                                        gjn

1    that statement; is that correct?

2              MR. ROSENBLATT:  Objection to the leading.

3     Q     Well, whose words are they?

4     A     Yes, they were his.

5              MR. BANDELLI:  You can hand it back to the

6    officer.

7              THE WITNESS:  (Handing.)

8     Q     Do you have any idea about how long you were in the box

9    at that point when you had finished writing that second

10   statement?

11    A     Yes.

12    Q     About how long?

13    A     I was there -- I didn't check the time, but the time, I

14   was there from, I think was around 2:40 or -- until late Tuesday

15   night.  2:40 on Tuesday morning until late Tuesday night.  I

16   didn't have a watch to tell exactly the time.

17    Q     You weren't able to tell the time?

18    A     No, not the exact time.

19    Q     Okay.  So you had no idea of how long --

20             MR. ROSENBLATT:  Objection to the leading.

21             THE COURT:  Mr. Bandelli, please do not lead the

22   witness.

23    Q     Was there any way for you to determine how long you had

24   been in there at that point in time?

25    A     No.

gjn

1      Q     Okay.  So any times that were written on those

2      paperwork, they didn't come from you, did they?

3                  MR. ROSENBLATT:  Objection to the leading.

4                  THE COURT:  Mr. Bandelli.  Mr. Bandelli, please.

5            You cannot lead the witness.

6                  MR. BANDELLI:  Okay.  I'm not.  I understand,

7            Judge.

8                  THE COURT:  Thank you.

9      Q     Where did the times come from that were placed on the

10     statements?

11     A     Detective Shulman.

12     Q     You didn't actually know what time it was, did you?

13     A     No.

14                 MR. ROSENBLATT:  Objection to the leading.

15                 THE COURT:  Sustained.

16     Q     Did you know what time it was?

17     A     Not the exact time, no.  Only what he told me.

18     Q     So what happened after he took the second statement

19     from you?

20     A     He went outside again and he came back.  He spent a

21     longer time, stayed a long time outside.  Took a break or

22     something.  Told me he was on a break when he came back in.

23           Then he asked to sign another paper with a picture

24     drawing.

25     Q     Okay.  And what happened?

1      A      And I signed it.

2      Q      Did he say anything other than to sign that?

3      A      No.  He wrote on it, he wrote some -- I don't remember

4    what exactly what he wrote, but he wrote about some vibrator and

5    he asked me to sign it.

6      Q      Okay.  Did you sign it?

7      A      Yes, I did.

8      Q      What happened after that?

9      A      He left.  He left the room.

10     Q      Did he come back, ever?

11     A      He came back awhile after again, and he told me I'll

12   need you to do one more thing before you go home.

13     Q      What was that?

14     A      I said what it is.  He said I need to you to make -- I

15   spoke to the district attorney and he want -- they coming to

16   make a statement, and after that, they will decide if I will go

17   home or not with the supervisor.

18            So I said okay, on my way home.  I decide to go, I said

19   okay.

20     Q      So do you know about how long you had been in the box

21   at that time that Detective Shulman came in and told you that?

22     A      I know it was a long time, but I don't know what time

23   it was.

24     Q      Had you had any food during that time?

25     A      I had no food from Sunday night.

1     Q     Okay.  Had you had anything to drink?

2     A     No.

3     Q     Okay.  Were you in the same clothes in fact that you

4    were wearing when you first came to the precinct?

5     A     Yes.

6     Q     Did they permit you to call your wife at any time

7    during that?

8     A     No.

9     Q     Did they permit you to call a lawyer at any time during

10   that?

11    A     No.

12    Q     What did Detective Shulman tell you would happen if you

13   did not talk to the district attorney's office?

14              MR. ROSENBLATT:  Objection to the leading.

15              THE COURT:  Sustained.

16              Do not lead your client.

17    Q     What, if any conversation did you have with Detective

18   Shulman about the statement that was to be given to the DA?

19    A     He told me if I do the statement, I'll be going home.

20    Q     So you were led to believe that if you said certain

21   things, that you would be permitted to leave?

22              MR. ROSENBLATT:  Objection.

23              THE COURT:  Sustained.

24    A     A few times --

25              THE COURT:  Sustained, sustained, sustained.

1              MR. ROSENBLATT:  I ask it be stricken, Judge.

2              THE COURT:  Stricken from the record.

3      Q    What did you believe based on the conversation you had

4    with Detective Shulman --

5              MR. ROSENBLATT:  Objection.  Asked and answered.

6              MR. BANDELLI:  Well, actually it was stricken.

7        Sustained, stricken, sustained, so I apologize.

8              THE COURT:  Overruled.

9              Answer the question.

10             MR. BANDELLI:  You can answer the question.

11     A    Can you repeat the question?

12     Q    What did you believe would happen, based on the

13   statement with the district attorney's office, based on the

14   conversation with Detective Shulman?

15             MR. ROSENBLATT:  Objection.

16             THE COURT:  Overruled.

17             MR. ROSENBLATT:  Personal beliefs, Judge.

18     Q    What were you led to believe?

19             MR. ROSENBLATT:  Same objection.

20             THE COURT:  Sustained.

21     A    I was --

22     Q    What did you believe?

23             MR. ROSENBLATT:  Objection.

24     A    I believe I was going home.

25             THE COURT:  Sustained.  Answer stricken.

1    Q    At some point, the district attorney's office showed

2    up?

3    A    Yes.

4    Q    Would this (indicating) have been one of the Assistant

5    DA's that showed up?

6    A    Yes.

7    Q    And there was another assistant DA?

8    A    Yes.

9    Q    Did Detective Shulman tell you how this was going to

10   play out with the DAs?

11   A    Yes.

12             MR. ROSENBLATT:  Objection to the leading.

13             THE COURT:  Sustained.  Answer is stricken.

14   Q    What, if anything --

15             THE COURT:  Mr. Bandelli, when there is an

16   objection, please.

17             MR. BANDELLI:  Yes, sir.

18             THE COURT:  Don't start asking another question

19   until the Court rules.

20             MR. BANDELLI:  Yes, sir.

21             THE COURT:  Please stop leading your client.

22   Q    What, if anything did Detective Shulman say with regard

23   to the interview with the DAs?

24   A    Told me if I do the interview, told me to sit on the

25   chair, told me to look at the camera, told me to look, he will

1    be right there on the side of me, he is going to sit on the side

2    with me, everything will be okay.  We are going to do this and I

3    am going to be going home.

4        Q    What, if anything did Detective Shulman tell you about

5    what you needed to say on the videotape?

6        A    Told me to just answer the question that they ask me

7    and the same question he ask me is what they going to ask me.

8        Q    Go ahead, sorry.

9        A    And I said all right.  If I'm going home, you know, I'm

10   going to do it.

11            Then I ask him should I, at that time, again I ask him,

12   I say do you think I should have a lawyer when I going to do

13   this.  He say if you get a lawyer, no, you will have to start

14   all over again, so just do this and you'll be going home.  This

15   is your way home.

16       Q    When you gave that videotaped statement, were you

17   telling the truth?

18       A    Yes.

19            MR. ROSENBLATT:  Objection to the leading.

20            THE COURT:  Overruled.  He said yes.

21       Q    When you gave the videotaped statement, you were

22   telling the truth?

23       A    I tell the truth of what Shulman told me to say about

24   what I was going home.

25       Q    So with regards to what you were saying --

1              MR. BANDELLI:  Withdrawn.

2        Q    About how long did that process take place?

3        A    About, approximately twenty minutes.

4        Q    Okay.  And what happened?

5        A    I'm not too sure.

6        Q    What happened afterwards?

7        A    What happened during?

8        Q    No, what happened afterwards?  After they completed the

9   video, what happened?

10       A    Detective Shulman took me back to the room and he

11  slammed the door and he left.

12       Q    And that was the last time you saw Detective Shulman?

13       A    That was the last time I saw him.

14       Q    You never got your phone call?

15       A    Never got the phone call.

16              MR. ROSENBLATT:  Objection to the leading.

17              THE COURT:  Sustained.

18              Answer is stricken.

19       Q    At some point you learned that a series of sexual abuse

20  charges were being brought against you; is that correct?

21       A    Yes.

22       Q    Okay.  And with regard to the sexual abuse charges that

23  were brought against you in this indictment, are any of them

24  true?

25       A    No.

1    Q    Any single one of them true?

2    A    No.

3    Q    That pertain to this indictment?

4    A    No.

5    Q    Do you love your daughter, Sana Awan?

6    A    I love her as my own child.

7              MR. BANDELLI:  I have no further questions.

8              THE COURT:  You going to be long, Mr. DA?

9              MR. ROSENBLATT:  Certainly going to be longer than

10   the next five minutes, Judge.

11             THE COURT:  All right.  I am going to recess for

12   the evening, ladies and gentlemen.

13             Remember, you are not to discuss this case among

14   yourselves or with anyone else.  If anyone tries to discuss

15   it with you, you are to bring it to my attention.  You are

16   not to form any opinion as to whether or not you feel the

17   defendant is guilty or not guilty of the crimes with which

18   he is charged.

19             Get home safely.  Come back tomorrow morning at

20   9:30 and we will start with the cross-examination.

21             Please follow the instruction of the court

22   officer.

23             (Whereupon, the jury exited the courtroom and the

24   following occurred:)

25             (Whereupon, the witness left the witness stand.)

1                    THE COURT:  9:30 tomorrow.  Be prepared to sum up

2        tomorrow.

3                    MR. BANDELLI:  Great.

4                    MR. ROSENBLATT:  Have a good evening, your Honor.

5                    THE COURT:  Good evening.

6

7                    (The trial was adjourned to July 16, 2010,

8        9:30 A.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF QUEENS:  CRIMINAL TERM, PART TAP-D
2    ---------------------------------------X

3    THE PEOPLE OF THE STATE OF NEW YORK,
                                          Ind. No.
4              -against-                  2065-08
                                          **TRIAL**
5    HAROLD GOPAUL,

6                        Defendant.
     ---------------------------------------X
7

8                              July 16, 2010
                               125-01 Queens Boulvevard
9                              Kew Gardens, New York 11415

10

11   B E F O R E :

12        THE HONORABLE GREGORY L. LASAK,

13                              Justice, Supreme Court

14   A P P E A R A N C E S :  (Same as previously noted.)

15

16

17

18

19

20                              **Gail J. Neufeld, RPR**
                                Official Court Reporter
21

22

23             THE CLERK:  Case on trial, People versus Harold

24      Gopaul.

25             Let the record reflect the defendant is before the

                                          gjn

1          Court.

2                    Counselors, your appearance, please.

3                    MR. BANDELLI:  Sanford Bandelli on behalf of the

4          defendant.

5                    Good morning, Judge Lasak.

6                    THE COURT:  Good morning.

7                    MR. ROSENBLATT:  For the People, Assistant

8          District Attorney Jared Rosenblatt.

9                    Good morning, your Honor.

10                   THE COURT:  Good morning.

11                   Bring in the jurors, please.

12                   (Whereupon, the jury entered the courtroom and

13         upon taking their respective seats, the following occurred:)

14                   THE CLERK:  Case on trial.  All parties present,

15         your Honor.

16                   Both sides stipulate that all jurors are present

17         and properly seated?

18                   MR. ROSENBLATT:  Yes.

19                   MR. BANDELLI:  So stipulated.

20                   THE COURT:  All right.  Good morning, ladies and

21         gentlemen.

22                   THE JURY:  Good morning.

23                   (Whereupon, the witness entered the witness

24         stand.)

25                   THE CLERK:  Have a seat, sir.

                                                          gjn

1              You are reminded you are still under oath.

2              MR. ROSENBLATT:  May I inquire, your Honor?

3              THE COURT:  Yes, you may.

4              MR. ROSENBLATT:  Thank you.

5    CROSS-EXAMINATION

6    BY MR. ROSENBLATT:

7         Q    Mr. Gopaul, I want to talk about something you omitted

8    on your direct examination.

9              MR. BANDELLI:  Objection to the --

10             THE COURT:  Sustained.

11        Q    In May of 2009, you were in a courtroom similar to

12   this, correct?

13        A    Yes.

14        Q    Yes or no?

15        A    Yes.

16        Q    And in that courtroom, there was a judge a different

17   judge?

18             MR. BANDELLI:  Objection, your Honor.

19             THE COURT:  Approach the bench, please.

20             (Whereupon, a conference was held between all

21        counsel and the Court on the record at the side-bar.)

22             THE COURT:  What are you doing?

23             MR. ROSENBLATT:  I am permitted to ask him.

24             THE COURT:  I asked you what you're doing.

25             Don't tell me what you're permitted to do.

                                                        gjn

1          MR. ROSENBLATT:  I am leading to the fact of your

2     Honor's ruling that he was convicted of numerous offenses,

3     calling his attention to what I'm talking about.

4          THE COURT:  All right.

5          MR. BANDELLI:  Judge, I object as he is in the

6     Sandoval, he is permitted to ask whether or not he has been

7     convicted of numerous offenses.  He is not allowed to take

8     him through what happened in the courtroom, the fact that

9     there was a judge present, and then he is going to ask if

10    there was a jury present.  This is prejudicial.  It's

11    actually prosecutorial misconduct.

12         MR. ROSENBLATT:  I haven't said anything.

13         MR. BANDELLI:  He already crossed the line.

14    Object to this.

15         THE COURT:  Thanks for your ruling.

16         What did you intend to do after you set the

17    courtroom setting?

18         MR. ROSENBLATT:  There was a judge, there was a

19    district attorney, he had a lawyer and he was convicted of

20    numerous offenses, numerous offenses.

21         MR. BANDELLI:  That was the ruling, that he could

22    ask him if he was convicted of numerous offenses.

23         MR. ROSENBLATT:  Judge.

24         MR. BANDELLI:  It has to do with his credibility,

25    Judge, propensity to commit crimes, if you are convicted of

                                                        gjn

1     something.

2                    THE COURT:  All right, sustained.

3                    MR. BANDELLI:  Thank you.

4                    MR. ROSENBLATT:  Judge --

5                    THE COURT:  You can ask him if he has been

6     convicted on such and such a date and such and such a

7     county.

8                    MR. ROSENBLATT:  Okay.

9                    THE COURT:  You don't have to.

10                    MR. ROSENBLATT:  I wanted to lead it in so he knew

11    where I was going.

12                    MR. BANDELLI:  He knew which way you were going.

13                    MR. ROSENBLATT:  Okay.

14                    (Whereupon, all parties returned from the sidebar

15    and the following took place:)

16    Q     In May of 2009, you were convicted of crimes in Nassau

17    County, correct?

18    A     Yes.

19    Q     And that was a felony, correct?

20    A     Yes.

21    Q     And it wasn't one felony, correct?

22    A     No.

23    Q     It was numerous offenses, correct?

24    A     I wouldn't say numerous, it was offense, it wasn't

25    numerous offense.

                                                           gjn

HAROLD GOPAUL - Defense - Cross                    843

1              MR. ROSENBLATT:  Judge, may I inquire further?

2              THE COURT:  Proceed.

3      Q    Mr. Gopaul, it was in fact more than five offenses,

4    wasn't it?

5      A    Yes.

6      Q    It was more than six offenses?

7              THE COURT:  All right.

8              MR. BANDELLI:  Objection, your Honor.

9              THE COURT:  All right.

10     Q    You were convicted of numerous offenses, correct?

11             MR. BANDELLI:  Objection, asked and answered.

12             THE COURT:  Overruled.

13     A    Yes.

14     Q    Now, and that was may 15th of 2009, correct?

15     A    Yes.

16             MR. BANDELLI:  Objection, asked and answered,

17     Judge.

18             THE COURT:  Overruled.

19     Q    Now let's talk about your relationship with your now

20    wife.

21          You began dating her when Sana was three or four,

22    correct?

23     A    Yes.

24     Q    And shortly after dating her, you moved into a home

25    together, correct?

HAROLD GOPAUL - Defense - Cross                    844

1        A     Yes.

2        Q     And that's a home here in Queens?

3        A     Yes.

4        Q     In Bellrose?

5        A     Yes.

6        Q     And you would agree with me, sir, your date of birth is

7     February 28, 1958, correct?

8        A     Yes.

9        Q     That's the date of birth that you provided to the

10    police, correct?

11       A     Yes.

12       Q     And some time when Sana was three or four years old,

13    that's when your marital relationship began with Jenny Gopaul,

14    correct?

15       A     Yes.

16       Q     And when Sana was an early age, you established your

17    role as a father figure, correct?

18                   MR. BANDELLI:  Objection, your Honor.

19                   What's the relevance?

20                   THE COURT:  Overruled.

21       A     Yes.

22       Q     In fact, you were the closest thing to a father that

23    she had?

24       A     Yes.

25       Q     And you would agree with me, sir, that in your house in

1    Bellrose, there was one bathroom that the family used, correct?

2         A    Yes.

3         Q    And that was the bathroom upstairs?

4         A    Yes.

5         Q    And there was -- that was the shower that everyone

6    used, correct?

7         A    Yes.

8         Q    In fact everyone shared that bathroom, correct?

9         A    Yes.

10        Q    If somebody was in the shower, somebody else could

11   brush their teeth, correct?

12        A    Yes.

13        Q    And if somebody was in the shower, somebody can use the

14   toilet bowl, correct?

15        A    Yes.

16        Q    And at some point, Sana --

17             MR. ROSENBLATT:  Withdrawn.

18        Q    At some point, you and your wife had two children,

19   Kaitlynn and Darrien, correct?

20        A    Yes.

21        Q    And those were Sana's bother and Sana's sister,

22   correct?

23        A    Yes.

24        Q    And Sana loved her brother Darrien, correct?

25        A    Yes.

1      Q    And loved her sister Kaitlynn, right?

2      A    Yes.

3      Q    Loved spending time with Kaitlynn?

4      A    Yes.

5      Q    And she loved spending time with Darrien?

6      A    Yes.

7      Q    And you would agree with me, sir, that the kids got

8  along, correct?

9      A    Yes.

10      Q    And over the time that Kaitlynn and Darrien grew up,

11  Sana expressed her love to her brother and sister, correct?

12      A    Yes.

13                MR. BANDELLI:  Objection to what Sana expressed.

14                THE COURT:  Overruled.

15      Q    And sir, you would agree with me that prior to June 6,

16  2008, Sana was a good student, correct?

17      A    Yes.

18      Q    In fact, she did very well in school --

19      A    Yes.

20      Q    -- correct?

21           She was a member of different clubs in school, correct?

22      A    Yes.

23      Q    She volunteered her time at the school?

24      A    Yes.

25      Q    She volunteered to help teachers, correct?

gjn

1    A    Yes.

2    Q    She never cut school, correct?

3    A    She cut classes.

4    Q    She did?

5    A    Yes.

6    Q    And she didn't go out at night, correct?

7    A    No.

8    Q    She didn't stay out late, correct?

9    A    No.

10   Q    She didn't stay out late on weekends, correct?

11   A    No.

12   Q    And as far as you know, she didn't drink alcohol,

13   correct?

14   A    Not that I know of.

15   Q    You had rules in your house in regards to curfew,

16   correct?

17   A    Yes.

18   Q    And she followed those rules, correct?

19   A    Yes.

20   Q    And you would agree with me, sir, that if at some point

21   punishment needed to be tolled out in the house, you were

22   responsible for that, correct?

23   A    Both me and my wife.

24   Q    Jenny Gopaul, your wife, she punished Sana if

25   necessary, correct?

gjn

1     A     If necessary.

2     Q     And the punishment we are talking about is taking away

3  the TV, right --

4     A     Yes.

5     Q     -- correct?  Or --

6                MR. BANDELLI:  Objection, your Honor.

7                This is -- I didn't bring up anything about

8        punishment of this client up to this point, Judge, so it's

9        beyond the scope of my direct and impermissive cross.

10               THE COURT:  Overruled.

11    Q     If Sana would need to be punished, you would make her

12  stay in her room, correct?

13    A     Yes.

14    Q     There was nothing extreme about the punishment, fair to

15  say?

16    A     Fair to say.

17    Q     Never used any weapons on her, right?

18    A     No.

19    Q     And neither did your wife, correct?

20    A     No.

21    Q     Nobody tortured her, correct?

22    A     No.

23    Q     And at times, if your wife needed to punish her, she

24  did that as well, correct?

25    A     Yes.

HAROLD GOPAUL - Defense - Cross                849

1    Q    And that was the same thing you did, go to your room?

2              MR. BANDELLI:  Objection, your Honor, asked and

3         answered.

4              THE COURT:  Overruled.

5    A    Yes.

6    Q    Or you can't watch television, correct?

7    A    Yes.

8    Q    Those are the types of punishment that we are talking

9    about, correct?

10   A    Yes.

11   Q    But it was are that Sana needed to be punished because

12   she was well-behaved, correct?

13   A    No all kid behave well all the times.

14   Q    I am not asking you that, sir.

15        I am saying she didn't need to be punished often

16   because she was well-behaved, correct --

17   A    No.

18   Q    -- in the house?

19             MR. ROSENBLATT:  Well, withdrawn.

20   Q    Prior to June 24, 2008, you worked, correct?

21   A    Yes.

22   Q    And your wife wasn't working, correct?

23   A    No.

24   Q    You were the sole bread winner of the family, correct?

25   A    Yes.

```
 1        Q    In fact, at some point, your wife and you purchased a
 2   home, correct?
 3        A    Yes.
 4        Q    And that was based upon your work that you had done,
 5   you had earned enough money to purchase a home, correct?
 6        A    Yes.
 7        Q    And you would agree with me, sir, that you would
 8   consider yourself an intelligent man; fair to say?
 9        A    Yes.
10                  MR. BANDELLI:  Objection, your Honor.
11                  THE COURT:  Overruled.
12        Q    And you would agree with me that in fact you are
13   above -- you have an above average intelligence?
14                  MR. BANDELLI:  What's the relevance of this?
15                  THE COURT:  Overruled.
16        A    I wouldn't say above, but --
17        Q    Okay.  You've worked for years, correct?
18        A    Yes.
19        Q    Started your own business, correct?
20        A    Yes.
21        Q    You have a license for your job, correct?
22        A    Yes.
23        Q    Did that require you taking a test?
24        A    Yes.
25        Q    And you passed the test, correct?
```

1       A     Yes.

2       Q     And in the house, you managed bills, correct, back

3   before June of '08?

4       A     Repeat again?

5       Q     You paid a mortgage?

6       A     I paid a mortgage.

7       Q     And you were able to maintain the money coming into the

8   house and the money going out, correct?

9       A     Well, I was the one bringing it in.  My wife is the one

10  who really controlled it in the house.

11      Q     Okay.  When the kids needed help with their schoolwork,

12  you would help them, correct?

13      A     Sometimes, yes.

14      Q     You would try to help them if they needed assistance

15  with their schoolwork?

16      A     Yes.

17      Q     And in fact, if there were questions that you knew the

18  answers, you would try to suggest the answers to those

19  questions, correct?

20      A     Yes.

21      Q     You did that with Sana, correct?

22      A     Yes.

23      Q     And you did that with Kaitlynn and Darrien, correct?

24      A     Yes.

25      Q     You would agree with me that there were rules in the

                                                              gjn

HAROLD GOPAUL - Defense - Cross          852

1    house that you set, correct?

2         A    Yes.

3         Q    And the children were required to follow those rules,

4    correct?

5         A    Yes.

6         Q    And at times, like all kids, they didn't want to follow

7    the rules, correct?

8         A    Yes.

9         Q    And you had to stand up for the rules that you believed

10   in, correct?

11                    MR. BANDELLI:  Objection.

12                    What is the relevance here?

13                    THE COURT:  Overruled.

14        A    Yes.

15        Q    At times you had to make decisions that wasn't popular

16   with Darrien and, Kaitlynn correct?

17        A    Yes.

18        Q    As well as with Sana, correct?

19        A    Yes.

20        Q    And at times, you would agree with me, sir, that your

21   wife and you had disagreements as to the rules in the house,

22   correct?

23        A    Yes.

24        Q    But you stood for what you believed in, correct?

25                    MR. BANDELLI:  Objection.

1              What is the relevance of him standing for what he

2        believes in?

3              THE COURT:  Overruled.

4        A    Yes.

5        Q    Now sometime in May of 2008, you learned that Sana had

6    a friend who was a boy, correct?

7        A    Well, yes.

8        Q    Well, was there anything incorrect in what I said?

9              Around May of 2008, you learned that Sana had a friend

10   who was a boy?

11       A    Yes.

12       Q    And she had a crush on the boy, correct?

13       A    I don't know what crush, but I know she had a friend

14   who is a boy.

15       Q    And you would agree with me at no time in 2008 did she

16   get in trouble with that friend, correct?

17       A    I don't understand the question.

18       Q    Well, at any point in time in May of 2008, was she in

19   trouble with the boy; meaning did she ever get in trouble in

20   school?

21       A    Not that I know of, no.

22       Q    Okay.  And certainly, if she was in trouble, you would

23   have been made aware, correct?

24       A    Maybe.

25       Q    In fact, in May of 2008, her grades remained the same,

1    A's, correct?

2        A    Yes.

3        Q    And that continued into June of 2008 while she still

4    was friends with this boy, correct?

5        A    Yes.

6        Q    She continued to do her schoolwork at home, correct?

7        A    Yes.

8        Q    She continued to follow your rules with curfews,

9    correct?

10       A    Yes.

11       Q    She continued to follow your rules and didn't drink

12   alcohol, correct?

13       A    As far as I know, yes.

14       Q    And this is a boy who was around the same age as Sana,

15   correct?

16       A    He was older.

17       Q    They were in high school together, correct?

18       A    I don't know.  I don't know if he was going to the same

19   school, but I know he was older than her.

20       Q    But you know they were in the same math class?

21       A    They were doing afterschool program, afterschool

22   program.

23       Q    High school afterschool program?

24       A    Yes.

25       Q    He wasn't 40 years old?

1      A    No.

2      Q    He wasn't 30 years old?

3      A    No.

4      Q    He was 18 or 17?

5      A    He was 19, 19 -- 19 at the time.

6      Q    Fair to say he wasn't a grown man?

7               MR. BANDELLI:  Objection.

8      A    Yes.

9               MR. BANDELLI:  Your Honor.

10              THE COURT:  Overruled.

11              MR. BANDELLI:  What's a grown man?

12              THE COURT:  Mr. Bandelli, if you have an

13     objection, you stand up.

14              MR. BANDELLI:  Objection, your Honor.

15              THE COURT:  Overruled.

16     Q    And at some point --

17              MR. ROSENBLATT:  Well, withdrawn.

18     Q    You do not find anything strange about the fact that

19     your 17 year old daughter liked a boy, did you?

20              MR. BANDELLI:  Objection to the use of the

21     language "strange," your Honor.

22              THE COURT:  Overruled.

23     A    Well, we disagreed.

24     Q    Right.  But you wouldn't find it unusual that a

25     teen-ager liked a boy?

1          MR. BANDELLI:  Objection as to whether or not my

2     client would find it unusual, Judge.

3          THE COURT:  Sustained.

4     Q    Were you surprised that she liked a boy?

5          MR. BANDELLI:  Objection as to whether or not he

6     was surprised.

7          THE COURT:  Sustained.

8     Q    You didn't like the fact that she liked a boy, correct?

9          MR. BANDELLI:  Objection as to --

10         THE COURT:  Overruled.

11    A    At the age -- at her age, we don't want her to have a

12    boyfriend at the time, so I thought it was wrong.

13    Q    Didn't say anything about a boyfriend, I am just

14    talking about liking a boy.

15    A    Well, liking a boy, yeah.

16    Q    There was nothing bad about that though, right?

17    A    Well, depends on the relationship.

18    Q    Um, prior to June 23, 2008, you knew where the 105

19    police precinct was, correct?

20    A    Yes.

21    Q    And Sana knew where the 105 Queens precinct was,

22    correct?

23         MR. BANDELLI:  Objection as to whether or not Sana

24    knew where it was.

25         THE COURT:  Sustained.

                                                      gjn