1    Q    Are you aware if Sana knew?

2              MR. BANDELLI:  Objection as to what Sana knew.

3              THE COURT:  Overruled.

4    A    Yes, I know.

5    Q    And she knew, correct?

6    A    Yes.  She went to the school across the street.

7    Q    Right.  And you would agree with me at some point prior

8    to June 23, 2008, did Sana ever make a complaint against her

9    mother, correct --

10             MR. BANDELLI:  Objection, your Honor.

11   Q    -- to the police?

12             MR. BANDELLI:  Relevance.

13   A    Never.

14             THE COURT:  Overruled.

15   Q    Never, right?

16   A    Never, yeah.

17   Q    Prior to June 23, 2008, as a family, you took

18   vacations, correct?

19   A    Yes.

20   Q    And Sana had been to Florida, correct?

21   A    Yes.

22   Q    You had taken her south on other occasions, correct?

23   A    Yes.

24   Q    And you had taken her as a family to New Jersey,

25   correct?

1      A    Yes.

2      Q    And as a family, Sana had been on vacations, other

3   vacations as well, correct?

4      A    Yes.

5      Q    She had her cell phone paid by you and your wife,

6   correct?

7      A    By me.

8      Q    I'm sorry?

9      A    By me.

10      Q    By you.

11           And you had medical insurance that she was --

12      A    Yes.

13      Q    Then when --

14      A    Yes, through my job.

15      Q    And Sana had lots of clothes in her house, correct?

16      A    Yes.

17      Q    And she had her own bedroom, correct?

18      A    Yes.

19      Q    Now yesterday, your wife testified, correct?

20      A    Yes.

21      Q    And you heard her testimony, correct?

22      A    Yes.

23      Q    And your wife is a witness that you and your lawyer

24   called to testify in your behalf, correct?

25      A    Yes.

gjn

1              MR. BANDELLI:  Objection, your Honor.

2              THE COURT:  He answered it.

3      Q      And you heard when she testified that on June 23, 2008,

4   you left the home between 3:30 and 4:00 in the morning, correct,

5   you heard that testimony, correct?

6      A      Yes.

7      Q      In fact, that was the time that you left your house on

8   June 23rd, between 3:30 and 4:00 in the morning?

9      A      Yes, that's the time.  That's why she said it.

10     Q      No.  That was the time you left the house, correct?

11     A      That's the time she remembered.  I think I left later

12  than that.  I think it was probably 4:30.

13     Q      In the morning?

14     A      Yes, in the A.M.

15             MR. BANDELLI:  Judge, just for clarification.

16             MR. ROSENBLATT:  Objection, Judge.

17             THE COURT:  Is he talking about when he went to

18     work or when he went to the precinct?

19             MR. BANDELLI:  I am just asking for clarification

20     because --

21             THE COURT:  Talking about the precinct, Mr. DA?

22             MR. ROSENBLATT:  That's what he said, Judge.

23     A      Oh, no, I thought you talking about my job.

24     Q      You left for your job at 4:00 in the morning on June

25  23, 2008?

                                                        gjn

1       A     Monday morning, I left for work 4:30, to work.

2       Q     Do you remember we were talking about what your wife

3   testified to yesterday?

4       A     I thought you were talking about the job.

5       Q     Your wife didn't testify about her job.

6       A     She was asked questions about that.

7       Q     She was asked questions about what time you left to go

8   to the 105 precinct.

9       A     I went to the 105 precinct about 2:25.

10      Q     That wasn't my question.

11            You heard your wife testify you left the house to go to

12  the precinct between 3:30 and 4:00 in the morning?

13      A     She didn't say that.

14      Q     She didn't say that?

15      A     No.

16      Q     Okay.  Now as part of your work, sir, you were given an

17  EcoLab truck, correct?

18      A     Yes.

19      Q     And --

20            MR. ROSENBLATT:  Gary, if the witness can be

21      handed People's Exhibit 9 that's in evidence.

22            THE OFFICER:  (Handing.)

23            MR. ROSENBLATT:  Thank you.

24      Q     Take a look at what's in front of you as People's

25  Exhibit 9 that's in evidence.

1                That's your truck, correct?

2       A     That's a company --

3       Q     That's the truck that was given to you?

4       A     Yes.

5       Q     And they gave you that truck, correct?

6       A     Yeah, while I was on the job, yes.

7       Q     And no one else had keys to that truck, correct?

8       A     No.

9       Q     No one else other than you used that vehicle, correct?

10      A     That's right.

11      Q     You never gave the keys of that truck to anybody else,

12   correct?

13      A     Except for the police.  They had to park it.

14      Q     But prior to June 23rd, no one else had keys to that

15   truck, correct?

16      A     No.

17      Q     And you would agree with me prior to June 23rd, you had

18   never seen anyone else drive your truck, correct?

19      A     That's correct.

20      Q     And in your truck was the knife that you saw, correct,

21   that came into evidence?

22      A     Yes.

23      Q     That was in your truck, correct?

24      A     Yes.

25      Q     That was in your truck underneath the center, near the

gjn

1    center console, correct?

2         A    Well, it goes by the radio.

3         Q    That's in the middle, near the center console, correct?

4         A    Yeah, yes.

5         Q    And you saw the vibrator that was received into

6    evidence, correct?

7         A    Yes.

8         Q    That was under your bed?

9         A    Yeah.

10        Q    In your room?

11        A    Yes.

12        Q    Those were both yours, correct?

13        A    Yes.

14        Q    Over --

15             MR. ROSENBLATT:  Withdrawn.

16        Q    During the time Sana was in high school, you would

17   occasionally drive her to school in the morning, correct?

18        A    Yes.

19        Q    And up until -- I'm just talking about the time from

20   '05 up until May of 2008 -- you would occasionally pick her up

21   from school as well, correct?

22        A    Yes.  Sometimes with her friends.

23        Q    Sometimes you would have to drive home Christine

24   Alioto?

25        A    And other friends too.

1      Q    And other friends?

2      A    Yes.

3      Q    You didn't drive Darrien to school, correct?

4      A    Sometimes, if the school bus didn't come for them, my

5   wife call; if I am close in the area, I go and drop them to

6   school sometimes.

7      Q    Sometimes?

8           MR. BANDELLI:  Judge, I am going to object to this

9      line of questions.  On direct, I didn't ask my client any

10     questions.

11          THE COURT:  All right, Mr. Bandelli.

12          MR. BANDELLI:  Okay.  Well, just note that I am

13     objecting on the basis that's beyond the scope of direct and

14     it's improper cross.

15          THE COURT:  Overruled.

16     Q    And you didn't drive Kaitlynn to school, correct?

17     A    Sometimes.

18     Q    But primarily, you drove Sana?

19     A    Yes.

20     Q    And prior to May of 2008 when she was in high school,

21   you would pick her up to two or three times a week, correct?

22     A    Yes.

23     Q    Now there comes a point in May of 2008 when you learn

24   about the boy and you pick her up every day, correct?

25     A    Not every day.

1        Q     Well, isn't it true that you actually had a

2   disagreement with your wife about how often you were going to

3   pick her up?

4                MR. BANDELLI:  Objection, your Honor.

5        A     No.

6                MR. BANDELLI:  Relevance.

7                THE COURT:  Overruled.

8        Q     So how many days a week did you pick her up starting in

9   May of 2008?

10       A     Sometimes it could be four, sometimes three, sometimes

11  it could be two.  Depends on the area I work.  Sometimes I work

12  all the way in Suffolk County, there was no way I could.  She is

13  to call me every day morning and evening for ride to go to

14  school and to come from school.

15       Q     In May of 2008, you drove her to school every day,

16  correct?

17       A     No.

18       Q     You made sure you were available to pick her up,

19  correct?

20       A     Not all the time.

21       Q     I just want to understand your testimony from

22  yesterday, sir.

23                MR. BANDELLI:  Objection to what the DA wants to

24           understand, your Honor.

25                THE COURT:  Sustained.

                                                              gjn

1      Q    Sir, is it your testimony to the jury that if you told

2    the police in June of 2008 that you molested your stepdaughter

3    for the last two years, that they were going to let you go home;

4    was that your testimony yes or no?

5      A    Yes.

6      Q    Can you tell us wherever in your entire life that you

7    would heard of such a thing where if you tell the police you are

8    molesting your stepdaughter, they let you go home?

9            MR. BANDELLI:  Objection.

10           THE COURT:  Sustained.

11     Q    Well, do you read the newspaper, sir?

12           MR. BANDELLI:  Objection, your Honor.

13     A    Sometimes.

14           THE COURT:  Overruled.

15     Q    And you watch the news on television?

16           MR. BANDELLI:  Objection, your Honor.

17           THE COURT:  Counsel, approach for a second.

18           (Whereupon, a conference was held between all

19    counsel and the Court off the record at the side-bar.)

20     Q    Now sir, on direct examination yesterday you testified

21    at some point when you entered the police, a group of police

22    officers attacked you at the door, correct?

23     A    They didn't attack me at the same time, not as soon as

24    I walked through the door.

25     Q    And at some point one of them pushed your face against

1    the table, correct?

2         A    Not my face.

3         Q    That wasn't your testimony?

4         A    No.

5         Q    And at some point you got pushed up against the wall,

6    correct?

7         A    I was.

8         Q    And they spread open your legs, correct?

9         A    Yes.

10        Q    And they start cursing at you, right?

11        A    Yes.

12        Q    And they are threatening you?

13        A    They didn't use threat at that time.

14        Q    I'm sorry?

15        A    No, didn't use any threat at that time, it was just --

16        Q    They were calling you names?

17        A    Yes.

18        Q    And then you were pushed up the stairs, correct?

19        A    Well, not like -- I was held by my hand and I was, you

20   know, he was (indicating) like.

21        Q    Well, were you walked up the steps or were you thrown

22   up the steps?

23        A    No, I walked up the steps, but with a force.

24        Q    What does that mean?

25        A    Coming from -- the detective, he held my hand, he was

1    pushing me up the stairs from my --

2        Q    And your hands were touching, right?

3        A    Yes, he was holding on one arm (indicating).

4        Q    You would agree with me, sir, the detective helped you

5    get up the steps?

6        A    I wouldn't say helped, he helped -- I could have walked

7    by myself.

8        Q    And at some point, it's your testimony to this jury

9    that Detective Shulman has you inside this room, correct?

10       A    Yes.

11       Q    And he grabs you by the neck and puts you against the

12   wall, correct?

13       A    He didn't grab my neck.  He grabbed me by my shirt.

14       Q    Grabbed you by your shirt?

15       A    And slapped me against the wall.

16       Q    And he slammed you against the wall?

17       A    Yes.

18       Q    And that hurt, right?

19       A    Yes.

20       Q    That's what your testimony is?

21       A    Yes.

22       Q    And caused you pain in your back, correct?

23       A    Well, caused me pain but --

24       Q    Where was the pain you are telling the jury you have?

25       A    I had pain in my shoulders and on my arms (indicating).

HAROLD GOPAUL - Defense - Cross                    868

1      Q     Your arms?

2      A     The back, yeah.

3      Q     And your back?

4      A     Yeah.

5      Q     And your neck, right?

6      A     Yeah.

7      Q     Hurt a lot?

8      A     Well, not a lot.  I had pain.

9      Q     Well, did it hurt or didn't it?

10     A     It hurt.

11     Q     And it's your testimony to this jury that this

12   detective really, really did things to you that were bad,

13   correct?

14     A     Yes.

15     Q     And at some point, the detective says to you what, to

16   write down and that's what you write down?

17     A     Yes.

18     Q     And it's your testimony that at some point after that

19   statement, the detectives tell you what to say on that video and

20   that's what you said on that video?

21     A     What he told me was he told me that, go there and look

22   at the camera, be comfortable and ask any questions -- answer

23   the questions, but then I'll be going home from there.

24     Q     That wasn't my question.

25           My question was to you, sir:  That at some point the

gjn

1    detective tells you what to say on the video, that was your

2    testimony --

3        A    Yes.

4        Q    -- right?

5            And it's your testimony to this jury that the

6    detectives tell you what to say on that video and then that is

7    what you say on the video?

8        A    Yes.

9        Q    And it's your testimony to this jury that on June 23rd

10   of 2008, the detective tells you that if you say stuff on this

11   video, you're going to go home?

12       A    Yes.

13       Q    Okay.  So you believe, sir, that on June 24, 2008, if

14   you admit on video that you touched your daughter's breasts,

15   you're going to go home?

16       A    Yes.

17       Q    You believe it's your testimony to this jury that if

18   you admit on video that you touched your daughter's vagina,

19   you're going to go home?

20       A    Yes.

21            That's what he promised me.

22       Q    I am not asking what he promised you.

23       A    Yes.

24       Q    I am asking what you believed on that date.

25       A    Yes.

gjn

1        Q    And it's your testimony to this jury that if you

2   admitted on video that your daughter touched your penis, you

3   were going to be permitted to go home?

4        A    Yes.

5        Q    Prior to June 24th of 2008, you were aware of what the

6   district attorney was, correct?

7                    MR. BANDELLI:  Objection, your Honor.  Relevance.

8                    THE COURT:  Overruled.

9        A    Yes, I know what a district attorney was.

10       Q    You are aware that they have a role in a courtroom,

11   correct?

12                   MR. BANDELLI:  Objection, your Honor.

13                   What's the relevance?

14                   THE COURT:  Mr. DA?

15                   MR. ROSENBLATT:  Judge, it goes to his claim of

16       voluntariness.

17                   THE COURT:  Overruled.

18       A    Yes.

19       Q    You are aware that the role of the district attorney is

20   different than the role of your own attorney, correct?

21                   MR. BANDELLI:  Well, objection, your Honor.  He

22       didn't have an attorney at that time.

23                   THE COURT:  Mr. Bandelli, don't make speeches in

24       front of the jury.

25                   Jury is to disregard Mr. Bandelli's comments.

1               The objection is overruled.

2       A     Repeat the question?

3       Q     You were aware on June 24, 2008, that the district

4    attorney's role was different than the role of a defendant's

5    attorney, correct?

6       A     No.

7       Q     You didn't know that?

8       A     No.

9               THE COURT:  Overruled.

10              MR. ROSENBLATT:  I'm sorry, Judge.  I missed his

11   answer.

12              THE WITNESS:  I said no.

13              MR. ROSENBLATT:  Judge, can we approach?

14              THE COURT:  Approach.

15              (Whereupon, a conference was held between all

16   counsel and the Court off the record at the side-bar.)

17              THE COURT:  You may proceed.

18              MR. ROSENBLATT:  Thank you, your Honor.

19      Q     You would agree with me, sir, that on June 24, 2008,

20   that other than what's contained on that video, you had no

21   conversations with District Attorney Hughes, Correct, Assistant

22   District Attorney Hughes?

23      A     Besides the tape?

24      Q     Correct.

25      A     Yeah, only on the tape I spoke to him.

1      Q    Okay.  And prior to --

2            MR. ROSENBLATT:  Well, withdrawn.

3      Q    You were able to see the tape the other day, correct?

4      A    Yes.

5      Q    And you had seen that tape before that, correct?

6      A    Yes.

7      Q    Other than what's contained on that tape, you had no

8    conversations with myself, correct?

9      A    No.

10      Q    And you would agree with me, sir, that on that tape,

11    you never complained of pain?

12      A    No.

13      Q    On that tape, you never asked for medical attention,

14    correct?

15      A    Correct.

16      Q    You knew the tape was running, correct?

17      A    Yes.

18      Q    On that tape, you never said that you had been thrown

19    around, correct?

20      A    Correct.

21      Q    In fact, on that tape, you were read your Miranda

22    warnings?

23      A    Yes.

24      Q    And you were read the first question and you said yes,

25    correct?

1      A      Yes.

2      Q      You were told you had the right to remain silent on

3   video?

4      A      Yes.

5      Q      And you said yes?

6      A      Yes.

7      Q      You were told about a lawyer on the video and you said

8   yes?

9      A      Yes.

10      Q      And when you were asked about wanting a lawyer, you

11   didn't say, thank God it's being videotaped, I have been asking

12   for a lawyer the entire day?

13              MR. BANDELLI:  Objection, your Honor.

14              THE COURT:  Overruled.

15      Q      Did you say that?

16      A      No.

17      Q      When you were told that if you can't afford one, if you

18   can't afford a lawyer, that one would be provided to you, did

19   you say I'm going to take that option?

20      A      No.

21      Q      You weren't afraid of Assistant District Attorney

22   Hughes, were you?

23      A      No.

24      Q      You weren't afraid of me when you were in that room,

25   were you?

```
 1        A    No.

 2        Q    You weren't afraid of the man behind the video camera,

 3   were you?

 4        A    No.

 5        Q    Nobody told you on that video what to say, correct?

 6        A    Except for Detective Shulman.

 7        Q    No, my question is:  On the video, nobody told you what

 8   to say?

 9        A    No.

10        Q    And you were given an opportunity to answer questions,

11   correct?

12        A    Yes.

13        Q    And you answered those questions?

14        A    Yes.

15        Q    And at some point, you even asked ADA Hughes or myself

16   if you can explain something, correct?

17        A    Yes.

18        Q    And did you that?

19        A    I did that.

20        Q    You were given that opportunity --

21        A    (Nodding.)

22        Q    -- correct?

23        A    Yes.

24        Q    And on that video, you moved your hands back and forth,

25   correct?
```

1        A     Yes.

2        Q     Those were the same arms that you complained were in

3    pain from being thrown against the wall, correct?

4        A     Yeah.

5              But I didn't say I was paralyzed, I said I had pain.  I

6    didn't say how much pain I had.

7        Q     Nobody threatened you with a firearm, correct?

8        A     No.

9        Q     In fact, during the video, at any point in time, you

10   had the opportunity to stop the video and say I don't want to do

11   this anymore, correct?

12       A     Yes.

13       Q     You never did that?

14       A     No.

15       Q     In fact, right after the Miranda warnings are read, ADA

16   Hughes asked you about allegations involving your daughter,

17   correct; do you remember hearing that on the tape?

18       A     Yes.

19       Q     And he mispronounced your daughter's name, correct?

20       A     Yes.

21       Q     And you actually corrected ADA Hughes?

22       A     Yes.

23       Q     You weren't scared to correct him, right?

24       A     No.

25       Q     That wasn't the only time that you corrected ADA Hughes

1    or myself on that video, correct?

2         A    I don't remember.

3         Q    Detective Shulman asked you questions, I think two

4    questions on that video, correct?

5         A    Yes.

6         Q    And your answer to his questions were "no," correct?

7         A    I think so.

8         Q    So he asked you questions and your answer to him was no

9    on the video?

10        A    I think, yeah, that's correct.

11        Q    In fact, on the video, you suggested --

12             MR. ROSENBLATT:  Well, withdrawn.

13        Q    And in the video, you talked about your relationship

14   with your wife, correct?

15        A    Yes.

16        Q    The sexual relationship with your wife?

17        A    Yes.

18        Q    And you talked about how the relationship began with

19   your daughter, correct?

20        A    Yes.

21        Q    Those are all things that you said on the video?

22        A    Yes.

23        Q    You would agree with me, sir, that prior to the video,

24   okay, before the video started, you were provided a bottle of

25   water, correct?

1      A    Yes.

2      Q    In fact, on the video, you can see the bottle of water

3  on the table?

4      A    Yes.

5      Q    And before the video started, you were given a bag of

6  chips by ADA Hughes through Detective Shulman, correct?

7      A    Chips?  I don't remember.  I don't remember.

8      Q    You don't remember Detective Shulman giving you a bag

9  of chips?

10     A    He never give me anything to eat that I remember, no.

11     Q    Well, you don't remember or the answer is no?

12     A    I would say no, then, no.

13     Q    Don't guess, sir.

14     A    No, no.

15     Q    So it's your testimony that you weren't given a bag of

16  chips?

17     A    Yes.

18              MR. ROSENBLATT:  If I could have just one moment,

19     your Honor, please.

20              THE COURT:  Take your time.

21              (There was a brief pause in the proceedings.)

22     Q    In fact, on the video you were asked specifically about

23  how your relationship changed with your wife, correct?

24              MR. BANDELLI:  Objection, your Honor.  What's the

25     relevance?

HAROLD GOPAUL - Defense - Cross                 878

1              THE COURT:  Overruled.

2       Q     Do you remember being asked that question?

3       A     Can you repeat it?

4       Q     About why the relationship, about your relationship

5    with your wife, and you responded it's hard to explain?

6       A     I --

7       Q     Do you remember giving that answer on the video?

8       A     Yes.

9       Q     Okay.  And you explained that on the video, correct?

10      A     Yes.

11      Q     Is that something that Detective Shulman told you to

12   say?

13      A     No.

14      Q     Now at some point --

15             MR. ROSENBLATT:  Withdrawn.

16      Q     You are aware of what of how to make a complaint

17   against the police, correct?

18             MR. BANDELLI:  Objection, your Honor.

19             THE COURT:  Overruled.

20      Q     I missed your answer?

21      A     Can you repeat that question?

22      Q     You are aware about how to make a complaint against the

23   police, right?

24      A     If I remember?

25      Q     I didn't hear you.

                                                        gjn

1    A    If I remember what?

2    Q    You are aware of how to make a complaint against the

3    police, correct?

4    A    Yes.

5    Q    And in this case, you never called and made a complaint

6    against Detective Shulman after June 23, 2008; yes or no?

7    A    No, no.

8    Q    You never called Internal Affairs and made a complaint

9    against Detective Shulman, correct?

10   A    No.

11   Q    On June 23, 2008, at some point on June 24th, you were

12   brought before a judge, correct?

13   A    Yes.

14        MR. BANDELLI:  Objection, your Honor.

15        THE COURT:  Overruled.

16   Q    You never requested medical attention when you were

17   brought before the judge, correct?

18   A    No.

19   Q    Never told the judge that you were beaten up, correct?

20   A    No.

21   Q    Never told anyone that the judge -- that you were

22   forced into speaking on video, correct?

23   A    Correct.

24        (There was a brief pause in the proceedings.)

25   Q    On that video, you were not intimidated, correct, when

1      the --

2                      MR. BANDELLI:  Objection.

3          Q      -- by assistant district attorney?

4                      MR. BANDELLI:  Can you be more specific?

5          Q      By Assistant District Attorney Hughes when the tape was

6      on, correct?

7                      MR. BANDELLI:  Objection.  Asked and answered.

8                      THE COURT:  Overruled.

9          A      No.

10         Q      It's not your testimony Detective Shulman intimidated

11     you, correct?

12         A      No.

13         Q      It's not your testimony when the video was on I

14     intimidated you, correct?

15         A      Correct.

16         Q      It's your testimony that you believed by admitting to

17     the police about abuse with your daughter, you were going to be

18     let home by the district attorney's office, correct?

19         A      Yes.

20                     MR. ROSENBLATT:  I have nothing further.

21                     THE COURT:  Any redirect?  Ready?

22                     MR. BANDELLI:  (Nodding.)

23                     (Whereupon, the witness left the witness stand.)

24                     THE COURT:  Mr. Bandelli, do you wish to call any

25         other witnesses?

gjn

1          MR. BANDELLI:  No, your Honor.  Defense rests.

2          THE COURT:  All right, ladies and gentlemen.  As

3     you can see, both sides have rested their case.  You've

4     heard all the testimony.

5          We are going to take a short recess to discuss

6     some legal issues.

7          Remember you are not to discuss this case among

8     yourselves or with anyone else.  If anyone tries to discuss

9     it with you, you are to bring it to my attention.  You are

10    not to form any opinions as to whether you feel the

11    defendant is guilty or not guilty with crimes with which he

12    is charged.

13         Please follow the instructions of the court

14    officer.

15         (Whereupon, the jury exited the courtroom and the

16    following occurred:)

17         THE COURT:  Mr. Bandelli, any motions at the end

18    of the entire case?

19         MR. BANDELLI:  Yeah.  As I made my motion

20    throughout the case, your Honor, there has been a failure by

21    the DA to use specificity to describe the charges in this

22    case.

23         Allegedly this went on for over 36 months.  If

24    charges are broken down to four-month periods as was made

25    clear during the direct of the People, and moreso on the

gjn

1       cross by myself, this witness, Sana Awan, was able to

2       identify with more detail when exactly these alleged events

3       occurred.

4               I don't know why the DA chose not to investigate

5       it further and try to be more precise in terms of the dates,

6       but that was his choice, and because of that, my client was

7       at a disadvantage in terms of effectively preparing a

8       defense in this case.  It's impossible to come up with an

9       alibi for 36 months.  It's impossible to identify what

10      you're doing every day, every week of every month for the

11      37-month period.  The DA is under an obligation to exhaust

12      all investigative techniques in order to give a more precise

13      time.

14              I know sometimes in cases like this when you have

15      a witness who is six or seven or eight or nine years old,

16      that's very difficult to accomplish.  I get that.  You have

17      an 18-year-old girl talking about what happened when she was

18      15.  She is an A student.  There is no mental health issues,

19      there is no handicap, there is no disability.  In fact, when

20      she testified, she started giving more precise dates and

21      times.  The DA chose not to flesh that out, and now my

22      client and myself, we have our hands tied behind our back in

23      terms of preparing defense.

24              I believe under -- I think the case is People

25      versus Condelle, People versus Morris, those are the older

1    cases, they are really the start of this whole area.   The

2    Court of Appeals has made clear that certain time periods

3    when charged are excessive, they are unreasonable.   It's not

4    cured by breaking 37 months into four-month periods.   That

5    doesn't cure the excessiveness.   It's even worse when a

6    witness could have given more details when the DA exhausted

7    his investigative tools.

8          The DA has failed to comply with the CPL.   The DA

9    has failed to comply with the cause law as cited by the

10   Court of Appeals.   Every count of this indictment should be

11   dismissed because of that, Judge.

12         There is incredible prejudice in terms of my

13   ability to effectively represent my client and produce

14   witnesses in terms of when he was at work, when he wasn't at

15   work, when the kids were home, whether the kids weren't at

16   home, when he drove her to school, when he didn't drive her

17   to school.   And we are talking about a 37-month period.

18         So I renew my application to dismiss every count

19   on the indictment for that basis.

20         Additionally, your Honor, according to the

21   victim's testimony, the only point where any threats were

22   made was in May of 2008, so I guess that would cover the May

23   and June period.   There is no allegations of any force being

24   used prior to that.   Based on the direct examination of ADA

25   Rosenblatt, the force applied by my client was telling her

1    to shhh, telling her to behave.  She never said he slapped

2    her, she never said he -- she never said he threatened her

3    at that time.  It was "shhh, behave."  I don't think "shhh,

4    behave" rises to the level of force required as an element

5    of criminal sexual contact in the first degree or sexual

6    abuse in the first degree.

7          So any of those charges that require force based

8    on the testimony that this DA elicited from his witness must

9    be dismissed.

10          Those are my applications, Judge.

11          THE COURT:  Mr. DA.

12          MR. ROSENBLATT:  Judge, again, I would renew my

13   same response that I made to the Court after I rested.

14          Additionally, I would just note for the record

15   that the --

16          THE COURT:  You renew your same response?

17          MR. ROSENBLATT:  My same response, my apologies,

18   your Honor.

19          THE COURT:  What was your response?

20          MR. ROSENBLATT:  Viewing the evidence in the light

21   most favorable to the People, each element of each count of

22   the indictment has been made out.

23          I would specifically address the argument that

24   force wasn't made out.  The complainant testified that the

25   defendant forced himself on her, that she tried to push him

gjn

1      away and tried to get her -- him off of her and the

2      defendant continued to do it.

3              And additionally, each time that she described the

4      incident, she described the force used by the defendant and

5      I would rely on the record as to that, Judge.

6              THE COURT:  You have 53 counts here.

7              MR. ROSENBLATT:  Yes, Judge.

8              THE COURT:  How many of these do you think I'm

9      going to submit to this jury?

10             MR. ROSENBLATT:  I have 17 that I am asking your

11     Honor to submit.

12             THE COURT:  17?

13             MR. ROSENBLATT:  Yes.

14             THE COURT:  You going to let us in on that secret

15     soon?

16             MR. ROSENBLATT:  Sure.

17             MR. BANDELLI:  I would like to know, Judge.

18             THE COURT:  Which ones are you dismissing?

19             MR. ROSENBLATT:  Judge, first, I would seek to

20     move to amend count one to read:  Between May 1, 2005

21     through June 30, 2005.

22             And I would also seek to attempt to read:  Oral

23     sexual act only.  I move to eliminate the language "or anal

24     sexual conduct."

25             MR. BANDELLI:  Judge, I would just like the record

gjn

1    to reflect the DA knew about this before he even put the

2    witness on the stand, and this is exactly my point.

3         MR. ROSENBLATT:  It's made out in the Bill of

4    Particulars, Judge.

5         MR. BANDELLI:  But that's my point, Judge.  That

6    he knew about this before he even put her on the stand,

7    before he even opened, okay?  And if he didn't know about

8    it, shame on him, because the witness knew about it.

9         So to present this as it happened between May and

10   August when it happened May and June, how am I supposed to

11   defend my client?  That's my exact point.

12        MR. ROSENBLATT:  The testimony was between May and

13   June, Judge.  The Bill of Particulars makes out the oral

14   sexual conduct and the Bill of Particulars makes out the

15   time period contained in the indictment.

16        MR. BANDELLI:  Says May and August in the

17   indictment.  Doesn't say between May and June.  He added on

18   an additional two months.

19        How am I supposed to prepare my defense?

20        THE COURT:  What does the testimony in the grand

21   jury reflect?

22        MR. ROSENBLATT:  The testimony in the grand jury

23   reflects May through August.

24        MR. BANDELLI:  Exactly.

25        MR. ROSENBLATT:  She narrowed the time period down

gjn

1          during the time in front of the trial jury, Judge, and I

2          believe pursuant to 200.70, I can present this to the jury

3          as a smaller time period.

4                    MR. BANDELLI:  My argument has to do with my

5          ability to effectively represent my client.  The DA should

6          have known that before we started the trial.

7                    MR. ROSENBLATT:  This is the first time at the

8          trial stage this motion was ever made.  No point in any

9          motion was ever made, and in fact, the grand jury minutes

10         were reviewed by another judge and another judge deemed

11         those minutes acceptable.

12                   MR. BANDELLI:  I made the motion before we started

13         the trial, Judge.

14                   MR. ROSENBLATT:  Which is way too late.

15                   MR. BANDELLI:  I wasn't the attorney.

16                   Why is that way too late?

17                   MR. ROSENBLATT:  Judge, he has been the attorney

18         for the last year and a half.

19                   MR. BANDELLI:  Actually, I have been the attorney

20         since October 23rd of 2009.

21                   THE COURT:  Both of you, please, please, please,

22         both of you.

23                   Is the objection to the date amendment or the

24         oral/anal issue?

25                   MR. BANDELLI:  Judge, to the whole charge.

                                                              gjn

1              THE COURT:  Whole charge.

2              Do you have any other applications there, Mr. DA?

3              MR. ROSENBLATT:  Yes, Judge.

4              I move to dismiss counts two and three.

5              THE COURT:  Dismiss counts two and three?

6              MR. ROSENBLATT:  Yes.

7              I move to amend count four to read:  "Between

8      May 1st and May 31st of 2006," and move to eliminate:

9      "attempt to eliminate" or "anal sexual conduct."

10             MR. BANDELLI:  Judge, these are things he should

11     have known before he even put her on the stand.  How am I

12     supposed to represent my client effectively, make arguments

13     on the facts and prepare for the defense when he has given

14     me a bigger time frame, then taking the option after the

15     testimony, after my client has testified, after we have all

16     rested to say now, oh, I'm going to narrow the time frame

17     down.

18             MR. ROSENBLATT:  Your Honor, may I continue?  Do

19     you want me to continue going through the indictment?

20             THE COURT:  In a minute.

21             MR. ROSENBLATT:  Yes, your Honor.

22             (There was a brief pause in the proceedings.)

23             THE COURT:  Continue.

24             MR. ROSENBLATT:  Okay.  Judge, just so your Honor

25     understands where I'm going, through each of the counts that

1          I'm keeping are the ones she described in specific detail on

2     the stand.

3               I am seeking to dismiss counts 5, 6, 7 and 8.

4               MR. BANDELLI:  Can you just slow down a little

5     bit?

6               MR. ROSENBLATT:  I am moving to dismiss counts 13

7     through 17.

8               MR. BANDELLI:  13 and 17.

9               MR. ROSENBLATT:  13 through 17.

10              I am moving to dismiss counts 19, 20 and 21.

11              I am moving to dismiss counts 23 through 28.

12              I am moving to dismiss counts 30 through 32.

13              I am moving to dismiss count 35 through 38.

14              MR. BANDELLI:  30 through 32 and 35 to 38; is that

15    accurate?

16              MR. ROSENBLATT:  Yes.

17              I am moving to dismiss counts 40 through 42.

18              I am moving to amend count 43 to the time period

19    May 1st of 2005 through June 30th of 2005 to reflect count

20    one, or mirror count one, rather.

21              I am also seeking on that count to eliminate the

22    "or anal sexual conduct."

23              I am moving to dismiss counts 44 and 45.

24              I am moving to amend count 46 to mirror count,

25    what was previously count four, to read:  May 1st of 2006

                                                        gjn

1    through May 31st of 2006, and to eliminate "or anal sexual

2    conduct."

3              I am moving to dismiss counts 47 through 50.

4              And on count 51, I am moving to eliminate the "or

5    anal sexual conduct" language.

6              Judge, can I just point out one other thing that's

7    reflected in my motion papers, with your Honor's permission?

8              THE COURT:  What do you want to do?

9              MR. ROSENBLATT:  I just wanted to point out that

10   on the -- before everything gets renumbered, count 34 refers

11   to "the act described by the complainant on Commonwealth

12   Boulevard."  I just wanted to point that out.

13             THE COURT:  Is that the only count that --

14             MR. ROSENBLATT:  Yes, I believe so, Judge.

15             THE COURT:  -- is alleged to have been committed

16   on Commonwealth Boulevard?

17             MR. ROSENBLATT:  Yes, Judge.

18             (There was a brief pause in the proceedings.)

19             THE COURT:  Mr. DA, do you plan to call any

20   rebuttal witnesses?

21             MR. ROSENBLATT:  No, your Honor.

22             And for the record, I would not oppose the

23   defendant's wife being present for summations.

24             THE COURT:  All right.  You can notify the

25   defendant's wife if she is outside, she can come in back in

1      the courtroom now.

2              MR. BANDELLI:  Okay.  Can I just make a record

3      about what just happened in terms of dismissing of the

4      charges?

5              THE COURT:  In a minute.  I just want to go over

6      these counts.

7              DA is moving to dismiss counts 2, 3, 5, 6, 7, 8,

8      13, 14, 15, 16, 17, 19, 20, 21, 23, 24, 25, 26, 27, 28, 30,

9      31, 32, 35, 36, 37, 38, 40, 41, 42, 44, 45, 47, 48, 49, 50,

10     and the DA has moved to amend the fourth count.

11             MR. ROSENBLATT:  Sorry, Judge.  Also count one

12     too, move to amend count one.

13             THE COURT:  DA has moved to amend the first count

14     to read:  Between May 1, 2005 and May 31st or June?

15             MR. ROSENBLATT:  No, between May 1, 2005 and June

16     30, 2005, as to the testimony that was given by the

17     complainant.

18             THE COURT:  And to remove the "or anal sexual

19     conduct."

20             MR. ROSENBLATT:  Yes, your Honor.

21             THE COURT:  And the DA has moved to amend the

22     fourth count to read:  Between May 1, 2006 and May 31, 2006,

23     and to remove the "or anal sexual conduct;" is that correct.

24             MR. ROSENBLATT:  Yes.

25             THE COURT:  DA has also moved to amend the 43rd

gjn

1          count to read:  Between May 1, 2005 and June 30, 2005, and

2          to remove the words "or anal sexual conduct;" is that

3          correct?

4                    MR. ROSENBLATT:  Judge, I'm sorry, I missed the

5          time period.  May 1st -- through June 30th is my request of

6          2005.  I just didn't hear your Honor.

7                    THE COURT:  DA has also moved to amend the 46th

8          count to reflect the time period May 1, 2006 to May 31,

9          2006; and to remove the words "or anal sexual conduct;" is

10         that correct, Mr. DA?

11                   MR. ROSENBLATT:  Yes, your Honor.

12                   THE COURT:  DA has also moved to amend the 51st

13         count to remove the words "or anal sexual conduct;" is that

14         correct?

15                   MR. ROSENBLATT:  Yes, your Honor.

16                   THE COURT:  Have you moved to amend any other

17         counts of this indictment?

18                   MR. ROSENBLATT:  Oh, Judge, my apologies.

19                   Counts 9 through 12 should also -- my motion would

20         be to move to amend it "oral only;" that is, to eliminate

21         the words "or anal sexual conduct."

22                   THE COURT:  9 through 12?

23                   MR. ROSENBLATT:  Yes.

24                   And did I say count 51 already, Judge?

25                   THE COURT:  I just went over that with you.

1           MR. ROSENBLATT:  I'm sorry.  I wrote next to it

2    but I wasn't sure if I just wrote it or that was what you

3    said.

4           THE COURT:  At the beginning of this trial I asked

5    you if you want to dismiss any of these counts.  This all

6    could have been done earlier.

7           Anything else?

8           MR. ROSENBLATT:  No.

9           THE COURT:  Do you want to make a record?

10           MR. BANDELLI:  I do, Judge.

11           Well, I won't deny I am happy some of these counts

12    got dismissed.  I don't think it cures the problem that's

13    already been created.  Now it's actually exacerbated, and

14    let me say why.

15           The DA should have known, even if the DA says he

16    didn't know, this is his witness.  His duty to investigate

17    never ends, okay?  I am a former DA.  It's your witness,

18    it's your case, you need to know, okay?  They could have

19    known what the dates were before she testified in this case

20    at trial and they could have made this application before

21    she testified at this trial.  And they were under an

22    obligation to do that and to disclose to me.  And now by

23    merely saying, well, Judge, you know, it wasn't really a

24    four-month period, it was only a 30-day period and she did,

25    that it was a 30-day period.  So therefore, we made out the

1    count.  You know, no harm, no foul, no -- not the case,

2    Judge.  Just the opposite.  Because I was required to

3    prepare as if this particular crime occurred between May 1st

4    and August 31st, okay?  I wasn't required to prepare as if

5    it occurred between May 1st and May 31st or between May 1st

6    and June 30th in 2005.

7         The DA is under an absolute obligation to get more

8    precise times, and it doesn't seem like it was that hard.

9    It wasn't like we had to dig it out of her when she got on

10   the witness stand.  As a matter of fact, it came forward

11   like kind of smoothly, kind of easily, so to say that, well,

12   you know, Judge, I'm just going to cure this thing by doing

13   that after the defense has rested, it's improper.

14        There may be some ethical issues around it.  It's

15   incredibly problematic.  Every one of those counts that he

16   moved to amend that had an extended time period should be

17   dismissed at this point.

18        THE COURT:  Anything else?

19        MR. BANDELLI:  That's it, Judge.

20        THE COURT:  Defendant's application is denied.

21        MR. BANDELLI:  Note my exception, Judge.

22        THE COURT:  You have your exception.

23        People's application to move to dismiss the counts

24   I just enumerated is granted and his motion to amend

25   pursuant to 200.70 of the CPL to amend those counts which I

1      just enumerated is granted.

2              The indictment now contains 17 counts.  The fourth

3      count becomes the second count; the ninth count becomes the

4      third count; the 10th count becomes the fourth count; the

5      11th count becomes the fifth count; the twelfth count

6      becomes the sixth count; the 18th count becomes the seventh

7      count; the 22nd count is now the eighth count; the 29th

8      count is now the ninth count; 33rd count is now the tenth

9      count; the 34th count is now the 11th count; 39th count is

10     now the 12th count; the 43rd count is now the 13th count;

11     the 46th count is now the 14th count; the 51st count is now

12     the 15th count; the 52nd count is now the 16th count; and

13     the 53rd count is now the 17th and final count.

14              We will now proceed with closing arguments.

15              Bring in the jury.

16              MR. ROSENBLATT:  Judge, could we just approach?

17              THE COURT:  Approach.

18              (Whereupon, a conference was held between all

19     counsel and the Court off the record at the side-bar.)

20              THE COURT:  Defense application for missing

21     witness charge is denied.

22              MR. BANDELLI:  With regard to the missing witness

23     charge, your Honor, there was evidence offered at the trial

24     that my client was taken into custody by a police officer

25     that worked at the 105 precinct that was not called by the

1    People at the trial.

2              Counsel has made numerous -- counsel being defense

3    counsel -- to identify who that police officer was either by

4    obtaining paperwork or asking questions of the witnesses

5    presented by the People.  Unfortunately, nobody was able to

6    answer the question who that officer was that was working at

7    the 105 precinct, but based on the testimony of the witness

8    presented by the People, Ms. Alioto, it was clearly a

9    uniform police officer at the 105 who initially placed my

10   client in custody, and that's corroborated by the testimony

11   of Detective Shulman and Police Officer Alfaro -- who has a

12   new name -- but both of them had testified that my client

13   was in custody prior to their being involved in the case.

14             This is incredibly significant where there is a

15   statement taken from my client and there are issues as to

16   the voluntariness of the statement.  There are issues as to

17   whether or not my client had asked for an attorney, there

18   are issues as to whether or not my client had asked to make

19   a phone call, there are issues as to whether or not my

20   client had indicated that he did not want to speak with

21   anybody without an attorney.

22             Whoever this was clearly has material relevant

23   evidence to offer in this area.  Whether it would be in

24   support of my argument or against my argument, I can't say

25   at this point because it's not being provided; however, the

1      DA has the ability to get the information to bring this

2      witness in and chose not to do that.  Therefore, under the

3      case law, I am entitled to a charge an inference may be

4      drawn unfavorable to the People as to what the testimony of

5      that police officer would be.

6              There is no record that the People have used any

7      diligence or any efforts to identify that police officer.

8      We know that he was on the 105 precinct when this happened.

9      This is an important charge in this case, the voluntariness

10     of the statement, my client's right to have an attorney

11     prior to making statements, prior to being interviewed all

12     night for approximately 15 hours by Shulman and the DA.

13     This is a very important issues in the case and I am

14     requesting that that charge be given to the jury.

15             THE COURT:  Mr. DA, do you wish to respond?

16             MR. ROSENBLATT:  Yes, Judge.  I did some research.

17     I have some case law which I provided to the Court.

18             This is not a material fact issue where there are

19     questions untimely, more personal.  The issue as to whether

20     it goes to a material fact in the case, this does not.

21             MR. BANDELLI:  It absolutely does.

22             THE COURT:  Defendant's application for missing

23     witness charge is denied.

24             (Attorneys at sidebar but argument was taken in

25     open court.)

1          (Whereupon, a recess was taken, after which the

2    following occurred.)

3          THE COURT:  Bring out the jurors, please.

4          (Whereupon, the jury entered the courtroom and

5    upon taking their respective seats, the following occurred:)

6          THE COURT:  Mr. Bandelli, do you wish to make a

7    closing argument on behalf of the defendant?

8          MR. BANDELLI:  Yes, I do, Judge.

9          THE COURT:  You may.

10          MR. BANDELLI:  Thank you, Judge.

11          Ms. Foreperson, ladies and gentlemen of the jury.

12          Good afternoon.

13          THE JURY:  Good afternoon.

14          MR. BANDELLI:  Good afternoon.

15          It's been awhile.  Couple weeks.  Well, this is

16    it, this is the showdown, okay?  My client, Harold Gopaul,

17    is not guilty of any of the charges in this case.  Not

18    guilty.  There is no evidence to support it.  Zero.  There

19    is no physical evidence of sexual abuse.

20          Sana gets up, she testifies that she went to the

21    hospital, right?  She went to the hospital to get examined.

22    It sounded the way they described it as some type of

23    gynecological.  I have never been to one, but I got the

24    sense from the way they described it, it's one of those

25    intimate, private examinations, right?

1      You hear testimony from ADA Hughes that he went

2   there, we hear testimony from Jenny that she went there, we

3   hear testimony maybe from somebody else who went there.  But

4   who didn't we hear testimony from?  Who didn't we hear

5   testimony from?  The doctor.  We never heard from the doctor

6   who examined her.  Why do you think that is?  If that doctor

7   had detected any evidence of sexual abuse, don't you think

8   he or she would have been here to testify to that?  Right?

9   That would be a good witness for the People.  Mr. Rosenblatt

10  could get up there:  Doctor, you had an opportunity to

11  examine Sana Awan?  Yes, I did.  And you know you did this

12  test, you did this test, you did that evaluation, and what

13  did you find, doctor, what were your conclusions.  Oh, that

14  there was sexual abuse, there was evidence of sexual abuse.

15  We didn't hear that testimony, did we?  That's because there

16  is no physical evidence of sexual abuse.

17      There are no witnesses to the sexual abuse.  Sana

18  lived in the same house with her father, with her mother,

19  with her brother, with her sister, the whole time this was

20  allegedly going on.  The whole time, right?

21      They sleep on one floor, the second floor of the

22  house.  The bedrooms are all beside each other.  There is

23  Sana's bedroom, there is the master bedroom, there's the

24  son's bedroom and right here is the bathroom (indicating),

25  okay?  Everything is there on the same floor.

1     According to the testimony, Sana sleeps with the

2     daughter, the son sleeps with the mother, nobody uses the

3     last bedroom, so they are sleeping in the two bedrooms that

4     are closest to the bathroom right?

5            Does anybody here live in a small house like that?

6     I can't get a moment where I can go to the bathroom by

7     myself in my house.  Every time I'm in the bathroom, this

8     morning, as a matter of fact, every one of my kids came in

9     and then my wife came in.  There is no privacy in a small

10    house, okay?

11           It is unfathomable, it is unfathomable that this

12    could have been going on for three years in this house and

13    not a single person, not a single person had any idea it was

14    going on.  Not one person in that house.  The sister didn't

15    come up here and testify, the brother didn't come up here

16    and testify.  The mother came up and testified.

17           THE COURT:  Objection.

18           MR. ROSENBLATT:  Calls for speculation, Judge.

19           THE COURT:  Sustained.

20           MR. BANDELLI:  Nobody testified that they

21    witnessed anything going on in that house.

22           Now there is also testimony that it had happened

23    before school, that it had happened in a car before school,

24    right, at a high school, right, where all the kids are

25    coming into school together and this girl apparently is

1    being molested, right?  This is horrible stuff.  She is

2    being threatened with a knife.  I am going to cut off your

3    finger, right?  And then these horrible, disturbing acts are

4    going on in this car.  There is not a single witness.  She

5    goes to school, nobody puts her aside and says, are you

6    okay?  You don't look okay, did anything happen?

7              Went to school, I know there are people that are

8    here that work for the Department of Education.  Aren't

9    there like systems set up in the school to identify children

10   who have been victims of abuse?  The teacher will say:  Do

11   you know what, somebody, so-and-so didn't look okay.  Maybe

12   we should talk to them after class, maybe she could contact

13   their parents, right?

14             This girl is saying she was threatened, that he

15   licked her vagina, that he touched her breasts, whatever it

16   was, but very, very upsetting stuff, right before she went

17   to school.  And nobody, nobody has any clue about it.

18   Nobody.

19             There are no symptoms of sex abuse, okay?  There

20   was time spent going over Sana's school records, right?  One

21   of the things that I attempted to bring out, and Sana

22   acknowledged, was that her grades actually improved from the

23   time this allegedly occurred until June 23rd when she

24   reported it in May, when she first started in high school,

25   actually, which would have been September of 2008, she was a

1    B student.  When she got to June of 2008, the end of her

2    junior year, she was actually an A student.  I mean, you got

3    to use your common sense here a little bit too, all right?

4    This is going on for three years, my dad is sexually abusing

5    me, threatens me with a knife, all of these horrible things

6    are happening, and yet, and yet, I am continuing to

7    concentrate in school.  I'm doing better.  I'm improving.

8    Not only that, she graduated high school on time, she is

9    going to college, she has got a 3.5 average, she is working,

10   she looked pretty good up there.  She doesn't look as if she

11   is somebody who suffered sexual abuse and threats of

12   violence for three years.

13          There is no testimony that she was an alcohol

14   abuser, there is no testimony that she developed some type

15   of substance abuse, there is no testimony that she tried to

16   kill herself, there is no testimony that she started

17   withdrawing from her friends or her family.

18          DA knows these are problems, right?  He knows

19   these are problems, so he wants to explain them away by

20   calling Dr. Lewittes, right?  He calls in this guy in a

21   suit.  Looks good, sounds good, has all the credentials,

22   graduated with this degree, graduated with that degree,

23   familiar with this story, familiar with that story, very

24   proud, right?

25          What do we know?  He is a hired gun.  This is what

gjn

1    he does for a living.  He is getting paid to be here to

2    testify, right?  That's a source of income.  That's expert

3    testimony, that's what he does for a living.  He comes in

4    and he explains things for the DA.

5              Now I would note for you, and I think this is very

6    important, that he never examined Sana Awan.  He never spoke

7    to Jenny Gopaul, the mother.  He never spoke to Harold

8    Gopaul, the father.  He never interviewed anybody at her

9    school, he never looked at her school records.  He knows

10   nothing about the witness in this case.  Zero.  Nothing.

11             So look at Dr. Lewittes for what he is.  He is a

12   hired gun, okay?  He is a guy who is brought in to help him

13   out when he is having problems.  That's it.  Nothing more.

14   And he doesn't even cure those problems because he can't

15   even acknowledge anything.  Well, isn't it true that, you

16   know, school grades can be a sign of, you know, somebody

17   doing poorly in school, that can be a sign of being sexually

18   abused?  Well, it can be and it can not be.  How about

19   alcohol abuse?  Well, it may be and it may not be.  Well,

20   everything may be and it may not be, so what is he telling

21   us?  What's he telling us?  He is telling us nothing, okay?

22   It was a waste of time.  Waste of time.

23             One of the things we know also about Sana, right,

24   from her testimony, the testimony of the People's witnesses,

25   is that -- and from my witnesses as well and the

1    cross-examination of the DA -- she has an active social

2    life, right?  She is very active in school.  She goes to

3    afterschool activities, she has a group of friends, right?

4    None of whom came forward to testify that --

5              MR. ROSENBLATT:  Objection.

6              THE COURT:  Overruled.

7              MR. BANDELLI:  -- none of whom came forward to

8    testify about anything that had been going on in the past

9    three years that might have given them cause for concern

10   that Sana was being victimized in some way, okay?

11             She is going to basketball games, she is going to

12   the movies, she has her dance, she has her math class.

13   Everything is going good.  Everything is going good.

14             There are no signs of sexual abuse.  Christine

15   Alioto testified that she and Sana were best friends during

16   high school, right?  That was the best friend.  Never once

17   did she indicate that she noticed anything about Sana's

18   behavior that suggested that anything was wrong.  In fact,

19   in fact, she testified that on more than ten occasions my

20   client drove her either to or from school, right?  She said

21   I don't feel unsafe with Harold.  Nobody felt unsafe with

22   Harold because there was no reason to feel unsafe with

23   Harold.

24             That's the evidence that's missing in this case.

25   None from the witnesses, no physical evidence, no signs, no

1    symptoms.  So what do we have?  What does the DA have here,

2    right?  We all know what he has.  He has a girl who

3    testified within two months, within two months of her

4    parents disrupting a relationship with an older boy who

5    remains unidentified, right -- couldn't find out who this

6    guy was, right, what's his name?  Objection sustained.  I

7    can't find out who he is.

8                    MR. ROSENBLATT:  Objection, Judge.  As to the --

9                    THE COURT:  Sustained.

10                   MR. BANDELLI:  Right?  Nobody knows who he is.

11   Okay?  Never came here to testify, right?

12                   Based upon my client and his wife, the mother and

13   the father disproving and shutting down this relationship,

14   within two months, within two months there is an allegation,

15   right?

16                   And what else happened?  Within two days of a very

17   explosive moment at a fair at which she testified she was

18   publicly humiliated, he embarrassed her in front of her

19   friends -- we don't know if the belief was there, we know

20   you've been there too -- within two days of that and within

21   two days of a very, very horrible and traumatic scene in the

22   house where there was an argument and my client slapped his

23   daughter on the arms in front of the other kids and

24   everybody was very devastated, within two days of all of

25   these events, for the first time, for the first time, this

1        comes out, right?

2                And it doesn't come out to the mom, doesn't come

3        out through another family member.  Somehow it comes out to

4        the Aliotos.

5                And I'm not quite sure what the Aliotos are all

6        about.  I have to tell you, I don't get it, all right?  This

7        mother and daughter somehow take it upon themselves for

8        whatever reason to rescue Sana.  They are going to rescue

9        her, they are going to take her and drive her all around

10       Queens and secret phone calls, these clandestine phone

11       calls.

12               Ms. Alioto, why are you making these phone calls?

13       Well, I don't want to get in trouble for driving around a

14       kid in my car.  Sana is 17 years old.  It's what, 8:30,

15       9 o'clock at night.  What trouble you going to get in, or is

16       there something that you're concerned about that you're not

17       sharing with us?  Is there a conversation occurring that you

18       don't want to disclose?  All right, why?  Why is she afraid

19       of getting in trouble for driving around with a 17 year old

20       at 9 o'clock at night?  Why is she spending all night at the

21       precinct?  Think about that.  This woman spent a whole night

22       at the precinct.  What's that this is all about.

23               And then on top of that on top of that, and this

24       is beautiful, I love this, she is the one -- she is the one

25       who gave the cop the heads up.  She is the one, she

                                                                   gjn

1   testified that, you know, she is going down for a smoke

2   break, I guess she has done whatever she is doing upstairs,

3   and she sees my client come through the doors and she is the

4   one who indicates to the cops, okay, there he is, there he

5   is.  This is very exciting for her, I guess.  You know, a

6   big soap opera, very traumatic, very traumatic.  She is

7   there at the precinct and this is all a lot of excitement.

8          Okay.  Bottom line is my client is coming there to

9   report his daughter missing, right?  He is coming there to

10  report his daughter missing.  He comes there in his car in

11  his work clothes after coming home after checking in on the

12  kids, right, saying Sana is not here, Jenny, get up, get up,

13  Sana is not here.  You know, we got to, we got to -- I am

14  concerned, right, because he knows there was a bad fight two

15  days earlier, right?

16          MR. ROSENBLATT:  Objection.

17          THE COURT:  Sustained.

18          MR. BANDELLI:  He knows that there was an issue at

19  the fair.  My client, right, he knows all about that.  He is

20  going, gosh, she is gone.  She has taken off.  We have got

21  to go to the police.  Somebody has got to report this to the

22  police.

23          I am going to call the Aliotos, that's what he

24  testified to because he knows they are very close.  I am

25  going to call them.  There is no answer at the Aliotos.

1    Isn't it interesting that the Aliotos, Ms. Alioto never

2    reaches out to Sana's mom?  Never.  Did she have a personal

3    relationship with Sana's mom or did she have an experience

4    with Sana's mom that would lead her not to notify the mom?

5    Say, hey, listen, and tell her you're taking the kid to the

6    precinct.  Even, listen, I don't know what happened, I don't

7    want to be involved, your daughter said some really horrible

8    things, I am just going to bring her to the precinct, okay?

9    But I want to let you know that's where your daughter is.

10   That's what my neighbor would do, right?  Because you are

11   not endangering by letting the mother know, who is not

12   accused of anything, that there is -- this is where the kid

13   is, right?  As a parent, would you not want to be notified

14   at least that this is where my kid has been?  Taken that my

15   kid is at a precinct, she is not like dead somewhere.

16        Maybe that's why she is running around making

17   phone calls because she has got an agenda.  I don't know

18   what her agenda is, but she doesn't call the mom, she

19   doesn't say, hey, listen, meet us at the precinct, please,

20   there is something serious going on.

21        No, that's not how she is going to handle it.  So

22   my client, on his own, not knowing where the heck his

23   daughter is, right, and it's clear he loves her, right --

24   the daughter testified to that, he testified to that -- he

25   goes and he doesn't even change his clothes.  He is there in

1    his work clothes, drives there in his work car, and I submit

2    to you -- and I said this during my opening statement -- if

3    you have been sexually abusing a child for three years, she

4    disappears in the middle of the night, are you going to a

5    police precinct to report her missing?  If you for one

6    second have any sense of guilt or concern that you might get

7    in trouble because you have been doing something so horrible

8    for three years, are you going to the police or do you get

9    in the car and hit the road?  He went to the precinct.  They

10   didn't come and get him, he went there.  He shows up there

11   on his own immediately.  Which is what a concerned parent

12   would do.

13           From the second my client showed up at the

14   precinct, this thing spins completely out of control.

15   Completely out of control, right?  We know that.  For

16   whatever reason, nobody seems to know who placed my client

17   in custody.  We have a second grade detective, works on

18   homicides, big, husky detective, right?  He doesn't know who

19   the police officer downstairs is that put my client in

20   handcuffs?  He doesn't know?  How the heck can you not know

21   that?  Why don't you know that?  Why don't you want to know

22   who the police officer is that put my client in handcuffs?

23   That's hard to figure out, right?  Get out of your chair,

24   walk downstairs.  Yeah, that's Detective Shulman, Sergeant

25   Omega, tell me who the officer was.  It's in my report, I

1     want to be thorough.  I want to get statements from this

2     guy.  I want to know who the officer is, right?  I don't

3     want to give the appearance anything improper is going on.

4     Tell me who the officer is.  Is that that hard?

5            Is that?  But he doesn't know.  He didn't recall,

6     doesn't recall.  I don't recall, I don't recall.  You don't

7     know, and then for some reason, Police Officer Alfaro who

8     was like on patrol is called back to the precinct to take

9     the arrest?  What's that about?  You have detectives and

10    police officers in the precinct, the police officers already

11    put my client in custody, right?  Yet you're calling out to

12    a police officer who is out on the street to come back to

13    the precinct after my client is in custody to take over?

14    What's that about?  What's that about?  Does that make any

15    sense to anybody?

16           What is going on at the 105 precinct, ladies and

17    gentlemen?  What's going on?  Mr. Shulman talked to the girl

18    for an hour and a half, give or take ten minutes or

19    whatever, got some information from her, found out what was

20    going on and went into this other interview room and my

21    client is just standing there appearing from out of the

22    blue.  Got a phone call that he was in there.  Huh?  What do

23    you mean?  He was just -- you don't know who told you he was

24    up there, you didn't speak to somebody to bring him up, he

25    just shows up in this room sitting there like what's going

1    on.  Why don't you just tell us what's going on?  These are

2    like really simple questions.  I mean, who brought him up?

3    Who told you he was up?  Who placed him in custody?  What

4    have you got, what are you holding back?  What don't you

5    want us to know?

6         So he goes in there the first time.  He is rough

7    with my client.  He is a big guy.  Shulman, he weighs what,

8    150 pounds.  Shulman gets in, you are going to tell me what

9    I want to know.  You are going to tell me what I want to

10   know.  There are allegations, I want the truth.  I want the

11   truth.  I'm here for the truth.  You're going to sign this,

12   you're going to sign this, my client does this, my client

13   already got smacked around downstairs, all right?  He is a

14   little guy.  He doesn't know what the heck is going on here.

15   Oh, shit, is this because of what happened at the fair,

16   because we had an argument at the house after the fair?

17   Like what's going on?  These cops are beating the crap out

18   of me, throwing me in a room upstairs by myself, closing the

19   door; there is no window, there is no clock.  I am sitting

20   here trying to find out where my daughter is.

21        So then Shulman leaves after he says I'll tell you

22   whatever you want to know, just get me the hell out of here.

23   I'll tell you whatever you want to know.

24        Here I am waiving my Miranda warning, no, I don't

25   want a lawyer -- which he did say I want a lawyer -- but no,

gjn

1      I don't want a lawyer, I want to talk to you, Detective

2      Shulman, I trust you, Detective Shulman, you are my friend,

3      you are my daddy, I want to talk to you.  I want to talk to

4      you, Detective Shulman at 4 o'clock in the morning,

5      5 o'clock in the morning in this little room.  I want to

6      talk to you.  I trust you, right?

7              And then what does Shulman do after he gets him to

8      sign everything and say yeah, you can search the car, you

9      can search my house?  Shulman walks out, that's his

10     testimony, he walks out of the room.  What's that all about?

11     This guy just said here, I want to talk to you, go search my

12     car, search my house, I want to talk to you, then Shulman

13     walks out and goes up and walks out?  What's that about?

14             Shulman comes back some time later.  Nobody knows

15     what time it is, but he comes back, says you're going to

16     give me a statement, and my client does -- let me see --

17     gives him the first written statement, basically tells him

18     everything about what happened at the fair.  Look, at the

19     same time, my friend, Saturday, June 21st, my family had

20     gone to St. Gregory's fair to have some fun and he goes on

21     from there and tells them everything that happened.  We went

22     to the fair, my wife was sick.  Do you know what, we wanted

23     to have a good time but my wife wasn't feeling well.  There

24     was intention Sana wanted to stay longer.  We wanted her to

25     go da-da-da-da.  It got a little bit hot.  I am telling you

1    what happened.  When I got home, it got worse.  I handled

2    it, I hurt hit her in the arms.  I know you think that's

3    wrong, I understand.  I hit her on the arm, I did.  Okay?

4    There is the statement.

5           Shulman leaves the room again, comes back a little

6    bit later and now it's a little bit different.  He is

7    rolling his sleeves up.  You're going to tell me what you

8    know.  I put people away for twenty years.  You're going to

9    tell me what you know.  It's no joke.

10          Look at his shirt in the videotape.  Look at the

11   way the collar is spread, okay?  Look at the way that collar

12   is spread in the video.  If you watch it again, if he shows

13   it again, look at it.  This guy was physically roughed up.

14   Yeah, he was smart enough not to punch them in the face or

15   clock them over the head, right, because he knew at some

16   point this might end up on video, but he did what he had to

17   do, right?  And he told you he was going in there to get the

18   truth.  I going to get the truth.  Well, you had the truth.

19   Why you coming back?  He told you what happened at the fair,

20   why are you coming back?  Because he wants more.  He wants

21   more, and what's interesting is if you look at these two

22   statements -- and I ask that you do that -- and the

23   following statement, the wording kind of changes.

24          It's not where my client just starts off my family

25   had gone to St. Gregory's fair to have some fun.  All of a

gjn

1       sudden for the first time, my client is identifying himself

2       by name.  I, Harold Gopaul, and then he says:  Is writing

3       this of my own free will.  Is this his will that he is

4       writing out here that he is saying I am writing this of my

5       own free will?  Why do you think this language is in there?

6       Do you really think that's his words?  Do you really think

7       that's his words, or did the detective tell him what to say?

8       I want you to put on the top of it you are doing this on

9       your own and it's of your own free will.

10              And then Detective Shulman says:  I want you to

11      say this and I want to you say this and he is writing, okay?

12      What else do you want me to write, and then unfortunately,

13      after he is finished writing, everything, he didn't mention

14      his daughter's name in it, so Shulman looks at it and says

15      you forgot to mention your daughter's name in it too, so in

16      the last line he says my daughter is a Sana Awan, is the

17      person I am talking about.

18              Do you really think he put that in there on his

19      own?  My daughter, Sana Awan, is the person I am talking

20      about?  Did we have any doubt who he was talking about or

21      wasn't talking about?  Did he have any doubt about what

22      Detective Shulman wanted him to say at that time, but it

23      wasn't enough it wasn't enough?  Shulman wanted everything.

24      You got to say it was your daughter, Sana Awan you were

25      talking about, you got to say this.  I need this in the

1    statement.  And he says, don't worry, I will back off.  We

2    will take care of this.  You will go home, you'll be okay,

3    just do what I'm telling you to do.

4           Shulman leaves again -- there is one more

5    statement, hold on.  Oh, this one, right -- and what's

6    funny, this is the last written statement, but none of this

7    is in my client's words, so clearly what had happened was

8    Shulman got frustrated at this point, was getting tired of

9    telling my guy what to write, says do you know what, it's

10   frigging 9 o'clock in the morning, I am just writing it

11   myself.  Because if you look, and he said it, they are in

12   his own words, so Shulman starts:  My girl is telling you

13   the truth, it's not what he wants to hear.  He threats him,

14   gets violent with him, tells him what he wants to hear,

15   tells him what to write down.  Then ten hours later, I

16   guess, Shulman is shot, I am not going to waste my time

17   telling you what to write, I will just write it down

18   (indicating).  It's nonsense.  It's horrible.  Detective

19   sworn to uphold justice would operate in this fashion, to

20   testify that way.

21          He knew who the police officer was who placed him

22   in custody.  You don't get to be second grade detective.  He

23   knew exactly what he was doing.  He was going to get a

24   statement out of this guy no matter what.  He was going to

25   get him to say what he needed, whom he said it to.

1        Do you know why that was important?  Do you know

2    why that was important?  Because there was no evidence of

3    what had happened.  Zero.  Zero evidence.  And isn't it

4    interesting that the whole time this is happening, there is

5    no videotape of any of this.  Nothing.  Not anything.

6        You know, the DA, ADA Hughes, yeah, we are on

7    24/7, you can get us any time.  So page him, tell him this

8    is important, this is important evidence, I don't -- I want

9    to videotape, unless you don't want it videotaped.  You

10   don't want this on videotape.  This is behind.

11       The answer is this is the part you don't want the

12   jurors to see, right?  This is when my guy gets primed, when

13   he gets prepped, get him ready for the DA, get him ready for

14   Rosenblatt, get him ready for Rosenblatt, get him ready for

15   Hughes, right?  Because it takes how much time to get to the

16   105 precinct from the Queens DA's office, with a beeper

17   going twenty-four hours?  Why would you want it on video?

18   Because that would solve all these points I'm making,

19   wouldn't it?  Right, if they had everything that was

20   happening, statements on video and it didn't happen,

21   couldn't say this, right, because it would be there, it

22   would be like oh, look, Detective Shulman was very gentle,

23   very gentle with my client.  Oh, he was very polite, treated

24   him very nicely, polite, he was his friend, this was a very

25   nice relationship that had developed between Harold and

gjn

1    Detective Shulman.  That's what you didn't see it on the

2    video, it's not.  What you saw was a script, that's a script

3    and it took 15 hours to get it together, 15 hours.  And the

4    DA told you he spoke to Shulman before he went there.  There

5    he knew what Shulman had gotten out of him already.  They

6    knew what was going to come out when they got there.  They

7    knew the questions and answers.  Maybe a few curve balls,

8    but they knew what they hoped to get.

9              Cameras, light, action.  We are ready to go.  He

10   is ready.  Mr. Gopaul, he has been here 15 hours, he is

11   ready to tell his story.  And what's interesting is they

12   brought Shulman in too.  They made sure Shulman was present

13   for that statement, not O'Farrell, not the arresting

14   officer, but Shulman.  Why do you think that was?  Why do

15   you think Shulman was in there, huh?  Honestly, we are from

16   Queens, why is Shulman in there?  To make sure he says what

17   he wants him to say.

18              And I'll note, if you have to watch the videotape

19   again, right, I was making certain notes and this is hard,

20   but if you look at particular points in time, at 5:30 and 25

21   seconds, at 5:33, at 5:37 and 42 seconds, at 5:45 and 35

22   seconds, you see my client looking at Shulman when he is

23   being asked questions.  You see the DA asked questions,

24   wasn't sure what to say, and he is like, (indicating), you

25   know, Shulman is there, you know what to say.  If you want,

1    you don't have to, but I caught it.  I saw it.  He is not

2    looking at the DA those times, he is looking at Shulman.

3             Why is he looking at Shulman?  What's Shulman

4    doing to him?  And the DA is probably going to make a whole

5    point of why, why would the cops make this up, why would the

6    cops do all this, what do the cops have to gain by creating

7    this whole scenario?  Why would the cops make up the

8    statement, that's ridiculous, that's nonsense.  Why would a

9    cop come up here, what does he have against Harold Gopaul

10   that he would come up here and do that?

11            Well, I'm tell you.  Police Officer Alfaro got up

12   here and I caught her lying twice under oath.  Twice, right?

13   She testified that in the grand jury under oath she talked

14   to the complainant, she talked to Sana, then she put her in

15   custody, right?  Then she testified here that she placed my

16   client in custody and then she spoke to Sana.  She lied.

17   She lied.  It's on record, okay?  She lied under oath.  I

18   don't know which one it was, we don't know what the answer

19   is, but she lied.

20            And then there is a second lie where she says

21   that, here, she didn't know whether or not my client was in

22   custody before she got to the precinct, right?  And she had

23   testified previously at a hearing under oath that she had

24   been informed that my client was in custody.  So she is

25   lying again.  I don't know why.  I don't know why.  Can't

1    answer why police officers lie, but she lied.  I saw it.

2    It's on the record, it's under oath.  What am I supposed to

3    do with that?  I can't tell you why certain people lie, all

4    right, but there is evidence that this officer lied.

5          Shulman doesn't know who the police officer was

6    that placed my client in custody.  Do you really believe

7    that?  Why does he have to lie about that?  You know he is

8    not telling the truth about that, right?  I would want to

9    know.  I would want to know because I know a lawyer is going

10   to come in and say, do you know what, something must have

11   happened, something must have happened.  We better find out

12   who that officer was so that the lawyer can't say that they

13   didn't get that officer.  What does that tell you?  That

14   something must have happened.  Something must have happened,

15   right?  They are withholding, holding back, can't trust that

16   testimony.

17         Mrs. Jenny Gopaul.  The mother, the wife.  She

18   came here and she testified on behalf of Harold, not Sana,

19   two years after it happened.  Struggling.  Struggling to

20   figure out what the heck happened, right?  The mom and the

21   wife.  There are these horrible allegations.  What's going

22   on, what's going on?  My husband has gotten arrested.  He

23   gave a confession, he is saying they forced him to make the

24   confession.  My daughter is telling me he didn't do it, he

25   never touched me.  Six months later, he is lying, she is

1    lying.  Who is, what's going on?  Who is telling the truth?

2    I don't know what to do.  I got to figure this out.  Who is

3    telling the truth?  Who do I believe?  Do I believe my

4    husband, do I believe my daughter; who do I believe?

5              She came here and testified for the defense.  You

6    know who she believed.

7              MR. ROSENBLATT:  Objection.

8              MR. BANDELLI:  You know who she testified for.

9              THE COURT:  Sustained.

10             MR. BANDELLI:  Nobody, nobody knows these parties

11   better than Jenny Gopaul.  Not me, not him, not him

12   (indicating), none of you.  She knows her daughter and her

13   husband because she came to testify on behalf of her

14   husband.  Should she be crucified because she believes her

15   husband and not her daughter?

16             You know, words, people, words, just saying them

17   isn't enough.  You can say really horrible things but it

18   doesn't make it true, right?  You can say really horrible

19   things but it doesn't make them true.  There has got to be

20   evidence to support it.  Something, something, right?  Mom

21   heard it all and is here for the defendant.  Is here for her

22   husband.

23             It's a tragedy what happened here, ladies and

24   gentlemen, tragedy this family got ripped apart at the

25   seams.  Didn't have to happen.

1          My client is not guilty of any of these charges.

2          Thank you.

3          THE COURT:  Thank you, Mr. Bandelli.

4          Mr. DA, you may proceed.

5          MR. ROSENBLATT:  Thank you, your Honor.

6          Sana Awan didn't look like someone who was

7    sexually abused.  Red light.  Really, really?  What does

8    someone who has been sexually abused look like?  What does

9    that mean?  What does he expect her to look like?  Does he

10   expect her to dress a certain way?  Does he expect her to

11   look a certain way, to have a certain characteristic about

12   her?  What about someone who has been sexually abused makes

13   them have a characteristic that they look like they have

14   been sexually abused?

15          That is patently offensive.  She doesn't look like

16   someone who is sexually abused.  That's the argument that

17   they are making.

18          You know, let us not forget why we are all here.

19   We are here because beginning on a date between May and June

20   of 2005, Sana Awan, a fourteen year old girl, an honor

21   student then beginning high school was coming out of the

22   bathroom, out of the shower that she shared with her family

23   when her stepfather, that man (indicating), the man she

24   trusted as a father figure, the man she thought she loved,

25   came to her in that bathroom and he took off her towel, he

1    forced open her legs and he got on his knees and put his

2    mouth on her vagina.  That's why we are here.

3         And why did he do that?  Well, he told you in his

4    own words, because he thought she looked nice and

5    attractive.  Those were his words.  Those were the words he

6    chose.  Those were the words he selected.  No one told him

7    to say that.  He just had the urge for it.  Those were the

8    words that he used.  Those were the words that he selected.

9    And he testified -- excuse me -- and he told you on that

10   video that it just happens.  Those are the words that he

11   used in June of 2008 before he ever knew about the

12   allegations as they were presented.

13        He used his relationship, he used his authority to

14   force his stepdaughter to do the things that he wanted and

15   he told you on that video in June of 2008 before he had an

16   opportunity to hear or see what Sana was saying, that he

17   told her it's okay, don't be afraid.  She looked scared.

18   That's what he said.  Those are the words that he selected.

19   Nobody told him to say it that way.

20        When you evaluate the testimony in this case, the

21   two versions of events are certainly conflicting.  Someone

22   took the stand and lied.  Are you going to believe the

23   defendant?  Who has a greater motive to lie than him?

24        The law --

25             MR. BANDELLI:  Objection, your Honor.

gjn

1          THE COURT:  Sustained.

2          MR. ROSENBLATT:  The law gives the defendant's

3     interest in this case a specific title.  He is an interested

4     witness because he is most interested in the outcome --

5          MR. BANDELLI:  Objection.

6          MR. ROSENBLATT:  -- of this case.

7          MR. BANDELLI:  Your Honor.

8          THE COURT:  Sustained.

9          MR. ROSENBLATT:  His interest?

10          MR. BANDELLI:  Ask it be stricken.

11          THE COURT:  Jurors, disregard it.

12          MR. ROSENBLATT:  His interest is as obvious as it

13     is great.

14          MR. BANDELLI:  Objection, your Honor.

15          THE COURT:  Overruled.

16          MR. ROSENBLATT:  And the law permits you to

17     consider that factor, and I ask you to listen to the judge's

18     instruction when he defines that to you.

19          The defendant is a convicted felon.  He has been

20     convicted of numerous offenses.  He doesn't want you to know

21     that.  In fact --

22          MR. BANDELLI:  Objection, your Honor.

23          THE COURT:  Overruled.

24          MR. ROSENBLATT:  -- on direct examination, he

25     completely omitted that fact, but on cross-examination when

1    asked if he was convicted of numerous offense, he denied it.

2    Apparently, to him, to this man, five is not numerous.  His

3    testimony is uncorroborated, and when I say that, what I

4    mean is no evidence in this case supports what he said,

5    none.

6              Or are you going to believe Sana, because in 2008,

7    Sana Awan lived at home with her two siblings who she loved,

8    who she cared about.  She no longer sees them, she no longer

9    has contact with them.  In fact, the one time she tried to

10   get them a small present, candy, it was returned by her own

11   mother.

12             She was an honor student.  She had a home with two

13   parents.  She had her own room and now she is in foster

14   care, thrown out of her home.

15             MR. BANDELLI:  Objection.  She is no longer in

16   foster care.

17             MR. ROSENBLATT:  Is he testifying, Judge?

18             THE COURT:  Mr. Bandelli, don't make any speeches

19   in front of the jury.

20             MR. BANDELLI:  I understand.

21             Objection.

22             THE COURT:  Disregard Mr. Bandelli's statement.

23             Continue.

24             MR. ROSENBLATT:  She's placed in foster care,

25   thrown out of her home, the home that she grew up in, the

1    home where she went to school and studied, where she was

2    rarely punished, where she followed the rules, never had a

3    problem with the law or at school.

4              That was Sana Awan in 2008.  That's what she gave

5    up.

6              Or are you going to believe the defendant, a man

7    who admitted to his own wife that he abused her daughter.

8    Admitted.

9              MR. BANDELLI:  Objection, your Honor.

10             THE COURT:  Overruled.

11             MR. ROSENBLATT:  Admitted to her that he was sick

12   and needed help.

13             MR. BANDELLI:  Objection, your Honor.  There is no

14   evidence to support that.

15             MR. ROSENBLATT:  May I proceed, your Honor?

16             THE COURT:  Proceed.

17             MR. ROSENBLATT:  A man who claims he was beaten

18   and abused by the police.  A man beaten and abused by the

19   police, he then wanted to trust them after they threw him

20   against the wall and did all these things that he claimed

21   they did.

22             That after they did all those things, he actually

23   believed them that if he told them, if he told Detective

24   Shulman and did this video, that was going to go home, that

25   he was going to walk out of the 105 precinct a free man.

                                                      gjn

1          For every statement that the defendant made to you

2     under oath, ask yourself:  Is it credible, do I believe it.

3     And when you consider whether you're willing to believe the

4     defendant, remember and listen to the judge's charge on

5     interested witnesses.

6          I submit to you that I have proven the defendant's

7     guilt of each and every count contained in this indictment

8     beyond a reasonable doubt.  If you were presented one

9     witness in this case, if you were presented the testimony of

10    Sana Awan alone and her testimony convinced you beyond a

11    reasonable doubt to your satisfaction, her testimony alone

12    is proof that the defendant is guilty of each and every

13    charge.

14          We don't have just one witness in this case.  You

15    have more than one witness.  You have two statements, you

16    have a statement in the defendant's own handwriting that he

17    beat-up his daughter, that he slapped her around.  You have

18    a second statement admitting that he had an ongoing sexual

19    relationship with her.

20          But you don't only have Sana's name, you don't

21    only have two written statements, you have a video

22    statement.  On video, under -- excuse me -- all of it

23    captured on camera, no statements were made to any members

24    of the district attorney's office that were not videotaped.

25    And I ask you to look at that and remember what you saw.

1     Did he appear scared?  Did he appear nervous?  Did he appear

2     unwilling to testify -- excuse me -- unwilling to speak?

3     Did he appear intimidated?  Did he appear roughed up?  No.

4     He wasn't injured, he wasn't attacked.  He told the police,

5     he told the district attorney's office what he did.

6               We have even more evidence of the defendant's

7     guilt.  You have more than Sana's word, you have more than

8     two written statements, more than a videotaped statement.

9               You have a knife that was recovered from his car

10    that was described by Sana that was used inside that car and

11    in the house.

12              And you have a vibrator that Sana described, was

13    used in the exact location of where she told the police it

14    was ultimately recovered.

15              You have even more than her word and two

16    statements and a videotape and a knife and a vibrator,

17    because you have her emotionally disclosing to her friend

18    after years of abuse the man that she called dad abusing

19    her.  And unlike what the defendant wants you to believe

20    that there is no evidence, there is overwhelming evidence in

21    this case.  The evidence is stacked up against the

22    defendant, and when you evaluate all of the evidence, all of

23    the evidence that you have seen and heard, the testimony

24    that you've seen and heard, don't base arguments on

25    speculation or a whim.  Base things on what there is no

                                                    gjn

1      testimony or evidence of.

2            When you evaluate all of it, rather than pick out

3      pieces as the defendant tries to do, it only points to one

4      reasonable conclusion, and that is that the defendant was

5      sexually abusing his daughter from 2005 through 2008.

6            You know, notwithstanding the fact that there are

7      two conflicting versions of events and someone took the

8      stand and lied, there are numerous facts that everybody

9      agrees on.

10           You know there is no dispute as to the fact that

11     Sana was born on March 1, 1991 and the abuse began when she

12     was fourteen years old.  There is no dispute.

13           The fact that the defendant was born February of

14     1958, there is no dispute.

15           The fact that during that entire time period the

16     defendant and Sana both lived inside their home in Bellrose,

17     242-10 89th Avenue here in Queens.

18           And there is no dispute to the fact that that

19     videotape, in that videotape, he uses the words, those were

20     words that he used on that video.  They are there for you to

21     evaluate.

22           And there is no dispute that on June 21st, the

23     defendant's hands connected to Sana's body.

24           There is no dispute that he hit her on the face

25     and the arms.

1          There is no dispute that it caused her to cry and

2    she got upset.

3          There is really only one issue for you to decide

4    and that's who do you want to believe.  I submit Sana was

5    truthful and told you what happened to her from 2005 through

6    2008.

7          Because some of this is not in dispute, I submit

8    some of the arguments that the defendant has tried to make

9    to you are arguments that are intended to divert your

10   attention away from the real issues in this case, and that's

11   who testified truthfully.  Some things are meant to divert

12   your attention from this issue because they play no role, I

13   submit, in your deliberations.  I submit when you are

14   deliberating and somebody brings up one of these

15   distractions that I am going to point out to you, that you

16   should point out to your fellow juror that it does not help

17   you to decide the ultimate issue in this case and that's who

18   told the truth.

19          First thing is the medical records.  What does

20   that do to help you decide whether Sana told you the truth

21   or not; what medical evidence do you expect to see when

22   someone's tongue touches somebody else's vagina?  What do

23   you expect to see in there that?  Do you expect the tongue

24   to do some sort of horrendous damage that the doctor is

25   going to testify to?  No, it's common sense.

1           Common sense dictates that when somebody's mouth

2     is on somebody else's vagina, there is no injury, no injury

3     in a medical record that's going to point out to any

4     specific abuse.

5           He touched her breast.  Use your common sense, use

6     your life experience.  Is that going to cause some sort of

7     injury, something that a doctor is going to be able to say

8     oh, her breast had fingerprint marks on it from June of

9     2008, weeks before.  It does nothing to help you in your

10    ultimate issue in this case.

11          The setup of the home is another distraction.  You

12    know what is the fact that the rooms are next to each other,

13    the living room is spread opened.  Do you think that when

14    the defendant was going to abuse his daughter he called the

15    family down to let them know what was going to happen?

16    Honey, I'm going to pull my daughter to the basement now and

17    get on my knees and abuse her.  Does that make sense?  Is

18    that reasonable?  Defies common sense, it's illogical.

19          And if his argument is illogical, if his argument

20    is unreasonable, doesn't make sense, push it aside and you

21    are free to not use that in your deliberations.

22          And again, when someone brings up these medical

23    records with the ridiculous argument about the setup of the

24    home, I say, I ask you to tell your fellow juror to pay no

25    mind to that.  It does nothing to help us with the ultimate

1          issue in this case.

2                    Finally, the last distraction is this whole

3          argument about grades.  I mean, really, it is so offensive

4          to say that somebody who has been abused can't do well in

5          school.  I mean really.  That is just offensive.  Every

6          traumatic event in somebody's life has a drastic increase --

7          you are saying at some point in somebody's life somebody is

8          abused, that all of a sudden the grades drop?  It's absurd.

9          It's absolutely absurd.  It is unreasonable.  It is

10         illogical.  The argument defies common sense, and if an

11         argument defies common sense, you are free to push it aside

12         and not use it.

13                   So when you push aside the defendant's

14         distractions, when you brush aside the things that mean

15         nothing to the ultimate issue in the case, what is the

16         ultimate defense?  I mean, the defense in this case, the

17         defense in this case is that every single person who

18         testified for the People is lying, every single one of them.

19         Sana, liar; Denise Alioto, liar; Christine Alioto, liar;

20         Officer Alfaro, liar.  Actually, not one person according to

21         his version of the events testified and told the truth.

22                   So before you just call somebody a liar, I ask you

23         to consider what does that mean?  Where does the defense

24         come from?  What evidence is there before you to come to the

25         conclusion that everybody is lying?

1        During jury selection and when the judge instructs

2    you on the law, you were told to not base your verdict on

3    speculation or whim.  That's what he is asking you to do.

4    That's where this defense comes from.

5        You know, during the course of this trial the

6    defendant was -- you were told numerous times he has no

7    burden, okay?  The burden of proof remains on the People,

8    remains with me the entire case.  But they did put on

9    evidence, and because they did, it's subject to the same

10   scrutiny as any evidence in the case.  It needs to be

11   analyzed and it needs to be dissected.

12       And what they had in this case coming into this

13   courtroom is they had the defendant admitted on paper that

14   he abused his daughter.

15       They had coming into the case the defendant

16   admitting on paper that he physically assaulted her.

17       They had on coming into this case on video the

18   defendant molested his daughter.

19       So the argument here today before you is everybody

20   is lying.  What reason based upon the evidence you've heard,

21   not based upon whim, not based upon speculation, based upon

22   the evidence that you heard, what reason on June 23, 2008

23   when her mother goes to sleep, when Sana's siblings are in

24   bed, what reason does she have to call her friend, her best

25   friend, and tell her that she is being molested?  What

                                                    gjn

1    reason?  What reason does she have to call her friend's

2    mother -- excuse me, not call her friend's mother -- ask to

3    speak to her friend's mother and tell her that she is being

4    molested and her father plans to rape her?  There is no

5    reason.  There is no evidence before you to reach that

6    conclusion.

7              What evidence before you leads you to conclude

8    that a 17 year old girl with a family with financial

9    support, doing well in school, is going to rip apart her

10   life, walk into a precinct and tell a police officer, tell a

11   detective, tell members of the district attorney's office,

12   then go to the hospital and tell everyone that she is being

13   orally sodomized by her father?

14             What reason would Sana go into a grand jury and

15   testify in front of complete strangers that her father

16   forced her to engage in these acts?  There is none.

17             What reason would she have to come back then

18   before you, in front of a roomful of strangers, in front of

19   her own stepfather, subject herself to cross-examination?

20   What reason, why would she have to do that?  There is no

21   reason whatsoever that you have heard.  There is no reason.

22   There is no evidence to suggest that she is the type of

23   person who would make up this allegation.

24             I mean, use your common sense and your life

25   experiences.  What's the type of person who comes before a

gjn

1      group of strangers, the police, and makes up, intentionally

2      lies about being abused by her stepfather?  Who is that type

3      of person?  That person would have to be so sick, so

4      sinister, so despicable, so screwed up in the head, that's

5      the type of person who would make that up.

6              What kind of hatred, what kind of animosity does

7      somebody have to make that up against their stepfather.

8              And compare that to the testimony and the evidence

9      you heard in this case about Sana Awan.  She did well in

10     school, she didn't do drugs, she didn't drink alcohol, she

11     behaved.  She has no motivation to lie.  She gains nothing

12     from being here, she receives no benefit.

13             You know, evaluate again, when you consider the

14     motivation to lie, that she has none, with what she gave up

15     and what she got now.  She gave up vacations, she gave up

16     trips, she gave up the life living with siblings whom she

17     loved, whom she cared about who she now never sees, no

18     contact whatsoever.  They provided her food, her family

19     provided her shelter.  They provided her a cell phone and

20     insurance and she took that and she gave all of it up and

21     went into foster care.  Why?  There is no evidence before

22     you to suggest that she is this type of person.

23             And evaluate Sana Awan now.  She is 19 years old,

24     and when she first made this -- when she first told the

25     police about the allegations about her stepfather, she was

gjn

1        17.  Use your common sense.  Use your life experience.  What

2        are the things that a girl between the ages of 17 and 19 are

3        concerned about?  They are concerned about things that any

4        teen-ager is concerned about; their clothing, their hair;

5        how they appear in front of their friends; their

6        self-consciousness.

7                What did Sana Awan do?  She took all of the

8        self-conscious thoughts that a normal child has and is

9        forced to express over and over again that her father is

10       putting his mouth on her vagina.  Putting his hand down her

11       pants, putting his hand up her shirt.  She is forced to

12       suffer the embarrassment of telling men detectives, female

13       officers, doctors; for what?  For what purpose?  There is no

14       evidence to suggest that she has any reason to do it.

15               And then maintain the allegations because what he

16       is saying is true, she has maintained this lie since June of

17       '08.  She is out of the house.  It's not a runaway train.

18               If at any point in time the allegations were

19       false, she comes over to the district attorney's office and

20       says, it's all false, it's a lie, I made it up.  But she

21       continues to testify before a grand jury, she continues to

22       testify before you for two years.  That's the girl they want

23       you to believe is a liar.

24               You know, she told you the first time she ever

25       received any sort of gynecological exam, and for the men,

1      ask the women about the invasiveness of this type of an

2      exam.   This is a girl who had never been to that type of

3      doctor, but in June of 2008 after running out of her house

4      to her friend's car for safety, after being questioned by

5      the detectives and the police, she is brought to a hospital

6      to a doctor she has never met or seen, a doctor -- she told

7      you, she didn't choose, her knees are pressed up towards

8      where her ears are, and a doctor who she has never met is

9      examining her genitalia.   That's what this girl chose to do?

10     For what?   For what purpose?   What does she get out of that?

11              You know, at some point on June 24, 2008 after

12     midnight when everybody starts coming down, any time

13     Detective Shulman, Officer Alfaro, Assistant District

14     Attorney Hughes, the doctors, at any time, she just needed

15     to say:   You got me, but she didn't, she continues to tell

16     you the truth.

17              You know, maybe when the doctors have her in the

18     gynecological exam, that may have been the whole time, she

19     may have wanted to point out that it wasn't true.   But she

20     didn't.   In order for you to believe that these allegations

21     were made up, you have to believe she is a sick, despicable

22     human being.

23              And why say sex?   You know, if the argument by the

24     defendant is that she made it up because she wanted a boy,

25     she liked a boy, she had bruising on her arms, all she

gjn

1       needed to say is my dad hit me.  All she needed to say is my

2       dad beat me up and she is out, she gets what they say she

3       wanted.

4              Why does she pick the most embarrassing,

5       humiliating personal topic to talk about with members of the

6       police to you?  Why talk about sex?

7              She tells the police that she is abused because

8       for the last three years she was abused.  Their defense

9       doesn't make sense.  Their defense is unreasonable, the

10      arguments are illogical.  It defies common sense.  It's not

11      a reason to doubt the People's witnesses.  She was not the

12      cold, calculating liar that I submit the defendant portrays

13      her to be.

14             She is able to recall the events, in fact some of

15      the events which you are going to be asked to reach a

16      verdict on are the ones she specifically recalls.  She told

17      you there were other events that occurred that were

18      continuous, that happened over time that she can't tell you

19      specific incidents.

20             MR. BANDELLI:  Objection, your Honor.

21             THE COURT:  What's the basis of your objection?

22             MR. BANDELLI:  Talking about stuff that's not

23      going to be charged in the case.

24             MR. ROSENBLATT:  Talking about the testimony,

25      Judge.

                                                           gjn

1          MR. BANDELLI:  Saying there is --

2          THE COURT:  Ladies and gentlemen, it's your

3    recollection of the testimony that counts, not what either

4    side of the case says.

5          And if your recollection should fail, you can have

6    everything read back to you as you wish.

7          Proceed.

8          MR. ROSENBLATT:  Thank you, your Honor.

9          She told you some of these acts she has no

10   specific recollection about.  I submit to you when you

11   evaluate her testimony, you'll find it plausible, truthful.

12   I submit that her testimony was consistent with the other

13   witnesses in the case, that when you evaluate her

14   credibility, she has no bias, no hostility, no anger, no

15   motivation to lie, no reason to distort the truth.  Her

16   testimony was consistent over time.  She wasn't impeached

17   with any inconsistencies.

18          These are factors which you as jurors can use when

19   evaluating credibility of witnesses.  These two stories, the

20   defendant's version of events and what Sana and what

21   happened to Sana are certainly conflicting.

22          I submit to you that when the defendant presented

23   witnesses, they contradicted each other.  The defendant made

24   a decision as he pointed out, to call Jenny Gopaul, the

25   defendant's wife.  She wasn't my witness, she was his.  It

1     was his decision to call her.

2          And as the judge will instruct you, I am free to

3     call as many or as few witnesses as I choose, but this was

4     the defendant's position, presumably they called her because

5     she had to provide information to help him.  Well, boy, did

6     that backfire, because even the defendant's own wife told

7     you he confessed to her.  She continued to argue with him

8     over time about the fact.

9          MR. BANDELLI:  Objection to this part of

10    summation, Judge.

11          THE COURT:  Overruled.

12          MR. ROSENBLATT:  That he confessed to her.  She

13    continued to press him after June 24th, the day he confessed

14    to her.  She continued to talk to him after he confessed to

15    her into 2009.  He was her financial support.  He provided

16    the income, he paid the mortgage, he paid the bills.  When

17    you consider her testimony regarding the day her husband was

18    arrested, I ask you to remember the questions and the

19    answers that she claims she didn't remember, because when

20    she was questioned on cross-examination about whether she

21    remembered whether her husband admitted to her that her

22    daughter was abused, she was asked whether she remembered

23    the day her husband confessed to her that he molested his

24    daughter --

25          MR. BANDELLI:  Again, note my objection to this

gjn

1      part of the summation, Judge.

2                  THE COURT:  Overruled.

3                  MR. ROSENBLATT:  And she (indicating) told you she

4      didn't remember.  She didn't remember.  She didn't remember

5      the day her husband admitted to her that he molested her

6      daughter.

7                  In her own words:  So you would agree with me,

8      that on June 24, 2008, the defendant admitted to you that he

9      abused his daughter Sana, correct?

10                 "ANSWER:  Yes."

11                 Under oath.

12                 On June -- excuse me -- Mr. Gopaul admitted on

13     cross-examination on July 10th of 2009, Ms. Gopaul, she told

14     the defendant he cannot return to her home because he

15     molested Sana.  Now at first, she denied it.  Then she

16     denied taking her to her husband's attorney's office

17     claiming that she couldn't leave her 17 year old daughter at

18     home alone.  17 year old and she couldn't be left at home

19     when she went to his lawyer's office?  She couldn't be left

20     at home alone because she wanted to bring her daughter to

21     the lawyer's office to get her husband back to get the

22     income back.  Her testimony was offensive.  She took her

23     husband's side the day after Sana told the police she was

24     molested.  That's the type of person that they called.

25     That's the type of person that Sana couldn't trust.  That's

                                                            gjn

1          the type of person that Sana described to you that she

2          didn't want to tell about the abuse.

3                So when you're examining why Sana wouldn't want to

4          tell her mom?  That's why (indicating).  And she also told

5          you because she wasn't aware of what defendant's story was,

6          that he left the home.

7                MR. BANDELLI:  Objection to defendant's story.

8                THE COURT:  Sustained.

9                MR. ROSENBLATT:  The defendant's -- what the

10         defendant's testimony would be that he left the home between

11         3:30 and 4:00 in the morning, well, that's in direct

12         contradiction to what the defendant wants you to believe.

13         In fact, if he leaves the house at 3:30 to 4:00 in the

14         morning, it corroborates everything that DA told you she

15         saw.

16                Defendant testified last.  He sat and listened to

17         each and every witness.  He heard all of the evidence, he

18         reviewed every document, he was the witness who heard every

19         other person's testimony.  He is the only one who did that.

20         And after doing that, he chose to testify that was his

21         decision.  And when your wife can't do the job for you,

22         apparently he needed to finish it for himself.  His plan to

23         distort the truth to you backfired because his statement to

24         you is so patently illogical, is so patently unreasonable

25         that it defies common sense.

                                                              gjn

1           When -- excuse me -- when given the opportunity to

2     testify, when given the opportunity to take the stand, he

3     chose to admit one major piece, one major piece he never

4     wanted to explain and that's the decision to admit to his

5     wife on June 24th that he molested his daughter.  He chose

6     to not provide you with that information.

7           MR. BANDELLI:  Objection, your Honor.

8           THE COURT:  Sustained.

9           MR. ROSENBLATT:  After being forced to sign

10    documents, according to the defendant's version of events,

11    he you wants to believe that by confessing to touching her

12    daughter's breasts to forcing his hand down her pants to

13    forcing her to touch his penis, that he is going to be let

14    go.

15          What?  In what civilized society, in what country,

16    in what democracy would we have an individual walk into a

17    precinct, tell the police that they are abusing their

18    stepdaughter and then be escorted out the front door and

19    told have a nice day?  Mr. Gopaul, thanks for telling us

20    about the abuse between you and your stepdaughter.  It is

21    absurd.  It is so absurd it defies every logic that we have

22    as people.  It defies common sense, it defies life

23    experience.

24          You know, when you compare the testimony of

25    Mrs. Gopaul to the testimony of Sana, when Sana told you I

gjn

1    don't think I can confide in her, I didn't know whether she

2    would believe me, Sana was dead right.  All of her fears,

3    all of her concerns about ever disclosing it to her mother

4    about what would she do would, she confronts the defendant,

5    would he deny it, would he just say it didn't happen then

6    she would be forced to live there?

7              It all became reality.  She chose to ostracize her

8    daughter.  She chose to kick her out of the house.  She

9    chose to dump her belongings on the street.  She chose to

10   not cooperate with CPS, Child Protection, she refused to

11   give her own sister and brother candy she wanted to give

12   her.  That's the type of person defendant chose to marry.

13             And you can use those things when you evaluate the

14   testimony, and notwithstanding all of those things about

15   what the mother did and who she was, never did Sana make an

16   allegation against her.  The person that she didn't confide

17   in, the person that didn't help her, the person who she had

18   no real relationship with in her house, there is not an

19   allegation against her.  Never was one.  So if she is making

20   up answers because she doesn't like her mom and dad because

21   she wants a more free way about her life, why did she point,

22   pick the guy who actually cared about her?  Because the

23   defendant was the one who was abusing her.

24             When you evaluate what's consistent, when you

25   evaluate what makes sense, when you evaluate what's

                                                      gjn

1    reasonable, I submit to you that I have proven the

2    defendant's guilt beyond any reasonable doubt.

3         Sana told you what she remembered and what she

4    didn't.  She told you the specific acts that she recovered,

5    and she did her best to point out the time periods, in fact

6    because it happened over such a period of time, you were

7    presented with the testimony of Dr. Lewittes.

8         Dr. Lewittes, you are free to accept or reject his

9    testimony just like any other witness.  But he was brought

10   in to help explain the dynamics, what happens in adolescent

11   sexual abuse.  Because this is so unique, it is so

12   different, because things weren't what we normally expect,

13   and I submit he explained to you the reasons why somebody

14   who has been the victim of abuse can't remember every single

15   act, why the acts blend together, why when they occur

16   together, why they blend together, why it's more common to

17   remember the first act, the specific details which Sana did

18   between -- excuse me -- between May of 2000 and June of 2005

19   in the shower.

20        When you examine all of the evidence, when you

21   examine Sana's testimony, when you compare it to this

22   videotaped confession which -- let me point out one thing

23   and I am almost done, so just bear with me -- according to

24   the defendant, Detective Shulman told him what to say; in

25   fact, he provided the words.  But the words provided on the

1   video are touching.

2           If Detective Shulman was going to tell the

3   defendant the words to say, why didn't he tell them to use

4   the words "lick it," because that's what Sana was saying in

5   the precinct, to the grand jury, in the hospital.  Sana is

6   telling everybody all along, he touched me and he licked me.

7   So if the defendant is this big ogre, this big bruiser who

8   is setting up this confession, why not get all of it?  I

9   submit to you the defendant tried to minimize his

10  responsibilities on that tape and that's why during opening

11  statement and now again, I indicate to you the defendant's

12  admissions on that tape are not completely truthful because

13  he tried to minimize his responsibility on camera.  He tried

14  to minimize his responsibility to the police.

15          So I ask you not to just accept the fact that Sana

16  was touched, she was licked by the defendant as well.  Those

17  words by the defendant on this video are his words and

18  that's how you know, because if it was in fact a forced

19  confession, then they would have told him to say he forced

20  her -- excuse me, he forceably licked her vagina.

21          When you analyze all the testimony, when you

22  evaluate the testimony of Assistant District Attorney

23  Hughes, Officer Alfaro or Christine and Denise Alioto, all

24  of this corroborates Sana's story.

25          When the judge charges you on the law, I want you

                                                        gjn

1    to pay attention to the charges he is going to present to

2    you.  I want to go through them quickly, so I want you to

3    understand what evidence is proven, each count.

4          When you listen to the first six counts, charge of

5    criminal sexual act in the first degree, listen when the

6    judge instructs you on the law on those counts.  Those

7    counts require force, right?  I submit to you that the

8    testimony as described by Sana make out each force;

9    specifically, the first act between May and June of 2005,

10   that's count one.  The incident Sana described inside the

11   bathroom when he removed her towel and forced open her legs.

12         Count two applies to the specific incident that

13   Sana described in May of 2006 when she was inside her room

14   and the defendant forced his mouth on her vagina.

15         Count three applies to the specific incident

16   between January, February of 2008 Sana described to you when

17   she tried to go upstairs, defendant forced her to watch

18   porn, held her on his lap, forced his mouth on her vagina.

19   When you listen to the judge's instruction on count four,

20   that applies to the incident that she described in March of

21   2008 sometime after her birthday that she told you she

22   remembered when she was told to come into the dining room

23   and he forced her down on the floor.

24         When you listen to count five, that's the count

25   that applied to the specific incident described in April of

gjn

1    2008 when her mother was gardening outside and she was

2    forced to go downstairs and the defendant forced his mouth

3    on her vagina next to the freezer.

4            Count six applies to the specific incident she

5    described in May of 2008 where the defendant was sharpening

6    the knife that you saw in evidence inside the kitchen and he

7    told her she was going to force some utensil up her vagina

8    if she didn't comply.

9            That's counts one through six, all requiring six,

10   that's his mouth to her vagina.

11           Count seven and eight charges defendant with

12   sexual abuse in the first degree.  Those are specific

13   charges for his forcing his hand on to her vagina.  The law

14   doesn't require her -- excuse me -- the law doesn't require

15   his finger to be inserted into a vagina, the law only

16   requires that I prove to you that he forced his hand to

17   touch her vagina and did he that for the purpose of

18   satisfying his sexual desires.

19           Count seven applies to the incident between

20   January and February of '08, the corner incident.

21           Count eight is the June 2008 incident that she

22   described during the last month when she was inside her room

23   and defendant came into her room when she was under the

24   covers.

25           Counts nine through eleven charges defendant with

gjn

1    sexual abuse in the second degree, but this time under the

2    theory he forced his hand to her breasts, that's his hand

3    touching her breasts.  Count nine applies to the incident

4    between January and February with the porn.

5            Count ten applies to the incident in June of 2008

6    in the bedroom.

7            Count eleven applies to the act, the specific act

8    described in May of 2008 in the car on Commonwealth

9    Boulevard when she was on her way to school and the

10   defendant told her he wanted her to engage in oral sex and

11   she refused, then the defendant threatened her to cut off

12   the finger with the knife that's in evidence, he then forced

13   his hand on to her breast.

14           Count twelve charges the defendant with sexual

15   abuse in the first degree, forcing Sana to touch his penis

16   in the kitchen as described by her in May of 2008.

17           Now counts thirteen through fifteen apply to

18   criminal sexual act, but these are statutory crimes.

19   Thirteen --

20           MR. BANDELLI:  Objection, Judge.

21           THE COURT:  Sustained.

22           MR. ROSENBLATT:  Count thirteen charges the

23   defendant with criminal sexual act in the second degree,

24   that's his mouth to her vagina, but this requires no force.

25           MR. BANDELLI:  Objection, your Honor.

gjn

1        THE COURT:  Mr. DA, I'll charge the jury on the

2    law.

3        MR. ROSENBLATT:  Yes, your Honor.

4        Listen to the judge's instructions when he

5    compares -- excuse me -- when he tells you the law as it

6    applies to criminal sexual act second and third and how it's

7    different than the first degree, because count thirteen

8    applies to the first incident when Sana was fourteen years

9    old and the defendant was where --

10        MR. BANDELLI:  Objection, your Honor.

11        THE COURT:  What's the basis of the objection?

12        MR. BANDELLI:  I thought it was the role of the

13    Court to go through the counts and the elements of the

14    counts and charge them on the law.

15        THE COURT:  Overruled.

16        MR. ROSENBLATT:  During that first incident, Sana

17    was fourteen years old and the defendant was greater than

18    eighteen, and on that date, that's the count that applies to

19    the ages.  Listen to the judge's instructions.

20        Counts fourteen and fifteen charge the defendant

21    with criminal sexual act in the third degree, that is his

22    mouth to her vagina.  Listen to the judge's specific

23    instruction on how criminal sexual act in the third degree

24    differs from second and first degree.

25        During these two counts, Sana was under the age of

1    17 and the defendant was over the age of 21.

2          Count 16 charges the defendant with assault in the

3    third degree.  That charge applies to the defendant when he

4    assaulted Sana inside their home, assaulted her so bad that

5    his own wife had to tell him to stop.  He was so angry that

6    Ms. Gopaul was actually even more upset on that issue.

7          And count 17 charges the defendant with

8    endangering the welfare of a child.

9          Members of the jury, soon you're going to go back

10   to the jury room and you're going to deliberate.  And when

11   you go back there, I ask you to remember how the defendant

12   used his role as her father, how he took advantage of the

13   fact it was his own daughter, how he used his power.

14   Remember how he took advantage of the time that he had

15   alone, the limited time he had and how he needed to hurry

16   through those events because other people were around.  The

17   defendant violated the trust placed in him by his own wife.

18   He was a grown man, he was Sana's stepfather, he betrayed

19   the trust in him to satisfy his sexual desires.

20         When you go back to that jury room, remember how

21   every piece of testimony that you heard from Sana Awan is

22   corroborated.  Remember how the defendant confessed not only

23   on video to the police but to his own wife.  The defendant

24   began to find his stepdaughter attractive and he could not

25   help himself.

                                                    gjn

1      Tell the defendant by your verdict that you know

2   what he did.  Tell him that you know he forced his mouth and

3   his hands on Sana's vagina and tell him with your verdict

4   that you know he forced his hand down her pants.  Tell the

5   defendant with your verdict that you know that he forced

6   Sana to touch his penis, and when you do that, when you

7   return a verdict, when you return the only fair and just

8   verdict, the only verdict consistent with the evidence free

9   from a whim or speculation, you'll find the defendant guilty

10  of each and every charge that he is charged with.

11      Thank you.

12      THE COURT:  Thank you, Mr. DA.

13      Ladies and gentlemen, we are going to take a quick

14  five minute recess to allow you to use the facilities before

15  I charge you on the law.

16      Remember you are still not to discuss the case

17  among yourselves or with anyone else and you are still not

18  to form any opinion as to whether or not you feel the

19  defendant is guilty or not guilty of the crimes with which

20  he is charged.

21      Please follow the instructions of the court

22  officer.

23      (Whereupon, the jury exited the courtroom and the

24  following occurred:)

25      THE COURT:  Take a five minute recess.

                                                        gjn

1        Put the defendant back in.

2        (Whereupon, a recess was taken, after which the

3    following occurred.)

4        (Whereupon, the jury entered the courtroom and

5    upon taking their respective seats, the following occurred:)

6        THE CLERK:  Case on trial.  All parties present,

7    your Honor.

8        Do both sides stipulate that all jurors are

9    present and properly seated?

10       MR. ROSENBLATT:  Yes.

11       MR. BANDELLI:  Yes, so stipulated.

12       THE COURT:  Members of the jury, we have now

13   reached that point in the trial when you are to assume your

14   actual function as jurors.  You have heard all the evidence

15   in the case.

16       My charge on the law is divided into two principle

17   parts; the first one is the rules applicable to criminal

18   trials in general, and the second part of my charge is

19   applicable to the charges in the indictment.

20       As I have previously stated, an indictment is not

21   evidence.  It's merely the device required by law to inform

22   the defendant of the charges against him and to bring such

23   charges to trial as we have done here.

24       You and I are sitting here together as judges.

25   You are the judges of the fact and I as the judge of the

1    law.   You as jurors and I as the Court have individual

2    responsibilities in seeing that a just result is reached

3    both on the law and on the facts.

4            The first and most important principle for you as

5    jurors to remember is that you are the sole and exclusive

6    judges of the facts in this case.   In that capacity, you

7    will decide the facts coolly, calmly and deliberately

8    without fear or favor or passion or prejudice or sympathy,

9    and solely on the evidence submitted during the trial and

10   pass judgment upon, if in determination of all the issues,

11   you must not under any circumstances indulge in any

12   speculation.   You must not under any circumstances indulge

13   in any guesswork.

14           In other words, don't try to be detectives.   Don't

15   try to conjecture what you would do or what should have been

16   done or what could have been done or what might have been

17   done.   Your own recollection, understanding and evaluation

18   of the facts presented as evidence at this trial is what

19   controls regardless of what counsel on either side of the

20   case may say about the facts and regardless of what I may

21   say about the facts.   I have no power to tell you what the

22   facts are, to tell you that one fact is more important than

23   another.   Those are all matters within your own and

24   exclusive power as judge of the facts.

25           You are not bound to accept the arguments of

1      respective counsel. If you find that any argument by either

2      of them is reasonable and logical based upon the evidence as

3      you recall it and is consistent with that, then you are free

4      to accept that argument as your own and give it as much

5      weight as you deem advisable.

6              On the other hand, if you find that any argument

7      or conclusion is not based upon the evidence or that it is

8      unreasonable, illogical or inconsistent with the evidence,

9      you may disregard it entirely.

10             As to the law of the case, however, you as jurors

11     must not set up your own preconceived notions of what the

12     law should be. You must accept the law as I'm giving it to

13     you without reservation and you must apply the law as I am

14     giving it to you for your guidance in determination of all

15     the issues here.

16             During the course of the trial I have denied

17     motions made by the People and by the defense. Such rulings

18     have been matters of law only. You are not to speculate on

19     my rulings. They were made concerning the rules of

20     evidence.

21             Each and every one of you has it within your power

22     to draw proper, reasonable and just inferences from the

23     testimony and the exhibits in evidence and to determine the

24     probabilities arising from the case after carefully

25     analyzing, weighing and considering the testimony of each

1    witness who has testified at this trial.

2              Since you are the exclusive judges of the facts,

3    you have a duty to evaluate the testimony.  It's your duty

4    to sort out what you believe to be the credible testimony

5    and to disregard any testimony you do not consider credible.

6              During the course of the trial, instances may have

7    occurred which you were instructed to disregard, and at

8    times questions were asked to which objections were

9    interposed and which I sustained.  You must not be

10   influenced by them nor shall you draw any inference with

11   respect to any of them.

12             As I told you in the beginning of the case,

13   questions in and of themselves are not evidence.  It's the

14   answers coupled with the question that constitutes evidence

15   in this case.  Any inference confined in the question are

16   not to be considered facts unless the answer confirms that

17   inference.  When you judge the facts, you are to consider

18   only the evidence and the evidence in this case consisted of

19   the testimony of the witnesses and any exhibits that were

20   received in evidence.

21             Testimony which was stricken from the record or to

22   which an objection was sustained must be disregarded by you.

23   Exhibits that were received in evidence are available upon

24   your request for your inspection and your consideration in

25   the jury room as you start to deliberate.

1          As judge of the facts, you alone determine the

2     truthfulness and accuracy of the testimony of each witness.

3     You must decide whether a witness told the truth and was

4     accurate; or instead was mistaken or testified falsely.

5          You must also decide what importance to give to

6     the testimony you accept as truthful and accurate.  It's the

7     quality of the testimony that's controlling, not the number

8     of witnesses.  The testimony of one witness, if you find

9     such testimony credible and you are satisfied from that

10    testimony and from all of the evidence offered of the

11    defendant's guilt beyond a reasonable doubt, it may be

12    sufficient to convict a defendant.

13         If you find that any witness has intentionally

14    testified falsely as to any material fact, you must

15    disregard that witnesses entire testimony; or you may

16    disregard so much of it as you find untruthful and accept so

17    much of is it as you find to be truthfully and accurately

18    given.

19         There is no particular formula for evaluating the

20    truthfulness and accuracy of another person's statements or

21    testimony.  You bring to this process all of your varied

22    experiences.  In life, you frequently decide the

23    truthfulness and accuracy of statements made to you by other

24    people.  The same factors used to make those decisions

25    should be used in this case when evaluating the testimony

1     that you heard.

2              Some of the factors that you may wish to consider

3     in evaluating the testimony of a witness is as follows:  Did

4     the witness have an opportunity to see or hear the events

5     about which he or she testified; did the witness have the

6     ability to recall those events accurately; was the testimony

7     of the witness plausible and likely to be true, or was it

8     implausible and not likely to be true; was the testimony of

9     the witness consistent or inconsistent with other testimony

10    or evidence in this case; did the manner in which the

11    witness testified reflect upon the truthfulness of that

12    witness's testimony; to what extent, if any, with the

13    witnesses' training, background or experience affect the

14    believability of that witness's testimony; did the witness

15    have a bias, hostility or some other attitude that effected

16    the truthfulness of that witness's testimony.

17             You may consider whether a witness did or did not

18    have a motive to lie; if a witness had a motive to lie, you

19    may consider whether and to what extent if any that motive

20    effected the truthfulness of that witness's testimony.  If a

21    witness did not have a motive to lie, you may consider that

22    as well in evaluating the witness's truthfulness.

23             You may consider whether a witness made statements

24    at this trial that are inconsistent with each other; you may

25    also consider whether a witness made previous statements

1    that are inconsistent with his or her testimony here; you

2    may consider whether a witness testified to a fact here at

3    trial that the witness omitted to state at a prior time when

4    it would have been reasonable and logical for the witness to

5    have stated the fact.

6           In determining whether it would have been

7    reasonable and logical for the witness to have stated the

8    omitted fact, you may consider whether the witness's

9    attention was called to the matter and whether the witness

10   was specifically asked about it.

11          If the witness has made inconsistent statements,

12   you may consider whether and to what extent the effect the

13   truthfulness or accuracy of that witness's testimony has

14   here at this trial.

15          The contents of a prior inconsistent statement are

16   not proof of what happened.  You may use evidence of a prior

17   inconsistent statement only to evaluate the truthfulness or

18   accuracy of the witness's testimony here at this trial.  You

19   may consider whether a witness's testimony is consistent

20   with the testimony of other witnesses or with other evidence

21   in this case.  If there were inconsistencies by one witness,

22   you may consider whether they were significant

23   inconsistencies related to important facts or instead were

24   minor inconsistencies.

25          In this case, you heard the testimony of police

1    officers.   The testimony of a witness should not be believed

2    solely and simply because the witness is a police officer.

3    At the same time, a witness's testimony should not be

4    disbelieved solely and simply because the witness is a

5    police officer.   You must evaluate a police officer's

6    testimony in the same way you would evaluate the testimony

7    of any other witness.

8         You will recall that Dr. Don Lewittes, an expert

9    in the field of clinical psychology and adolescent sexual

10   abuse, testified about certain technical matters and gave an

11   opinion on such matters.

12        Ordinarily, a witness is limited to testifying

13   about facts and is not permitted to give an opinion.   Where,

14   however, scientific, technical or other specialized

15   knowledge will help the jury understand the evidence or to

16   determine a fact in issue, a witness with expertise in a

17   specialized field may render opinions about such matters.

18   You should evaluate the testimony of any such witness just

19   as you would the testimony of any other witness.   You may

20   accept or reject such testimony in whole or in part just as

21   you may with respect to the testimony of any other witness.

22        In deciding whether or not to accept such

23   testimony, you should consider the following:   The

24   qualifications and believability of the witness; the facts

25   and other circumstances upon which the witness's opinion was

gjn

1    based; the reasons given for the witness's opinion; and

2    whether the witness's opinion is consistent or inconsistent

3    with other evidence in this case.

4         I will now discuss the law as it relates to

5    testimony concerning the defendant's statements made to

6    police officers.

7         Our law does not require that a statement by a

8    defendant be in any particular form; it may be oral, written

9    or electronically recorded.  A statement in written form

10   need not have been written or signed by the defendant

11   provided that the defendant adopted the statement.  A

12   defendant adopts a statement when he knowingly acknowledges

13   the contents of the statement as his own.

14        In deciding whether the statement was adopted, the

15   presence or absence of the defendant's signature may be

16   considered.  There is no requirement that a statement be

17   under oath.

18        There is testimony that while the defendant was in

19   custody, the police asked him what we call pedigree

20   questions concerning matters relating to his name, address,

21   date of birth, et cetera.

22        Under our law, a police officer may ask those

23   questions of a person who is in custody and the officer is

24   not required to advise the defendant of his rights before

25   doing so; thus, if you find the defendant made such

1   statements, you may consider them in your evaluation of the

2   evidence.  In determining whether the statement was made,

3   you can apply the tests of truthfulness, accuracy that we

4   have already discussed.

5            There is testimony that while the defendant was in

6   custody he was questioned by the police and made an oral,

7   written and videotaped statement.  Under our law, before you

8   may consider any such statement as evidence in the case, you

9   must first be convinced that the statement attributed to the

10  defendant was in fact made by him.  In determining whether

11  the defendant made the statement, you may apply the tests of

12  believability and accuracy that we have already discussed.

13           Also, under our law, even if you find the

14  defendant made a statement, you still may not consider it as

15  evidence in the case unless the People have proven beyond a

16  reasonable doubt that the defendant made the statement

17  voluntarily.

18           How do you determine whether the People have

19  proven beyond a reasonable doubt the defendant made a

20  statement voluntarily?  Initially, under our law, before a

21  person is in custody may be questioned by the police.  That

22  person first must be advised of his rights; second, must

23  understand those rights; third, must voluntarily waive the

24  rights and agree to speak to the police.  If any one of

25  those three conditions are not met, the statement made in

1     response to questions is not voluntary; therefore, you must

2     not consider it.

3              There is no particular point in time that the

4     police are required to advise the defendant in custody of

5     his rights as long as they do so before questioning begins.

6     A defendant in custody need be advised only once of the

7     rights regardless of how many times or to whom the defendant

8     speaks after having been so advised provided that the

9     defendant is in continuous custody from the time he was

10    advised of his rights to the time he was questioned and

11    there was no reason to believe that the defendant had

12    forgotten or no longer understood his rights.

13             While there is no particular words that the police

14    are required to use in advising a defendant, in sum and

15    substance, the defendant must be advised:  One, that he has

16    a right to remain silent; two, that anything he may say may

17    be used against him in a court of law; three, he has a right

18    to consult with a lawyer before answering any questions and

19    the right to the presence of a lawyer during the questions;

20    and four, that if he cannot afford a lawyer, one will be

21    provided for him prior to any questioning if he so desires.

22             Before you may consider his the statement made by

23    defendant in response to questioning, you must find beyond a

24    reasonable doubt that the defendant was advised of his

25    rights, understood those rights, and voluntarily waived

                                                             gjn

1          those rights and agreed to speak to the police.  If you do

2          not make those findings, then you must disregard the

3          statement and not consider it.

4                   Under our law, a statement is not voluntary if it

5          is obtained from the defendant by the use of threatened use

6          of physical force.

7                   In addition, a statement is not voluntary if it is

8          obtained by any improper conduct or undue pressure which

9          impairs the defendant's physical or mental condition to the

10         extent of undermining his ability to make a choice or

11         whether or not to make a statement.

12                  In considering whether a statement was obtained by

13         means of any improper conduct or undue pressure which

14         impaired the defendant's physical or mental condition to the

15         extent of undermining his ability to make a choice of

16         whether or not to make a statement, you may consider such

17         factors as the defendant's age, intelligence, physical and

18         mental condition and conduct of the police during their

19         contact with the defendant; including, of course, the number

20         of officers who questioned the defendant, the manner in

21         which the defendant was questioned, the defendant's

22         treatment during the period of detention and questioning,

23         and the length of time defendant was questioned.

24                  It is for you to evaluate and weigh the various

25         factors to determine whether in the end a statement was

1    obtained by means of any improper conduct or undue pressure

2    which impaired the defendant's physical and mental condition

3    to the extent of undermining his ability to make a choice of

4    whether or not to make a statement.

5         Under our law, a statement of the defendant is not

6    voluntary made when it is obtained by the defendant by a

7    public servant engaged in law enforcement activity by means

8    of any promise or statement of fact which promise or

9    statement creates a substantial risk that the defendant

10   might also incriminate himself.

11        Under that law, promise or statement of fact made

12   to a defendant does not by itself render the defendant's

13   subsequent statement involuntary.  The defendant's statement

14   would be involuntary only if the promise or statement made

15   to him created a substantial risk that he might falsely

16   incriminate himself.

17        Therefore, if the People have not proven beyond a

18   reasonable doubt the statement of the defendant was

19   voluntarily made, then you must disregard the statement and

20   not consider it.  If the People have proven beyond a

21   reasonable doubt the statement of the defendant was

22   voluntarily made, then you may consider that statement as

23   evidence in evaluating it as you would any other evidence.

24        You may have heard testimony that the DA or

25   defense attorney spoke to a witness about the case before

1       the witness testified at trial.

2               The law does not prohibit a DA or defense attorney

3       from speaking to a witness about the case before the witness

4       testifies, nor does it prohibit the DA or defense counsel

5       from reviewing with the witness the questions that would be

6       asked at the trial.

7               You may also have heard testimony that a witness

8       read certain materials pertaining to the case before the

9       witness testified.  The law does not prohibit a witness from

10      doing so.

11              Although not required to do so, the defendant in

12      this case testified in his own behalf.  His testimony should

13      be considered by you as you would the testimony of any other

14      witness.

15              A defendant is, of course, an interested witness,

16      interested in the outcome of this trial.  You may as jurors

17      wish to keep such interest in mind in determining the weight

18      and credibility to be given to his testimony.  You should

19      not, however, reject the testimony of a defendant merely

20      because of his interest.  It's your duty as in the case of

21      all witnesses to accept such testimony that you believe to

22      be truthful and reject such testimony you believe to be

23      false.

24              You will recall that the defendant took the

25      witness stand, has previously been convicted of a crime, and

1    I now charge and emphasis:  Under no circumstances are you

2    to consider the fact defendant has previously been convicted

3    of a crime as proof that he committed any of the crimes with

4    which he is now charged.  You may consider the defendant's

5    previous conviction only for the purpose of assisting you in

6    making your evaluation of his testimony.  That is, his

7    believability as a witness.  In other words, to aid you in

8    making your determination of what weight you will give to

9    the testimony of the defendant.  Decide this case solely

10   upon the competent evidence before you or the lack of

11   evidence in and determine the issues on what you believe to

12   be credible, believable evidence.  Base your verdict on the

13   evidence alone.

14        You may have heard testimony concerning a prior

15   proceeding in this case.  The fact that there was such a

16   proceeding should not in any way be considered by you as any

17   indication of the guilt or lack of guilt of the defendant.

18        Now there are certain fundamental legal principles

19   that are applicable to criminal cases in general.  These are

20   safeguards maintained by our Constitution with which the law

21   surrounds every defendant in the criminal trial.  These

22   basic principles of law apply to every criminal case

23   conducted in the courts of New York State regardless of the

24   nature or seriousness of the crimes charged.

25        We now turn to those fundamental principles:  The

1    presumption of innocence, the burden of proof, and the

2    requirement of proof beyond a reasonable doubt.

3            Throughout these proceedings, the defendant is

4    presumed to be innocent.  As a result, you must find the

5    defendant not guilty unless on the evidence presented at

6    this trial you conclude that the People have proven

7    defendant guilty beyond a reasonable doubt.

8            In determining whether the People have satisfied

9    their burden of proving defendant's guilt beyond a

10   reasonable doubt, you may consider all the evidence

11   presented whether by the People or by the defendant.  In

12   doing so, however, remember that even though the defendant

13   introduced evidence, the burden of proof remains on the

14   People.

15           Defendant is not required to prove that he is not

16   guilty.  In fact, the defendant is not required to prove or

17   disprove anything.  To the contrary, the People have the

18   burden of proving defendant guilty beyond a reasonable

19   doubt.  This means that before you can find the defendant

20   guilty of a crime, the People must prove beyond a reasonable

21   doubt every element of the crime, including that the

22   defendant is the person that committed the crime.  The

23   burden of proof never shifts from the People to the

24   defendant.  If the People fail to their satisfy their burden

25   of proof, you must find defendant not guilty; if the People

1    satisfy their burden of proof, you must find the defendant

2    guilty.

3            Now what does our law mean when it requires proof

4    beyond a reasonable doubt?  The law recognizes that in

5    dealing with human affairs, there are very few things in

6    this world that we now know with absolute certainty.

7    Therefore, the law does not require the People to prove a

8    defendant guilty beyond all possible doubt.  In a criminal

9    case, a proof of guilt must be beyond a reasonable doubt.

10           A reasonable doubt is an honest doubt of

11   defendant's guilt for which a reason exists based on the

12   nature and quality of the evidence.  It's an actual doubt.

13   It's not based on some guess, not based on some whim, nor is

14   it based on any speculation.  It is not an imaginary doubt.

15   It's a doubt that a reasonable person acting in a matter of

16   this importance would be likely to entertain because of the

17   evidence that was presented or because of the lack of

18   convincing evidence.

19           Proof of guilt beyond a reasonable doubt is proof

20   that leaves you so firmly convinced of the defendant's guilt

21   that you have no reasonable doubt of the existence of any

22   element of the crime or of defendant's identity as the

23   person who committed the crime.

24           In determining whether or not the People have

25   proven a defendant's guilt beyond a reasonable doubt, you

1    should be guided solely by a full and fair evaluation of the

2    evidence.  After carefully evaluating the evidence, each of

3    you must decide whether or not that evidence convinces you

4    beyond a reasonable doubt of defendant's guilt.

5            Whatever your verdict may be, it must not rest

6    upon baseless speculations, nor may be influenced in any way

7    by bias, prejudice, sympathy or by a desire to bring an end

8    to your deliberations or to avoid doing what is an

9    unpleasant duty.  If you are not convinced beyond a

10   reasonable doubt that the defendant is guilty of a charged

11   crime, you must find the defendant not guilty of that crime.

12   If you are convinced beyond a reasonable doubt that the

13   defendant is guilty of a charged crime, then you must find

14   the defendant guilty of that crime.

15           Now our law provides that in determining your

16   verdict, you may not consider nor may you speculate

17   concerning matters related to sentence or punishment.  You

18   must not discuss such matters nor should you your

19   deliberations in any way be influenced by such matters.  If

20   you render a verdict of guilty, I am required to impose

21   sentence in accordance with the law.  The jury has no

22   function relating to sentence.  It has no function relating

23   to punishment, and such matters are wholly immaterial to

24   your deliberations on this case.  Nor are you to be affected

25   by other considerations outside of the evidence or by what

1    the reaction to your verdict may be whether it be popular or

2    unpopular, whether it pleases or displeases anyone; nor

3    shall sympathy be of any concern to you.

4              Our law states that you the jurors are the sole

5    judges of the facts, not the Court.  It is for you to judge

6    what evidence is credible and what you deem important.  It's

7    your obligation to calmly, patiently and intelligently

8    discuss the evidence in the case and the inferences you draw

9    from, to reason with each other, make an honest effort to

10   agree on the facts and to accept the law as I am giving it

11   to you.

12             We now turn to the second part of my charge which

13   is the specific counts in this indictment, of which there

14   are 17.

15             The first count of the indictment is criminal

16   sexual act in the first degree.

17             Under our law, a person is guilty of criminal

18   sexual act in the first degree when he engages in oral

19   sexual conduct with another person by forcible compulsion.

20             Under our law, it is also an element of this

21   offense that the sexual act was committed without consent.

22             Oral sexual conduct takes place without a person's

23   consent when the lack of consent is also forcible

24   compulsion.

25             I will define these terms:  Oral sexual conduct

gjn

1       means conduct between two persons consisting of contact

2       between the mouth and the vulva or vagina.

3                   Forcible compulsion means to intentionally compel

4       either, one, by the use of physical force; or two, by a

5       threat, express or implied, which places a person in fear of

6       immediate death or physical injury to herself.

7                   So in order for you to find the defendant guilty

8       of this crime, the People are required to prove from all the

9       evidence in the case beyond a reasonable doubt both of the

10      following two elements:  One, that on or about and between

11      May 1, 2005 and June 30, 2005, here in Queens County, the

12      defendant engaged in oral sexual conduct with Sana Awan; and

13      two, that the defendant did so without Sana Awan's consent

14      by the use of forcible compulsion.

15                  Therefore, if you find that the People have proven

16      beyond a reasonable doubt both of those elements, you must

17      find the defendant guilty of the crime of criminal act of

18      sexual act in the first as charged in the first count.

19                  On the other hand, if you find that the People

20      have not proven beyond a reasonable doubt either one or both

21      of those elements, you must find the defendant not guilty of

22      the crime of criminal sexual act in the first degree as

23      charged in the first count.

24                  Now the first six counts -- I just read the first

25      count to you -- the second count, the third count, the

1    fourth count, the fifth count and the sixth count all charge

2    the same section of the Penal Law, criminal sexual act in

3    the first degree.  But there is a different time period for

4    all six of these counts.  As he said, the first one was

5    between May 1, 2005 and June 30, 2005; the second count is

6    criminal sexual act in the first degree and it's the exact

7    same charge I just read you for the first count, the time

8    period is on or about and between May 1, 2006 and May 31,

9    2006 here in Queens County.

10         So in order for you to find the defendant guilty

11   of this crime, that is in the second count, People are

12   required to prove from all the evidence in the case beyond a

13   reasonable doubt both the following two elements:  One, that

14   on or about and between May 1, 2006 and May 31, 2006 here in

15   Queens County, the defendant engaged in oral sexual conduct

16   with Sana Awan; and two, that the defendant did so without

17   Sana Awan's consent by the use of forcible compulsion.

18         Therefore, if you find that the People have proven

19   beyond a reasonable doubt both of those elements, you must

20   find the defendant guilty of the crime of criminal sexual

21   act in the first degree as charged in the second count.

22         On the other hand, if you find that the People

23   have not proven beyond a reasonable doubt either one or both

24   of those elements, you must find the defendant not guilty of

25   the crime of criminal sexual act in the first degree as

gjn

1      charged in the second count.

2              Now the third count, again, is criminal sexual act

3      in the first degree, and as I said, it's the same charge

4      that I read to you for criminal sexual act in the first

5      degree under the first count except it again is a different

6      time period.

7              In order for you to find defendant guilty of this

8      crime, the People are required to prove from all the

9      evidence in the case beyond a reasonable doubt both the

10     following two elements:  One, that on or about and between

11     January 1, 2008 and February 28, 2008 here in Queens County,

12     the defendant engaged in oral sexual conduct with Sana Awan;

13     and two, that the defendant did so without Sana Awan's

14     consent by the use of forcible compulsion.

15             Therefore, if you find that the People have proven

16     beyond a reasonable doubt both of those elements, you must

17     find the defendant guilty of the crime of criminal sexual

18     act in the first degree as charged in the third count.

19             On the other hand, if you find that the People

20     have not proven beyond a reasonable doubt either one or both

21     of those elements, you must find the defendant not guilty of

22     the crime of criminal sexual act in the first degree as

23     charged in the third count.

24             Now the fourth count, again, is criminal sexual

25     act in the first degree with a different time period.  In

1      order for to you find the defendant guilty of this crime,

2      the People are required to prove from all the evidence in

3      the case beyond a reasonable doubt both of the following two

4      elements:  One, that on or about and between March 1, 2008

5      and March 31, 2008 here in Queens County, the defendant

6      engaged in oral sexual conduct with Sana Awan; and two, that

7      the defendant did so without Sana Awan's consent by the use

8      of forcible compulsion.

9              Therefore, if you find that the People have proven

10     beyond a reasonable doubt both of those elements, you must

11     find the defendant guilty of the crime of criminal sexual

12     act in the first degree as charged in the fourth count.

13             On the other hand, if you find that the People

14     have not proven beyond a reasonable doubt either one or both

15     of those elements, you must find the defendant not guilty of

16     the crime of criminal sexual act in the first degree as

17     charged in the fourth count.

18             Again, the fifth count is the same, criminal

19     sexual act in the first degree, and again, the two elements

20     that must be proven are the same, again, except that it's a

21     different time period:  On or about and between April 1,

22     2008 and April 30, 2008.

23             The sixth count, again, is criminal sexual act in

24     the first degree.  I will read it to you again and I will

25     define those terms:  Under our law, a person is guilty of

1      criminal sexual act in the first degree when he engages in

2      oral sexual conduct with another person by forcible

3      compulsion.

4              Under our law, it is also an element that this

5      offense, criminal sexual act in the first degree is

6      committed without consent.  Oral sexual conduct takes place

7      without a person's consent when the lack of consent results

8      from forcible compulsion.

9              I will define those terms:  Oral sexual conduct

10     means conduct between two persons consisting of contact

11     between the mouth and the vulva or vagina.

12             Forcible compulsion means to intentionally compel

13     either, one, by the use of physical force; or two, by a

14     threat, express or implied, which places a person in fear of

15     immediate death or physical injury to herself.

16             So in order for you to find the defendant guilty

17     of this crime, People are required to prove from all the

18     evidence in the case beyond a reasonable doubt both of the

19     following two elements:  One, that on or about and between

20     May 1, 2008 and May 31, 2008 here in Queens County, the

21     defendant engaged in oral sex with Sana Awan; and two, that

22     the defendant did so without Sana Awan's consent by the use

23     of forcible compulsion.

24             Therefore, if you find that the People have proven

25     beyond a reasonable doubt both of those elements, you must

1    find the defendant guilty of the crime of criminal sexual

2    act in the first degree as charged in the sixth count.

3            On the other hand, if you find that the People

4    have not proven beyond a reasonable doubt either one or both

5    of those elements, you must find the defendant not guilty of

6    the crime of criminal sexual act in the first degree as

7    charged in the sixth count.

8            Once again, those first six counts are all the

9    same charge, it's just a different time period for each

10   count.

11           Seventh count is sexual abuse in the first degree.

12   Under our law, a person is guilty of sexual abuse in the

13   first degree when he subjects another person to sexual

14   contact by forcible compulsion.

15           Under our law, it is also an element of this

16   offense that the sexual act was committed without consent.

17           Sexual contact takes place without person's

18   consent when the lack of consent results in the forcible

19   compulsion.

20           I will define those terms for you:  Sexual contact

21   means any touching of the sexual or other intimate parts of

22   a person for the purpose of gratifying the sexual desire of

23   either party.  It includes the touching of the actor by that

24   person as well as the touching of that person by the actor

25   whether directly or through clothing.

                                                    gjn

1          Forcible compulsion means you intentionally compel

2    either, one, by the use of physical force; or two, by a

3    threat, express or implied, which places a person in fear of

4    immediate death or physical injury to herself.

5          So in order for you to find the defendant guilty

6    of this crime, the People are required to prove from all the

7    evidence in the case beyond a reasonable doubt both of the

8    following two elements:  One, that on or about and between

9    January 1, 2008 and February 28, 2008 here in Queens County

10   the defendant subjected Sana Awan to sexual contact to wit,

11   touching her vagina with his hand; and two, that the

12   defendant did so without Sana Awan's consent by the use of

13   forcible compulsion.

14         Therefore, if you find that the People have proven

15   beyond a reasonable doubt both of those elements, you must

16   find the defendant guilty of the crime of sexual abuse in

17   the first degree as charged in the seventh count.

18         On the other hand, if you find that the People

19   have not proven beyond a reasonable doubt either one or both

20   of those elements, you must find the defendant not guilty of

21   the crime of sexual abuse in the first degree as charged in

22   the seventh count.

23         The eighth count is also sexual abuse in the first

24   degree.  I have already defined those terms.  This, again,

25   is a different time period.

                                                     gjn

1           On or about and between June 1, 2008 and June 20,

2    2008 -- and I will tell you the two elements that are

3    necessary in order for to you find the defendant guilty of

4    this crime -- the People are required to prove from all the

5    evidence in the case beyond a reasonable doubt both of the

6    following two elements:  One, that on or about and between

7    June 1, 2008 and June 20, 2008 here in Queens County,

8    defendant subjected Sana Awan to sexual contact; to wit,

9    touching her vagina with his hand; and two, that defendant

10   did so without Sana Awan's consent by the use of forcible

11   compulsion.

12          Therefore, if you find that the People have proven

13   beyond a reasonable doubt both of those elements, you must

14   find the defendant guilty of the crime of sexual abuse in

15   the first degree as charged in the eighth count.

16          On the other hand, if you find that the People

17   have not proven beyond a reasonable doubt either one or both

18   of those elements, you must find the defendant not guilty of

19   the crime of sexual abuse in the first degree as charged in

20   the eighth count.

21          And ninth count, again, is sexual abuse in the

22   first degree.  It's the same as the other two counts except

23   it involves another time period and another act, touching

24   the breast with his hand.

25          So in order for you to find the defendant guilty

                                                           gjn

1    of this crime, the People are required to prove from all the

2    evidence in the case beyond a reasonable doubt both the

3    following two elements:  One, that on or about and between

4    January 1, 2008 and February 28, 2008 here in Queens County,

5    the defendant subjected Sana Awan to sexual contact, to wit,

6    touching her breast with his hand; and two, that the

7    defendant did so without Sana Awan's consent by the use of

8    forcible compulsion.

9            Therefore, if you find that the People have proven

10   beyond a reasonable doubt both of those elements, you must

11   find the defendant guilty of crime of sexual abuse in the

12   second degree as charged in the ninth count.

13           On the other hand, if you find the People have not

14   proven beyond a reasonable doubt either one or both of those

15   elements, you must find the defendant not guilty of the

16   crime of sexual abuse in the first degree as charged in the

17   ninth count.

18           Tenth count, again, is sexual abuse in the first

19   degree, and it involves another time period.  In order for

20   you to find the defendant guilty of this crime, the People

21   are required to prove from all the evidence in the case

22   beyond a reasonable doubt one of the following -- to both of

23   the elements:  That on June 1, 2008 and June 20, 2008 here

24   in Queens County, the defendant subjected Sana Awan to

25   sexual act, to wit, touching her breast with his hand; and

1    two, that defendant did so without Sana Awan's consent by

2    the use of forcible compulsion.

3            Therefore, if you find that the People have proven

4    beyond a reasonable doubt both of those elements, you must

5    find the defendant guilty of the crime of sexual abuse in

6    the first degree as charged in the tenth count.

7            On the other hand, if you find that the People

8    have not proven beyond a reasonable doubt either one or both

9    of those elements, you must find the defendant not guilty of

10   the crime of sexual abuse in the first degree as charged in

11   the tenth count.

12           The eleventh count, again, is sexual abuse in the

13   first degree.  Same definitions I have given you previously,

14   and again, it involves another time period.  In order for

15   you to find the defendant guilty of this crime, the People

16   are required to prove from all the evidence in the case

17   beyond a reasonable doubt both of the following two

18   elements:  One, that on or about and between May 1, 2008 and

19   May 31, 2008 here in Queens County, defendant subjected Sana

20   Awan to sexual contact, to wit, touching her breast with his

21   hand; and two, that the defendant did so without Sana Awan's

22   consent by the use of forcible compulsion.

23           Therefore, if you find the People have proven

24   beyond a reasonable doubt both of those elements, you must

25   find the defendant guilty of the crime of sexual abuse in

1        the first degree as charged in the eleventh count.

2              On the other hand, if you find that the People

3        have not proven beyond a reasonable doubt either one or both

4        of those elements, you must find the defendant not guilty of

5        the crime of sexual abuse in the first degree as charged in

6        the eleventh count.

7              Twelfth count, again, is sexual abuse in the first

8        degree.  I defined those terms for you.  This involves

9        another time period and another act.  In order for you to

10       find the defendant guilty of this crime, the People are

11       required to prove from all the evidence in the case beyond a

12       reasonable doubt both the following two elements:  One, that

13       on or about and between May 1, 2008 and May 31, 2008 here in

14       Queens County, the defendant subjected Sana Awan to sexual

15       contact, to wit, placing her hand on his penis; two, that

16       the defendant did so without Sana Awan's consent by the use

17       of forcible compulsion.

18             Therefore, if you find the People have proven

19       beyond a reasonable doubt both of those elements, you must

20       find the defendant guilty of the crime of sexual abuse in

21       the first degree as charged in the twelfth count.

22             On the other hand, if you find that the People

23       have not proven beyond a reasonable doubt either one or both

24       of those elements, you must find the defendant not guilty of

25       the crime of criminal sexual abuse in the first degree as

1       charged in the twelfth count.

2               The thirteenth count is criminal sexual act in the

3       second degree.  Under our law, a person is guilty of

4       criminal sexual act in the second degree when, being 18

5       years old or more, he engages in oral sexual conduct with

6       another person less than fifteen years old.

7               Under our law, there is also an element of this

8       offense that the oral sexual conduct was committed without

9       the consent of the other person.  Oral sexual conduct takes

10      place without a person's consent when that person is deemed

11      by law to be incapable of consent.

12              Under our law, a person is deemed incapable of

13      consenting to oral sexual conduct when she is less than

14      fifteen years old.  Oral sexual conduct with such a person

15      is always deemed to be without that person's consent even if

16      in fact that person did consent.  It is not a defense to

17      this charge that the actor did not know with whom the actor

18      engaged in oral sexual conduct was less than fifteen years

19      old or that the actor believed that such person was fifteen

20      years old or more on the date of the crime.

21              I will define this term again for you:  Oral

22      sexual conduct means conduct between persons consisting of

23      contact between the mouth and the vulva or vagina.

24              So in order for you to find the defendant guilty

25      of this crime, the People are required to prove from all the

1      evidence in the case beyond a reasonable doubt each of the

2      following three elements:  One, that on or about and between

3      May 1, 2005 and June 30, 2005 here in Queens County, the

4      defendant engaged in oral sexual conduct which Sana Awan;

5      and two, that the defendant was eighteen years or more; and

6      three, that Sana Awan was less than fifteen years old.

7              Therefore, if you find that the People have proven

8      beyond a reasonable doubt each of those elements, you must

9      find the defendant guilty of the crime of criminal sexual

10     act in the second degree as charged in the thirteenth count.

11             On the other hand, if you find that the People

12     have not proven beyond a reasonable doubt any one or more of

13     those elements, you must find the defendant not guilty of

14     the crime of criminal sexual act in the second degree as

15     charged in the thirteenth count.

16             Fourteen:  Criminal sexual act in the third

17     degree.  Under our law, a person is guilty of criminal

18     sexual act in the third degree when, being 21 years or more,

19     he engages in oral sexual conduct with a person who is

20     incapable of consent by reason of being less than 17 years

21     old.

22             I already defined oral sexual conduct.  Under our

23     law, a person is incapable of consenting to oral sexual

24     conduct when that person is less than 17 years old; thus,

25     oral sexual conduct with such a person is always deemed to

gjn

1    be without that person's consent, even if in fact that

2    person did consent.

3         It's not a defense to a child, criminal sexual act

4    in the third degree, that the actor did not know that the

5    person with whom the actor had oral sexual conduct was less

6    than 17 years old, or that the actor believed that this

7    person was 17 years old or more on the date of the crime.

8         So in order for you to find the defendant guilty

9    of this crime, the People are required to prove from all the

10   evidence in the case beyond a reasonable doubt each of the

11   following three elements:  One, that on or about and between

12   May 1, 2006 and May 31, 2006 in Queens County, the defendant

13   engaged in oral sexual conduct with Sana Awan; and two, that

14   the defendant was 21 years old or more at the time; and Sana

15   Awan was incapable because she was less than 17 years old.

16        Therefore, if you find the People have proven

17   beyond a reasonable doubt each of those elements, you must

18   find the defendant guilty of the crime of criminal sexual

19   act in the third degree as charged in the fourteenth count.

20        On the other hand, if you find the People have not

21   proven beyond a reasonable doubt any one or more of those

22   elements, you must find the defendant not guilty of the

23   crime of criminal sexual act in the third degree as charged

24   in the fourteenth count.

25        Fifteenth count is criminal sexual act in the